UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES, MOVE TEXAS CIVIC FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, and AMERICAN GI FORUM OF TEXAS, INC., | § § § § § § § § | |
| *Plaintiffs* | § § | |
| v. | § § | Civil Case No. 5:19-cv-00963 |
| TEXAS SECRETARY OF STATE, TRUDY HANCOCK, in her official capacity as BRAZOS COUNTY ELECTIONS ADMINISTRATOR, and PERLA LARA in her official capacity as CITY OF MCALLEN, TEXAS SECRETARY, | § § § § § § § | |
| *Defendants*. | § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs, Dr. George Richardson, Rosalie Weisfeld, Austin Justice Coalition, Coalition of Texans with Disabilities, MOVE Texas Civic Fund, League of Women Voters of Texas, and American GI Forum of Texas, Inc., file this Original Complaint seeking declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 and the United States Constitution. Plaintiff Coalition of Texans with Disabilities additionally seeks declaratory and injunctive relief pursuant to Title II of the Americans with Disabilities Act and the Rehabilitation Act of 1973.

## I.
## THE NATURE OF THE CASE

1.      The right to vote is a precious and fundamental political right that is preservative of all other rights. By definition, it includes the right of qualified voters within a state to cast their

ballots and have them counted. But Texas unlawfully rejects the duly signed mail-in ballots of thousands of eligible voters every major election. Indeed, Texas counties rejected at least 1,873 mail-in ballots during the 2018 General Election and at least 1,567 mail-in ballots during the 2016 General Election solely on the basis of mismatching signatures. *See* Ex. A.

2.     Texas offers the opportunity to vote by mail to voters who are outside of their county during elections, voters with disabilities, voters 65 years-of-age or older, and voters confined in jail but otherwise eligible to vote.[1] Even though Texas' mail-in ballot process should make voting easier for voters from these underrepresented groups, the current flawed process leads to the unlawful disenfranchisement of these Texas voters. Specifically, current rules authorize untrained local election officials to arbitrarily and subjectively reject mail-in ballots if officials believe, based on their own layman analysis, that the signature on a ballot is not in fact the voter's signature. No advance notice is given to voters before their vote is rejected, and the decision to reject a mail-in ballot is final.

3.     For example, during the 2018 General Election, Brazos County rejected the mail-in ballot of Plaintiff Dr. George Richardson—a doctor whose signature has been used to prescribe countless medications—on the basis of a signature mismatch. The county gave him no notice of its decision until after the election, notwithstanding the fact that Dr. Richardson would have confirmed that it was his signature on the mail-in ballot if so asked. When Dr. Richardson confronted Brazos County officials, they told him that they had "eye-balled" his signature to determine it was not his.

---

[1] "A qualified voter is eligible for early voting by mail if, at the time the voter's early voting ballot application is submitted, the voter is confined in jail:
    (1) serving a misdemeanor sentence for a term that ends on or after election day;
    (2) pending trial after denial of bail;
    (3) without bail pending an appeal of a felony conviction;  or
    (4) pending trial or appeal on a bailable offense for which release on bail before election day is unlikely."
Tex. Elec. Code § 82.004(a)

4.     Similarly, during a city run-off election in 2019, the City of McAllen rejected Plaintiff Rosalie Weisfeld's mail-in ballot on the same basis. To her recollection, Ms. Weisfeld has voted in every primary, city, bond, constitutional, school district, county, runoff, water district, and general election for the last 30 years. Ms. Weisfeld would have confirmed that the signature was hers had she been asked. Yet, the City of McAllen gave her no notice of the rejection until after the election.

5.     Because Texas' mail-in ballot process fails to provide uniform standards for signature comparison, deprives voters of the ability to cure ballots questioned for an alleged signature mismatch, and fails to require meaningful pre-rejection notice to voters with ballots questioned for an alleged signature mismatch, the mail-in ballot process violates both the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment to the United States Constitution on its face and as applied to all Plaintiffs, including Dr. Richardson and Ms. Weisfeld. U.S. CONST. amend. XIV, § 1.

6.     For these same reasons, Texas' mail-in ballot process also violates Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, *et seq.*, and the Rehabilitation Act of 1973 (RA), 29 U.S.C. § 794.3, with respect to voters who cannot sign matching or sufficiently similar signatures due to a disability. Defendants' refusal to reasonably accommodate this group of mail-in ballot voters with disabilities—either by allowing them to contest and cure a ballot rejected for signature mismatch or by not applying the signature comparison requirements to their ballots—discriminates against said voters and excludes them from participation in and unfairly denies them the benefits of the mail-in ballot process.

7.     Plaintiffs, therefore, respectfully request this court enter a declaratory judgment invalidating Texas' signature comparison procedure, as laid out in Texas Election Code §§

87.041(b)(2), (e), and (f), for violating the United States Constitution, the ADA, and the RA. Plaintiffs further request a permanent injunction enjoining Defendants from implementing Texas Election Code §§ 87.041(b)(2), (e), and (f) or, in the alternative, requiring that Defendants (1) provide voters meaningful notice prior to the rejection of a mail-in ballot and (2) offer voters the ability to cure a mail-in ballot questioned for an alleged signature mismatch.

