IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE  WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH   DISABILITIES, MOVE TEXAS CIVIC FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, and AMERICAN GI FORUM OF TEXAS, INC., *Plaintiffs*, v. TEXAS SECRETARY OF STATE, TRUDY HANCOCK, in her official capacity as BRAZOS COUNTY ELECTIONS ADMINISTRATOR, and PERLA LARA in her official capacity as CITY OF MCALLEN, TEXAS SECRETARY, *Defendants*. | § § § § § § § § § § § § § § § | No. 5:19-cv-00963 |

### DEFENDANT SECRETARY OF STATE'S MOTION TO DISMISS

Plaintiffs challenge the laws under which local election officials in Texas accept early ballots voted by mail, naming the Texas Secretary of State as a Defendant. But the Secretary is not involved in the acceptance of early ballots voted by mail. Thus, Plaintiffs' alleged injuries are neither caused by nor redressable through her, and this case should be dismissed for lack of standing. FED. R. CIV. P. 12(b)(1). Even if Plaintiffs had standing, this case should still be dismissed because none of Plaintiffs' allegations states a violation of the Constitution, the Americans with Disabilities Act ("ADA"), or the Rehabilitation Act ("RA"). FED. R. CIV. P. 12(b)(6).

### LEGAL & FACTUAL BACKGROUND

### I.     Local authorities administer early voting by mail in Texas.

#### a.   The early voting clerk processes all applications for mail-in early ballots.

Texas voters may elect to vote early by mail if they are eligible due to absence from their county of residence on election day, disability, age of 65 or older, or confinement in jail. TEX. ELEC. CODE §§ 82.001-.004. The early voting clerk is responsible for conducting early voting. For most state-

1

and county-wide elections, the county clerk or elections administrator serves as the early voting clerk,[1] whereas "[t]he city secretary is the early voting clerk for an election ordered by an authority of a city." *Id.* § 83.005. The early voting clerk is responsible for "review[ing] each application for a ballot to be voted by mail" to determine whether it complies with all statutory requirements, providing notice and instructions to cure to a voter who submits a noncompliant application, and "provid[ing] an official ballot envelope and carrier envelope with each ballot provided to a voter" who properly completes an application. *Id.* §§ 86.001(a), .008, .009, .002(a). After a voter marks their mail-in ballot, they must return it to the early voting clerk in the official carrier envelope. *Id.* § 86.006(a).

> **b. The early voting ballot board—and signature verification committee, if one is appointed—review early ballots submitted by mail for acceptance.**

An early ballot voted by mail "may only be accepted if," among other things, "the carrier envelope certificate is properly executed [and] neither the voter's signature on the ballot application nor the signature on the carrier envelope certificate is determined to have been executed by a person other than the voter, unless signed by a witness." TEX. ELEC. CODE § 87.041(b)(1)-(2); *see also id.* § 1.011(a) (providing that any signature required under the Election Code "may be signed for the person by a witness . . . if the person required to sign cannot do so because of a physical disability or illiteracy.") An early voting ballot board ("EVBB")—which must be created "in each election to process early voting results from the territory served by the early voting clerk"—is responsible for determining whether to accept each early ballot voted by mail. *Id.* §§ 87.001, .002-.004 (composition of EVBB),[2] .021-.041 (EVBB is responsible for receiving ballots from early voting clerk and

---

[1] TEX. ELEC. CODE § 83.002; *but see id.* §§ 83.003 (clerk in less-than-countywide elections held at county expense); 83.004 (clerk in elections ordered by county not held at county expense); 31.043 (county elections administrator performs, among other things, the duties of county clerk. *See also Election Duties*, TEXAS SECRETARY OF STATE, available at https://www.sos.state.tx.us/elections/voter/county.shtml (listing early voting clerks for state and county elections).

[2] County commissioners' courts appoint presiding election judges for each regular county election precinct, and State law sets out detailed requirements for each appointed judge. TEX. ELEC. CODE § 32.001-.002. County commissioners use the same process to appoint presiding election judges and presiding EVBB judges. *Id.* § 87.002. The EVBB presiding judge then appoints at other members to the EVBB using the method for appointing precinct election clerks. *Id.* § 87.002(b).

determining whether to accept each one). In making this determination, the EVBB "may also compare the signatures with any two or more signatures of the voter made within the preceding six years and on file with the county clerk or voter registrar[.]" *Id.* § 87.041(e). For military and other voters overseas,[3] the EVVB "shall compare the signature on the carrier envelope or signature cover sheet with the signature of the voter on the federal postcard application." *Id.* § 87.041(f).

