UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES, MOVE TEXAS CIVIC FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, and AMERICAN GI FORUM OF TEXAS, INC., | § § § § § § § § | |
| *Plaintiffs* | § § | |
| v. | § § | Civil Case No. 5:19-cv-00963-OG |
| TEXAS SECRETARY OF STATE, TRUDY HANCOCK, in her official capacity as BRAZOS COUNTY ELECTIONS ADMINISTRATOR, and PERLA LARA in her official capacity as CITY OF MCALLEN, TEXAS SECRETARY, | § § § § § § § § | |
| *Defendants*. | § | |

**PLAINTIFFS' COMBINED RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

BACKGROUND ............................................................................................... 1

STANDARD OF REVIEW ................................................................................ 3

ARGUMENT .................................................................................................... 4

I.    Plaintiffs Have Article III Standing Against All Defendants ............................. 4

    A.    Plaintiffs Have Standing to Bring Their Claims Against Defendant SOS .............. 5

        1.    Plaintiffs Austin Justice, MOVE, CTD, the League, and GI Forum
Satisfy the Injury-in-Fact Requirement for their Constitutional
Claims Against Defendant SOS ..................................................................... 5

        2.    Plaintiffs Satisfy Causation and Redressability as to their
Constitutional Claims Against Defendant SOS .......................................... 10

        3.    Plaintiff CTD Properly Alleges Standing on Behalf of its Members
to Bring ADA/RA Claims ............................................................................ 12

    B.    Defendants Brazos County EA and McAllen City Secretary Are Proper
Defendants ...................................................................................................... 14

        1.    State-Level Officials *and* Local Government Officials are Proper
Defendants When Both Play a Role in the Enforcement of the
Challenged Law ............................................................................................ 14

        2.    Plaintiffs' Injuries are Fairly Traceable to and Redressable by
Defendants Brazos County EA and McAllen City Secretary ................... 16

            i.    Duties Explicitly Given to EVC ..................................................... 17

            ii.    Duties Given to Other Authorities ................................................. 18

            iii.    The Local Defendants are Proper Parties ...................................... 19

    C.    Plaintiffs Properly Allege the Local Defendants' Involvement With
Respect to Each Claim Stated in Plaintiffs' Complaint ......................................... 21

    D.    Injunctive Relief is Not Redundant and It is Irrelevant That Plaintiffs Did
Not Bring Claims Against Every Possible Defendant in the State of Texas ......... 22

II.   Plaintiffs State Valid Claims Under Rule 12(b)(6) for Violations of Procedural Due
Process, Equal Protection, the ADA, and the RA ............................................... 23

    A.    State Election Laws are Reviewed for Procedural Due Process Violations
Under the *Mathews* Test, Not the *Anderson-Burdick* Test ............................... 23

        1.    Plaintiffs Satisfy the *Mathews* Test for Their Procedural Due
Process Claim ............................................................................................... 25

            i.    The Private Interest Affected by Official Action is the Right to
Vote ................................................................................................ 25

ii.      The Risk of Erroneous Deprivation is Great, as is the Probable Value of Procedural Remedies.........................................................26

      a.      No Sufficient Remedies Currently Exist............................27

iii.     Threat to Government Interests and Cost of Remedial Procedures are Low ....................................................................................30

B.     Plaintiffs Adequately State a Violation of the Equal Protection Clause................33

     1.     The *Anderson-Burdick* Test Applies to Equal Protection Claims .............33

     2.     Plaintiffs Properly Allege a Severe Burden ...............................................35

     3.     Defendant SOS Provides No Sufficient Justification for the Severe Burden Imposed by the Current Mail-in Ballot Process............................36

     4.     Defendants Fail to Provide Uniform Guidelines or Principles .................37

C.     Plaintiff CTD Properly Alleges a Violation of the ADA and RA ........................39

CONCLUSION..............................................................................................................40

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*281 Care Comm. v. Arneson,*
   638 F.3d 621 (8th Cir. 2011) ..................................................15

*Alevsky v. GC Services Limited Partnership,*
   2014 WL 1711682 (E.D.N.Y. Apr. 30, 2014) ..........................23

*Anderson v. Celebrezze,*
   460 U.S. 780 (1983).................................................................33, 34

*Ass'n of Cmty Orgs. for Reform Now v. Fowler,*
   178 F.3d 350 (5th Cir. 1999) ..................................................5, 6

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007).................................................................23

*Bennett-Nelson v. La. Bd. of Regents,*
   431 F.3d 448 (5th Cir. 2005) ..................................................39

*Burdick v. Takushi,*
   504 U.S. 428 (1992).................................................................33, 34

*Bush v. Gore,*
   531 U.S. 98 (2000)...................................................................37, 38, 39

*Cleveland Bd. of Educ. v. Loudermill,*
   470 U.S. 532 (1985).................................................................28

*Common Cause S. Christian Leadership Conference of Greater L.A. v. Jones,*
   213 F. Supp. 2d 1106 (C.D. Cal. 2001) ..................................37

*Crawford v. Marion Cty. Election Bd.,*
   472 F.3d 949 (7th Cir. 2007) ..................................................35

*Crawford v. Marion Cty. Election Bd.,*
   553 U.S. 181 (2008).................................................................24, 34, 35

*Democratic Exec. Comm. of Fla. v. Detzner,*
   347 F.Supp.3d 1017 (N.D. Fla. 2018).....................................34, 35, 36

*Democratic Exec. Comm. of Fla. v. Lee,*
   915 F.3d 1312 (11th Cir. 2019) ..............................................34, 35, 36, 37

*Dunn v. Blumstein*,
  405 U.S. 330 (1972) ................................................................33

*Eu v. San Francisco Cty. Democratic Cent. Comm.*,
  489 U.S. 214 (1989) ................................................................24

*Fla. Democratic Party v. Detzner*,
  2016 WL 6090943 (N.D. Fla. Oct. 16, 2016) ........................11, 34, 35, 37

*Fla. State Conf. of N.A.A.C.P. v. Browning*,
  522 F.3d 1153 (11th Cir. 2008) ..................................................8

*Georgia Muslim Voter Project v. Kemp*,
  918 F.3d 1262 (11th Cir. 2019) ..................................................24

*Gulf Coast Hotel-Motel Ass'n v. Mississippi Gulf Coast Golf Course Ass'n*,
  658 F.3d 500 (5th Cir. 2011) ....................................................21

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*,
  634 F.3d 787 (5th Cir. 2011) ....................................................14

*Harper v. Virginia State Bd. of Elections*,
  383 U.S. 663 (1966) ................................................................25

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ..............................................................6, 9

*Hunt v. Wash. St. Apple Adver. Comm'n*,
  432 U.S. 333 (1977) ................................................................12

*Kucinich v. Texas Democratic Party*,
  563 F.3d 161 (5th Cir. 2009) ....................................................34

*Lane v. Halliburton*,
  529 F.3d 548 (5th Cir. 2008) ......................................................3

*League of Women Voters of N. Carolina v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ....................................................35

*League of Women Voters of Ohio v. Brunner*,
  548 F.3d 463 (6th Cir. 2008) ....................................................37

*Leal v. McHugh*,
  731 F.3d 405 (5th Cir. 2013) ......................................................3

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ........................................................4, 6, 8, 12

*Mark Wandering Med. v. McCulloch,*
    2014 WL 12588302 (D. Mont. Mar. 26, 2014) .................................................................15

*Martin v. Kemp,*
    341 F.Supp.3d 1326 (N.D. Ga. 2018) ............................................................. *passim*

*Martin v. Sec'y of State of Georgia,*
    2018 WL 7139247 (11th Cir. Dec. 11, 2018) .......................................................24

*Mathews v. Eldridge,*
    424 U.S. 319 (1976).............................................................................. *passim*

*Melton v. Dall. Area Rapid Transit,*
    391 F.3d 669 (5th Cir. 2004) ..............................................................................39

*Nat'l Fed'n of the Blind v. Lamone,*
    813 F.3d 494 (4th Cir. 2016) ..............................................................................40

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, &
    Explosives,*
    700 F.3d 185 (5th Cir. 2012) ..............................................................................13

*Obama for Am. v. Husted,*
    697 F.3d 423 (6th Cir. 2012) ..............................................................................34

*OCA-Greater Houston v. Texas,*
    867 F.3d 604 (5th Cir. 2017) ............................................................. *passim*

*Okpalobi v. Foster,*
    244 F.3d 405 (5th Cir. 2001) ..................................................................11, 12

*Prete v. Bradbury,*
    438 F.3d 949 (9th Cir. 2006) ..............................................................................31

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006)................................................................................................24

*Santana v. City of Tulsa,*
    359 F.3d 1241 (10th Cir. 2004) .........................................................................28

*Saucedo v. Gardner,*
    335 F. Supp. 3d 202 (D. N.H. 2018)............................................................. *passim*

*Stringer v. Pablos,*
    274 F.Supp.3d 588 (W.D. Tex. 2017) ...............................................................34

*Summers v. Earth Island Institute,*
    555 U.S. 488 (2009)............................................................................................13

*Tex. Democratic Party v. Benkiser,*
   459 F.3d 582 (5th Cir. 2006) .......................................................................13

*Tex. Indep. Party v. Kirk,*
   84 F.3d 178 (5th Cir. 1996) .........................................................................24

*True the Vote v. Hosemann,*
   43 F.Supp.3d 693 (S.D. Miss. 2014)............................................................15

*True v. Robles,*
   571 F.3d 412 (5th Cir. 2009) .........................................................................3

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP),*
   412 U.S. 669 (1973)........................................................................................6

*U.S. Airways, Inc. v. Barnett,*
   535 U.S. 391 ................................................................................................40

*Veasey v. Abbott,*
   830 F.3d 216 (5th Cir. 2016) ..................................................................10, 24

*Voting for Am., Inc. v. Andrade,*
   888 F.Supp.2d 816 (S.D. Tex. 2012) (Costa, J.), *rev'd on other grounds* ........................11, 15

*Voting for Am., Inc. v. Steen,*
   732 F.3d 382 (5th Cir. 2013) ..................................................................11, 15

*Zessar v. Helander,*
   2006 WL 642646 (N.D. Ill. March 13, 2006).........................................20, 24, 29

**Statutes and Rules**

42 U.S.C. § 12132...........................................................................................39

Americans with Disabilities Act (ADA) .........................................................3

Federal Rules of Civil Procedure 12(b)(1).................................................3, 14

Rehabilitation Act of 1973 ..............................................................................3

Tex. Elec. Code § 1.011(a) ......................................................................29, 30

Tex. Elec. Code §§ 31.001(a), 31.003 ..........................................................10

Tex. Elec. Code § 65.0541(a) .........................................................................32

Tex. Elec. Code § 83.001 ..........................................................................16, 19

Tex. Elec. Code § 83.002 ..............................................................................16

Tex. Elec. Code §§ 84.007–84.009 ..................................................................17

Tex. Elec. Code §§ 86.002(d), 86.012(b), 86.013(d), (g) ..............................10

Tex. Elec. Code § 86.011 ..........................................................................17, 19

Tex. Elec. Code § 87.027(i) ...............................................................18, 19, 38

Tex. Elec. Code §§ 87.027(d), (f) ...................................................................18

Tex. Elec. Code § 87.041(b)(1)–(2) .................................................................1

Tex. Elec. Code § 87.127 ..........................................................................18, 20

Tex. Elec. Code §§ 87.127(a), 31.091(1) ........................................................27

Tex. Elec. Code § 87.0241 ..............................................................................17

Tex. Elec. Code §§ 87.0241, 87.027(h)–(j) .....................................................18

Tex. Elec. Code § 87.0431 .........................................................................19, 28

Tex. Elec. Code § 102.001(a) .........................................................................30

**Other Authorities**

*Application for Ballot by Mail*, Texas Secretary of State,
    https://webservices.sos.state.tx.us/forms/5-15f.pdf (last visited Oct. 21, 2019) ......................10

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 935–37
    (2018) ...........................................................................................................22

Philip Bump, *That coin-toss election in Virginia? Dramatic. But it pales in
    comparison to other historic contests*. WA. POST, Dec. 22, 2017,
    https://www.washingtonpost.com/news/politics/wp/2017/12/22/that-coin-toss-
    election-in-virginia-dramatic-but-it-pales-in-comparison-to-other-historic-
    contests/.........................................................................................................26

5C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1255 (3d ed.,
    Supp. 2019) ...................................................................................................23

TO THE HONORABLE ORLANDO L. GARCIA, CHIEF U.S. DISTRICT JUDGE:

Plaintiffs respectfully submit the following Combined Response to Defendants' three motions to dismiss (Doc. 27, 29, 30). Because Defendants have failed to show that Plaintiffs' claims should be dismissed pursuant to Rules 12(b)(1) and 12(b)(6), Defendants' motions should be denied. In the alternative, if the Court finds any deficiencies in the pleadings, Plaintiffs should be permitted to amend the Complaint in accordance with the local rules of the Court.

