## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

**FILED**

DEC 2 3 2019

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | |
|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES, MOVE TEXAS CIVIC FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, and AMERICAN GI FORUM OF TEXAS, INC., §§§§§§§§§§§§ | |
| *Plaintiffs,* §§§ | |
| *v.* § | Civil No. SA-19-cv-00963-OLG |
| TEXAS SECRETARY OF STATE, TRUDY HANCOCK, in her official capacity as BRAZOS COUNTY ELECTIONS ADMINISTRATOR, and PERLA LARA, in her official capacity as CITY OF MCALLEN, TEXAS SECRETARY, §§§§§§§§ | |
| *Defendants.* § | |

## ORDER

On this date, the Court considered Defendants' motions to dismiss (docket nos. 27, 29 & 30). Having considered the pending motions and the parties' briefing, the Court concludes that the motions should be DENIED.

## BACKGROUND

This case arises from provisions of the Texas Election Code (the "Election Code") related to the process of voting by mail. Before addressing the merits of the pending motions, the Court will briefly describe the parties and the relevant allegations.[1]

---

[1] The background provided in this Section is based on the allegations asserted in Plaintiffs' Original Complaint. *See* docket no. 1 (the "Complaint").

## I.   Alleged Rejection of Mail-In Ballots

Like many states, Texas offers certain voters the opportunity to vote by mail. Specifically, Texas offers the opportunity to vote by mail to voters who are outside of their county during elections, voters with disabilities, voters 65 years-of-age or older, and certain voters confined in jail but otherwise eligible to vote. *See* Tex. Elec. Code §§ 82.001-.004.

In order to vote by mail, an eligible voter must first request a mail-in ballot by completing a mail-in ballot application at least 11 days before the election day. *Id.* at §§ 84.001 & 84.007. In order to cast his or her vote by mail, the voter must mark the ballot, place it in the official ballot envelope provided by the county, seal the official ballot envelope, place the official ballot envelope in the carrier envelope provided by the county, seal the carrier envelope, and sign the certificate on the carrier envelope. *Id.* at § 86.005(a)-(c). Specifically, the carrier envelope certificate requires the voter to "certify that the enclosed ballot expresses [the voter's] wishes independent of any dictation or undue persuasion by any person," and includes a line for the voter's signature across the flap of the envelope. *Id.* at § 86.013(c). The carrier envelope then must be returned to the county in a timely manner. *Id.* at §§ 86.006(a) & 86.013(c).

Upon receipt of a mail-in ballot, the Election Code instructs each local jurisdiction's Early Voting Ballot Board ("EVBB") or Signature Verification Committee ("SVC") to open the ballot envelope and determine whether to accept or reject the voter's ballot.[2] *See id.* at §§ 87.001,

---

[2] The signature-comparison process is generally conducted by the Early Voting Ballot Board, a statutorily required board established in each county that includes representatives from county parties. *See generally* Tex. Elec. Code § 87.001. However, the local jurisdiction's Early Voting Clerk ("EVC") may determine that a Signature Verification Committee should be established, in which case the SVC will perform the signature reviews rather than the EVBB. *See generally id.* at § 87.027. An SVC is also mandatory if the EVC receives a timely petition of at least 15 registered voters requesting such a committee. *Id.* at § 87.027(a-1). An SVC is composed of at least five members and, "[i]n an election in which party alignment is indicated on the ballot," must include at least two members designated by each county party on the ballot in equal numbers. *Id.* at

2

87.027(a-1) & 87.041. The Section states that a ballot may only be accepted if various conditions are satisfied. *Id.* at § 87.041(b). One such provision, which is central to this lawsuit, states that the ballot may only be accepted if "neither the voter's signature on the ballot application nor the signature on the carrier envelope certificate is determined to have been executed by a person other than the voter, unless signed by a witness." *Id.* at § 87.041(b)(3). As a result of that provision, each EVBB or SVC is instructed to reject a ballot if the EVBB or SVC concludes that a signature on the carrier envelope or ballot was "executed by a person other than the voter." *Id.* The Election Code provides guidance as to which signatures an EVBB or SVC should use for the purposes of comparison, *see id.* at § 87.027(i), (j), but the Election Code contains no guidance as to the appropriate procedure or standard for determining that two signatures do not match, nor does it require that EVBBs' or SVCs' members receive training in evaluating signatures. *See* docket no. 1 ¶ 41. As a result, Plaintiffs allege that the standard for evaluating signature matches will necessarily vary from county to county, panel to panel, and even from meeting to meeting or ballot to ballot within the same committee panel. *See id.* Plaintiffs further note that the review process cannot be performed anonymously, as the EVBB or SVC necessarily knows the identity of the voter when determining whether a ballot should be accepted or rejected. *See id.* at ¶ 42.

If a ballot is rejected on the basis of the EVBB's or SVC's signature comparison, the Election Code only requires that the voter be notified about the rejection of his or her ballot within 10 days following the election. *Id.* at § 87.0431(a). The Election Code does not require local jurisdictions to provide a specific opportunity for the voter to verify or prove that he or she did indeed sign the relevant documents or challenge the signature verification at any time before

---

§ 87.027(d). According to the Complaint, SVCs are usually established in larger counties, but may also appear in many smaller ones. *See* docket no. 1 ¶ 38.

rejection.[3] *See* docket no. 1 ¶ 47. Thus, according to Plaintiffs, a "voter whose ballot is rejected is not given any notice of [his or her] rejection prior to the rejection, any opportunity to cure [his or her] ballot, or any ability to contest the decision of the EVBB or SVC since counties have until 10 days after the Election Day to notify the voter of a rejected mail-in ballot." *Id.*

Through these procedures, Plaintiffs allege that Texas counties rejected at least 1,873 mail-in ballots during the 2018 general election and at least 1,567 mail-in ballots during the 2016 general election solely on the basis of mismatching signatures. *See* docket no. 1 ¶ 1. Plaintiffs allege that these procedures (and the resulting improper rejection of votes) disenfranchise certain members of the groups who are explicitly eligible by statute to vote by mail. Finally, Plaintiffs note that certain of those specific groups, namely the elderly and people who are disabled, are those most likely to have signature variations that could cause improper rejection of a ballot. *See id.* at ¶ 46.

## II.    The Parties

Plaintiffs in this case include both individuals who had their votes rejected on the basis of alleged signature mismatches and various organizations whose members or whose services are allegedly affected by Texas' mail-in voting procedures.

According to the Complaint, Plaintiff Dr. George Richardson ("Richardson") had his ballot rejected by Brazos County officials during the 2018 general election on the basis of an alleged signature mismatch.[4] *See* docket no. 1 ¶ 10. Similarly, during a city run-off election in 2019, the City of McAllen rejected Plaintiff Rosalie Weisfeld's ("Weisfeld," and with Richardson, the

---

[3] Instead, the Election Code states that a "county election officer may petition a district court for injunctive or other relief as the court determines appropriate" if the county election officer "determines a ballot was incorrectly rejected or accepted by the [EVBB]." *Id.* at § 87.127(a). However, the language of the code appears to give the election officer discretion as to whether to file such a petition on a voter's behalf.

[4] The Complaint further alleges that Richardson is a doctor and that his signature "has been used to prescribe countless medications." *See* docket no. 1 ¶ 10.

