UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES, MOVE TEXAS CIVIC FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, and AMERICAN GI FORUM OF TEXAS, INC., | § § § § § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Civil Case No. 5:19-cv-00963-OLG |
| TEXAS SECRETARY OF STATE, TRUDY HANCOCK, in her official capacity as BRAZOS COUNTY ELECTIONS ADMINISTRATOR, and PERLA LARA in her official capacity as CITY OF MCALLEN, TEXAS SECRETARY, | § § § § § § § | |
| *Defendants*. | § § | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# Table of Contents

PRELIMINARY STATEMENT ..................................................................................................2

PROCEDURAL BACKGROUND............................................................................................4

UNDISPUTED FACTS ............................................................................................................5

A.    Mail-in Voting Procedure .............................................................................................5

B.    Processing Applications for Ballot by Mail.................................................................7

C.    Processing and Qualifying the Mail-in Ballots...........................................................8

D.    Flaws in the Signature Comparison Procedure.........................................................11

    1.    Reasons Signatures Often Do Not Match ......................................................12

    2.    Members of an EVBB Receive No Training and Insufficient Guidance.............12

E.    The Plaintiffs in this Case ...........................................................................................16

    1.    Dr. George Richardson ...................................................................................16

    2.    Rosalie Weisfeld .............................................................................................17

    3.    Austin Justice Coalition ..................................................................................19

    4.    Coalition of Texans with Disabilities .............................................................20

    5.    MOVE Texas Civic Fund ...............................................................................22

    6.    League of Women Voters of Texas .................................................................26

STANDARD OF REVIEW ......................................................................................................28

ARGUMENT ...........................................................................................................................29

A.    Plaintiffs Satisfy the *Mathews* Test for Their Procedural Due Process Claim .................29

    1.    The Private Interest Affected by Official Action is the Right to Vote .................30

    2.    The Risk of Erroneous Deprivation is Great, as is the Probable Value of Procedural Remedies ...................................................................................30

    3.    The Threat to Government Interests and Cost of Remedial Procedures are Low ...................................................................................................................34

B.    Defendants' Implementation Of Signature-Matching Procedures Violates The Equal Protection Clause ...........................................................................................37

    1.    Legal Standard ...............................................................................................37

    2.    The Disenfranchisement Of Mail-In Voters By Texas's Signature-Comparison Procedure Constitutes A Severe Burden ...........................................38

    3.    There Is No Relevant And Legitimate State Interest That Justifies The Rejection Of Mail-In Ballots Under Defendants' Signature-Matching Processes With No Meaningful Notice or Opportunity To Cure.........................41

C.    Defendants' Implementation of the Texas Election Code's Mail-In Ballot Provisions Violates Title II Of The Americans With Disabilities Act Of 1990 And The Rehabilitation Act Of 1973 .........................................................................44

1.      Legal Standard ................................................................................................45

2.      Plaintiff CTD's Members Are Qualified Individuals Under The ADA and RA ..................................................................................................................46

3.      Plaintiff CTD's Members Are Being Denied Equal Access Mail-In Voting By Reason Of Their Disabilities ......................................................................47

PRAYER ...........................................................................................................................53

TABLE OF AUTHORITIES

## Cases

*Alexander v. Choate*, 469 U.S. 287 (1985) ........................................................ 52

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ........................................... 37, 38, 41, 42

*Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448 (5th Cir. 2005) ............................................................................................ 45, 46, 47

*Burdick v. Takushi*, 504 U.S. 428 (1992) ................................................ 37, 38, 41, 42

*Bush v.* Gore, 531 U.S. 98 (2000) .......................................................................... 41

*California Council of the Blind*, 985 F. Supp. 2d 1229 (N.D. Cal. 2013) ................................................................................................... 50, 51

*Commerce & Indus. Ins. Co. v. Grinnell Corp.*, 280 F.3d 566 (5th Cir. 2002) (citation omitted) ..................................................................... 28

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) ......................... 37, 38, 42

*Delano-Pyle v. Victoria Cty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002) .......................................................................................................... 45

*Democratic Exec. Comm. of Fla. v. Detzner,* 347 F. Supp. 3d 1017 (N.D. Fla. 2018) .............................................................................................. 4

*Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312 (11th Cir. 2019) ................................................................................................... 4, 39, 43

*Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189 (2d Cir. 2014) ......................................................................... 50

*Fla. Democratic Party v. Detzner,* 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016) ....................................................................... 4, 39, 42, 43

*Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011) ......................................... 45

*Hale v. King*, 642 F.3d 492 (5th Cir. 2011) ............................................................. 46

*Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) ............................... 30

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003) (citation omitted) ......................................................................................................... 49

*In re Texas EZPawn Fair Labor Standards Act Litig.*, 633 F. Supp. 2d 395 (W.D. Tex. 2008) (citation omitted) ........................................... 28

*League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ....................................................................... 39

*Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga 2018) *appeal dismissed sub nom* ..................................................................... 4, 30, 44

*Martin v. Sec'y of State of Georgia*, 2018 WL 7139247 (11th Cir. Dec. 11, 2018) .................................................................................... 30

*Mathews v.* Eldridge, 424 U.S. 319 (1976) ....................................................... 29, 30, 35

*Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494 (4th Cir. 2016) ........................... 50, 52

*Ne. Ohio Coal. For the Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012) ....................................................................................................... 39

*Norman v. Reed*, 502 U.S. 279 (1992) ........................................................... 42

*Reynolds v. Sims*, 377 U.S. 533 (1964) ......................................................... 30, 37

*Saucedo v. Gardner,* 335 F. Supp. 3d 202 (D.N.H. 2018) ..................................... passim

*Stringer v. Pablos*, 2020 WL 532937 (W.D. Tex. Jan. 30, 2020) ............................... 37

*Taylor v. Louisiana*, 419 U.S. 522 (1975) ....................................................... 43

*Tennessee v. Lane*, 541 U.S. 509 (1978) ........................................................ 47

*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002) ........................................... 48

*Wesberry v. Sanders*, 376 U.S. 1 (1964) ........................................................ 38

*Zessar v. Helander,* 2006 WL 642646 (N.D. Ill. March 13, 2006) .......................... 4, 30, 31

## State Statutes

Tex. Elec. Code § 1.011 ........................................................................... 49

Tex. Elec. Code § 1.011(a) ....................................................................... 34

Tex. Elec. Code § 102.001 ........................................................................ 34

Tex. Elec. Code § 102.001(a) ..................................................................... 34

Tex. Elec. Code § 102.003(c)(3) .................................................................. 34

Tex. Elec. Code § 102.004 ........................................................................ 34

Tex. Elec. Code § 102.006 ........................................................................ 34

Tex. Elec. Code § 31.043 ........................................................................... 7

Tex. Elec. Code § 31.091(1) .................................................................... 10, 32

Tex. Elec. Code § 32.071 ........................................................................... 7

Tex. Elec. Code § 64.009 .......................................................................... 51

Tex. Elec. Code § 65.0541(a) ..................................................................... 36

Tex. Elec. Code § 82.001 .......................................................................... 52

Tex. Elec. Code § 82.004 .......................................................................... 52

Tex. Elec. Code § 83.001 ........................................................................... 7

Tex. Elec. Code § 83.002 ........................................................................... 7

Tex. Elec. Code § 83.005 ........................................................................... 7

Tex. Elec. Code § 84.003(c) ...................................................................... 34

Tex. Elec. Code § 84.004 ........................................................................................ 34

Tex. Elec. Code § 84.007 .......................................................................................... 5

Tex. Elec. Code § 84.007(b) ...................................................................................... 5

Tex. Elec. Code § 84.007(b-1) ................................................................................... 5

Tex. Elec. Code § 84.012 .......................................................................................... 7

Tex. Elec. Code § 86.001 .......................................................................................... 7

Tex. Elec. Code § 86.0015 ........................................................................................ 6

Tex. Elec. Code § 86.002 .......................................................................................... 8

Tex. Elec. Code § 86.005(a)-(c) ................................................................................ 6

Tex. Elec. Code § 86.006(a) ...................................................................................... 6

Tex. Elec. Code § 86.008 .......................................................................................... 8

Tex. Elec. Code § 86.009 .......................................................................................... 8

Tex. Elec. Code § 86.011 .......................................................................................... 8

Tex. Elec. Code § 86.011(b) ...................................................................................... 8

Tex. Elec. Code § 86.013(c) ...................................................................................... 6

Tex. Elec. Code § 87.0241 ........................................................................................ 9

Tex. Elec. Code § 87.0241(b)(2) ............................................................................... 9

Tex. Elec. Code § 87.0241(e) .................................................................................... 9

Tex. Elec. Code § 87.027(a) ...................................................................................... 9

Tex. Elec. Code § 87.027(a-1) ................................................................................... 9

Tex. Elec. Code § 87.027(d) ...................................................................................... 9

Tex. Elec. Code § 87.027(f) ....................................................................................... 9

Tex. Elec. Code § 87.027(h)–(j) ................................................................................ 9

Tex. Elec. Code § 87.027(i) ....................................................................................... 9

Tex. Elec. Code § 87.027(j) ....................................................................................... 9

Tex. Elec. Code § 87.041(b)(1)–(2) ...................................................................... 3, 39

Tex. Elec. Code § 87.041(b)(2) ........................................................................ 14, 39, 49

Tex. Elec. Code § 87.041(e) ..................................................................................... 14

Tex. Elec. Code § 87.041(f) ...................................................................................... 14

Tex. Elec. Code § 87.0431 ..................................................................................... 9, 33

Tex. Elec. Code § 87.127(a) .................................................................................. 10, 32

Tex. Elec. Code §§ 82.001–82.004 ......................................................................... 5, 49

Tex. Elec. Code §§ 84.007–84.009 ............................................................................ 7

Tex. Elec. Code §§ 87.021–87.024 ........................................................................ 8

Tex. Elec. Code §§ 87.022–87.024 ........................................................................ 9

## Federal Statutes

28 C.F.R. § 35.130(b)(1)(ii) ...................................................................... 48, 51, 53

28 C.F.R. § 35.130(b)(1)(iii) ................................................................................ 50

28 U.S.C. § 1657 ................................................................................................... 5

29 U.S.C. § 701(b)(1) ................................................................................... 50, 51

29 U.S.C. § 794 .................................................................................................. 47

29 U.S.C. § 794(a) .............................................................................................. 45

42 U.S.C. § 12101(a)(3) ...................................................................................... 47

42 U.S.C. § 12102(1) .......................................................................................... 46

42 U.S.C. § 12102(2) .......................................................................................... 46

42 U.S.C. § 12131(1)(a) ...................................................................................... 47

42 U.S.C. § 12131(1)(b) ...................................................................................... 47

42 U.S.C. § 12132 ............................................................................................... 45

45 C.F.R. § 1232.3(d) ......................................................................................... 47

45 C.F.R. § 1232.3(h) ......................................................................................... 46

45 C.F.R. § 1232.4(a) ......................................................................................... 45

## Rules

Fed. R. Civ. P. 56(a) .......................................................................................... 28

## Constitutional Provisions

U.S. CONST. amend. I ......................................................................................... 38

U.S. CONST. amend. XIV § 1 .............................................................................. 38

Texas's current election system leaves mail-in voters vulnerable to the outright violation of their fundamental right to vote by forcing their ballots to undergo an arbitrary and error-prone signature comparison procedure that provides no meaningful notice and cure protections. According to the United States Election Assistance Commission, alleged mismatched signatures accounted for 1,567 of the 6,131 mail-in ballots rejected in Texas during the 2016 General Election. Similarly, Texas counties rejected for perceived mismatched signatures 3,746 of the 18,754 mail-in ballots rejected during the 2018 General Election.[1] Thus, in the last two General Elections alone, signature mismatch determinations accounted for around 20% to 25% of domestic ballot rejections; over 5,000 Texas voters, like the Individual Plaintiffs in this case, were disenfranchised without any opportunity to challenge the rejection of their ballots.

Texas's signature comparison procedure violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment on its face and as applied, the Americans with Disabilities Act of 1990 ("ADA"), and the Rehabilitation Act of 1973 ("RA") because it does not require Texas election officials to provide voters meaningful pre-rejection notice and an opportunity to cure mail-in ballots rejected for a perceived signature mismatch. Defendants Texas Secretary of State ("SOS"), Trudy Hancock, in her official capacity as Brazos County Elections Administrator ("Brazos County EA"), and Perla Lara, in her official capacity as City of McAllen, Texas Secretary ("McAllen City Secretary") are responsible for enforcing the signature comparison procedure in their respective jurisdictions. Plaintiffs are eligible Texas voters who will use mail-in ballots in upcoming elections and have had their mail-in ballots rejected in previous elections, as well as

---

[1] *See* Ex. 16, Rainbolt Dec. ¶¶ 2–3 (2016 numbers), 6–7 (2018 numbers). According to the United States Election Assistance Commission, alleged signature problems accounted for 367 of the 3,567 Uniformed & Overseas Citizens Absentee Voting Act ("UOCAVA") mail-in ballots rejected in Texas during the 2016 General Election. *Id.* ¶ 4. In the 2018 General Election, Texas counties rejected for signature issues 880 of the 3,030 UOCAVA mail-in ballots rejected. *Id.* ¶ 8.

1

organizations representing themselves and/or members who are at significant risk of disenfranchisement under Texas's current unlawful signature comparison procedure. Plaintiffs respectfully ask the Court to enter final summary judgment against Defendants enjoining their enforcement of Texas's signature comparison procedure or, in the alternative, ordering each to take immediate steps to comply with the Constitution and other federal law by providing mail-in voters meaningful pre-rejection notice and an opportunity to cure ballots with alleged mismatching signatures.

## PRELIMINARY STATEMENT

Every election year, thousands of Texas mail-in voters are disenfranchised by Texas's signature comparison procedure due to the arbitrary rejection of their ballots without pre-rejection notice or an opportunity to cure. The key features of this process, and the key facts of this case, have never been in dispute: SOS is Texas's chief elections officer, and the Brazos County EA and McAllen City Secretary are responsible for the administration of elections in their respective jurisdictions. Lay election officials discard otherwise legally-cast ballots if, in their sole discretion, they perceive a signature mismatch between a voter's mail-in ballot application (or another document on file within the last six years that bears the voter's signature) and the carrier envelope containing the ballot itself. Defendants provide no meaningful guidelines or criteria for these lay election officials to follow, and Texas's signature comparison procedure provides no pre-rejection notice or opportunity for affected voters to correct erroneously rejected ballots. This system does not meet the requirements of the Constitution or other federal law.

Plaintiffs' claims in this case arise from the signature comparison provisions of the Texas Election Code that result in the unlawful disenfranchisement of thousands of Texas voters who choose to vote by mail. The current mail-in ballot process permits lay election officials to reject a

voter's mail-in ballot if, in their sole discretion, they determine that the signature on a carrier envelope or on an application to vote by mail was "executed by a person other than the voter." *See* Tex. Elec. Code § 87.041(b)(1)–(2).

The Texas Election Code provides no guidance or direction on how to compare signatures or verify that signatures are executed by a person other than the voter. Purportedly, to carry out Section 87.041(b)(2), Defendants—through guidance developed by SOS and implemented by local election officials—merely instruct lay early voting personnel to "use their best judgment and to verify if these signatures are the same."[2] Unsurprisingly, the consequences of this vague and unlawful procedure are severe.

