# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES MOVE TEXAS CIVIC FUND, AND LEAGUE OF WOMEN VOTERS OF TEXAS, *Plaintiffs*, | § § § § § § § | |
| v. | § § | No. 5:19-cv-00963 |
| TEXAS SECRETARY OF STATE, TRUDY HANCOCK IN HER OFFICIAL CAPACITY AS BRAZOS COUNTY ELECTIONS ADMINISTRATOR, AND PERLA LARA IN HER OFFICIAL CAPACITY AS CITY OF MCALLEN, TEXAS SECRETARY, *Defendants*. | § § § § § § § § | |

## DEFENDANT SECRETARY OF STATE'S MOTION FOR SUMMARY JUDGMENT

This case is about Texas's signature-verification process for mail-in ballots.

Dr. George Richardson and Rosalie Weisfeld ("Individual Plaintiffs") allege that each had a ballot rejected by their local election officials through this process. They assert that such rejection violated their rights under the Equal Protection Clause and the Due Process Clause of the United States Constitution. Austin Justice Coalition ("AJC"), Coalition of Texans with Disabilities ("CTD"), the League of Women Voters of Texas ("League"), and MOVE Texas Civic Fund ("MOVE") (collectively, "Plaintiff Organizations") also challenge Texas's signature-verification process on these same constitutional theories. CTD further claims that the process violates Title II of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA").

The Court should enter summary judgment dismissing the Texas Secretary of State ("Secretary") as a defendant herein. *See* FED. R. CIV. P. 56. It is local election officials—and not the Secretary—who are responsible for carrying out the signature-verification process for mail-in ballots. Because the Secretary has no hand in this process, Plaintiffs cannot carry their burden to establish this

1

Court's jurisdiction over her as a defendant. But even if the Court had jurisdiction, Plaintiffs' claims would fail on the merits given the undisputed summary judgment record.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A movant who would not bear the burden of proof at trial need not present evidence to put the plaintiff's claims in issue. *Id.* at 325. Rather, a defendant need only "point[ ] out…that there is an absence of evidence to support the nonmoving party's case." *Id.* Once defendant meets this obligation, the burden shifts to the plaintiff to produce competent evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986). To survive summary judgment, a plaintiff must demonstrate a genuine issue of material fact as to each element of every disputed claim. *Id.* at 247–48. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could enter a verdict for the nonmoving party." *Id.*

To meet her summary judgment burden, a plaintiff cannot rely on unsupported or conclusory assertions, speculation, or subjective belief. *Lawrence v. Fed. Home Loan Mortg. Corp.*, 808 F.3d 670, 673 (5th Cir. 2015); *Auguster v. Vermilion Parish Sch. Bd.*, 249 F.3d 400, 403 (5th Cir. 2001). Rather, she "must go beyond the pleadings and come forward with specific facts" demonstrating a genuine issue for trial—and the evidence must be admissible. *Brandon v. Sage Corp.*, 808 F.3d 266, 270 (5th Cir. 2015) (citation and quotations omitted); *Mersch v. City of Dall., Tex.*, 207 F.3d 732, 734–35 (5th Cir. 2000). The evidence is viewed in the light most favorable to the nonmovant, but "[w]here critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant, summary judgment is appropriate." *Alton v. Tex. A&M Univ.*, 168 F.3d 196, 199 (5th Cir. 1999). Summary judgment also is proper when a plaintiff's evidence is "merely colorable" or is not "significantly probative." *Anderson*, 477 U.S. at 249–50.

STATEMENT OF UNDISPUTED FACTS[1]

I.      **Voting by Mail in Texas**

A.  **The Early Voting Clerk Processes All Applications for Mail-In Ballots.**

Texas voters may apply for a mail-in ballot if they are eligible due to absence from their county of residence on election day, disability, age of 65 or older, or confinement in jail. TEX. ELEC. CODE §§ 82.001-.004. The early voting clerk conducts mail-in voting. For most state- and county-wide elections, the county clerk or elections administrator is the early voting clerk,[2] whereas "[t]he city secretary is the early voting clerk for an election ordered by an authority of a city." *Id.* § 83.005. The early voting clerk is responsible for "review[ing] each application for a ballot to be voted by mail" ("ABBM") to determine whether it complies with all requirements, providing notice and instructions to cure to a voter who submits a noncompliant ABBM, and "provid[ing] an official ballot envelope and carrier envelope with each ballot provided to a voter" who properly completes an ABBM. *Id.* §§ 86.001(a), .008, .009, .002(a). After a voter marks their mail-in ballot, they must return it to the early voting clerk in the official carrier envelope. *Id.* § 86.006(a).

B.  **The Early Voting Ballot Board (and Signature Verification Committee Where Applicable) Reviews and Accepts Mail-In Ballots.**

A mail-in ballot "may only be accepted if," *inter alia*, "the carrier envelope certificate is properly executed [and] neither the voter's signature on the ballot application nor the signature on the carrier envelope certificate is determined to have been executed by a person other than the voter, unless signed by a witness." TEX. ELEC. CODE § 87.041(b)(1)-(2); *id.* § 1.011(a) (providing that any signature required under the Election Code "may be signed for the person by a witness . . . if the person required

---

[1] Proof supporting this motion is set forth in the Secretary's Appendix and Sealed Appendix on file with the Court.

[2] TEX. ELEC. CODE § 83.002; *but see id.* §§ 83.003 (county-funded but not countywide elections); 83.004 (county-ordered but not county-funded elections); 31.043 (county elections administrator performs, among other things, the duties of county clerk). *See Election Duties*, TEXAS SECRETARY OF STATE, https://www.sos.state.tx.us/elections/voter/county.shtml (early voting clerks for state and county elections).

to sign cannot do so because of a physical disability or illiteracy.") An early voting ballot board ("EVBB")—which must be created "in each election to process early voting results from the territory served by the early voting clerk"—is responsible for determining whether to accept each mail-in ballot. *Id.* §§ 87.001, .002-.004 (EVBB composition),[3] .021-.041 (EVBB receives ballots from early voting clerk and determines whether to accept each one). In making this determination, the EVBB "may also compare the signatures with any two or more signatures of the voter made within the preceding six years and on file with the county clerk or voter registrar[.]" *Id.* § 87.041(e). For military and other voters overseas,[4] the EVVB "shall compare the signature on the carrier envelope or signature cover sheet with the signature of the voter on the federal postcard application." *Id.* § 87.041(f).

In some elections, a signature verification committee ("SVC") reviews mail-in ballots before the EVBB reviews them. A SVC "may be appointed in any election," and the early voting clerk is "responsible for determining whether a signature verification committee is to be appointed." *Id.* § 87.027(a). The early voting clerk must establish a SVC in a general election for state and county officers if requested in writing by at least 15 voters. *Id.* § 87.027(a-1). Where a SVC is established, the early voting clerk "shall deliver the jacket envelopes containing the early voting ballots voted by mail to the committee instead of to the early voting ballot board." *Id.* § 87.027(h). Upon receipt

> The signature verification committee shall compare the signature on each carrier envelope certificate, except those signed for a voter by a witness, with the signature on the voter's ballot application to determine whether the signatures are those of the voter. The committee may also compare the signatures with any two or more signatures of the voter made within the preceding six years and on file with the county clerk or voter registrar to determine whether the signatures are those of the voter. Except as provided by Subsection (l) [where more than 12 members are appointed to the committee and those members are working in subcommittees of not less than six members each], a determination under this subsection that the signatures are not those of the voter must be made by a majority vote of the committee's membership.

---

[3] County commissioners' courts appoint presiding election judges for each regular county election precinct, and State law sets out detailed requirements for each appointed judge. TEX. ELEC. CODE § 32.001-.002. County commissioners use the same process to appoint presiding election judges and presiding EVBB judges. *Id.* § 87.002. The EVBB presiding judge then appoints other members to the EVBB using the method for appointing precinct election clerks. *Id.* § 87.002(b).
[4] *See also id.* §§ 101.001, *et seq.*; 105.001, *et seq.* (voting by military personnel and other persons overseas).

