Austin Justice Coalition - 5/20/2020

63

1  printed materials that you use when you go into the

2  jails for Project Orange?

3              MR. KALAR:  Objection to form.

4       A.    So this one has the addresses on the

5  second page.  When we do our voter registration

6  drives, we also take another list of addresses that

7  can be useful, specifically for people who are

8  experiencing homelessness.  So their addresses are

9  shelters, includes the jail address for folks that

10 want to use the jail as their address on their voter

11 registration.

12 BY MS. MACKIN:

13      Q.    Anything else?

14      A.    No.

15      Q.    Okay.

16      A.    Oh, well, and just the voter registration

17 applications and the ballot by mail applications, we

18 take those in with us.

19      Q.    Sure.  These questions just at the outset

20 just to let you know, aren't meant to suggest that

21 you should be doing certain things.  I'm just

22 curious as to whether you do.

23      A.    That's fine.

24      Q.    When you do Project Orange visits, do you

25 advise voters who are applying to vote by mail about

Appx._099

64

1    their option to have a witness sign for them if they

2    can't sign for themselves?

3                    MR. KALAR:  Objection to form.

4                    But go ahead.

5        A.     Not that I'm aware of.

6    BY MS. MACKIN:

7        Q.    Okay.  So I'm done with this document.

8    Thank you.

9                    Other than the visits -- well, strike

10   that.

11                   Does AJC currently plan to continue

12   providing assistance with voter registration through

13   Project Orange?

14       A.     Yes.

15       Q.     For how long?

16       A.     For as long as this is the only way to

17   get inmates registered to vote.  Indefinitely.

18       Q.     Has Austin Justice Coalition ever

19   assisted any voter whose mail-in ballot was rejected

20   for a signature mismatch?

21                   MR. KALAR:  Objection to form.

22       A.     No, not that I'm aware of.

23   BY MS. MACKIN:

24       Q.    Okay.  When volunteers sign up to

25   volunteer with Austin Justice Coalition, do they

73

1                  REPORTER'S CERTIFICATION

2

3          I, Micheal A. Johnson, Registered Diplomate

4   Reporter, Certified Realtime Reporter and Notary

5   Public in and for the State of Texas, certify that

6   on the 20th day of May, 2020, I reported the Remote

7   Oral Deposition of LARISSA RODIONOV, after the

8   witness had first been duly cautioned and sworn to

9   testify under oath; said deposition was subsequently

10  transcribed by me and under my supervision and

11  contains a full, true and complete transcription of

12  the proceedings had at said time and place; and that

13  reading and signing was requested.

14         I further certify that I am neither counsel

15  for nor related to any party in this cause and am

16  not financially interested in its outcome.

17         GIVEN UNDER MY HAND AND SEAL of office on

18  this 29th day of May, 2020.

19

20

21         _____
           MICHEAL A. JOHNSON, RDR, CRR
22         NCRA Registered Diplomate Reporter
           NCRA Certified Realtime Reporter
23
           Notary Public in and for the
24         State of Texas
           My Commission Expires:  8/8/2020
25

Appx._101

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE | § | |
| WEISFELD, AUSTIN JUSTICE COALITION, | § | |
| COALITION OF TEXANS WITH | § | |
| DISABILITIES, MOVE TEXAS CIVIC FUND, | § | |
| LEAGUE OF WOMEN VOTERS OF TEXAS, | § | |
| and AMERICAN GI FORUM OF TEXAS, | § | |
| INC., | § | |
|     *Plaintiffs*, | § | |
| | § | |
| v. | § | No. 5:19-cv-00963 |
| | § | |
| TEXAS SECRETARY OF STATE, TRUDY | § | |
| HANCOCK, IN HER OFFICIAL CAPACITY | § | |
| AS BRAZOS COUNTY ELECTIONS | § | |
| ADMINISTRATOR, AND PERLA LARA IN | § | |
| HER OFFICIAL CAPACITY AS CITY OF | § | |
| MCALLEN, TEXAS SECRETARY, | § | |
|     *Defendants*. | § | |

## DEFENDANT SECRETARY OF STATE'S NOTICE OF ORAL DEPOSITION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30

TO:    Austin Justice Coalition, by and through its attorneys of record, Hani Mirza, Zachary D. Dolling, Beth Stevens, and Ryan Cox, Texas Civil Rights Project, 1405 Montopolis Drive, Austin, Texas 78741; and Richard Mancino, Jennifer Hardy, Joanna Suriani, Willkie Farr & Gallagher LLP, 1875 K Street, N.W., Washington, DC 20006.

Defendant Texas Secretary of State hereby notices the deposition upon oral examination of Austin Justice Coalition "AJC," including all subsidiaries, DBAs, and aliases, beginning at **10:00 AM** on **Wednesday**, **May 20, 2020** and continuing from day to day until complete. The deposition will be held virtually via Zoom videoconference and will be transcribed and videotaped by a certified court reporter and videographer designated by Defendant. Defendant reserves the right to use the

1



Appx_102

deposition for any purpose permitted under the Federal Rules of Civil Procedure or Federal Rules of Evidence.

Pursuant to Federal Rule of Civil Procedure 30(b)(6), AJC is directed to designate one or more officers, directors, managing agents, or other persons who will testify on AJC's behalf regarding all information known or reasonably available to AJC with respect to the matters set forth in **Attachment A**.

Pursuant to Federal Rules of Civil Procedure 30(b)(2) and 45, AJC is also requested to produce at least 24 hours before the videoconference deposition, all documents in response to the subpoena duces tecum in **Attachment B**.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Texas Bar No. 24078898
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov

2

**ATTORNEYS FOR DEFENDANT**
**TEXAS SECRETARY OF STATE**

**CERTIFICATE OF SERVICE**

I certify that that on May 14, 2020 this notice was served upon counsel listed below via email.

**Hani Mirza**
hani@texascivilrightsproject.org
**Zachary D. Dolling**
zachary@texascivilrightsproject.org
**Rebecca Harrison Stevens**
beth@texascivilrightsproject.org
**Ryan V. Cox**
ryan@texascivilrightsproject.org
**Samuel Kalar**
skalar@willkie.com
**Joanna Suriani**
jsuriani@willkie.com
**Eric Magee**
e.magee@allison-bass.com
**Isaac J. Tawil**
itawil@mcallen.net
**Austin Stevenson**
astevenson@mcallen.net
**C. Robert Heath**
bheath@bickerstaff.com
**Gunnar P. Seaquist**
gseaquist@bickerstaff.com

*/s/Anne Marie Mackin*
ANNE MARIE MACKIN
Assistant Attorney General

3

## DEFINITIONS

The terms below are used in this notice as follows:

1. "Austin Justice Coalition," "AJC," "you," "your," or "yours" means Austin Justice Coalition (a plaintiff in this Lawsuit) and anyone acting or purporting to act on their behalf with respect to any matter inquired about herein, including without limitation representatives, employees, or agents.

2. "League of Women Voters," "LWVTX" or "LWV" means the League of Women Voters of Texas (a plaintiff in this Lawsuit), and anyone acting or purporting to act on its behalf with respect to any matter inquired about herein, including without limitation representatives, employees, or agents.

3. "Coalition of Texans with Disabilities" or "CTD" means Coalition of Texans with Disabilities (a plaintiff in this Lawsuit), and anyone acting or purporting to act on its behalf with respect to any matter inquired about herein, including without limitation representatives, employees, or agents.

