League of Women Voters of Texas - 5/18/2020

44

1  Texas provide funding to those voter registration

2  activities?

3       A.    Well, we provide some funding.  We also

4  provide resources.  We provide handouts that we

5  create at the state level and we provide those for

6  the local communities to use, to not just leagues

7  but other partnering organizations or anybody can

8  actually download those and share them with whoever

9  they want.  We have a lot of resources we provide

10 that include voter registration information.

11      Q.    And so I want to separate that out in

12 terms of you mentioned some funding and then you

13 also mentioned resources.  And when we're talking

14 about resources, I'm kind of envisioning that as

15 like PowerPoints, videos, like walking scripts, like

16 materials that get created at the state level.  Is

17 that a fair understanding?

18      A.    Almost.

19      Q.    Okay.

20      A.    My understanding would be that we are a

21 all-volunteer organization.  We have one and a half

22 staff.  I consider the resources of all those

23 volunteers to include -- to include the time and

24 energy and efforts of all those volunteers who are

25 actually registering or those volunteers who created

League of Women Voters of Texas - 5/18/2020

45

1    those documents and created the videos and created

2    the PowerPoints and did all that effort.  To me,

3    that is one of the biggest resources we have is the

4    volunteers who work for our organization who don't

5    work.  They volunteer for our organization.

6         Q.    And so I just want to make sure I

7    understand about -- does the League of Women Voters

8    of Texas provide money to support voter registration

9    efforts?

10        A.    We provide -- so we provide money for all

11   the efforts that local -- we do provide some money

12   that local could use for voter registration.

13        Q.    Okay.

14        A.    Yes, we do.

15        Q.    Do you provide anything that you say, you

16   have to use this for voter registration?

17        A.    The League of Women Voters of Texas does

18   not provide anything that says they have to use it

19   for voter registration, that I know of.

20        Q.    It's more of just locally use it for what

21   you need it for, basically?

22        A.    We have -- voter registration is such an

23   integral part of what we do.  It is -- it would be a

24   part of the Voters Guide, which we provide or pay

25   for for the leagues to use.  And it's a part of

Appx._200

1   VOTE411, which is also a way that voters can get

2   to -- information on registering.  It is a part of

3   our website.  It is integral to what we do at the

4   league.  So I wouldn't say that we provide resources

5   and money, but it's not like in a little pot that

6   says, just use this for voter registration.  It is

7   in everything that we do.

8         Q.    Fair enough.  I want to also talk about

9   those state-level resources that you mentioned that

10  League of Women Voters of Texas creates and shares

11  with the local leagues.  I know you've listed some

12  examples, but can I get you to kind of maybe refresh

13  me on it because I wasn't writing them down.  You

14  mentioned the Voters Guide?

15        A.    The Voters Guide, yeah.  We have

16  PowerPoints.  We have bookmarks.  We have brochures.

17  We have handouts.  We have YouTubes, videos,

18  websites, web pages, graphics and we have people who

19  support all the voter registration activities, and I

20  consider them a resource.

21        Q.    Absolutely.  Anything else you can think

22  of?

23        A.    About -- ask the question again.  I can't

24  remember.

25        Q.    Sure.  Resources that the League of Women

1  the name of our dinners that we have where we bring

2  in money.

3      Q.   Okay.  And what about Publications?

4      A.   So that would be the education income --

5  income.  This is income.  So when we -- income.  So

6  when we would make a Voters Guide, the league may

7  pay for -- and other organizations may pay for a

8  printed copy of it.  And so that would probably be

9  part of the publication's income.  I don't know if

10  there was other income from publications that year.

11  I don't know where it's coming from because I -- I

12  was on the board, but it's a long time ago.

13      Q.   Workshops and Seminars?

14      A.   Income.  So probably when we had

15  workshops around the state or if we had workshops at

16  an event, then we would probably charge $10 a person

17  or something like that.  That's where I guess that

18  money would come from.

19      Q.   Okay.  And I think we've actually covered

20  all of the different categories on that, so thank

21  you for bearing with me and moving through that --

22      A.   No problem.

23      Q.   Can you identify which of these expenses

24  were dedicated to voter registration efforts?

25      A.   So I would look at the League of Women

1  Voters of Texas Education Fund and I would say it

2  would be Mission Projects, is probably one of the

3  areas.  I would say the -- it's a part of everything

4  we do, so probably part of the social media is about

5  that.  Probably some of the staff expense because

6  they have to write the newsletters.  Probably some

7  of the -- you know, the software or whatever that we

8  use to send out newsletters and that's what I would

9  think, yes.  So it's mixed up all over in everything

10  we do.

11       Q.   So thank you for -- thank you.  So you

12  can't identify like a specific dollar amount,

13  though?

14       A.   I cannot.

15       Q.   Is it possible to identify which of these

16  resources were dedicated to educating voters about

17  voting by mail?

18       A.   I would -- I would -- it would be very

19  similar, in that it would be mixed up in everything

20  we do because it would be a part of our mission, it

21  would be a part of marketing social media, it would

22  be a part of staff expenses because -- and that

23  would be it, I think.  So it's -- again, it's mixed

24  up.

25       Q.   Fair enough.  All right.  I would like to

1   2018-2020 appears.

2         A.    Let's look on page 17.  Okay.  So the

3   explanation for the proposed budget is on Bates

4   number 68 and the budget spreadsheet is on Bates

5   number 69.  And is that it?  That's it.  Thank you.

6         Q.    And was this the budget that was adopted

7   for 2018-2020?

8         A.    Just a second.  It is a little bit more

9   complicated than that, so I need to read it so that

10  I understand and say things correctly.

11        Q.    Absolutely.  Take your time.

12              (Witness reviews document.)

13        A.    Just a second.  Let me go down now to the

14  budget.  I want to get it right.  Okay.  So the --

15  I'm going to try to turn this page so I can see it

16  in the right without straining my neck.  So yes, the

17  proposed budget which was adopted at this convention

18  was the Lone Star League of Women Voters budget,

19  which at that point was a combining LWV Texas and

20  the LWV Education Fund into one 501(c)(3)

21  organization.

22  BY MS. MACKIN:

23        Q.    Okay.  And so does the Lone Star League

24  of Women Voters still exist today?

25        A.    It was changed over to the League of

League of Women Voters of Texas - 5/18/2020

1 Women Voters of Texas.

2       Q.    I see.

3       A.    So it was like a holding name -- a

4 holding name.

5       Q.    To combine the two entities into that and

6 then rename it once they were combined?

7       A.    Yes.

8       Q.    Makes sense.

9       A.    Thank you.

10      Q.    Do you know why the decision was made to

11 combine -- well, essentially to no longer have a

12 (c)(4) for the League of Women Voters of Texas?

13      A.    We still have a (c)(4), but it is an

14 empty shell in case we need it.

15      Q.    Okay.

16      A.    Okay.  Just to be clear.

17      Q.    Thank you.  I appreciate that.

18      A.    Okay.  The reason why is -- my

19 understanding, and it's probably in this document

20 somewhere, is twofold.  One is that even our

21 treasurer is a volunteer person.  And it is very

22 complicated to try to figure out the money for two

23 different organizations.  And it's very complicated

24 to determine to raise money for two different

25 organizations.  And so we decided that it would be

1  much better to have one organization, especially

2  that -- since we don't spend a lot of money on

3  advocacy.

4       Q.    And so --

5       A.    On lobbying.  I'm sorry.  I'm sorry, can

6  I change?

7       Q.    Yes.

8       A.    I interrupted you and I apologize,

9  wherever you are.

10      Q.    On page LWV69, it lists Lone Star League

11  of Women Voters, League of Women Voters of Texas and

12  League of Women Voters of Texas Education Fund, up

13  at the top.

14      A.    That's right.

15      Q.    Under Lone Star League of Women Voters,

16  does that just combine the line items under League

17  of Women Voters of Texas and League of Women Voters

18  of Texas Education Fund?

19      A.    Yes, that is my understanding.

20      Q.    Okay.  And is it possible to look at this

21  document and identify what was spent on voter

22  registration activities?

23      A.    Because voter registration is integral to

24  our organization and our mission, it is mixed up in

25  here in everything we do, because it would be a part

1  of -- at convention, we would have training on voter

2  registration; at marketing and social media, we

3  would do marketing and social media about voter

4  registration.  We would have it in our -- have

5  information in our voter -- in our Voters Guide and

6  in -- we would produce many different educational

7  items or printed items, PowerPoints and things like

8  that, having to do with voter education.  So it

9  would be very hard to separate it out.