## II.
## JURISDICTION AND VENUE

8.      This is a civil and constitutional rights action arising under 42 U.S.C. § 1983, the Fourteenth Amendment to the United States Constitution, Title II of the ADA, and the RA. This Court has jurisdiction over these claims under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

9.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district, and because Defendant Secretary of State conducts business in this district.

## III.
## PARTIES

### Individual Plaintiffs

10.     Plaintiff Dr. George Richardson is an individual voter who was improperly and unconstitutionally disenfranchised in the 2018 General Election. Dr. Richardson applied for a mail-in ballot for the 2018 General Election in Brazos County due to his eligibility as a voter over 65 years-of-age. After applying for a mail-in ballot, Dr. Richardson properly signed and timely mailed his ballot in compliance with the Texas Election Code. After the election, he received a letter from Brazos County notifying him that his ballot was rejected because of a signature mismatch. Dr. Richardson confronted county election officials who explained that the panel "eye-balls" the signatures, had determined his signature was not actually his, and that their decision was

final. Dr. Richardson is a physician who has signed hundreds of prescriptions every year for 41 years and has never had his signature questioned by a pharmacist. Had Brazos County notified Dr. Richardson during the election that county election officials questioned the signature on his ballot, Dr. Richardson would have confirmed that the signature on his ballot was, in fact, his own. Dr. Richardson wishes, intends, and plans to continue casting a mail-in ballot but, in order to avoid future disenfranchisement, will only do so when the county either stops rejecting mail-in ballots based on an alleged signature mismatch or provides voters, at the very least, a pre-rejection notice and the ability to cure mail-in ballots questioned for an alleged signature mismatch.

11.     Plaintiff Rosalie Weisfeld is an individual voter who was improperly and unconstitutionally disenfranchised in the 2019 McAllen, Texas city run-off election. Ms. Weisfeld applied for a mail-in ballot for the June 22, 2019 McAllen, Texas city run-off election because she had to be out of the county during the early voting period and on Election Day. After applying for a mail-in ballot, Ms. Weisfeld properly signed and timely mailed her ballot in compliance with the Texas Election Code. About ten days after the election, she received a letter from the City of McAllen, mailed to her out-of-town address where she was no longer staying, notifying her that her ballot was rejected because of an alleged signature mismatch. Had the City of McAllen notified Ms. Weisfeld during the election that city election officials questioned the signature on her ballot envelope, Ms. Weisfeld would have confirmed that the signatures on the application and envelope were both, in fact, her own. Ms. Weisfeld votes regularly. To her recollection, Ms. Weisfeld has voted in every primary, city, bond, constitutional, school district, county, runoff, water district, and general election for at least the last 30 years, and she plans to vote in every single upcoming election for which she is eligible to vote. Ms. Weisfeld regularly has professional and family obligations that require her to be out of her county of residence, requiring her to vote by mail on

many occasions in the past, and she intends to vote by mail in the future when such obligations
prevent her from voting in person.

Austin Justice Coalition

12.     Plaintiff Austin Justice Coalition (AJC) sues Defendants on its own behalf. AJC is
a non-partisan, non-profit organization dedicated to "providing the tools for people of color and
people who are marginalized to improve their lives by being the driving force behind their own
liberation." As part of this mission, AJC operates #ProjectOrange, a coordinated campaign to enter
the Travis County Jail, register eligible voters, and provide support to them in requesting and
submitting mail-in ballots. AJC's #ProjectOrange mission is to ensure that eligible voters—those
who have not been finally convicted of a felony or, if they have been convicted of a felony in the
past, are "off paper"—are able to vote, despite their present confinement in county jails.

13.     Among other services, AJC, through its staff and volunteers, helps inmate voters
fill out the mail-in ballot application section by section and instructs each inmate voter to write out
their signature neatly. AJC works with the Travis County Jail and the Travis County Elections
Department to ensure applications are received on time by the Elections Department, mail-in
ballots are received by the inmate voters, and completed mail-in ballots are received by the
Elections Department on time. While inmate voters fill their mail-in ballots, AJC, through its staff
and volunteers, instructs each inmate voter to neatly write out the signature across the flap of the
carrier envelope.

14.     AJC's mission is significantly frustrated by the current state laws and policies that
result in the improper rejection of incarcerated voters' mail-in ballots. Because of Defendants'
unlawful signature comparison procedure, each signed ballot improperly and arbitrarily rejected
for an alleged signature mismatch undermines the efficacy of AJC's #ProjectOrange campaign.

6

Moreover, AJC must expend additional resources, such as staff and volunteer time and resources instructing inmate voters to write out signatures neatly, when providing support to inmate voters with mail-in ballot applications and mail-in ballots due to the risk of arbitrary and unconstitutional rejection based on an alleged signature mismatch. The resources diverted for these purposes are transferred away from AJC's other voting-related activities.