In some elections, a signature verification committee ("SVC") reviews early mail-in ballots before the EVBB. A SVC "may be appointed in any election," and the early voting clerk is "responsible for determining whether a signature verification committee is to be appointed." *Id.* § 87.027(a). The early voting clerk must establish a SVC in a general election for state and county officers if requested in writing by at least 15 registered voters of the county. *Id.* § 87.027(a-1). Where a SVC is established, the early voting clerk "shall deliver the jacket envelopes containing the early voting ballots voted by mail to the committee instead of to the early voting ballot board." *Id.* § 87.027(h). Upon receipt

> The signature verification committee shall compare the signature on each carrier envelope certificate, except those signed for a voter by a witness, with the signature on the voter's ballot application to determine whether the signatures are those of the voter. The committee may also compare the signatures with any two or more signatures of the voter made within the preceding six years and on file with the county clerk or voter registrar to determine whether the signatures are those of the voter. Except as provided by Subsection (l) [where more than 12 members are appointed to the committee and those members are working in subcommittees of not less than six members each], a determination under this subsection that the signatures are not those of the voter must be made by a majority vote of the committee's membership.

*Id.* § 87.027(i). The EVBB then reviews the ballots just as they would be in election without a SVC, "except that the [EVBB] may not determine whether a voter's signatures on the carrier envelope certificate and ballot application are those of the same person if the [SVC] has determined that the signatures are those of the same person." *Id.* § 87.027(j). Nevertheless, "[i]f the [SVC] has determined

---

[3] *See also id.* §§ 101.001, *et seq.* (voting by military personnel); 105.001, *et seq.* (voting by other persons overseas).

that the signatures are not those of the same person, the board may make a determination that the signatures are those of the same person by a majority vote of the board's membership." *Id.*[4]

If an early ballot voted by mail is rejected, the EVBB presiding judge must deliver written notice to the voter no later than the tenth day after election day. *Id.* § 87.0431. "If a county election officer . . . determines that a ballot was incorrectly rejected or accepted by the [EVBB] before the time set for convening the canvassing authority, the county election officer may petition a district court for injunctive or other relief as the court determines appropriate." *Id.* § 87.127(a).

## II.     Plaintiffs' Allegations

Plaintiff Richardson claims that Brazos County rejected his mail-in ballot in the 2018 general election due to signature mismatch. Compl. ¶3. Plaintiff Weisfeld claims that the City of McAllen rejected her mail-in ballot in a 2019 city run-off election due to signature mismatch. Compl. ¶4. Both Richardson and Weisfeld state that they were not notified of these rejections until after the election and that, if asked, they would have confirmed that the signatures were theirs. Compl. ¶¶4, 5.

Plaintiff Austin Justice Coalition ("AJC") helps Travis County Jail inmates complete applications for mail-in ballots "and instructs each inmate voter to write out their signature neatly." Compl. ¶13. AJC states that it "must expend additional resources . . . instructing inmate voters to write out signatures neatly" because such ballots risk being rejected for signature mismatch. Compl. ¶14.

Plaintiff Coalition of Texans with Disabilities ("CTD") states that it has members eligible to vote by mail because of disability, "expends resources by informing voters statewide about their ability to cast a mail-in ballot," and "encourages voters who are eligible to utilize mail-in ballots if they cannot vote in person." Compl. ¶17. According to CTD, it "must expend additional resources . . . instructing

---

[4] The Complaint alleges that in an election where a SVC is established, "the SVC will perform the signature reviews rather than the EVBB." Compl. ¶38. This is wrong. Instead, both bodies review signatures in such elections, and both must determine that there is a signature mismatch in order for the ballot to be rejected. *Id.* § 87.027(i), (j).

voters to write out signatures neatly, when educating voters on completing mail-in ballot applications and mail-in ballots" because such ballots risk being rejected for signature mismatch. Compl. ¶18.

Plaintiff MOVE Texas Civic Fund ("MOVE") works to register young people to vote and helps college students vote by mail. Compl. ¶20. MOVE claims to expend resources "to make sure that individual voters are following through with their mail-in ballot plans, and specifically warns voters . . . to sign mail-in ballots as clearly and legibly as possible" to avoid rejection. Compl. ¶23.

Plaintiff League of Women Voters of Texas (LWV) states that it has voter registration efforts in Texas and expends resources to avoid rejection of mail-in ballots for signature mismatch by "instructing voters to write out signatures neatly through LWV's website" and in "in PowerPoint presentations and scripts prepared for its members and local-area League of Women Voters organizations to use when educating and providing support to mail-in ballot voters." Compl. ¶26.

Plaintiff American GI Forum of Texas, ("AGIF") claims to expend "resources to register eligible Texas veterans, servicemembers, and their families to vote and to ensure that" their ballots count. Compl. ¶29. AGIF states that "improper rejection of mail-in ballots frustrates" its "mission of expanding voter registration and increasing voter turnout . . . which is essential to advancing and leveraging its influence to advance policy change." Compl. ¶30. AGIF also states that "Texas' signature comparison procedure decreases overall confidence in the mail-in ballot process, and elections, generally, which directly undermines [AGIF's efforts] to encourage eligible voters to use mail-in ballots and support those voters in making sure their mail-in ballots are counted." Compl. ¶30.