## BACKGROUND

Plaintiffs' claims in this case arise from provisions of the Texas Election Code (Election Code) that result in the unlawful disenfranchisement of thousands of Texas voters. The current mail-in ballot process permits election officials to reject a voter's mail-in ballot if, in their sole discretion, they determine that the signature on a carrier envelope was "executed by a person other than the voter." *See* Tex. Elec. Code § 87.041(b)(1)–(2); Compl. ¶¶ 38–44. These decisions are made by partisan appointees to local boards, and are not conducted blindly—the officials necessarily know the name of the specific voter before they reject the ballot. Compl. ¶ 42. Additionally, without any standards for reviewing signatures, these decisions are necessarily arbitrary and vary from county to county or even from meeting to meeting. Compl. ¶ 41. These signature comparison decisions are also final; the voter has no opportunity to verify or prove that they did indeed sign the relevant documents submitted to election officials, or to otherwise challenge the decisions at any time before rejection. *Id*. ¶ 44. The Election Code does not even require that the voter be notified about the rejection of their ballot until up to 10 days after an election. *Id*.

Collectively, this statutory scheme has disenfranchised the individual Plaintiffs, members of the Plaintiff associations, and thousands of others across the state. Compl. ¶¶ 1, 3–5, 10–11, 15–

19, 24–31. The scheme continues to threaten disenfranchisement of the individual Plaintiffs, as well as members of the Plaintiff associations who are particularly susceptible to variances in handwriting. *Id.* ¶¶ 3–5, 10–11, 15–19, 24–31, 45–51. It has also forced and continues to force the organizational Plaintiffs to divert resources in an effort to prevent the unlawful disenfranchisement it causes, thereby frustrating their organizational missions. *Id.* ¶¶ 12–31.

While the Election Code provides that a mail-in ballot may only be rejected if a determination is made that the carrier envelope or the mail-in ballot application was signed "by a person other than the voter," the individual Plaintiffs in this case actually did, in recent elections, sign both their respective mail-in ballot applications and their carrier envelopes—and their ballots were still rejected. *Id.* ¶¶ 3–4, 10–11. There is no provision of law related to the process at issue that requires a person to sign their name in the same way. While a voter is free to change how they sign their name at any time, and even though a voter generally cannot sign their name the exact same way every time, Defendants nevertheless treat a signature as a uniform proxy for identity verification, resulting in the illegal disenfranchisement of voters. *Id.* ¶¶ 48–51. The limited permissibility of a witness signature on a ballot—in cases in which a voter can affirm that they *cannot* sign the ballot—does not resolve these issues. Voters like the individual Plaintiffs, many of the members of Plaintiff associations, and many of the voters helped by the organizational Plaintiffs bringing this suit are not permitted under the law to have a witness sign their ballot in their stead, and they would have no reason to do so in the first place, knowing that they are capable of signing all the relevant materials. Compl. ¶¶ 10–31.

Plaintiffs bring this lawsuit against Perla Lara, in her official capacity as City of McAllen, Texas Secretary (Defendant McAllen City Secretary), Trudy Hancock, in her official capacity as Brazos County Elections Administrator (Defendant Brazos County EA), and the Texas Secretary

of State (Defendant SOS), alleging violations of Plaintiffs' constitutional rights to procedural due process and equal protection of the law, as well as violations of the Americans with Disabilities Act (ADA) and the Rehabilitation Act of 1973 (RA). All Defendants, through their actions, direction, and guidance, or lack thereof, bear responsibility for the unlawful mail-in ballot process. Plaintiffs respectfully submit that the existing signature comparison procedure should either be enjoined, or, alternatively, that the Court should order Defendants to put in place a scheme that provides pre-rejection notice of and an opportunity to cure any alleged signature mismatch prior to the rejection of a ballot.

## STANDARD OF REVIEW

Each Defendant moves to dismiss under Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and/or 12(b)(6) for failure to state a claim upon which relief can be granted. Because there is no record developed in this case and the parties have not introduced any facts supplemental to the Complaint, the Court must "accept[] all well-pleaded facts as true and view[] those facts in the light most favorable to the plaintiff." *True v. Robles*, 571 F.3d 412, 417 (5th Cir. 2009) (internal quotation marks omitted). Dismissal is appropriate under Rule 12(b)(1) if the Court, applying that standard, finds that Plaintiffs have not alleged "a plausible set of facts" sufficient to state a basis for jurisdiction, *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008), and appropriate under Rule 12(b)(6) "if Plaintiffs have not alleged 'enough facts to state a claim to relief that is plausible on its face,'" *Robles*, 571 F.3d at 417 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). Motions to dismiss under Rule 12(b)(6) are generally "viewed with disfavor and [are] rarely granted." *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013).

**ARGUMENT**

I.   <u>**Plaintiffs Have Article III Standing Against All Defendants**</u>

Each Plaintiff has standing to bring their respective claims against all Defendants. In her Motion to Dismiss, Defendant SOS claims she is not liable and that local elections officials, such as the local Defendants, are proper parties for Plaintiffs to bring their case against. In their motions to dismiss, the local Defendants claim they are not liable and that state officials, such as Defendant SOS, are proper parties. If all of these claims by Defendants are accepted, no Defendant would be liable, even though Defendants have broad authority over elections, including the mail-in ballot process. As explained below, all Defendants are proper parties with respect to Plaintiffs' claims.

A plaintiff must satisfy three criteria to establish a case or controversy sufficient to give a federal court standing over their claims: (1) that they have suffered or are about to suffer an "injury in fact"; (2) that there exists "a causal connection between the injury and the conduct complained of"; and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted). These requirements also apply to associational and organizational plaintiffs. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 609–10 (5th Cir. 2017).

> "Associational standing" is derivative of the standing of the association's members, requiring that they have standing and that the interests the association seeks to protect be germane to its purpose. By contrast, "organizational standing" does not depend on the standing of the organization's members. The organization can establish standing in its own name if it meets the same standing test that applies to individuals.

*Id*. at 610 (citations and some internal quotation marks omitted)

Individual Plaintiffs (Dr. George Richardson and Rosalie Weisfeld), the Austin Justice Coalition (Austin Justice), and MOVE Texas (MOVE) have standing to bring claims against Defendants on their own behalf. The Coalition of Texans with Disabilities (CTD), the League of

Women Voters (the League), and the American GI Forum (GI Forum) have standing to bring claims against Defendants on their own behalf and also on behalf of their members.

### A.     Plaintiffs Have Standing to Bring Their Claims Against Defendant SOS

As explained below, all Plaintiffs have standing to bring this lawsuit against Defendant SOS. Defendant SOS, in her Motion to Dismiss, does not contest that Individual Plaintiffs suffered an injury-in-fact. Neither does Defendant SOS contest that the Plaintiffs representing their members suffered an injury-in-fact as to their constitutional claims. Instead, Defendant SOS argues solely that (1) Plaintiffs Austin Justice, MOVE, CTD, the League, and GI Forum fail to allege an injury-in-fact for purposes of organizational standing as to the constitutional claims brought on their own behalf; (2) no Plaintiff has satisfied causation and redressability as to any of their claims; and (3) CTD lacks associational standing to sue under the ADA and RA on behalf of their members.

### 1.     Plaintiffs Austin Justice, MOVE, CTD, the League, and GI Forum Satisfy the Injury-in-Fact Requirement for their Constitutional Claims Against Defendant SOS

Plaintiffs Austin Justice, MOVE, CTD, the League, and GI Forum[1] allege an injury-in-fact on their own behalf as to their constitutional claims against Defendant SOS. To begin with, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 357 (5th Cir. 1999) (citing *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 529 (5th Cir. 1996)) (internal quotation marks omitted). "[T]he injury in fact requirement under

---

[1] GI Forum sufficiently alleges an injury-in-fact as to the constitutional claims brought on its own behalf. GI Forum and its chapter's "efforts . . . to encourage eligible voters to use mail-in ballots and support those voters in making sure their mail-in ballots are counted" were and continue to be undermined by the unlawful mail-in ballot process. Compl. ¶ 30.

Article III is qualitative, not quantitative, in nature." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (citing *Fowler*, 178 F.3d at 357–58) (internal quotation marks and brackets omitted). So while an injury-in-fact must be (a) concrete and particularized and (b) "actual or imminent, not conjectural or hypothetical," *Lujan,* 504 U.S. at 560 (internal citations and quotation marks omitted), "it need not measure more than an 'identifiable trifle.'" *OCA-Greater Houston*, 867 F.3d at 612 (quoting *Fowler*, 178 F.3d at 358); *see United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) (noting that the Court has upheld standing where plaintiffs have "no more at stake in the outcome of an action than a fraction of a vote, . . . a $5 fine and costs, . . . and a $1.50 poll tax") (citations omitted).

Applying this understanding in the context of organizational standing, the Fifth Circuit has explained that "an organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices." *Fowler*, 178 F.3d at 360. If a defendant's actions perceptibly impair an organization in such a way, "there can be no question that the organization has suffered injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Thus, in *OCA-Greater Houston*, the Fifth Circuit held that an advocacy organization—the Organization for Chinese Americans (OCA)—had standing to challenge a Texas law restricting the "interpretation assistance that English-limited voters may receive." 867 F.3d at 606, 612. The court held that the organization had suffered an injury-in-fact, even though the "injury was not large," because the Texas statute at issue "'perceptibly impaired' [the organization's] ability to 'get out the vote'" when the organization "went out of its way to counteract the effect of Texas'[] allegedly unlawful" statute by "educat[ing] voters" on how to avoid being negatively impacted by the statute. *Id.* at 612.