"Individual Plaintiffs") mail-in ballot on the same basis. *See id.* at ¶ 11. The Complaint alleges that Richardson and Weisfeld each received a letter following the respective election notifying them that their ballot had been rejected on the basis of an alleged signature mismatch. *See id.* at ¶¶ 10-11. The Individual Plaintiffs allege that they would have confirmed that the signatures on the ballots were their own had they been given timely notice and the opportunity to do so. *See id.*

Plaintiff Austin Justice Coalition ("AJC") is a non-partisan, non-profit organization that—among other services—operates the #ProjectOrange campaign, which involves registering eligible voters incarcerated at the Travis County Jail and providing support in requesting and submitting mail-in ballots. *See id.* at ¶ 12. Plaintiff Coalition of Texans with Disabilities ("CTD") is an organization that "works to ensure that people with disabilities may live, work, learn, play, and participate fully in the community of their choice." *See id.* at ¶ 16. Among other things, CTD expends resources informing voters statewide about their ability to vote by mail-in ballot and explaining the rules and procedures for doing so. *See id.* Plaintiff MOVE Texas Civic Fund ("MOVE") is a non-partisan, non-profit organization that, among other things, actively works to register eligible young people to vote at various college campuses and to assist them with voting. *See id.* at ¶ 20. Because college students are often eligible for mail-in voting because they are away from their counties of residence while attending school, MOVE provides various types of support to students wishing to vote by mail. *See id.* at ¶¶ 20-22. Plaintiff League of Women Voters of Texas ("LWV") is a non-partisan, non-profit organization that works to register eligible individuals to vote and to ensure that they actually cast a ballot that counts. *See id.* at ¶ 24. Among other activities, LWV expends resources to educate Texans about mail-in ballots and to provide support to eligible voters using such ballots. *See id.* at ¶¶ 24-25. Finally, Plaintiff American GI Forum of Texas, Inc. ("GI Forum") is an organization whose membership includes significant

numbers of voters who are eligible to vote by mail because they are: (1) classified as disabled veterans; (2) military retirees 65 years-of-age or older; and/or (3) active duty service members (and/or their family members) who are stationed away from their county of residence in Texas. *See id.* at ¶ 28. GI Forum and its constituent chapters expend resources to register eligible Texas veterans and servicemembers (and their family members) to vote and to ensure that they actually cast a ballot that counts. *See id.* at ¶¶ 28-29.

Defendant Texas Secretary of State (the "Secretary") is the Chief Election Officer of the State of Texas (the "State"). Tex. Elec. Code § 31.001(a). In this role, Plaintiffs allege that the Secretary is responsible for enforcing the State's elections statutes. *See* docket no. 1 ¶ 32. Plaintiffs also allege that the Secretary routinely issues guidance to the county registrars of all 254 Texas counties on various elections procedures. *See id.* Defendant Trudy Hancock ("Hancock") is the Brazos County Elections Administrator ("Brazos EA"), and she is sued in her official capacity for the manner in which she implements the voting procedures that are at issue in this action. *See id.* at ¶ 33. Finally, Defendant Perla Lara ("Lara") is the Secretary of the City of McAllen, Texas ("McAllen City Secretary," and, collectively, with Brazos EA, the "Local Defendants"). *See id.* at ¶ 34. The McAllen City Secretary is responsible for the administration of elections conducted within the City of McAllen, and Lara is sued in her official capacity for the manner in which she implements the voting procedures that are at issue in this action. *See id.*

### III.     The Pending Claims and Motions

On August 7, 2019, Plaintiffs filed the present action seeking declaratory and injunctive relief against Defendants. *See* docket no. 1. Plaintiffs' Complaint asserts the following causes of action: (1) a claim alleging the violation of the Due Process Clause of the Fourteenth Amendment for Defendants' alleged failure to provide pre-rejection notice and an opportunity to cure to voters

whose ballots are rejected on the basis of an alleged signature mismatch; (2) a claim alleging the violation of the Equal Protection Clause of the Fourteenth Amendment due to an alleged severe burden that has been placed on voters that is not justified by a legitimate government interest; (3) a separate claim alleging the violation of the Equal Protection Clause of the Fourteenth Amendment due to the Secretary's, State's and/or Local Defendants' failure to provide any uniform guidelines or principles regarding the comparison of signatures; and (4) a claim asserted only by Plaintiff CTD alleging violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, and the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794.

In response to Plaintiffs' claims, each Defendant filed a motion to dismiss. The McAllen City Secretary's Motion to Dismiss essentially asserts that the McAllen City Secretary is an improper defendant. *See* docket no. 27 (the "McAllen Motion"). Specifically, the McAllen Motion states that the McAllen City Secretary merely complies with and enforces state laws and regulations and "has no role in interpreting or litigating the constitutionality of state law" nor does she "have the authority to defend it." *See* docket no. 27 ¶ 2.9. The McAllen City Secretary therefore asserts that the claims should proceed only against state officials. *See id.* at ¶ 2.8. Similarly, the Brazos EA's Motion to Dismiss also essentially argues that the Brazos EA is an improper defendant. *See* docket no. 29 (the "Brazos Motion"). Specifically, the Brazos Motion contends that the Complaint specifically fails to assert claims against the Brazos EA, and that the Brazos EA is an improper Defendant because the allegations "do not allege that [the Brazos EA] did anything other than follow the law." *Id.* at p. 4. Thus, the Brazos Motion asserts that the Brazos EA has no authority to remedy the Plaintiffs' complaints. *See id.* Finally, the Secretary's motion to dismiss essentially *also* argues that the Secretary is an improper Defendant because "Plaintiffs' alleged injuries are neither caused by nor redressable through her." Docket no. 30 (the "Secretary's

Motion"). Thus, the Secretary argues that Plaintiffs' claims against the Secretary should be dismissed for lack of standing, as local election authorities have the authority to provide Plaintiffs with the relief requested. *See id.* at pp. 6-11. Additionally, the Secretary argues that—even assuming Plaintiffs have standing—the claims should be dismissed on the basis that Plaintiffs' Complaint fails to state any plausible claim for relief. *See id.* at pp. 12-20. Plaintiffs filed a combined response in opposition to the three motions, and each Defendant filed a reply brief in support of the respective motions. *See* docket nos. 32, 33, 34 & 35.

Below, the Court addresses the merits of each motion.

## DISCUSSION

**I.      Defendants' Motions to Dismiss for Lack of Standing**

The Secretary's Motion contends that Plaintiffs lack standing to bring claims against the Secretary, and thus, the motion seeks dismissal pursuant to Fed. R. Civ. P. 12(b)(1). *See* docket no. 30 pp. 6-11. The Brazos Motion also raises standing arguments, but states that its motion is filed pursuant to Fed. R. Civ. P. 12(b)(6). *See* docket no. 29 p. 4. The McAllen City Secretary similarly moves pursuant to Rule 12(b)(6), but also asserts arguments disputing whether the McAllen City Secretary is a proper defendant in this action. *See* docket no. 27 pp. 3-6. All three motions either explicitly or implicitly implicate Article III, and thus, the Court will address them together pursuant to Rule 12(b)(1) before moving to any analysis pursuant to Rule 12(b)(6). *See, e.g., Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795 n.2 (5th Cir. 2011) (noting the proper vehicle to challenge Article III standing, i.e., a jurisdictional question, is a motion to dismiss under Rule 12(b)(1)).

## A. Legal Standard

The constitutional requirement of standing contains three elements: (1) the plaintiff must have suffered an injury-in-fact; (2) there must be a causal connection between the injury and the conduct complained of; and (3) it must be likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). The same requirements also apply to entities seeking to establish that they have "associational" or "organizational" standing. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 609-10 (5th Cir. 2017).

> "Associational standing" is derivative of the standing of the association's members, requiring that they have standing and that the interests the association seeks to protect be germane to its purpose. By contrast, "organizational standing" does not depend on the standing of the organization's members. The organization can establish standing in its own name if it meets the same standing test that applies to individuals.

*Id.* at 610 (citations and some internal quotation marks omitted).

To show standing "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [a court may] presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561. "[T]he injury in fact requirement under Article III is qualitative, not quantitative, in nature," and the injury "need not be substantial." *OCA-Greater Houston*, 867 F.3d at 612 (citations, internal quotation marks and brackets omitted). Thus, while an injury-in-fact must be (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical," *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted), "it need not measure more than an 'identifiable trifle.'" *OCA-Greater Houston*, 867 F.3d at 612 (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999)).