Individual Plaintiffs, Dr. George Richardson and Rosalie Weisfeld, were each disenfranchised when election officials unilaterally decided that the carrier envelopes they signed were not actually signed by them. They and Associational Plaintiffs, who collectively have hundreds of members who are eligible to vote by mail and plan to do so in the future, are at significant risk of disenfranchisement when they vote by mail again in upcoming elections. Organizational Plaintiffs have been and continue to be engaged in educating voters about voting by mail and encouraging turnout among voters who vote by mail, only to see their efforts wasted when voters comply with the law and have their ballots arbitrarily rejected anyway. In response to Texas's unlawful signature comparison procedure, Organizational Plaintiffs have each developed guidance to help reduce the chances of a voter having their mail-in ballot rejected.

The provisions allowing a ballot to be rejected under Texas's signature comparison procedure are unconstitutional because (1) they permit a voter's ballot to be rejected without any

---

[2] Ex. 4 at SOS_000466, 468  ("Early Voting Ballot Board & Signature Verification Committee Handbook for Election Judges and Clerks 2020" issued by Defendant SOS ("EVBB Handbook"))

prior notice or opportunity to challenge an improper rejection, and (2) they impose a differential and arbitrary burden on the right to vote that is unjustified. These provisions also violate the ADA and the RA because they deny voters whose disabilities prevent them from being able to produce consistently similar signatures the benefit of voting effectively by mail.

For the same reasons Plaintiffs now advocate, courts across the country—including in challenges to election laws in Florida, Georgia, New Hampshire, and Illinois—have held that signature comparison procedures such as those used in Texas are unconstitutional.[3] Moreover, the harm to Texas voters is likely to become even more acute, as even Defendants recognize that the volume of mail-in voters will almost certainly increase in light of the ongoing COVID-19 pandemic. Nevertheless, Defendants continue to defend Texas's unlawful signature comparison procedure.

The relevant facts of this case are not in dispute and make clear this illegality. Plaintiffs are entitled to summary judgment as a matter of law.

## PROCEDURAL BACKGROUND

Plaintiffs filed this lawsuit on August 7, 2019.[4] Each Defendant moved to dismiss Plaintiffs' claims, but the Court denied each motion.[5] Discovery in this case closed on May 22, 2020.[6] Additionally, Plaintiffs designated an expert witness, Dr. Linton Mohammed, a certified forensic document examiner and expert on signature comparison, and served his expert report on

---

[3] *Democratic Exec. Comm. of Fla. v. Detzner,* 347 F. Supp. 3d 1017 (N.D. Fla. 2018); *Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312 (11th Cir. 2019); *Fla. Democratic Party v. Detzner,* 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016); *Martin v. Kemp,* 341 F. Supp. 3d 1326 (N.D. Ga. 2018); *Saucedo v. Gardner,* 335 F. Supp. 3d 202 (D.N.H. 2018); *Zessar v. Helander,* 2006 WL 642646 (N.D. Ill. March 13, 2006).
[4] Dkt. 1.
[5] Dkt. 27, 29, 30, 41.
[6] Dkt. 59.

all parties on February 3, 2020 in accordance with the federal rules and the Court's Scheduling Order.[7] No other experts were designated in this case. Plaintiffs now respectfully move for summary judgment so that the Court may resolve this matter as soon as possible prior to the November 2020 General Election.[8]

## UNDISPUTED FACTS

Texas law permits early voting by mail for (1) voters who expect "to be absent from the county of . . . [their] residence on election day and during the regular hours for conducting early voting," (2) voters who have "a sickness or physical condition that prevents . . . [them] from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring . . . [their] health," (3) voters "65 years of age or older," and (4) persons "confined in jail"[9] but otherwise eligible to vote. Tex. Elec. Code §§ 82.001–82.004.

### A. Mail-in Voting Procedure

To vote by mail, a voter must first send their county or local election authority an application for ballot by mail ("ABBM") via mail.[10] Tex. Elec. Code § 84.007. A voter must submit the ABBM for a specific election no later than 11 days before Election Day. *Id*. If a voter is voting

---

[7] Dkt. 40, 46.

[8] Plaintiffs request the Court expedite a decision on this matter pursuant to 28 U.S.C. § 1657.

[9]      "A qualified voter is eligible for early voting by mail if, at the time the voter's early voting ballot application is submitted, the voter is confined in jail:
       (1) serving a misdemeanor sentence for a term that ends on or after election day;
       (2) pending trial after denial of bail;
       (3) without bail pending an appeal of a felony conviction; or
       (4) pending trial or appeal on a bailable offense for which release on bail before election day is unlikely."
       Tex. Elec. Code § 82.004(a).

[10] Voters may also fax or email the ABBM as long as the application is also received via mail within four business days after the faxed or emailed application is received by the Early Voting Clerk. Tex. Elec. Code § 84.007(b), (b-1); Ex. 6 (*Application for Ballot by Mail*, Texas Secretary of State, https://webservices.sos.state.tx.us/forms/5-15f.pdf (last visited June 18, 2020)).

by mail because the voter is disabled or is 65 years of age or older, the voter may use a single application to request mail-in ballots for all county elections in a calendar year. Tex. Elec. Code § 86.0015. The ABBM does not instruct the voter how to sign their name or even that the voter's signature will be compared with other signatures on file or reviewed to verify identity.[11]

In order to cast a mail-in ballot, once the voter receives their ballot, the voter must mark the ballot, place it in the official ballot envelope provided by the Early Voting Clerk ("EVC"), seal the official ballot envelope, place the official ballot envelope in the carrier envelope provided by the EVC, seal the carrier envelope, and sign the certificate on the carrier envelope. *Id*. § 86.005(a)-(c). The carrier envelope certificate requires the voter to "certify that the enclosed ballot expresses [the voter's] wishes independent of any dictation or undue persuasion by any person" and includes a line for the voter's signature across a part of the seal flap and a part of the back of the envelope.[12] Tex. Elec. Code § 86.013(c). The carrier envelope must be returned to the county or local election authority. *Id*. §§ 86.006(a), 86.013(c). Like the ABBM, none of the ballot materials sent to the voter instruct the voter how to sign the carrier envelope or even inform the voter that their signature will be compared with other signatures on file or reviewed to verify identity.[13]

---

[11] Ex. 2, Ingram Dep. 32:25–35:4 (discussing ABBM available on Texas Secretary of State website and attached to deposition as Exhibit Ingram 2); Ex. 3 (ABBM attached as Exhibit 2 to Ingram Deposition); Ex. 8 (screenshot of https://www.sos.state.tx.us/elections/voter/reqabbm.shtml (last visited June 18, 2020)) (ABBM available on Defendant SOS's website); Ex. 6 (*Application for a Ballot by Mail*, Texas Secretary of State, https://www.sos.state.tx.us/elections/voter/reqabbm.shtml (last visited June 18, 2020) (same as Ex. 3)).

[12] Ex. 2, Ingram Dep. 35:12–23; Ex. 19 (carrier envelope submitted by Plaintiff Dr. George Richardson in Brazos County 2018 election); Ex. 32 (carrier envelope submitted by Plaintiff Rosalie Weisfeld in McAllen 2019 run-off election).

[13] *See supra* n.11 (ABBM does not inform voter that signature will be compared to others); *supra* n.12 (carrier envelopes received by individual Plaintiffs lacked any such information); Ex. 2, Ingram Dep. 105:2–106:22 (neither carrier envelope nor ABBM mentions signature verification procedure); Ex. 1, SOS 30(b)(6) Dep. 64:15–68:5 (admitting that no materials sent to voter mention the signature verification procedure except unsure whether the "Dear Voter" letter sent with materials and publicly available on Defendant SOS website may do so); Ex. 7 (*Dear Voter*

**B.  Processing Applications for Ballot by Mail**

The Texas Election Code tasks the EVC with handling virtually every aspect of early voting within their respective jurisdictions. Defendants Brazos County EA and McAllen City Secretary serve as the EVCs for their respective jurisdictions.[14] As EVCs they have "the same duties and authority with respect to early voting as a presiding election judge has with respect to regular voting, except as otherwise provided by [Title 7 of the Election Code]." Tex. Elec. Code § 83.001. A presiding election judge for regular voting "is in charge of and responsible for the management and conduct of the election at the polling place of the election precinct that the judge serves." *Id.* § 32.071. The EVC for an election is therefore responsible for all communication with voters seeking to cast a mail-in ballot, with one limited exception discussed below. This includes providing the ABBM, reviewing ABBMs, providing ballots, and communicating with voters about facial defects in their ABBMs or carrier envelopes.[15]

Specifically, all ABBMs must be submitted to the EVC. Tex. Elec. Code §§ 84.007–84.009. The EVC is required, upon request by a voter, to mail the voter an ABBM, and is responsible for reviewing ABBMs, providing ballots to voters, and notifying voters of rejected applications and the reasons for rejection. *Id*. §§ 84.012, 86.001. The EVC is also tasked with providing ballot envelopes and carrier envelopes to voters, mailing or otherwise delivering a new

---

*Letter*, Texas Secretary of State, https://www.sos.texas.gov/elections/forms/dearvoter/dear-voter-letter-may-2020-eng.pdf (last visited June 18, 2020) (containing no mention of signature verification procedure).

[14] *See* Tex. Elec. Code § 83.002 (county clerk is the EVC for county for general elections held at county expense, primary elections, and certain special elections); *id.* § 31.043 (county elections administrator "shall perform . . . the duties and functions placed on the county clerk by [the Election Code]"); *id.* § 83.005 (city secretary is the EVC for an election ordered by an authority of a city); Ex. 12, Lara Dep. 25:20–27:20; 55:11–57:2; Ex. 10, Hancock Dep. 20:8–25, 22:2–9, 30:10–31:2.

[15] Ex. 12, Lara Dep. 25:20–27:20; 55:11–57:2; Ex. 10, Hancock Dep. 20:8–25, 22:2–9, 30:10–31:2.

application to any voter whose submitted application does not fully comply with the requirements, and providing new mail-in ballots to voters if voting options on the ballot change after the provision of the first mail-in ballot. *Id.* §§ 86.002, 86.008, 86.009. The EVC is also permitted to allow a mail-in ballot voter to cure defects in their carrier envelope prior to the mail-in ballot deadline, including by delivering the envelope in person or by mail, or by notifying the person by telephone and advising that they may come to the clerk's office to correct the defect. *Id.* § 86.011. It is undisputed that Defendants Brazos County EA and McAllen City Secretary have carried out or were responsible for carrying out all of these functions in prior elections in their capacities as EVCs for their jurisdictions, and will do so again in future elections.[16] It is also undisputed that they have, in the past, utilized e-mail, text messages, phone calls, and/or physical mail to communicate with voters for these purposes.[17]

### C.  Processing and Qualifying the Mail-in Ballots

Once the application process is complete and the voter has delivered their mail-in ballot, the EVC is responsible for placing the carrier envelopes containing the mail-in ballots, as well as the voters' early voting ballot applications, into jacket envelopes, *id.* § 86.011(b), and then delivering the jacket envelopes to the Early Voting Ballot Board ("EVBB"), *id.* §§ 87.021–87.024.[18]

---

[16] Ex. 12, Lara Dep. 55:11–57:2; Ex. 10, Hancock Dep. 41:20–46:12, 56:13–57:23.

[17] Ex. 12, Lara Dep. 58:5–59:20, 60:19–62:14, 105:11–110:7 (calls and texts sent to voters for deficiencies and instead of written rejection notices); Ex. 10, Hancock Dep. 46:4–22, 47:21–48:21.

[18] *See, e.g.*, Ex. 10, Hancock Dep. 61:17–62:5 (as EVC for Brazos County, Trudy Hancock's office places carrier envelopes containing ballots in locked box and delivers the envelopes to the EVBB when the EVBB meets); Ex. 12, Lara Dep. 71:23–72:8 (as EVC for McAllen, Perla Lara's office has ballots until EVBB meets and then takes them to the EVBB).

The EVBB[19] and its presiding judge have three main duties relating to mail-in ballots under the Texas Election Code. First, the EVBB as a whole must review each mail-in ballot and choose to accept or reject it. Tex. Elec. Code § 87.0241. The ballot must be rejected if the EVBB determines that either "the voter's signature on the ballot application" or "the signature on the carrier envelope certificate is determined to have been executed by a person other than the voter, unless signed by a witness." *Id.* § 87.0241(b)(2). The EVBB is also permitted to compare the signatures on the application or the carrier envelope "with any two or more signatures of the voter made within the preceding six years and on file with the county clerk or voter registrar to determine whether the signatures are those of the voter." *Id.* § 87.0241(e). Second, the presiding judge may request the EVC deliver the jacket envelopes containing the mail-in ballot materials to the EVBB at certain times. *Id.* §§ 87.022–87.024. Third, the presiding judge is required to send notice to a voter that their ballot has been rejected, which can occur up to 10 days after the election. *Id.* § 87.0431.

Because the EVC generally controls every other aspect of the early voting process, the EVC also has authority to manage the EVBB and assist the EVBB in completing its narrow and

---

[19] As discussed immediately *infra* in the text, the EVBB is tasked with determining whether a mail-in ballot should be rejected due to a purported signature mismatch, Tex. Elec. Code § 87.0241, except when a Signature Verification Committee ("SVC") is appointed, in which case the SVC carries out that task, *id.* §§ 87.027(h)–(j). The appointment of an SVC is up to the discretion of the EVC, except that an SVC must be appointed if 15 or more registered voters submit a written request for one. *Id.* §§ 87.027(a), (a-1). Though the EVC does not appoint the members to the SVC, she does determine "the number of members who are to compose the [SVC]," as well as the "place, day or days, and hours of operation of the [SVC]," which can be as far in advance as "the 20th day before election day." Tex. Elec. Code §§ 87.027(d), (f). During operating hours, the SVC carries out the signature comparison procedure and separates the accepted ballots from the rejected ballots before delivering sorted materials to the EVBB at a time designated by the EVBB's presiding judge. *Id.* § 87.027(i). Importantly, the EVBB is not permitted to reverse the SVC's decision that a ballot should be accepted on the basis of a signature match, but may overrule the SVC's decision that a ballot should be rejected on the basis of a signature mismatch. *Id.* § 87.027(j).

specific functions.[20] The EVC manages the EVBB by providing EVBB committee members the EVBB Handbook, a space to convene, all the office supplies necessary to carry out their tasks, assistance whenever the EVBB requires help making a signature determination, and mails out rejection notices for the EVBB.[21] This makes sense. The members of the EVBB are temporarily appointed citizens, and the EVBB, as an entity, requires members to be appointed every election.[22] EVBB members are not expected to spend their own resources on the job, and the EVC manages the resources required for the EVBB to function.

The EVBB's decision to accept or reject a ballot is final. If a voter's ballot is rejected, under Texas's signature comparison procedure, that voter has no recourse or process to challenge the panel's determination that the voter's ballot was "signed by someone other than the voter." The decision to discard a mail-in ballot is not subject to appeal by the voter and although a "county election officer may petition a district court for injunctive or other relief" if the officer believes the EVBB or SVC has made a mistake, the plain language of the statute makes clear the insufficiency of this "remedy"—it belongs to the county official, not the voter, is not available to non-county elections administrators (such as a city or other election authority), and in practical effect, it is extremely difficult to utilize to correct an error.[23] *See* Tex. Elec. Code §§ 87.127(a), 31.091(1).