*Id.* § 87.027(i). The EVBB then reviews the ballots just as they would in election without a SVC, "except that the [EVBB] may not determine whether a voter's signatures on the carrier envelope certificate and ballot application are those of the same person if the [SVC] has determined that the signatures are those of the same person." *Id.* § 87.027(j). Thus, in an election where an SVC is used, both the SVC and EVBB review signatures, and both must determine that the signatures were not made by the same person for the ballot to be rejected. *Id.* § 87.027(i), (j).

If a mail-in ballot is rejected, the EVBB presiding judge must deliver written notice to the voter no later than the tenth day after the election. *Id.* § 87.0431. "If a county election officer . . . determines that a ballot was incorrectly rejected or accepted by the [EVBB] before the time set for convening the canvassing authority, the county election officer may petition a district court for injunctive or other relief as the court determines appropriate." *Id.* § 87.127(a).

## II.      Plaintiffs

**<u>Dr. George Richardson</u>** is aware that Texas voters must verify their identity to cast a ballot, and that signatures are used to verify voter identity for mail-in ballots.[5] He acknowledges that mail-in voting is one of multiple options for casting a ballot.[6] In the 2018 general election, Dr. Richardson elected to vote by mail in Brazos County, and the early voting clerk rejected his ballot because the EVBB determined that the signature on his ABBM and carrier envelope were not signed by the same person.[7] Plaintiffs' own expert witness, forensic document examiner Dr. Linton Mohammed, testified that Dr. Richardson's signatures were not a match.[8]

---

[5] Richardson Dep. 21:7-12; 22:11-14; 24:23-25:20 & Ex.2.
[6] Richardson Dep. 18:25-19:4.
[7] Richardson Dep. 25:23-26:2; 27:13-22; 28:19-29:6; Ex.4.
[8] Mohammed Dep. 29:1-5.

Dr. Richardson does not recall the date he received Brazos County's notice of rejected ballot.[9] After learning his ballot was rejected, he did not contact the Secretary's Office, nor does he have evidence that the Secretary was involved in the decision to reject his ballot.[10] Dr. Richardson does not believe his ballot will be rejected should he vote by mail in the future.[11]

**Rosalie Weisfeld** is aware that Texas voters must verify their identity in order to cast a ballot, and that signatures are used to confirm voter identity for mail-in ballots.[12] She also acknowledges that mail-in voting is not the only way to vote in Texas.[13] Weisfeld voted by mail in the 2019 City of McAllen run-off election claiming absence from the county during early voting and on election day.[14] The City of McAllen early voting clerk rejected Weisfeld's ballot because the EVBB determined the signatures on her ABBM and carrier envelope were not signed by the same person.[15] Plaintiffs offer no evidence that these signatures *should have been* determined to have been signed by the same person.

Ms. Weisfeld requested that the City of McAllen send her mail-in ballot to her fiancé's Houston address.[16] Thus, that is where her notice of rejected ballot was sent, but she did not return to that address until July and therefore has no idea when her notice of rejected ballot actually arrived.[17] After learning her ballot had been rejected, Weisfeld did not contact the Secretary's Office, and there is no evidence that the Secretary was involved in the decision to reject her ballot.[18]

**AJC**'s mission is "serv[ing] the black and brown populations of Austin, Texas, in helping them liberate themselves from the systemic racism in our society."[19] AJC engages in advocacy for policy

---

[9] Richardson Dep. 29:2-14.
[10] Richardson Dep. 32:1-8; 33:3-6.
[11] Richardson Dep. 38:2-4, 6-20.
[12] Weisfeld Dep. 24:14-17; 31:23-32:6; 38:3-16.
[13] Weisfeld Dep. 21:13-22:5.
[14] Weisfeld Dep. 26:22-27:18.
[15] Weisfeld Dep. 40:20-41:3 & Ex. 4.
[16] Weisfeld Dep. 32:9-15; 32:23-33:11 & Ex. 2.
[17] Weisfeld Dep. Ex. 4; 43:16-22.
[18] Weisfeld Dep.46:23-47:7.
[19] AJC Dep. 25:16-26:2.

change (including education, policing, civic engagement, and community building), a mental health program, an anti-gentrification initiative, and educational programs.[20] To the extent that AJC engages in activities related to voter registration, it does so as part of an initiative it calls Project Orange.[21] Project Orange has the "main mission" of registering inmates in jail to vote.[22] AJC is considering expanding Project Orange to Texas counties that have "been voting more Democrat recently."[23]

According to AJC's records, Project Orange has registered 1,000 people since it began in 2018 and has helped 159 people apply for a mail-in ballot since October 2019.[24] The only resources AJC expends on Project Orange are not segregable from AJC's other expenditures, and are limited to those used to "promote" the project by mentioning it on its website and in informational materials about the organization.[25] There is no evidence that AJC uses any resources to educate any voters about signature matching on mail-in ballots, and Project Orange does not educate about the option to use a witness if a voter cannot make their signatures match.[26] AJC has no evidence that anyone it has assisted with a mail-in ballot has ever had their ballot rejected for signature mismatch.[27] AJC plans to continue operating Project Orange "for as long as this is the only way to get inmates registered to vote. Indefinitely."[28]

**CTD**'s mission is to maintain access for people with disabilities in the communities of their choice.[29] CTD cannot identify specific resources it has expended on voting-related work.[30] CTD acknowledges that voters with disabilities may vote at the polls independently with an accessible voting

---

[20] AJC Dep. 49:2-12 & Ex. 4.
[21] AJC Dep. 43:22-44:4; 45:3-5, 21-24.
[22] AJC Dep. 43:22-44:4.
[23] AJC Dep. 46:24-47:8.
[24] AJC Dep. 45:21-46:3 & Ex. 4.
[25] AJC Dep. 51:18-21; 52:3-53:8; 53:9-11; 53:14-54:6, 8-9 & Ex. 5.
[26] AJC Dep. 63:24-64:2, 5.
[27] AJC Dep. 60:14-16, 18-22; 64:18-20, 22.
[28] AJC Dep. 64:11-17.
[29] CTD Dep. 26:2-7, 13-21.
[30] CTD Dep. 60:16-61:4 & Ex. 4; 62:17-63:3 & Ex. 5.

machine, and also with the assistance of the person's choosing (so long as the assistant is not the person's employer or an election worker.).[31] CTD has no evidence that any of its members has had a mail-in ballot rejected because of signature mismatch.[32] Nor has it expended resources assisting voters unable to vote in person with obtaining a witness to sign their carrier envelope.[33] And CTD has no evidence that it has ever assisted any voter after their ballot was rejected for signature mismatch.[34]

**MOVE** "is a grassroots nonpartisan nonprofit organization building power for young people through civic education, leadership development and issue advocacy."[35] While MOVE (Civic Fund) is a 501(c)(3) organization, it is also affiliated with a 501(c)(4), MOVE Texas Action Fund, which has a similar mission.[36] All MOVE employees are paid by the Action Fund, then the Action Fund invoices the Civic Fund for the time spent on (c)(3) permissible activities.[37]

MOVE (Texas Civic Fund)'s voter-registration efforts target young voters.[38] To the extent that MOVE engages in activities related to voting by mail, it only does so when individuals ask specific questions in the course of its broader voter registration efforts.[39] MOVE cannot apportion the value of the resources it expends on voter registration—let alone any resources dedicated to mail-in ballots generally or signature matching in particular.[40] Nor is any of MOVE's funding restricted to use for voter-registration activities generally (or mail-in ballots in particular).[41] Rather, MOVE's activities related to mail-in ballots are limited to educating voters about the ability to vote by mail and interacting with county election administrators.[42]

---

[31] CTD Dep. 63:4-24; 65: 3.
[32] CTD Dep. 66:1-4.
[33] CTD Dep. 74:11-14, 17.
[34] CTD Dep. 66:5-7, 10.
[35] MOVE Dep. 25:16-20.
[36] MOVE Dep. 26:16-24.
[37] MOVE Dep. 18:5-24.
[38] MOVE Dep. 29:11-30:6.
[39] MOVE Dep. 31:19-32:8.
[40] MOVE Dep. 34:3-10; 34:20-35:2; 35:8-13.
[41] MOVE Dep. 35:21-36:3.
[42] MOVE Dep. 38:24-39:7.