4. "MOVE Texas Civic Fund," "MOVE Texas," or "MOVE" means MOVE Texas Civic Fund (a plaintiff in this Lawsuit), and anyone acting or purporting to act on its behalf with respect to any matter inquired about herein, including without limitation representatives, employees, or agents.

5. "Individual Plaintiffs" means Dr. George Richardson and Ms. Rosalie Weisfeld, natural persons who are plaintiffs in this lawsuit, and anyone acting or purporting to act on their behalf with respect to any matter inquired about herein, including without limitation representatives, employees, or agents.

6. "Organizational Plaintiffs" means AJC, CTD, MOVE, and LWVTX, and anyone acting or purporting to act on their behalf with respect to any matter inquired about herein, including without limitation representatives, employees, or agents.

7. "Plaintiffs" means the Individual Plaintiffs and the Organizational Plaintiffs.

8. "Person" means the plural as well as the singular and includes: natural persons, corporations, firms, associations, partnerships, joint ventures, trusts, estates, or any other form of legal entity; and governmental agencies, departments, units, or subdivisions thereof.

9. "SOS" means the Defendant Texas Secretary of State, in her official capacity, including without limitation representatives, employees, agents, or officers acting on her behalf with respect to any matter inquired about herein.

10. "Defendants" means SOS; Trudy Hancock, in her official capacity as Brazos County Elections Administrator; and Perla Lara, in her official capacity as City of McAllen, Texas, Secretary.

11. "Lawsuit" means the case styled, *Dr. George Richardson, et. al. v. Texas Secretary of State, et al.*, civil action no. 5:19-cv-00963 in the United States District Court for the Western District of Texas, San Antonio Division.

12. "Complaint" means your live pleading in this case—as of service of these discovery requests, the document entitled "Plaintiff's Original Complaint," filed in this Lawsuit on August 7, 2019 (Dkt. 1).

13. "Communication" means any manner or means of disclosure, transfer, or exchange of information, whether oral, written, in-person, telephonic, electronic, digital, mailed, or otherwise.

14. "Document" includes all writings of every kind, source and authorship, both originals and all non-identical copies thereof including handwritten, typewritten, printed, photocopied, photographic, or electronically recorded matter. For purposes of illustration and not limitation, the term shall include: emails, Facebook postings, social media postings, letters, journals, diaries, bank statements, charts, Excel spreadsheets, handwritten notes, affidavits, schedules, workpapers, audio recordings, video recordings, transcriptions, contracts, agreements, and memoranda of any kind.

15. "Relating to" means in any way concerning, constituting, analyzing, discussing, describing, considering, modifying, amending, confirming, endorsing, evidencing, representing, supporting, substantiating, qualifying, negating or refuting, unless qualified by word of limitation.

16. The singular includes the plural and vice versa.

17. The masculine gender includes the feminine and vice versa.

18. All other terms are to be interpreted in accordance with their normal usage in the English language.

## Attachment A

### 30(B)(6) CORPORATE REPRESENTATIVE DEPOSITION TOPICS

1. Your mission.

2. Your organization, including your organizational structure, employees, physical assets, parent and sibling entities, tax status, and history; the services that you provide, and the activities you perform.

3. The activities on which you have spent funds or to which you have dedicated resources in Texas between January 1, 2017 and the present.

4. The allegations you make in your Complaint and the factual bases therefor.

5. The relief that you contend would remedy the claims you make in this lawsuit.

6. The documents produced in response to

   a. the subpoena duces tecum described in Attachment B, and;

   b. Defendants' Requests for Admission, Interrogatories, and Requests for Production in this cause.

## Attachment B

To the extent not already produced by you in response to the Secretary of State's discovery requests in this cause, produce the following:

1. Documents sufficient to substantiate the factual allegations you make in your Complaint.

2. All communications between you and any person to assist them in voting by mail in Texas.

3. Documents sufficient to show all information described and/or requested in 30(b)(6) deposition topic numbers 2, 3, and 4 in Attachment A to this notice.

4. To the extent not already provided in response to items 1-3 above, all documents reviewed in preparation for your deposition.

If documents responsive to these categories have already been produced in discovery, the witness is expected to be able to identify those documents by bates numbers.

Appx._108





**Exhibit**
**Larissa Rodionov**

**4**

5/20/2020    MJ

exhibitsticker.com

AJC-00000017
Appx._109





# THE AUSTIN JUSTICE COALITION

is a Racial Justice Group that educates and builds community power for people of color who live in Austin, Texas that need support, community, and liberation during a time of systemic injustice in America.

AJC-00000018





## OUR VISION AND MISSION

The Austin Justice Coalition (AJC) serves people who are historically
and systematically impacted by gentrification, segregation, over policing,
a lack of educational and employment opportunities, and other
institutional forms of racism in Austin.

AJC's mission is to improve the quality of life for people of color
by helping them be the driving force behind their own liberation.

AJC strives to narrow the scope of the criminal justice system and to usher
in transformative justice that no longer relies on criminalization and punitive
excess, but instead has human dignity as its core organizing principle
and defers to community-based initiatives to improve public safety.

AJC-00000019
Appx._111





## OUR HISTORY

Since 2015, AJC has served as a catalyst for positive change towards economic and racial equity for Austin's people of color by developing, organizing, and providing robust programs and events.

AJC's big four areas of advocacy are education, policing, civic engagement, and community building.

AJC's strategy continues to create direct and indirect impact in communities of color by influencing changes in local government and advocating for policy reform. This strategy builds on AJC's experience and knowledge from its work thus far.

AJC-00000020



# AJC IN THE PRESS...

## Patch

Community Corner

### Austin Justice Coalition 'Black Boy Joy' Showcase This Saturday

April event to feature local talent from across Centra narrative of boys and men of color, organizers said.

By Tony Cantu, Patch Staff
Mar 6, 2019 11:26 pm CT | Updated Apr 23, 2019 9:54 am CT

👍 Like 52   Share

LOCAL

**Austin Justice Coalition speaks out 'retaliation' for those who come forward during investigation into racism at APD**



▶ RADIO                    Tuesday, February 18, 2020 by Austin Monitor

### Austin Monitor Radio: Austin Justice Coalition

Chas Moore, the founder and executive director of the Austin Justice Coalition, joins Austin Monitor reporter Jessi Devenyns and editor Elizabeth Pagano this week. Tune in below to listen to a conversation that spans AJC's focus of 2020, from the Austin Police Department to land use, and how the coalition is working to address continued inequity in our city.

Austin Monitor
Austin Monitor Radio: Austin Justic...

# austin360
By Austin American-Statesman

Entertainment & Life
## Austin Justice Coalition's ATX Black Food Week starts Monday



Austin Justice Coalition, Huston-Tillotson University collecti...

**KUT 90.5**   Austin's NPR Station

News ▾   Features ▾   Life & Arts ▾   Podcasts   Events   Support ▾   About ▾

## Activist Urges Austin To Look At Land Development Code Through Lens Of Equity

By JENNIFER STAYTON | KUT • DEC 10, 2019

Share   Tweet   Email

### Austin Justice Coalition, Huston-Tillotson University partner to survey neighborhoods vulnerable to gentrification

University of Texas Uproot Project released its findings in 2018. A year later, AJC and Huston-Tillotson University are asking residents about their neighborhoods.







## POLICY

Austin Justice Coalition has been involved in policy change in Austin since 2016. Most significantly, in working to improve policing policies that impact officer training, oversight, and accountability—areas which directly affect Black and Brown communities.