10      Q.    Would it be possible to --

11      A.    It would be impossible -- no, it's not

12  possible to separate it out, because it's

13  everywhere.

14      Q.    And what about voter education activities

15  specific to ballot by mail?

16      A.    That also is included in everything we

17  do.  Our mission is empowering voters and we would

18  empower voters with that information so that they

19  can vote in the elections.  So it is also mixed up

20  in everything we do, I think.

21      Q.    The next document I have is going to be

22  very quick.

23      A.    Okay.  So I can click out of this one?

24      Q.    Yes.  Thank you.  And I will make League

25  of Women Voters 68 through 69, Exhibit 5.

League of Women Voters of Texas - 5/18/2020

75

```
 1        Q.    I appreciate that.

 2        A.    And I -- yeah.  Thank you.

 3        Q.    And did the League of Women Voters of

 4   Texas track how many voters were registered as a

 5   result of their Get Out the Vote project?

 6        A.    We have -- no, we did not.

 7                 MS. MACKIN:  I think if it's all

 8   right with everyone, it might be a good time to take

 9   a quick break for lunch.

10                 THE WITNESS:  Okay.

11                 MS. SURIANI:  Grace, that's good with

12   us if it's good with you.

13                 THE WITNESS:  Yes.

14                 MS. SURIANI:  Anna, how long are you

15   thinking, an hour?

16                 THE REPORTER:  We're off the record

17   now.

18                 (Recess taken from 12:23 p.m. to

19   1:27 p.m.)

20   BY MS. MACKIN:

21        Q.    Ms. Chimene, are you ready?

22        A.    Yes.  May I update you on something you

23   asked me previously?

24        Q.    Yes, please.

25        A.    Okay.  If you go to 051, Bates
```

League of Women Voters of Texas - 5/18/2020

76

```
 1  number 051.  Now I have to look for the number.

 2              MS. SURIANI:  And I think that's

 3  Exhibit 5.

 4      A.    Did I get the wrong one?  Page number --

 5  my page No. 28.  Let me see what the other type of

 6  page is.  So Bates number 79 and 80.

 7  BY MS. MACKIN:

 8      Q.    Okay.

 9      A.    You previously asked me about the Get Out

10  the Vote budget.

11      Q.    Yes.

12      A.    And you can ask me again so I know what

13  the question was.  I put it back on you.

14      Q.    I believe that the question was how much

15  did the League of Women Voters of Texas spend on its

16  Get Out the Vote campaign?

17      A.    So we spent exactly what we brought in

18  donated by our members at convention, which was

19  $8,000.

20      Q.    And do you know how much of that was

21  dedicated to preparing the two PowerPoints we looked

22  at in Exhibits 8 and 9?

23      A.    No, I don't know.

24      Q.    Does the League of Women Voters of Texas

25  plan to continue making educational materials
```

Appx._209

League of Women Voters of Texas - 5/18/2020

77

1  available on its website?

2      A.    Yes.

3      Q.    Including those about voting by mail?

4      A.    Yes.

5      Q.    For how long?

6      A.    As long as people are allowed to vote by

7  mail.

8      Q.    What would -- well, focusing in on the

9  issue of mismatched signatures, are you aware of any

10  individual voter that the League of Women Voters of

11  Texas has assisted in -- well, let me ask that

12  differently.

13          Has the League of Women Voters of Texas

14  ever assisted any individual voter after their

15  mail-in ballot was rejected for signature mismatch?

16          MS. SURIANI:  I'm going to object to

17  form.

18          Grace, if you understand, you can

19  answer.

20      A.    The League of Women Voters -- the League

21  of Women Voters of Texas is a part of the Election

22  Protection Coalition.  The Election Protection

23  Coalition provides a phone number and a service

24  where voters can call in when they have an issue.  I

25  would presume that any issues that came up would go

1  of our education for our members and supporters, it

2  goes out in newsletters.  And so do we send funds to

3  the group?  We don't.  We also don't get any funds

4  from the group.  What we do is work with them

5  because it's such an important part of our mission

6  of empowering voters and defending democracy.

7      Q.    And so just to make sure I understand the

8  answer, there isn't like -- you couldn't give me

9  like the name of an individual voter who had their

10  ballot rejected for signature mismatch who then the

11  League of Women Voters of Texas went in and tried to

12  assist them with rectifying --

13      A.    No.

14      Q.    -- the rejection?  Okay.

15          The complaint mentions that the League of

16  Women Voters is bringing this lawsuit both in its

17  own right as the League of Women Voters and also on

18  behalf of members of the League of Women Voters.  Is

19  that consistent with your understanding?

20      A.    That is my understanding.

21      Q.    How many members is the league suing on

22  behalf of?

23      A.    I would presume all --

24          MS. SURIANI:  Objection.

25          Go ahead, you can answer, Grace.

1    A.    I would presume all of our members, which

2  is somewhere around -- it goes up and down, but

3  somewhere around 3,000.

4  BY MS. MACKIN:

5    Q.    Do you know if any of those league

6  members have ever had a mail-in ballot rejected

7  based on a signature mismatch?

8    A.    No, I don't know.

9    Q.    I'm going to share a document with you

10  that was produced to us this morning and it's

11  actually an Excel file.  And please let me know when

12  you're able to pull up that document.

13    A.    What number is it?

14    Q.    It -- the title of the Excel file is

15  LWV-00000701.

16    A.    I don't see it.

17        MS. SURIANI:  And I don't think it's

18  in --

19  BY MS. MACKIN:

20    Q.    I accidentally didn't send it.  User

21  error.  All right.  Let me know if that works.

22        THE WITNESS:  Do y'all see it?  Oh,

23  there it is down there at the bottom.

24    A.    Okay.  It's up.

25

League of Women Voters of Texas - 5/18/2020

82

```
 1              (Deposition Exhibit 10 marked for
 2   identification.)
 3   BY MS. MACKIN:
 4        Q.    Do you recognize this Excel file?
 5        A.    Yes.
 6        Q.    What is it?
 7        A.    It is the -- it is the report spreadsheet
 8   from a survey we sent out on Friday to our league
 9   members.
10        Q.    And Friday would have been May 15th,
11   2020?
12        A.    15, yes.  And we sent it out in the
13   afternoon on the 15th.
14        Q.    And what questions did the survey ask?
15        A.    Can I open it and --
16        Q.    Absolutely.  Yes.  Yes.
17        A.    I'm going to make it be a wrap so I
18   can -- a wrap text so I can see it.  I can't do it.
19              Okay.  It says, have you voted by mail in
20   the past and are you planning on voting by mail in
21   the future.  That was the first question.  And the
22   answers available were yes and no.
23              And then it says, are you planning on
24   voting by mail in the future?  And the answers --
25   possible answers were yes and no.
```

League of Women Voters of Texas - 5/18/2020

83

1          And then it was, if you answered yes to
2   either of the questions above, under what category
3   were you eligible to vote by mail in the next
4   election?  And then it had the eligibility
5   categories for vote by mail.
6          And then I had -- we had people say which
7   league they were with.
8      Q.    Okay.  Did the survey collect any other
9   information?
10     A.    No.
11     Q.    So it didn't -- it didn't collect the
12  names of any respondents?
13     A.    No.  No, ma'am.
14     Q.    And how -- how was it -- how was this
15  survey prepared?  Was it Google Forms or Survey
16  Monkey?
17     A.    Google Forms.
18     Q.    And you may have said this, but I don't
19  recall.  Who was it sent out to?
20     A.    It was sent out to the member list.
21     Q.    Of the League of Women Voters of Texas?
22     A.    Texas, uh-huh.
23     Q.    And the first column shows a time stamp,
24  looks like a date and a time.
25     A.    Uh-huh.