Coalition of Texans with Disabilities

15.     Plaintiff Coalition of Texans with Disabilities (CTD) sues Defendants on its own behalf and on behalf of its members who use the mail-in ballot process based on their eligibility due to disability. These members are qualified individuals with a disability for purposes of the ADA and the RA.

16.     The interests at stake in this lawsuit are germane to CTD's purpose. CTD is a non-partisan, non-profit membership organization that works to ensure that people with disabilities may "live, work, learn, play, and participate fully in the community of their choice." CTD organizes events on subjects such as accessible voting, civil rights, and new state level initiatives with the potential to affect the disability community.

17.     CTD expends resources by informing voters statewide about their ability to cast a mail-in ballot, explains the rules and deadlines related to mail-in ballots, and encourages voters who are eligible to utilize mail-in ballots if they cannot vote in-person.

18.     CTD's mission is significantly frustrated by the current state laws and policies that result in the improper rejection of disabled voters' mail-in ballots. Many of the people CTD serves are especially likely to have variations in their signatures from one writing to the next, due to a disability. Because of Defendants' unlawful signature comparison procedure, each signed ballot improperly and arbitrarily rejected for an alleged signature mismatch undermines the efficacy of

CTD's mail-in ballot work. Moreover, CTD must expend additional resources, such as staff and volunteer time and resources instructing voters to write out signatures neatly, when educating voters on completing mail-in ballot applications and mail-in ballots due to the risk of arbitrary and unconstitutional rejection based on an alleged signature mismatch. The resources diverted for these purposes are transferred away from CTD's other voting-related activities.

19.     Neither the claims asserted nor the relief requested by CTD require the participation of its individual members who regularly vote by mail. Plaintiffs seek only equitable relief which does not require any individualized inquiry into damages sustained by any member.

MOVE Texas Civic Fund

20.     Plaintiff MOVE Texas Civic Fund (MOVE) sues Defendants on its own behalf. MOVE's principal place of business is in San Antonio, Texas. MOVE is a non-partisan, non-profit, and grassroots organization "building power in underrepresented youth communities through civic education, leadership development, and issue advocacy." "MOVE" stands for "Mobilize. Organize. Vote. Empower." Since its inception, MOVE has worked to expand voter registration and equal access to voting. MOVE actively works to register eligible young people to vote and ensure that they cast a ballot that actually counts. In doing so, MOVE operates on 32 college campuses around the State of Texas, with 14 of those in the San Antonio area, and registers thousands of students to vote every year.

21.     Because college students are often absent from their counties of residence while attending school, MOVE provides support to students in applying for mail-in ballots when appropriate and follows up with them to ensure they have mailed their ballots in a timely manner. MOVE works with three distinct groups of students in relation to mail-in ballots: (1) eligible students who attend schools outside of Texas and away from their county of residence; (2) eligible

8

students who attend a Texas school outside of their county of residence; and (3) eligible students who attend a Texas school and consider their address at or nearby school as their residence, but are nevertheless away from school during an election for summer work, holidays, or another conflict.

22.     Depending on the election, MOVE expends resources to educate students about mail-in ballots, encourage eligible student voters to use mail-in ballots, and provide support to eligible student voters utilizing such ballots.

23.     MOVE's mission is significantly frustrated by the current state laws and policies that result in the improper rejection of youth voters' mail-in ballots. Because of Defendants' unlawful signature comparison procedure, each signed ballot improperly and arbitrarily rejected for an alleged signature mismatch undermines the efficacy of MOVE's mail-in ballot work. Moreover, MOVE must expend additional resources when providing support to voters with mail-in ballot applications and mail-in ballots due to the risk of arbitrary and unconstitutional rejection based on an alleged signature mismatch. MOVE sends messages through social media posts and paid texts to make sure that individual voters are following through with their mail-in ballot plans, and specifically warns voters, since the signature comparison procedure is strict and arbitrary, to sign mail-in ballots as clearly and legibly as possible to avoid improper rejection. The resources diverted for these purposes are transferred away from MOVE's in-person voting and voter registration activities.

League of Women Voters of Texas

24.     Plaintiff League of Women Voters of Texas (LWV) sues Defendants on its own behalf and on behalf of its members who use the mail-in ballot process. The interests at stake in this lawsuit are germane to LWV's purpose. LWV is a non-partisan, non-profit member

organization dedicated to empowering voters and defending democracy. LWV "strives for a democracy where every person has the desire, the right, the knowledge[,] and the confidence to participate in the democratic process." LWV actively works to register eligible people to vote and ensure that they actually cast a ballot that counts. In doing so, LWV operates across Texas, registering thousands every year.

25.     LWV expends resources to educate Texans about mail-in ballots, encourage eligible voters to use mail-in ballots, and provide support to eligible voters utilizing such ballots. LWV also prepares training materials for its members and local-area League of Women Voters organizations to use to educate and provide support to voters with the mail-in ballot process.