Plaintiffs challenge Texas Election Code § 87.041(b)(2), (e), and (f)—both facially and as applied to Richardson and Weisfeld—under the Equal Protection and Due Process clauses of the United States Constitution. Compl. ¶5. As noted above, these provisions require a determination that the signatures on a mail-in ballot and its carrier envelope match and allow comparison with signatures already on file with the county clerk, voter registrar, and—where applicable—signatures on the voter's

federal postcard application. *Id.* § 87.041(b)(2), (e), (f). Plaintiffs claim that the Due Process Clause requires pre-rejection notice and an opportunity to cure before a mail-in ballot is rejected for signature mismatch. Compl. pp. 18-19. They further argue that § 87.041(b)(2), (e), and (f) violate the Equal Protection Clause by unduly burdening the right to vote, and because the signature matching guidelines are not sufficiently "uniform." Compl. pp. 19-22. Plaintiff CTD also claims that these provisions violate "Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, *et seq.*, and the Rehabilitation Act of 1973 (RA), 29 U.S.C. § 794.3, with respect to voters who cannot sign matching or sufficiently similar signatures due to a disability." Compl. ¶6, pp. 22-24.

**ARGUMENT & AUTHORITY**

**I.    The Secretary should be dismissed under Rule 12(b)(1) for lack of jurisdiction because Plaintiffs do not allege injury-in-fact caused by the Secretary.**

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject-matter jurisdiction. *E.g.*, *Hooks v. Landmark Indus., Inc.*, 797 F.3d 309, 312 (5th Cir. 2015). ). Jurisdiction is "a threshold issue that must be resolved before any federal court reaches the merits of the case before it." *Perez v. U.S.*, 312 F.3d 191, 194 (5th Cir. 2002); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). "[S]tanding is perhaps the most important of the jurisdictional doctrines." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotation omitted). To establish standing, a plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant (causation); and (3) that is likely to be redressed by a favorable decision (redressability). *Friends of the Earth, Inc. v. Laidlaw Env't'l. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). All three elements are "an indispensable part of the plaintiff's case" and plaintiff bears the burden to establish them. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

**a.  The organizational Plaintiffs have not alleged organizational injury-in-fact.**

An organization has standing to sue if it satisfies the same Article III requirements of injury-in-fact, causation, and redressability applicable to individuals. *NAACP v. City of Kyle, Tex.*, 626 F.3d

6

233, 237 (5th Cir. 2010) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. at 560–61). "[A]n organization may establish injury in fact by showing that it had diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to" conduct its routine "'activities—with the consequent drain on the organization's resources[.]'" *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). "Not every diversion of resources to counteract [a] defendant's conduct, however, establishes an injury in fact." *Id.* at 238. Rather, any "[s]uch injury must be 'concrete and demonstrable.'" *Id.*

Thus, to establish standing, "an organizational plaintiff must explain how the activities it undertakes in response to the defendant's conduct differ from its 'routine [] activities,'" and must "identify 'specific projects that [it] had to put on hold or otherwise curtail in order to respond to' the defendant's conduct." *Def. Distributed v. United States Dep't of State*, No. 1:15-CV-372-RP, 2018 WL 3614221, at *4 (W.D. Tex. July 27, 2018) (quoting *City of Kyle*, 626 F.3d at 238). *See also, e.g., ACORN v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999) (holding that organization's expenditures must be "caused by an[] action by" the defendant that the organization "claims is illegal, as opposed to part of the normal, day-to-day operations of the group" to confer standing) (citing *Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78 & n.5 (3d Cir. 1998)).[5]

The Plaintiff organizations here do not meet this standard. AJC, CTD and LWV claim that, in the context of existing voter education and outreach efforts, they "instruct[] voters to write out signatures neatly" to avoid mail-in ballot rejection for signature mismatch. Compl. ¶¶12-14; 15-19; 24-27. MOVE claims that—within its overall efforts to "educate students about mail-in ballots, encourage eligible student voters to use mail-in ballots, and provide support to eligible student voters utilizing

---

[5] *See also, e.g., Advocacy Ctr. v. Louisiana Tech Univ.*, No. CV 18-0934, 2019 WL 1303212, at *4 (W.D. La. Mar. 6, 2019) ("[A]lthough an organization conceivably could have standing if it incurred [] costs [], the organization still must show that it would not have incurred these costs in the absence of defendant's illegal conduct."), report and recommendation adopted, 2019 WL 1301983 (W.D. La. Mar. 21, 2019) (citing *ACORN v. Fowler*, 178 F.3d at 357-58).

such ballots"—it "warns voters . . . to sign mail-in ballots as clearly and legibly as possible to avoid improper rejection." Compl. ¶¶22, 23. And AGIF claims to have members "eligible to vote by mail," and states that "improper rejection of mail-in ballots frustrates" its "mission of expanding voter registration and increasing voter turnout." Compl. ¶¶28, 30.