Like the organizational plaintiffs in *OCA-Greater Houston*, Plaintiffs Austin Justice, MOVE, CTD, and the League have standing to challenge Defendant SOS's actions. As alleged in the Complaint, these plaintiffs have gone "out of [their] way to counteract Texas'[] allegedly unlawful [mail-in ballot process]," *id.*, by diverting resources from their traditional activities toward, in the case of Austin Justice's, CTD's, and the League's education efforts, "instruct[ing]" and, through MOVE's education efforts, "warn[ing] voters" to write out their signature "neatly," "clearly," "legibly," and/or have "signatures match each other as much as possible." Compl. ¶¶ 13, 14, 18, 23, 26. Such efforts by these Plaintiffs help to reduce the chance of an improper mail-in ballot rejection based on a signature mismatch because each Plaintiff's instruction alerts voters to the abnormal scrutiny applied to mail-in ballot application and carrier envelope signatures, and, further, each instruction provides guidance for voters to use when writing out their signatures, which, if followed, can help to build at least some consistency among a voter's signatures. If the signature comparison procedure is struck down or if the mail-in ballot process provided the requested safeguards of pre-rejection notice and an opportunity to cure, Plaintiffs Austin Justice, MOVE, CTD, and the League would not need to expend resources instructing and warning the voters they are working with to write out their signatures neatly, clearly, legibly, and/or have the signatures match each other as much as possible.[2] *See Martin v. Kemp*, 341 F.Supp.3d 1326, 1335 (N.D. Ga. 2018) (finding that organizational plaintiffs "will not bear the same burden of assisting and warning voters once the State is required to assist voters whose ballots are challenged as illegitimate and once the urgency of warning voters is diminished by way of due process

---

[2] Defendant SOS argues that "[n]o Plaintiff organization claims that instructing individuals to write signatures neatly falls outside the 'normal, day-to-day operations of the group.'" SOS MTD 8 (citing *Fowler*, 178 F.3d at 358-59). Defendant SOS's claim misrepresents the allegations in the Complaint. All applicable Plaintiffs allege that each "must expend additional resources" because of the unlawful process at issue while providing instruction and support on mail-in ballots to voters. Compl. ¶¶ 14, 18, 23, 26.

protections"). Each of these Plaintiffs have had to counteract and will continue to counteract to the best of their abilities the unlawful mail-in ballot process, including the signature comparison procedure, enshrined in Texas law.

Defendant SOS incorrectly characterizes the Fifth Circuit's decision in *N.A.A.C.P. v. City of Kyle* as requiring that an organizational plaintiff must identify "'specific projects that [it] had to put on hold or otherwise curtail in order to respond to' the defendants conduct" to establish standing. *See* SOS MTD 7 (quoting 626 F.3d 233, 238 (5th Cir. 2010)) (citation omitted). However, the Fifth Circuit in *OCA-Greater Houston* disagreed with this very interpretation of the language from *City of Kyle* and clarified that the court's "remark [in *City of Kyle*] . . . was not a heightening of the *Lujan* standard, but an example of how to satisfy it by pointing to a non-litigation-related expense." 867 F.3d at 612. The *OCA-Greater Houston* panel further explained that "the Supreme Court has commanded that, in determining whether an organization has organizational standing, 'we conduct the same inquiry as in the case of an individual,'" which requires that an "injury alleged as an Article III injury-in-fact need not be substantial." *Id*. (quoting *Havens Realty Corp.*, 455 U.S. at 378; citing *Fowler*, 178 F.3d at 358).

Defendant SOS also claims that because "voter registration, education, and outreach are already central to these organizations' 'routine activities,' . . . [a]dvising voters to sign ballots and carrier envelopes neatly within these broader efforts is not a 'concrete and demonstrable' injury." SOS MTD 8 (citing *Havens Realty Corp.*, 455 U.S. at 379; *City of Kyle*, 626 F.3d at 238). However, Plaintiff Austin Justice's, MOVE's, CTD's, and the League's efforts need not fall outside the scope of their mission or central initiatives to be considered actions that counteract the Texas provisions at issue. *See, e.g.*, *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008) (quoting *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) ("[A]n

organization suffers an injury in fact when a statute 'compel[s]' it to divert more resources to accomplishing its goals" and "'[t]he fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury.'")). For instance, even though in *Havens Realty Corp.* the organizational plaintiff HOME's "activities included the operation of a housing counselling service[] and the investigation and referral of complaints concerning housing discrimination," HOME sufficiently alleged an injury-in-fact because the defendant's actions "frustrated . . . [HOME's] efforts to assist equal access to housing through counseling and other referral services," requiring HOME to make "duplicative efforts"[3] to "identify and counteract the defendant's" actions. 455 U.S. at 368, 379; *see also Martin*, 341 F.Supp.3d at 1335 (finding that plaintiffs met their burden of establishing a concrete and particularized injury under the organizational standing rubric where plaintiffs showed they had to "divert more resources towards warning voters about the risk of a signature mismatch").

Furthermore, the injury shown by OCA in *OCA-Greater Houston* is especially similar to the injury suffered by Plaintiffs Austin Justice, MOVE, CTD, and the League, particularly in how it related to OCA's—and here, Plaintiffs'—mission and central initiatives. Even though "[o]ne of [OCA's] primary missions [was] to promote civic participation and provide civic education, which it carrie[d] out through a 'Get Out the Vote' initiative," the Fifth Circuit found that OCA alleged an injury-in fact because, through its educational efforts, OCA had to advise voters on how to "reduce the chance" of denial of their choice of interpreter due to the existence of the Texas law at issue in that case. *OCA-Greater Houston*, 867 F.3d at 609, 612. Here, although Plaintiffs Austin Justice, MOVE, CTD, and the League all generally participate in voter registration, education, and

---

[3] "In order to compensate for the misinformation it received from Havens, HOME was forced to employ its white staff in duplicative efforts in order to determine whether the information given by Havens to HOME's black staff was accurate and complete." Br. for Resp'ts at 36, *Havens Realty Corp.*, 455 U.S. 363 (1982) (No. 80–988).

outreach, none would have had to educate voters on how to sign a carrier envelope and/or application absent the Texas provisions at issue. Therefore, these Plaintiffs sufficiently allege an injury-in-fact as to the constitutional claims brought on their own behalf.

     2.    <u>Plaintiffs Satisfy Causation and Redressability as to their Constitutional Claims Against Defendant SOS</u>

As to causation and redressability for Plaintiffs' constitutional claims, the Election Code names Defendant SOS as the "chief election officer of the state" and empowers her to "obtain and maintain uniformity in the application, operation, and interpretation of [the] code and of the election laws outside [the] code." Tex. Elec. Code §§ 31.001(a), 31.003. Due to Defendant SOS's broad and far-reaching authority, the Fifth Circuit has held that "[t]he facial invalidity[4] of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State." *OCA-Greater Houston*, 867 F.3d at 613 (citing Tex. Elec. Code §§ 31.001(a)).[5]

---

[4] Because Defendant SOS's authority over the Election Code and, specifically, the mail-in ballot process remains the same under the specific facts alleged by each Plaintiff, Plaintiffs' claims are traceable to and redressable by Defendant SOS for the same reasons under an as-applied challenge.

[5] Defendant SOS also cites *John Does #1-7 v. Abbott* to support the claim that traceability cannot be "based solely on an official['] general authority to enforce a state's laws" and must be based on "'definite responsibilities' with respect to the [Early Voting Ballot Boards]." SOS MTD 9-10 (citing 345 F.Supp.3d 763, 773 (N.D. Tex. 2018)). *Abbott* does not apply to Plaintiffs' case. In *Abbott*, the court held the Governor was not a proper party because the plaintiffs in the case claimed no enforcement authority besides the Governor's responsibility under the Texas Constitution to "ensure that laws are faithfully executed." 345 F.Supp.3d at 773. In contrast, and as explained in this section, Defendant SOS's authority is firmly rooted in a specific mandate within the Election Code itself, not some general authority set out in the Texas Constitution. Thus, in *OCA-Greater Houston*, the Fifth Circuit addressed a challenge to a specific section of the Election Code and premised its holding that the plaintiffs had established causation and redressability as to Defendant SOS entirely on Sections 31.001(a) and 31.003 of the Election Code. *See OCA-Greater Houston*, 867 F.3d at 613–14 & nn.34, 43, 44.

    As an aside, Defendant SOS's responsibilities are even further distinguishable from the responsibilities of the Governor in *Abbott*. Defendant SOS is additionally responsible for parts of the mail-in ballot process relevant to Plaintiffs' case, including but not limited to the following:

    (1) Defendant SOS prescribes instructions to be printed on mail-in ballot applications and mail-in ballot materials used by voters, including Individual Plaintiffs, members of Plaintiff associations, and voters educated and supported by the organizational Plaintiffs. *See* Tex. Elec. Code §§ 86.002(d), 86.012(b), 86.013(d), (g); *Application for Ballot by Mail*, Texas Secretary of State, https://webservices.sos.state.tx.us/forms/5-15f.pdf (last visited Oct. 21, 2019) ("Prescribed by the Office of the Secretary of State of Texas").

    (2) Defendant SOS is required to "provide a method by which counties and political subdivisions located in the county can exchange and update information on [annual mail-in ballot applications]." *Id.* § 86.0015(d).

    (3) Defendant SOS prescribes "appropriate procedures . . . to provide accountability for the delivery of the carrier envelopes from the voting place to the early voting clerk." *Id.* § 86.006(e).

This is true irrespective of who is the local enforcer of the statute in question, whether it be the Early Voting Ballot Board (Ballot Board), Signature Verification Committee (Verification Committee), or the Early Voting Clerk. *See OCA-Greater Houston*, 867 F.3d at 612–13 (rejecting Defendant SOS's argument that the plaintiffs had standing only against local government officials who enforced election code restrictions regarding eligibility to serve as interpreter in challenge to those restrictions); *Voting for Am., Inc. v. Andrade*, 888 F.Supp.2d 816, 833 (S.D. Tex. 2012) (Costa, J.), *rev'd on other grounds*, sub nom. *Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013). Additionally, courts have rejected similar arguments by the Florida Secretary of State with nearly identical statutory authority and based on nearly identical claims to those brought by Plaintiffs in this case. *See, e.g.*, *Fla. Democratic Party v. Detzner*, 2016 WL 6090943 at *4–5 (N.D. Fla. Oct. 16, 2016) (citing *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011)).

Defendant SOS cites to *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001), and argues that she "has—at most—only general enforcement powers, and Plaintiffs have not alleged that she has taken or threatened any action giving rise to the injuries they allege." SOS MTD 9. Defendant SOS then describes how local authorities, including the Ballot Board, Verification Committee, and the Early Voting Clerk, are involved in the mail-in ballot process in relation to Plaintiffs, and how Defendant SOS lacks authority to enjoin the unlawful signature comparison procedure or to

---

(4) Defendant SOS prescribes necessary procedures to count mail-in ballots that arrive after the required deadline but are deemed not untimely under the Election Code. *Id.* §§ 86.007(d), (g).

(5) Defendant SOS "monitor[s] the situation and advise[s] the clerk, who shall mail the ballots as soon as possible in accordance with [Defendant SOS]'s guidelines" when it is not possible for local authorities to send certain mail-in ballots to voters by their required deadline. *Id.* § 86.004(b).

(6) Defendant SOS maintains a supply of the official mail-in ballot application forms and is required to "furnish the forms in reasonable quantities without charge to individuals or organizations requesting them for distribution to voters." *Id.* § 84.013.

(7) Defendant SOS "shall prescribe any procedures necessary for implementing" when, after early voting by personal appearance ends, a Ballot Board can determine whether to accept a mail-in ballot "in an election conducted by an authority of a county with a population of 100,000 or more or conducted jointly with such a county." *Id.* § 87.0241(c).

implement a lawful mail-in ballot process in the alternative. *Id.* at 9–11. However, the Fifth Circuit squarely rejected this same argument and reliance on *Okpalobi* in holding that Defendant SOS is a proper defendant for challenges to provisions of the Election Code. As the *OCA-Greater Houston* panel explained:

> [U]nlike in *Okpalobi*, where the defendants had no "enforcement connection with the challenged statute," [Defendant SOS] is the "chief election officer of [Texas]" and is instructed by statute to "obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside of this code."

867 F.3d at 613–14 (quoting *Okpalobi*, 244 F.3d at 427 n.35; Tex. Elec. Code §§ 31.001(a), 31.003). Therefore, Plaintiffs satisfy causation and redressability as to their constitutional claims against Defendant SOS.