## B. Plaintiffs' Injury-in-Fact

The Secretary's Motion asserts that Plaintiffs AJC, MOVE, CTD, LWV and GI Forum do not have standing to assert their constitutional claims because they have failed to allege that they suffered an injury-in-fact such that they can assert claims against the Secretary. *See* docket no. 30 pp. 6-8. Plaintiffs AJC, MOVE, CTD, LWV, and GI Forum contend that they have organizational standing to assert constitutional claims against Defendants. *See* docket no. 1 ¶¶ 12, 15, 20, 24 & 28. Additionally, Plaintiffs CTD, LWV and GI Forum also appear to contend that they have associational standing to assert certain claims on behalf of their members. *See id.* at ¶¶ 15, 24 & 28.

As discussed above, Plaintiffs do not have a difficult standard to satisfy in order to adequately *allege* an injury-in-fact at the motion to dismiss stage. With respect to "organizational standing," the Fifth Circuit has held that "an organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices." *Fowler*, 178 F.3d at 360. Indeed, if a defendant's actions "perceptibly impair" an organization in its provision of services, "there can be no question that the organization has suffered injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Here, Plaintiffs AJC, MOVE, CTD, and LWV have each alleged that they have been forced to expend "additional resources" in order to help counteract the impacts of Texas' allegedly unlawful mail-in ballot procedures.[5] *See* docket no. 1 ¶¶ 13, 14, 18, 23 & 26. Such efforts help

---

[5] Defendant Secretary asserts that this is a mere "threadbare recital" which is insufficient to satisfy the requisite pleading standard. *See* docket no. 35 p. 3. To the contrary, however, Plaintiffs' Complaint provides examples of certain specific activities in which Plaintiffs engage allegedly as a result of the Texas mail-in voting procedures. As but one example, the Complaint specifically alleges the following with respect to Plaintiff LWV:

> LWV must expend additional staff and volunteer time and resources instructing voters to write out signatures neatly and have the signatures match each other as

reduce the chance of an improper ballot rejection, and Plaintiffs allege that they would not have to expend these resources if the mail-in ballot procedures provided the safeguards of uniform application, pre-rejection notice, and an opportunity to cure. *See id.*; *see also Martin v. Kemp*, 341 F. Supp. 3d 1326, 1335 (N.D. Ga. 2018), *appeal dismissed*, sub nom. *Martin v. Sec'y of State of Georgia*, 2018 WL 7139247 (11th Cir. Dec. 11, 2018) (finding organizations had standing because the groups "will not bear the same burden of assisting and warning voters once the State is required to assist voters whose ballots are challenged as illegitimate and once the urgency of warning voters is diminished by way of due process protections"). Defendant Secretary appears to contest the exact extent to which the plaintiff organizations' activities were "perceptibly impaired" by the State's mail-in ballot procedures, *see* docket no. 35 p. 3, but the argument ignores that the Court must accept Plaintiffs' allegations as true at this stage. Thus, it is not appropriate at this stage for the Court to delve into the precise extent to which each organization has actually expended resources outside of those that would otherwise be spent in order to counteract the State's mail-in ballot procedures. Instead, the Court must accept the allegation that Plaintiffs AJC, MOVE, CTD, and LWV have been forced to expend "additional resources" when "providing instruction and support on mail-in ballots" in order to counteract the State's policies.[6] *See* docket no. 1 ¶¶ 14, 18,

---

much as possible in PowerPoint presentations and scripts prepared for its members and local-area League of Women Voters organizations to use when educating and providing support to mail-in ballot voters. The resources diverted for these purposes are transferred away from LWV's other voting-related activities.

Docket no. 1 ¶ 26.

[6] The Court notes that Plaintiff GI Forum does not allege that it must expend additional resources in light of Texas' allegedly unlawful mail-in voting procedures. For that reason, the allegations in the Complaint less clearly support Plaintiffs' position that GI Forum has suffered an injury-in-fact such that it has organizational standing to assert its claims in this case. However, the practical impact of this conclusion is minimal because, as explained in the next paragraph, the Court concludes that GI Forum has adequately *alleged* that it has associational standing to assert claims on behalf of its members who have allegedly suffered an injury-in-fact.

23 & 26. And based on those allegations, Plaintiffs AJC, MOVE, CTD, and LWV have each adequately alleged that they have organizational standing to pursue the asserted claims.[7] *See, e.g., Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008) (quoting *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) ("[A]n organization suffers an injury in fact when a statute 'compel[s]' it to divert more resources to accomplishing its goals" and "'[t]he fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury.'")).

Similarly, with respect to Plaintiffs CTD's, LWV's and GI Forum's assertion of "associational standing," the Court concludes that each has satisfied the requisite *pleading* standard. Defendant Secretary correctly notes that Plaintiffs have not alleged that *specific* members each organization had their votes improperly rejected due to Texas' mail-in ballot procedures. *See* docket no. 35 p. 4. Therefore, the Secretary's Motion asserts that Plaintiffs CTD, LWV, and GI Forum "ha[ve] failed to allege facts establishing that [their] members otherwise have standing to sue in their own right."[8] Docket no. 30 p. 11-12. But having reviewed the Complaint, it is clear that Plaintiffs allege that the individual members of CTD, LWV and GI Forum "regularly vote by mail." Docket no. 1 ¶¶ 19, 27 & 31. The allegations also make clear that the membership of these organizations is comprised in significant part by individuals who are likely to be impacted by the

---

[7] The Court notes that Defendant may move again at later stages of the litigation if the evidentiary record ultimately supports the Secretary's contention that certain or all of the organizational Plaintiffs do not have organizational standing because they have not suffered a cognizable injury-in-fact.

[8] Plaintiffs' response correctly notes that Defendant Secretary's Motion only explicitly challenges Plaintiff CTD's associational standing. *See* docket no. 32 p. 5. However, in its reply, the Secretary makes clear that it intended such an argument to apply equally to Plaintiffs LWV and GI Forum. *See* docket no. 35 p. 4 n.4. Ultimately, the exact scope of the Secretary's Motion need not be addressed because the Court concludes that each of the three parties adequately alleges an injury-in-fact for the purposes of associational standing.

relevant policies at issue. *See, e.g.*, docket no. 1 ¶ 28. Thus, because the Court must assume that these "general allegations embrace those specific facts that are necessary to support the claim," *Lujan*, 504 U.S. at 561, the Court will infer at this stage that at least certain members of CTD, LWV and GI Forum have suffered an injury-in-fact as a result of Texas' mail-in ballot signature-comparison procedures. For that reason, the Court finds that the allegations plausibly support a claim for which Plaintiffs CTD, LWV, and GI Forum have associational standing based on injuries allegedly suffered by their members.[9]

Accordingly, the Court concludes that each Plaintiff has adequately alleged injury-in-fact such that each Plaintiff may assert claims on its own behalf and/or on the behalf of its members.[10] Thus, the Court will consider the other relevant factors with respect to Plaintiffs' standing.

### C. Causation and Redressability—Texas Secretary of State

Defendant Secretary asserts that no Plaintiff has asserted that any applicable injury-in-fact was caused by the Secretary's actions because any alleged injury resulted from local determinations of signature mismatch rather than any action by the Secretary. *See* docket no. 30 pp. 9-10. Thus, the Secretary's Motion asserts that "Plaintiffs' alleged injuries turn on the actions of local election officials and are not traceable to the Secretary." *Id.* Similarly, the Secretary asserts that it is the local election officials who are in a position to provide Plaintiffs with redressability by (i) ceasing the rejection of ballots, (ii) providing pre-rejection notice, and/or (iii) acting in the case of an improperly rejected ballot. *See id.* at pp. 11.

---

[9] Again, Defendants certainly may move again on this issue if discovery indicates that CTD, LWV, and GI Forum are not in a position to assert claims on behalf of injured members, including because their members have not or will not suffer an injury in the form of an improperly rejected ballot.