---

[20] *See, e.g.*, Ex. 12, Lara Dep. 55:11–57:2; Ex. 10, Hancock Dep. 41:20–46:12, 56:24–57:23.

[21] Ex. 12, Lara Dep. 55:11–57:2; Ex. 10, Hancock Dep. 41:20–46:12.

[22] *See* Tex. Elec. Code §§ 87.002, 87.027; Ex. 25 at Richardson-00000011 (letter from Trudy Hancock to Dr. Richardson explaining that the EVBB members are volunteers); Ex. 10, Hancock Dep. 122:14–123:8 (same).

[23] Defendant Trudy Hancock testified in her deposition that she has never made this determination, that it is "not [her] responsibility" to "check [the EVBB's] work," and that it is literally "impossible" for her to utilize this process despite being an Elections Administrator ostensibly qualified to utilize it. Ex. 10, Hancock Dep. 103:25–107:19.

Defendant McAllen City Secretary testified that, despite receiving complaints of ballots rejected in error, she has never attempted to use this provision and is not a county election officer qualified to do so under the statute. *See* Ex. 11, McAllen 30(b)(6) Dep. 53:20–25, 56:9–24.

### D.  Flaws in the Signature Comparison Procedure

Members of the EVBB, who are laypeople, are not provided any training whatsoever in handwriting analysis.[24] Furthermore, nothing in the Texas Election Code or any Texas law precludes a voter from consciously changing their signature—whether because of a name change or any other reason. For example, nothing in the Texas Election Code forbids a voter from signing their full name at one time, and then changing their signature to just an "X" at a later time. The signature comparison procedure takes no account of the entirely permissible possibility that signatures, appearing completely different, can nevertheless be signed by the same person.[25]

---

The Director of Elections for Defendant SOS could identify only a single instance of this process being used anywhere in the State. Ex. 2, Ingram Dep. 44:21–46:16. *See also* Dkt. 41 at 22–23 & n.15 (this Court's order at 15 denying Defendants' motions to dismiss and explaining that this procedure is insufficient to reduce the burden on Plaintiffs for purposes of *Anderson-Burdick*).

[24] Ex. 12, Lara Dep. 78:3–79:8, 79:9–80:21, 81:5–82:11, 129:14–130:19 (no signature related qualifications required or listed on past SVC member applications), 139:16–140:8 ("[W]e're not there to be . . . handwriting experts."); Ex. 10, Hancock Dep. 31:8–19 (Neither EA nor any staff have received training on signature comparison), 73:6–17 (EVBB receives no training from EA, and is only given the EVBB Handbook); Ex. 4 at SOS_000466, 000468 (EVBB Handbook issued by Defendant SOS instructing EVBB members to "use their best judgment" and nothing else).

[25] *See, e.g.*, Ex. 10, Hancock Dep. 78:22-25 ("Q: Is it your belief that the standard is if the signatures don't match, that determines that it's been signed by a different person? A: Correct."), 78:12–14 ("Q: And if the signatures don't match, what does that mean to you? A: If they're not similar."), 109:15–110:16 (identifying "reasonably similar" as a "general standard that is just known in the election community."), 121:24–122:1 ("Q: What constitutes "similar enough" in terms of comparing signatures? A: A reasonable person's acceptance."); Ex. 11, McAllen 30(b)(6) Dep. 61:18–62:13 (EVC explains to complaining rejected voters that their signatures appeared "differently"); Ex. 2, Ingram Dep. 76:23–77:7 (acknowledging that it "possibly happens for a ballot board using their best judgment—to have signatures that were, in fact, made by the same person that they reject because they do not believe they were made by the same person"). Additionally, it is undisputed that Plaintiffs Dr. George Richardson and Rosalie Weisfeld were both improperly disenfranchised when their respective EVBBs incorrectly determined that each of their ABBMs and carrier envelopes was not signed by the same person. *See infra* at 16–19 (Undisputed Facts, Sections E, 1 and 2).

### 1.   Reasons Signatures Often Do Not Match

It is undisputed, as Plaintiffs' expert Dr. Linton Mohammed has testified, that a person's signature may vary for all manner of innocent reasons. This includes accidental occurrences, alternative styles, ambidexterity, carelessness or negligence, changes in the physical condition of the writer, such as fatigue or weakness, changes in the mental condition or state of the writer, the writer's level of concentration, the consumption of drugs or alcohol, the influence of medications, nervous tension, basic natural variations as a result of differences in neuro-muscular coordination, the surrounding writing conditions such as whether in a moving vehicle or at a stationary table, the type of writing instrument such as a pen or a stylus, the individual's stance, and variations in the writing surface itself.[26] Furthermore, studies show that

> illiterate writers, writers for whom English is a second language, elderly writers, disabled writers, and writers with health conditions . . . have less pen control than most other writers" and therefore "have a greater range of variation in their signatures.[27]

Similarly, people between the ages of 18 to 25 "are not likely to have fully developed signatures," leading to "an increased range of variation in a young writer's signature."[28]

### 2.   Members of an EVBB Receive No Training and Insufficient Guidance

EVBB members are not required to be handwriting experts, nor do they receive any training to assist in determining if two signatures were made by the same person. EVBB members are generally only provided the EVBB Handbook, which states the following:

---

[26] Ex. 14, Mohammed Expert Rep. ¶ 41; Ex. 15, Mohammed Dep. 43:5–22 (discussing how a range of variation can occur between scribbling a signature to accept delivery of a package versus going to an attorney's office to sign a last will and testament); *id.* at 74:16–19 ("Some people have a very narrow range of variation. Some people have a very wide range of variation. So it really depends on the individual.").
[27] Ex. 14, Mohammed Expert Rep. ¶ 42; Ex. 15, Mohammed Dep. 68:23–69:5, 72:8–73:5,
[28] Ex. 14, Mohammed Expert Rep. ¶ 42; Ex. 15, Mohammed Dep. 73:6–74:10, 74:20–75:7.

we understand that [EVBB and SVC members] are not handwriting experts. With that said it is at the discretion of the committee members to use their best judgment and to verify if these signatures are the same . . . The standard should be whether the two signatures could have been made by the same person.[29]

As "untrained laypersons," EVBB members are "very likely to make mistakes when comparing signatures and are particularly likely to reject signatures erroneously as inauthentic or non-matching when they are in fact written by the same individual."[30] This is particularly true with respect to the signatures of illiterate voters, English-as-a-second-language voters, young voters, elderly voters, and disabled voters.[31] EVBB members are provided no training on how to "discern whether a feature or combination of features in signatures" constitutes a permissible "variation" in the signature versus an unexplainable "difference."[32] Distinguishing between the two is "one of the most difficult determinations in signature examinations, even for experienced Forensic Document Examiners ("FDEs")."[33] To make such a judgment[34] reliably requires, at a minimum,

---

[29] Ex. 4 at SOS_000466, 000468 (EVBB Handbook); Ex. 12, Lara Dep. 48:3-10 (only provide SOS EVBB Handbook, training limited to EVBB Handbook guidance), 78:3–79:8, 79:9–80:21, 81:5–82:11, 129:14–130:19 (no signature-related qualifications required or listed on past SVC member applications), 139:16–140:8 ("[W]e're not there to be . . . handwriting experts."); Ex. 10, Hancock Dep. 31:8–19, 73:6–17; Ex. 9, Brazos 30(b)6 Dep. 14:1-4 ("Q: Is there any special knowledge, skills, or training required to be an early voting ballot board member? A: Not to my knowledge."), 15:19–16:2 ("Q: What training does Brazos County provide to members of the EVBB? A: None. Q: Does Brazos County provide any training to EVBB members related to signature comparison? A: No. Q: To your knowledge, does anybody else provide such training? A: No."); Ex. 2, Ingram Dep. 48:2–51:5 (the only training EVBB members receive comes from the EVBB Handbook which instructs them to utilize their "best judgment"); Ex. 4 at SOS_000466, 000468  (EVBB Handbook).

[30] Ex. 14, Mohammed Expert Rep. ¶ 32; Ex. 15, Mohammed Dep. 65:9–66:6; Ex. 12, Lara Dep. 98:9–99:4 (recounting that Plaintiff Weisfeld's ballot met all eligibility but was rejected anyway), 136:13–138:7 (discussing Defendant SOS's inspector report indicating that McAllen EVBB had difficulty agreeing on signatures during the June 22, 2019 run-off election), 139:16–140:8; Ex. 69 (inspector report discussed in Lara deposition).

[31] Ex. 14, Mohammed Expert Rep. ¶¶ 42–44; Ex. 15, Mohammed Dep. 65:9–67:16, 68:14–69:5.

[32] Ex. 14, Mohammed Expert Rep. ¶¶ 37–38; Ex. 15, Mohammed Dep. 63:19:64–20.

[33] Ex. 14, Mohammed Expert Rep. ¶¶ 37–38; Ex. 15, Mohammed Dep. 63:19:64–20.

[34] During Dr. Mohammed's deposition. Defendant SOS's counsel repeatedly attempted to draw some distinction between a layperson EVBB member's "judgment" and a "forensic judgment"

years of training under an FDE, including learning the science of signature examination, gaining experience in casework, and being tested for proficiency; adequate magnification and lighting equipment; excellent eyesight; and adequate time[35]—between two and four hours per assessment.[36] Plaintiffs' expert believes that, without this training, EVBB members "are likely to misconstrue legitimate and expected 'variations' between one individual's signatures for 'differences' in signatures between two individuals, and conclude incorrectly that someone other than the registered voter signed the mail-in ballot or ballot application."[37]

Furthermore, even "given proper examination conditions," professionally trained FDEs require a minimum of ten signature samples "for an accurate signature determination to account for an individual's signature variability."[38] However, Texas law and Defendants do not require or even recommend EVBBs review a minimum number of signatures when making their determinations.[39] Tex. Elec. Code §§ 87.041(b)(2), (e), (f). "[F]ailure to use adequate specimens fully representing the range of variation in a writer's signature" is a "well-known source of error."[40]

---

made by an FDE, as though a layperson's judgment can be held to a lower standard. As Dr. Mohammed stated, however, at the end of the day the "judgment" at issue is the same for either an FDE or a layperson—"did someone write the signature or did they not write the signature. . . . that's the judgment I think the election officials are being asked to make" and "[t]he FDEs are being asked to make as well." Ex. 15, Mohammed Dep. 58:6–17.

[35] Ex. 14, Mohammed Expert Rep. ¶ 39.

[36] Ex. 14, Mohammed Expert Rep. ¶ 30; Ex. 15, Mohammed Dep. 44:4–17.

[37] Ex. 14, Mohammed Expert Rep. ¶ 39; Ex. 15, Mohammed Dep. 63:19–64:20.

[38] Ex. 14, Mohammed Expert Rep. ¶ 28; Ex. 15, Mohammed Dep. 42:9–12.

[39] Ex. 4 at SOS_000435–36, 438, 447, 466, 468 (EVBB Handbook containing no instruction beyond that EVBB or SVC may request signatures on file for the last six years); Ex. 1, SOS 30(b)(6) Dep. 49:20–50:3 (only three documents might be used for signature comparison under this provision: the voter's past mail-in ballot carrier envelopes, ABBMs, and voter registration signatures); Ex. 9, Brazos 30(b)(6) Dep. 45:1–46:23 (Brazos County did not find any record of EVBB requesting to compare signatures on record within the last 22 months; supposedly the EVBB "normally" makes such a request "at least once every election" but never more than "dozens"); Ex. 11, McAllen 30(b)(6) Dep. 26:6–27:24 (McAllen EVBB has never requested additional signatures).

[40] Ex. 14, Mohammed Expert Rep. ¶ 49.

In the modern age, that number tends to increase to "15 to 20" because "[i]n today's world where people are not taught to write, you're going to get more variation in signatures."[41] Ideally, these samples are "contemporaneous signatures . . . that are on like documents."[42] Whether 10, 15, or 20 signatures is the baseline for reliable comparison, "this minimum amount can increase exponentially in cases where the writer is ill, disabled, elderly, or has other handwriting issues."[43] Even then, "[d]etermining whether a signature is genuine is a difficult task for even a trained FDE."[44] It is thus of no surprise that "[l]aypersons, such as Texas election officials . . . are significantly more likely than trained examiners to make an incorrect signature-comparison determination and are particularly likely to incorrectly decide that the signatures are *not* signed by the same person."[45] In addition, studies have shown that laypersons are between 3.5 and 5.5 times more likely to make errors than FDEs *even when* given "adequate signature samples and examination time,"[46] up to and including "as much time as they required."[47]

As Dr. Mohammed succinctly put it during his deposition, in response to Defendant SOS's counsel's question of what he believed "would be sufficient guidance" to render Texas's signature-matching process reliable:

> In these cases, not much is going to help, because you have—the officials are comparing one signature with one or maybe two or three other signatures. They have a very limited amount of time and even—I have a number of years of experience in document—as an FDE, and I wouldn't do it. It's just not enough comparison material. You have to remember, a signature is a very small amount of

---

[41] Ex. 15, Mohammed Dep. 42:16–22.

[42] *Id.* at 43: 20–22.

[43] Ex. 14, Mohammed Expert Rep. ¶ 28.

[44] *Id.* ¶ 24.

[45] *Id.*

[46] *Id.* ¶¶ 34–36 (one study found that FDEs had a 7.05% error rate versus laypersons' 26.1% error rate; another that FDEs had a 3.4% error rate versus laypersons' 19.3% error rate); Ex. 15, Mohammed Dep. 53:16–54:11 (discussing one such study; "if you reduce the amount of standard specimens and you reduce the amount of time available . . . the error rates will be bigger").

[47] Ex. 15, Mohammed Dep. 54:2–11.

handwriting, as you can see. You have many factors that can affect the way signatures are executed. And given what the Texas officials have to work with, I think no amount of guidance will help them.[48]

### E.  The Plaintiffs in this Case

#### 1.  Dr. George Richardson

Plaintiff Dr. George Richardson is an individual voter whose mail-in ballot was rejected by Brazos County in the 2018 General Election after the Brazos County EVBB erroneously determined his signature was not his.[49] Dr. Richardson, who is 70 years old, has regularly voted since he was 18 years old.[50] He applied for a mail-in ballot for the 2018 General Election in Brazos County due to his eligibility as a voter 65 years of age or older.[51] After applying for a mail-in ballot, Dr. Richardson properly signed and mailed his ballot in compliance with the Texas Election Code.[52] After the election, he received a letter from Brazos County notifying him that his ballot was rejected because of a signature mismatch.[53] This prompted him to send a letter detailing his experience to the daily newspaper The Eagle, which published it in print and online.[54] Defendant Brazos County EA then wrote Dr. Richardson a letter explaining the signature comparison procedure, that she "underst[ood] that [he was] upset," and that she hoped the explanation

---

[48] *Id.* at 40:5–18.