MOVE has no evidence that a MOVE Texas Civic Fund employee, on MOVE Texas Civic Fund time, diverted any resources to assist any individual voter whose ballot was rejected for signature mismatch.[43] Nor does MOVE have evidence that it has registered any voter who later had a mail-in ballot rejected for signature mismatch.[44] And there is no evidence that any of MOVE's training materials specifically address mail-in ballot signature matching.[45]

**The League** is the Texas state affiliate of the League of Women Voters, which also has a national organization and local affiliates.[46] The League of Women Voters' activities to register individual voters are carried by local leagues.[47] The (Texas) League provides financial support to local affiliates which could (but is not required to) be used for voter registration.[48] But it has no evidence any of that funding was, in fact, used for voter registration, nor can it identify any expenditures specifically attributable to voter-registration activities, let alone resources dedicated to mail-in ballots in general, and certainly not signature comparison in particular.[49]

The League creates non-monetary voter-registration resources such as handouts.[50] Of these materials, only a YouTube video created in April, 2020, a PowerPoint presentation created as part of the League's Get Out the Vote Campaign, and the League's website even mentions signature comparison on mail-in ballots.[51] But the League did not track how many individuals it registered to vote through its Get Out the Vote campaign, nor can it attribute a cost to creating the training

---

[43] MOVE Dep. 47:6-14; 47:22-48:7, 13.
[44] MOVE Dep. 48:15-25.
[45] MOVE Dep. 49:3-6.
[46] League Dep. 29:14-30:1. The League modified its structure effective 2019, combining activities previously conducted by both a 501(c)(3) and a 501(c)(4) under the umbrella of the 501(c)(3). League Dep. 39:17-20; 40:11-15; 61:16-62:14.
[47] League Dep. 43:16-22.
[48] League Dep. 43:25-44:10; 45:10-19.
[49] League Dep. 46:4-7; 58:23-59:24 & Ex. 3; 63:20-64:20 & Ex. 4.
[50] League Dep. 43:25-44:10.
[51] League Dep. 116:1-17.

materials used in that campaign.[52] And there is no specific expense associated with including any particular bit of information on the League's website.[53]

While the League purports to bring this lawsuit on behalf of "all" of its members, there is no evidence that any League member has ever had a ballot rejected for signature mismatch.[54] On May 15, 2020—shortly before the League's deposition—it circulated a survey asking individual voters whether they had voted by mail in the past or intended to do so in the future, but that survey did not collect the names of or otherwise identify those purported members, nor was there any way to authenticate the survey responses to ensure there were not duplicate entries.[55] There is no evidence that any of the anonymous purported League members has ever had a mail-in ballot rejected for signature mismatch.[56]

Also in the days before its deposition, the League sought to bolster its position in this lawsuit by requesting names of individuals who have voted by mail or intend to vote by mail.[57] But there is no evidence that any individual who responded to that request has ever had a ballot rejected for signature mismatch.[58] And there is no evidence that the League ever assisted any voter whose ballot was rejected for signature mismatch.[59]

The League intends to continue educating people about voting by mail "for as long as people are allowed to vote by mail,"[60] and has a "nice working relationship" with the Secretary's office.[61]

### III.    Plaintiffs' Allegations

---

[52] League Dep. 75:3-6; 76:14-23.
[53] League Dep. 46:4-7; 58:23-59:24 & Ex. 3; 63:20-64:20 & Ex. 4.
[54] League Dep. 80:21-23; 81:1-8.
[55] League Dep. 14:2-8; 82:4-13 & Ex. 10; 82:19-83:13; 84:6-10.
[56] League Dep. 85:9-12, 17-20.
[57] League Dep. 15:13-19; LWV699-70 (included in Sealed Appendix at S.Appx._009-10).
[58] League Dep. 86:4-13; 87:8-17; 117:5-7.
[59] League Dep. 112:18-25; 113:18-20; 114:7-10; League Dep. 80:8-14.
[60] League Dep. 76:24-77:7.
[61] League Dep. 24:21-25:5.

Plaintiffs claim that the Due Process Clause requires pre-rejection notice and an opportunity to cure before a mail-in ballot is rejected for signature mismatch. Dkt. 1 at 18-19. They further argue that Texas Election Code § 87.041(b)(2), (e), and (f) violate the Equal Protection Clause by unduly burdening the right to vote, and because the signature matching guidelines are not sufficiently "uniform." Dkt. 1 at 19-22. CTD also claims that these provisions violate "Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, *et seq.*, and the Rehabilitation Act of 1973 (RA), 29 U.S.C. § 794.3, with respect to voters who cannot sign matching or sufficiently similar signatures due to a disability." Dkt. 1 ¶ 6.

## ARGUMENT AND AUTHORITY

### I.     The Court Lacks Jurisdiction Over Plaintiffs' Claims Against the Secretary.

Jurisdiction is "a threshold issue that must be resolved before any federal court reaches the merits of the case before it." *Perez v. U.S.*, 312 F.3d 191, 194 (5th Cir. 2002); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). The Court lacks jurisdiction here, for at least two reasons.

### A.  Sovereign Immunity Bars Plaintiffs' Claims.

"Federal courts are without jurisdiction over suits against a state, a state agency, or a state official in his official capacity unless the State has waived its sovereign immunity or Congress has clearly abrogated it." *Moore v. La. Bd. of Elementary & Secondary Educ.*, 743 F.3d 959, 963 (5th Cir. 2014). Thus, Plaintiffs may only maintain this suit against the Secretary under *Ex Parte Young*, which "rests on the premise—less delicately called a fiction—that when a federal court commands a state official to do nothing more than refrain from violating a federal law, he is not the State for sovereign-immunity purposes." *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (citation omitted). This requires a plaintiff to show a "sufficient connection between the defendant state officials and the challenged statute." *Okpalobi v. Foster*, 244 F.3d 405, 415 (5th Cir. 2001) (en banc) (plurality).

Though it might be a "convenient way for obtaining a speedy judicial determination of questions of constitutional law" to allow a plaintiff to sue an official because (he "might represent the state" in "enforcement of its statutes," *Ex Parte Young* recognized that this would be fundamentally at odds with our federal system. 209 U.S. 123, 157 (1908). Instead, the named defendant must have both "the *particular duty* to enforce the statute in question and a demonstrated willingness to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (adopting *Okpalobi* plurality) (emphasis added). Moreover, generalized willingness to enforce the law is not sufficient; the plaintiff must show that the defendant is "likely to do [so] here." *City of Austin*, 943 F.3d at 1002.

Plaintiffs' claims against the Secretary fail because they cannot meet this burden. Plaintiffs seek an injunction prohibiting Defendants "from rejecting any mail-in ballot for signature mismatch reasons," and requiring Defendants to "(a) provide voters meaningful notice prior to the rejection of a mail-in ballot based on an alleged signature mismatch and (b) offer voters the ability to cure a mail-in ballot questioned for an alleged signature mismatch." Dkt. 1 at 24. But only "early voting clerks"— not the Secretary—"review each application for a ballot to be voted by mail" and either "provide" a ballot or "reject the application." TEX. ELEC. CODE § 86.001. Similarly, it is local officials and not the Secretary who provide notice that a ballot has been rejected. *Id.* §§ 87.041 (EVBB reviews signatures and accepts ballots); 87.027 (where established, SVC reviews signatures before EVBB; EVBB cannot reject ballot for signature mismatch if SVC accepts signatures as a match). And it is local officials who have the statutory authority to act in the case of an improperly rejected ballot. *Id.* § 87.127(a).