AJC's proven capabilities in fostering transformative justice through a strong lens of reckoning with racism and promoting equity has helped to embed the organization into new social policy areas, including housing, mental health, and education.

AJC-00000022
Appx._114





# MENTAL HEALTH

The Austin Justice Coalition has been passionate for years about reducing police use of force incidents, as well as excessive and unnecessary arrests, which have a disproportionate impact on people of color. One of the ways in which AJC has pursued this goal is by demanding reform in how mental health crises are handed by Austin's 911 system.

We believe that mental health crises deserve a health response, not a police response, and that reform to the mental health first response system could have saved the lives of Mauris DeSilva (2019), Morgan Rankins (2017), David Joseph (2016), Micah Jester (2016), and many others.

Currently, AJC is working actively with Integral Care, EMS, and APD, as well as representatives from other community groups, to ensure that the reforms are implemented in line with community needs and priorities.

AJC-00000023



 **COMPLETE COMMUNITIES**

1) How can we undo the legacy of segregation in Austin?

2) How can we heal as a community?

This initiative will involve a sustained effort to listen to those in our communities that have been most impacted by segregation and displacement, equipping them with the tools needed to engage in the ongoing housing conversation, make informed choices, and hold elected officials accountable.

Through this process, we work to provide the city with policy proposals that can move us closer to resolving the above stated questions.

AJC-00000024
Appx._116



## COMMUNITY POWER



A free educational Saturday program rooted in social justice, mentorship, and community building.

Our program is for youth of color from all socioeconomic backgrounds. Our curriculum is rooted in social justice, mentorship, and community building. All programs are geared towards participants healing from the racism and oppression embedded in the society in which they live, play, and learn. Our youth gain critical life skills, knowledge, and strategies necessary to become the next great change-makers in this world.



## COMMUNITY POWER



Project Orange registers eligible inmates to vote. This ambitious and successful partnership between Austin Justice Coalition, the Travis County Sheriff's Office, and the Travis County Tax Office serves as an example for future expansion across Texas.

 Registered more than 550 incarcerated citizens (up from over 300 in 2018).

 Since october 2019, we've helped 159 inmates fill out ballot by mail applications.

 Plans to expand to other counties across the state in 2020.

AJC-00000026
Appx._118



## COMMUNITY POWER

### BOOK CLUB

Everyone is welcome to join us each month, as we read and discuss books that inform our efforts, and deepen our understanding of the cultural and historical background of our struggles.

### GENERAL BODY MEETINGS

Our general body meetings offer an opportunity to meet AJC's team and hear about all that's in the works. Every meeting includes time for break-out sessions on policy, education, events, and housing, as well as other special project community initiatives.

AJC-00000027
Appx._119





**CONTACT AJC:**

# AUSTINJUSTICE.ORG



For more information:
info@austinjustice.org

AJC-00000028
Appx._120

|  | 2018 Total | Unrestricted | Temporarily Restricted |
|---|---|---|---|
| **INCOME** | | | |
| | | | |
| **Foundation & Nonprofit Grants** | | | |
| Borealis | 41,500.00 | 0.00 | 41,500.00 |
| Borealis Organizational Development | 15,000.00 | 0.00 | 15,000.00 |
| **Individual Donations** | | | |
| Glickman Donation for Undoing Racism | 30,000.00 | 30,000.00 | 0.00 |
| Glickman Donation for Higher Learning | 20,000.00 | 20,000.00 | 0.00 |
| **General Donations** | **5,000.00** | **5,000.00** | **0.00** |
| **TOTAL INCOME** | **111,500.00** | **55,000.00** | **56,500.00** |
| | | | |
| **EXPENDITURES** | | | |
| | | | |
| **BOREALIS** | | | |
| **Personnel** | | | |
| Contract Labor | 20,875.00 | 0.00 | 20,875.00 |
| Fiscal Sponsorship | 2,625.00 | 0.00 | 2,625.00 |
| **Office & Operations** | | | |
| Printing & Copying | 1,000.00 | 0.00 | 1,000.00 |
| Office Supplies | 1,000.00 | 0.00 | 1,000.00 |
| **Travel** | | | |
| Airfare | 3,000.00 | $0.00 | 3,000.00 |
| Hotel | 1,500.00 | $0.00 | 1,500.00 |
| Transportation | 500.00 | $0.00 | 500.00 |
| Meals | 1,000.00 | $0.00 | 1,000.00 |
| **Conferences & Meetings** | | | |
| Food | 3,000.00 | 0.00 | 3,000.00 |
| Other Expenses | 500.00 | 0.00 | 500.00 |
| **Rapid Response Grant** | | | |
| Conference Travel | 3,500.00 | 0.00 | 3,500.00 |
| **Total** | **38,500.00** | **0.00** | **38,500.00** |
| | | | |
| **BOREALIS ORGANIZATIONAL DEVELOPMENT** | | | |
| **Personnel** | | | |
| Contract Labor | 8,000.00 | 0.00 | 8,000.00 |
| CPA/Bookkeeping Fees | 2,875.00 | 0.00 | 2,875.00 |
| Fiscal Sponsorship Fee | 1,125.00 | 0.00 | 1,125.00 |
| **Office & Operations** | | | |
| IT Development | 1,000.00 | $0.00 | 1,000.00 |
| **Memberships & Training** | | | |

| | | | |
|---|---:|---:|---:|
| Staff Development | 2,000.00 | 0.00 | 2,000.00 |
| **Total** | **15,000.00** | **0.00** | **15,000.00** |
| | | | |
| **GLICKMAN UNDOING RACISM TRAINING** | | | |
| **Conferences & Meetings** | | | |
| Food | 5,000.00 | 5,000.00 | 0.00 |
| Childcare | 2,500.00 | 2,500.00 | 0.00 |
| Sponsorships | 22,500.00 | 22,500.00 | 0.00 |
| **Total** | **30,000.00** | **30,000.00** | **0.00** |
| | | | |
| **GLICKMAN HIGHER LEARNING** | | | |
| **Personnel** | | | |
| Contract Labor | 8,200.00 | 8,200.00 | 0.00 |
| Professional Fees | 4,960.00 | 4,960.00 | 0.00 |
| **Office & Operations** | | | |
| Office Supplies | 240.00 | 240.00 | 0.00 |
| **Transportation** | | | |
| Insurance | 3,600.00 | $3,600.00 | 0.00 |
| Gas | 2,500.00 | $2,500.00 | 0.00 |
| **Conferences & Meetings** | | | |
| Food | 500.00 | 500.00 | 0.00 |
| Rent | 0.00 | 0.00 | 0.00 |
| **Total** | **20,000.00** | **20,000.00** | **0.00** |
| | | | |
| **GENERAL DONATIONS** | | | |
| **Office & Operations** | | | |
| Printing & Copying | 500.00 | 500.00 | 0.00 |
| **Conferences & Meetings** | | | |
| Food | 1,000.00 | $1,000.00 | 0.00 |
| Venue Rental | 1,500.00 | 1,500.00 | 0.00 |
| Other Expenses | 500.00 | 500.00 | 0.00 |
| Media | 1,500.00 | 1,500.00 | 0.00 |
| **Total** | **5,000.00** | **5,000.00** | **0.00** |
| | | | |
| **TOTAL EXPENDITURES** | **108,500.00** | **55,000.00** | **53,500.00** |
| | | | |
| Surplus/Deficit Before Depreciation | 3,000.00 | 0.00 | 3,000.00 |
| Depreciation Expense | 0.00 | $0.00 | |
| **Surplus/Deficit After Depreciation** | **3,000.00** | **0.00** | **3,000.00** |
| | | | |
| Net Assets, Beginning of Year | 0.00 | 3,000.00 | |
| **Net Assets, End of Year** | **3,000.00** | **3,000.00** | **3,000.00** |