League of Women Voters of Texas - 5/18/2020

84

```
 1        Q.     So does that reflect when each of these
 2   responses was received?
 3        A.     Yes, that's what it reflects to me.
 4        Q.     And I want to be super clear that I am
 5   not suggesting any funny business on the part of the
 6   league or anyone.  I just want to ask.  Is there --
 7   do you know if there was anything to prevent the
 8   same person from making duplicate submissions?
 9        A.     Aren't you special?  I don't know because
10   I did not create the web form.
11        Q.     My mom thinks I'm special.
12        A.     Well, you're very special.  I am not that
13   devious, but I understand your -- I understand, but
14   I did not create the form so I don't know.
15        Q.     And just to be clear, I do not think that
16   you are devious.  The only reason I asked was
17   because I noticed that -- I think there may be three
18   responses that said like the exact same really
19   specific thing in the comments.
20        A.     Yeah.
21        Q.     And so that -- that's what made me ask
22   the question, not --
23        A.     Yeah.
24        Q.     -- suspicion of anyone monkeying around
25   with the document.
```

League of Women Voters of Texas - 5/18/2020

85

```
 1      A.    Yeah.  This is a really important issue
 2 to our members.  Our members tend to be older.  They
 3 care a lot about voting in elections and I think
 4 within the first -- you can look down here.  Within
 5 the first hour we had already gotten 100 answers, so
 6 I was pretty proud of the league members.
 7      Q.    It is a very robust response.
 8      A.    Yeah.
 9      Q.    And prompt.  Do you know, then, if any of
10 the individuals who responded to this survey have
11 ever had their mail-in ballot rejected because of
12 signature mismatch?
13      A.    I did not --
14            MS. SURIANI:  Objection to form.
15 Sorry.
16            Grace, you can answer.
17      A.    I don't know and I did not read all the
18 responses.  I'm looking at them now.
19            (Witness reviews document.)
20      A.    Okay.  I don't see anything in there.
21 BY MS. MACKIN:
22      Q.    Okay.  There were also a few e-mails
23 produced to us and I think I might be able to make
24 this go a little bit more quickly if the answer is
25 the same for all of them, but I'm happy to pull up
```

League of Women Voters of Texas - 5/18/2020

86

```
 1  any document if you're not sure or want to go
 2  through them.
 3      A.    It's okay.
 4      Q.    We received a few e-mails.  Let's see.
 5  There were -- one was from Virginia March, one was
 6  from Cathy Murphee, one was from Mary Clair Rowe,
 7  one was from Mitzi Michelle Rusk, one was from Jean
 8  Richards, and one was from Marilyn Wills.
 9      A.    Uh-huh.
10      Q.    Do you know if any of those individuals
11  have ever had a mail-in ballot rejected for
12  signature mismatch?
13      A.    I don't know.
14      Q.    Pivoting just a little bit -- actually
15  quite a bit.  We're done with the spreadsheet, so
16  you can close that.
17      A.    Okay.
18      Q.    Kind of bring things back to the
19  beginning, actually.  What is the purpose of the
20  county election website review?
21      A.    The purpose was to find what counties are
22  providing to their voters that they're serving in
23  their community to -- then to encourage the counties
24  to provide the information that is either required
25  legally or that we think would be a best practice
```

1    for counties to provide the voters.  Also for those

2    counties to use simple and clear language so that

3    voters can actually find what they're looking for.

4            Let me add one more thing.  And it's to

5    provide education to the county election officials

6    and the Secretary of State about how they might

7    improve their county election websites.

8        Q.    And actually pivoting back, there was one

9    more e-mail in the production we received this

10   morning that identified a few more individual league

11   member voters.  Looks like Leah and Steve Martindale

12   and Patricia Alford.

13       A.    Uh-huh.

14       Q.    Do you know if any of those individuals

15   have ever had a ballot by mail rejected for

16   signature mismatch?

17       A.    No, I don't.

18       Q.    Ms. Chimene, I want to thank you very

19   much for your time today and I'm sorry for making us

20   take a lunch break.  I didn't realize I would be

21   done so quickly, but I don't have any other

22   questions for you, other -- well, I have one more.

23   Have I treated you courteously today?

24       A.    Yes, you have.

25            MS. MACKIN:  We'll pass the witness.

1    Q.    Okay.  And do you know if anyone

2  responded to that message?

3    A.    Sent by Grace Chimene.  It looks to me

4  like they might have asked for something, and I sent

5  them the Texas primary runoff thing and then they

6  sent me something back.  And when I say me, it's

7  because I'm an administrator on the page.

8    Q.    Okay.

9    A.    They're still not responding to me

10  personally.  They're sending me something to --

11  something to the league.

12    Q.    And --

13    A.    That's my understanding of what this page

14  is.

15    Q.    What is the name of the individual who

16  sent this message to the league?

17    A.    It looks like it is Virginia Martinez.

18    Q.    And is Virginia Martinez a member of the

19  League of Women Voters of Texas?

20    A.    I did not check that out.  Anybody can

21  follow our page.  We answer questions on voting when

22  we can.  And she contacted us through Facebook.

23    Q.    Do you know if Ms. Martinez has ever had

24  a ballot by mail rejected for signature mismatch?

25    A.    No.

League of Women Voters of Texas - 5/18/2020

113

```
 1       Q.    That is all I have on that document.

 2       A.    Thank you.

 3       Q.    I'm going to share with you -- so you can

 4  close out of it.

 5       A.    Okay.

 6       Q.    I'm going to share what will be

 7  Exhibit 13 to this deposition.

 8             (Deposition Exhibit 13 marked for

 9  identification.)

10  BY MS. MACKIN:

11       Q.    And it is marked LWV703.  Please let me

12  know when you are able to pull up that document.

13       A.    I have it open.

14       Q.    And do you recognize this document?

15       A.    I believe it is -- we were contacted on

16  Facebook, the League of Women Voters of Texas, and

17  by Kathryn Motard.

18       Q.    And is Kathryn Motard a League of Women

19  Voters of Texas member?

20       A.    I don't know.

21       Q.    Is there a date on this message?

22       A.    It says 5/16.

23       Q.    So it was received on May 16th of 2020?

24       A.    Yes.

25       Q.    And I see that a response was sent.  Did
```

Appx._220

 1 | you send that response?

 2 |      A.    That response is an automatic response.

 3 |      Q.    I see.  So I didn't see that response on

 4 | the previous document.  Do you know why it's

 5 | included on this one and not on the previous one?

 6 |      A.    I don't know.

 7 |      Q.    And do you know if Ms. Motard has ever

 8 | had a ballot by mail rejected for signature

 9 | mismatch?

10 |      A.    No.

11 |      Q.    Of the education that the League of Women

12 | Voters of Texas provides, do you provide any

13 | educational materials about signature comparison or

14 | document examination?

15 |                MS. SURIANI:  Objection to form.

16 |                You can answer if you understand,

17 | Grace.

18 |      A.    Say it again.

19 | BY MS. MACKIN:

20 |      Q.    Sure.  Does the League of Women Voters of

21 | Texas provide any voter education materials about

22 | signature comparison for mail-in ballots?

23 |      A.    Signature comparison.  We provide voter

24 | education on our website, on the web page called

25 | Vote By Mail.  On tips, it tells people -- voters

1      Q.     We did.   We received screenshots from the

2  website, we received PowerPoints which we talked

3  about and we received a screenshot of the YouTube

4  page of the videos.

5      A.     Okay.   Thank you.

6      Q.     So to the best of your understanding, is

7  there anything else specific to signature

8  comparison?

9      A.     There are -- we create vote by mail

10 graphics to encourage voters and to provide them

11 with information, but they are not specific to the

12 signature, that I recall --

13     Q.     Okay.

14     A.     -- at this time.

15     Q.     So we just kind of ran through the list

16 of stuff that's specific to signature comparison.

17     A.     Uh-huh.

18     Q.     And then one last question that I

19 realized I forgot to ask when I was asking you about

20 Marilyn Wills.

21     A.     Yes.

22     Q.     I noticed that the e-mail included a

23 reference to her husband Dennis as well.

24     A.     That's right.

25     Q.     And it made me curious as to what

117

1  percentage of your members are male, if you know?

2      A.    I don't know what percentage is, but all

3  folks are invited to be a member who are over the

4  age of 16.

5      Q.    And do you know if Mr. Wills has ever had

6  a ballot by mail rejected for signature mismatch?

7      A.    I don't know.

8              MS. MACKIN:  All right.  Thank you

9  for indulging me with that second round,

10 Ms. Chimene.  I will pass the witness.

11             THE WITNESS:  Thank you.

12             MS. SURIANI:  And we'll reserve --

13 we'll reserve the remainder.  We're all set.

14             THE REPORTER:  Transcript orders?

15             MS. MACKIN:  E-tran is good with us.

16             MS. SURIANI:  We'll take a read and

17 sign, please.