26.     LWV's mission is significantly frustrated by the current state laws and policies that result in the improper rejection of voters' mail-in ballots. Because of Defendants' unlawful signature comparison procedure, each signed ballot improperly and arbitrarily rejected for an alleged signature mismatch undermines the efficacy of LWV's work. Moreover, LWV must expend additional resources when providing support to voters with mail-in ballot applications and mail-in ballots due to the risk of arbitrary and unconstitutional rejection based on an alleged signature mismatch. Specifically, LWV must expend additional staff and volunteer time and resources instructing voters to write out signatures neatly through LWV's website, and LWV must expend additional staff and volunteer time and resources instructing voters to write out signatures neatly and have the signatures match each other as much as possible in PowerPoint presentations and scripts prepared for its members and local-area League of Women Voters organizations to use when educating and providing support to mail-in ballot voters. The resources diverted for these purposes are transferred away from LWV's other voting-related activities.

27.     Neither the claims asserted nor the relief requested by LWV require the participation of its individual members who regularly vote by mail. Plaintiffs seek only equitable relief which does not require any individualized inquiry into damages sustained by any member.

American GI Forum of Texas, Inc.

28.     Plaintiff American GI Forum of Texas, Inc. (AGIF) sues Defendants on its own behalf and on behalf of its members who use the mail-in ballot process. A significant portion of AGIF's members are eligible to vote by mail because they are: (1) classified as Disabled Veterans by the Department of Veterans Affairs; (2) military retirees 65 years-of-age or older; and/or (3) active duty service members and their families who are often stationed away from their county of residence in Texas.

29.     The interests at stake in this lawsuit are germane to AGIF's purpose. AGIF is a non-partisan, non-profit, Family Veterans, and member organization dedicated to addressing problems of discrimination and inequities endured by veterans and the communities in which they operate. AGIF requires at least 75% of its members be veterans. AGIF works to "enforce, defend, and protect the civil and human rights, [including voting rights,] of Hispanics, women, and other minorities, and to ensure equal opportunities as mandated by federal and state laws." AGIF and its constituent chapters across the state expend resources to register eligible Texas veterans, servicemembers, and their families to vote and to ensure that they actually cast a ballot that counts.

30.     The improper rejection of mail-in ballots frustrates AGIF and its chapters' mission of expanding voter registration and increasing voter turnout among AGIF's membership and the communities it serves, which is essential to advancing and leveraging its influence to advance policy change that benefits veterans, their families, and their communities. Texas' signature comparison procedure decreases overall confidence in the mail-in ballot process, and elections,

generally, which directly undermines the efforts AGIF and its chapters take to encourage eligible voters to use mail-in ballots and support those voters in making sure their mail-in ballots are counted.

31.     Neither the claims asserted nor the relief requested by AGIF require the participation of its individual members who regularly vote by mail. Plaintiffs seek only equitable relief which does not require any individualized inquiry into damages sustained by any member.

Defendants

32.     Defendant is the Texas Secretary of State (SOS). The SOS is the Chief Election Officer of the State of Texas. Tex. Elec. Code § 31.001(a). In this role, the SOS is responsible for enforcing elections statutes and routinely issues guidance to the county registrars of all 254 Texas counties on various elections procedures. SOS is a public entity under Title II of the ADA and the RA.

33.     Defendant Trudy Hancock is the Brazos County Elections Administrator (Brazos EA). She is sued in her official capacity. She is sued for the manner in which she implements the policies, customs, or practices at issue in this action. The Brazos EA is a public entity under Title II of the ADA and the RA.

34.     Defendant Perla Lara is the City of McAllen, Texas Secretary (McAllen City Secretary). She is the Chief Elections Official for the City of McAllen. The McAllen City Secretary is responsible for the administration of elections conducted within the City of McAllen, including joint elections with Hidalgo County as well as elections independent of the Hidalgo County. The McAllen City Secretary is sued for the manner in which she implements the policies, customs, or practices at issue in this action. The McAllen City Secretary is a public entity under Title II of the ADA and the RA.

12

**IV.**
**FACTS**

Current Mail-in Ballot Procedures

35.    To vote a mail-in ballot, a voter must first send their county a mail-in ballot application via mail, fax (if available), or e-mail. *Application for a Ballot by Mail*, Texas Secretary of State, https://www.sos.state.tx.us/elections/voter/reqabbm.shtml (last visited June 25, 2019). A voter must submit the mail-in ballot application for a specific election 11 days before Election Day. *Id*. If a voter is voting by mail because the voter is disabled or is 65 years-of-age or older, the voter may use a single application to request mail-in ballots for all county elections in a calendar year. Tex. Elec. Code § 86.0015. While the voter can submit this annual application anytime during the calendar year, it still must be received at least 11 days before the first election in which the voter seeks to request a mail-in ballot. *Id*. § 86.0015(b-1).