This does not state that any of these organizations "diverted significant resources to counteract the [Secretary's] conduct" such that "the [Secretary's] conduct significantly and 'perceptibly impaired' the organization's ability to" engage in its "routine activities," as required to allege organizational standing. *City of Kyle*, 626 F.3d at 238. Instead, voter registration, education, and outreach are already central to these organizations' "routine activities." *Id.*; Compl. ¶¶ 13, 17, 22, 25, 29. Advising voters to sign ballots and carrier envelopes neatly within these broader efforts is not a "concrete and demonstrable" injury. *Havens Realty Corp. v. Coleman*, 455 U.S. at 379; *City of Kyle*, 626 F.3d at 238. No Plaintiff organization claims that instructing individuals to write signatures neatly falls outside the "normal, day-to-day operations of the group." *Cf. ACORN v. Fowler*, 178 F.3d at 358. In fact, AGIF does not allege making any expenditures *at all*, instead simply claiming a generalized interest in "expanding voter registration and increasing voter turnout." Compl. ¶30. None of the Plaintiff organizations has alleged injury-in-fact as required to show standing.

### b.  No Plaintiff has alleged causation or redressability.

Even if any Plaintiff had alleged organizational injury-in-fact, the Court would still lack subject-matter jurisdiction because no Plaintiff alleges causation or redressability as to the Secretary.

### i.  Causation

Courts have found causation where a defendant public official has taken or threatened action to enforce an allegedly unconstitutional law. *E.g., K.P. v. LeBlanc*, 627 F.3d 115, 123-24 (5th Cir. 2010) (finding causation where medical board refused to cap malpractice liability as challenged statute required); *Air Evac EMS, Inc. v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 514 (5th Cir.

2017) (finding causation where officials set rates, resolved fee disputes, and enforced billing rules under challenged statute). Injury can also be traced to an official who has "definite responsibilities" under a challenged statute. *K.P.*, 627 F.3d at 124. In such circumstances, a particular officer has the "coercive power" to cause the alleged injury. *See Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc). But here, the Secretary has—at most—only general enforcement powers, and Plaintiffs have not alleged that she has taken or threatened any action giving rise to the injuries they allege.

Richardson's claims arise from a determination by the Brazos County EVBB. Compl. ¶3; TEX. ELEC. CODE § 87.041. Weisfeld's claims arise from an action by the City of McAllen EVBB. Compl. ¶4; TEX. ELEC. CODE § 87.041.[6] The Secretary does not have a hand in appointments of EVBBs, delivering or receiving mail-in ballots, or determining validity of mail-in ballots. EVBBs are independent bodies created pursuant to authority expressly vested in local officials.[7] EVBB members are not part of the Secretary's office nor are they her employees or agents. EVBBs do not carry out their statutorily required functions at the behest or under the supervision of the Secretary. Indeed, it was the local EVBBs, not the Secretary, who would have received Plaintiffs' mail-in ballots from the local early voting clerks, determined their validity, and counted them. And it was local actors who had authority to review any validity determination and seek judicial relief.[8] Should a Plaintiff submit a Texas mail-in ballot in the future, local officials will again be responsible for these functions.

Thus, the individual Plaintiffs' alleged injuries are not traceable to the Secretary—she does not have "definite responsibilities" with respect to the EVBBs. *Cf. K.P.*, 627 F.3d at 124; *see John Does #1-7 v. Abbott*, 345 F. Supp. 3d 763, 773 (N.D. Tex. 2018) ("Because Plaintiffs are unable to show how their alleged injuries are fairly traceable to Governor Abbott's specific conduct, this Court joins other

---

[6] Neither individual states whether a SVC was appointed, but any such SVC would have been established and operated locally under the statutorily prescribed process which does not authorize the Secretary's involvement. *Id.* §§ 87.002, 87.027.
[7] *E.g., id.* §§ 87.002 (members of EVBB appointed by same process as election judges and clerks); 32.001-.012 (process for appointing election judges); 32.031-.035 (process for appointing election clerks); 32.051-.056 (eligibility).
[8] *Id.* §§ 87.127(a), 31.091(1).

courts in declining to find traceability based solely on an official[']s general authority to enforce a state's laws."); *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1157 (10th Cir. 2005) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 45-46 (1976) (The "plaintiff's burden of demonstrating causation is not satisfied when '[s]peculative inferences are necessary to connect [its] injury to the challenged actions.'")

For the same reasons, no Plaintiff organization alleges causation, as their alleged injuries result from local determinations of signature mismatch,[9] not any action by the Secretary. Consequently, no Plaintiff organization can "show that [they] would not have incurred the[] costs" of instructing voters to write signatures neatly  "in the absence of" the Secretary's "illegal conduct." *Cf. Advocacy Ctr. v. Louisiana Tech Univ.*, WL 1303212, at *4; *ACORN v. Fowler*, 178 F.3d at 357-58. All Plaintiffs' alleged injuries turn on the actions of local election officials and are not traceable to the Secretary.