> 3.    <u>Plaintiff CTD Properly Alleges Standing on Behalf of its Members to Bring ADA/RA Claims</u>

To establish associational standing, CTD must show:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. St. Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Under the first element, the traditional injury-in-fact analysis is applied to members of the association. *OCA-Greater Houston*, 867 F.3d at 610. Likewise, the analysis of both causation and redressability proceeds along traditional standing doctrine, so the injury must be "fairly traceable" to the defendant's conduct and there must be a likely chance that a favorable result will redress the injury. *See Lujan*, 504 U.S. at 560–61.

Defendant SOS contends that Plaintiff CTD fails to properly plead facts on behalf of its members to satisfy the first and third requirements of associational standing. SOS MTD 12. First, Defendant SOS contends that Plaintiff CTD's injuries under the ADA and RA are not traceable or

redressable through the SOS. *Id*. For the same reasons outlined in the previous section, Defendant

SOS is a proper defendant for Plaintiff CTD's ADA and RA claims, and Plaintiff CTD's injuries

are redressable by the relief requested against Defendant SOS. *See supra* Section I, A, 2.

Second, Defendant SOS contends that Plaintiff CTD lacks standing to bring its ADA and

RA claims because Plaintiff CTD has not identified specific members injured by the mail-in ballot

process due to an improper signature mismatch determination. At the outset, Defendant SOS

improperly relies on appellate and Supreme Court cases reviewing, at least in part, trial court

determinations of a motion for summary judgment, a request for preliminary injunction, or a

hearing on the merits of a case. *See Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco,*

*Firearms, & Explosives*, 700 F.3d 185, 188, 191 (5th Cir. 2012); *Summers v. Earth Island Institute*,

555 U.S. 488, 491–492 (2009); *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 585 (5th Cir.

2006). Additionally, in *National Rifle Association of America, Inc*., a case Defendant SOS relies

upon, the court explicitly permitted the plaintiffs to establish standing based on general findings

that significant segments of the organization's membership would be injured, without the need to

name individual members. *See id*. at 191–92 & n.5 (finding standing existed because the National

Rifle Association could demonstrate that its members of certain ages were necessarily injured on

the face of the law at issue). Finally, the proposition that an association must "name names" to

demonstrate associational standing at the pleading stage was squarely rejected by the Fifth Circuit

in *Hancock County Board of Supervisors v. Ruhr*, where the court considered a similar argument:

> [A]ppellees offer no authority for the proposition that an [association] must identify
> a particular [association] member at the *pleading stage*. We are aware of no
> precedent holding that an association must set forth the name of a particular
> member in its complaint in order to survive a Rule 12(b)(1) motion to dismiss based
> on a lack of associational standing.

487 F. App'x 189, 198 (5th Cir. 2012) (citing *Church of Scientology v. Cazares*, 638 F.2d 1272,

1279 (5th Cir.1981)) (emphasis in original). As a result, Plaintiff CTD has sufficiently alleged its

interest in the claims that directly affect segments of its membership. Therefore, Plaintiff CTD properly alleges standing to bring its ADA and RA claims against Defendant SOS.

### B.     Defendants Brazos County EA and McAllen City Secretary Are Proper Defendants

Both local Defendants Brazos County EA and McAllen City Secretary insist they have no authority to provide any relief requested and that neither is therefore a proper party to this suit. Defendant Brazos County EA specifically invokes the causation and redressability elements of Article III standing in making this argument, albeit through the improper vehicle of a Federal Rule of Civil Procedure 12(b)(6) motion. [6] Brazos MTD 1–4. Defendant McAllen City Secretary similarly moves to dismiss under Rule 12(b)(6) on the basis of her lack of authority to provide relief, but does not mention standing. *See generally* McAllen MTD. Neither Defendant Brazos County EA (who raised standing) nor Defendant McAllen City Secretary (who did not) have contested that Plaintiffs have suffered an injury in fact. As explained below, Plaintiffs' injuries are fairly traceable to the local Defendants' actions, and the local Defendants have the authority to redress those injuries and to provide the relief requested.

### 1.     State-Level Officials *and* Local Government Officials are Proper Defendants When Both Play a Role in the Enforcement of the Challenged Law

Defendants Brazos County EA and McAllen City Secretary both insist that the State of Texas or Defendant SOS are the *only* proper parties to this suit. Brazos MTD 4, 7; McAllen MTD 3–4. This is incorrect. Instead, as courts routinely hold, claimants may satisfy the requirements of causation and redressability via substantially the same analysis for state and local election officials.

---

[6] The proper vehicle to challenge Article III standing, i.e., a jurisdictional question, is a motion to dismiss under Rule 12(b)(1). *See, e.g.*, *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011).

For example, in *Voting for America, Inc. v. Andrade*, the Southern District of Texas held that "[b]oth . . . [Defendant SOS] and Johnson[, the Galveston County Tax Assessor and Voter Registrar,] ha[d] a designated role to play in the interpretation and enforcement of the Election Code, and both [were] proper parties" where the plaintiffs had challenged Texas' regulation of third-party voter registration activity. 888 F.Supp.2d at 833 *rev'd on other grounds*, sub nom. *Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013). The court pointed out that, "[a]s quick reference to well-known Supreme Court cases illustrates, constitutional challenges are often brought against local entities or officials enforcing statewide laws they played no role in creating." *Voting for Am.*, 888 F.Supp.2d at 832–33 (citing *Roe v. Wade*, 410 U.S. 113 (1973); *Sch. Dist. of Abington Twp., Pa. v. Schempp*, 374 U.S. 203 (1963)). Thus, while the court found that the voter registrar "had nothing to do with enacting the Election Code, [was] not involved in the promulgation of statewide regulations interpreting it, and [could not] enforce it outside Galveston County," an analysis of the Election Code made it clear that she was the governmental official directly responsible for Galveston County's enforcement of many of the provisions at issue in that lawsuit. *Voting for Am.*, 888 F.Supp.2d at 832–33. Because the county voter registrar "enforce[d] the laws that [the plaintiffs] contend[ed] cause[d] them injury, an injunction against her would directly redress that alleged injury." *Id.*[7] In sum, and as the Fifth Circuit explained in *K.P. v. LeBlanc*—an opinion on which the *Voting for America* court relied—a defendant may be "far from the sole participant in the application of [a] challenged statute," but if they have "definite

---

[7] *See also True the Vote v. Hosemann*, 43 F.Supp.3d 693, 712 (S.D. Miss. 2014) (holding that both county defendants and the Secretary of State were properly named in National Voter Registration Act lawsuit); *Mark Wandering Med. v. McCulloch*, 2014 WL 12588302, at *3–4 (D. Mont. Mar. 26, 2014) (finding that plaintiffs had standing to bring voting rights claims against both county officials and the Secretary of State); *281 Care Comm. v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011) (holding that "[w]hen a statute is challenged as unconstitutional, the proper defendants are the officials whose role it is to administer and enforce the statute," and finding plaintiff challenging criminal statute had shown causation and redressability as to the Attorney General of Minnesota, as well as four county attorneys responsible for enforcing a portion of the challenged statute).

responsibilities relating to the application [of the statute]," they may still satisfy the causation and redressability standards for Article III standing. 627 F.3d 115, 123—24 (5th Cir. 2010).

2.     Plaintiffs' Injuries are Fairly Traceable to and Redressable by Defendants Brazos County EA and McAllen City Secretary

The same type of analysis applied by the Southern District of Texas in *Voting for America* is proper here. Under the Election Code, both Defendants Brazos County EA and McAllen City Secretary have a designated role in elections as the Early Voting Clerk (EVC) for all elections ordered by their county and city respectively.[8] The EVC is specifically charged under the Election Code with "conduct[ing] the early voting in each election" and has "the same duties and authority with respect to early voting as a presiding election judge has with respect to regular voting, except as otherwise provided by [Title 7 of the Election Code]." Tex. Elec. Code § 83.001. A presiding election judge for regular voting "is in charge of and responsible for the management and conduct of the election at the polling place of the election precinct that the judge serves." *Id.* § 32.071.

Thus, by its plain language, the Election Code empowers the EVC with expansive authority and responsibility over the management and conduct of the early voting process, including a plethora of explicit duties with respect to the mail-in ballot process. Furthermore, there is nothing in the Election Code limiting the EVC's broad authority over the early voting process that would preclude the EVC from providing a form of relief prayed for in this action, such as pre-rejection notice of a signature mismatch and an opportunity to cure to a voter before the voter's mail-in ballot is actually rejected. There is similarly no limitation that would preclude the EVC from

---

[8] *See* Tex. Elec. Code § 83.002 (county clerk is the EVC for county for general elections held at county expense, primary elections, and certain special elections); *id.* § 31.043 (county elections administrator "shall perform . . . the duties and functions placed on the county clerk by [the Election Code]"); *id.* § 83.005 (city secretary is the EVC for an election ordered by an authority of a city).

providing training in signature comparison or from enacting uniform policies and procedures governing that process.

### i.   Duties Explicitly Given to EVC

The EVC's explicitly stated duties involving the mail-in ballot process include the responsibility for all communication with voters attempting to cast a mail-in ballot (excluding one exception, covered shortly). This includes providing the application to vote by mail, assessing applications, providing ballots, and offering voters the opportunity to cure defects in their applications or carrier envelopes.

Specifically, all applications for mail-in ballots must be submitted to the EVC. Tex. Elec. Code §§ 84.007–84.009. The EVC is required, upon request by a voter, to mail the voter a mail-in ballot application, and is responsible for reviewing applications, providing ballots to voters, and notifying voters of rejected applications and the reasons for rejection. *Id.* §§ 84.012, 86.001. She is also tasked with providing ballot envelopes and carrier envelopes to voters, mailing or otherwise delivering a new application to any voter whose submitted application does not fully comply with the requirements, and providing new mail-in ballots to voters if choices on the ballot change after the provision of the first mail-in ballot. *Id.* §§ 86.002, 86.008, 86.009. The EVC also is permitted to allow a mail-in ballot voter to cure defects in their carrier envelope prior to the mail-in ballot deadline, including by delivering the envelope in person or by mail, or by notifying the person by telephone and advising that they may come to the clerk's office to correct the defect. *Id.* § 86.011.

The EVC is also responsible for placing voters' carrier envelopes containing their mail-in ballots, as well as the voters' early voting ballot applications, into jacket envelopes, *id.* § 86.011 (b), and then delivering the jacket envelopes to either the Ballot Board, *id.* §§ 87.021–.024, or the Verification Committee, *id.* § 87.027(h). The Ballot Board is tasked with determining whether a mail-in ballot should be rejected due to a purported signature mismatch, Tex. Elec. Code §

17

87.0241, except when a Verification Committee is appointed, in which case the Verification Committee carries out that task, *id.* §§ 87.027(h)–(j). The appointment of a Verification Committee is up to the discretion of the EVC, except that a Verification Committee must be appointed if 15 or more registered voters submit a written request for a Verification Committee. *Id.* §§ 87.027(a), (a-1).[9] And, even though the Ballot Board or Verification Committee is responsible for comparing voters' signatures, the Election Code permits the EVC to challenge the Ballot Board's decision to accept or reject a ballot, at any time prior to the time set for convening the canvassing authority, by petitioning a district court for relief. *Id.* § 87.127.[10]

### ii.    *Duties Given to Other Authorities*

In comparison to the extensive list of duties above, the only main duties relating to the mail-in ballot process that the Election Code gives explicitly to a local authority other than the EVC are (1) the Ballot Board's or Verification Committee's duty to compare signatures, Tex. Elec. Code §§ 87.0241, 87.027(h)–(j); (2) the presiding judge of the Ballot Board's authority to request the EVC deliver the jacket envelopes containing the mail-in ballot materials to the Ballot Board at certain times, *id.* §§ 87.022–.024, or to set the time the Verification Committee delivers the mail-in ballots to the Ballot Board after the Verification Committee has completed the signature

---

[9] Though the EVC does not appoint the members to the Verification Committee, it does determine "the number of members who are to compose the [Verification Committee]," as well as the "place, day or days, and hours of operation of the [Verification Committee]," which can be as far in advance as "the 20th day before election day." Tex. Elec. Code §§ 87.027(d), (f). During operating hours, the Verification Committee carries out the signature comparison procedure and separates the accepted from the rejected ballots before delivering sorted materials to the Ballot Board at a time designated by the Ballot Board's presiding judge. *Id.* § 87.027(i). Importantly, the Ballot Board is not permitted to reverse the Verification Committee's decision that a ballot should be accepted on the basis of a signature match, but may overrule the Verification Committee's decision that a ballot should be rejected on the basis of a signature mismatch. *Id.* § 87.027(j).