[10] The Secretary's Motion does not contend that the Individual Plaintiffs did not suffer an injury-in-fact, and thus, the Court will not address that issue as part of this Order.

Having reviewed the allegations and Plaintiffs' facial challenges to Texas' mail-in ballot signature-comparison procedures, the Court concludes that Plaintiffs have satisfied the causation and redressability pleading requirements such that Defendant Secretary is a proper defendant in the lawsuit. The Texas Election Code names Defendant Secretary as the "chief election officer of the state" and empowers her to (i) "assist and advise all election authorities with regard to the application, operation, and interpretation of [the] code" and (ii) "obtain and maintain uniformity in the application, operation, and interpretation of [the] code and of the election laws outside [the] code." Tex. Elec. Code §§ 31.001(a), 31.003 & 31.004. For that reason, the Fifth Circuit has held that "[t]he facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State." *OCA-Greater Houston*, 867 F.3d at 613 (citing Tex. Elec. Code §§ 31.001(a)). Importantly, the Fifth Circuit has also made clear that this is true irrespective of whether a local official is also responsible for enforcing the statute in question. *See, e.g., OCA-Greater Houston*, 867 F.3d at 612-13 (rejecting Secretary's argument that the plaintiffs had standing only against local government officials who enforced election code restrictions regarding eligibility to serve as interpreter). Texas law plainly states that it is the Secretary's duty to "assist and advise all election authorities" and to "obtain and maintain uniformity" in the interpretation and application of the Election Code, and such duties no doubt include the obligation to ensure that the provisions of the Election Code are being enforced in a way that is consistent with the United States Constitution and federal law. For that reason, it is apparent that—if valid—Plaintiffs' alleged complaints are both traceable to the action (or inaction) of the Secretary and redressable by the Secretary.

Accordingly, the Court concludes that Plaintiffs have satisfied the causation and redressability requirements as to their claims against Defendant Secretary such that—at least at the present stage—Defendant Secretary is a proper defendant in the litigation.

### D. Causation and Redressability—Brazos EA and McAllen City Secretary

The Brazos Motion and McAllen Motion take the opposite position from that of the Secretary's Motion. Specifically, the Brazos Motion argues that the Brazos EA was not the cause of Plaintiffs' injuries because she "did not review the signatures in question" or create the state policies in question. *See* docket no. 5. Indeed, the Brazos Motion states that "Plaintiffs do not make a single allegation of wrongdoing against Hancock, other than that she followed Texas law." *Id.* at p. 5. Additionally, the Brazos Motion argues that the Brazos EA "has no authority to remedy the complaint" because she could not provide Plaintiffs with the relief they request "without violating Texas law." *Id.* at p. 6. Similarly, the McAllen Motion states that the Complaint "points to Defendant Lara's adherence to state laws" and is "completely devoid of any allegation of wrongdoing on the part of the McAllen City Secretary." Docket no. 27 p. 4. The McAllen Motion further argues that the "McAllen City Secretary does not have the authority to revise or defend state law," and thus, that "the suit should be brought against state officials." *Id.* at p. 5.

Having reviewed the record, the Court finds that Defendants Brazos EA's and McAllen City Secretary's arguments are—at least at this stage—without merit. Defendants Brazos EA's and McAllen City Secretary's assertions ignore that "constitutional challenges are often brought against local entities or officials enforcing statewide laws they played no role in creating." *Voting for America, Inc. v. Andrade*, 888 F. Supp. 2d 816, 832-33 (S.D. Tex. 2012), *rev'd on other grounds*, sub nom. *Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) (collecting cases). More specifically, courts have routinely held that both state-level and local officials may be proper

defendants when both play a role in the implementation and enforcement of a challenged election law. *See id.* at 829-33 (holding that county registrar and Secretary of State were both proper defendants for plaintiffs' claims regarding voter registration drives); *see also True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 712 (S.D. Miss. 2014) (holding that both county defendants and the Secretary of State were properly named in National Voter Registration Act lawsuit); *Mark Wandering Med. v. McCulloch*, CV 12-135-BLG-DWM, 2014 WL 12588302, at *3-4 (D. Mont. Mar. 26, 2014) (finding that plaintiffs had standing to bring voting rights claims against both county officials and the Secretary of State). Importantly, because it is the local official who often "enforces the laws that [the plaintiffs] contend cause them injury, an injunction against [the local official] would directly redress [the] alleged injury." *Voting for Am.*, 888 F. Supp. 2d at 832-33. For that reason, and as the Fifth Circuit has clearly explained, a defendant may still satisfy the causation and redressability standards for Article III standing if the defendant has "definite responsibilities relating to the application [of the statute]" even if the defendant may be "far from the sole participant in the application of [a] challenged statute." *K.P. v. LeBlanc*, 627 F.3d 115, 123-24 (5th Cir. 2010).

Applying these standards, it is clear that Plaintiffs' allegations satisfy both the causation and redressability requirements necessary to make Brazos EA and McAllen City Secretary proper defendants in this litigation. The allegations in the Complaint indicate that Brazos EA and McAllen City Secretary have a designated role as the county election officer for all elections ordered by their county and city respectively. *See* docket no. 1 ¶¶ 33 & 34; Tex. Elec. Code § 83.002, 83.005 & 31.043.[11] Importantly, the allegations indicate both that the Election Code provides the county

---

[11] As part of its analysis of the pending motions, the Court may consider all relevant provisions of the Texas Election Code. *See United States v. Schmitt*, 748 F.2d 249, 255-56 (5th Cir. 1984). Section 83.002 of the Texas Election Code states that the county clerk is the EVC for "the general election for state and county officers and any other countywide election held at county expense,"

election officer with broad authority over the mail-in ballot voting process and that Defendants Brazos EA and/or McAllen City Secretary have the authority to implement additional safeguards that may have prevented Plaintiffs' injuries in this case and may provide forms of relief going forward.[12] *See, e.g.,* docket no. 1 ¶¶ 38 & 60. Accepting that inference with respect to the Local Defendants' authority, as the Court must do at this stage, it is clear that the Local Defendants satisfy the redressability and causation pleading requirements for Plaintiffs' Article III standing. Indeed, at least one other court has found this type of authority is sufficient to render local defendants *liable* for the application of unconstitutional state laws governing mail-in ballot signature-comparison procedures. *See, e.g., Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646 (N.D. Ill. March 13, 2006) (finding county clerk who was responsible for most aspects of the mail-in ballot process, except matching signatures, liable for violating Fourteenth Amendment by failing to provide pre-deprivation notice and hearing to mail-in ballot voters).

Accordingly, because the Court finds that Plaintiffs' alleged injuries are both traceable to actions (and/or inaction) by the Local Defendants and potentially redressable by the Local

---

and Section 31.043 of the Election Code states that the county elections administrator shall perform "the duties and functions placed on the county clerk by this code." Similarly, Section 83.005 of the Election Code states that "the city secretary is the early voting clerk for an election ordered by an authority of a city."

[12] Plaintiffs' response appears to confirm that indication. Specifically, the response asserts that the Election Code does not prohibit Brazos EA and/or McAllen City Secretary from (i) taking steps (such as training) to ensure uniformity with respect to signature comparisons and/or (ii) providing voters with pre-rejection notice of a signature mismatch and an opportunity to cure before actually rejecting the ballot. *See* docket no. 32 pp. 16-17. Indeed, although the EVBB and/or SVC are responsible for comparing signatures and sending formal notice of a ballot's rejection, the county election officer is generally responsible for most aspects of the mail-in ballot process. As an example, it appears that the Election Code formally gives the county election officer the ability to file a lawsuit challenging the EVBB or SVC's determination regarding a voter's signature. *Id.* at §§ 87.127(a).