[49] Ex. 17, Richardson Dep. 24:20–25:6, 27:16–22 (testimony that he signed the mail-in ballot application and carrier envelope at issue); Ex. 25 at Richardson-00000010, 12 (Dr. Richardson's copies of his ABMM and carrier envelope); Ex. 18 (Brazos County's copy of Dr. Richardson's ABBM); Ex. 19 (same, for Dr. Richardson's carrier envelope); Ex. 21, Richardson Dec. ¶¶ 1–11; Ex. 9, Brazos 30(b)(6) Dep. 37:4–11.

[50] Ex. 17, Richardson Dep. 19:16–20:5.

[51] Ex. 17, Richardson Dep. 20:14–20, 22:19–23:1; Ex. 21, Richardson Dec. ¶ 4.

[52] Ex. 17, Richardson Dep. 24:20–26:12, 27:16–28:15; Ex. 21, Richardson Dec. ¶¶ 5–6.

[53] Ex. 17, Richardson Dep. 28:19–29:14; Ex. 25 at Richardson-00000009 (Dr. Richardson's copy of his notice of rejection); Ex. 20 (Brazos County's copy of Dr. Richardson's notice of rejection); Ex. 21, Richardson Dec. ¶¶ 6–7.

[54] Ex. 17, Richardson Dep. 29:15–30:2; Ex. 24 (The Eagle online article); Ex. 22 (The Eagle print article).

"help[ed] ease [his] confusion and frustration with voting by mail."[55] Dr. Richardson also went to

the Brazos County election office to complain and spoke with an individual at the front desk who

"shrugged and said 'Well, I wouldn't have rejected them.'"[56] She also explained the signature

comparison was carried out by "three people that are not experts in anything regarding

signatures,"[57] who simply "eye ball[ed]" the signatures before making the final decision that his

signature was not his.[58]

Dr. Richardson has been a physician for 41 years and has never had his signature on a

prescription questioned by a pharmacist.[59] Had Brazos County notified Dr. Richardson during the

election that county election officials questioned the signature on his application or carrier

envelope, Dr. Richardson would have confirmed that the signatures were, in fact, his own.[60] Dr.

Richardson intends to continue voting by mail because it is "convenient" and "easy."[61]

### 2.  Rosalie Weisfeld

Plaintiff Rosalie Weisfeld is a voter whose mail-in ballot was rejected in the City of

McAllen 2019 Runoff Election after the McAllen EVBB erroneously determined her signature

was not hers.[62] Ms. Weisfeld applied for a mail-in ballot for the June 22, 2019 McAllen, Texas

Runoff Election because she had to be out of the county during the early voting period and on

---

[55] Ex. 25 at Richardson-00000011 (letter from Trudy Hancock to Dr. Richardson)

[56] Ex. 17, Richardson Dep. 29:15–32:1; Ex. 21, Richardson Dec. ¶ 9.

[57] Ex. 17, Richardson Dep. 31:10–20.

[58] Ex. 21, Richardson Dec. ¶ 9.

[59] Ex. 23 (Dr. Richardson's Texas Medical Board license); Ex. 17, Richardson Dep. 41:18–42:11, 43:6–10.

[60] Ex. 21, Richardson Dec. ¶ 11.

[61] Ex. 17, Richardson Dep. 37:14–38:1; Ex. 21, Richardson Dec. ¶ 12.

[62] Ex. 30, Weisfeld Dec. ¶¶ 4–11; Ex. 26, Weisfeld Dep. 29:11–31:7, 36:21–37:24 (testimony that she signed the mail-in ballot application and carrier envelope at issue); Exs. 31, 32 (Ms. Weisfeld's copies of her ABBM and carrier envelope); Ex. 27 and Ex. 13 at 95 (McAllen's copy of Ms. Weisfeld's ABBM); Ex. 28 (Ms. Weisfeld's carrier envelope bearing stamp indicating the McAllen City Secretary's Office received it); Ex. 12, Lara Dep. 98:9–99:4; 116:20–118:6

Election Day.[63] She included her e-mail address, phone number, mailing address, and residential address on the application.[64] After applying for a mail-in ballot, Ms. Weisfeld properly signed and mailed her ballot in compliance with the Texas Election Code.[65] On July 4, she received a letter from the City of McAllen, mailed to her fiancé's Houston address where she was no longer visiting, notifying her that her ballot was rejected because of an alleged signature mismatch.[66] The envelope carrying the rejection notice was postmarked June 26, meaning it was sent four days after the June 22 election was over, and the notice itself was dated June 22.[67] Had the City of McAllen notified Ms. Weisfeld prior, during, or soon after the election that city election officials questioned the signature on her ballot envelope, Ms. Weisfeld would have readily confirmed that the signatures on the application and envelope were both, in fact, her own.[68]

Ms. Weisfeld has voted in every election for which she was eligible, except for one, since she registered to vote more than 40 years ago, including school board, city council, primary, runoff, constitutional, presidential, and gubernatorial elections.[69] However, she has frequently travelled for professional engagements in the past and currently travels often to see friends and family.[70] As a result, she has voted by mail numerous times.[71] Furthermore, Ms. Weisfeld recently suffered a traumatic brain injury following a car accident.[72] She is currently undergoing recovery treatment

---

[63] Ex. 26, Weisfeld Dep. 26:22–27:25, 37:5–24, 39:21–40:12; Ex. 30, Weisfeld Dec. ¶ 4; Ex. 12, Lara Dep. 116:20–118:6.
[64] Ex. 30, Weisfeld Dec. ¶¶ 4, 12; Exs. 27, 31; Ex. 12, Lara Dep. 116:20–18:6.
[65] Ex. 26, Weisfeld Dep. 29:11–31:7, 36:21–37:24; Ex. 30, Weisfeld Dec. ¶¶ 4–7.
[66] Ex. 30, Weisfeld Dec. ¶ 8; Ex. 26, Weisfeld Dep. 19:23–20:6, 60:6–20; Ex. 33 (copy of Ms. Weisfeld's notice of rejection in Spanish); Ex. 29 (same, in English).
[67] Ex. 30, Weisfeld Dec. ¶ 9; Ex. 33.
[68] Ex. 26, Weisfeld Dep. 44:7–16; Ex. 30, Weisfeld Dec. ¶ 12.
[69] Ex. 26, Weisfeld Dep. 20:1–6, 24:22–25:13; Ex. 30, Weisfeld Dec. ¶ 2.
[70] Ex. 30, Weisfeld Dec. ¶ 3; Ex. 26, Weisfeld Dep. 33:17–34:13.
[71] Ex. 30, Weisfeld Dec. ¶ 3; Ex. 26, Weisfeld Dep. 22:20–23:2, 26:22–27:25.
[72] Ex. 26, Weisfeld Dep. 77:1–8; Ex. 30, Weisfeld Dec. ¶ 16.

and therapy and must travel frequently between McAllen, where she resides, and Houston, where her doctors and therapists are located.[73] Due to this traumatic injury, Ms. Weisfeld intends to vote by mail during the 2020 General Election under the disability qualification.[74] She also intends to vote by mail in any future election in which she is outside of Hidalgo County under the absence from county of residence qualification.[75] And finally, Ms. Weisfeld is 63 years old and intends to exclusively vote by mail once she turns 65, under the 65 years of age or older qualification.[76]

### 3. Austin Justice Coalition

Plaintiff Austin Justice Coalition ("AJC") sues Defendants on its own behalf. AJC is a non-partisan, non-profit organization "dedicated to serving people who are historically and systematically impacted by gentrification, segregation, over policing, a lack of educational and employment opportunities, and other institutional forms of racism in Austin."[77] As part of this mission, AJC operates Project Orange, a coordinated campaign to enter the Travis County Jail, register eligible voters, and assist them in requesting and submitting mail-in ballots.[78] AJC's Project Orange mission is to ensure that eligible voters are able to vote, despite their present confinement in county jails.[79]

AJC's mission is frustrated by state laws that result in the improper rejection of an inmate voter's mail-in ballot, which undermine the very means of empowerment—voting—championed

---

[73] Ex. 26, Weisfeld Dep. 77:10–25; Ex. 30, Weisfeld Dec. ¶ 16.

[74] Ex. 30, Weisfeld Dec. ¶ 16.

[75] *Id.* ¶ 15.

[76] *Id.* ¶ 16.

[77] Ex. 35, Rodionov Dec. ¶ 3 (internal quotation marks omitted); Ex. 34, AJC 30(b)(6) Dep. 25:11–20 ("AJC is a black-led organization that serves the black and brown populations of Austin, Texas, in helping them liberate themselves from the systemic racism in our society.").

[78] Ex. 35, Rodionov Dec. ¶ 4; Ex. 34, AJC 30(b)(6) Dep. 43:14–46:23.

[79] Ex. 35, Rodionov Dec. ¶¶ 4, 6–9; Ex. 34, AJC 30(b)(6) Dep. 43:14–46:23.

by Project Orange. [80] AJC must expend resources to educate inmate voters about ABBMs and

mail-in ballots.[81] Among other services, AJC, through its representatives, educates inmate voters

on how to fill out the ABBM section by section and instructs each inmate voter to write out their

signature neatly in order to avoid improper rejection.[82] AJC works with the Travis County Jail and

the Travis County Elections Department to ensure mail-in ballots are received by the inmate voters,

and that completed mail-in ballots are received by the Travis County Elections Department on

time.[83] AJC, through its representatives, instructs each inmate voter to neatly write out the

signature across the flap of the carrier envelope in order to avoid improper rejection.[84]

### 4.   Coalition of Texans with Disabilities

Plaintiff Coalition of Texans with Disabilities ("CTD") sues Defendants on its own behalf

and on behalf of its members[85] who use the mail-in ballot process based on their eligibility due to

disability. These members are qualified individuals with a disability for purposes of the ADA and

---

[80] Ex. 35, Rodionov Dec. ¶¶ 11–12.

[81] Ex. 35, Rodionov Dec. ¶¶ 6–11 (Project Orange has devoted hundreds of hours registering inmates to vote, educating inmates on how to fill out ABBMs, and instructing inmates "to carefully and neatly sign the application material" in an attempt to prevent improper disenfranchisement); Ex. 34, AJC 30(b)(6) Dep. 45:25–46:23 (AJC volunteers have educated hundreds of inmates on how to use ABBMs), 54:15–56:21 (discussing volunteer hours dedicated to voter registration and ABBM drives in jail), 57:22–58:10 (discussing voter education class given to inmates, including Project Orange's ballot by mail efforts at the jail).

[82] Ex. 35, Rodionov Dec. ¶ 9; Ex. 34, AJC 30(b)(6) Dep. 44:11–14, 45:25–46:23, 61:1–62:14; Ex. 36 (Project Orange reminder sheet for volunteers carrying out vote by mail drives at jail, to ensure that volunteers instruct inmates to print and sign legibly so the county can read their signature).

[83] Ex. 35, Rodionov Dec. ¶ 4; Ex. 34, AJC 30(b)(6) Dep. 58:11–60:1.

[84] Ex. 35, Rodionov Dec. ¶ 9; Ex. 34, AJC 30(b)(6) Dep. 61:21–62:14; Ex. 36 (Project Orange reminder sheet for volunteers carrying out vote by mail drives at jail, to ensure that volunteers instruct inmates to print and sign legibly so the county can read their signature).

[85] Ex. 37, CTD 30(b)(6) Dep. 36:9–23 (CTD has about 2,200 active members across the State), 73:1–16 (CTD is suing on behalf of "any and every one of our members that [the mail-in ballot signature comparison procedure] would affect"), 13:6–15:15, 75:13–76:13 (naming at least four CTD members who intend to vote by mail due to their disability in the future).

RA. Neither the claims asserted nor the relief requested by CTD require the participation of its individual members who regularly vote by mail.

CTD is a non-partisan, non-profit membership organization that works to ensure that people with disabilities may "live, work, learn, play, and participate fully in the community of their choice."[86] CTD organizes events about, advocates around, and educates the public on subjects such as accessible voting, civil rights, and new state level initiatives with the potential to affect the disability community.[87] Depending on the election, CTD informs voters statewide about their ability to cast a mail-in ballot, explains the rules and deadlines related to mail-in ballots, and encourages voters who are eligible to utilize mail-in ballots if they cannot vote in-person.[88] Additionally, persons with disabilities are especially likely to have variations in signatures due their disability.[89] CTD expends and intends to continue to expend resources to educate Texans about mail-in ballots, encourage eligible voters to use mail-in ballots, and guide eligible voters on

---

[86] *Id.* at 25:9–26:21.

[87] *Id.* at 34:5–35:22, 37:9–39:21, 71:4–72:25 (discussing legislative development and community organizing conferences and voter training efforts, including mail-in ballot trainings).

[88] Ex. 37, CTD 30(b)(6) Dep. 38:13–39:21, 71:5–72:20; Exs. 40, 46 (CTD Facebook posts reminding public of vote by mail deadlines); Ex. 39 (Disability Rights Texas voting notice encouraging those displaced by Hurricane Harvey to vote by mail); Ex. 41 (CTD electronic newsletters sent to members and member organizations encouraging people to vote and explaining methods of doing so including vote by mail).

[89] *See supra* at 11–12 & nn. 26–28 (Plaintiffs' expert's testimony regarding greater variation in disabled persons' signatures); *see also* Ex. 37, CTD 30(b)(6) Dep. 19:6–14, 67:11–24, 71:21–25 (CTD's 30(b)(6) witness, Chase Bearden, explaining how his disability—paralysis from the neck down—often makes "my writing look[] different"), 15:1–8 (CTD members "are the people that a lot of them tend to have signature issues").

how to utilize such ballots.[90] CTD specifically diverts resources to further educate and warn mail-in ballot voters about Texas's comparison procedure.[91]

### 5. MOVE Texas Civic Fund

Plaintiff MOVE Texas Civic Fund ("MOVE") sues Defendants on its own behalf. MOVE's principal place of business is in San Antonio, Texas.[92] MOVE is a non-partisan, non-profit, and grassroots organization that builds power in underrepresented youth communities through civic education, leadership development, and issue advocacy.[93] "MOVE" stands for Mobilize, Organize, Vote, Empower.[94] Since its inception, MOVE has worked to expand voter registration and equal access to voting.[95] MOVE actively works to register eligible young people to vote and ensure that they cast a ballot that actually counts.[96] In doing so, MOVE operates on more than 32 college campuses around the State of Texas, with 14 of those in the San Antonio area, and registers thousands of students to vote every year.[97]

---

[90] Ex. 37, CTD 30(b)(6) Dep. 72:21–25 (CTD intends to continue training voters on voting by mail), 60:13–61:4 (discussing how CTD's voting-related work permeates all aspects of its budgetary expenses).

[91] Exs. 46–47 (CTD Facebook posts reminding voters to make sure mail-in ballot-related signatures match); Ex. 42 at CTD-00000040, 43  (2019 Annual Report containing reminder and warning about potential for disenfranchisement); Ex. 43 at CTD-00000066 (online version of report with similar reminder); Ex. 44 at CTD-00000070 (similar reminder on CTD website); Ex. 37, CTD 30(b)(6) Dep. 71:10–25 (explaining that CTD pays special attention to instructing people "to make sure your signature matches as close as possible[], [t]hat way people realize that's an issue[,] [b]ecause for many of them, it's someone holding a piece of paper for them"), 73:18–74:6.