Moreover, the Secretary cannot compel local election officials to review mail-in-ballot applications in any particular way. *See, e.g.*, *United States v. State of Tex.*, 445 F. Supp. 1245, 1261 (S.D. Tex. 1978) ("Symm has, for a number of years (in the face of advice from the Secretary of State) continued to apply to the students of Prairie View an erroneous rule of law."), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979); *In re Stalder*, 540 S.W.3d 215, 218 n.9 (Tex. App.—Hous. [1st Dist.]

2018, no pet.) (expressing doubt that a "party chair lacked the authority to then form and act upon her own ultimate legal judgment" despite "having received the Secretary of State's assistance and advice in response to an inquiry"); *Ballas v. Symm*, 351 F. Supp. 876, 888 (S.D. Tex. 1972), *aff'd*, 494 F.2d 1167 (5th Cir. 1974) ("the Secretary's opinions are unenforceable at law and are not binding.").[62]

And here, to the extent the Secretary has authority to direct local officials to process mail-in ballots in any particular way, it has exercised the scope of that authority by issuing Election Advisory 2020-07. In that advisory, the Secretary noted that, while Texas law gives the EVBB until the 10th day after election day to mail notice of a rejected ballot to the voter, TEX. ELEC. CODE § 87.0431, "**our office recommends mailing notices of rejected ballots to affected voters as soon as possible**."[63]

### B. Plaintiffs Lack Standing to Sue the Secretary.

For similar reasons, Plaintiffs lack standing as to the Secretary.[64] To establish Article III standing, a plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant (causation); and (3) that is likely to be redressed by a favorable decision (redressability). *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 180–81 (2000). Each element is "an indispensable part of the plaintiff's case" which plaintiff bears the burden to show. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). An organization has direct standing only if it satisfies the same Article III requirements of injury-in-fact, causation, and redressability applicable to individuals. *NAACP v. City of Kyle, Texas*, 626 F.3d 233, 237 (5th Cir. 2010) (citing *Lujan*, 504 U.S. at 560–61).

---

[62] Thus, a recent dispute about interpreting the Texas Election Code was resolved, not when the Secretary issued advice to local officials, but when the Attorney General filed a petition for a writ of mandamus against local officials charged with approving or rejecting ABBMs. *See In re State of Texas*, No. 20-0394, 2020 WL 2759629 (Tex. May 27, 2020).

[63] Ingram Dep. Ex. 6. *See also, e.g.*, AJC RFA Resp. 1-6; CTD RFA Resp. 1-6; League RFA Resp. 1-6; MOVE RFA Resp. 1-6; Richardson RFA Resp. 1-12; Weisfeld RFA Resp. 1-12 (disclaiming any knowledge of Secretary's authority or action to enforce relevant Election Code provisions; averring that "SOS is the appropriate party" with such information).

[64] Though they present distinct questions, the "Article III and *Ex Parte Young* analysis 'significantly overlap[.]'" *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019) (citation omitted). Both require a determination "that an official *can* act" and a "significant possibility that he or she *will* act to harm [the] plaintiff." *Id.* (emphasis added) (citation omitted).

1. **No Plaintiff can show causation or redressability.**

There is no evidence that the Secretary has taken any action that has caused injury to any Plaintiff. Courts have found causation where a defendant public official has taken or threatened action to enforce an allegedly unconstitutional law. *E.g., K.P. v. LeBlanc*, 627 F.3d 115, 123-24 (5th Cir. 2010) (finding causation where medical board refused to cap malpractice liability as challenged statute required). But whether a mail-in ballot is rejected or counted depends on the actions of local election officials, not the Secretary.

Indeed, Brazos County election officials rejected Dr. Richardson's ballot, provided him notice of that rejection, and had authority to seek judicial relief in connection with that rejection.[65] And City of McAllen election officials rejected Ms. Weisfeld's ballot, provided her notice of that rejection using the contact information Weisfeld provided, and had authority to seek appropriate judicial relief in connection with that rejection.[66] No evidence in the record connects action by the Secretary to any Plaintiff Organization's asserted injury.

Thus, Plaintiffs' asserted injuries are not "fairly traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560 (quotation and alterations omitted). They are instead "the result of the independent action of some third party[.]" *Id.* (quotation and alterations omitted). As the Eleventh Circuit recently explained, a plaintiff does not have standing to sue a Secretary of State for the actions of local officials. *See Jacobson*, 957 F.3d at 1207 (holding that the plaintiffs lacked standing because state "law tasks [local officials], independently of the Secretary, with printing the names of candidates on ballots"). Indeed, whether the challenged statutes injure any Plaintiff does not answer whether the

---

[65] Richardson Dep. 24:23-25:3 & Ex. 2; 25:23-26:2 27:13-22 & Ex. 3; 28:19-29:6 & Ex. 4; TEX. ELEC. CODE § 87.127(a).
[66] Weisfeld Dep. 26:22-27:18; 32:9-15; 32:23-33:11 & Ex. 2; 40:20-41:3 & Ex. 4; TEX. ELEC. CODE § 87.127(a).

*Secretary* caused their injuries. *See Okpalobi*, 244 F.3d at 426 (dismissing for lack of standing because courts should not "confuse[] the statute's immediate coercive effect on the plaintiffs with any coercive effect that might be applied by the defendants"). There is no evidence to support such causation here.

In addition, an injunction against the Secretary would not redress any Plaintiffs' purported harm. *E.g., id.* at 426-27 ("Because these defendants have no powers to redress the injuries alleged, the plaintiffs have no case or controversy with these defendants that will permit them to maintain this action in federal court.") Because the legislature gave local officials exclusive authority to establish and operate EVBBs, rendering these local actors the final authorities with respect to the signature matching requirement,[67] an injunction against her would not prevent local officials from enforcing the challenged provisions or control the manner in which they carry out that enforcement.

### 2.  Injury-in-Fact

#### a.  No Plaintiff Organization can prove organizational injury-in-fact.[68]

That an organization has an "interest in a problem . . . is not sufficient" for organizational standing, "no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). Rather, "an organization may establish injury in fact by showing that it [] diverted significant resources to counteract the defendant's conduct; hence, the defendant's conduct significantly and 'perceptibly impaired' the organization's ability to" conduct its routine "'activities—with the consequent drain on the organization's resources [that] constitutes far more than simply a setback to the organization's abstract social interests.'" *City of Kyle*, 626 F.3d at 238 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

To meet this standard, Plaintiff Organizations must show a "cognizable interest" threatened by the Secretary's conduct and which a diversion of resources was targeted "to counteract." *Elec.*

---

[67] TEX. ELEC. CODE §§ 87.041, .027.
[68] Defendant does not concede that Individual Plaintiffs have suffered injury-in-fact and reserves all rights to test the evidence on this point.

*Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017). And those resources must have been "diverted" to activities that are in some way "different from the plaintiffs' daily operations." *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (citing *City of Kyle*, 626 F.3d 233). *See also ACORN v. Fowler*, 178 F.3d 350, 359 (5th Cir. 1999) (holding that organization's voter-registration activities that did not target voters specifically impacted by state's procedure did not confer organizational standing to challenge that procedure).