| 2019 BUDGET | Total | | Unrestricted | Restricted | |
|---|---|---|---|---|---|
| **INCOME** | | | | | |
| **Foundation & Nonprofit Grants** | | | | | |
| Borealis | 17,500 | | | 17,500 | |
| Alliance for Boys and Men of Color | 18,853 | | | 18,853 | |
| Ford Foundation (Pending) | 50,000 | | 10,000 | 40,000 | |
| **Individual Donations** | | | | | |
| Glickman Donation for Undoing Racism | 24,500 | | | 24,500 | |
| Glickman Donation for General | 20,000 | | 20,000 | | |
| **General Donations** | | | | | |
| Individual Donations | 18,500 | | 18,500 | | |
| **TOTAL INCOME** | **149,353** | | **48,500** | **100,853** | |
| | | | | | |
| **EXPENDITURES** | | | | | |
| **BOREALIS (ENDS JUNE 31, 2019)** | | | | | |
| **Personnel** | | | | | |
| Contract Labor | 13,500 | | | 13,500 | |
| **Travel** | | | | | |
| Flights | 400 | | | 400 | |
| Hotel | 350 | | | 350 | |
| Food | 188 | | | 188 | |
| **Conferences & Meetings** | | | | | |
| Policy Team Meetings | 3,062 | | | 3,062 | |
| **Total** | **17,500** | | | **17,500** | |
| | | | | | |
| **COLOR (ENDS MAY 31, 2019)** | | | | | |
| Staffing | 6,250 | | | 6,250 | |
| Meeting Space Feb to July | 6,500 | | | 6,500 | |
| Male Summit | 1,000 | | | 1,000 | |
| Black Boy Joy Initiative | 3,500 | | | 3,500 | |
| Website/Materials | 1,000 | | | 1,000 | |
| Other Expenses | 603 | | | 603 | |
| **Total** | **18,853** | | | **18,853** | |
| | | | | | |
| **FORD FOUNDATION** | | | | | |
| Indirect cost - Meeting space Aug to Jan | 7,000 | | 7,000 | | |
| Indirect cost - Ground transportation - in town | 3,000 | | 3,000 | | |
| Contract Labor | 30,000 | | | 30,000 | |
| Policy team meetings | 2,400 | | | 2,400 | |
| Flights (4 trips/$592 per roundtrip) | 2,370 | | | 2,370 | |
| Taxi/Rideshare (4 trips/6 rides/$31 per ride) | 750 | | | 750 | |
| Hotel (4 trips/$500 total for 2 nights) | 2,000 | | | 2,000 | |
| Food (4 trips/$60 per day for 2 days) | 480 | | | 480 | |
| Conference registration (4 trips/500 per conf.) | 2,000 | | | 2,000 | |
| **Total** | **50,000** | | **10,000** | **40,000** | |

| **HIGHER LEARNING** | | | | |
|---|---|---|---|---|
| Mentor stipends (41 Saturdays x $20 x 6 mento | 4,920 | | 4,920 | |
| 41 Saturdays) Paid by Glickman general | 4,920 | | 4,920 | |
| Events and field trips | 2,000 | | 2,000 | |
| Food | 2,500 | | 2,500 | |
| Office Supplies | 500 | | 500 | |
| Kitchen Supplies | 1,000 | | 1,000 | |
| Technology (Tablet or Laptop) | 1,000 | | 1,000 | |
| HL business cards | 100 | | 100 | |
| HL marketing materials | 600 | | 600 | |
| General Liability Insurance | 1,360 | | 1,360 | |
| **Total** | **18,900** | | **18,900** | |
| | | | | |
| **GLICKMAN UNDOING RACISM TRAINING** | | | | |
| Food, including Saturday dinner | 2,000 | | | 2,000 |
| Childcare | 500 | | | 500 |
| Sponsorships | 6,000 | | | 6,000 |
| Trainings | 16,000 | | | 16,000 |
| **Total** | **24,500** | | | **24,500** |
| **GLICKMAN GENERAL** | | | | |
| Office utilities | 4,000 | | 3,250 | |
| Social media videos | 2,700 | | 3,450 | |
| Leadership and Board meetings ($291/month) | 3,500 | | 3,500 | |
| **Total** | **10,200** | | **10,200** | |
| | | | | |
| **GENERAL DONATIONS** | | | | |
| Website (WIX) | 1,200 | | 1,200 | |
| Printed Material | 1,000 | | 1,000 | |
| General Body Food | 1,100 | | 600 | |
| Venue Rental | 1,500 | | 1,500 | |
| Programs (6 programs at $666) | 4,000 | | 4,000 | |
| Other expenses | 600 | | 600 | |
| **Total** | **9,400** | | **8,900** | |
| | | | | |
| **TOTAL EXPENDITURES** | **149,353** | | **48,000** | **100,853** |
| Surplus/Deficit Before Depreciation | 1 | | 500 | 1 |
| Depreciation Expense | | | | |
| **Surplus/Deficit After Depreciation** | **1** | | **500** | **1** |
| Net Assets, Beginning of Year | 0 | | 0 | |
| **Net Assets, End of Year** | **1** | | **500** | **1** |

| 2020 BUDGET | Total | | Unrestricted | Restricted |
|---|---|---|---|---|
| **INCOME** | | | | |
| **Foundation & Nonprofit Grants** | | | | |
| Alliance For Boys & Men of Color | 8,426 | | 8,426 | |
| Borealis Policing/Old BOD | 33,985 | | | 33,985 |
| Borealis Organizational Development | 13,798 | | | 13,798 |
| **Emergent Fund** | 18,500 | | 18,500 | |
| Ford Foundation | 10,111 | | | 10,111 |
| New Profit | 46,250 | | 46,250 | |
| Higher Learning | 15,000 | | | 15,000 |
| **Undoing Racism** | 983 | | 983 | |
| GEN | 51,310 | | 51,310 | |
| **TOTAL INCOME** | **198,364** | | **125,469** | **72,894** |
| | | | | |
| **EXPENDITURES** | | | | |
| **BOREALIS Policing** | | | | |
| **Personnel** | | | | |
| Contract Labor | 16,625 | | | 16,625 |
| **Travel** | | | | |
| Flights | 500 | | | 500 |
| Hotel | 700 | | | 700 |
| Food | 500 | | | 500 |
| **Conferences & Meetings** | | | | |
| Special Guests | 6,160 | | | 6,160 |
| Policy Team Meetings | 4,000 | | | 4,000 |
| Printing | 5,500 | | | 5,500 |
| **Total** | **33,985** | | | **33,985** |
| | | | | |
| **EXPENDITURES** | | | | |
| **BOREALIS Organizational Development** | | | | |
| **Marketing** | | | | |
| Website | 2,000 | | | 2,000 |
| Signage, business cards, office supplies (printer, white boards, power strips) | 800 | | | 2,304 |
| **Bookkeeping** | 3,600 | | | 3,600 |
| **Leadership Development** | | | | |
| **Travel** | 7,398 | | | 8,000 |
| Conference Fees (~$250) | | | | |
| Ground Transportation (~$300) | | | | |
| Food (~$150) | | | | |
| Hotel (~$700) | | | | |
| Flight (~$400) | | | | |
| **Total** | **13,798** | | | **13,798** |