18             MR. MAGEE:  E-tran is good with me.

19             MR. TAWIL:  And the same for Isaac.

20             THE REPORTER:  We're off the record.

21             (Deposition concluded at 2:40 p.m.)

22

23

24

25

119

1                    REPORTER'S CERTIFICATION

2

3           I, Micheal A. Johnson, Registered Diplomate

4    Reporter, Certified Realtime Reporter and Notary

5    Public in and for the State of Texas, certify that

6    on the 18th day of May, 2020, I reported the Remote

7    Oral Deposition of GRACE CHIMENE, after the witness

8    had first been duly cautioned and sworn to testify

9    under oath; said deposition was subsequently

10   transcribed by me and under my supervision and

11   contains a full, true and complete transcription of

12   the proceedings had at said time and place; and that

13   reading and signing was requested.

14           I further certify that I am neither counsel

15   for nor related to any party in this cause and am

16   not financially interested in its outcome.

17           GIVEN UNDER MY HAND AND SEAL of office on

18   this 29th day of May, 2020.

19

20

21   _____
     MICHEAL A. JOHNSON, RDR, CRR
22   NCRA Registered Diplomate Reporter
     NCRA Certified Realtime Reporter
23   Notary Public in and for the
     State of Texas
24   My Commission Expires:  8/8/2020

25

### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | |
|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES, MOVE TEXAS CIVIC FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, and AMERICAN GI FORUM OF TEXAS, INC.,     *Plaintiffs*, <br><br> v. <br><br> TEXAS SECRETARY OF STATE, TRUDY HANCOCK, IN HER OFFICIAL CAPACITY AS BRAZOS COUNTY ELECTIONS ADMINISTRATOR, AND PERLA LARA IN HER OFFICIAL CAPACITY AS CITY OF MCALLEN, TEXAS SECRETARY,     *Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§    No. 5:19-cv-00963<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

### DEFENDANT SECRETARY OF STATE'S FIRST AMENDED NOTICE OF ORAL DEPOSITION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30

TO: League of Women Voters, by and through its attorneys of record, Hani Mirza, Zachary D. Dolling, Beth Stevens, and Ryan Cox, Texas Civil Rights Project, 1405 Montopolis Drive, Austin, Texas 78741; and Richard Mancino, Jennifer Hardy, Joanna Suriani, Willkie Farr & Gallagher LLP, 1875 K Street, N.W., Washington, DC 20006.

Defendant Texas Secretary of State hereby notices the deposition upon oral examination of League of Women Voters of Texas "LWVTX," including all subsidiaries, DBAs, and aliases, beginning at **10:00 AM** on, **Monday**, **May 18, 2020** and continuing from day to day until complete. The deposition will be held virtually via Zoom videoconference and will be transcribed and videotaped by a certified court reporter and videographer designated by Defendant. Defendant reserves the right to

1



Exhibit
Grace Chimene
1
5/18/20  MJ

Appx._225

use the deposition for any purpose permitted under the Federal Rules of Civil Procedure or Federal Rules of Evidence.

Pursuant to Federal Rule of Civil Procedure 30(b)(6), LWVTX is directed to designate one or more officers, directors, managing agents, or other persons who will testify on LWVTX's behalf regarding all information known or reasonably available to LWVTX with respect to the matters set forth in **Attachment A**.

Pursuant to Federal Rules of Civil Procedure 30(b)(2) and 45, LWVTX is also requested to produce at least 24 hours before the videoconference deposition, all documents in response to the subpoena duces tecum in **Attachment B**.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Texas Bar No. 24078898
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov

2

**ATTORNEYS FOR DEFENDANT**
**TEXAS SECRETARY OF STATE**

**CERTIFICATE OF SERVICE**

I certify that that on May 14, 2020 this notice was served upon counsel listed below via email.

**Hani Mirza**
hani@texascivilrightsproject.org
**Zachary D. Dolling**
zachary@texascivilrightsproject.org
**Rebecca Harrison Stevens**
beth@texascivilrightsproject.org
**Ryan V. Cox**
ryan@texascivilrightsproject.org
**Samuel Kalar**
skalar@willkie.com
**Joanna Suriani**
jsuriani@willkie.com
**Eric Magee**
e.magee@allison-bass.com
**Isaac J. Tawil**
itawil@mcallen.net
**Austin Stevenson**
astevenson@mcallen.net
**C. Robert Heath**
bheath@bickerstaff.com
**Gunnar P. Seaquist**
gseaquist@bickerstaff.com

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Assistant Attorney General

3

## DEFINITIONS

The terms below are used in this notice as follows:

1. "League of Women Voters," "LWV," "LWVTX," "you," "your," or "yours" mean League of Women Voters of Texas (a plaintiff in this Lawsuit) and anyone acting or purporting to act on their behalf with respect to any matter inquired about herein, including without limitation representatives, employees, or agents.

2. "Austin Justice Coalition," or "AJC," means Austin Justice Coalition (a plaintiff in this Lawsuit), and anyone acting or purporting to act on its behalf with respect to any matter inquired about herein, including without limitation representatives, employees, or agents.

3. "Coalition of Texans with Disabilities" or "CTD" means Coalition of Texans with Disabilities (a plaintiff in this Lawsuit), and anyone acting or purporting to act on its behalf with respect to any matter inquired about herein, including without limitation representatives, employees, or agents.

4. "MOVE Texas Civic Fund," "MOVE Texas," or "MOVE" means MOVE Texas Civic Fund (a plaintiff in this Lawsuit), and anyone acting or purporting to act on its behalf with respect to any matter inquired about herein, including without limitation representatives, employees, or agents.

5. "Individual Plaintiffs" means Dr. George Richardson and Ms. Rosalie Weisfeld, natural persons who are plaintiffs in this lawsuit, and anyone acting or purporting to act on their behalf with respect to any matter inquired about herein, including without limitation representatives, employees, or agents.

6. "Organizational Plaintiffs" means AJC, CTD, MOVE, and LWVTX, and anyone acting or purporting to act on their behalf with respect to any matter inquired about herein, including without limitation representatives, employees, or agents.

7. "Plaintiffs" means the Individual Plaintiffs and the Organizational Plaintiffs.

8. "Person" means the plural as well as the singular and includes: natural persons, corporations, firms, associations, partnerships, joint ventures, trusts, estates, or any other form of legal entity; and governmental agencies, departments, units, or subdivisions thereof.

4

9.  "SOS" means the Defendant Texas Secretary of State, in her official capacity, including without limitation representatives, employees, agents, or officers acting on her behalf with respect to any matter inquired about herein.

10. "Defendants" means SOS; Trudy Hancock, in her official capacity as Brazos County Elections Administrator; and Perla Lara, in her official capacity as City of McAllen, Texas, Secretary.

11. "Lawsuit" means the case styled, *Dr. George Richardson, et. al. v. Texas Secretary of State, et al.*, civil action no. 5:19-cv-00963 in the United States District Court for the Western District of Texas, San Antonio Division.

12. "Complaint" means your live pleading in this case—as of service of these discovery requests, the document entitled "Plaintiff's Original Complaint," filed in this Lawsuit on August 7, 2019 (Dkt. 1).

13. "Communication" means any manner or means of disclosure, transfer, or exchange of information, whether oral, written, in-person, telephonic, electronic, digital, mailed, or otherwise.

14. "Document" includes all writings of every kind, source and authorship, both originals and all non-identical copies thereof including handwritten, typewritten, printed, photocopied, photographic, or electronically recorded matter. For purposes of illustration and not limitation, the term shall include: emails, Facebook postings, social media postings, letters, journals, diaries, bank statements, charts, Excel spreadsheets, handwritten notes, affidavits, schedules, workpapers, audio recordings, video recordings, transcriptions, contracts, agreements, and memoranda of any kind.

15. "Relating to" means in any way concerning, constituting, analyzing, discussing, describing, considering, modifying, amending, confirming, endorsing, evidencing, representing, supporting, substantiating, qualifying, negating or refuting, unless qualified by word of limitation.

16. The singular includes the plural and vice versa.

17. The masculine gender includes the feminine and vice versa.

18. All other terms are to be interpreted in accordance with their normal usage in the English language.

Appx._229

## Attachment A

**30(B)(6) CORPORATE REPRESENTATIVE DEPOSITION TOPICS**

1. Your mission.

2. Your organization, including your organizational structure, employees, physical assets, parent and sibling entities, tax status, and history; the services that you provide, and the activities you perform.