36.    In order to successfully vote by mail, the voter must mark the ballot, place it in the official ballot envelope provided by the county, seal the official ballot envelope, place the official ballot envelope in the carrier envelope provided by the county, seal the carrier envelope, and sign the certificate on the carrier envelope. *Id*. § 86.005(a)-(c). Specifically, the carrier envelope certificate requires the voter to "certify that the enclosed ballot expresses [the voter's] wishes independent of any dictation or undue persuasion by any person," and includes a line for the voter's signature across the flap of the envelope. *Id*. § 86.013(c).

37.    Then, the carrier envelope must be returned to the county in a timely manner. *Id*. §§ 86.006(a), 86.013(c). Typically, counties must receive mail-in ballots that are not postmarked or do not have a delivery receipt by 7 p.m. on Election Day. Tex. Elec. Code § 86.007. At the latest, counties must receive mail-in ballots from voters inside the United States with a postmark

or delivery receipt dated on or before 7 p.m. on Election Day by 5 p.m. the next business day after Election Day. *Id*. § 86.007(a)(2).[2]

38.     The decision as to whether to reject a mail-in ballot is generally conducted by the Early Voting Ballot Board (EVBB), a statutorily required board established in each county that includes representatives from county parties. *See generally* Tex. Elec. Code § 87.001. The Early Voting Clerk, however, may determine that a Signature Verification Committee (SVC) should be established, in which case the SVC will perform the signature reviews rather than the EVBB. *See generally id*. § 87.027. SVCs are usually established in larger counties, but also appear in many smaller ones. An SVC is also mandatory if the Early Voting Clerk receives a timely petition of at least 15 registered voters requesting such a committee. *Id*. § 87.027(a-1).

39.     An SVC is composed of at least five members and, "[i]n an election in which party alignment is indicated on the ballot," must include at least two members designated by each county party on the ballot in equal numbers. *Id*. § 87.027(d). The chair of the SVC is appointed from a list provided by the party whose nominee for governor received the most votes in the county in the most recent gubernatorial general election. *Id*. The only qualification required to serve on an SVC is that the person be an eligible voter in the district or area for which the election is being held. Tex. Elec. Code § 87.027(e). Pursuant to these rules, SVC's are by law partisan committees of laypersons without any specific expertise or training.

40.     The only statutory guidance for an SVC to follow in performing reviews of mail-in ballots is stated in Tex. Elec. Code § 87.027(i), which provides:

---

[2] Counties must receive from non-military overseas voters mail-in ballots with a postmark or delivery receipt dated on or before 7 p.m. on Election Day no later than the 5th day after Election Day or, if the 5th day after Election Day falls on a Saturday, Sunday, or legal state or national holiday, then the deadline is extended to the next regular business day. *Id*. §§ 86.007(d), (d-1). Counties must receive from military overseas voters mail-in ballots no later than the 6th day after Election Day or, if the 6th day after Election Day falls on a Saturday, Sunday, or legal state or national holiday, then the deadline is extended to the next regular business day. *Carrier Envelope for FPCA Voter*, Texas Secretary of State, https://www.sos.state.tx.us/elections/forms/pol-sub/5-35.pdf (last visited June 25, 2019).

> The signature verification committee shall compare the signature on each carrier
> envelope certificate, except those signed for a voter by a witness, with the signature
> on the voter's ballot application to determine whether the signatures are those of
> the voter. The committee may also compare the signatures with any two or more
> signatures of the voter made within the preceding six years and on file with the
> county clerk or voter registrar to determine whether the signatures are those of the
> voter. Except [where more than one SVC is appointed in the same county], a
> determination under this subsection that the signatures are not those of the voter
> must be made by a majority vote of the committee's membership.

The same procedure is to be followed by the EVBB if an SVC is not appointed in a particular

county. Tex. Elec. Code § 87.027(j).

41.    The Election Code does not establish any standards or guidance that must be used

for actually determining if a signature is that of the voter, nor has SOS or any other entity used

rule-making authority to create such standards. Accordingly, each county (and even each

committee if multiple SVC panels are created) necessarily develops its own idiosyncratic,

arbitrary, and ad hoc procedure to determine that a ballot should be rejected. *See* Tex. Elec. Code

§ 87.041(b)(2) (requiring rejection). These standards will necessarily vary from county to county,

panel to panel, and even from meeting to meeting or ballot to ballot within the same committee

panel.

42.    The above signature verification procedure is not and cannot be performed

anonymously. In other words, members of the EVBB or SVC necessarily know which voter's

ballot they are considering prior to determining if it should be accepted or rejected.

43.    All decisions of the committee are final; if a voter's ballot is rejected, that voter has

no recourse or process to challenge the panel's determination that the voter's ballot was signed by

someone other than the voter.

44.    Additionally, the board is not required to send notice of rejection to the voter until

10 days after an election, regardless of how early it makes the decision to reject the ballot. *Id.*

§ 87.0431(a). These voters are not provided any kind of notice of their ballot's rejection, nor sufficient time to seek judicial relief, such as that sought in this Complaint, prior to the final votes in the election-at-issue being counted.