### ii.  Redressability

Nor are Plaintiffs' alleged injuries redressable through the Secretary. Plaintiffs state that the Secretary is Texas's "chief election officer," and complain that the Secretary has not "used rule-making authority to create . . . any standards or guidance that must be used for actually determining if a signature is that of the voter." Compl. ¶¶ 32 (citing TEX. ELEC. CODE § 31.001(a)), 41. But Plaintiffs do not identify any relevant enforcement authority granted to the Secretary over EVBBs. Instead, the legislature gave local officials exclusive authority to establish and operate EVBBs, rendering these local actors the final authorities with respect to the signature matching requirement.[10] Thus, no Court order to the Secretary would redress Plaintiffs' alleged injuries. *See, e.g., Okpalobi v. Foster,* 244 F.3d at 426-27 ("Because these defendants have no powers to redress the injuries alleged, the plaintiffs have no case or controversy with these defendants that will permit them to maintain this action in federal court.")

---

[9] *See, e.g.,* Compl. ¶¶3, 4; TEX. ELEC. CODE § 87.041.
[10] TEX. ELEC. CODE §§ 87.041, .027.

Plaintiffs' prayer for relief emphasizes this lack redressability. They first ask the Court to "enjoin the State of Texas, the Texas Secretary of State, the Brazos County Elections Administrator, the City of McAllen, Texas Secretary, the 254 county agencies administering elections, and all other political subdivisions administering elections from rejecting any mail-in ballot for signature mismatch reasons." Compl. p. 24. But the Secretary lacks any statutory authority to "reject[] any mail-in ballot"— for "signature reasons" or otherwise. *See* TEX. ELEC. CODE §§ 87.041 (EVBB reviews signatures and accepts ballots); 87.027 (where established, SVC reviews signatures before EVBB).

In the alternative, Plaintiffs ask the Court to "require the State of Texas, the Texas Secretary of State, the Brazos County Elections Administrator, the City of McAllen, Texas Secretary, the 254 county agencies administering elections, and all other political subdivisions administering elections to (a) provide voters meaningful notice prior to the rejection of a mail-in ballot based on an alleged signature mismatch and (b) offer voters the ability to cure a mail-in ballot questioned for an alleged signature mismatch." Compl. p. 24. Here again, it is local election officials alone who provide notice that a mail-in ballot has been rejected. TEX. ELEC. CODE § 87.0431. And it is local election officers who have the statutory authority to act in the case of an improperly rejected ballot. *Id.* § 87.127(a). Relief entered against the Secretary will not redress Plaintiffs' alleged injuries.

### c.  CTD lacks standing to sue the Secretary under the ADA or RA.

CTD also seeks relief under the ADA and RA on behalf of its members who vote by mail. Compl. ¶¶75-83. CTD can only pursue these claims if it establishes representational (or "associational") standing. An association has standing to sue on its members' behalf when: (1) its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum*

*Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (*citing Hunt v. Washington St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 827–28 (5th Cir. 1997)).

At the 12(b)(1) stage, CTD's ADA and RA claims should be dismissed for failure to meet the first and third prongs of this test. CTD cannot satisfy the first prong for two reasons. First, as set forth above, no CTD member would have standing to sue the Secretary because no action complained of is traceable to or redressable through her. *See supra* Part (b). Second, CTD has not alleged "that at least one member of the association ha[s] standing to sue in his or her own right" because of an injury-in-fact. *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191 (5th Cir. 2012). Indeed, to establish representational standing, an association must "make specific allegations establishing that at least one identified member ha[s] suffered or w[ill] suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *see also Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (requiring that association's members independently meet the Article III standing requirements for organization to have representational standing.); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 279 (3d Cir. 2014) (recognizing this principle in ADA and RA context). Thus, CTD has failed to allege facts establishing that its members otherwise have standing to sue in their own right. *See Texans United for a Safe Econ. Educ. Fund*, 207 F.3d at 792.

## II.    Even if any Plaintiff had standing to sue the Secretary, this case should be dismissed under Rule 12(b)(6) for failure to state a valid claim.

Federal Rule of Civil Procedure 12(b)(6) "authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. William*, 490 U.S. 319, 326 (1989) (citations omitted). "This procedure, operating on the assumption that the factual allegations in the complaint are true, streamlines litigation by dispensing with needless discovery and factfinding." *Id.* at 326-27. Thus, the issue under Rule 12(b)(6) is whether the Complaint alleges "enough facts to state a claim to relief that is plausible on its face," assuming that the allegations are true. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notably, "[t]he tenet that a court must accept as true all of the allegations contained

in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (citing *Twombly*, 550 U.S. at 555). Plaintiffs allege violations of the Constitution's Due Process and Equal Protection clauses, as well as the ADA and RA. Because their factual allegations do not state a violation of these laws, this case should be dismissed under Rule 12(b)(6). *See, e.g., Twombly*, 550 U.S. at 555.