[10] This power is granted only to "county election officer[s]" as defined under Section 31.091(1) of the Election Code, Tex. Elec. Code 87.127(a), which defines the term to mean "the county elections administrator in counties having that position, the county tax assessor-collector in counties in which the county clerk's election duties and functions have been transferred to the tax assessor-collector, and the county clerk in other counties."

comparison procedure, *id.* § 87.027(i); and (3) the presiding judge of the Ballot Board's duty to send notice to a voter that their ballot has been rejected, which can occur up to 10 days after the election, *id.* § 87.0431.

### iii. The Local Defendants are Proper Parties

In sum, there is nothing in the Election Code limiting the EVC's general power and authority over the early voting process that would prevent the EVC from providing *pre*-rejection notice to a voter before the voter's mail-in ballot is actually rejected. The EVC is responsible for most aspects of the mail-in ballot process at issue other than the comparison of signatures itself, including before, during, and after the signature comparison procedure.

More specifically, before the deadline to submit mail-in ballots, the EVC is explicitly tasked with all manner of communications with mail-in voters, including the provision of notice and an opportunity to cure to voters with defects in their mail-in ballot applications and carrier envelopes—a process similar to the pre-rejection notice and opportunity to cure that Plaintiffs seek to make mandatory for all mail-in ballot voters whose ballots are questioned for signature mismatch. *See* Tex. Elec. Code § 86.011. The EVC continues these duties throughout the time for early voting, including during any time the Ballot Board or Verification Committee meets, and is responsible for delivering the jacket envelopes containing the mail-in ballots to those entities, thereby enabling them to carry out the signature comparison process. *Id.* §§ 87.021–87.024, 87.027(h). Even after the signature comparison is completed, the EVC may challenge the Ballot Board or Verification Committee's decision in district court. *Id.* §§ 87.127(a); 31.091(1). Furthermore, while the Ballot Board or Verification Committee are responsible for the signature comparison itself, there is no limitation on the EVC's broad authority over the early voting process that would prevent the EVC from enacting uniform policies and procedures for a Ballot Board or Verification Committee to follow. *See id.* § 83.001. Courts have found this sort of authority

19

sufficient to render local defendants liable for the application of unconstitutional state laws governing mail-in ballot processes. *See, e.g.*, *Zessar v. Helander*, 2006 WL 642646 (N.D. Ill. March 13, 2006) (finding county clerk who was responsible for most aspects of the mail-in ballot process, except matching signatures, liable for violating Fourteenth Amendment by failing to provide pre-deprivation notice and hearing to mail-in ballot voters).

Thus, like Defendant SOS, Defendants Brazos County EA and McAllen City Secretary—as the EVCs for elections in their respective political subdivisions—have power under the Election Code to control the mail-in ballot process in a way that would afford Plaintiffs procedural due process, equal protection of the laws, accommodate their disabilities, and prevent their arbitrary disenfranchisement. The local Defendants' failure to take these actions as well as their authority over the mail-in ballot process render Plaintiffs' injuries "fairly traceable" to their conduct, and an injunction ordering all Defendants, including local Defendants, to exercise these powers would redress Plaintiffs' injuries. Plaintiffs therefore have standing with respect to their claims against the local Defendants. For the same reasons, even if there is some concept of "authority to provide relief" that does not overlap with the concept of redressability—the latter of which Defendant McAllen City Secretary did not mention in her motion to dismiss under Rule 12(b)(6)—she is a proper defendant because she does have that authority under the Election Code.[11]

---

[11] Defendant Brazos County EA additionally and repeatedly argues that she cannot provide the relief requested because she cannot "inject [her] own opinion into whether a mail-in ballot is valid or not" and "cannot provide a remedy without violating Texas law by superseding the judgment of the [Ballot Board]." Brazos MTD 4–5. As already discussed, however, the EVC can in fact interject her opinion into the process by seeking judicial review of the Ballot Board's decision. Tex. Elec. Code § 87.127. Furthermore, none of the relief Plaintiffs have requested requires the EVC to supersede any judgment of the Ballot Board, notwithstanding the fact that the EVC is empowered to seek judicial review of the Ballot Board's signature comparison decisions.

**C.** **Plaintiffs Properly Allege the Local Defendants' Involvement With Respect to Each Claim Stated in Plaintiffs' Complaint**

In addition to claiming they do not have the authority to provide relief, both Defendants Brazos County EA and McAllen City Secretary make some variation of the argument that Plaintiffs failed to specifically state the local Defendants' names in each count of the complaint, although Defendant McAllen City Secretary appears to limit that alleged defect to the argument that she has no authority to provide relief. *See, e.g.*, McAllen MTD 4 (characterizing the only allegations against Defendant McAllen City Secretary as those contained in paragraphs 56 and 78); Brazos MTD 6 (asserting that Plaintiffs did not "even reference[]" Defendant Brazos County EA in stating their procedural due process claim). Plaintiffs used the term "Defendants" in their complaint to refer to the three Defendants in this case: SOS, Brazos County EA, and McAllen City Secretary.[12] Furthermore, the thrust of Plaintiffs' Complaint is that all Defendants are responsible for the harms alleged therein. Accordingly, the Court should find that Plaintiffs adequately alleged the requisite connection between the local Defendants and all four counts in Plaintiffs' Complaint.

---

[12] In three of their four counts Plaintiffs specifically reference the actions of "Defendants" as the basis for their claims. *See* Compl. ¶¶ 52–61 (procedural due process claims), ¶¶ 62–70 (portion of equal protection claims), ¶¶ 75–83 (ADA claim, using term "Defendants" and also specifically naming each Defendant). As Defendant Brazos County EA points out, Count Three does not specifically reference Defendant Brazos County EA or "Defendants," but instead mentions by name that "Texas has not promulgated" standards for signature matching. *Id.* ¶¶ 71–74. However, a complaint should be "read as a whole." *Gulf Coast Hotel-Motel Ass'n v. Mississippi Gulf Coast Golf Course Ass'n*, 658 F.3d 500, 506 (5th Cir. 2011). Count three itself, which is linked to the other equal protection claims in count two, notes that both "[s]tate and local governments" have an obligation to prevent the disparate treatment of their electorates, and that standards that vary "even within a single county" are suspect. Compl. ¶ 71 (emphasis added) (citing *Bush v. Gore*, 531 U.S. 98, 105–06 (2000)). Plaintiffs also alleged that they are suing Defendant Brazos County EA "for the manner in which she implements the policies, customs, or practices at issue in this action." Compl. ¶ 33. Read as a whole, it is apparent that Plaintiffs intended to name Defendant Brazos County EA as a defendant for purposes of their equal protection claims in Count Three, and that the complaint should be read that way.

**D.      Injunctive Relief is Not Redundant and It is Irrelevant That Plaintiffs Did Not Bring Claims Against Every Possible Defendant in the State of Texas**

Lastly, Defendant Brazos County EA asserts that "[w]hile the Court may determine whether Texas law is constitutional, it may not enjoin 254 counties (only one of whom is a party to this suit)." Brazos EA MTD 7. According to her, "[i]t is redundant to ask the Court to declare a law unconstitutional and then ask the Court to enjoin anyone from following an unconstitutional law" because, "[s]hould the Plaintiffs prevail against the State, there is no need to enjoin anyone because the law is invalid." *Id*. She additionally states that "Plaintiffs only ask the Court to enjoin . . . counties" and not the thousands of "cities," "towns," "school districts," "water districts," "utility districts," or "other political subdivisions in the State of Texas who hold elections." *Id*. As a result, a county-specific injunction "would not resolve [Plaintiffs'] complaint nor grant them relief." *Id.* Defendant Brazos County EA does not cite any authority for these arguments.

First, when a federal court rules a state law unconstitutional or preempted by federal law, that ruling does not erase the state statute from the books. The ruling has no direct coercive effect on the defendants absent an injunction prohibiting them from enforcing the law. *See generally* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 935–37 (2018). It may be that the order redounds to the benefit of those not parties to the litigation, that the ruling has preclusive effect in future lawsuits, or that it deters others from attempting to enforce the law, but it does not of itself erase the law such that, as Defendant Brazos County EA argues, it is "redundant" to ask the Court to enjoin a party from enforcing a law that the Court has declared unconstitutional. Brazos MTD 7. Second, Defendant Brazos County EA incorrectly states that Plaintiffs request to only enjoin counties. However, Plaintiffs also request to enjoin "all other political subdivisions administering elections," which would include the entities Defendant Brazos County EA listed in her Motion. Compl. 24 ¶ 2; Brazos EA MTD 7.

22

Third, Defendant Brazos County EA argues that this Court cannot enjoin parties not before it. But "[a] Rule 12(b)(6) motion . . . cannot challenge the demand for relief, since that motion tests the legal sufficiency of allegations." *Alevsky v. GC Services Limited Partnership*, 2014 WL 1711682 at *1 (E.D.N.Y. Apr. 30, 2014). Thus, "the selection of an improper remedy in the Rule 8(a)(3) demand for relief will not be fatal to the party's pleading if the statement of the claim indicates the pleader may be entitled to relief of some other type" and the court is not "limited by the demand for judgment if a deviation seems appropriate at any point after the interposition of the pleading." 5C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 1255 (3d ed., Supp. 2019) (collecting cases); Compl. 25 ¶ 5. Plaintiffs have standing against Defendant Brazos County EA for each of their claims, and she is a proper defendant irrespective of the propriety of Plaintiffs' requested relief with respect to other parties not before the Court.

II. **Plaintiffs State Valid Claims Under Rule 12(b)(6) for Violations of Procedural Due Process, Equal Protection, the ADA, and the RA**

Plaintiffs have articulated sufficient facts to "state a claim to relief that is plausible on its face," and the Court should reject Defendant SOS's motion to dismiss Plaintiffs' claims under Rule 12(b)(6).[13] *See Twombly*, 550 U.S. at 570.

A. **State Election Laws are Reviewed for Procedural Due Process Violations Under the *Mathews* Test, Not the *Anderson-Burdick* Test**

Defendant SOS argues that the state's signature matching laws are reviewed for procedural due process violations under the *Anderson-Burdick* test. This is incorrect. The *Anderson-Burdick* test is used to evaluate equal protection claims, as discussed further in Section II, B—not

---

[13] Defendant SOS is the only party that contests the substantive claims brought by Plaintiffs in the Complaint. SOS MTD 12-20, Brazos MTD, McAllen MTD.