Defendants' future conduct, the Court finds that Plaintiffs have adequately alleged standing to assert their claims against Defendants Brazos EA and McAllen City Secretary in this action.

## II.    Defendants' Motions to Dismiss for Failure to State a Claim

The various Defendants each also assert numerous bases on which they contend Plaintiffs' claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). The Secretary's Motion argues that Plaintiffs' due process and equal protection claims must be dismissed because the provisions of the Election Code at issue (i) do not impose a severe burden on the right to vote and/or (ii) are justified by the State's legitimate interests. *See* docket no. 30 pp. 14-19. The Secretary also seeks dismissal of Plaintiff CTD's claim asserted pursuant to the ADA and RA, contending that Texas law already provides reasonable accommodations to disabled voters. *See id.* at p. 20. Defendants Brazos EA and McAllen City Secretary seek dismissal of Plaintiffs' claims pursuant to Rule 12(b)(6) because certain claims fail to specifically name the Local Defendants and/or identify their alleged wrongdoing. *See* docket no. 27 pp. 4-5; docket no. 29 pp. 5-6. Finally, the Brazos Motion also argues that Plaintiff's prayer request is improper. *See* docket no. 29 pp. 6-7.

### A.    Legal Standard

Under Fed. R. Civ. P. 8(a), a complaint is considered well pled if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a) is considered in conjunction with Fed. R. Civ. P. 12(b)(6), which provides that a complaint may be dismissed if it "fails to state a claim upon which relief can be granted." Courts apply these rules through the process outlined by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

Dismissal is appropriate under Fed. R. Civ. P. 12(b)(6) if, assuming the truth of all facts alleged in the complaint, it fails to state a "claim to relief that is plausible on its face." *Iqbal*, 556

U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). In order to state a plausible claim to relief, the complaint must include "allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). Those allegations may be "either direct or inferential." *Id.* In applying Rule 12(b)(6), the Court must distinguish between pleadings of fact, which are presumed as true, and statements of legal conclusion, which are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 679. "A plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief,' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265 (1986)). Throughout the Rule 12(b)(6) analysis, "[t]he complaint must be liberally construed, with all reasonable inferences drawn in the light most favorable to the plaintiff." *Morgan v. Swanson*, 659 F.3d 359, 370 n.17 (5th Cir. 2011) (en banc) (quoting *Woodard v. Andrus*, 419 F.3d 348, 351 (5th Cir. 2005)).

### B. Plaintiffs' Due Process Claim

Plaintiffs' due process claim alleges that Defendants have violated the Due Process Clause of the Fourteenth Amendment by failing to provide pre-rejection notice and an opportunity to cure to mail-in voters who have their votes rejected on the basis of an alleged signature mismatch. *See* docket no. 1 ¶¶ 52-61. Defendant Secretary asserts that the claim is subject to dismissal because (i) the relevant Election Code provisions do not impose a severe burden, (ii) any burden imposed is justified by the State's interest, and that (iii) in any event, Plaintiffs failed to avail themselves of the post-election processes available to them. *See* docket no. 30 pp. 12-18.

As an initial matter, the parties dispute whether Plaintiffs' due process claim is governed by the "*Matthews*" standard or "*Anderson/Burdick*" standard. *See Matthews v. Eldridge*, 424 U.S.

319, 225 (1976); *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992). Plaintiffs contend that the *Matthews* framework should apply to the due process analysis, *see* docket no. 32 pp. 23-25, and Plaintiffs note that numerous courts evaluating due process claims related to mail-in voting procedures have evaluated the claims under that framework, which instructs the Court to balance the following considerations:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Matthews*, 424 U.S. at 335. The Secretary, on the other hand, contends that a more flexible standard—known as the "*Anderson/Burdick*" test—applies to the constitutional analysis of all state laws that allegedly burden the right to vote. Under the *Anderson/Burdick* test, a court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788-89). Strict scrutiny applies only when the right to vote is "subjected to 'severe' restrictions." *Burdick*, 504 U.S. at 434. Where a law "imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.*; *see also Anderson*, 460 U.S. at 788. The parties appear to agree that such a standard should apply to the analysis of Plaintiffs' equal protection claims, but the Secretary asserts that the *Anderson/Burdick* standard should also govern the analysis of Plaintiffs' due process claim. *See* docket no. 30 pp. 13-14.

The argument for applying the *Matthews* test to Plaintiffs' due process claim is a strong one, as the framework explicitly references both "procedures" and potential "procedural safeguards." *Matthews*, 424 U.S. at 335. For that reason, the standard appears to be more directly applicable to due process claims premised on mail-in ballot procedures and/or the lack of procedural safeguards related to the mail-in voting process. Notably, it appears that multiple courts have applied the *Matthews* framework to substantially similar claims involving due process challenges to mail-in ballot signature-comparison procedures. *See, e.g., Saucedo v. Gardner*, 335 F. Supp. 3d 202, 214 (D.N.H. 2018); *Martin*, 341 F. Supp. 3d at 1338; *Zessar*, 2006 WL 642646 at *7. On the other hand, certain courts have stated that the *Anderson/Burdick* framework is meant to apply to all constitutional challenges to voting restrictions, including both due process claims and equal protection claims. *See, e.g., Duncan v. Husted*, 125 F. Supp. 3d 674, 679-80 (S.D. Ohio 2015), *aff'd* (Mar. 7, 2016) (stating that in the Sixth Circuit, "the *Anderson-Burdick* test serves as single standard for evaluating challenges to voting restrictions" including "First Amendment, Due Process Clause of the Fourteenth Amendment, and Equal Protection Clause of the Fourteenth Amendment claims"); *Weber v. Shelley*, 347 F.3d 1101, 1105-06 (9th Cir. 2003) (analyzing equal protection and due process challenges to touchscreen voting system without voter-verified paper trail under *Anderson* and *Burdick*). However, the Secretary has failed to cite any cases in which the *Anderson/Burdick* framework has been applied to an evaluation of a due process claim related to mail-in ballot procedures.

In any event, the Court need not specifically decide the issue at this stage, as the Court concludes that Plaintiffs have adequately alleged a due process claim against Defendants

regardless of whether the *Matthews* or *Anderson/Burdick* framework applies.[13] As an initial matter, the Court notes that most of the Secretary's arguments for dismissal would require the Court to balance and evaluate the parties' asserted burdens, interests and justifications at the motion to dismiss stage. Doing so would be improper, however, as the Court must accept Plaintiffs' factual allegations as true at as part of the 12(b)(6) analysis, and no factual record has been developed at this stage.

With respect to the specific application of the *Anderson/Burdick* framework, the first step in the analysis requires the Court to consider the burden—if any—created by the relevant Texas Election Code provisions and/or their enforcement.[14] Based on the allegations in Plaintiffs' Complaint, the burden created by the State's mail-in ballot procedures is a substantial one. Here, Plaintiffs allege that thousands of voters have been disenfranchised as a result of Texas' mail-in voting process and signature-matching procedures. Unsurprisingly, courts have held that the lack of an opportunity to cure mail-in ballot rejections, which disenfranchises thousands of voters, is a "serious burden on the right to vote." *Florida Democratic Party v. Detzner*, No. 4:16-cv-607-MW/CAS, 2016 WL 6090943, at *6 & n.11 (N.D. Fla. Oct. 16, 2016) (citing *Ne. Ohio Coal. For the Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012)). Although the Secretary asserts that there are various safeguards that reduce any burden, each of the State's referenced procedures is alleged to have flaws that result in (or fail to prevent) disenfranchisement.[15] Perhaps the most

---

[13] Although the Court need not make such a determination as part of this Order, the parties should be prepared to provide additional briefing and/or argument as to the issue as the case progresses.

[14] As discussed in the prior note, the Court has not determined that the *Anderson/Burdick* standard is the appropriate standard for analyzing the merits of Plaintiffs' due process claim. The Court is merely demonstrating that Plaintiffs have adequately *alleged* a due process claim against Defendants irrespective of whether the *Matthews* or *Anderson/Burdick* framework is applicable. *See also* note 20, *infra*.