[92] Ex. 49, Galloway Dec. ¶ 2.

[93] Ex. 49, Galloway Dec. ¶ 3; Ex. 48, MOVE 30(b)(6) Dep. 25:17–20, 52:21–53:3; Ex. 58 (organizational slides describing MOVE's mission and areas of priority, including civic education and leadership development).

[94] Ex. 48, MOVE 30(b)(6) Dep. 26:4–8.

[95] Ex. 49, Galloway Dec. ¶ 4; Ex. 48, MOVE 30(b)(6) Dep. 26:11–15.

[96] Ex. 49, Galloway Dec. ¶ 5; Ex. 48, MOVE 30(b)(6) Dep. 29:19–30:18, 52:21–53:3 (MOVE focuses primarily on registering people between the ages of 17–35 to vote, but will register anybody that is in the classroom or comes to MOVE's events regardless of age).

[97] Ex. 49, Galloway Dec. ¶ 5.

Because college students are often absent from their counties of residence while attending school, MOVE educates students in how to apply for mail-in ballots when appropriate and follows up with them to ensure they have mailed their ballots in a timely manner.[98] MOVE works with several distinct groups of students in relation to mail-in ballots: (1) eligible students who attend schools outside of Texas and away from their county of residence; (2) eligible students who attend a Texas school outside of their county of residence; (3) eligible students who attend a Texas school and consider their address at or nearby school as their residence, but are nevertheless away from school during an election for summer work, holidays, or another conflict; and (4) students with disabilities.[99]

Depending on the election, MOVE informs voters statewide about their ability to cast a mail-in ballot, explains the rules and deadlines related to mail-in ballots, and encourages voters who are eligible to utilize mail-in ballots if they cannot vote in-person.[100]

Because of the COVID-19 pandemic that has shuttered many college campuses and threatened the safety of in-person voters, MOVE has expanded its voter education and assistance related to mail-in ballots during 2020, including more extensive information sharing and outreach to voters with whom MOVE has interacted in the past, either by registering those voters or other

---

[98] Ex. 49, Galloway Dec. ¶¶ 6–8.

[99] Ex. 49, Galloway Dec. ¶ 9.

[100] Ex. 49, Galloway Dec. ¶¶ 7–12; Ex. 48, MOVE 30(b)(6) Dep. 30:24–31:9, 31:19–32:8, 37:19–39:7 (MOVE educates young people about the ability to vote by mail, works on vote by mail advocacy with certain Texas counties, and frequently encounters vote by mail questions during voter registration efforts); Ex. 54 (active links to MOVE's past social media posts relating to advocacy and education on mail-in ballots); Ex. 51 (MOVE e-mail to MOVE list-serv containing voting deadlines and reminder to vote); Ex. 52 (phone and voicemail scripts for MOVE volunteers to use in running phone bank to remind voters that the election has begun, to register voters, and to remind voters of the availability of mail-in ballots); Exs. 55, 57 (MOVE posts on Facebook, Instagram, and Twitter reminding public of mail-in ballot deadline and giving instructions on applying for and submitting mail-in ballot); Ex. 56 (MOVE mass text message reminding public of mail-in ballot deadline and providing link to application).

interactions that have allowed MOVE to collect contact information for these voters. In response to this additional outreach, MOVE has also answered many more questions about mail-in ballots, including through social media, and has sent more than 50,000 text messages to eligible voters about their options for mail-in ballot voting, at a cost to MOVE of $0.06 per text, including any questions received from voters and subsequent responses sent by MOVE.[101]

The risk of improper rejection of a student's mail-in ballot directly undermines the efforts MOVE takes to educate eligible voters on how to use mail-in ballots, and wastes MOVE's time and resources spent encouraging eligible students to vote by mail.[102] A particular difficulty in MOVE's work, evidenced by thousands upon thousands of one-on-one interactions with students, is convincing young people that their vote matters.[103] Overcoming this perception in young people is critical to MOVE achieving its goals of increased voter participation.[104] The risk of an improper rejection or even knowledge of the improper rejection of other voters' ballots undermines this work, reduces confidence in elections, and reinforces some students' perception that their votes do not matter.[105] Such perception makes it difficult for MOVE to register or otherwise encourage participation in elections, and as to a particular voter, can take months or years to reverse in MOVE's efforts to create life-long voters.[106]

Based on years of experience and the registering and tracking of voting habits of more than 80,000 new voters registered by MOVE, MOVE estimates that it takes six interactions with a new or young voter to turn them out to vote one time.[107] MOVE additionally estimates that a new or

---

[101] Ex. 49, Galloway Dec. ¶ 11.
[102] *Id.* ¶ 12.
[103] *Id.* ¶ 13.
[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] *Id.* ¶ 14.

young voter must vote in three consecutive elections before they become a regular, or "life-long" voter without the need for further outreach or convincing (80% of voters that MOVE has tracked who vote in three consecutive elections continue to vote in all or most subsequent elections without additional outreach).[108] If external factors disrupt this streak, MOVE's efforts to create life-long voters usually have to start from scratch.[109] The external factors that can play into a voter's confidence in elections, and whether they achieve a streak of voting in three consecutive elections, often have nothing to do with their own effort, but remain extremely detrimental to MOVE's work to make them a life-long voter.[110] These can include a young or new voter who has their voter registration processed late, who could not wait in excessively long lines, who was turned away from the polls for lack of ID or because they appeared at the wrong polling place, who could not vote because of work or family obligations, who received their ballot by mail too late to submit, or had their ballot—either a mail-in or provisional ballot—rejected by election officials.[111] In MOVE's experience, when voters encounter these issues, they lose confidence in the electoral process, the fairness of elections, and the importance of their own role in voting, and MOVE must expend significant resources to convince them otherwise through continued contact and education.[112] Additionally, in order to mitigate or preempt the risk of improper rejection of mail-in ballots under the current mail-in ballot process, MOVE diverts resources to further educate and warn mail-in ballot voters about Texas's signature comparison procedure, and how to take steps to try to prevent such a rejection.[113]

---

[108] *Id.*
[109] *Id.*
[110] *Id.* ¶ 15.
[111] *Id.*
[112] *Id.*
[113] *Id.* ¶ 16; Ex. 48, MOVE 30(b)(6) Dep. 46:21–47:5 ("We also commonly have to educate young people . . . of the importance of making sure that their signature is the same because of the situation

Based on thousands of interactions with potential voters, MOVE estimates that during its regular voter registration and education activities (such as tabling or canvassing at a college campus or presenting to a college class) it has between two to five minutes to engage a potential new voter and provide relevant information to them.[114] Even the small amount of time needed to explain the risk of signature rejections on mail-in ballots and how to reduce this risk reduces the time that MOVE has to discuss other issues with a voter by as much as 25%.[115]

In addition to in-person activities, MOVE sends messages through social media posts and paid texts to make sure that individual voters are following through with their mail-in ballot plans, and specifically warns voters to sign mail-in ballots as clearly and legibly as possible to avoid improper rejection.[116] The resources diverted for these purposes—staff time in drafting, ad buys on social media, and paid text-messaging services—are transferred away from MOVE's in-person voting and voter registration activities, its other education activities, and its limited mail registration drives.[117]

### 6. League of Women Voters of Texas

Plaintiff League of Women Voters of Texas ("LWV") sues Defendants on its own behalf and on behalf of its members who use the mail-in ballot process.[118] Neither the claims asserted nor

---

in Texas."); Exs. 50, 53 (MOVE drafting text message to voters regarding mail-in ballot process and deadlines and reminding voters that "[t]he application must be signed, so make sure your signature is consistent to ensure your vote is counted").

[114] Ex. 49, Galloway Dec. ¶ 17.

[115] *Id.*

[116] *Id.* ¶ 18.

[117] *Id.*

[118] LWV has 33 chapters covering 39 Texas counties, with approximately 3,000 individual members across the state, many of whom vote by mail. Ex. 60, Chimene Dec. ¶¶ 4, 13–15. LWV has named multiple members who will use mail-in ballots in upcoming elections. *Id.* ¶¶ 13–14; Exs. 65, 67 (filed under seal) (e-mails between LWV President Grace Chimene and six LWV members). Additionally, in May of 2020, LWV conducted a voluntary survey of its members about their past and expected future use of mail-in ballots. Ex. 68 (filed under seal). Hundreds of

the relief requested by LWV require the participation of its individual members who regularly vote by mail.

LWV is a non-partisan, non-profit member organization dedicated to "empowering voters and defending democracy."[119] LWV "strives for a democracy where every person has the desire, the right, the knowledge and the confidence to participate" in the democratic process.[120] LWV actively works to educate voters, provide training materials, register eligible people to vote, and ensure that they actually cast a ballot that counts.[121] Depending on the election, LWV informs voters statewide about their ability to cast a mail-in ballot and explains the rules and deadlines related to mail-in ballots.[122]

The improper rejection of mail-in ballots decreases overall confidence in the mail-in ballot process, and elections, generally, which directly undermines the efforts LWV takes to encourage eligible voters to use mail-in ballots and assist said voters with those mail-in ballots.[123] LWV has expended and intends to continue to expend resources to educate Texans about mail-in ballots, encourage eligible voters to use mail-in ballots, and guide eligible voters on how to use such ballots.[124] LWV diverts resources to further educate and warn mail-in ballot voters about Texas's

---

responses indicated use of mail-in ballots in the past, or both the use of mail-in ballots in the past and an intent to do so in the future. *Id.*

[119] Ex. 59, LWV 30(b)(6) Dep. 28:8–29:8; Ex. 60, Chimene Dec. ¶¶ 3, 16.

[120] Ex. 60, Chimene Dec. ¶ 3.

[121] Ex. 60, Chimene Dec. ¶¶ 6–8; Ex. 59, LWV 30(b)(6) Dep. 41:21–42:21, 43:3–47:6, 68:14–70:20 (discussing voter education and registration efforts and resources LWV provides across Texas to local communities for use in voter education, such as volunteer hours, PowerPoints, YouTube videos, social media posts, a website, and other materials).

[122] Ex. 60, Chimene Dec. ¶¶ 8–11; *see note* 124 *infra*.

[123] Ex. 60, Chimene Dec. ¶¶ 11, 16–18.

[124] *Id.* ¶¶ 15–18; Ex. 59, LWV 30(b)(6) Dep. 76:24–77:7 (LWV intends to continue to provide educational materials on voting by mail as long as people are allowed to vote by mail), 41:21–42:21 (discussing voter education and registration efforts, including vote by mail education), 59:15–24 (voting by mail education expenses are "mixed up in everything we do"), 108:14–24 (providing up-to-date mail-in ballot information on LWV's website, social media, YouTube,

signature comparison procedure.[125] Each ballot improperly rejected for an alleged signature mismatch decreases the effectiveness of LWV's work.

## STANDARD OF REVIEW

A party is entitled to summary judgment if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is material if its resolution could affect the outcome of the action." *Commerce & Indus. Ins. Co. v. Grinnell Corp.*, 280 F.3d 566, 570 (5th Cir. 2002) (citation omitted). "Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate." *In re Texas EZPawn Fair Labor Standards Act Litig.*, 633 F. Supp. 2d 395, 397–98 (W.D. Tex. 2008) (citation omitted).

---

Facebook, Instagram, and Twitter is "very time-consuming and an important part of our work that we do"); Ex. 62 (LWV-produced "Vote by Mail: Step by Step" PowerPoint); Ex. 61 (LWV-produced "Get in the Game" PowerPoint covering, among other things, how to apply for and cast a mail-in ballot); Ex. 63 (LWV website page on voting by mail); Exs. 64, 66 (screen captures of YouTube instructional videos on voting by mail created and uploaded by LWV).

[125] Ex. 60, Chimene Dec. ¶¶ 9–10, 17–18; Ex. 59, LWV 30(b)(6) Dep. 114:20–115:9 (both the LWV website and its YouTube videos tell voters to make sure their signatures match for mail-in ballot purposes); Ex. 61 at LWV-000000282-291 (portion of "Get in the Game" voter education PowerPoint covering how to apply for and cast a mail-in ballot, including reminders that "[y]our signature [on the Application for Ballot by Mail] MUST match the one on your voter registration card," to "[b]e sure this signature [on the carrier envelope] is exactly the same as the signature on your Application for Ballot by Mail," and that a ballot may be rejected if "[t]he signature on the [carrier] envelope and on the Application for Mail Ballot are different"); Ex. 62 at LWV-000000356-365 (portion of "Vote by Mail: Step by Step" PowerPoint used in trainings which reminds voters that "[y]our signature [on the Application for Ballot by Mail] MUST match the one on your voter registration card," to "[b]e sure this signature [on the carrier envelope] <u>is exactly the same</u> as the signature on your Application for Vote by Mail," and that a ballot may be rejected if "[t]he signature on the [carrier] envelope and on the Application for Mail Ballot are different"); Ex. 63 (LWV website page on voting by mail, including a reminder for voters to "[a]void any confusion by election officials and sign both your application and ballot in the same way").

**ARGUMENT**

This Court should permanently enjoin Texas election officials from rejecting any mail-in ballot for perceived signature mismatch and declare the relevant portions of the Texas Election Code unconstitutional and unlawful absent a meaningful pre-rejection notice and cure opportunity for affected voters. Texas's signature comparison procedure risks the erroneous deprivation of the right to vote with no furtherance of any legitimate government interest, places a severe burden on mail-in voters' fundamental right to vote through their disenfranchisement and subjection to an arbitrary and error-prone process, and denies certain voters with disabilities meaningful access to Texas's mail-in ballot services by failing to reasonably accommodate them. For these reasons, the undisputed facts show that the Texas Election Code violates the Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, the ADA, and the RA.

### A.  Plaintiffs Satisfy the *Mathews* Test for Their Procedural Due Process Claim

In determining whether a state-created process is adequate under procedural due process, the Supreme Court in *Mathews v. Eldridge* instructed courts to balance the following considerations:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335 (1976).[126] The *Mathews* court further "implored courts to recognize that procedural due process rules are shaped by the risk of error inherent in the truthfinding process as

---

[126] "[M]ultiple courts have applied the *Mathews* framework to substantially similar claims involving due process challenges to mail-in ballot signature-comparison procedures." Dkt. 41 at

applied to the generality of cases, not the rare exceptions." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga 2018) *appeal dismissed sub nom. Martin v. Sec'y of State of Georgia*, 2018 WL 7139247 (11th Cir. Dec. 11, 2018) (quoting *Mathews*, 424 U.S. at 344) (internal quotation marks omitted). As detailed below, application of the three *Mathews* considerations compels a ruling in Plaintiffs' favor on Count I.

### 1.   The Private Interest Affected by Official Action is the Right to Vote

The private interest at issue here is nothing less than the fundamental right to vote. *See e.g. Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 667 (1966) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561–562 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.")). Other courts striking down mail-in ballot signature comparison laws on procedural due process grounds have accorded this factor significant weight. *See, e.g.*, *Martin*, 341 F. Supp. 3d at 1338 ("Here, the Court agrees with Plaintiffs that the private interest at issue implicates the individual's fundamental right to vote and is therefore entitled to substantial weight."); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018) ("Plaintiffs argue that the individual interest at issue is the fundamental right to vote . . . The court accords this factor significant weight."). As the Texas provisions at issue result in the complete deprivation of the fundamental right to vote, consideration of private interests weighs heavily in Plaintiffs' favor.