Plaintiff Organizations' missions differ widely—from expanding access for Texans with disabilities,[69] to fighting systemic racism,[70] to "empowering voters and defending democracy,"[71] to empowering young people.[72] But Plaintiff Organizations cannot identify any expenditures specifically attributable to voter-registration activities—let alone resources dedicated to mail-in ballots generally or signature-matching in particular.[73] And merely engaging in voter-related activity is not enough to establish a cognizable interest. *E.g.*, *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018) (holding that an interest in increasing voter turnout for particular groups is not a cognizable injury, as it is akin to a "generalized partisan preference[]," which is insufficient to establish Article III standing);[74] *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459–60 (6th Cir. 2014) ("it is not an injury to instruct election volunteers about absentee voting procedures when the volunteers are being trained in voting procedures already."); *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161-62 (D.C. Cir. 2005) (Mere "[f]rustration of an organization's objectives is the type of abstract concern that does not impart standing.") (quotation omitted).

---

[69] CTD Dep. 26:2-7, 13-21.
[70] AJC Dep. 25:16-26:2.
[71] League Dep. 28:8-11.
[72] MOVE Dep. 25:17-20.
[73] AJC Dep. 51:18-21; 52:3-53:8; 53:9-11; 53:14-54:6 & Ex. 5; CTD Dep. 60:16-61:4 & Ex. 4; 62:17-63:3 & Ex. 5; MOVE Dep. 31:19-32:8; 34:3-10; 34:20-35:2; 35:8-13; 35:21-36:3; 38:24-39:7; League Dep. 46:4-7; 58:23-59:24 & Ex. 3; 63:20-64:20 & Ex. 4; League Dep. 75:3-6; 76:14-23.
[74] *Accord Jacobson*, 957 F.3d at 1206 ("An organization's general interest in its preferred candidates winning as many elections as possible is still a 'generalized partisan preference[]' that federal courts are 'not responsible for vindicating.'") (quoting *Gill*, 138 S. Ct. at 1933).

16

Litigants "cannot manufacture standing by choosing to make expenditures based on" alleged harm that does not itself constitute injury-in-fact." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013). Instead, under such circumstances, "any resources" the organization "used to counteract" the defendant's conduct "were a self-inflicted budgetary choice." *Elec. Privacy Info. Ctr.*, 878 F.3d at 379 (quotation omitted). Because Plaintiff Organizations can identify no such cognizable interest here, they lack standing, and the mere fact that some of them engage in some voter registration activities does not change this result.

Even if any Plaintiff Organization had a cognizable interest, an organization's expenditures must be "caused by an[] action by" the defendant that the organization "claims is illegal, as opposed to part of the normal, day-to-day operations of the group," to confer standing. *Fowler*, 178 F.3d at 358 (citing *Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78 & n.5 (3d Cir. 1998)). *See also La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (a diversion of resources can only satisfy Article III if the plaintiff "would have suffered" injury to a cognizable interest "if it had not diverted resources to counteracting the problem.")

No Plaintiff Organization has evidence that any purported member has had a ballot rejected for signature mismatch, or that it has expended any resources assisting or registering any voter whose mail-in ballot was rejected for that reason.[75] Instead, the evidence indicates that Plaintiff Organizations will continue their existing voter-related activities without regard to any action by the Secretary related to mail-in ballot signature matching.[76] Thus, no Plaintiff Organization can identify any expenditures that "differ from the [organization's] routine . . . activities," or point to any "specific projects" they have "had to put on hold or other-wise curtail in order to respond" to the Secretary's conduct. *City of Kyle*, 626 F.3d at 238; *OCA-Greater Hous.*, 867 F.3d at 612.

---

[75] AJC Dep. 60:14-16, 18-22; 64:18-20, 22; CTD Dep. 66:1-4; 66:5-7, 10; MOVE Dep. 47:22-48:7, 13; 48:15-25; 49:3-6; League Dep. 80:8-14, 21-23; 81:1-8; 85:9-12, 17-20; 86:4-13; 87:8-17; 117:5-7; 112:18-25; 114:7-10
[76] AJC Dep. 64:11-17; 44:1-4; CTD Dep. 72:21-25; League Dep. 76:24-77:7.

The evidence shows that, at most, Plaintiff Organizations' voter-related activities are part of "the normal, day-to-day operations of the group[s]" and insufficient to confer standing. *Fowler*, 178 F.3d at 358. *See also Common Cause Indiana v. Lawson*, 937 F.3d 944, 955 (7th Cir. 2019) (organizations cannot assert "standing based solely on the baseline work they are already doing," and cannot "convert ordinary program costs into an injury in fact.") (punctuation omitted).

### b.  Nor does the League or CTD have associational standing.

An association has standing to sue on its members' behalf when: (1) its members would have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members. *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Case Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (citing *Hunt v. Washington St. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 827–28 (5th Cir. 1997)). CTD asserts associational standing on behalf of "any and every one of [its] members . . . even if they don't know that the issue is there."[77] The League asserts associational standing on "on behalf of [its] members."[78] Neither satisfies the associational standing test.

***First***, the evidence does not show that CTD or the League has members within the meaning of associational standing. *See Hunt*, 432 U.S. at 344 (requiring "indicia of membership"). To meet this standard, an organization must have members who "elect leadership, serve as the organization's leadership, and finance the organization's activities, including the case's litigation costs." *Tex. Indigenous Council v. Simpkins*, No. 5:11-cv-315, 2014 WL 252024, at *3 (W.D. Tex. Jan. 22, 2014); *see also Hunt*, 432 U.S. at 344-45 (describing "indicia of membership").

---

[77] CTD Dep. 73:1-4, 7-13.
[78] League Dep. 80:21-23, 81:1-3.

The evidence shows that CTD considers its "membership" the people on its email list,[79] and that "[w]hether you join our e-newsletter mailing list, donate money, volunteer, or attend events, you are a member."[80] To the extent they engage in voter-registration activities, members of the League do so as members of their local affiliate, rather than the League (of Women Voters of Texas).[81] This falls far short of demonstrating the "indicia of membership" required for an association to establish standing as such. *Cf. Ass'n for Retarded Citizens of Dall. v. Dall. Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994) (finding that an organization is not a "membership" group eligible to assert associational standing under *Hunt* unless its members "participate in and guide the organization's efforts.")

**_Second_**, even if CTD or the League were a "membership" organization for purposes of associational standing, they still must identify at least one specific member of the organization with standing in their own right. *See City of Kyle*, 626 F.3d at 238-39; *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (citing *Lujan*, 504 U.S. at 563 (holding that an organization lacked standing because it failed to "submit affidavits . . . showing, through specific facts . . . that one or more of [its] members would . . . be 'directly' affected" by the allegedly illegal activity.")) (alterations in *Summers*).

The Supreme Court has rejected the contention that standing can be established by "'accepting the organization's self-description of the activities of its members' and determining that 'there is a statistical probability that some of those members are threatened with concrete injury.'" *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 343-44 (5th Cir. 2012) (quoting *Summers*, 555 U.S. at 497). Rather, this requires evidence "establishing that at least one identified member had suffered or would suffer harm." *Summers*, 555 U.S. at 498 (citations omitted); *see also Funeral Consumers All.*, 695

---

[79] CTD Dep. 36:10-14.
[80] *Get Involved*, Coalition of Texans with Disabilities, *available at* https://www.txdisabilities.org/get-involved (accessed June 22, 2020); Appx.185.
[81] League Dep. 29:14-30:1.

F.3d at 344; *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (requiring that association's members independently meet the Article III standing requirements for organization to have associational standing.).[82] Plaintiffs have presented no such evidence here.

**_Third_**, that CTD purports to bring a claim on behalf of its members under the ADA and RA does confer standing, because neither the RA nor ADA Title II alters the test for associational standing. *See, e.g.*, *A Helping Hand, LLC v. Baltimore Cty., MD*, 515 F.3d 356, 364, n.4 (4th Cir. 2008) (distinguishing between "associational discrimination" claims under the ADA—which are not at issue here—and test for third-party or associational standing); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 279-80 (3d Cir. 2014) (recognizing *Summers* test in ADA and RA context). Because the evidence does not identify even one individual CTD member who has been injured within the meaning of the ADA or RA, it lacks associational standing to maintain such a claim.