| | | | | |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **Not yet deposited** | | | | |
| | | | | |
| | | | | |

| COLOR | | | |
|---|---|---|---|
| Art & Essay Contest | 750 | 750 | |
| Male Summit | 1,600 | 1,600 | |
| Black Boy Joy Initiative | 3,000 | 3,000 | |
| Leadership Development | 3,076 | 3,076 | |
| Total | 8,426 | 8,426 | |
| | | | |
| FORD FOUNDATION | | | |
| Indirect cost - Meeting space Aug to Jan | 2,986 | | 2,986 |
| Contract Labor | 7,125 | | 7,125 |
| Total | 10,111 | | 10,111 |

| | | | |
|---|---|---|---|
| **EMERGENT FUND** | | | |
| **Complete Communities** | | | |
| Printed Materials | **1,000** | **1,000** | |
| Contract Labor | 6,000 | 6,000 | |
| Stipends | **10,000** | **10,000** | |
| Other Expenses | **1,500** | **1,500** | |
| **Total** | **18,500** | **18,500** | |
| | | | |
| **NEW PROFIT** | | | |
| Indirect cost - Meeting space Aug to Jan | | | |
| Indirect cost - Ground transportation - in town | | | |
| Contract Labor | | | |
| Policy team meetings | | | |
| Flights (4 trips/$592 per roundtrip) | | | |
| Taxi/Rideshare (4 trips/6 rides/$31 per ride) | | | |
| Hotel (4 trips/$500 total for 2 nights) | | | |
| Food (4 trips/$60 per day for 2 days) | | | |
| Conference registration (4 trips/500 per conf.) | | | |
| **Total** | **46,250** | **46,250** | |
| | | | |
| **HIGHER LEARNING** | | | |
| Stipends | 13,000 | | 13,000 |
| Events and field trips | 800 | | 800 |
| Food | 900 | | 900 |
| Supplies | 300 | | 300 |
| **Total** | **15,000** | | **15,000** |
| | | | |
| **GENERAL DONATIONS** | | | |
| Contract Labor | 18,000 | 18,000 | |
| Website | 3,210 | 3,210 | |
| General Body Food | 1,200 | 1,200 | |
| Venue Rental | 5,000 | 5,000 | |
| Programs (6 programs at $650) | 3,900 | 3,900 | |
| Other expenses | 20,000 | 20,000 | |
| **Total** | **51,310** | **51,310** | |
| | | | |
| **TOTAL EXPENDITURES** | **197,380** | **124,486** | **72,894** |
| Surplus/Deficit Before Depreciation | 984 | 983 | 0 |
| Depreciation Expense | | | |
| **Surplus/Deficit After Depreciation** | **984** | **983** | **0** |
| Net Assets, Beginning of Year | 0 | 0 | |
| **Net Assets, End of Year** | **984** | **983** | **0** |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES, MOVE TEXAS CIVIC FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, and AMERICAN GI FORUM OF TEXAS, INC., | § § § § § § § § | |
| *Plaintiffs* | § § | |
| v. | § § | Civil Case No. 5:19-cv-00963 |
| TEXAS SECRETARY OF STATE, TRUDY HANCOCK, in her official capacity as BRAZOS COUNTY ELECTIONS ADMINISTRATOR, and PERLA LARA in her official capacity as CITY OF MCALLEN, TEXAS SECRETARY, | § § § § § § § | |
| *Defendants*. | § § | |

## PLAINTIFF AUSTIN JUSTICE COALITION'S OBJECTIONS AND RESPONSES TO DEFENDANT SECRETARY OF STATE'S FIRST REQUESTS FOR ADMISSION, REQUESTS FOR PRODUCTION, AND INTERROGATORIES, AND SECOND REQUESTS FOR PRODUCTION

TO:  Defendant Texas Secretary of State, by and through her attorneys of record Ken Paxton, Jeffrey C. Mateer, Darren L. McCarty, Thomas A. Albright, and Anne Marie Mackin, via e-mail to anna.mackin@oag.texas.gov.

Pursuant to Federal Rules of Civil Procedure 33, 34, and 36, Plaintiff Austin Justice Coalition ("AJC") hereby serves the following Objections and Responses to Defendant Secretary of State's First Requests for Admission, Requests for Production, and Interrogatories, and Second Requests for Production.

Dated: April 16, 2020

Respectfully Submitted,

/s/         *Hani Mirza*

**TEXAS CIVIL RIGHTS PROJECT**

Mimi M.D. Marziani
Texas Bar No. 24091906
mimi@texascivilrightsproject.org
Rebecca Harrison Stevens
Texas Bar No. 24065381
beth@texascivilrightsproject.org
Hani Mirza
Texas Bar No. 24083512
hani@texascivilrightsproject.org
Ryan V. Cox
Texas Bar No. 24074087
ryan@texascivilrightsproject.org
Zachary D. Dolling
Texas Bar No. 24105809
zachary@texascivilrightsproject.org

1405 Montopolis Drive
Austin, Texas 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)

**WILLKIE FARR & GALLAGHER LLP**

Richard Mancino (NY Bar No. 1852797)
Samuel Kalar (NY Bar No. 5360995)
JoAnna Suriani (NY Bar No. 5706395)

787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: rmancino@willkie.com
         skalar@willkie.com
         jsuriani@willkie.com

-AND-

Jennifer J. Hardy (TX Bar No. 24096068)
Denis A. Fallon (TX Bar No. 24059731)
Garrett Johnston (TX Bar No. 24087812)
Audra White (TX Bar No. 24098608)

600 Travis Street, Suite 2100
Houston, Texas 77002

Appx._130

Telephone: (713) 510-1700
Facsimile: (713) 510-1799
Email: jhardy2@willkie.com
afallon@willkie.com
gjohnston@willkie.com
awhite@willkie.com

***COUNSEL FOR PLAINTIFFS***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 16th day of April, 2020, a true and correct copy of the foregoing *Plaintiff Austin Justice Coalition's Objections and Responses to Defendant Secretary of State's First Requests for Admission, Requests for Production, and Interrogatories, and Second Requests for Production* was served upon counsel of record via email.

/s/          *Hani Mirza*

## <u>RESERVATION OF RIGHTS</u>

AJC has responded to these requests for admission, interrogatories, and requests for production based on the information currently available to it. Discovery, however, is not yet complete. Additional discovery and investigation may lead to additions to, changes in, or modification of these responses. AJC therefore reserves its right to supplement, amend, revise, correct, modify, or clarify these responses as additional information becomes available.

AJC makes its objections and responses in accordance with its interpretation and understanding of *Defendant Secretary of State's First Requests for Admission, Interrogatories, and Request for Production* and *Defendant Secretary of State's Second Requests for Production* ("Requests") in accordance with its current knowledge, understanding, and belief as to the facts and information available to it at the time of serving these responses. If Defendant subsequently provides an interpretation of any of its Requests that differs from AJC's understanding of the same, AJC reserves its right to complete the discovery of facts in this case and rely at trial or in any other

3

proceeding on documents and information in addition to the information provided herein, regardless of whether such information is newly discovered or newly in existence. It also reserves the right to amend, revise, correct, modify, or clarify its responses to properly respond to any interpretation Defendant may give these Requests.