3. The activities on which you have spent funds or to which you have dedicated resources in Texas between January 1, 2017 and the present.

4. Your members on whose behalf you seek to maintain this suit.

5. The allegations you make in your Complaint and the factual bases therefor.

6. The relief that you contend would remedy the claims you make in this lawsuit.

7. The documents produced in response to

   a. the subpoena duces tecum described in Attachment B, and;

   b. Defendants' Requests for Admission, Interrogatories, and Requests for Production in this cause.

6

**<u>Attachment B</u>**

To the extent not already produced by you in response to the Secretary of State's discovery requests in this cause, produce the following:

1. Documents sufficient to substantiate the factual allegations you make in your Complaint.

2. All communications between you and any person to assist them in voting by mail in Texas.

3. Documents sufficient to show all information described and/or requested in 30(b)(6) deposition topic numbers 2, 3, 4, and 5 in Attachment A to this notice.

4. To the extent not already provided in response to items 1-3 above, all documents reviewed in preparation for your deposition.

If documents responsive to these categories have already been produced in discovery, the witness is expected to be able to identify those documents by bates numbers.

# EXPLANATION OF PROPOSED BUDGETS FOR 2016-2018

**Rationale**

The League of Women Voters of Texas (LWV-TX) and League of Women Voters of Texas Education Fund (LWV-TEF) are two separate organizations and have separate budgets. The LWV- TX budget is adopted by the delegates at the biennial Convention; the LWV-TEF budget is adopted by the Board of Trustees at their first meeting after Convention.

Although separate organizations with separate budgets, LWV-TX and LWV-TEF are closely related and share the same Board; only their operational emphasis is different.  For example, all lobbying is done through LWV-TX, a 501(c)(4) organization, while citizen information and education activities are carried out by LWV-TEF, a 501(c)(3).  Where resources are shared, such as staff time and office facilities, the respective contributions and usage by the two organizations are carefully tracked and expenses are split accordingly. For these reasons, the proposed budgets for both LWV-TX and LWV-TEF are presented in this workbook to facilitate members' assessment of the financial outlook.

**Criteria and Assumptions**
- Staff, administrative, and property expenses will be split 25:75 between LWV-TX and LWV-TEF. Ratios are based upon prior year's records kept by the executive administrator.
- Per member payment (PMP) rates remain unchanged at $22 per member, $33 for household and $12 for Student.
- The Ricoh office printer has been eliminated, thus reducing printing costs by $4360/year.
- Silent Auction benefits have been moved to LWV-TEF from LWV-TX.
- Odd number years have two Voters Guides published.
- "When You Go to Austin" guide will be discontinued. This information is now available electronically, eliminating the need for a paper guide.
- While it appears that board costs have gone up sharply, board members are now reporting their expenses. Except for lodging, most of these expenses are in-kind donations.
- Education Fund proposes aggressive fund raising campaigns.
- More emphasis will be placed on Development/Marketing/Social Media.
- More emphasis will be placed on Mission Projects & Member Services.

**Budget Committee Members:**
Carol Olewin, Chair
Elaine Wiant, President
Miriam Foshay, Treasurer
Nancy Parra, VP Program
Laura Blackburn, VP Advocacy
Susan Morrison, Director

**Budget Questions & Answers Follow-up Work Shops**

If you have questions about the proposed budgets, please contact the Budget Committee Chair Carol Olewin, by email, *c.olewin@gmail.com,* at any time before Convention weekend.  She also will be available at Convention, along with the other committee members, to answer your questions.

Prior to adoption of the budget during plenary, delegates will have an opportunity to ask questions and make comments. Budget Q&A sessions will be held Friday and Saturday night during Convention to give delegates a chance to discuss the budget. We urge delegates to take advantage of those times to obtain advance answers to questions of a detailed or technical nature.

**2016 Convention Workbook - Houston, TX**

Exhibit
Grace Chimene

4

5/18/20  MJ

**LEAGUE OF WOMEN VOTERS OF TEXAS**
**PROPOSED BUDGET FOR 2016-2018**

| | BUDGET 2014-2016 | BUDGET 2016-2018 |
|---|---|---|
| **INCOME** | | |
| PMP & MALs | 46,600 | 43,716 |
| CONTRIBUTIONS/DONATIONS | 24,300 | 39,500 |
| PROJECTS/GIFTS/GRANTS | - | - |
| STATE CONVENTION | 25,000 | 20,000 |
| LOBBY DAYS | 500 | 500 |
| INVESTMENTS | 600 | 2,400 |
| **TOTAL INCOME** | 97,000 | 106,116 |
| | | |
| **EXPENSES** | | |
| ADVOCACY | 400 | 2,100 |
| MISSION PROJECTS | - | 5,840 |
| MEMBER SERVICES | - | 900 |
| STATE CONVENTION | 20,000 | 18,000 |
| ADVOCACY/D&M SOFTWARE SERVICES | - | 2,600 |
| ADMINISTRATION | 17,500 | 8,350 |
| CONTRACTUAL SERVICES | 6,000 | 4,925 |
| DEVELOPMENT/FUNDRAISING | - | 3,000 |
| MARKETING/SOCIAL MEDIA | - | 500 |
| BOARD EXPENSES | 10,200 | 18,600 |
| RENT | 4,800 | 4,800 |
| STAFF EXPENSES | 34,400 | 35,063 |
| **TOTAL EXPENSES** | 93,300 | 104,678 |
| | | |
| TRANSFER TO/FROM RESERVES | 3,700 | 1,438 |
| | | |
| **TOTAL EXPENSES and TRANSFERS** | **97,000** | **106,116** |

Appx. 233
LWV-00000021

**LEAGUE OF WOMEN VOTERS OF TEXAS EDUCATION FUND (TEF)**
**PROPOSED BUDGET FOR 2016-2018**

| | BUDGET 2014-2016 | BUDGET 2016-2018 |
|---|---|---|
| **INCOME** | | |
| PMP & MALs | 26,600 | 24,120 |
| CONTRIBUTIONS/DONATIONS | 48,100 | 98,200 |
| PROJECTS/GIFTS/GRANTS | 40,900 | 19,000 |
| EVENTS/MDW | 26,500 | 27,500 |
| STATE CONVENTION FUNDRAISING | - | 5,000 |
| PUBLICATIONS | 13,500 | 21,500 |
| WORKSHOPS AND SEMINARS | 200 | 600 |
| INVESTMENTS | 2,400 | 25,000 |
| **TOTAL INCOME** | **158,200** | **220,920** |
| | | |
| **EXPENSES** | | |
| MISSION PROJECTS | 29,200 | 34,200 |
| MEMBER SERVICES | 5,900 | 4,800 |
| ADVOCACY/D&M SOFTWARE SERVICES | - | 2,600 |
| ADMINISTRATION | 27,200 | 25,050 |
| CONTRACTUAL SERVICES | 6,100 | 6,775 |
| DEVELOPMENT/FUNDRAISING | - | 9,000 |
| MARKETING/SOCIAL MEDIA | - | 1,500 |
| BOARD EXPENSES | 10,400 | 18,600 |
| PROPERTY EXPENSES | 26,900 | 19,500 |
| RENT | (4,800) | (4,800) |
| STAFF EXPENSES | 51,400 | 105,188 |
| **TOTAL EXPENSES** | **152,300** | **222,413** |
| | | |
| TRANSFER TO/FROM RESERVES | 5,900 | (1,493) |
| | | |
| **TOTAL EXPENSES and TRANSFERS** | **158,200** | **220,920** |

Appx. 234
LWV-00000022

# Budget

## Explanation of Proposed Budgets

LWVTX = League of Women Voters of Texas, a 501(c)(4) social welfare organization
LWVTEF = League of Women Voters of Texas Education Fund, a 501(c)(3) trust
LSLWV = Lone Star League of Women Voters, a 501(c)(3) corporation

### Rationale

Three separate budgets are presented. The first budget assumes that the LWVTX and the LWVTEF consolidate their assets and functions into a single 501(c)(3) corporation, currently designated the LSLWV. The second and third budgets assume that the two current organizations (LWVTX & LWVTEF) remain unchanged. Delegates at Convention 2018 will adopt either the LSLWV or the LWVTX budget. If consolidation is not passed, the LWVTEF Board of Trustees will adopt the LWVTEF budget at their first meeting after Convention 2018.