45.     Mail-in ballot procedures exclusively affect groups of people who are explicitly eligible by statute to apply for a ballot by mail, including: (1) disabled persons, (2) persons 65 years-of-age or older, (3) persons detained in state jails but otherwise eligible to vote, and (4) persons who will be out of their county of residence during the entire early voting period and on Election Day (a group with significant representation from active-duty military members and college students attending school away from their county of residence). *See* Tex. Elec. Code §§ 82.001–82.004.

46.     The groups that are eligible to vote by mail are also the same groups, in many cases, that are most likely to have signature variations that could cause an improper rejection—especially the elderly, disabled, and persons who speak English as a second language.

47.     A voter whose ballot is rejected is not given any notice of their rejection prior to the rejection, any opportunity to cure their ballot, or any ability to contest the decision of the EVBB or SVC since counties have until 10 days after Election Day to notify the voter of a rejected mail-in ballot. Tex. Elec. Code § 87.0431(a).

<u>Reasons Signatures Often Do Not Match</u>

48.     A person's signature may vary for a variety of reasons, both intentional and unintentional. Unintentional factors that can affect a person's handwriting include medical and/or physical factors such as growing old, illness, injury, symptoms from taking certain medicine, change in eyesight, and consuming alcohol and/or drugs; mechanical factors such as pen type, ink, signing surface, signing position, and paper quality; and psychological factors such as distress,

anger, fear, depression, happiness, and nervousness. *Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312, 1320 (11th Cir. 2019); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 212 (D.N.H. 2018). Moreover, a person's handwriting naturally changes over time. Variances between signatures are more prevalent in people who are elderly, disabled, under extreme stress, or who speak English as a second language. *Saucedo*, 335 F. Supp. 3d at 212.

49.     For the most part, signature variations are of little consequence in a person's life. But in the context of voting by mail, these variations become profoundly consequential under Texas' signature comparison procedure, as they may result in the improper disenfranchisement of eligible voters. Elderly and disabled voters, two groups of voters expressly permitted to use the mail-in ballot process, are especially likely to have signature variations.

<u>Texas' Alleged Signature-Matching Process Is Severely Flawed</u>

50.     As a procedure to verify identity, signature comparison is extremely unreliable. Members of EVBBs and SVCs are not handwriting experts, nor do they receive any training to assist in determining if two signatures were made by the same person. On its face, the signature comparison procedure for mail-in ballots gives no guidance on the questions that inevitably arise during signature comparison evaluations, including what stylistic variations suggest that two signatures were made by different individuals, and what threshold number of variations is required to conclude that the signature on the mail-in ballot carrier envelope, the mail-in ballot application, or previous documents is executed by a person other than the voter.

51.     Moreover, EVBBs and SVCs are required by the Texas Election Code to consider signatures in a vacuum, without regard to any other pertinent information that may be available.

**V.**

**CAUSES OF ACTION**

**COUNT ONE**

**Violation of the Due Process Clause of the Fourteenth Amendment for Failure to Provide Pre-Rejection Notice and Opportunity to Cure**

52.     Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs.

53.     Section 1 of the Fourteenth Amendment to the United States Constitution prohibits states from depriving "any person of . . . liberty . . . without due process of law." U.S. CONST. amend. XIV, § 1.

54.     Defendants may not deprive mail-in ballot voters of procedural due process because each voter's fundamental right to vote is implicated when using a mail-in ballot.

55.     Counties throughout Texas have rejected and continue to reject thousands of mail-in ballots solely based on an error-prone and flawed signature comparison exercise conducted by election officials who are not trained in signature verification, resulting in the erroneous deprivation of the right to vote.

56.     Defendants have not established a procedure for providing voters whose mail-in ballots are rejected because of an alleged signature mismatch pre-rejection notice, an opportunity to be heard, or the ability to cure.

57.     By mandating the unilateral and non-reviewable rejection of mail-in ballots due to an alleged signature mismatch without according pre-rejection notice, an opportunity to be heard, and an ability to cure, Texas' scheme as outlined in Texas Election Code §§ 87.041(b)(2) and (d), both on its face and as it is applied, violates the Due Process Clause of the Fourteenth Amendment. Defendants deprived and continue to deprive Texas voters, including Mr. Richardson and Ms. Rosalie, voters provided support by organizational Plaintiffs, and voters who are members of

associational Plaintiffs, of adequate procedural due process to protect their fundamental right to vote.

58.     Providing a voter whose mail-in ballot has been questioned for an alleged signature mismatch a pre-rejection notice, an opportunity to be heard, and the ability to cure their ballot would avoid disenfranchisement and, thereby, protect the voter from the outright denial of their fundamental right to vote.

59.     Notice, an opportunity to be heard, and the ability to cure a ballot are already provided to voters in comparable circumstances. In-person voters whose ballots cannot be counted on Election Day due to lack of identity verification can provide photo identification confirming their identity within six days of Election Day to have their ballot counted. Tex. Elec. Code § 65.0541. It would not be burdensome to apply similar procedures to mail-in ballot voters with allegedly mismatched signatures.