### a. State election laws are reviewed under the *Anderson/Burdick* standard.

"[T]he Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). "It does not follow, however, that the right to vote in any manner . . . [is] absolute." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). To that end, a "flexible standard" known as *Anderson/Burdick* applies to state laws alleged to burden the right to vote. *Burdick*, 504 U.S. at 434; *see also Anderson v. Celebrezze*, 460 U.S. 780 (1983).

Under *Anderson/Burdick*, "[a] court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Tex. Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996) (citing *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789). "The rigorousness of the inquiry into the propriety of the state election law depends upon the extent to which the challenged regulation burdens First and Fourteenth Amendment rights." *Id.* (citing *Burdick*, 504 U.S. at 434). Strict scrutiny applies only when the right to vote is "subjected to 'severe' restrictions." *Burdick*, 504 U.S. at 434. Where a law "imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.; see also Anderson*, 460 U.S. at 788. Courts consider a state's election regime in its entirety, including aspects which mitigate the burdens of the challenged provisions. *See, e.g., Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 199 (2008); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627-28 (6th Cir. 2016) (noting that numerous opportunities available to cast a ballot mitigate burden of early voting requirements).

### b.   The Complaint does not state a due process violation.

Plaintiffs argue that the mail-in ballot provisions violate due process because a voter might not receive "pre-rejection notice and opportunity to cure" before a mail-in ballot is rejected for signature mismatch. Compl. p. 18. But Plaintiffs identify no authority purporting to confer a constitutional right to such notice—particularly where, as here, voters are on notice of the signature requirements and may elect an alternative method of casting a ballot if they wish. Texas's process is constitutionally sound under *Anderson/Burdick* because the burden on the right to vote is minimal and justified by the State's important interests in fraud prevention and detection; orderly and efficient administration of elections; and safeguarding public confidence in the integrity of Texas elections.

### i.   The mail-in ballot provisions do not impose a severe burden.

"Ordinary and widespread burdens [on the right to vote], such as those requiring 'nominal effort' of everyone, are not severe." *Crawford*, 553 U.S. at 205 (Scalia, J., concurring) (citations omitted). Rather, "[b]urdens are severe if they go beyond the merely inconvenient" and are "so burdensome" as to be "virtually impossible" to satisfy. *Id.* (cleaned up).

The challenged laws are minimally burdensome. Mail-in voters receive notice that their signatures are required and must match or be signed by a witness. TEX. ELEC. CODE § 87.041(b)(2). An application for a mail-in ballot must contain "a space for indicating the fact that an applicant whose application is signed by a witness cannot make the applicant's mark," ensuring that voters who cannot make their signatures match receive notice of the witness option before deciding to vote by mail. *Id.* § 84.011(a)(4)(B). Unless signed by a witness (in which case it cannot be rejected for signature mismatch), the EVBB uses signatures on file with the county clerk or registrar to verify the genuineness of a ballot. *Id.* § 87.041(e). Elections with SVCs have another round of signature review, and the signatures constitute a match if either the EVBB or SVC so determines. *See id.* § 87.027(j).

Thus, all an individual must do for their mail-in ballot to be counted is provide recognizable signatures, or, if they are unable to do that, have a witness sign the ballot application and carrier envelope. There are additional checks after local officials review the signatures, too. If a ballot is rejected for a signature mismatch, the voter receives notice within 10 days after the election. *Id.* § 87.0431. Then, if it is determined that the ballot was rejected in error, the "county election officer may petition a district court for injunctive or other relief as the court determines appropriate." *Id.* § 87.127(a). The broad nature of the relief that courts are empowered to award further guards against disenfranchisement. And prompt notice of rejection ensures that county election officials can seek relief in the immediate aftermath of Election Day. Notice also guards against repeat occurrences, because a voter whose signature has changed can update their signature on file with the county clerk or voter registrar. *Id.* § 87.041(e). Moreover, if a voter cannot make their signatures match due to a disability "that originates on or after the day before the last day for submitting an application for a ballot to be voted by mail," the voter is eligible to vote a late ballot. *Id.* § 102.001.

These burdens are no weightier than those for in-person voters, who must travel to a designated polling place on Election Day, often necessitating taking time off work, arranging childcare, and waiting in line. The Supreme Court has held that similar laws, requiring nominal effort of everyone, are not severe burdens on the right to vote. For example, the Court in *Crawford* considered whether a law requiring in-person voters to present photo ID unconstitutionally burdened the right to vote. 553 U.S. at 185. Announcing the Court's judgment, Justice Stevens concluded that "the inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase of the usual burdens of voting." *Id.* at 198. So, too, here. Voters need only ensure their signatures match or use a witness. In the event of an erroneous rejection, they

will be promptly notified and need only contact their county election official who can seek appropriate relief. These are no more than the "usual burdens of voting." *Crawford*, 553 U.S. at 198.