23

procedural due process claims.[14] The proper standard of review for allegations of procedural due process violations under these facts, as employed by multiple district courts in their review of mail-in ballot signature matching laws, is the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *See, e.g.*, *Saucedo v. Gardner,* 335 F. Supp. 3d 202, 214 (D. N.H. 2018) (granting plaintiffs' request for summary judgment and permanent injunctive relief as to their procedural due process challenge against a New Hampshire mail-in ballot signature matching law); *Martin*, 341 F. Supp. 3d at 1338, *appeal dismissed*, sub nom. *Martin v. Sec'y of State of Georgia*, 2018 WL 7139247 (11th Cir. Dec. 11, 2018) (granting plaintiffs' request for injunctive relief against a Georgia mail-in ballot signature matching law pursuant to procedural due process requirements); *Zessar*, 2006 WL 642646 at *7 (employing the *Mathews* test to strike down a mail-in ballot signature matching law on due process grounds); *see also Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1267 (11th Cir. 2019). It is telling that Defendant SOS cites none of these cases in her Motion to Dismiss, even though they are in line with the present facts.

The only cases from controlling jurisdictions cited by Defendant SOS in support for using *Anderson-Burdick* to analyze Plaintiffs' procedural due process claims are distinguishable: none discuss procedural due process. *See Tex. Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996) (regarding requirements for nominating petitions); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 199 (2008) (regarding voter ID requirements); *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 233 (1989) (regarding primary endorsement laws); *Purcell v. Gonzalez*, 549 U.S. 1, 2 (2006) (regarding proof of citizenship laws); *Veasey v. Abbott*, 830 F.3d 216, 225 (5th Cir. 2016) (regarding voter identification laws). Plaintiffs are not aware of any court opinions in

---

[14] Although improper, even applying the *Anderson-Burdick* test to the procedural due process claim would favor Plaintiffs. *See* Sections II, A & B.

controlling jurisdictions concerning procedural due process claims brought against mail-in ballot signature matching laws. Given that Plaintiffs expressly pleaded a due process violation separate from and in addition to an equal protection violation under *Anderson-Burdick*, Compl. ¶¶ 52–74, the lack of relevant authority in controlling jurisdictions, and the use of the *Mathews* test by multiple district courts facing similar procedural due process challenges to mail-in ballot signature matching laws, the *Mathews* balancing test is the proper standard for analyzing Plaintiffs' procedural due process claim.

      1.      <u>Plaintiffs Satisfy the *Mathews* Test for Their Procedural Due Process Claim</u>

In determining whether a state-created process is adequate under procedural due process, the Supreme Court in *Mathews v. Eldridge* instructed courts to balance the following considerations:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. at 335. The *Mathews* court further "implored courts to recognize that procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." *Martin*, 341 F. Supp. 3d at 1338 (quoting *Mathews*, 424 U.S. at 344) (internal quotation marks omitted). As detailed below, consideration of the three *Mathews* factors points clearly in Plaintiffs' favor.

      i.      *The Private Interest Affected by Official Action is the Right to Vote*

The private interest at issue here is nothing less than the fundamental right to vote. *See e.g. Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 667 (1966) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561–562 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a

free and democratic society.")). Other courts striking down mail-in ballot signature comparison laws on procedural due process grounds have accorded this factor significant weight. *See, e.g.*, *Martin*, 341 F. Supp. 3d at 1338 ("Here, the Court agrees with Plaintiffs that the private interest at issue implicates the individual's fundamental right to vote and is therefore entitled to substantial weight."); *Saucedo*, 335 F. Supp.3d at 217 ("Plaintiffs argue that the individual interest at issue is the fundamental right to vote . . . The court accords this factor significant weight."). As the Texas provisions at issue result in the deprivation of the fundamental right to vote, consideration of private interests weighs heavily in Plaintiffs' favor.

ii.   *The Risk of Erroneous Deprivation is Great, as is the Probable Value of Procedural Remedies*

The risk of erroneous deprivation under the current Texas scheme is great. As noted in Paragraph 1 of the Complaint, Texas counties rejected at least 1,873 mail-in ballots during the 2018 General Election and at least 1,567 mail-in ballots during the 2016 General Election solely on the basis of mismatching signatures. Even one wrongly discarded ballot implicates the loss of the fundamental right to vote.[15]

Moreover, the current Texas process is fraught with error. The task of handwriting analysis—from which an unappealable decision without the opportunity to cure is made to disenfranchise a voter—is performed by laypersons, with no expert training or uniform standards. For example, when Plaintiff Dr. Richardson confronted Brazos County officials about his rejected

---

[15] It is worth noting the oft-quoted refrain: "Every vote counts." This is not civic hyperbole—in 2017, control of the Virginia legislature briefly appeared to switch parties due to a race decided by one vote, before a three-judge panel ruled out a questionable ballot, resulting in a tie. Per state rules, that tie was resolved by a coin flip. *See* Philip Bump, *That coin-toss election in Virginia? Dramatic. But it pales in comparison to other historic contests*. WA. POST, Dec. 22, 2017, https://www.washingtonpost.com/news/politics/wp/2017/12/22/that-coin-toss-election-in-virginia-dramatic-but-it-pales-in-comparison-to-other-historic-contests/ (further noting a 2010 state House race in Massachusetts resulting in a tie after a recount of 13,174 ballots, and a 1974 federal race in New Hampshire decided by two votes out of more than 223,000).

ballot, he was told they "eye-balled" his signature. Compl. ¶ 10. Given the lay status of signature reviewers, combined with a system devoid of expert training or functional standards, there is substantial risk to Plaintiffs' fundamental right to vote. As the court noted in *Saucedo*, "[i]t cannot be emphasized enough that the consequence of a moderator's decision—disenfranchisement—is irremediable." *Saucedo*, 335 F.Supp.3d at 218 (citing *Zessar*, 2006 WL 642646 at *9).

Thankfully, the probable value of procedural remedies is high. Implementing procedures allowing voters sufficient opportunity to cure alleged signature mismatches will allow voters to preserve their fundamental right to vote. Given that potentially thousands of voters will attempt to vote by mail-in ballot in coming elections, the positive impact of such change is significant.

      a.      No Sufficient Remedies Currently Exist

Moreover, despite Defendant SOS's suggestions to the contrary, sufficient remedial procedures do not currently exist to mitigate the burden on mail-in ballot voters. The decision to discard a mail-in ballot is not subject to appeal by the voter. Defendant SOS argues that Plaintiffs wrongly failed to pursue remedial processes available to them, but that is incorrect. Defendant SOS describes how, "if it is determined that the ballot was rejected in error, *the county election officer may* petition a district court for injunctive or other relief[.]" SOS MTD 15 (citing Tex. Elec. Code §§ 87.127(a), 31.091(1)) (emphasis added) (internal quotation marks omitted). The plain language of the statute makes clear the insufficiency of this alleged "remedy"—it belongs to the county official, not the voter. Additionally, the term "county election officer" is defined to include only county election administrators (if one exists), county clerks, or, in some circumstances, county tax-assessor collectors. *See supra* n.10; Tex. Elec. Code §§ 87.127(a), 31.091(1). Thus, a limited number of county officials *may* challenge a ballot's rejection, but a voter has no ability to force the official to petition a district court. That decision is left to the official's discretion. Nor do Defendants cite any controlling authority for the proposition that a county officials' discretionary

ability to seek judicial relief somehow creates a process sufficient to cure the deprivation of Plaintiffs' fundamental right to vote.[16]

The system's inadequacy is clear from the fact that Plaintiff Dr. Richardson did notify an election official of Brazos County's error, and the office declined to pursue any relief. Compl. ¶ 10. Moreover, notice of a rejected ballot is hardly "prompt," as it can take up to 10 days after an election for a voter to be notified that their ballot was rejected.[17] SOS MTD 15; Tex. Elec. Code § 87.0431. And the "alternative options" for casting ballots—for example, voting in person—are practically unavailable to almost all mail-in ballot voters and insufficient to outweigh the procedural flaws inherent to the system.

Defendant SOS's suggestion that Plaintiffs fail to cite any support for a constitutional right to notice in this situation similarly misses the point. Notice can be a critical component of ensuring proper procedural due process. SOS MTD 14; *See, e.g.*, *Cleveland Bd. of Educ.*, 470 U.S. at 546 ("The essential requirements of due process . . . are notice and an opportunity to respond. The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement."). To assess the validity of a state's failure to

---

[16] The cases Defendant SOS does cite are unavailing. From *Santana v. City of Tulsa*, Defendant SOS omits the immediately preceding sentence that works strongly in Plaintiffs' favor—that "the [government's] requirements are reasonable and give the aggrieved party adequate notice and an opportunity to meaningfully participate." *Santana v. City of Tulsa*, 359 F.3d 1241, 1244 (10th Cir. 2004) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)); SOS MTD 17. Texas law permits no such notice or opportunity. In *Duboc v. Twp. of Green Oak*, the procedure at issue provided owners actual notice of an impending determination and multiple opportunities to be heard, in contrast to the complete lack of notice of a mail-in ballot determination until up to 10 days after an election and the complete lack of an opportunity to cure for Texas mail-in ballot voters. *See* 406 F. App'x 983, 987 (6th Cir. 2011). Finally, *Herrell v. Benson* involved a disciplinary policy that "provided Herrell with the opportunity to challenge all of the factual allegations against him and, more to the point, afforded him the opportunity to attend the sanctions hearing and to appeal any sanction rendered"—again, a wholly different process and set of remedies than is made available to disenfranchised Texas mail-in ballot voters. 261 F.Supp.3d 772, 779–80 (E.D. Ky. 2017).

[17] This "notice" also cannot "guard against repeat occurrences" by allowing a voter to update their signature on file, as Defendant SOS alleges, because an updated signature on file will still be reviewed under the same flawed signature comparison procedure. SOS MTD at 15.

provide notice, a court will balance the considerations outlined in *Mathews v. Eldridge*. *Zessar*, 2006 WL 642646 at *9 (holding that procedural due process requires a pre-deprivation notice and hearing for mail-in ballot voters after applying *Mathews v. Eldridge* test).[18]

Defendant SOS also states that Plaintiffs face only "the nominal effort of legibly signing a ballot[,]" and that the laws in question are "minimally burdensome," and, further, that Plaintiffs had sufficient notice, from Section 87.041(b)(2) of the Election Code, that "signatures must match." SOS MTD 14–16. These arguments are contrary to reality. Section 87.041(b)(2) of the Election Code does not state that signatures must match; it only states that neither of the signatures presented can be "executed by a person other than the voter." Moreover, because of the flawed signature comparison procedure, voters have no reasonable grounds on which to assess whether their signature will in fact be accepted, regardless of whether voters know about the signature comparison procedure. Next, for many voters, particularly the elderly or disabled, "legibly" signing a ballot is not a "nominal effort" or a "minimal burden"—signing may in fact be a significant effort. Furthermore, the burden voters face arises mainly from disenfranchisement or the increased risk of disenfranchisement, both of which can be avoided if due process safeguards are in place. Additionally, the existence of Ballot Boards as an added layer of review when Verification Committees are appointed is similarly ineffective, as Plaintiffs still fail to receive timely notice or an opportunity to cure.

Defendant SOS's reference to the use of witness signatures is similarly insufficient. A witness can only sign for a mail-in ballot voter "if the person required to sign cannot do so because of a physical disability or illiteracy." Tex. Elec. Code § 1.011(a). Many voters, including voters

---

[18] Defendant SOS's suggestion that Plaintiffs somehow erred by not "contacting the Secretary's office with their concerns prior to filing this lawsuit" is similarly immaterial, as Defendant SOS cites no requirement that Plaintiff pursue such a course of action before seeking a judicial remedy.  SOS MTD at 17.

eligible for a mail-in ballot due to a disability, would not be eligible to use a witness under Section 1.011(a) of the Election Code. For those disabled voters who are eligible to use a witness, many simply do not, or may not, have access to a person who can serve as a witness, such as those voters living alone. Moreover, the Election Code permits a person to only serve as a witness one time for mail-in ballot applications, making it difficult to facilitate efficient use of witnesses.[19] *Id.* § 84.004. For example, if a nursing home attendant serves as a witness for a single resident's mail-in ballot application, that attendant can no longer serve as a witness to any other nursing home residents who need to submit mail-in ballot applications.