[15] For example, the Secretary argues that a provision that permits a witness signature—in lieu of the signature matching requirement—reduces the burden of the State's signature-comparison

telling allegations are those indicating that at least one of the named Individual Plaintiffs tried to cure the improper rejection of his ballot following post-election notice, and yet was unable to do so under the State's current procedures. *See* docket no. 1 ¶ 10; docket no. 32 p. 28. On that basis, this Court concludes that Plaintiffs have adequately alleged that the procedures in question impose a substantial burden on the right to vote.

The allegations—if accepted as true—also indicate that the State has no compelling justification for the existing voting procedures, such that the second factor of the *Anderson/Burdick* test is also satisfied for the purposes of the Rule 12(b)(6) analysis. To be clear, the Court agrees with the Secretary's general assertion that Texas "indisputably has a compelling interest in preserving the integrity of its election process" by preventing voter fraud. *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). But Plaintiffs' due process allegations do not wholesale challenge Texas' decision to use signatures as one method for preventing voter fraud on certain mail-in ballots. Instead, Plaintiffs challenge the fact that Texas has instituted procedures that result in disenfranchisement because voters are not provided a meaningful opportunity to cure if a ballot is improperly rejected on the basis of mismatched signatures. Importantly, the Secretary's Motion offers no argument as to how the State's interest in preventing voter fraud is furthered by failing to provide pre-rejection notice

---

provisions. *See* docket no. 30 pp. 14-15. However, a review of the provision indicates that only certain individuals who vote by mail—namely those who certify that they are unable to sign the ballot "because of a physical disability or illiteracy"—are able to utilize the witness signature procedure. *See* Tex. Elec. Code § 1.011(a). Plaintiffs' response also notes that many voters may not have access to such a witness. *See* docket no. 32 p. 30. Moreover, although the Secretary notes that a voter is entitled to notice of a ballot's rejection within ten days following the election, such notice may be of little use to a voter whose ballot has *already* been rejected if it does not provide the voter with sufficient opportunity to seek relief. Tex. Elec. Code § 87.0431; docket no. 1 ¶ 44. And although it is true that a local election officer "may petition a district court for injunctive relief," such relief is discretionary, and the law does not appear to require election officers to pursue such action. *See id.* at § 87.127.

and an opportunity to cure.[16] Indeed, Plaintiffs' allegations indicate that there is no compelling

justification for Defendants' failure to provide an opportunity to cure, as the Secretary's stated

concerns regarding voter fraud appear to be *inconsistent* with the State's apparent objections to the

due process protections sought by Plaintiffs.[17] Notably, although the State no doubt also has a

compelling interest in preventing in-person voter fraud, the Complaint alleges that Texas presently

provides pre-rejection notice and an opportunity to cure to voters who fail to comply with certain

requirements for in-person voting. *See* docket no. 1 ¶ 59 (citing Tex. Elec. Code. § 65.0541, which

states that voters who lack identification on election day may cast a provisional ballot and provide

photo identification within six days of the election in order to have their ballot counted). The

Secretary's briefing fails to explain why a form of pre-rejection notice and an opportunity to cure

cannot be provided to mail-in voters as well.

Additionally, the Secretary's argument that "Plaintiffs disregarded the process available to

them" would be an improper basis for dismissing the claim at this stage. *See* docket no. 30 p. 17.

Specifically, the Secretary asserts that Tex. Elec. Code §§ 87.127(a) provided Plaintiffs with

---

[16] The Secretary directs the Court to *Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir. 2008), in which the Ninth Circuit rejected due process and equal protection challenges to Oregon's signature-matching procedures for verifying citizens' signatures on petitions for ballot initiatives. *See* docket no. 30 pp. 16-17. In *Lemons*, however, the Ninth Circuit noted that signatures on petitions for "initiative and referenda . . . are often gathered by privately hired signature gatherers" which may be more likely to lead to fraudulent signatures. 538 F.3d at 1104. Moreover, a review of *Lemons* indicates that Oregon provided additional safeguards during the signature-comparison process that are not provided under the Texas Election Code. *Id.* at 1105. In light of the differences between the specific circumstances in *Lemons* and those at issue in this case, the Ninth Circuit's opinion in *Lemons* does not provide a basis for dismissing Plaintiffs' due process claims at this stage.

[17] Here, "Defendants offer no satisfying explanation for why [the State] cannot have both a robust signature-match protection and a way to allow every eligible voter-by mail and provisional voter whose ballot is mistakenly rejected an opportunity to verify their identity and have their votes count." *Democratic Executive Comm. of Florida v. Lee*, 915 F.3d 1312, 1322 (11th Cir. 2019). If anything, "letting mismatched-signature voters cure their vote by proving their identity further prevents voter fraud—it allows supervisors of elections to confirm the identity of that voter before their vote is counted." *Fla. Democratic Party v. Detzner*, 2016 WL 6090943, at *7.

protection, such that "Plaintiffs could have raised their concerns of improper rejection to their

county election officer" who could have then—at his or her discretion—chosen to file a lawsuit

on the voter's behalf. *See* docket no. 30 p. 17. As an initial matter, the Secretary fails to cite

precedent for the proposition that an election officer's *discretionary* ability to seek judicial relief

affords process sufficient to cure the deprivation of the fundamental right to vote. Additionally,

the Secretary's argument depends on the Court adopting the Secretary's assertion of the facts at

the motion to dismiss stage, which would be improper *even if* the Secretary provided evidentiary

support for its contentions. *See Iqbal*, 556 U.S. at 678. Instead, however, the Secretary's assertion

appears to ignore specific factual allegations contained in Plaintiffs' Complaint which directly

*contradict* the Secretary's contention. Indeed, the Complaint alleges that Plaintiff Richardson did

specifically notify an election official of Brazos County's error, and county officials declined to

pursue any relief on Richardson's behalf. *See* docket no. 1 ¶ 10. Thus, at least at this stage, the

Secretary's argument lacks both legal and factual support.

Finally, to the extent either Local Defendant argues that Plaintiffs' Complaint fails to state

a due process claim against Brazos EA and/or McAllen City Secretary, such an argument is without

merit.[18] As an initial matter, Plaintiffs' Complaint references conduct by "Defendants," such that

it is clear that the claim is asserted against the Local Defendants as well as the Secretary. *See, e.g.*,

docket no. 1 ¶¶ 54, 56-57 & 60. Moreover, and as discussed in Section I.D, *supra*, it is the local

election officers, such as Defendant Brazos EA and/or Defendant McAllen City Secretary, who

allegedly enforce Texas election laws in a manner that has violated Plaintiffs' due process rights.

---

[18] The Brazos Motion asserts that "Hancock" is not specifically named in Count I, and that "Plaintiffs do not make a single allegation of wrongdoing against Hancock." *See* docket no. 29 p. 5. Meanwhile, the McAllen Motion generally asserts that the Complaint is "devoid of any allegation of wrongdoing on the part of the McAllen City Secretary" and again asserts that state officials are the proper Defendants. *See* docket no. 27 pp. 4-5.