### 2.   The Risk of Erroneous Deprivation is Great, as is the Probable Value of Procedural Remedies

The risk of erroneous deprivation under the current Texas scheme is great. As noted above, Texas counties rejected at least 3,746 mail-in ballots during the 2018 General Election and at least 1,567 mail-in ballots during the 2016 General Election solely on the basis of mismatching

---

21 (citing *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 214 (D.N.H. 2018); *Martin*, 341 F. Supp. 3d at 1338; *Zessar*, 2006 WL 642646 at *7).

signatures.[127] Even one wrongly discarded ballot implicates the loss of the fundamental right to vote.

Moreover, the current Texas process is fraught with error. As discussed above, the task of handwriting analysis—from which an unappealable decision without the opportunity to cure is made to disenfranchise a voter—is performed by laypersons, with no expert training and no uniform standards to guide their review. For example, when Plaintiff Dr. Richardson confronted Brazos County officials about his rejected ballot, he was told they "eye ball[ed]" his signature.[128] Additionally, local defendants in this case affirm that none of the EVBB members who review signatures are handwriting experts,[129] and the Director of Elections for Defendant SOS testified, and EVBB guidance specifically states, that EVBBs are not required to be handwriting experts.[130] Given the lay status of signature reviewers, combined with a system devoid of expert training or functional standards, there is substantial risk to Plaintiffs' fundamental right to vote.[131] As the court in *Saucedo* noted, "[i]t cannot be emphasized enough that the consequence of a moderator's decision—disenfranchisement—is irremediable." *Saucedo*, 335 F. Supp. 3d at 218 (citing *Zessar*, 2006 WL 642646 at *9).

Thankfully, the probable value of procedural remedies is high. Implementing procedures allowing voters sufficient opportunity to cure alleged signature mismatches will allow voters to

---

[127] *See supra* at 1, n. 1.

[128] Ex. 21, Richardson Dec. ¶ 9.

[129] *See supra* at n.29.

[130] Ex. 2, Ingram Dep. 52:7–12 ("[W]e do not expect [EVBB or SVC members] to be handwriting experts or document examiners."), 102:10–16 ("[W]e tell [EVBB members] you're not handwriting experts, [and] nobody expects you to be a handwriting expert."); Ex. 4 at SOS_000466, 468 (EVBB Handbook, stating that "we understand that the SVC [and EVBB] are not handwriting experts").

[131] *See supra* at 11–15 & nn. 24–48 (Undisputed Facts, Part D, discussing the flaws in the signature comparison procedure).

preserve their fundamental right to vote. Such a procedure would have prevented each of the individual Plaintiffs in this case from being disenfranchised.[132] Given that potentially thousands of voters will attempt to vote by mail in coming elections, especially after the COVID-19 pandemic has taken the lives of over 100,000 Americans, disproportionately among those who are over 65, the positive impact of such change is significant.[133]

### i.    No Sufficient Remedies Currently Exist

Moreover, despite Defendant SOS's suggestions to the contrary in her previous pleadings, sufficient remedial procedures do not currently exist to mitigate the burden on mail-in voters. The decision to discard a mail-in ballot is not subject to appeal by the voter. In her Motion to Dismiss, Defendant SOS described how, "if it is determined that the ballot was rejected in error, *the county election officer may* petition a district court for injunctive or other relief[.]"[134]As described in the Undisputed Facts section above, the plain language of the statute makes clear the insufficiency of this alleged "remedy"—it belongs to the county official,[135] not the voter; is unavailable in elections held by local entities other than a county, such as the election in which Plaintiff Weisfeld was disenfranchised; and is, in practice, extremely difficult to invoke.[136] Thus, only some local officials

---

[132] *See, e.g.*, Ex. 21, Richardson Dec. ¶ 11 (Plaintiff Dr. Richardson would have readily confirmed that it was his signature on his ABBM and his carrier envelope had Brazos County contacted him at any time prior to rejecting his ballot); Ex. 30, Weisfeld Dec. ¶ 12 (same with respect to McAllen).

[133] Ex. 2, Ingram Dep. 95:13–98:13 (Defendant SOS has issued an advisory to Texas counties to prepare for increased mail-in ballot use due to the pandemic and convened an advisory group of counties to have biweekly phone calls about how to prepare for increase); Ex. 9, Brazos 30(b)(6) Dep. 51:11–52:2 (Brazos County expects that mail-in ballot voting will increase due to pandemic).

[134] Dkt. 30 at 15 (citing Tex. Elec. Code § 87.127(a)) (emphasis added) (internal quotation marks omitted).

[135] The term "county election officer" is defined to include only county election administrators (if one exists), county clerks, or, in some circumstances, county tax-assessor collectors. *See* Tex. Elec. Code §§ 87.127(a), 31.091(1).

[136] *See supra* at 8–10 & n. 23 (Undisputed Facts, Part C, discussing the procedures for processing and qualifying mail-in ballots). As noted there, among other things, Trudy Hancock testified in her

may challenge a ballot's rejection, and a voter has no ability to force those officials to petition a district court. That decision is left to the official's discretion. The system's inadequacy is exemplified by Plaintiff Dr. Richardson's experience—he did notify an election official of Brazos County's error, but the office did not pursue any relief.[137] Moreover, notice of a rejected ballot is hardly "prompt," as it can take up to 10 days after an election for a voter to be notified that their ballot was rejected.[138] Tex. Elec. Code § 87.0431.

The "alternative options" for casting ballots—for example, voting in person—not only provide no avenue for redress for an unlawfully disenfranchised mail-in voter, but these options are practically unavailable to many mail-in voters. Voting in-person as an alternate option is not feasible for mail-in voters who receive a notice of rejection after an election, who are voting from outside of their county and cannot travel back to vote in-person, are voting from jail, or are disabled and unable to travel to their polling location to vote in-person. Thus, in-person voting is an insufficient remedy and does not outweigh the procedural flaws inherent to the system.[139]

Defendant SOS's reference in her Motion to Dismiss to the use of witness signatures is similarly insufficient. A witness can only sign for a mail-in ballot voter "if the person required to

---

deposition that it is literally "impossible" for her to utilize this process. Ex. 10, Hancock Dep. 103:25–107:19.

[137] Ex. 21, Richardson Dec. ¶ 9; *See* Ex. 25 at Richardson-00000011 (letter from Trudy Hancock to Dr. Richardson explaining that the incorrect rejection of his ballot was in compliance with the Texas Election Code and making no mention of any attempt to rectify the situation).

[138] This "notice" also cannot "guard against repeat occurrences" by allowing a voter to update their signature on file, as Defendant SOS has alleged, because an updated signature on file will still be reviewed under the same flawed signature comparison procedure. Dkt. 30 at 15.

[139] *See, e.g.*, Ex. 37, CTD 30(b)(6) Dep. 64:8–65:24 (notice and cure is necessary to provide disabled voters who cannot vote in person an opportunity to vote that is equally effective as the opportunity given to those who can); Ex. 30, Weisfeld Dec. ¶¶ 3, 15–16 (unsurprisingly, when outside of the county during the early voting and election period, Ms. Weisfeld votes by mail, and even if she is not outside of the county during the November 2020 election she will need to vote by mail under the disability qualification to accommodate her recent traumatic brain injury).

sign cannot do so because of a physical disability or illiteracy." Tex. Elec. Code § 1.011(a). Many voters, including voters eligible for a mail-in ballot due to a disability, would not be eligible to use a witness under Section 1.011(a) of the Texas Election Code. For those disabled voters who are eligible to use a witness, many simply do not have access to a person who can serve as a witness, such as those voters living alone.[140] Moreover, the Texas Election Code permits a person to serve as a witness only one time for ABBMs, making it difficult to facilitate efficient use of witnesses.[141] *Id.* § 84.004. For example, if a nursing home attendant serves as a witness for a single resident's ABBM, that attendant can no longer serve as a witness to any other nursing home residents who need to submit ABBMs.[142]

### 3. The Threat to Government Interests and Cost of Remedial Procedures are Low

The final *Mathews* factor weighs the government interests at issue, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural

---

[140] Further exacerbating the burden imposed by the use of a witness is the potential liability imposed on the witnesses themselves. Through Box 11 of the ABBM, a witness is required to provide certain information (including their printed name, address, and relationship to applicant), and on the carrier envelope a witness must sign an oath. Box 11 then states that "[f]ailure to complete this information is a Class A misdemeanor if signature was witnessed or applicant was assisted in completing the application." *See also* Tex. Elec. Code § 84.003(c). In other words, a disabled Texan mail-in voter seeking to sign through a witness must find one willing to risk criminal liability for, in the case of the ABBM, mere failure to properly complete a form.

[141] In her Motion to Dismiss, Defendant SOS also cited Section 102.001 of the Texas Election Code, which allows a voter to submit a late ballot through a representative, as a remedy for disabled voters whose disability "originates on or after the day before the last day for submitting an application for a ballot by mail." Dkt. 30 at 15. However, the process under Chapter 102 is afforded only to a tiny minority of Texas's disability community, since, to be eligible, the voter's disability must originate at most the day before the deadline to submit an application for a mail-in ballot. Tex. Elec. Code § 102.001(a). Additionally, the representative who submits a late ballot for a voter cannot serve as a representative for another voter eligible for a late ballot. *Id.* §§ 102.003(c)(3), 102.004, 102.006. As a result, the late ballot process suffers from the same type of insufficiency as the process for mail-in ballots eligible to be signed by a witness.

[142] Ex. 37, CTD 30(b)(6) Dep. 67:1–10.

requirement would entail." *Mathews*, 424 U.S. at 335. Again, consideration of this factor does not weigh in favor of Defendants—the government's interests would actually be enhanced by Plaintiffs' requested improvements to the mail-in ballot process.

Defendant SOS's previous pleadings note three government interests: "fraud prevention and detection; orderly and efficient administration of elections; and safeguarding public confidence in the integrity of Texas elections."[143] The relief Plaintiffs request, however, would advance the state's interest in preventing voter fraud and enhancing the efficiency of elections by adding processes to confirm that signatures were signed by the correct voter. In the same way, adding protective measures to the mail-in ballot process can only serve to enhance public confidence in the integrity of Texas elections, by ensuring lawful votes are properly counted. *See, e.g.*, *Saucedo*, 335 F. Supp. 3d at 220–21 ("Likewise, improving the currently opaque, unreviewable process by which moderators compare signatures and consider extrinsic evidence would only serve to enhance voter confidence in elections.").[144]

Defendant SOS has also argued that Plaintiffs' requested remedies are too burdensome. Since Texas already allows curative schemes for other voters who face issues while attempting to vote, the cost of remedial procedures would likely be low.[145] For example, the State allows in-person voters who forget to bring required identification on Election Day to submit a provisional ballot and then provide required identification to the county registrar within six days after the

---

[143] Dkt. 30 at 14.

[144] *See also* Ex. 49, Galloway Dec. ¶¶ 13–15 (explaining that one of MOVE's greatest difficulties as an organization is convincing young people that their vote matters and building confidence in the electoral process, which is severely undermined by the improper rejection of mail-in ballots).

[145] A meaningful notice and cure process would also cost less time and resources for county election officials who currently have to file a district court action if they wish to overturn an EVBB signature verification determination even after verifying with a voter that the EVBB's determination was incorrect. *See, e.g.*, Ex. 11, McAllen 30(b)(6) Dep. 35:3–17 (noting that extra steps in contacting voters would take almost no time and have no additional cost).

election. Tex. Elec. Code § 65.0541(a). Once the county registrar confirms the required identification, the county will accept the voter's provisional ballot. *Id.*

Additionally, local election officials are already regularly in contact with voters, including those who cast mail-in ballots, via mail, email, text, phone, facsimile, or in-person.[146] Furthermore, the updated notice of rejection of vote by mail form contemplates communication between local election officials and voters about mail-in ballots.[147] The form specifically requires local election officials to be responsive to voters who receive the form and contact them, and local election officials are encouraged to send out the form as soon as possible to ensure that voters find out about their rejected ballot and, if possible, vote in person in order to avoid disenfranchisement.[148] Even though the updated form and corresponding guidance from Defendant SOS does not provide a notice and cure process that is constitutional or compliant with other federal law, the updated form and the directions and recommendations on how to use it are proof that communication between voters and local election officials about mail-in ballots will not burden Defendants.

---

[146] Ex. 10, Hancock Dep. 46:4–16 (when the Brazos County EA's office receives a defective but timely carrier envelope its policy is to send a letter to the voter to allow them to cure the defect), 54:14–56–9 (voters call in to the Brazos County EA's office regularly to discuss issues like voter registration and the mail-in ballot process, and during the lead up to large elections even the EA herself fields multiple calls a day), 125:20–126:8 (Brazos County EA's office communicates with voters by e-mail, including inquiries from voters about the mail-in ballot process); Ex. 12, Lara Dep. 60:17–62:14 (The McAllen City Secretary will "always contact" a voter if there is a deficiency in their ABBM, and voters sometimes call in to say they've changed their mind and wish to vote in person), 116:20–118:6 (when a voter provides their e-mail and phone number on ABBM, as Ms. Weisfeld did, the City Secretary's office can use that information "[i]n the event that we need to contact her or do something . . . in a good faith effort to try and contact them"), 105:11–110:7 (McAllen calls and texts voters regarding application deficiencies, and has sent rejection notices by text in the past).

[147] Ex. 5 at SOS_000738 (Defendant SOS Election Advisory issued February 2020 noting that the Notice of Rejected Ballot, also updated February 2020, and included at SOS_000740, had been revised to include the following: "If you believe that your mail ballot was rejected in error, please contact your early voting clerk to determine what remedies may be available to you").

[148] *Id.*

Plaintiffs' requested relief will therefore not be burdensome, or in any event, will not be so burdensome as to weigh the *Mathews* balancing test in Defendants' favor.

### B. Defendants' Implementation Of Signature-Matching Procedures Violates The Equal Protection Clause

The Constitution protects not only the right of any qualified Texas mail-in voter to cast a ballot, but the equally important right to have that ballot count. *Reynolds v. Sims*, 377 U.S. 533, 554 (1964) ("It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, and to have their votes counted.") (internal citations omitted). Thus, the Equal Protection Clause of the Fourteenth Amendment not only ensures that the fundamental right to cast a ballot is not unduly burdened, but forbids subjecting any ballot to arbitrary or disparate treatment. Defendants violate these principles. Texas's signature comparison procedure places arbitrary and ad hoc restrictions on all mail-in voters. By placing arbitrary restrictions on mail-in voters, Texas's election procedures treat mail-in voters differently than in-person voters, voters with a signature-impairing disability differently than other mail-in voters, and mail-in voters differently than each other based on the fluctuating ad hoc signature comparison standards applied by local jurisdictions.