### 3.  Plaintiff Organizations also lack statutory standing.

Plaintiff Organizations also lack standing to maintain an Equal Protection or Due Process claim under § 1983. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014) (explaining statutory standing); Dkt. 1 ¶ 8 (alleging jurisdiction to bring constitutional claims under § 1983). Section 1983 provides a cause of action only where a plaintiff suffers "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. It does not provide a cause of action to plaintiffs claiming an injury based on the violation of a third party's rights. *See, e.g.*, *Coon v. Ledbetter*, 780 F.2d 1158, 1160 (5th Cir. 1986) ("[L]ike all persons who claim a deprivation of constitutional rights, [plaintiffs] were required to prove some violation of their personal rights."). Thus, to maintain a claim under § 1983, a plaintiff "must assert [her] own legal rights and

---

[82] *See also City of Kyle*, 626 F.3d 233, 237 (5th Cir. 2010) (requiring evidence of "a specific member"); *Disability Rights Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 804 (7th Cir. 2008) (concluding a plaintiff "has not established associational standing" because its "Complaint does not identify any . . . disabled student with standing to bring suit").

interests, and cannot rest [her] claim to relief on the legal rights or interests of third parties." *Danos v. Jones*, 652 F.3d 577, 582 (5th Cir. 2011) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)).

When "[t]he alleged rights at issue" belong to a third party, not the plaintiff, the plaintiff lacks statutory standing, regardless of Article III standing. *Id.; see also Conn v. Gabbert*, 526 U.S. 286, 292–93 (1999) (holding that lawyer "clearly had no standing" to bring § 1983 claim for injury suffered as a result of "the alleged infringement of the rights of his client" because a plaintiff "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."). As artificial entities, Plaintiff Organizations do not have voting rights (and certainly do not have the right to a mail-in ballot). *See, e.g.*, *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 91 (2d Cir. 2015) ("But Plaintiffs—five corporations and a not-for-profit trade organization—are not entitled to vote and have no right to equal representation in the legislature.") Since Plaintiff Organizations are necessarily asserting third parties' rights, they lack standing under § 1983.

## II.     The Secretary is Entitled to Summary Judgment on the Merits of Plaintiffs' Constitutional Claims.

Plaintiffs assert that Texas's "mail-in ballot process violates the Equal Protection Clause and the Due Process Clause of the Fourteenth Amendment . . . on its face and as applied to all Plaintiffs, including Dr. Richardson and Ms. Weisfled." Dkt. 1 ¶8. For the reasons stated in the previous part, Plaintiff Organizations cannot maintain a due process or equal protection claim, because they do not have a right to vote (or eligibility to vote by mail). But even if any Plaintiff had standing and suit were proper against the Secretary, their equal protection, due process, and ADA/RA claims fail on their merits at the summary judgment stage.

### A.  The Legal Standard

"[T]he Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). "It does not follow, however, that the right to vote in any manner . . . [is] absolute." *Burdick v. Takushi*, 504 U.S. 428, 433

(1992). To that end, *Anderson-Burdick*'s "flexible standard" generally governs First and Fourteenth Amendment challenges predicated on voting rights. *Burdick*, 504 U.S. at 434; *see also Anderson v. Celebrezze*, 460 U.S. 780 (1983). Under that standard, courts "weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Tex. Indep. Party v. Kirk*, 84 F.3d 178, 182 (5th Cir. 1996) (citing *Burdick*, 504 U.S. at 434; *Anderson*, 460 U.S. at 789).

"The rigorousness of the inquiry into the propriety of the state election law depends upon the extent to which the challenged regulation burdens First and Fourteenth Amendment rights." *Id.* (citing *Burdick*, 504 U.S. at 434). Strict scrutiny applies only when the right to vote is "subjected to 'severe' restrictions." *Burdick*, 504 U.S. at 434. Where a law "imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.; see also Anderson*, 460 U.S. at 788. In performing this balancing, courts consider a state's election regime in its entirety, including aspects mitigating any burdens the evidence shows. *See, e.g., Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 199 (2008); *Ohio Democratic Party v. Husted*, 834 F.3d 620, 627-28 (6th Cir. 2016) (noting that numerous opportunities available to cast a ballot mitigate burden of early voting requirements).

The Fifth Circuit recently addressed the standard for voting-related Fourteenth Amendment claims: unless plaintiffs "'are in fact absolutely prohibited from voting by the State,'" it held, "the right to vote is not 'at stake,' and rational-basis review follows." *Texas Democratic Party v. Abbott*, No. 20-50407, 2020 WL 2982937, at *10 (5th Cir. June 4, 2020) (applying rational basis review to statute allowing voters 65 or older to vote by mail without extending that opportunity to voters under 65) (quoting *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 808 n.7, 807, 807–11 (1969)).[83]

---

[83] *See also, e.g., Biener v. Calio*, 361 F.3d 206, 214 (3d Cir. 2004) (applying rational basis review to ballot access restriction); *Michigan State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 350 (6th Cir. 2018) (applying rational basis review to statute outlawing straight-ticket voting).

Accordingly, under the flexible standard that applies, as stated by the Fifth Circuit, Texas's mail-in ballot framework need only pass rational basis review. But even if a higher standard applies, Plaintiffs' constitutional claims still fail.

### B.  Plaintiffs' Due Process Claim Fails.

Plaintiffs argue that Texas law violates due process because a voter might not receive "pre-rejection notice and opportunity to cure" before a mail-in ballot is rejected for signature mismatch. Dkt. 1 at 18. But Plaintiffs identify no authority purporting to confer a constitutional right to such notice—particularly where, as here, voters are on notice of the signature requirements and may elect an alternative method of casting a ballot if they wish. The caselaw suggests a rational basis standard. *See McDonald*, 394 U.S. at 807 (distinguishing "the right to vote" from the "claimed right to receive absentee ballots"); *Mays v. LaRose*, 951 F.3d at 783 (6th Cir. 2020) ("State action making it easier for some electors to vote—such as providing them an extended deadline to register for absentee ballots—doesn't make it harder to vote for electors that don't get the same benefit."). But even if something more applied, Texas law easily satisfies it. The burden on the right to vote is minimal and justified by the State's important interests in fraud prevention and detection; orderly and efficient administration of elections; and safeguarding public confidence in election integrity.

### i.  The mail-in ballot framework does not impose a severe burden.

"Ordinary and widespread burdens [on the right to vote], such as those requiring 'nominal effort' of everyone, are not severe." *Crawford*, 553 U.S. at 205 (Scalia, J., concurring) (citations omitted). By contrast, "[b]urdens are severe if they go beyond the merely inconvenient" and are "so burdensome" as to be "virtually impossible" to satisfy. *Id.* (cleaned up).

Texas's signature-verification process is minimally burdensome. Mail-in voters receive notice that their signatures are required and must match or be signed by a witness. TEX. ELEC. CODE § 87.041(b)(2). An application for a mail-in ballot must contain "a space for indicating the fact that an

applicant whose application is signed by a witness cannot make the applicant's mark," ensuring that voters who cannot make their signatures match receive notice of the witness option before deciding to vote by mail. *Id.* § 84.011(a)(4)(B). Unless signed by a witness (in which case it cannot be rejected for signature mismatch), the EVBB uses signatures on file with the county clerk or registrar to verify the genuineness of a ballot. *Id.* § 87.041(e). Elections with SVCs have another round of signature review, and the signature is accepted if either the EVBB or SVC so determines. *See id.* § 87.027(j).