AJC reserves his right to object on any grounds, at any time, to the admission or use of any response on any ground. AJC is also willing to meet and confer about any of its objections or responses.

### GENERAL OBJECTIONS

1.    AJC objects to these Requests, including the definitions and instructions, to the extent that they seek information or documents: (i) protected by attorney client privilege, the work product doctrine, or any other applicable privilege or immunity; (ii) not in AJC's possession, custody, or control; and (iii) that are publicly available or already within Defendants' possession.

2.    AJC objects to these Requests to the extent they are duplicative of a request that Defendants have propounded to another Plaintiff in this lawsuit. To the extent that Plaintiffs agree to produce a document that is responsive to multiple Requests duplicated across multiple Plaintiffs, Plaintiffs will only produce such documents once.

3.    AJC objects to the definitions of "Coalition of Texans with Disabilities," "CTD," "Austin Justice Coalition," "AJC," "MOVE Texas Civic Fund," "MOVE Texas," "MOVE," "League of Women Voters of Texas," "LWVTX," "LWV," "Individual Plaintiffs," and "Organizational Plaintiffs," (together, "Plaintiffs Definitions") as overly broad and unduly burdensome to the extent that they define each party as including "anyone acting or purporting to act on their behalf with respect to any matter inquired about herein, including without limitation representatives, employees, or agents."  For the purposes of these responses, each Plaintiff will

construe the Plaintiffs Definitions in accordance with the definition of "Plaintiffs" as found in Plaintiffs' First Set of Discovery Requests served on February 5, 2020.

4.     AJC objects to the definitions of "EVBB" and "SVC" as vague and ambiguous. For the purposes of these responses, AJC will construe the terms "EVBB" and "SVC" in accordance with the definitions of "EVBB" and "SVC" found in Plaintiffs' First Set of Discovery Requests served on February 5, 2020.

5.     These General Objections are incorporated into each of the specific responses and objections set forth below. No specific response or objection herein shall constitute a waiver, in whole or in part, of any of the foregoing General Objections. AJC reserves the right at any time to revise, correct, supplement, or clarify the objections or responses set forth herein and any production made pursuant thereto.

## AJC'S OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSION

1.      Admit that if a county election officer determines that a ballot was incorrectly rejected by the EVBB before the time set for convening the canvassing authority, the county election officer may petition a district court for injunctive or other relief as the court determines appropriate.

**RESPONSE**: AJC objects to this request for admission on the ground that it calls for a legal conclusion. AJC has no particular knowledge of this legal issue. The provisions of the Texas Election Code speak for themselves.

2.      Admit that SOS does not select the members of any EVBB.

**RESPONSE**: AJC can neither admit nor deny because it has no particular knowledge of the actions Defendant SOS takes. Defendant SOS is the appropriate party with information responsive to this request.

3.      Admit that SOS does not select the members of any SVC.

**RESPONSE**: AJC can neither admit nor deny because it has no particular knowledge of the actions Defendant SOS takes. Defendant SOS is the appropriate party with information responsive to this request.

4.      Admit that local election authorities, and not SOS, are responsible for receiving completed mail-in ballots.

**RESPONSE**: AJC objects to this request for admission on the ground that it calls for a legal conclusion. AJC has no particular knowledge of this legal issue. The provisions of the Texas Election Code speak for themselves.

5.      Admit that local election authorities, and not SOS, are responsible for delivering completed mail-in ballots to the appropriate EVBB or SVC.

**RESPONSE**: AJC objects to this request for admission on the ground that it calls for a legal conclusion. AJC has no particular knowledge of this legal issue. The provisions of the Texas Election Code speak for themselves.

6.      Admit that SOS lacks authority to reject any mail-in ballot for signature mismatch.

**RESPONSE**: AJC objects to this request for admission on the ground that it calls for a legal conclusion. AJC has no particular knowledge of this legal issue. The provisions of the Texas Election Code speak for themselves.

7.      Admit that voting by mail is a different process from in-person voting.

**RESPONSE**: AJC objects to this request for admission on the ground that it calls for a legal conclusion and is vague. Subject to and without waiving the foregoing, admit only to the

extent that, as a practical matter, voting by mail involves some different procedures than voting in-person.

       8.     Admit that Texas has an interest in ensuring that only eligible voters cast ballots.

      **<u>RESPONSE</u>**: AJC objects to this request for admission on the ground that it calls for a legal conclusion and is vague. Subject to and without waiving the foregoing, AJC can neither admit nor deny because it has no particular knowledge of the current interests of the State of Texas. Texas, including Defendant SOS, is the appropriate party with information responsive to this request.

## AJC'S OBJECTIONS AND RESPONSES TO FIRST REQUESTS FOR PRODUCTION

1.      To the extent not already produced in response to a subpoena duces tecum served upon you in this Lawsuit, all documents you may rely upon to support your claims in this Lawsuit.

**RESPONSE**: AJC objects to this request as broad and vague and because it demands that AJC marshal all of its evidence that may be presented at trial, regardless of whether that evidence is within AJC's care, custody, or control or whether Defendants have superior access of right to such documents. AJC will produce all documents it relies upon to support its claims in this lawsuit according to the Amended Scheduling Order, the Federal Rules of Civil Procedure, and Federal Rules of Evidence.

## AJC'S OBJECTIONS AND RESPONSES TO SECOND REQUESTS FOR PRODUCTION

1.      All documents and communications supporting your contention that "Texas unlawfully rejects the duly signed mail-in ballots of thousands of eligible voters every major election," as alleged in Paragraph 1 of your Complaint.

**RESPONSE**: Please see attached BATES GENERAL-00000001-2030.

2.      All documents and communications supporting your contention that "Texas counties rejected at least 1,873 mail-in ballots during the 2018 General Election and at least 1,567 mail-in ballots during the 2016 General Election solely on the basis of mismatching signatures," as alleged in Paragraph 1 of your Complaint.

**RESPONSE**: Please see attached BATES GENERAL-00000001-2030.

3.      Documents sufficient to show all activities on which you have spent funds or to which you have dedicated resources in Texas between January 1, 2017 and the present, including

      a.   Total spent on all activities in Texas;
      b.   Total spent on the #ProjectOrange campaign discussed in Paragraph 12 of your Complaint; including activities you undertake as part of the #ProjectOrange Campaign, and total funds spent on each of those activities.
      c.   Activities other than the #ProjectOrange campaign on which you spent funds or to which you have dedicated resources in Texas; and total spent on each of those activities.

**RESPONSE**: Please see attached BATES AJC-00000001-16.

4.      All documents and communications supporting your contention that "[t]he groups that are eligible to vote by mail are also the same groups, in many cases, that are most likely to have signature variations that could cause an improper rejection—especially the elderly, disabled, and persons who speak English as a second language," as alleged in Paragraph 46 of your Complaint.

**RESPONSE**: AJC objects to this request for production on the ground that it calls for expert witness testimony. Plaintiffs' expert witness report was served on Defendants on February 3, 2020. Subject to and without waiving the foregoing, AJC responds that it has no responsive documents.

5.     All documents and communications supporting your contention that "growing old, illness, injury, symptoms from taking certain medicine, change in eyesight, and consuming alcohol and/or drugs; mechanical factors such as pen type, ink, signing surface, signing position, and paper quality; and psychological factors such as distress, anger, fear, depression, happiness, [or] nervousness" can affect an individual's handwriting to the extent that their ballot would be erroneously rejected for signature mismatch, as referenced in Paragraph 48 of your Complaint.