Although LWVTX and LWVTEF have separate budgets, the two organizations are closely related and share the same board; only their operational emphasis is different. For example, all advocacy work is done through LWVTX, while citizen information and education activities are carried out by LWVTEF. Where resources are shared, such as staff time and office facilities, the respective contributions and use of resources by the two organizations are carefully tracked and expenses are split accordingly.

### Criteria and Assumptions

- Staff, administrative, and property expenses will be split 35% LWVTX and 65% LWVTEF. Ratios are based upon prior year's records kept by the executive administrator.
- Per-member-payments remain unchanged at $22/member, $11/additional household member, and $12/student.
- A new texting service will be funded by the fund-a-need campaign. Expenses for this service are included under the line item for online software services.
- While it appears that board expenses are high, board members now report their expenses. Most of these expenses are in-kind donations, except for lodging.
- Membership and Convention attendance will increase as we approach our 100th anniversary.
- The monthly *Action News! has replaced* the *Texas VOTER*. It is delivered exclusively by email, reducing the cost of member services.
- Emphasis will continue to be placed on development/marketing/social media.
- Property expenses include $1,500 to purchase a new laptop computer and two office chairs.
- Support staff hours will increase from 12 to 30 hours/week. A salary increase of 4% is built into the budget for each year of the biennium.
- If consolidation is not approved, there will be a net loss for the biennium due to an additional $4,000 required for accounting services.

### Budget Committee

Marilyn Wills, chair and president, LWV of Tyler/Smith County
Elaine Wiant, president
Marguerite "Meg" Scott-Johnson, secretary
Miriam Foshay, treasurer
Grace Chimene, vice president and chair, Advocacy Committee
Nancy Parra, vice president and chair, Education Committee

### Budget Q & A

If you have questions about the proposed budgets, please contact the chair of the Budget Committee, Marilyn Wills, by email at lwv_president@lwvtyler.org any time before Convention. The Budget Committee will be available to discuss your questions at Convention during two Q & A sessions Friday and Saturday evenings. We urge delegates to use these times to obtain advance answers to questions of a detailed or technical nature. See the workshop schedule on page 6.

Exhibit
Grace Chimene

**5**

5/18/20  MJ

Convention 2018

LWV Texas

# Proposed Budgets 2018-2020

| | Lone Star League of Women Voters 501(c)(3) | | League of Women Voters of Texas 501 (c)(4) | | League of Women Voters of Texas Education Fund 501(c)(3) | |
|---|---|---|---|---|---|---|
| | Biennium Budget | | Biennium Budget | | Biennium Budget | |
| | 2016-18 Actual ($)* | 2018-20 Proposed ($) | 2016-18 Actual ($)* | 2018-20 Proposed ($) | 2016-18 Actual ($)* | 2018-20 Proposed ($) |
| **Income** | | | | | | |
| Dues & per member payments | 77,780 | 84,049 | 51,381 | 65,549 | 26,399 | 18,500 |
| Individual donations | 148,636 | 110,900 | 17,769 | 29,742 | 130,867 | 81,158 |
| In-kind donations | 26,291 | 39,000 | 2,526 | 3,000 | 23,765 | 36,000 |
| Project funding | 35,224 | 50,000 | 0 | 0 | 35,224 | 50,000 |
| Fundraising events | 15,233 | 24,000 | 0 | 0 | 15,233 | 24,000 |
| State convention | 24,000 | 39,500 | 18,500 | 20,000 | 5,500 | 19,500 |
| Investments | 13,876 | 12,700 | 1,730 | 1,700 | 12,146 | 11,000 |
| Publications, Lobby Days, regional training | 24,543 | 31,800 | 829 | 1,800 | 23,714 | 30,000 |
| **Total income** | **365,583** | **391,949** | **92,735** | **121,791** | **272,848** | **270,158** |
| **Expenses** | | | | | | |
| Advocacy & lobbying | 5,272 | 9,390 | 5,242 | 9,390 | 0 | 0 |
| Mission projects | 65,945 | 51,500 | 0 | 2,000 | 65,945 | 49,500 |
| Member services | 4,195 | 2,450 | 940 | 800 | 3,255 | 1,650 |
| Convention | 15,000 | 18,000 | 15,000 | 18,000 | 0 | 0 |
| Online software services | 8,429 | 14,500 | 3,565 | 4,350 | 4,864 | 10,150 |
| Office expenses | 27,257 | 28,100 | 9,902 | 9,135 | 17,355 | 18,965 |
| Accounting, payroll, information technology, & website services | 17,946 | 7,240 | 4,699 | 5,053 | 13,247 | 6,187 |
| Development & fundraising | 11,363 | 18,000 | 3,977 | 5,850 | 7,386 | 12,150 |
| Marketing & social media | 1,729 | 3,100 | 564 | 1,003 | 1,195 | 2,098 |
| Board expenses | 34,145 | 42,200 | 17,073 | 21,100 | 17,072 | 21,100 |
| Property expenses | 17,634 | 22,530 | 0 | 0 | 17,634 | 22,530 |
| Rent | 0 | 0 | 4,800 | 4,800 | (4,800) | (4,800) |
| Salaries, payroll, taxes, benefits | 140,472 | 171,124 | 48,590 | 55,699 | 91,882 | 115,425 |
| **Total expenses** | **349,388** | **388,134** | **114,352** | **137,180** | **235,036** | **254,954** |
| **Net income** | **16,195** | **3,815** | **(21,617)** | **(15,388)** | **37,812** | **15,204** |

*Income and expenses are actual from June 1, 2016 to February 15, 2018, and estimated for the remaining 3½ months.

## Budget

**Explanation of Proposed Budget for 2020-2022**
**The League of Women Voters of Texas continues to have three entities:**

- The League of Women Voters of Texas (LWVTX), is a 501(c)(3) corporation that began operations January 1, 2019. It is the membership organization of the state League, and the only one addressed at this Convention and in the budget below;
- League of Women Voters of Texas Education Fund (LWVTEF, or Ed Fund), is a 501(c)(3) trust that currently holds the 501(c)(3) accounts for local Leagues and some Leagues at large; and
- League of Women Voters of Texas Action Fund (LWVTAF), is a 501(c)(4) corporation, has been kept in case the lobbying allowed under 501(c)(3) rules is inadequate to address future circumstances. It was formerly the membership organization.

LWVTEF has no members; the trustees are the same individuals as the board members of LWVTX. Its sole function is to hold in trust the tax-exempt moneys raised by local Leagues. LWVTEF will be dissolved when it is no longer needed to hold funds of local Leagues.
 LWVTAF has three board members, including the president of LWVTX and at least one off-board member. Under 501(c)(3) rules, it may not be related to LWVTX.

**Budget Criteria and Assumptions**
- PMP rates remain unchanged at $22 per member, $11 for additional household members, and $0 for Student and Life members.
- The texting service will be continued through donations to Fund-a-Need. Its expenditures are listed under Online Software Services.
- Board costs have increased, primarily because board members are reporting more of their expenses. Except for lodging, most of these expenses are in-kind donations.
- Emphasis will continue to be placed on Development/Marketing/Social Media.
- A salary increase of 4% for office staff is built into the budget for each year of the biennium.

**Budget Committee Members:** Marilyn Wills, Chair (_LWV_president@lwvtyler.org_), Grace Chimene, President, Miriam Foshay, Treasurer, Elaine Wiant, Development Chair, Dorothy Marchand, Director

**Budget Questions & Answers Follow-up Workshop**
If you have questions about the proposed budgets, please contact the Budget Committee Chair Marilyn Wills by email, _lwv_president@lwvtyler.org_, at any time before Convention.  She also will be available at Convention, along with the other committee members, to answer your questions.
Prior to adoption of the budget during plenary, delegates will have an opportunity to ask questions and make comments. A Budget Q&A session will be held Friday evening at 7:30 pm to give delegates a chance to discuss the budget. We urge delegates to take advantage of this time to obtain advance answers to questions of a detailed or technical nature.