60.     The fundamental right to vote is at stake, and the risk that even one person will be denied the right to cast a mail-in ballot outweighs any justification Defendants may put forward for depriving all mail-in ballot voters the same notice, opportunity to be heard, and ability to cure that is already provided to voters in comparable circumstances.

61.     This challenge is both facial and as-applied to the Plaintiffs in this case.

### COUNT TWO
**Violations of the Equal Protection Clause of the Fourteenth Amendment Due to Severe Burden on Voters Not Justified by Legitimate Government Interest**

62.     Plaintiffs re-allege and incorporate by reference the allegations contained in the preceding paragraphs.

63.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.

64.     Under the First Amendment and Equal Protection Clause of the Fourteenth Amendment, a state cannot utilize election practices that unduly burden the fundamental right to vote. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

65.     A court considering a challenge to a state election law must carefully balance the character and magnitude of the injury to the First and Fourteenth Amendment rights that Plaintiffs seek to vindicate against the justifications put forward by Defendants for the burdens imposed by the rule. *See Anderson*, 460 U.S. 780, 789 (1983); *Burdick*, 504 U.S. 428, 434 (1992). A challenged regulation that imposes a severe burden on the right to vote must be narrowly tailored to advance a compelling state interest. *See Burdick*, 504 U.S. at 434.

66.     Defendants cannot burden the exercise of the right to vote by applying election law, policies, and practices in an arbitrary or inconsistent manner.

67.     By implementing a signature matching procedure, Defendants treat mail-in ballot voters differently than in-person voters. Tex. Elec. Code § 87.041(b)(2), (d).

68.     By implementing a signature matching procedure, Defendants treat differently than other mail-in ballot voters the members of CTD who are mail-in ballot voters and, due to their disability, cannot make their signatures match. Tex. Elec. Code § 87.041(b)(2), (d).

69.     Texas Election Code Sections 87.041(b)(2) and (d), by mandating the unilateral, arbitrary, and ad hoc rejection of mail-in ballots due to an alleged signature mismatch, disenfranchise mail-in ballot voters, a burden that is undoubtedly severe, especially when such

voters are given no pre-rejection notice or opportunity to resolve the mismatch or otherwise confirm their identity.

70.     Rejecting thousands of mail-in ballots based solely on an error-prone signature comparison procedure conducted by election officials who are not trained in signature verification and failing to provide mail-in ballot voters any opportunity to contest or cure signature mismatch determinations is neither reasonable nor narrowly tailored to serve any compelling and legitimate state interest, particularly since Defendants already otherwise verify a mail-in ballot voter's eligibility to cast a ballot and especially because Defendants provide voters in comparable circumstances an opportunity to be heard and ability to cure ballots.

**COUNT THREE**
**Violation of Equal Protection Clause of the Fourteenth Amendment Due to Failure to Provide any Uniform Guidelines or Principles for Counties to Compare Signatures**

71.     An electoral procedure becomes problematic "in the absence of specific standards to ensure its equal application." *Bush v. Gore*, 531 U.S. 98, 106 (2000). Such procedures are immediately suspect if "the standards for accepting or rejecting contested ballots might vary not only from county to county but [even] within a single county." *Id*. State and local governments have an "obligation to avoid arbitrary and disparate treatment of the members of [their] electorate." *Id*. at 105. Failure to establish procedures to ensure equal application of such rules renders them unconstitutional under the Fourteenth Amendment's Equal Protection Clause. *Id*. at 111.

72.     Texas has not promulgated any procedures to assist individual counties or the EVBB or SVCs within those counties in evaluating signatures on mail-in ballots, thereby creating an arbitrary system for evaluation in which committees of laypersons "eye-ball" signatures and evaluate them based on their own ad hoc standards.

73.     The procedures for evaluating signatures for mail-in ballots in Texas therefore vary from county to county, from SVC to SVC in counties with multiple committees, and even from meeting to meeting and ballot to ballot.

74.     Accordingly, Texas' procedures for evaluating mail-in ballot signature matches violate the Equal Protection Clause for their failure to provide specific standards to ensure their equal application.

## COUNT FOUR
### Violation of Title II of the Americans with Disabilities Act and the Rehabilitation Act of 1973

75.     In addition to the previous claims, Plaintiff CTD brings the following specific claims against Defendants under Title II of the ADA and the RA. The rights and remedies under the ADA and the RA are almost entirely duplicative.

76.     "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; 28 C.F.R. § 35.149.

77.     "No [person] shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving federal funding assistance." 29 U.S.C. § 794(a); 45 C.F.R. § 1232.4(a).

78.     Defendant SOS, as a state agency, and Defendants Brazos EA and McAllen City Secretary, as other political subdivision agencies, are public entities pursuant to 42 U.S.C. § 12131(1)(a) and (b), 45 C.F.R. § 1232.3(d), and 29 U.S.C. § 794. The administration of elections and voting, including mail-in ballot voting and the counting of votes, is a service, program, or activity provided by Defendants SOS, Brazos EA, and McAllen City Secretary.