### ii. Texas's important interests justify any burden the provisions impose.

Texas "indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). This concern is perhaps most compelling in the context of mail-in ballots. *See, e.g., Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (acknowledging "the State's compelling interest in preventing voter fraud"); *Veasey v. Abbott*, 830 F.3d 216, n.46 (5th Cir. 2016) ("[T]he greatest fraud risk exists when unauthorized persons direct an elderly, immobile voter's choices on a mail-in ballot"); *Crawford*, 553 U.S. at 225 (Souter, J., dissenting) ("absentee-ballot fraud . . . is a documented problem"); *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004) ("Voting fraud . . . is facilitated by absentee voting."). Thus, Texas's weighty and undeniable interest in ensuring that only eligible voters cast ballots necessitates laws to guarantee that mail-in ballots are genuine. Because complying with the nominal effort of legibly signing a ballot does not outweigh Texas's weighty interests in protecting the franchise, Plaintiffs' due process claim fails.

*Lemons v. Bradbury* considered an Oregon signature verification process that did not notify voters when their signatures were rejected and is instructive in this regard. 538 F.3d 1098, 1104 (9th Cir. 2008). The Ninth Circuit rejected the plaintiffs' argument that were entitled to notice and an opportunity to be heard in the event of signature rejection, noting that the state's "interests in detecting fraud and in the orderly administration of elections are weighty and undeniable," and that "the verification process is already weighted in favor of accepting questionable signatures." *Id.* at 1104-05. *Lemons* also noted that "referendum petition cover sheets instruct voters to '[s]ign your full name, as you did when you registered to vote,'" and that Oregon's procedures allow for "challenges to decisions by county elections officials." *Id.* at 1104, 1105. The Court concluded that, "[i]n contrast to the

significant weight of the state's interests, plaintiffs' interest in the additional procedures they seek is slight," given the safeguards already in place. *Id.* at 1105.

Though *Lemons* contemplated ballot petition signature verification, it illustrates that courts applying *Anderson/Burdick* consider the totality of voting procedures—and what is to be gained by any "additional procedures" plaintiffs seek—in assessing equal protection challenges. *Id.* at 1104. In Texas, mail-in voters receive ample notice of the signature requirement, have the option to have a witness sign the ballot application and/or carrier envelope if they cannot, have alternative options for casting their ballot, and can pursue judicial relief—if all else fails—through a local election official. Texas's process is also already weighted in favor of accepting questionable signatures. *Id.* at 1104-05; TEX. ELEC. CODE §§ 87.041(e), .027(j). Given these safeguards, "plaintiffs' interest in the additional procedures they seek is slight," and the laws satisfy *Anderson/Burdick*. *E.g.*, *Lemons* at 1104-05.

### iii. Even if the Complaint stated a due process violation, it would fail because Plaintiffs disregarded the process available to them.

Plaintiffs' allegation that they have no means to contest rejection of a ballot for signature mismatch conflicts with Texas law. Indeed, "[i]f a county election officer . . . determines that a ballot was incorrectly rejected or accepted by the [EVBB] before the time set for convening the canvassing authority, the county election officer may petition a district court for injunctive or other relief as the court determines appropriate." TEX. ELEC. CODE §§ 87.127(a), 31.091(1). Thus, Plaintiffs could have raised their concerns of improper rejection to their county election officer and requested that the officer file suit to challenge the EVBB's determination. But Plaintiffs allege no such action. Nor do they allege contacting the Secretary's office with their concerns prior to filing this lawsuit.

Plaintiffs cannot claim that Texas law provides inadequate procedures when they wholly failed to utilize those procedures. *See, e.g.*, *Santana v. City of Tulsa*, 359 F.3d 1241, 1244 (10th Cir. 2004) ("A party cannot create a due process claim by ignoring established procedures."); *Dubuc v. Twp. of Green Oak*, 406 F. App'x 983, 989 (6th Cir. 2011) (holding that property owners who failed to take advantage

of a zoning board's post-deprivation appeal procedures could not claim that those procedures violated due process); *Herrell v. Benson*, 261 F. Supp. 3d 772, 777-78 (E.D. Ky. 2017) (noting that a plaintiff "was afforded due process, but waived his right to it by refusing to participate in the process offered to him."). This is another basis upon which Plaintiffs' due process claim fails on the pleadings.

### c.  Plaintiffs also do not state a violation of the Equal Protection Clause.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Plaintiffs offer two equal protection theories. First, Plaintiffs claim that the mail-in ballot requirements unduly burden the right to vote and treat mail-in voters differently than in-person voters. Compl. ¶67. Plaintiff CTD also claims that these requirements treat its member voters who cannot make their signatures match differently from other voters. Compl. ¶68. Second, Plaintiffs argue that "Texas's procedures for evaluating mail-in ballot signature matches" violate equal protection because they lack "specific standards to ensure their equal application." Compl. ¶74.