                *iii.*     *Threat to Government Interests and Cost of Remedial Procedures are Low*

The final *Mathews* factor weighs the government interests at issue, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. Again, consideration of this factor does not weigh in favor of Defendants—the government's interests would actually be enhanced by Plaintiffs' requested improvements to the mail-in ballot process.

Defendant SOS's Motion to Dismiss notes three government interests: "fraud prevention and detection; orderly and efficient administration of elections; and safeguarding public confidence in the integrity of Texas elections." SOS MTD 14; *see infra* n. 25. The relief Plaintiffs request would, in actuality, advance the State's interest in preventing voter fraud and enhancing

---

    [19] Defendant SOS also cites Section 102.001 of the Texas Election Code, which allows a voter to submit a late ballot through a representative, as a remedy for disabled voters whose disability "originates on or after the day before the last day for submitting an application for a ballot by mail." SOS MTD 15. However, the process under Chapter 102 is afforded only to a tiny minority of Texas' disability community, since, to be eligible, the voter's disability must originate at most the day before the deadline to submit an application for a mail-in ballot. Tex. Elec. Code § 102.001(a). Additionally, the representative who submits a late ballot for a voter cannot serve as a representative for another voter eligible for a late ballot. *Id.* §§ 102.003(c)(3), 102.004, 102.006. As a result, the late ballot process suffers from the same type of insufficiency as the process for mail-in ballots eligible to be signed by a witness.

the efficiency of elections by adding processes to confirm that signatures were signed by the correct voter. In the same way, adding protective measures to the mail-in ballot process can only serve to enhance public confidence in the integrity of Texas elections, by ensuring lawful votes are properly counted.[20] *See, e.g.*, *Saucedo*, 335 F.Supp.3d at 220–21 ("Likewise, improving the currently opaque, unreviewable process by which moderators compare signatures and consider extrinsic evidence would only serve to enhance voter confidence in elections.").

Defendant SOS leans heavily on *Lemons v. Bradbury*, in which the Ninth Circuit rejected due process and equal protection challenges to Oregon's signature-matching procedures for verifying citizens' signatures on petitions referring legislative acts to the ballot for a popular vote. 538 F.3d 1098 (9th Cir. 2008). But *Lemons* is readily distinguishable. First, the Ninth Circuit recognized that "fraudulent signatures are less likely in vote-by-mail elections," whereas the signatures in "initiative and referenda . . . are often gathered by privately hired signature gatherers who are paid a fixed amount for each signature they obtain." *Id.* at 1104. This distinction between referendum petitions and vote-by-mail ballots was key to the court's decision that "Oregon's important interests" justified the state's burden on the right to vote. *Id.* Second, every county in Oregon "had a system for reviewing initially rejected signatures" and "[a]ll counties provide[d] that higher county elections authorities [would] review all signatures that [were] initially rejected." *Id.* at 1102, 1104. Third, "[c]hief petitioners[21] and members of the public observe[d] the [signature-comparison] process and [could] object to signature verification decisions." *Id.* at 1104. It was

---

[20] Additionally, at least one district court has found limited instances of voter fraud insufficient to balance against the overwhelming number of persons wrongfully disenfranchised by a flawed mail-in ballot scheme. *See Saucedo*, 335 F.Supp.3d at 220 ("[I]n comparison to the two instances of absentee-voter fraud that defendants cite as support, . . . hundreds of voters . . . were disenfranchised[.]").

[21] "Under Oregon law, a petition for a ballot measure must designate one to three 'chief petitioners,' who are the main sponsors of the measure." *Prete v. Bradbury*, 438 F.3d 949, 952 n.2 (9th Cir. 2006) (citing Or. Rev. St. § 250.045(3), now Or. Rev. St. § 250.045(6)).

only in these circumstances that the Ninth Circuit found "[t]he value of additional procedural safeguards" to be "negligible." *See id.* at 1105.

None of the above considerations apply to this case. The signatures at issue in Plaintiffs' case determine the validity of a mail-in ballot, not support for a referendum petition. Defendants do not systemically review every initially-rejected ballot for errors. And there is no public observation of, or opportunity to object to, signature comparison decisions. As the District of New Hampshire explained in *Saucedo*, the procedures detailed in *Lemons* are a "far cry" from procedures of the kind at issue here and in that case, *i.e.*, where a panel of laypersons makes unappealable, *ad hoc* determinations on the validity of actual ballots. *See Saucedo*, 335 F.Supp.3d at 218 ("[T]otal reliance on untrained laypersons entails tangible risks" and is "a far cry from the procedure upheld in *Lemons*, where the public could object to determinations and there were multiple layers of review.").

As a last resort, Defendant SOS retreats to the argument that Plaintiffs' requested remedies are too burdensome. This again fails. Since Texas already allows curative schemes for other voters who face issues while attempting to vote, the cost of remedial procedures would likely be low. For example, the State allows in-person voters who forget to bring required identification on Election Day to submit a provisional ballot and then provide required identification to the county registrar within six days after the election. Tex. Elec. Code § 65.0541(a). Once the county registrar confirms the required identification, the county will accept the voter's provisional ballot.[22] *Id*.

Plaintiffs' requested relief also is similar to the relief requested and granted in other signature matching cases decided against the state. *See e.g. Martin*, 341 F.Supp.3d at 1329.

---

[22] The burden will also remain low on individual counties because, even though thousands of voters are rejected statewide in each election, each county individually only rejects a relatively small portion of mail-in ballots.

Plaintiffs' requested relief will therefore not be burdensome to Defendant SOS, or in any event, will not be so burdensome as to weigh the *Mathews* balancing test in Defendant SOS's favor.

### B.  Plaintiffs Adequately State a Violation of the Equal Protection Clause

1.  The *Anderson-Burdick* Test Applies to Equal Protection Claims

When assessing an Equal Protection Clause challenge to a state restriction on the right to vote, courts scrutinize the restriction using a standard established in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992). Under the *Anderson-Burdick* test, a court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788-89).

As already discussed, Defendant SOS incorrectly applied the *Anderson-Burdick* test to Plaintiffs' procedural due process claims. Defendant SOS again confuses the issues here by conflating Plaintiffs' *Anderson-Burdick* equal protection claim with a traditional equal protection claim, which would require a "similarly situated" analysis. This is incorrect, and Defendant SOS can point to no case suggesting that anything but a straightforward application of the *Anderson-Burdick* test set out above applies to Plaintiffs' equal protection claims.[23]

"[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). "The Equal Protection Clause applies when the state either classifies voters in

---

[23] Plaintiffs allege that Defendants treat mail-in ballot voters differently than in-person voters; voters with disabilities who, due to their disability, cannot make their signatures match differently than other mail-in ballot voters; and mail-in ballot voters differently depending on their county or city of residence and/or the individuals reviewing their ballots. Compl. ¶¶ 67—68, 71—74. Additionally Plaintiffs allege all mail-in ballot voters suffer from Defendants' arbitrary restriction. Compl. ¶ 69. These allegations, along with the other equal protection allegations in the Complaint, sufficiently support an equal protection claim. Compl. ¶ 62-74.

disparate ways" or "places restrictions on the right to vote." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (citations omitted). Thus, as Justice Scalia explained in *Crawford v. Marion County Election Board*, "[t]o evaluate a law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process—we use the approach set out in *Burdick*." 553 U.S. 181, 204 (2008) (Scalia, J., concurring). Likewise, in *Kucinich v. Texas Democratic Party*, 563 F.3d 161 (5th Cir. 2009), the Fifth Circuit noted that *Anderson* and *Burdick* "balance the individual's rights against state imposed requirements." *Id*. at 168 n.6. This Court has previously applied a straightforward *Anderson-Burdick* analysis to an equal protection challenge to a Texas restriction on voter registration, despite Defendant SOS making the same "similarly situated" argument she makes here. *Stringer v. Pablos*, 274 F.Supp.3d 588, 601, 168 n.9 (W.D. Tex. 2017) (Garcia, J.) (citing *Kucinich*, 563 F.3d at 168 n.6; *Obama for Am.*, 697 F.3d at 429).

In addition, Defendant SOS ignores caselaw finding equal protection violations under similar facts to those Plaintiffs allege. *See Fla. Democratic Party v. Detzner*, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016); *Democratic Exec. Comm. of Fla. v. Detzner,* 347 F.Supp.3d 1017 (N.D. Fla. 2018); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019).[24] For the foregoing reasons, Plaintiffs need not meet any "similarly situated" requirement to state their equal protection claim under *Anderson-Burdick*.

---

[24] Defendant SOS' reliance on the Tenth Circuit's statement in *ACLU of New Mexico v. Santillanes*—that voting by mail "is a fundamentally different process from in-person voting, and is governed by procedures entirely distinct from in-person voting procedures"—is misplaced. SOS MTD 18 (quoting 546 F.3d 1313, 1320 (10th Cir. 2008)). *Santillanes* involved a challenge to a city law that required in-person voters to provide photo identification, but not absentee voters. 546 F.3d at 1316. The plaintiffs argued that the law discriminated between absentee and non-absentee voters without justification, particularly because absentee voters could theoretically present their ballots in-person, thereby avoiding the photo identification requirement. *Id.* at 1320–21. The Tenth Circuit rejected plaintiffs' argument not by applying a "similarly situated" analysis, but by applying the *Anderson-Burdick* test and holding that a justification existed for that specific difference in treatment between absentee and in-person voters. *Id*. In Plaintiffs' case, the burden voters have faced and continue to face is far greater than the one analyzed in *Santillanes*, and Defendants have no justification for not providing pre-rejection notice and an opportunity to cure.

2.    Plaintiffs Properly Allege a Severe Burden

Under the *Anderson-Burdick* test, if the burden placed on voters by a law or regulation is "severe," Defendant SOS must provide a justification for the burden that passes "strict" or significant scrutiny. *Fla. Democratic Party*, 2016 WL 6090943 at *7. The lack of an opportunity to cure mail-in ballot rejections, which disenfranchises thousands of voters every general election, is a "severe" and "serious burden on the right to vote." *Id*. at *6 & n.11 (citing *Ne. Ohio Coal. For the Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012)); *Lee*, 915 F.3d at 1321; *Democratic Exec. Comm. of Fla. v. Detzner*, 347 F.Supp.3d at 1030 ("Disenfranchisement of approximately 5,000 voters based on signature mismatch is a substantial burden."); *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) (noting that it is a "basic truth that even one disenfranchised voter—let alone several thousand—is too many"). This type of burden "can be constitutional only if justified by legitimate state interests of sufficient weight." *Lee*, 915 F.3d at 1321.

In her Motion to Dismiss, Defendant SOS cites to *Crawford v. Marion County Election Board* and incorrectly claims the burdens Plaintiffs face "are no weightier than those for in-person voters, who must travel to a designated polling place on Election Day, often necessitating taking time off work, arranging childcare, and waiting in line." SOS MTD 15 (citing 553 U.S. at 198). Defendant SOS grossly misunderstands Plaintiffs' alleged burden, which is the systemic disenfranchisement of voters without the safeguards of pre-rejection notice or an opportunity to cure. As a result, the burden discussed in *Crawford*, which involves having to make a trip to the Bureau of Motor Vehicles, gathering required documents, and posing for a photograph, is much lower than the severe burden of disenfranchisement or the threat of disenfranchisement that mail-in ballot voters face. 553 U.S. at 185.