Further, Plaintiffs contend that the Local Defendants have broad powers under the Election Code

that provide them with the authority to afford Plaintiffs additional procedural protections such as

pre-rejection notice and/or an opportunity to cure. Accordingly, the Court concludes that Plaintiffs

have adequately alleged a due process claim against the Local Defendants in addition to stating a

claim against the Secretary.[19]

Accordingly, the Court finds that—even if the *Anderson/Burdick* standard is applied—

Plaintiffs have adequately alleged a due process claim related to Defendants' failure to provide

Plaintiffs with pre-rejection notice and an opportunity to cure the improper rejection of mail-in

ballots based on the State's signature-comparison process.[20]

---

[19] To the extent that the Brazos Motion asserts that Plaintiffs' prayer request is improper, *see* docket no. 29 pp. 6-7, the Court need not specifically consider the argument at this stage. Importantly, a Rule 12(b)(6) motion "tests the legal sufficiency of allegations," and *even assuming* Plaintiffs' specific request for relief is in some way improper, that request is not fatal to Plaintiffs' pleading so long as the statement of the claim indicates that the Plaintiffs may be entitled to some form of relief. *See, e.g., Dingxi Longhai Dairy, Ltd. v. Becwood Tech. Grp. L.L.C.*, 635 F.3d 1106, 1108 (8th Cir. 2011) (emphasis in original) (citations omitted) (reversing dismissal of complaint and noting that Rule 12(b)(6) dismissal is only appropriate "if it is clear that *no* relief could be granted under *any* set of facts that could be proved consistent with the allegations"); *Carcano v. Cooper*, 350 F. Supp. 3d 388, 422 n.27 (M.D.N.C. 2018) ("[A]n improperly-stated request for relief is not normally grounds for dismissal of a complaint."); *Zurich Am. Ins. Co. v. Southern-Owners Ins. Co.*, Case No. 3:15-cv-01041-J-34PDB, 2018 WL 1071939, at *3 (M.D. Fla. Feb. 26, 2018) ("Indeed, a well-pleaded claim ought not be dismissed because a party misconceives the appropriate remedy."). Because the Complaint in this case adequately alleges that Plaintiffs may be entitled to some relief, the Brazos Motion is denied to the extent it takes issue with Plaintiffs' prayer request.

[20] In the event the *Matthews* test is the appropriate standard, it is even more apparent that Plaintiffs have adequately alleged a due process claim against Defendants. Indeed, multiple courts have awarded *judgment* in plaintiffs' favor under similar factual circumstances after applying the *Matthews* test. *See, e.g., Saucedo v. Gardner*, 335 F. Supp. 3d 202, 214 (D. N.H. 2018) (granting plaintiffs' request for summary judgment and permanent injunctive relief as to their procedural due process challenge against a New Hampshire mail-in ballot signature matching law); *Martin*, 341 F. Supp. 3d at 1338 (granting plaintiffs' request for injunctive relief against a Georgia mail-in ballot signature matching law pursuant to procedural due process requirements); *Zessar*, 2006 WL 642646 at *7 (employing the *Mathews* test to strike down a mail-in ballot signature matching law on due process grounds). Based on the Complaint's allegations, the private interest—here, the deprivation of the fundamental right to vote—weighs heavily in Plaintiffs' favor. Moreover,

C.     **Plaintiffs' Equal Protection Claims**

Plaintiffs' first equal protection claim generally asserts that the implementation of Texas' signature-matching provisions for mail-in ballots has placed an undue burden on certain voters' right to vote that is not justified by any state interest. *See* docket no. 1 ¶¶ 62-70. Plaintiffs' second equal protection claim generally targets the non-uniformity of the application of the law, and asserts that because neither uniform standards nor training is required with respect to signature comparison, the State's procedures are enforced in an "arbitrary" manner based on "ad hoc" standards. *See id.* at ¶¶ 71-74. Thus, Plaintiffs assert that the procedures for evaluating signatures "vary from county to county, from SVC to SVC in counties with multiple committees, and even from meeting to meeting and ballot to ballot." *Id.* at ¶ 73. In response, Defendant Secretary argues that (i) the State is permitted to treat mail-in voters differently than in-person voters, and (ii) the standard for comparing signatures is "sufficiently uniform to ensure equal treatment of voters." Docket no. 30 pp. 18-19.

For reasons similar to those set forth in the prior Section, the Court finds that Plaintiffs have adequately alleged a violation of the Equal Protection Clause in the Fourteenth Amendment.[21]

---

Plaintiffs' allegations indicate that the risk of erroneous deprivation of their rights is significant, as is the probable value of the procedural remedies that may be available. Finally, the allegations—especially those indicating that the State already affords similar safeguards to other groups of voters—indicate that the threat to government interests and the cost of remedial procedures are not significant.

[21] The Court interprets the first equal protection claim (Count II) to largely overlap with Plaintiffs' due process claim, in which Plaintiffs contend that the Texas Election Code is unconstitutional to the extent it does not require that mail-in voters receive pre-rejection notice of a signature mismatch and an opportunity to cure an improper rejection. The Court interprets the second equal protection claim (Count III) to assert that the Texas Election Code places an undue burden on the right to vote to the extent it does not require the promulgation of uniform standards and/or training with respect to signature comparison such that signature comparisons are conducted in a consistent manner. Although Plaintiffs assert the claims separately, the Court will consider them together in this Section, in light of the fact that the Supreme Court has indicated that it is appropriate to consider the statutory framework as a whole in determining whether an undue burden has been

As an initial matter, the Court does not necessarily disagree with the Secretary's general assertion that a State may use different procedures for mail-in ballots as those used for in-person voting. *See ACLU of New Mexico v. Santillanes*, 546 F.3d 1313, 1320 (10th Cir. 2008) (noting that voting by mail "is a fundamentally different process from in-person voting, and is governed by procedures entirely distinct from in-person voting procedures."). Here, however, the crux of Plaintiffs' equal protection claim is not a complaint that the Election Code contains different provisions for in-person and mail-in voting. Instead, Plaintiffs allege that the State's mail-in voting procedures (and their implementation by local officials) result in the disenfranchisement of eligible voters who attempt to vote by mail. This injury allegedly results both from the provisions' and local officials' failure to provide voters with pre-rejection notice and an opportunity to cure, as well as from the State's and local officials' failure to promulgate standards regarding signature comparison and/or training for EVBB and/or SVC members. Moreover, this type of alleged injury (*i.e.,* the improper rejection of a voters' ballots and the resulting disenfranchisement) places a significant burden on the voting rights of individuals who are eligible to and elect to vote by mail. *See* Section II.B., *supra*; *see also Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d at 1030 ("Disenfranchisement of approximately 5,000 voters based on signature mismatch is a substantial burden.").

The Court must compare this burden to Defendants' justification for the design and implementation of the mail-in ballot signature-matching procedures,[22] and based on the allegations

_____

placed on the right to vote. *See generally Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 199 (2008). Moreover, Plaintiffs' first equal protection claim (in Count II) appears to also incorporate many of the allegations from the second (in Count III), including that the current mail-in ballot procedures involve "an error-prone signature comparison procedure conducted by election officials who are not trained in signature verification." Docket no. 1 p. 70.

[22] As noted in Section II.B, *supra*, the parties appear to agree that the *Anderson/Burdick* standard governs the analysis of Plaintiffs' equal protection claims.

in the Complaint, Plaintiffs have adequately alleged that such a burden is not outweighed by any compelling justification. To the extent the Secretary asserts its interest in preventing voter fraud as a justification for the existing procedures, the prior Section explains how providing pre-rejection notice and an opportunity to cure may actually *further* that interest. *See* Section I.B & note 17, *supra*. In addition, to the extent that any party asserts that providing an opportunity to cure defects with a signature would result in unjustified costs or delays, the Complaint alleges that Defendants already provide such an opportunity to cure to in-person voters who fail to properly comply with in-person photo ID requirements. *See* docket no. 1 ¶ 59 (citing Tex. Elec. Code. § 65.0541). Moreover, at this stage, the Court is in no position to evaluate (i) the cost or burdens associated with promulgating standards and/or mandating training related to signature comparisons or (ii) the extent to which the existing provisions already result in uniformity,[23] and thus, neither evaluation is a basis for dismissal. Accordingly, at least based on Plaintiffs' allegations, the Court cannot conclude that any state interest outweighs the disenfranchisement that results from the existing mail-in ballot procedures and signature verification process.[24]

Additionally, at least one court has applied the *Anderson/Burdick* framework to a similar equal protection claim targeting Florida's signature-comparison framework for mail-in ballots that failed to provide (i) pre-rejection notice and an opportunity to cure and/or (ii) uniform procedures for conducting signature comparisons, and that court issued injunctive relief after finding that the

---

[23] Defendant Secretary directs the Court to Tex. Elec. Code §§ 87.041(e), (f) & 87.027(i) for the proposition that "local election officials employ a uniform standard provided by statute" when comparing signatures. *See* docket no. 30 p. 19. However, these sections provide guidance as to which signatures an EVBB or SVC should use for the purposes of signature comparison, but the sections provide no guidance as to the appropriate procedure or standard for determining that a voter's signatures do not match.