#### 1. Legal Standard

Equal Protection challenges to burdens placed on voters by state election procedures are evaluated under the standard laid out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992). *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 190-191 (2008); *see also Stringer v. Pablos*, 2020 WL 532937, at *7 (W.D. Tex. Jan. 30, 2020)

(collecting cases); U.S. CONST. amend. I, XIV § 1.[149] The *Anderson-Burdick* standard is a balancing test:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). The *Anderson-Burdick* standard is flexible, and there is no "litmus test for measuring the severity of a burden." *Crawford*, 553 U.S. at 191. Instead, any burden whatsoever must be justified by "relevant and legitimate state interests sufficiently weighty to justify the limitation."" *Id.* (quotations and citations omitted).

### 2. The Disenfranchisement Of Mail-In Voters By Texas's Signature-Comparison Procedure Constitutes A Severe Burden

The first step in the *Anderson-Burdick* analysis here is assessing the burden placed on mail-in voters by Defendants' implementation of Texas's signature comparison procedure. To be clear, the burden at issue is not the requirement that mail-in voters sign their names on ballot applications and ballot envelopes. The burden at issue is the irreversible disenfranchisement caused by Defendants' rejection of mail-in ballots for perceived signature mismatches without any viable notice and opportunity for correction. It is difficult to overstate its severity.

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Consistent with this axiom, courts have consistently held that the mass disenfranchisement of

---

[149] It is Plaintiffs' understanding that Defendants agree that *Anderson-Burdick* applies to these Equal Protection claims, as the Court noted in its denial of Defendants' motions to dismiss. *See* Dkt. No. 41 at 28 n.22 ("[T]he parties appear to agree that the *Anderson/Burdick* standard governs the analysis of Plaintiffs' equal protection claims.").

voters places "a severe burden on the right to vote." *Fla. Democratic Party v. Detzner*, 2016 WL 6090943, at *6 n.11 (N.D. Fla. Oct. 16, 2016) (citing *Ne. Ohio Coal. For the Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012)); *see also League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) (stating that it is a "basic truth that even one disenfranchised voter—let alone several thousand—is too many"); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1321 (11th Cir. 2019) ("[W]e have no trouble finding that Florida's [vote-by-mail signature-matching] scheme imposes at least a serious burden on the right to vote.").

This burden of disenfranchisement is the product of the arbitrary and unappealable nature of Texas's signature comparison procedure. When a Texas voter's mail-in ballot is rejected due to perceived mismatched signatures, this rejection is done by a layperson-comprised EVBB under the auspices of Texas Election Code Sections 87.041(b)(2) and (e). There is no additional statutory guidance as to how election officials should determine when a signature "has been executed by a person other than the voter" or otherwise implement § 87.041(b)(2).

As an initial matter, and as previously discussed, a layperson's comparison of application and ballot signatures to each other (and/or a small number of additional sample signatures) is already an arbitrary and error-filled method of determining whether a signature is genuine.[150] *See Saucedo*, 335 F. Supp. 3d at 218 ("Dr. Mohammed's uncontroverted conclusion is that … election officials are likely to make erroneous signature comparisons.").[151] As explained above in Part A

---

[150] Additionally, mail-in voters who cannot consistently sign the same way due to a disability face an even higher risk of harm because they, as Plaintiffs' Expert explained, "have a greater range of variation in their signatures." *See supra* at 12 & n.27 (Undisputed Facts, Part D.1)

[151] *See also* Mohammed Expert Rep. at ¶¶ 34–36 (one study found that FDEs had a 7.05% error rate versus laypersons' 26.1% error rate; another that FDEs had a 3.4% error rate versus laypersons' 19.3% error rate); Mohammed Dep. 54:2–11 (discussing one such study; "if you reduce the amount of standard specimens and you reduce the amount of time available . . . the error rates will be bigger").

of the Argument, compounding the fraught nature of Defendants' layperson-reliant signature-comparison process is the complete lack of training provided to EVBB members on how to compare signatures.[152] The only guidance of any kind given to EVBB members is Defendant SOS's EVBB Handbook, which is regularly distributed to election officials throughout the state.[153]

The EVBB Handbook does not provide any meaningful signature comparison guidance for local election officials. Instead, it states only that " it is at the discretion of the committee members to use their best judgment and to verify if these signatures are the same. . . . The standard should be whether the two signatures could have been made by the same person."[154] Not only are there are no practical, repeatable procedures or guidelines in the EVBB Handbook, but Defendants themselves cannot consistently articulate what standard the EVBB Handbook is actually explaining.

Keith Ingram, the Director of Elections for Defendant SOS, testified that the standard put forth by the SOS is "could [the signatures] have been made by the same person," and EVBB members are to use "their best judgment" to make this determination.[155] Defendant Hancock testified that she believed EVBB members use a "reasonable [person] standard"—i.e., "what a reasonable person would think" when comparing two or more signatures—while Defendant Lara

---

[152] *See supra* at 12–15 & nn.29–48 (Undisputed Facts, Part D.2, discussing lack of training provided to EVBB members). Ex. 10, Hancock Dep. 73:6–13 ("Q: Are members of the early voting ballot board required to undergo any training? A: I do not know. Q: Have you ever heard of any training of EVBB members occurring? A: The only thing I have knowledge of is that we always supply them a copy of the [Secretary of State's EVBB] handbook before they meet.").

[153] Ex. 10, Hancock Dep. 73:14–74:4 (describing how Defendant Hancock distributes the EVBB Handbook to the EVBB Presiding Judge); *see also* Ex. 12, Lara Dep. 27:3–4 (same).

[154] Ex. 4 at SOS_000466, 468 (EVBB Handbook).

[155] Ex. 2, Ingram Dep. 50:2–10. Mr. Ingram added that "it is at the discretion of the [EVBB] committee members to use their best judgment and to verify that the signatures are made by the same person," and that "[t]he [EVBB] committee members must use their best judgment if the signatures match" but that "the standard has to be whether or not the two signatures could have been made by the same person." *Id.* at 50:18–51:5.

testified that she believed EVBB members look to see if the signatures "resemble[]" one another such that they could "ascertain that it's the same individual and the same voter."[156] Given this framework, it is unsurprising that whether a mail-in voter's ballot is counted or not may not only vary from jurisdiction to jurisdiction, but even among a single jurisdiction's EVBB or SVC members.[157] As Defendant Hancock testified, the Brazos County EVBB divides into two-person teams to review mail-in ballots, and different teams may reach different conclusions with respect to the signatures on the same ballot.[158]

Overall, the disenfranchisement that results from Texas's signature comparison procedure clearly constitutes a severe burden on mail-in voters.

### 3. There Is No Relevant And Legitimate State Interest That Justifies The Rejection Of Mail-In Ballots Under Defendants' Signature-Matching Processes With No Meaningful Notice or Opportunity To Cure

The second step under *Anderson-Burdick* requires weighing the burden placed on voters against the "precise interests" offered by election officials as justification. *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). "However slight that burden may appear … it must be

---

[156] Ex. 10, Hancock Dep. 111:14–23; Ex. 12, Lara Dep. 81:9–19. McAllen City Secretary Perla Lara also testified that EVBB members in McAllen attempt to make their signature comparison determination "unanimous" but that sometimes EVBB members "override" each other's signature comparison determination "if [the vote was] not unanimous and somebody feels that it . . . reasonably resembled the signature, you can take another vote." *Id*. at 81:20–83:4.

[157] For all the same reasons, this is precisely the sort of "arbitrary and disparate treatment"—via a process without "sufficient guarantees of equal treatment" or "minimal procedural safeguards"— as explained in *Bush v. Gore*, the Equal Protection Clause also forbids. 531 U.S. 98, 105-109 (2000); *see also id*. at 106 (concern arises when "standards for accepting or rejecting contested ballots might vary not only from county to county but indeed within a single county"). In *Bush*, the Supreme Court made clear that a voting regulation is unconstitutional "in the absence of specific standards to ensure its equal application." *Id*. at 106. Defendants' signature comparison procedure contains no such standards, and without meaningful pre-rejection notice and an opportunity to cure, have caused and will continue to cause the erroneous disenfranchisement of Texas mail-in voters. This is precisely the type of severe burden accorded significant weight under *Anderson-Burdick*.

[158] Ex. 10, Hancock Dep. 122:18–123:12.

justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'"

*Crawford*, 553 U.S. at 191. Not only is the burden caused by Texas's signature-comparison

procedure far from slight, there is no legitimate interest of any weight that Defendants can offer as

justification.[159]

To the extent Defendants identify the same interests raised previously in this case—"fraud

prevention and detection; orderly and efficient administration of elections; and safeguarding public

confidence in the integrity of Texas elections"[160]—these are plainly insufficient.

As a general matter, the prevention and detection of voter fraud may be a legitimate state

interest. But, as explained above in Section A of the Argument, Defendants' failure to provide

meaningful notice and an opportunity to cure mail-in ballots rejected on the basis of a signature

mismatch in no way furthers this interest, and a meaningful notice and opportunity to cure process

would only serve to strengthen the state's ability to prevent fraud.[161] As the *Detzner* court also

concluded,

> letting mismatched-signature voters cure their vote by proving their identity *further*
> prevents voter fraud—it allows supervisors of elections to confirm the identity of
> that voter before their vote is counted.

---

[159] The Court need not categorize its analysis according to traditional notions of constitutional inquiry (e.g., strict scrutiny, intermediate scrutiny, or rational basis review), as *Anderson-Burdick* is "a more flexible standard." *Burdick*, 504 U.S. at 434. The critical test is whether any burden on the right to vote is justified by interests of sufficient "legitimacy and strength," with consideration given to "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789 (collecting cases). There are no such interests here. However, to the extent Defendants are able to precisely identify any interest of "compelling importance," any signature-matching procedure would still need to be "narrowly drawn" in order to justify the severe burden caused by a no-cure scheme. *Norman v. Reed*, 502 U.S. 279, 289 (1992).

[160] Dkt. 30 at 14.

[161] Dkt. No. 41 at 24 ("[T]he Secretary's stated concerns regarding voter fraud appear to be *inconsistent* with the State's apparent objections to the . . . protections sought by Plaintiffs.") (emphasis in original).

2016 WL 6090943, at *7 (emphasis in original); *see also Lee*, 915 F.3d at 1322 ("Defendants offer no satisfying explanation for why Florida cannot have both a robust signature-match protection and a way to allow every eligible vote-by-mail and provisional voter whose ballot is mistakenly rejected an opportunity to verify their identities and have their votes count.").

Neither is Defendants' previously identified interest in "the orderly and efficient administration of elections" furthered by their refusal to allow an opportunity to cure ballots rejected on the basis of signature mismatch. Even if it were, this interest does not justify Defendants' disenfranchisement of mail-in voters. *See Detzner*, 2016 WL 6090943, at *7 ("[E]ven assuming that it *would* be an administrative inconvenience—and the evidence shows it is not—that interest cannot justify stripping Florida voters of their fundamental right to vote and to have their votes counted.") (citing *Taylor v. Louisiana*, 419 U.S. 522, 535 (1975)). As Defendants have described in great detail, election officials are in regular contact with voters throughout the mail-in voting process, and the necessary administrative infrastructure to contact mail-in voters is already in place. Defendant Hancock testified that the cost to the Brazos County EA's office of mailing a voter was negligible.[162] Defendant Lara testified that her office would be able to provide notice to an affected voter electronically or by fax, and that such notice "wouldn't take long" and would not result in any additional costs. [163] Mail-in voters whose ballots are rejected for failure to sign the ballot envelope—rather than for a mismatch between that signature and the signature on the application—are already contacted by election officials and given the opportunity to cure their ballot.[164]

---

[162] Ex. 10, Hancock Dep. 121:21–125:4.
[163] Ex. 11, McAllen 30(b)(6) Dep. 33:22–35:17.
[164] Ex. 10, Hancock Dep. 47:21–48:4 ("Sometimes we'll receive those [carrier envelopes] back without a signature on those, and we do return the unsigned ones to that voter for them to sign that carrier envelope and return it. But that's the only notification we do."), 48:17–24 ("Q: So as the

A meaningful notice and opportunity to cure process would also only further any state interest in "safeguarding public confidence in the integrity of Texas elections." Confirming that mail-in ballots were properly cast provides an additional safeguard to Defendants' current processes, and a desire to maintain the less robust status quo is not a legitimate justification for the burden it places on mail-in voters. *See Martin*, 341 F. Supp. 3d at 1340 ("[T]he Court does not understand how assuring that all eligible voters are permitted to vote undermines integrity of the election process. To the contrary, it strengthens it.").

There is no legitimate reason—related to voter fraud, administrative efficiency, election integrity, or any other interest—why the same cure opportunity cannot be provided to mail-in voters.

### C. Defendants' Implementation of the Texas Election Code's Mail-In Ballot Provisions Violates Title II Of The Americans With Disabilities Act Of 1990 And The Rehabilitation Act Of 1973

Defendants' implementation of Texas's signature comparison procedure violates Title II of the ADA and the RA because Texas voters with disabilities—including Plaintiff CTD's members—whose signatures vary due to their disability are not provided equal opportunity to participate in mail-in voting. An extension of the RA, the ADA was enacted as

> a broad mandate of comprehensive character and sweeping purpose intended to eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life.

---

Brazos County early voting clerk, have you, in fact—you or your office—notified applicants when their mail-in ballot applications were defective? A: Yes. Q: And you would provide the new applications to these applicants? A: Yes."); Ex. 12, Lara Dep. 58:5–18 ("[B]efore election day, we have contacted [voters], especially if we get [the ballot] before the election—or, you know, when they still have an opportunity to vote on election day, we will contact them."), 60:19–24 ("Q: . . . If you receive an application that has deficiencies, an application for a ballot by mail, and it has deficiencies and there's still time to fix those deficiencies, would you always contact ·the voter about that? A: Yes. On the application, yes."), 107:10–109:8 (describing McAllen City Secretary's office efforts to contact a voter whose mail-in ballot had been rejected via text message).

*Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011) (internal citations and quotation marks omitted). In order to prevent such discrimination, "both the ADA and the R[A] impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). Defendants have failed in this affirmative obligation by not providing impacted CTD members with reasonable accommodations that would allow equal access to the mail-in voting process. Instead, impacted CTD members suffer discrimination by way of an arbitrary signature comparison procedure, the effects of which disenfranchise them and other similarly situated Texans with disabilities in particular. As the undisputed facts in this case show, these signature matching processes are in violation of the ADA and the RA and Plaintiff CTD is entitled to summary judgment on Count IV.

### 1. Legal Standard

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; 45 C.F.R. § 1232.4(a). In nearly identical terms, the RA provides that

> [n]o [person] shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving federal funding assistance.

29 U.S.C. § 794(a); 45 C.F.R. § 1232.4(a); *Delano-Pyle v. Victoria Cty., Tex.*, 302 F.3d 567, 574 (5th Cir. 2002) ("The language in the ADA generally tracks the language set forth in the RA. In fact, the ADA expressly provides that the remedies, procedures and rights available under the RA are also accessible under the ADA. Thus, jurisprudence interpreting either section is applicable to both.") (internal citations and quotation marks omitted)).

A meritorious ADA or RA claim requires a plaintiff to show:

(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.

*Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). In practice, a plaintiff can satisfy these elements by showing that they have a qualifying disability and that this disability prevents meaningful access to a service or activity due to a public entity's failure in its "affirmative obligation to make reasonable accommodations." *Bennett-Nelson*, 431 F.3d at 454. Plaintiff CTD has met these standards because its impacted members have qualifying disabilities, are being denied meaningful access to Texas's mail-in ballot services, and Defendants have made no reasonable accommodations that would otherwise provide equal access for disabled mail-in voters.