There are additional checks after local officials review the signatures, too. If a ballot is rejected based on signature, the EVBB presiding judge provides a rejection notice to the voter within 10 days after the election—and the Secretary has encouraged local officials to provide such notice as early as possible. *Id.* § 87.0431.[84] Then, if the county election officer determines that the ballot was rejected in error, the "county election officer may petition a district court for injunctive or other relief as the court determines appropriate." *Id.* § 87.127(a). In addition, misapplication of the signature-verification process can support an election contest. *Cf. Reese v. Duncan*, 80 S.W.3d 650, 660–62 (Tex. App.—Dallas 2002, pet. denied) (affirming order for a new election because mail-in ballots with mismatching signatures had been counted).

The broad nature of the relief that courts are empowered to award further guards against disenfranchisement. And prompt notice of rejection ensures that county election officials can seek relief in the immediate aftermath of election day. Notice also guards against repeat occurrences, because a voter whose signature has changed can update their signature on file with the county clerk or voter registrar. Tex. Elec. Code § 87.041(e). Moreover, if a voter cannot make their signatures match due to a disability "that originates on or after the day before the last day for submitting an application for a ballot to be voted by mail," the voter is eligible to vote a late ballot in compliance with Chapter 102 of the Election Code. *Id.* § 102.001.

---

[84] *See also* Ingram Dep. Ex. 6.

24

Any burden under these provisions is no more substantial than the ordinary burdens of voting in-person, such as traveling to a designated polling place on Election Day, taking time off work, arranging childcare, and waiting in line. The Supreme Court has held that similar laws, requiring nominal effort of everyone, are not severe burdens on the right to vote. For example, the Court in *Crawford* considered whether a law requiring in-person voters to present photo ID unconstitutionally burdened the right to vote. 553 U.S. at 185. Announcing the Court's judgment, Justice Stevens concluded that "the inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase of the usual burdens of voting." *Id.* at 198.

So too here. All that a voter who elects to vote by mail must do to ensure their mail-in ballot is counted is provide signatures recognizable as having been signed by the same person, or, if unable to do that, have a witness sign the ABBM and carrier envelope. They can also vote in-person. In the event of an erroneous rejection, they will be promptly notified and need only contact their county election official who can seek appropriate relief. These are no more than the "usual burdens of voting," *Crawford*, 553 U.S. at 198, and are therefore facially valid.

Individual Plaintiffs here were aware of the signature requirement.[85] They were also eligible to vote in person[86] and aware of the option to do so.[87] Thus, there is no evidence that this process violated due process as applied to them Individual Plaintiffs.

> ### ii.  Texas's important interests justify any burden the signature-verification process imposes.

"There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality).

---

[85] Richardson Dep. 21:7-12; 22:11-14; 24:23-25:20 & Ex.2; Weisfeld Dep. 24:14-17; 31:23-32:6; 38:3-16.
[86] Richardson RFA Resp. 15; Weisfeld RFA Resp. 15.
[87] Richardson Dep. 18:25-19:4; Weisfeld Dep. 21:13-22:5.

Texas "indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989). This concern is perhaps most compelling in the context of mail-in ballots. *See, e.g., Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (acknowledging "the State's compelling interest in preventing voter fraud"); *Veasey v. Abbott*, 830 F.3d 216, 307 n.46 (5th Cir. 2016) (en banc) (Jones, J., concurring in part and dissenting in part) ("[T]he greatest fraud risk exists when unauthorized persons direct an elderly, immobile voter's choices on a mail-in ballot"); *Crawford*, 553 U.S. at 225 (Souter, J., dissenting) ("absentee-ballot fraud . . . is a documented problem"); *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004) ("Voting fraud . . . is facilitated by absentee voting."). Signature verification is "[t]he most common method to verify that absentee ballots are coming from the intended voter."[88] A wide variety of States follow this approach. *See, e.g.*, Haw. Rev. Stat. § 15-9(c)(2); Me. Rev. Stat. tit. 21-A, §§ 756, 759; N.J. Stat. § 19:63-17.

Thus, Texas's weighty and undeniable interest in ensuring that only eligible voters cast ballots necessitates laws to guarantee that mail-in ballots are genuine. Indeed, even Plaintiffs cannot dispute this.[89] Because complying with the nominal effort of legibly signing a ballot does not outweigh Texas's weighty interests in protecting the franchise, Plaintiffs' due process claim fails.

*Lemons v. Bradbury* considered an Oregon signature verification process that did not notify voters when their signatures were rejected and is instructive in this regard. 538 F.3d 1098, 1104 (9th Cir. 2008). The Ninth Circuit rejected the plaintiffs' argument that they were entitled to notice and an opportunity to be heard in the event of signature rejection, noting that the state's "interests in detecting fraud and in the orderly administration of elections are weighty and undeniable," and that "the verification process is already weighted in favor of accepting questionable signatures." *Id.* at 1104-05.

---

[88] National Conference of State Legislatures, *Verification of Absentee Ballots* (Jan. 21, 2020), https://www.ncsl.org/research/elections-and-campaigns/verification-of-absentee-ballots.aspx (accessed June 22, 2020).
[89] AJC RFA Resp. 8; CTD RFA Resp. 11; League RFA Resp. 8; MOVE RFA Resp. 8; Richardson RFA Resp. 17; Weisfeld RFA Resp. 17 (each claiming "no particular knowledge of the current interests of the State of Texas," and further stating that "Texas, including Defendant SOS, is the appropriate party" with such knowledge and information.)

*Lemons* also noted that "referendum petition cover sheets instruct voters to '[s]ign your full name, as you did when you registered to vote,'" and that Oregon's procedures allow for "challenges to decisions by county elections officials." *Id.* at 1104, 1105. The Court concluded that, "[i]n contrast to the significant weight of the state's interests, plaintiffs' interest in the additional procedures they seek is slight," given the safeguards already in place. *Id.* at 1105.

Though *Lemons* contemplated ballot petition signature verification, it illustrates that courts applying *Anderson/Burdick* consider the totality of voting procedures—and what is to be gained by any "additional procedures" plaintiffs seek—in assessing equal protection challenges. *Id.* at 1104. In Texas, mail-in voters receive ample notice of the signature requirement, can have a witness sign the ballot application and/or carrier envelope if they cannot, have alternative options for casting their ballot, and can pursue judicial relief—if all else fails—through a local election official. Texas's process is also already weighted in favor of accepting questionable signatures. *Id.* at 1104-05; Tex. Elec. Code §§ 87.041(e), .027(j). Given these safeguards, "plaintiffs' interest in the additional procedures they seek is slight," and the laws satisfy *Anderson/Burdick. E.g.*, *Lemons* at 1104-05.

### iii. Even if Plaintiffs could prove a due process violation, their case would still fail because they have disregarded the process available to them.

Plaintiffs' allegation that they have no means to contest rejection of a ballot for signature mismatch conflicts with Texas law. Indeed, "[i]f a county election officer . . . determines that a ballot was incorrectly rejected or accepted by the [EVBB] before the time set for convening the canvassing authority, the county election officer may petition a district court for injunctive or other relief as the court determines appropriate." Tex. Elec. Code §§ 87.127(a), 31.091(1). Thus, Plaintiffs could have raised their concerns of improper rejection to their county election officer and requested that the officer file suit to challenge the EVBB's determination. But the record does not reflect that Plaintiffs

have engaged in any such action. Nor did they contact the Secretary's office regarding the allegedly erroneous rejections of their ballots prior to filing this lawsuit.[90]

Plaintiffs cannot claim that Texas law provides inadequate procedures when they wholly failed to utilize those procedures. *See, e.g.*, *Santana v. City of Tulsa*, 359 F.3d 1241, 1244 (10th Cir. 2004) ("A party cannot create a due process claim by ignoring established procedures."); *Dubuc v. Twp. of Green Oak*, 406 F. App'x 983, 989 (6th Cir. 2011) (holding that property owners who failed to take advantage of a zoning board's post-deprivation appeal procedures could not claim that those procedures violated due process); *Herrell v. Benson*, 261 F. Supp. 3d 772, 777-78 (E.D. Ky. 2017) (noting that a plaintiff "was afforded due process, but waived his right to it by refusing to participate in the process offered to him."). This is another basis upon which Plaintiffs' due process claim fails.