**RESPONSE**: AJC objects to this request for production on the ground that it calls for expert witness testimony. Plaintiffs' expert witness report was served on Defendants on February 3, 2020. Subject to and without waiving the foregoing, AJC responds that it has no responsive documents.

6.     All documents and communications supporting your contention that "a person's handwriting naturally changes over time" to the extent that their ballot would be erroneously rejected for signature mismatch, as referenced in Paragraph 48 of your Complaint.

**RESPONSE**: AJC objects to this request for production on the ground that it calls for expert witness testimony. Plaintiffs' expert witness report was served on Defendants on February 3, 2020. Subject to and without waiving the foregoing, AJC responds that it has no responsive documents.

7.     All documents and communications supporting your contention that "[v]ariances between signatures" significant enough to result in a ballot being erroneously rejected for signature mismatch "are more prevalent in people who are elderly, disabled, under extreme stress, or who speak English as a second language," as referenced in Paragraph 48 of your Complaint.

**RESPONSE**: AJC objects to this request for production on the ground that it calls for an expert witness testimony. Plaintiffs' expert witness report was served on Defendants on February 3, 2020. Subject to and without waiving the foregoing, AJC responds that it has no responsive documents.

8.     All documents and communications supporting your contention that "the cost of remedial procedures" you seek in this Lawsuit "would likely be low," as alleged at Dkt. 32, p. 40.

**RESPONSE**: AJC objects to this request for production on the ground that the contention requires a legal analysis. Subject to and without waiving the foregoing, AJC has no responsive documents.

9.     All documents and communications supporting your contention that Texas's signature matching procedure is "error-prone," as alleged in Paragraph 70 of your Complaint.

**RESPONSE**: AJC objects to this request for production on the ground that it calls for expert witness testimony. Plaintiffs' expert witness report was served on Defendants on February

3, 2020. Subject to and without waiving the foregoing, AJC responds that it has no responsive documents.

       10.     All documents and communications supporting your contention that "each county (and even each committee if multiple SVC panels are created) necessarily develops its own idiosyncratic, arbitrary, and ad hoc procedure to determine that a ballot should be rejected," and that "[t]hese standards will necessarily vary from county to county, panel to panel, and even from meeting to meeting or ballot to ballot within the same committee panel," as alleged in Paragraph 41 of your Complaint.

      **RESPONSE**: AJC objects to this request for production on the ground that it calls for expert witness testimony. Plaintiffs' expert witness report was served on Defendants on February 3, 2020. Subject to and without waiving the foregoing, AJC responds that it has no responsive documents.

## AJC'S OBJECTIONS AND RESPONSES TO INTERROGATORIES

1.     Describe any relief that Plaintiffs contend would "provide voters meaningful notice prior to the rejection of a mail-in ballot and [] offer voters the ability to cure a mail-in ballot questioned for an alleged signature mismatch," as discussed in Paragraph 7 of your Complaint.

**RESPONSE**: AJC objects to this interrogatory on the ground that it calls for a legal conclusion. Subject to and without waiving the foregoing, there are multiple forms of prospective relief that would provide voters meaningful notice prior to the rejection of a mail-in ballot and offer voters the ability to cure a mail-in ballot questioned for an alleged signature mismatch. Plaintiffs' counsel discuss such forms to relief in their pleadings as well as in communications with opposing counsel. To be meaningful, notice prior to final rejection must clearly explain the reason why the voter's ballot was questioned, be received by the voter through a method of delivery the voter has quick and easy access to, and be received with enough time for the voter to attempt to effectively cure the questioned ballot. A cure process must provide voters simple methods and ample time to correct a ballot wrongly questioned for signature mismatch.

2.     If you contend that the Secretary has "rule making authority" to "establish any standards or guidance that must be used for actually determining if a signature is that of the voter," as referenced in Paragraph 41 of your Complaint, please state the basis for that contention.

**RESPONSE**: AJC objects to this interrogatory on the ground that it calls for a legal conclusion.

3.     State the basis for your contention that "each county (and even each committee if multiple SVC panels are created) necessarily develops its own idiosyncratic, arbitrary, and ad hoc procedure to determine that a ballot should be rejected," and that "[t]hese standards will necessarily vary from county to county, panel to panel, and even from meeting to meeting or ballot to ballot within the same committee panel," as alleged in Paragraph 41 of your Complaint.

**RESPONSE**: AJC objects to this interrogatory on the ground that it calls for expert witness testimony. Plaintiffs' expert witness report was served on Defendants on February 3, 2020. Subject to and without waiving the foregoing, as alleged in paragraph 2 of the Complaint, "current rules authorize untrained local election officials to arbitrarily and subjectively reject mail-in ballots if officials believe, based on their own layman analysis, that the signature on a ballot is not in fact the voter's signature." Please also see responses to Open Records Requests from local election official, which are being produced to Defendants.

4.     State the basis for your contention that the "signature verification procedure is not and cannot be performed anonymously," as alleged in Paragraph 42 of your Complaint.

**RESPONSE**: AJC objects to this interrogatory on the ground that Defendants are better equipped to answer it. Subject to and without waiving the foregoing, AJC's understanding is that signature verification requires reviewing the written name of the voter. As a result, it essentially cannot be performed anonymously.

5.     If you contend that SOS is responsible for delivering, receiving, or accepting completed mail-in ballots, please state the basis for that contention.

11

**RESPONSE**: AJC objects to this interrogatory on the ground that it calls for a legal conclusion. The provisions of the Texas Election Code speak for themselves.

6.     If you contend that SOS has the authority to seek judicial relief in connection with a local election official's decision to reject a mail-in ballot, please state the basis for that contention.

**RESPONSE**: AJC objects to this interrogatory on the ground that it calls for a legal conclusion. The provisions of the Texas Election Code speak for themselves.

7.     If you contend that eligible voters have a constitutionally protected right to pre-rejection notice and opportunity to cure before a ballot voted by mail is rejected for signature mismatch, please state the basis for that contention.

**RESPONSE**: AJC objects to this interrogatory on the ground that it calls for a legal

conclusion.

8.     If you contend that eligible voters have a protected liberty interest in casting a ballot by mail, please state the basis for that contention.

**RESPONSE**: AJC objects to this interrogatory on the ground that it calls for a legal conclusion.

9.     If you contend that eligible voters have a protected property interest in casting a ballot by mail, please state the basis for that contention.

**RESPONSE**: AJC objects to this interrogatory on the ground that it calls for a legal conclusion.

10.     If you contend that SOS has the authority to reject any mail-in ballot for signature mismatch, please state the basis for that contention.

**RESPONSE**: AJC objects to this interrogatory on the ground that it calls for a legal conclusion. The provisions of the Texas Election Code speak for themselves.

11.     Describe what "specific standards" you contend are required for the signature comparison process to "ensure its equal application," as alleged in Paragraph 74 of your Complaint.

**RESPONSE**: AJC objects to this interrogatory on the ground that it calls for a legal conclusion. Subject to and without waiving the foregoing, there are multiple types of specific standards that could be put in place to resolve the issues in this lawsuit. Plaintiffs' counsel discuss such forms to relief in their pleadings and in communications with opposing counsel, and their expert witness' report served on Defendants on February 3, 2020 also discusses such issues.