Exhibit
Grace Chimene

**7**

5/18/20  MJ

Appx._237
LWV-00000151

## LWVTX BUDGET 2020-2022

| INCOME | 2018-2020 ACTUAL* | 2020-2022 PROPOSED BUDGET |
|---|---|---|
| DUES & PMP | 113,438 | 113,537 |
| INDIVIDUAL DONATIONS | 120,632 | 131,800 |
| IN-KIND DONATIONS | 15,957 | 18,000[a] |
| PROJECT FUNDING | 48,472 | 75,000[b] |
| FUNDRAISING EVENTS | 60,638 | 55,500[c] |
| STATE CONVENTION INCOME | 16,630 | 16,000 |
| INVESTMENT INCOME | 16,904 | 12,010 |
| PUBLICATIONS | 20,104 | 22,000 |
| LOBBY DAYS/REGIONAL TRAINING/OTHER | 5,759[d] | 4,700 |
| **TOTAL INCOME** | **418,534** | **428,547** |
| **EXPENSES** | **2018-2020 ACTUAL*** | **2020-2022 PROPOSED BUDGET** |
| ADVOCACY/LOBBYING/LOBBY DAYS | 8,204 | 9,500 |
| GRANT PROJECTS, VOTERS GUIDE, Vote411 | 69,643[e] | 65,300 |
| MEMBER SERVICES: SLL, REGIONAL TRAINING | 7,125 | 7,500 |
| CONVENTION | 10,609 | 16,500 |
| ONLINE SOFTWARE SERVICES | 18,234 | 25,700[h] |
| OFFICE EXPENSES | 35,321 | 31,700 |
| ACCOUNTING, PAYROLL, IT and WEB SERVICES | 15,464 | 15,200[f] |
| DEVELOPMENT/FUNDRAISING | 6,412 | 10,000 |
| BOARD EXPENSES | 37,864 | 33,200 |
| PROPERTY EXPENSES | 29,682[g] | 24,601 |
| SALARIES, PAYROLL TAXES, BENEFITS | 172,694 | 191,346 |
| **TOTAL EXPENSES** | **413,209** | **428,547** |
| **NET INCOME** | **7,282** | **0** |

Appx._238
LWVV-00000152

**Budget Notes (cont.)**

*Income and expenses are actual from 06/01/18-02/15/20 and are estimated for the remaining 3 ½ months.  Note that figures for the year 6/01/18-5/31/19 represent the combined income and expenditures of LWVTAF, LWVTEF, and the new LWVTX corporation, which began operations 1/01/2019.

Notes:

a)   In-kind donations are primarily board members' travel expenses for which reimbursement was not requested.

b)   The Development Committee plans to find grants and funding for many of our projects, with special emphasis on the Voters Guide.

c)   Our most successful fundraising project of the current biennium, the 100th Anniversary Luncheon, won't occur again for another 100 years. While we will have one less fundraiser, the Development Committee has embarked upon an ambitious plan to increase the proceeds of those that remain.

d)   The current biennium includes funds from the sale of pins and mugs on this revenue line, as well as revenue from local Leagues that have requested to join the 501(c)(3) group exemption. Neither of these funds is anticipated in the coming biennium.

e)   In the current biennium, we received $25,000 in grants from LWVUS towards educating Texans about redistricting. We do not anticipate such a large grant for the next biennium.

f)   "Accounting" includes money for a full audit, the first in many years.

g)   In the current biennium, we purchased two computers and received donations to buy new furniture for the State Office. We don't anticipate such large purchases in the coming biennium.

h)   The addition of texting and Quickbooks Online increases the cost of online software services by about $7,500 per year.

Appx.  239
LWV-00000153

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES, MOVE TEXAS CIVIC FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, and AMERICAN GI FORUM OF TEXAS, INC., | § § § § § § § § | |
| | § | |
| *Plaintiffs* | § | |
| | § | |
| v. | § | Civil Case No. 5:19-cv-00963 |
| | § | |
| TEXAS SECRETARY OF STATE, TRUDY HANCOCK, in her official capacity as BRAZOS COUNTY ELECTIONS ADMINISTRATOR, and PERLA LARA in her official capacity as CITY OF MCALLEN, TEXAS SECRETARY, | § § § § § § | |
| | § | |
| *Defendants*. | § | |

**PLAINTIFF LEAGUE OF WOMEN VOTERS OF TEXAS' OBJECTIONS AND RESPONSES TO DEFENDANT SECRETARY OF STATE'S FIRST REQUESTS FOR ADMISSION, REQUESTS FOR PRODUCTION, AND INTERROGATORIES, AND SECOND REQUESTS FOR PRODUCTION**

TO:   Defendant Texas Secretary of State, by and through her attorneys of record Ken Paxton, Jeffrey C. Mateer, Darren L. McCarty, Thomas A. Albright, and Anne Marie Mackin, via e-mail to anna.mackin@oag.texas.gov.

Pursuant to Federal Rules of Civil Procedure 33, 34, and 36, Plaintiff League of Women Voters of Texas (LWV) hereby serves the following Objections and Responses to Defendants' First Requests for Admission, Requests for Production, Interrogatories, and Second Requests For Production.

Dated: April 16, 2020                             Respectfully Submitted,

/s/_____Hani Mirza_____

**TEXAS CIVIL RIGHTS PROJECT**

Mimi M.D. Marziani
Texas Bar No. 24091906
mimi@texascivilrightsproject.org
Rebecca Harrison Stevens
Texas Bar No. 24065381
beth@texascivilrightsproject.org
Hani Mirza
Texas Bar No. 24083512
hani@texascivilrightsproject.org
Ryan V. Cox
Texas Bar No. 24074087
ryan@texascivilrightsproject.org
Zachary D. Dolling
Texas Bar No. 24105809
zachary@texascivilrightsproject.org

1405 Montopolis Drive
Austin, Texas 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)

**WILLKIE FARR & GALLAGHER LLP**

Richard Mancino (NY Bar No. 1852797)
Samuel Kalar (NY Bar No. 5360995)
JoAnna Suriani (NY Bar No. 5706395)

787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: rmancino@willkie.com
        skalar@willkie.com
        jsuriani@willkie.com

-AND-

Jennifer J. Hardy (TX Bar No. 24096068)
Denis A. Fallon (TX Bar No. 24059731)
Garrett Johnston (TX Bar No. 24087812)

Audra White (TX Bar No. 24098608)

600 Travis Street, Suite 2100
Houston, Texas 77002
Telephone: (713) 510-1700
Facsimile: (713) 510-1799
Email: jhardy2@willkie.com
        afallon@willkie.com
        gjohnston@willkie.com
        awhite@willkie.com

**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of April, 2020, a true and correct copy of the foregoing *Plaintiff League of Women Voters of Texas' Objections and Responses to Defendant Secretary Of State's First Requests for Admission, Requests For Production, and Interrogatories, and Second Requests for Production* was served upon counsel of record via email.

/s/ Hani Mirza_____

## RESERVATION OF RIGHTS

LWV has responded to these requests for admission, requests for production, and interrogatories based on the information currently available to it. Discovery, however, is not yet complete. Additional discovery and investigation may lead to additions to, changes in, or modification of these responses. LWV therefore reserves its right to supplement, amend, revise, correct, modify, or clarify these responses as additional information becomes available.

LWV makes its objections and responses in accordance with its interpretation and understanding of *Defendant Secretary of State's First Requests for Admission, Interrogatories, and Requests for Production,* and *Defendant Secretary of State's Second Requests for Production* ("Requests") and in accordance with its current knowledge, understanding, and belief as to the facts

and information available to it at the time of serving these responses. If Defendant subsequently provides an interpretation of any of its Requests that differs from LWV's understanding of the same, LWV reserves its right to complete the discovery of facts in this case and rely at trial or in any other proceeding on documents and information in addition to the information provided herein, regardless of whether such information is newly discovered or newly in existence. It also reserves the right to amend, revise, correct, modify, or clarify its responses to properly respond to any interpretation Defendant may give these Requests.

LWV reserves its right to object on any grounds, at any time, to the admission or use of any response on any ground. LWV is also willing to meet and confer about any of its objections or responses.

## **GENERAL OBJECTIONS**

1.      LWV objects to these Requests, including the definitions and instructions, to the extent that they seek information or documents: (i) protected by attorney client privilege, the work product doctrine, or any other applicable privilege or immunity; (ii) not in LWV's possession, custody, or control; and (iii) that are publicly available or already within Defendants' possession.

2.      LWV objects to these Requests to the extent they are duplicative of a request that Defendants have propounded to another Plaintiff in this Lawsuit. To the extent that Plaintiffs agree to produce a document that is responsive to multiple Requests duplicated across multiple Plaintiffs, Plaintiffs will only produce such documents once.