79.     Defendants are recipients of federal funds. 29 U.S.C. § 794.

80.     For purposes of the ADA and the RA, CTD has members who are qualified individuals with physical and/or mental impairments that substantially limit one or more of their major life activities, including but not limited to performing manual tasks such as seeing, lifting, bending, concentrating, communicating, and/or working. 42 U.S.C. § 12102(1), (2); 45 C.F.R. § 1232.3(h).

81.     CTD has members who are disabled and meet the essential eligibility requirements for the receipt of mail-in ballot services and to participate in the mail-in ballot process provided by Defendant SOS through existing statutes, regulations, and guidance and by the Defendants Brazos EA and McAllen City Secretary through their administration of the mail-in ballot process. Thus, CTD has members who are qualified individuals with a disability entitled to the protections of the ADA and the RA in accessing Texas' service, program, or activity of mail-in ballots.

82.     Members of CTD who use the mail-in ballot process and, due to their disability, cannot make their signatures match, risk disenfranchisement. By reason of such disability, the members at issue have suffered and/or risk future exclusion from participation in and denial of the benefits of the services, programs, or activities of Defendants, and are subjected to discrimination by Defendants. By failing to meet their obligation to provide voters who are disabled, cannot vote in person, and, due to their disability, cannot sign matching signatures an opportunity to vote that is equal and equally effective as that opportunity provided to others, Defendants are in violation of the ADA and the RA.

83.     The lack of reasonable accommodations—such as creating standards for comparing signatures on mail-in ballots and providing the opportunity to contest and cure a challenged mail-in ballot, or barring counties from rejecting mail-in ballots for signature mismatch or any mail-in

ballots submitted by persons with disabilities for signature mismatch—means that the CTD members at issue are excluded from participation in and denied the benefits of the services, programs, or activities of Defendants, and subjected to discrimination by Defendants. Requiring Defendants to provide these reasonable accommodations would not constitute an undue financial or administrative burden.

**PRAYER FOR RELIEF**

WHEREFORE, considering the law and facts alleged herein, Plaintiffs pray the Court grant the following relief:

1. That the Court enter declaratory judgment that the State of Texas' statutory scheme requiring the rejection of mail-in ballots with alleged signature mismatches, specifically set out in Texas Election Code §§ 87.041(b)(2), (e), and (f), is unconstitutional and violates the ADA and the RA;

2. That the Court permanently enjoin the State of Texas, the Texas Secretary of State, the Brazos County Elections Administrator, the City of McAllen, Texas Secretary, the 254 county agencies administering elections, and all other political subdivisions administering elections from rejecting any mail-in ballot for signature mismatch reasons, or, in the alternative, require the State of Texas, the Texas Secretary of State, the Brazos County Elections Administrator, the City of McAllen, Texas Secretary, the 254 county agencies administering elections, and all other political subdivisions administering elections to (a) provide voters meaningful notice prior to the rejection of a mail-in ballot based on an alleged signature mismatch and (b) offer voters the ability to cure a mail-in ballot questioned for an alleged signature mismatch.

3. That Plaintiffs be awarded attorneys' fees under 42 U.S.C. § 1988 and 29 U.S.C. § 794a;

4. That all costs of this action be taxed against Defendants; and

5. That the Court award any additional or alternative relief as may be deemed appropriate under the circumstances.

Respectfully submitted this 7th day of August, 2019.

By:    *Hani Mirza*

**TEXAS CIVIL RIGHTS PROJECT**

Mimi M.D. Marziani
Texas Bar No. 24091906
mimi@texascivilrightsproject.org
Rebecca Harrison Stevens
Texas Bar No. 24065381
beth@texascivilrightsproject.org
Hani Mirza
Texas Bar No. 24083512
hani@texascivilrightsproject.org
Ryan V. Cox
Texas Bar No. 24074087
ryan@texascivilrightsproject.org
Zachary D. Dolling
Texas Bar No. 24105809
zachary@texascivilrightsproject.org

1405 Montopolis Drive
Austin, Texas 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)

**WILLKIE FARR & GALLAGHER LLP**

Richard Mancino (NY Bar No. 1852797)
(*pro hac vice* forthcoming)
P. Maxwell Griffith (NY Bar No. 5323209)
(*pro hac vice* forthcoming)

787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111
Email: rmancino@willkie.com
      mgriffith@willkie.com

-AND-

Jennifer J. Hardy (TX Bar No. 24096068)
(*pro hac vice* forthcoming)
Denis A. Fallon (TX Bar No. 24059731)
(*pro hac vice* forthcoming)
Garrett Johnston (TX Bar No. 24087812)
(*pro hac vice* forthcoming)
Audra White (TX Bar No. 24098608)
(*pro hac vice* forthcoming)

600 Travis Street, Suite 2100
Houston, Texas 77002
Telephone: (713) 510-1700
Facsimile: (713) 510-1799
Email: jhardy2@willkie.com
      afallon@willkie.com
      gjohnston@willkie.com
      awhite@willkie.com

***COUNSEL FOR PLAINTIFFS***