### i.  Texas law properly distinguishes between individuals who elect to vote by mail and those who elect to vote in person.

Plaintiffs do not state an equal protection claim with respect to individuals who elect to vote by mail, because these individuals are not "similarly situated" to individuals who elect to vote in person. Indeed, voting by mail "is a fundamentally different process from in-person voting, and is governed by procedures entirely distinct from in-person voting procedures." *ACLU of New Mexico v. Santillanes*, 546 F.3d 1313, 1320 (10th Cir. 2008) (citing *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 830-31 (S.D. Ind. 2006) ("absentee voting is an inherently different procedure from in-person voting"), *aff'd sub nom. Crawford v. Marion County Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008). Thus, any differences in the burdens imposed by these two processes do not violate equal protection, because they treat all persons similarly situated alike. *E.g., City of Cleburne*, 473 U.S. at 439;

*Santillanes*, 546 F.3d at 1320 ("Because all registered voters [] have the option of voting in-person or by absentee ballot, voters may choose which set of procedures to follow.") CTD's allegation that the mail-in ballot requirements excessively burden disabled voters does not revive an equal protection claim. This is because Texas law expressly accommodates individuals who, because of disability, cannot make their signatures match, allowing them to both apply for a mail-in ballot and authenticate their ballot with a witness signature. TEX. ELEC. CODE § 1.011(a).

### ii.   Plaintiffs' *Bush v. Gore* equal protection claim also fails.

Plaintiffs claim that Texas lacks "uniform guidelines or principles for counties to compare signatures" in violation of equal protection. Compl. p. 21 (citing *Bush v. Gore*, 531 U.S. 98, 106 (2006)). *Bush* reversed a Florida Supreme Court ruling ordering county election officials to manually recount ballots in the 2000 Presidential election, tallying those ballots that show a "clear indication of the intent of the voter." 531 U.S. at 102. In a ruling "limited to the present circumstances," *Bush* held the recount violated equal protection because it lacked "specific standards to ensure its equal application." *Id.* at 106-07.

Even if *Bush* were not limited to its circumstances, Texas's standard for verifying mail-in ballot signatures would be sufficiently uniform to ensure equal treatment of voters, because local election officials employ a uniform standard provided by statute. *See* TEX. ELEC. CODE §§ 87.041(e), (f) (EVBB uses "any two or more signatures of the voter made within the preceding six years" and where applicable "the signature of the voter on the federal postcard application"), 87.027(i) (SVC uses same signatures used under § 87.041(e)). This stands in stark contrast to the amorphous "clear indication of intent" standard invalidated in the limited *Bush v. Gore* decision. 531 U.S. at 102. *See also, e.g.*, *Lemons*, 538 F.3d at 1104 (rejecting equal protection challenge predicated upon *Bush v. Gore* where Oregon "counties [] uniformly limit their review [of signatures] to a comparison between petition signatures and existing voter registration cards.")

### d.   CTD fails to state a claim under ADA Title II or the RA.

A plaintiff under ADA Title II must allege: "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). The elements of a reasonable accommodation claim under Title II and the RA are practically the same. *See* 29 U.S.C. § 794 (a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of [] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity"); *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir.), *cert. denied*, 531 U.S. 959 (2000); *Delano-Pyle v. Victoria Cty., Tex.*, 302 F.3d 567, 574 (5th Cir.), *cert. denied*, 540 U.S. 810 (2003).

Plaintiffs argue that "[d]efendants' refusal to reasonably accommodate [] mail-in ballot voters with disabilities—either by allowing them to contest and cure a ballot rejected for signature mismatch or by not applying the signature comparison requirements to their ballots—discriminates against said voters and excludes them from participation in and unfairly denies them the benefits of the mail-in ballot process." Compl. ¶6. This does not state a claim, because any disabled voter *can* avoid having the signature comparison requirements applied to their ballots—they need only sign through a witness. *See* TEX. ELEC. CODE §§ 87.041(b)(1)-(2) (mail-in ballot "may only be accepted if," among other things, "the carrier envelope certificate is properly executed [and] neither the voter's signature on the ballot application nor the signature on the carrier envelope certificate is determined to have been executed by a person other than the voter, *unless signed by a witness*") (emphasis added); 1.011(a) (a signature required under the Election Code "may be signed for the person by a witness . . . if the person required to sign cannot do so because of a physical disability or illiteracy."). Because Texas law *already provides* a reasonable accommodation that cures this alleged injury, CTD does not state a claim under ADA Title II or the or RA.

## CONCLUSION

For the forgoing reasons, this case should be dismissed.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Texas Bar No. 24078898
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov

**ATTORNEY FOR DEFENDANT**
**TEXAS SECRETARY OF STATE**

## CERTIFICATE OF SERVICE

I certify that that on October 7, 2019 this document was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Assistant Attorney General