Without citing caselaw that discusses the burden of disenfranchisement, Defendant SOS claims the burden in Plaintiffs' case is minimal because "[m]ail-in voters receive notice that their signatures are required and must match or be signed by a witness." SOS MTD 14 (citing Tex. Elec. Code § 87.041(b)(2)). First, as explained in Section II, A of this Response, Defendant SOS's interpretation of Section 87.041(b)(2) of the Election Code is incorrect. As also explained above, the witness signature requirement for mail-in ballot applications and the representative signature requirement for late ballots are not afforded to disabled voters who can write their signature, but rather only to people who are *unable* to write their signature. *See supra* II, A. Plaintiffs' Procedural Due Process argument above additionally explains why the mail-in ballot process fails to provide any legitimate review that would resolve Plaintiffs' burden. *See id.*

### 3.   Defendant SOS Provides No Sufficient Justification for the Severe Burden Imposed by the Current Mail-in Ballot Process

The *Anderson-Burdick* test next requires weighing the injury described above against the interests put forward by Defendant SOS as justification. She claims the current mail-in ballot process, including its signature comparison procedure, is justified by the State's interests in fraud prevention and detection, orderly and efficient administration of elections, and safeguarding public confidence in the integrity of Texas elections.[25] SOS MTD 14, 16–17.

These interests are insufficient, as demonstrated by the relevant caselaw analyzing mail-in ballot processes. For example, the Eleventh Circuit in *Lee* held that preventing voter fraud in the mail-in ballot process was not a sufficient justification to outweigh the severe burden of

---

[25] The court in *Martin* and the court in *Democratic Executive Committee of Fla. v. Detzner* both stated they do "not understand how assuring that all eligible voters are permitted to vote [by providing notice and an opportunity to cure] undermines the integrity of the election process." *Democratic Exec. Comm. of Fla. V. Detzner*, 347 F.Supp.3d at 1032–33 (quoting *Martin*, 341 F.Supp.3d at 1340). Furthermore, any such hardship is also "out-weighed by the risk of unconstitutionally depriving eligible voters of their right to vote and have that vote counted." *Democratic Exec. Comm. v. Detzner*, 347 F.Supp.3d at 1032–33.

disenfranchisement on the basis of a signature mismatch because the relief requested by the plaintiffs, like here, did not request a change to any mail-in ballot procedure used to investigate fraud, but rather only added a procedure to the existing process that allowed voters to cure their ballots. 915 F.3d at 1322 ("Defendants offer no satisfying explanation for why Florida cannot have both a robust signature-match protection and a way to allow every eligible voter-by mail and provisional voter whose ballot is mistakenly rejected an opportunity to verify their identity and have their votes count."). Moreover, "letting mismatched-signature voters cure their vote by proving their identity further prevents voter fraud—it allows supervisors of elections to confirm the identity of that voter before their vote is counted." *Fla. Democratic Party v. Detzner,* 2016 WL 6090943 at *7. Finally, to the extent Defendant SOS intended to rely upon her argument applying *Anderson-Burdick* to the procedural due process claim to also refute Plaintiffs' *Anderson-Burdick* equal protection claim, her citation to *Lemons* as supportive of her fraud argument has already been distinguished from Plaintiffs' case and analyzed in detail in Section II, A of this Response.

4.   Defendants Fail to Provide Uniform Guidelines or Principles

Texas' complete lack of uniform statewide (or even local) standards to implement its policy of rejecting ballots with mismatched signatures and the arbitrary rejection of these ballots is precisely the type of equal protection violation that the Supreme Court addressed in *Bush v. Gore,* which further strengthens the equal protection violation Plaintiffs claim under *Anderson-Burdick.* Although, as noted by Defendant SOS, the Supreme Court in *Bush* limited its decision to the circumstances of that case, other federal courts have continued to find its principles instructive for challenges to voting procedures. *See League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008); *Common Cause S. Christian Leadership Conference of Greater L.A. v. Jones,* 213 F. Supp. 2d 1106, 1108–10 (C.D. Cal. 2001); *Lee*, 915 F.3d at 1347. The Supreme Court in *Bush* held that Florida's overarching direction to election officials to consider the "intent of the

voter" was "unobjectionable as an abstract proposition and a starting principle." *Bush*, 531 U.S. at 106. Likewise, the instruction set forth in Election Code Sections 87.041 and 87.027(i) to "compare the signature on each carrier envelope certificate . . . with the signature of the voter's ballot application" (as well as to compare prior signatures of the voter) "to determine whether the signatures are those of the voter" is not disputed by Plaintiffs to be a reasonable starting point for determining the validity of a ballot. However, like the recount mechanisms at issue in *Bush*, the Texas procedure is problematic "in the absence of specific standards to ensure its equal application." *See* 531 U.S. at 106. As described in Plaintiffs' Complaint, because there are no established procedures to assist local election officials in evaluating signatures on mail-in ballots, an arbitrary system has been created in which committees of laypersons "eye-ball" signatures and evaluate them based on their own *ad hoc* standards. The guidance set forth in *Bush* instructs that such procedures are immediately suspect under *Anderson-Burdick* because "the standards for accepting or rejecting contested ballots might vary not only from county to county but [even] within a single county." *Id.*

Defendant SOS argues that the Texas law does set out a uniform standard: election officials compare a voter's ballot with his or her prior signatures made within the preceding six years and, if applicable, with the signature of the voter on the federal postcard application. Tex. Elec. Code § 87.027(i). In making this argument, however, Defendant confuses the *procedure* of "comparing two or more signatures of the voter" with a specific *standard* to ensure the equal application of such procedure, the lack of which rendered the recount mechanism at issue in *Bush* invalid in the view of the Supreme Court. The signature comparison procedure in the Election Code gives no guidance on making an evaluation, including what stylistic variations suggest that two signatures were made by different individuals, or what threshold number of variations is required to conclude

that the signature on the mail-in ballot carrier envelope, the mail-in ballot application, or previous documents is executed by a person other than the voter. Contrary to Defendant's claim, the mandate to simply "compare the signature" is, therefore, equally vague and prone to inconsistency as Florida's direction to look for the "intent of the voter."[26]

### C.    Plaintiff CTD Properly Alleges a Violation of the ADA and RA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To make out a claim of discrimination under Title II, a plaintiff must show

> (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671 (5th Cir. 2004). Title II of the ADA "impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 & n.11 (5th Cir. 2005). Defendant SOS argues that members of Plaintiff CTD, who, due to their disability, cannot make their signatures match and thereby risk disenfranchisement, were not in fact denied the benefits of a public service, program, or activity on the basis of their disability because the State

---

[26] Defendant SOS cites *Lemons* and argues that Texas' signature comparison procedure "stands in stark contrast to the amorphous 'clear indication of intent' standard invalidated in the limited *Bush v. Gore* decision." SOS MTD 19 (citing *Lemons*, 538 F.3d at 1104). However, the Ninth Circuit's analysis of *Bush* in *Lemons* is inapplicable here. Specific procedural safeguards existed in the process in *Lemons* that do not exist in Texas' signature comparison procedure, and the court in *Lemons* relied on these safeguards, in relevant part, to satisfy the rules informed by *Bush*. *See Lemons*, 538 F.3d at 1104-06; *see supra* II, A. Additionally, the Ninth Circuit pointed out that Oregon's referendum signature verification process had "sufficient guarantees of equal treatment," as required by *Bush*, in part because the Oregon Secretary of State provided signature verification training sessions, regularly attended by county election officials who use the materials provided at those sessions. *Id.* at 1106. Unlike *Lemons*, Texas provides no observation safeguards, higher-level review, or signature verification training sessions or materials, which would offer specific standards and guidelines to ensure a more equal application of signature comparison procedures.

allows such members to have their mail-in ballot signed by a witness, a reasonable accommodation in the Defendant SOS's view. The witness signature allowance is insufficient for two reasons.

First, as discussed earlier, the witness signature requirement is inadequate and impractical. *See supra* Sections II, A & B; *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (a reasonable accommodation is one which is "reasonable on its face, *i.e.*, ordinarily or in the run of cases"). Second, the witness requirement as the sole accommodation for those disabled voters who are eligible deprives them of the benefit of voting privately and independently, which is enjoyed by non-disabled voters. *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 506–7 (4th Cir. 2016).[27]

Defendants are therefore denying Plaintiff CTD's members both the benefit of casting their vote effectively through the mail-in ballot process as well as the benefit of casting their vote privately and independently. Mail-in voting can be made "meaningfully available" to disabled voters if Texas provided the opportunity to contest and cure a challenged mail-in ballot (or barred counties from rejecting mail-in ballots for signature mismatch, or any mail-in ballots submitted by persons with disabilities for signature mismatch).

## CONCLUSION

For all of these reasons, Plaintiffs respectfully request that this Court deny Defendant McAllen City Secretary's Motion to Dismiss, Doc 27, Defendant Brazos County EA's Motion to Dismiss, Doc. 29, and Defendant Texas SOS's Motion to Dismiss, Doc. 30, in full.

---

[27] *See supra* Section II, A & B. As the Fourth Circuit explained, "Maryland's absentee voting program [did] not provide disabled individuals with an 'opportunity to participate . . . equal to that afforded to others'" because the state's "absentee voting program [did] not allow disabled individuals . . . to mark their ballots without assistance," in comparison to non-disabled absentee voters who could. *Lamone*, 813 F.3d at 506 (quoting 28 C.F.R. § 35.130(b)(1)(ii)). This "sharp disparity" made it "obvious" that the absentee voting program violated the ADA by denying "meaningful access" to absentee voting. *Id*. at 506–07. It was irrelevant whether there was a standalone right to vote privately and independently without assistance, because once Maryland had provided such a benefit to non-disabled voters, it was not permitted to deny that same benefit to voters on the basis of their disability. *Id*. at 506. "The right to vote should not be contingent on the happenstance that others are available to help." *Id*. at 507 (quoting *Disabled in Action v. Board of Elections in City of New York*, 752 F.3d 198, 199–200 (2nd Cir. 2014)).

Dated: October 23, 2019

Respectfully submitted,

/s/   *Hani Mirza*

**TEXAS CIVIL RIGHTS PROJECT**

Mimi M.D. Marziani
Texas Bar No. 24091906
mimi@texascivilrightsproject.org
Rebecca Harrison Stevens
Texas Bar No. 24065381
beth@texascivilrightsproject.org
Hani Mirza
Texas Bar No. 24083512
hani@texascivilrightsproject.org
Ryan V. Cox
Texas Bar No. 24074087
ryan@texascivilrightsproject.org
Zachary D. Dolling
Texas Bar No. 24105809
zachary@texascivilrightsproject.org

1405 Montopolis Drive
Austin, Texas 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)

**WILLKIE FARR & GALLAGHER LLP**

Richard Mancino (NY Bar No. 1852797) (*pro hac vice*)
P. Maxwell Griffith (NY Bar No. 5323209) (*pro hac vice*)

787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: rmancino@willkie.com
        mgriffith@willkie.com

-AND-

Jennifer J. Hardy (TX Bar No. 24096068)
Denis A. Fallon (TX Bar No. 24059731)

41

Garrett Johnston (TX Bar No. 24087812)
Audra White (TX Bar No. 24098608)

600 Travis Street, Suite 2100
Houston, Texas 77002
Telephone: (713) 510-1700
Facsimile: (713) 510-1799
Email: jhardy2@willkie.com
      afallon@willkie.com
      gjohnston@willkie.com
      awhite@willkie.com

***COUNSEL FOR PLAINTIFFS***

## CERTIFICATE OF SERVICE

By my signature below, I certify that a true and correct copy of the foregoing has been served on all counsel of record on October 23, 2019 through the Electronic Case File System of the Western District of Texas.

/s/__Hani Mirza__

42