[24] Of course, Defendants may certainly develop a record on these issues and move again on these issues if the record supports their contention.

plaintiffs were likely to succeed on the merits of their claim. *See Florida Democratic Party v. Detzner*, 2016 WL 6090943, at *1, *3 ("The issue in this case is whether Florida's statutory scheme, which provides an opportunity to cure no-signature ballots yet denies that same opportunity for mismatched-signature ballots, is legally tenable. The answer is a resounding 'no.'"). Although this Court fully recognizes that the Florida litigation challenged a different set of mail-in signature-comparison procedures, Plaintiffs' burden at the motion to dismiss stage is much lower in this case. Thus, the court's determination in the Florida litigation further enforces this Court's conclusion that Plaintiffs have adequately *alleged* a potentially viable equal protection claim in this case. Accordingly, the Secretary's Motion is denied to the extent it seeks dismissal of Plaintiffs' equal protection claim.

Finally, much like with their due process claim, the Court concludes that Plaintiffs have also adequately asserted an equal protection claim against the Local Defendants. As an initial matter, the Court interprets the Complaint to assert its equal protection claims against both the Local Defendants and the Secretary.[25] As discussed above, the Court recognizes that the Local Defendants did not draft the Texas Election Code and their alleged conduct may have been

---

[25] The Brazos Motion correctly notes that Count III does not include a specific reference to "Defendants" or "Hancock," and thus, the Brazos EA asserts that Count III does not state an equal protection claim against the Brazos EA. *See* docket no. 29 p. 6. As an initial matter, the Complaint contains general allegations regarding the non-uniformity of the signature-comparison process, including at the local level, and thus, the assertion of such allegations against the Local Defendants is hardly a surprise. *See* docket no. 1 ¶ 73. Moreover, as discussed in note 21, *supra*, the two equal protection claims overlap, and Plaintiffs' allegations regarding the lack of uniformity and/or training regarding signature comparison are included both in Count II (which repeatedly identifies "Defendants" and describes their alleged conduct) and Count III (which describes local officials' alleged conduct but does not specifically reference "Defendants"). Thus, for the practical purposes of this litigation, the Court concludes that Plaintiffs have adequately asserted a claim against the Local Defendants related to the uniformity of the signature-review process and/or the lack of training involving signature comparison, irrespective of whether the Brazos EA or McAllen City Secretary are specifically identified by name in Count III.

consistent with the explicit requirements of the Election Code. However, the allegations indicate that—through the enforcement of the Election Code's provisions—the Local Defendants played an active role in the disenfranchisement of Plaintiffs and/or Plaintiffs' members. Further, the allegations indicate that nothing in the Texas Election Code prohibits the Brazos EA and/or McAllen City Secretary from providing pre-rejection notice of a signature mismatch and/or an opportunity to cure, nor does any provision prohibit local election officials from providing training such that—at least locally—signature reviews are conducted in a uniform and non-arbitrary basis. Accordingly, the allegations in the Complaint do indicate that the Local Defendants were actors in Plaintiffs' alleged equal protection violation, and thus, the Brazos Motion and McAllen Motion are also denied to the extent they seek dismissal of Plaintiffs' equal protection claims pursuant to Rule 12(b)(6).

### D.      Plaintiff CTD's ADA & RA Claims

A plaintiff asserting a claim under Title II of the ADA must allege: "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). The elements of a reasonable accommodation claim under Title II of the ADA and the RA are practically the same. *See* 29 U.S.C. § 794 (a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of [] disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity"); *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000), *cert. denied*, 531 U.S. 959 (2000) (noting that "Congress' intent was that Title II extend the protections of the Rehabilitation Act").

Plaintiff CTD alleges that "[d]efendants' refusal to reasonably accommodate [] mail-in ballot voters with disabilities—either by allowing them to contest and cure a ballot rejected for signature mismatch or by not applying the signature-comparison requirements to their ballots—discriminates against said voters and excludes them from participation in and unfairly denies them the benefits of the mail-in ballot process." Docket no. 1 ¶ 6. Defendant Secretary argues that Plaintiff CTD fails to state a claim under the ADA or RA and CTD fails to allege discrimination because the Texas Election Code provides for reasonable accommodations that prevent disabled individuals from being denied benefits. *See* docket no. 30 p. 20. Specifically, the Secretary states that "any disabled voter can avoid having the signature-comparison requirements applied to their ballots [if he or she] sign[s] through a witness." *See id.* (citing Tex. Elec. Code § 97.041(b)(1)-(2)). The Secretary also asserts that disabled voters have the right to vote in-person at the curbside of a polling place if the voter is unable to enter the polling place. *See* docket no. 35 (citing Tex. Elec. Code § 64.009).

As an initial matter, the Court notes that Defendant Secretary has asked the Court to conclude—at the motion to dismiss stage—that the State has provided disabled plaintiffs with reasonable accommodations as a matter of law. The Secretary's request again ignores that the Court must accept Plaintiffs' allegations at this stage. The Secretary is welcome to make this argument at later stages in the litigation after an evidentiary record has been developed, but it would be improper for the Court to rely on these assertions as a basis for dismissal. Instead, upon a review of the allegations, the Court concludes that Plaintiff CTD has adequately alleged that disabled voters who are unable to duplicate their signatures are not provided an opportunity to vote that is equal and equally effective as the opportunity provided to others.[26] Accordingly, the

---

[26] Plaintiff CTD argues that the witness signature option deprives a disabled voter of the ability to vote privately. *See* docket no. 32 p. 40. The Secretary responds to CTD's assertion by noting that

Secretary's Motion is denied to the extent it seeks dismissal of the Plaintiff CTD's ADA and RA claims.

Finally, the Brazos Motion argues that the Complaint does not "state that [Hancock] did anything wrong" with respect to Plaintiff CTD's alleged ADA and RA violations. *See* docket no. 29 p. 6. Although the Brazos Motion contends that Hancock merely complied with state law, CTD alleges that Hancock's (and other local officials') enforcement of the Election Code violated the ADA and RA. *See, e.g.*, docket no. 1 ¶ 81. Accordingly, the Court finds that Plaintiff CTD has also adequately alleged a claim against Brazos EA with respect to violations of the ADA and RA, notwithstanding the Brazos Motion's contention that Hancock merely followed state law.[27]

## CONCLUSION AND ORDER

For the reasons set forth above, Defendants' motions to dismiss (docket nos. 27, 29 & 30) are **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** this ___ day of December, 2019.

ORLANDO L. GARCIA
Chief United States District Judge

---

a disabled voter may still vote in private before having a witness sign the envelope. *See* docket no. 35 p. 10. Even assuming the Secretary's assertion is true, however, the framework still requires a disabled voter to locate and then seek the assistance of a witness, a burden that is not imposed on non-disabled voters. The same is also true to the extent a disabled voter must seek assistance in reaching the polling place before he or she is even able to vote curbside. Thus, the Court concludes that Plaintiff CTD states a claim pursuant to the ADA and RA even if the Secretary's assertions regarding accommodations are given weight at this stage.

[27] The McAllen Motion does not specifically address Plaintiff CTD's ADA and RA claim, but for the same reason, the Court concludes that Plaintiff CTD has also adequately alleged such a claim against the McAllen City Secretary.