## 2. Plaintiff CTD's Members Are Qualified Individuals Under The ADA and RA

It is undisputed that Plaintiff CTD has members with physical and/or mental impairments that substantially limit one or more of their major life activities, including but not limited to performing manual tasks such as seeing, lifting, bending, concentrating, communicating, and/or working. Such individuals are qualified individuals under the ADA.[165] 42 U.S.C. § 12102(1), (2); 45 C.F.R. § 1232.3(h).

---

[165] Ex. 45 at CTD-00000080 (screen grab of CTD "About Us" webpage: "Founded in 1978, CTD is the largest and oldest member-driven cross-disability organization in the state. "Cross-disability" refers to all types of disabilities and different functional needs, rather than a particular disability or subset of disabilities"); *see also* Ex. 37, CTD 30(b)(6) Dep. 25:9-16 ("CTD was started about 1978 by a group of people with disabilities trying to advocate for themselves . . . [a]nd our mission has pretty much stayed the same since the beginning and that was to advocate for people's rights to access."), 36:11-13 (CTD has "2200 active members across the state"); *see infra* at n.167.

### 3. Plaintiff CTD's Members Are Being Denied Equal Access Mail-In Voting By Reason Of Their Disabilities

Defendants[166] are in violation of the ADA and the RA due to their failure to reasonably accommodate disabled Texans who vote by mail. *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005). Because impacted CTD members' signatures vary due to their disability, Defendants' application of these standards to their ballots, without an opportunity to cure or correct a ballot rejected on these grounds, denies them an equal and equally effective opportunity to vote by mail.[167] The only accommodations Defendants point to in previous pleadings—using a witness signature or forgoing the mail-in process entirely by utilizing curbside voting—are wholly inadequate under the law.

---

[166] Defendant SOS, as a state agency, and Defendants Brazos EA and McAllen City Secretary, as other political subdivision agencies, are public entities pursuant to 42 U.S.C. § 12131(1)(a) and (b), 45 C.F.R. § 1232.3(d), and 29 U.S.C. § 794. The administration of elections and voting, including mail-in ballot voting and the counting of votes, is a service, program, or activity provided by Defendants SOS, Brazos County EA, and McAllen City Secretary. *Tennessee v. Lane*, 541 U.S. 509, 529 (1978) (Congress's purpose in enacting Title II was to address "[D]iscrimination against individuals with disabilities persists in such critical areas as . . . education, transportation, communication, recreation, institutionalization, health services, *voting*, and access to public services.") (emphasis added) (citing 42 U.S.C. § 12101(a)(3). Defendants also receive federal funds. *City of McAllen Grant Administration Department*, City of McAllen, https://www.mcallen.net/departments/grants (last visited June 21, 2020); *City Secretary*, City of McAllen, https://www.mcallen.net/departments/secretary (last visited June 21, 2020); *Help America Vote Act (HAVA) 2018-2020 Grant Funding Update, 6/3/2020*, Texas Secretary of State, https://www.sos.state.tx.us/elections/forms/hava/hava-grant-presentation-632020-update.pdf (last visited June 21, 2020); *Help America Vote Act (HAVA)*, Texas Secretary of State, https://www.sos.state.tx.us/elections/hava/hava_act.shtml (last visited June 21, 2020); *Brazos County Adopted Budget for Fiscal Year 2020*, Brazos County Budget Office, http://www.brazoscountytx.gov/DocumentCenter/View/2983 (last visited June 21, 2020).

[167] *See also* CTD 30(b)(6) Dep. 67:11-15 ("[W]hen I was first injured and I had no use of my arms and I could barely wiggle a pen, changing a pen was enough. Changing the paper—or the angle was enough to change my signature."), 71:10-25 (describing signature matching advocacy "That way people realize that's an issue. Because for many of them, it's someone holding a piece of paper for them. I use both hands to sign things, so I actually put my iPhone on top of papers to hold it so I can write, so many times my writing looks different."); Ex. 14, Mohammed Expert Rep. ¶¶ 25, 41–42.

As detailed previously, all Texas mail-in voters are subject to the whims and vagaries of an inadequate signature-matching system. However, impacted CTD members face unlawful discrimination under the ADA and the RA because they are further unable to make their signatures match by reason of their disability. 28 C.F.R. § 35.130(b)(1)(ii) ("A public entity, in providing any aid, benefit, or service, may not … [a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others.").

While all individuals' signatures "naturally vary[]," variations are greater among disabled individuals.[168] Additionally, the laypersons who comprise EVBBs and SVCs are "significantly more likely than [experts] to incorrectly reject authentic signatures of … disabled writers," among others.[169] Thus, based on these undisputed facts, impacted CTD members are denied equal opportunity to participate in and benefit from mail-in voting because their disabilities cause them to produce signatures with greater variation that are more likely to be rejected under Defendants' current signature-comparison procedure.

The question, then, is whether reasonable accommodations have been provided by Defendants such that impacted CTD members can overcome these risks of disenfranchisement and enjoy equal access to mail-in voting. Such accommodations have not been made. A reasonable accommodation is one which is "reasonable on its face, *i.e.*, ordinarily or in the run of cases." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002). In this case the facts are straightforward, the accommodations offered by Defendants are clearly inadequate, and the accommodations

---

[168] Mohammed Expert Rep. ¶¶ 25, 32, 41–42; *see supra* at n. 167.
[169] *See* Mohammed Expert Rep. ¶ 42; *see also see supra* at n. 167.

sought by Plaintiff CTD are plainly reasonable and would not cause an undue financial or administrative burden.

As an initial matter, mail-in voting in and of itself is not a reasonable accommodation for disabled Texans or otherwise the accommodation that is at issue here. In addition to voters with disabilities, mail-in voting is offered to voters who are outside their county of residence during an election, voters 65 years of age or older, and certain otherwise eligible voters who are confined to jail. Tex. Elec. Code §§ 82.001-82.004. Moreover, the fact that these other voters are also subject to the same deficient signature comparison procedure does not relieve Defendants of their obligations under the ADA and RA:

> A "reasonable accommodation" is one that gives the otherwise qualified plaintiff with disabilities 'meaningful access' to the program or services sought. That others cannot avail themselves of the services does not make the minimal access provided to the plaintiff "meaningful."

*Henrietta D. v. Bloomberg*, 331 F.3d 261, 282 (2d Cir. 2003) (citation omitted)); *see also id.* ("As we have held, meaningful access must be defined with reference to the plaintiff's facial entitlement to benefits . . . The mere fact that the plaintiffs, in the current apparently broken . . . system, might not be doing worse than persons without disabilities, does not render the dysfunctional [system] 'reasonable.'").

The first of two purported accommodations Defendants claim from previous pleadings in this case are the allowance of some disabled Texans to sign their ABBMs and carrier envelopes through a witness, thereby exempting their ballots from the signature comparison procedure. Tex. Elec. Code § 1.011; Tex. Elec. Code § 87.041(b)(2). As explained in Sections A and B of the Argument, the provisions applicable to the use of witnesses demonstrate the inadequacy of this option as an accommodation for impacted CTD members specifically. Even if the use of a witness were a reasonable accommodation for disabled Texans who are physically unable to sign or make

a mark—and it is not—it would still fail to accommodate whatsoever disabled voters, like the impacted CTD members, who are able to sign, but, because of their disability, unable to ensure that their signatures will be consistent enough to meet whatever signature comparison standards are applied by an EVBB or SVC.[170]

Further, mandating the use of a witness—who, as discussed in Sections A and B of the Argument, meets the restrictive requirements of the Texas Election Code and accepts the risk of criminal liability—places a significant burden on disabled mail-in voters; as this Court previously noted, "the framework still requires a disabled voter to locate and then seek the assistance of a witness, a burden that is not imposed on non-disabled voters."[171]  Other federal courts have reached precisely the same conclusion, and emphasized that reliance on the "fortuitous assistance of others" falls squarely within the realm of discriminatory conduct that the ADA and the RA were enacted to prevent. *See, e.g., Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 200 (2d Cir. 2014) ("[T]he purpose of the Rehabilitation Act is 'to empower individuals with disabilities to maximize employment, economic self-sufficiency, *independence,* and inclusion and integration into society.'") (citing 29 U.S.C. § 701(b)(1)) (emphasis in original); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 506–7 (4th Cir. 2016) (requiring disabled absentee voters to mark their ballots with assistance, while other absentee voters do not, results in "an aid, benefit, or service [to disabled individuals] that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others.") (citing 28 C.F.R. § 35.130(b)(1)(iii)); *California Council of the Blind*, 985 F. Supp. 2d 1229, 1239 (N.D. Cal. 2013) ("[R]equiring blind and visually impaired individuals to vote with

---

[170] *See also* Ex. 37, CTD 30(b)(6) Dep. 67:11-68:11, 71:10–25.
[171] Dkt. No. 41 at 32 n.26

the assistance of a third party, if they are to vote at all, at best provides these individuals with an inferior voting experience 'not equal to that afforded others.'") (citing 28 C.F.R. § 35.130(b)(1)(ii)).

Finally, the witness signature provisions also deny disabled voters the benefit of voting privately and independently. Mail-in voters who do not require a witness to sign their ballot enjoy the benefit of marking their ballot, placing their marked ballot in the carrier envelope, and signing and sealing the carrier envelope themselves. This process affords a voter privacy in casting their ballot, as is their right. *California Council of the Blind*, 985 F. Supp. 2d at 1238; *see also* 29 U.S.C. § 701(b)(1) (the purposes of the RA include "empower[ing] individuals with disabilities to maximize … independence"). The same privacy and independence are not enjoyed by a mail-in voter who requires the assistance of a witness. Plaintiff CTD testified that the "most secure ballot a person can have is one where they're able to handle it themselves. You take other people out of the equation and you'll do a better job and it will give them their privacy."[172] By contrast, "if a witness signs [a disabled voter's ballot], at the same time that takes away the person's ability to have that private ballot," because utilizing the assistance of a witness "allows [the witness] to look at how you're voting."[173]

Defendants' second purported accommodation from previous pleadings, that disabled voters who are unable to enter a polling place vote in person at the curbside rather than by mail, is even more unavailing. Tex. Elec. Code § 64.009. Curbside voting is not an accommodation at all for impacted CTD members seeking equal access to mail-in voting; it is the complete removal of

---

[172] Ex. 37, CTD 30(b)(6) Dep. 41:17–21.
[173] Ex. 37, CTD 30(b)(6) Dep. 66:22–67:10. *See also id*. at 13:15–14:3 (describing CTD members who cannot write and must use the witness assistance provisions despite their "concern[] that their ability to sign it and have it done privately would be kind of at risk"), 40:23–41:6 (describing member concerns over privacy of ballot), 41:7–16 (same).

those voters from the mail-in voting option afforded others. Mail-in voting is the benefit for which Plaintiff CTD seeks reasonable accommodations, and Defendants cannot obviate their obligation to implement such accommodations by merely directing disabled voters to a different benefit entirely. *Alexander v. Choate*, 469 U.S. 287,  301 (1985) ("The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled."). Accommodations for disabled voters to vote in-person do not suffice in reasonably accommodating a voter seeking to vote by mail, as is their right under Texas law, to say nothing of the complete inadequacy of this option for disabled voters who are also unable to vote in-person due to their absence from the county or confinement to jail. *See* §§ 82.001, 82.004.

Additionally, like the burden of securing a witness in order to cast a mail-in ballot, curbside voting requires some disabled voters to secure assistance in appearing outside a polling place.[174] *Lamone*, 813 F.3d at 507 ("The right to vote should not be contingent on the happenstance that others are available to help."). Plaintiff CTD testified that a disabled voter's ability to vote in person

> comes down to, do they have transportation to get there? . . . [T]here are many who they just can't make it. They don't have transportation. They don't have a family member that can get them there and get off work. So they use mail-in ballots.[175]

In short, forcing impacted CTD members and similarly situated disabled Texans to either secure assistance or forgo mail-in voting entirely does not constitute a reasonable accommodation,

---

[174] Dkt. No. 41 at 32 n.26 ("The same [additional burden] is also true to the extent a disabled voter must seek assistance in reaching the polling place before he or she is even able to vote curbside.").

[175] Ex. 37, CTD 30(b)(6) Dep. at 38:13–39:2. *See also id.* at 68:25–69:16 (describing that even when a disabled voter is able to arrange transportation to the polling place, "poll workers don't know how to set up the accessibility" and "you have those times when it doesn't work, it's because there was a breakdown in the system at the polling site."), 41:17–23.

and Defendants, in their previous pleadings, have not identified any other accommodation that allows impacted CTD members equal access to mail-in voting. 28 C.F.R. § 35.130(b)(1)(ii). Under the law, reasonable accommodations which would end this discrimination and the ongoing risk of disenfranchisement include those that Plaintiff CTD seeks through this action: meaningful pre-rejection notice and the ability to contest and cure a ballot rejected for signature mismatch, or an exemption for disabled mail-in voters from the signature-comparison procedure. For these reasons, and based on the undisputed facts in this case, Defendants are in violation of the ADA and the RA and Plaintiff CTD is entitled to summary judgment on Count IV.

## PRAYER

For the forgoing reasons, Plaintiffs are entitled to judgment as a matter of law and pray the Court grant their Motion for Summary Judgment as to all claims, and enter all final declaratory judgment and injunctive relief necessary to remedy Defendants' unlawful actions.

Respectfully submitted,

/s/      *Hani Mirza*

**TEXAS CIVIL RIGHTS PROJECT**

Mimi M.D. Marziani
Texas Bar No. 24091906
mimi@texascivilrightsproject.org
Hani Mirza
Texas Bar No. 24083512
hani@texascivilrightsproject.org
Ryan V. Cox
Texas Bar No. 24074087
ryan@texascivilrightsproject.org
Zachary D. Dolling
Texas Bar No. 24105809
zachary@texascivilrightsproject.org

1405 Montopolis Drive
Austin, Texas 78741
512-474-5073 (Telephone)

512-474-0726 (Facsimile)

**WILLKIE FARR & GALLAGHER LLP**

Richard Mancino (NY Bar No. 1852797)
Samuel Kalar (NY Bar No. 5360995)
JoAnna Suriani (NY Bar No. 5706395)

787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: rmancino@willkie.com
        skalar@willkie.com
        jsuriani@willkie.com

-AND-

Jennifer J. Hardy (TX Bar No. 24096068)
Denis A. Fallon (TX Bar No. 24059731)
Garrett Johnston (TX Bar No. 24087812)
Audra White (TX Bar No. 24098608)

600 Travis Street, Suite 2100
Houston, Texas 77002
Telephone: (713) 510-1700
Facsimile: (713) 510-1799
Email: jhardy2@willkie.com
        afallon@willkie.com
        gjohnston@willkie.com
        awhite@willkie.com

*COUNSEL FOR PLAINTIFFS*

**CERTIFICATE OF SERVICE**

By my signature below, I certify that a true and correct copy of the foregoing has been served on all counsel of record on June 22, through the Electronic Case File System of the Western District of Texas.

/s/ _Hani Mirza_____