### C.  Plaintiffs' Equal Protection Claim Fails.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). Plaintiffs offer two equal protection theories. First, they claim that the mail-in ballot framework unduly burdens the right to vote and treats mail-in voters differently than in-person voters. Dkt. 1 ¶ 67. CTD also claims that these requirements treat its member voters who cannot make their signatures match differently from other voters. Dkt. 1 ¶ 68. Second, Plaintiffs argue that "Texas's procedures for evaluating mail-in ballot signature matches" violate equal protection because they lack "specific standards to ensure their equal application." Dkt. 1 ¶ 74.

Both theories fail.

---

[90] Weisfeld Dep.46:23-47:7; Richardson Dep. 32:1-8; 33:3-6.

> ### i. Texas law draws an eminently reasonable distinction between voters who vote by mail and voters who vote in person.

Plaintiffs' equal protection claim with respect to individuals who vote by mail fails, because these individuals are not "similarly situated" to individuals who elect to vote in person. Indeed, voting by mail "is a fundamentally different process from in-person voting, and is governed by procedures entirely distinct from in-person voting procedures." *ACLU of New Mexico v. Santillanes*, 546 F.3d 1313, 1320 (10th Cir. 2008) (citing *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 830-31 (S.D. Ind. 2006) ("absentee voting is an inherently different procedure from in-person voting"), *aff'd sub nom. Crawford v. Marion County Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008). Plaintiffs themselves acknowledge this.[91]

Thus, any differences in these processes do not violate equal protection, because they treat all persons similarly situated alike. *E.g., City of Cleburne*, 473 U.S. at 439; *Santillanes*, 546 F.3d at 1320 ("Because all registered voters [] have the option of voting in-person or by absentee ballot, voters may choose which set of procedures to follow.") And CTD's allegation that the mail-in ballot requirements excessively burden voters with disabilities does not revive an equal protection claim, because Texas law expressly accommodates individuals who, because of disability, cannot make their signatures match, allowing them to both apply for a mail-in ballot and authenticate their ballot with a witness signature. TEX. ELEC. CODE § 1.011(a). Further, Texas law provides voters with disabilities the additional accommodations described *infra*, Part III.

> ### ii. *Bush v. Gore* does not save Plaintiffs' equal protection claim.

Plaintiffs next argue that Texas lacks "uniform guidelines or principles for counties to compare signatures" in violation of equal protection. Dkt. 1 at 21 (citing *Bush v. Gore*, 531 U.S. 98, 106 (2006)).

---

[91] AJC RFA Resp. 7; CTD RFA Resp. 10; League RFA Resp. 7; MOVE RFA Resp. 7; Richardson RFA Resp. 16; Weisfeld RFA Resp. 16. (all acknowledging that, "as a practical matter, voting by mail involves some different procedures than voting in person.").

*Bush* reversed a Florida Supreme Court ruling ordering county election officials to manually recount ballots in the 2000 Presidential election, tallying those ballots that show a "clear indication of the intent of the voter." 531 U.S. at 102. In a ruling "limited to the present circumstances," *Bush* held the recount violated equal protection because it lacked "specific standards to ensure its equal application." *Id.* at 106-07.

Even if *Bush* were not limited to its circumstances, Texas's standard for verifying mail-in ballot signatures would be sufficiently uniform to ensure equal treatment of voters, because local election officials employ a uniform process provided by statute. *See* TEX. ELEC. CODE §§ 87.041(e), (f) (EVBB uses "any two or more signatures of the voter made within the preceding six years" and where applicable "the signature of the voter on the federal postcard application"), 87.027(i) (SVC uses same signatures used under § 87.041(e)).[92] This stands in stark contrast to the amorphous "clear indication of intent" standard invalidated in the limited *Bush v. Gore* decision. 531 U.S. at 102. *See also, e.g.*, *Lemons*, 538 F.3d at 1104 (rejecting equal protection challenge predicated upon *Bush v. Gore* where Oregon "counties [] uniformly limit their review [of signatures] to a comparison between petition signatures and existing voter registration cards.").

## III.    The Court Should Enter Summary Judgment Dismissing CTD's Claims Under ADA Title II and the RA.

To maintain a claim under ADA Title II, a plaintiff must show: "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). The elements of a reasonable accommodation claim under the RA are, practically speaking, the same. *See* 29 U.S.C. § 794 (a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of []

---

[92] *See also* Ingram Dep. 50:9-10 & Ex. 6 ("our standard is could they have been made by the same person").

disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity"); *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir.), *cert. denied*, 531 U.S. 959 (2000); *Delano-Pyle v. Victoria Cty., Tex.*, 302 F.3d 567, 574 (5th Cir.), *cert. denied*, 540 U.S. 810 (2003).

CTD's ADA Title II and RA claims fail. That is because any voter with a disability can avoid having the signatures on her ABBM and carrier envelope used for identification—she need only have a witness mark her ABBM and/or carrier envelope after she has cast her ballot. *See* TEX. ELEC. CODE §§ 87.041(b)(1)-(2) (mail-in ballot "may only be accepted if," among other things, "the carrier envelope certificate is properly executed [and] neither the voter's signature on the ballot application nor the signature on the carrier envelope certificate is determined to have been executed by a person other than the voter, *unless signed by a witness*") (emphasis added); 1.011(a) (a signature required under the Election Code "may be signed for the person by a witness . . . if the person required to sign cannot do so because of a physical disability or illiteracy."). Because Texas law *already provides* a reasonable accommodation that cures this alleged injury, and CTD can present no evidence demonstrating that this accommodation is not reasonable, its ADA Title II and RA claims fail.

The other accommodations Texas provides voters with disabilities further confirm this result. Indeed, voters with disabilities also have the option to vote in-person, a process which accommodates voters with disabilities by, *inter alia*, allowing them to vote curbside, allowing them the option to be assisted by a person of their choice, and allowing local election officers to modify procedures as necessary to ensure individuals with disabilities are able to vote. TEX. ELEC. CODE § 64.009.[93] Texas

---

[93] This Section provides, *inter alia*, "[i]f a voter is physically unable to enter the polling place . . . on the voter's request, an election officer shall deliver a ballot to the voter at the polling place entrance or curb." TEX. ELEC. CODE § 64.009(a). It further establishes that "[t]he regular voting procedures may be modified by the election officer to the extent necessary to conduct voting under this section, and that "[o]n the voter's request, a person accompanying the voter shall be permitted to select the voter's ballot and deposit the ballot in the ballot box." *Id.* § 64.009(b), (d). CTD itself cannot dispute this and has instead indicated that it "has no particular knowledge of this [these] legal issue[s]." CTD RFA Resp. 12, 13, 14. *See also* CTD Dep. 63:4-24, 64:3 (acknowledging curbside voting, assistant procedure, and ADA/RA compliant voter station requirements under Texas law).

law also requires that polling places provide voting stations that comply with the RA and ADA Title II, and that "provide[] a practical and effective means for voters with physical disabilities to cast a secret ballot." *Id.* § 61.012.

### CONCLUSION

For the foregoing reasons, the Court should enter summary judgment dismissing the Secretary as a defendant in this case.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Texas Bar No. 24078898
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov

**ATTORNEY FOR DEFENDANT
TEXAS SECRETARY OF STATE**

**CERTIFICATE OF SERVICE**

I certify that that on June 22, 2020, this document was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Assistant Attorney General