12.     Describe any guidelines or trainings you contend SOS must provide to local election officials, EVBBs, or SVCs, including how you contend any such guidelines or trainings should be provided.

12

**RESPONSE**: AJC objects to this interrogatory on the ground that it calls for a legal conclusion and expert testimony. Subject to and without waiving the foregoing, there are multiple types of guidelines and trainings Defendant SOS could provide to resolve at least some of the issues in this lawsuit. Plaintiffs' counsel discuss such forms of relief in their pleadings and communications with opposing counsel.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES MOVE TEXAS CIVIC FUND, AND LEAGUE OF WOMEN VOTERS OF TEXAS, | § § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | No. 5:19-cv-00963 |
| | § | |
| TEXAS SECRETARY OF STATE, TRUDY HANCOCK IN HER OFFICIAL CAPACITY AS BRAZOS COUNTY ELECTIONS ADMINISTRATOR, AND PERLA LARA IN HER OFFICIAL CAPACITY AS CITY OF MCALLEN, TEXAS SECRETARY, | § § § § § § § | |
| *Defendants*. | § | |

<u>**DEFENDANT SECRETARY OF STATE'S MOTION FOR SUMMARY JUDGMENT**</u>

**Tab 4**

**Coalition of Texans with Disabilities**

```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
                       SAN ANTONIO DIVISION

DR. GEORGE RICHARDSON,     *
ROSALIE WEISFELD, AUSTIN   *
JUSTICE COALITION,         *
COALITION OF TEXANS WITH   *
DISABILITIES, MOVE TEXAS   *
CIVIC FUND, LEAGUE OF      *
WOMEN VOTERS OF TEXAS,     *
and AMERICAN GI FORUM OF   *
TEXAS, INC.,               *
                           *
         Plaintiffs,       *
                           *        CIVIL ACTION NUMBER
VS.                        *        5:19-cv-0963
                           *
TEXAS SECRETARY OF         *
STATE, TRUDY HANCOCK, IN   *
HER OFFICIAL CAPACITY AS   *
BRAZOS COUNTY ELECTIONS    *
ADMINISTRATOR, AND PERLA   *
LARA IN HER OFFICIAL       *
CAPACITY AS CITY OF        *
McALLEN, TEXAS             *
SECRETARY,                 *
                           *
         Defendants.       *
```

                    Remote Oral Deposition of

                Coalition of Texans with Disabilities,

            By and through their Designated Representative,

                           CHASE BEARDEN

                           May 19, 2020

                            10:05 a.m.

Reported by:

Micheal A. Johnson, RDR, CRR

26

1   choice.

2        Q.     And has that mission changed over time?

3        A.     I think it has changed some, but that's

4   just because as we found we moved forward in certain

5   areas, we found areas where there were setbacks and

6   we kind of had to fall back and work on those areas.

7   There's always new things that are changing.  Where

8   we finally had some of the architectural barrier

9   sides of our world fixed, when scooters came along

10  and started parking on the curb cuts in the

11  accessible parking spaces, there was no way to stop

12  it and no way to enforce it.  So that became a new

13  barrier that we had to adjust to and figure out.  So

14  it's always changing in a sense, but it still always

15  comes back to maintaining access in the community of

16  your choice.

17       Q.     Always about access, even if some of the

18  barriers maybe shift --

19       A.     Yes.

20       Q.     -- as time goes on?

21       A.     Right.

22       Q.     That makes sense.  What is Disability

23  Rights Texas?

24       A.     They're a federally funded legal resource

25  for -- in every state.

1      A.     Yeah.  One last thing on conferences,

2   just to make sure I get it all in there.  We also

3   get invited and asked to speak at a lot of different

4   conferences.  So they could be disability

5   conferences, pharmaceutical conferences, insurance

6   conferences.  We kind of run the gamut on that,

7   mainly because any chance we can speak about access,

8   we try to.

9      Q.     One quick follow-up that I realize I

10  hadn't asked.  About how many members does CTD have?

11     A.     So currently we have, as we tried to

12  migrate all our stuff over, 2200 active members

13  across the state.  There are many more.  We just

14  don't have -- we don't always include their e-mails.

15  As we shifted things, they've kind of dropped off.

16  But we also have member organizations somewhere over

17  the number of 50, I think, and basically those are

18  other types of disability organizations, some are

19  pharmaceutical companies that have the same beliefs,

20  insurance companies.  And basically, we share our

21  information where we send something out and then

22  they send it out to their members and it kind of

23  gives us a wider population number.

24         But as we've kind of gone digital, to try

25  and get our membership, we've started moving more

1 | doing consulting for different organizations and

2 | groups.

3 |     Q.   I see.  Okay.

4 |     A.   Yeah.

5 |     Q.   And then I see Interest and Other Income.

6 | What -- besides interest, do you know if there is

7 | another income source?

8 |     A.   I believe -- sorry.

9 |     Q.   No, please.

10 |     A.   I believe we have -- we've had stock

11 | donations in the back in the past.  I think other

12 | sources.  Not sure of any others versus that.

13 |     Q.   That's fine.  And looking down here on

14 | the Expenses, rather than kind of make you talk

15 | through each of them, because I think these are

16 | pretty self-explanatory, I'm wondering if you can

17 | identify from this document how much money CTD spent

18 | on its voting-related work.

19 |     A.   I actually can't break that down.  We

20 | basically roll everything in.  When you look at the

21 | way we do our work, we're covering so many areas.

22 | We don't narrow it down to each individual issue

23 | area or else we would have 40 or 50 different small

24 | accounts.  If it falls under advocacy and that's the

25 | work we're doing, that's where we place it.  More of

61

1  a general fund for that.

2      Q.    Would your answer be the same with

3  respect to the other budgets from other years?

4      A.    Yes.

5      Q.    Okay.  I'm showing you a document that I

6  will make Exhibit 5 to this deposition.

7              (Deposition Exhibit 5 marked for

8  identification.)

9  BY MS. MACKIN:

10     Q.    Please take the time you need to pull up

11 that document and review it and then let me know

12 when you're ready to discuss it.

13             (Witness reviews document.)

14     A.    Okay.

15 BY MS. MACKIN:

16     Q.    All right.  This document is marked

17 CTD 26 through 27.  Do you recognize this document?

18     A.    Yes.

19     Q.    And what is it?

20     A.    This is one of our newsletters.

21     Q.    Okay.  How was this document distributed?

22     A.    Electronically.

23     Q.    Okay.  And who is it sent to?

24     A.    It goes out to our members and our member

25 organizations.

1      Q.      And do you know if it was distributed any

2  other way?

3      A.      I mean, it might have been put on

4  Facebook as a link to it.

5      Q.      Okay.

6      A.      I'm not sure.

7      Q.      Do you know -- do you know when this

8  document was distributed?  And it's okay if you

9  don't.  I'm just asking because I couldn't find a

10  date on it.

11      A.      It has a date at the top left, but that

12  might have been when it was pulled up.  I don't

13  actually know.  I mean, we have ways of logging onto

14  our system.  Our newsletters are all on the website.

15  We could go to that and get you the exact date it

16  went out.

17      Q.      That's all right.  No problem.  Do you

18  know how much -- do you know if it's possible to

19  break down how much it costs CTD to send out this

20  newsletter?

21      A.      We don't have a breakdown of that.

22  Usually we -- we have a communications director and

23  staff, we meet, we have to pull things together,

24  make sure we've researched it, reach out to others

25  when these are going out.  So staff time, salaries,