3.      LWV objects to the definitions of "Coalition of Texans with Disabilities," "CTD," "Austin Justice Coalition," "AJC," "MOVE Texas Civic Fund," "MOVE Texas," "MOVE," "League of Women Voters of Texas," "LWVTX," "LWV," "Individual Plaintiffs," and "Organizational Plaintiffs," (together, "Plaintiffs Definitions") as overly broad and unduly burdensome to the extent

that they define each party as including "anyone acting or purporting to act on their behalf with respect to any matter inquired about herein, including without limitation representatives, employees, or agents." For the purposes of these responses, each Plaintiff will construe the Plaintiffs Definitions in accordance with the definition of "Plaintiffs" as found in Plaintiffs' First Set of Discovery Requests served on February 5, 2020.

4.      LWV objects to the definitions of "EVBB" and "SVC" as vague and ambiguous. For the purposes of these responses, LWV will construe the terms "EVBB" and "SVC" in accordance with the definitions of "EVBB" and "SVC" found in Plaintiffs' First Set of Discovery Requests served on February 5, 2020.

5.      These General Objections are incorporated into each of the specific responses and objections set forth below. No specific response or objection herein shall constitute a waiver, in whole or in part, of any of the foregoing General Objections. LWV reserves the right at any time to revise, correct, supplement, or clarify the objections or responses set forth herein and any production made pursuant thereto.

## LWV'S OBJECTIONS AND RESPONSES TO REQUESTS FOR ADMISSION

1.     Admit that if a county election officer determines that a ballot was incorrectly rejected by the EVBB before the time set for convening the canvassing authority, the county election officer may petition a district court for injunctive or other relief as the court determines appropriate.

**RESPONSE**: LWV objects to this request for admission on the ground that it calls for a legal conclusion. LWV has no particular knowledge of this legal issue. The provisions of the Texas Election Code speak for themselves.

2.     Admit that SOS does not select the members of any EVBB.

**RESPONSE**: LWV can neither admit nor deny because it has no particular knowledge of the actions Defendant SOS takes. Defendant SOS is the appropriate party with information responsive to this request.

3.     Admit that SOS does not select the members of any SVC.

**RESPONSE**: LWV can neither admit nor deny because it has no particular knowledge of the actions Defendant SOS takes. Defendant SOS is the appropriate party with information responsive to this request.

4.     Admit that local election authorities, and not SOS, are responsible for receiving completed mail-in ballots.

**RESPONSE**: LWV objects to this request for admission on the ground that it calls for a legal conclusion. LWV has no particular knowledge of this legal issue. The provisions of the Texas Election Code speak for themselves.

5.     Admit that local election authorities, and not SOS, are responsible for delivering completed mail-in ballots to the appropriate EVBB or SVC.

**RESPONSE**: LWV objects to this request for admission on the ground that it calls for a legal conclusion. LWV has no particular knowledge of this legal issue. The provisions of the Texas Election Code speak for themselves.

6.     Admit that SOS lacks authority to reject any mail-in ballot for signature mismatch.

**RESPONSE**: LWV objects to this request for admission on the ground that it calls for a legal conclusion. LWV has no particular knowledge of this legal issue. The provisions of the Texas Election Code speak for themselves.

7.     Admit that voting by mail is a different process from in-person voting.

**RESPONSE**: LWV objects to this request for admission on the ground that it calls for a legal conclusion and is vague. Subject to and without waiving the foregoing, admit only to the extent that, as a practical matter, voting by mail involves some different procedures than voting in-person.

8.      Admit that Texas has an interest in ensuring that only eligible voters cast ballots.

**RESPONSE**: LWV objects to this request for admission on the ground that it calls for a legal conclusion and is vague. Subject to and without waiving the foregoing, LWV can neither admit nor deny because it has no particular knowledge of the current interests of the State of Texas. Texas, including Defendant SOS, is the appropriate party with information responsive to this request.

## **LWV'S OBJECTIONS AND RESPONSES TO FIRST REQUESTS FOR PRODUCTION**

1. To the extent not already produced in response to a subpoena duces tecum served upon you in this Lawsuit, all documents you may rely upon to support your claims in this Lawsuit.

   **RESPONSE**:  LWV objects to this request as broad and vague and because it demands that LWV marshal all of its evidence that may be presented at trial, regardless of whether that evidence is within LWV's care, custody, or control or whether Defendants have superior access of right to such documents. LWV will produce all documents it relies upon to support its claims in this lawsuit according to the Amended Scheduling Order, the Federal Rules of Civil Procedure, and Federal Rules of Evidence.

## **LWV'S OBJECTIONS AND RESPONSES TO SECOND REQUESTS FOR PRODUCTION**

1. All documents and communications supporting your contention that "Texas unlawfully rejects the duly signed mail-in ballots of thousands of eligible voters every major election," as alleged in Paragraph 1 of your Complaint.

   **RESPONSE**:  Please see attached BATES GENERAL-00000001-2030.

2. All documents and communications supporting your contention that "Texas counties rejected at least 1,873 mail-in ballots during the 2018 General Election and at least 1,567 mail-in ballots during the 2016 General Election solely on the basis of mismatching signatures," as alleged in Paragraph 1 of your Complaint.

   **RESPONSE**: Please see attached BATES GENERAL-00000001-2030.

3. Documents sufficient to show all activities on which you have spent funds or to which you have dedicated resources in Texas between January 1, 2017 and the present, including:
   a. Total spent on all activities in Texas;
   b. Total spent on voter registration activities in Texas;
   c. Total spent educating Texans about mail-in ballots;
   d. Total spent encouraging eligible voters to use mail-in ballots in Texas;
   e. Total spent providing support to eligible voters utilizing mail-in ballots in Texas;
   f. Total spent preparing training materials to educate and provide support to voters with the mail-in ballot process in Texas;
   g. Activities other than those identified in b-f above on which you spent funds or to which you have dedicated resources in Texas; and total spent on each of those activities.

   **RESPONSE**: Please see attached BATES LWV-00000001-693.

4. All training materials you have prepared for your "members and local-area League of Women Voters organizations to use to educate and provide support to voters with the mail-in ballot process," as alleged in Paragraph 25 of your Complaint, between January 1, 2010 and the present.

**RESPONSE**: LWV objects to this request for production on the ground that it is overbroad to the extent that it seeks documents prior to January 1, 2012. Subject to and without waiving the foregoing, LWV agrees to produce documents responsive to this request only for the time period of January 1, 2012 to the present. Subject to and without waiving the foregoing, please see attached BATES LWV-00000103-132, LWV-00000185-225, LWV-00000272-368, LWV-00000576-614, LWV-00000661-693.

5. All documents and communications supporting your contention that "[t]he groups that are eligible to vote by mail are also the same groups, in many cases, that are most likely to have signature variations that could cause an improper rejection—especially the elderly, disabled, and persons who speak English as a second language," as alleged in Paragraph 46 of your Complaint.

**RESPONSE**: LWV objects to this request for production on the ground that it calls for an expert witness testimony. Plaintiffs' expert witness report was served on Defendants on February 3, 2020. Subject to and without waiving the foregoing, LWV has no responsive documents.

6. All documents and communications supporting your contention that "growing old, illness, injury, symptoms from taking certain medicine, change in eyesight, and consuming alcohol and/or drugs; mechanical factors such as pen type, ink, signing surface, signing position, and paper quality; and psychological factors such as distress, anger, fear, depression, happiness, [or] nervousness" can affect an individual's handwriting to the extent that their ballot would be erroneously rejected for signature mismatch, as referenced in Paragraph 48 of your Complaint.

**RESPONSE**: LWV objects to this request for production on the ground that it calls for expert witness testimony. Plaintiffs' expert witness report was served on Defendants on February 3, 2020. Subject to and without waiving the foregoing, LWV has no responsive documents.

7. All documents and communications supporting your contention that "a person's handwriting naturally changes over time" to the extent that their ballot would be erroneously rejected for signature mismatch, as referenced in Paragraph 48 of your Complaint.

**RESPONSE**: LWV objects to this request for production on the ground that it calls for expert witness testimony. Plaintiffs' expert witness report was served on Defendants on February 3, 2020. Subject to and without waiving the foregoing, LWV has no responsive documents.

8. All documents and communications supporting your contention that "[v]ariances between