# I N D E X

DEPOSITION OF LINTON A. MOHAMMED, PhD


| EXAMINATION | PAGE |
| --- | --- |
| BY MS. MACKIN | 8 |
| BY MR. MIRZA | 91 |
| ERRATA AND SIGNATURE | 94 |
| REPORTER'S CERTIFICATION | 96 |


---oOo---

## EXHIBITS


| DEFENDANTS' | | PAGE |
| --- | --- | --- |
| Exhibit 1 | Defendant Secretary of State's Notice of Oral Deposition of Dr. Linton A. Mohammed | 10 |
| Exhibit 2 | Declaration of Dr. Linton A. Mohammed | 11 |
| Exhibit 3 | Honors Theses, "Form-Blindness and Its Implications: A Verification Study," Meredith G. Moody | 79 |


---oOo---

BE IT REMEMBERED that on Monday, May 4, 2020, commencing at the hour of 11:17 a.m., via remote videoconferencing, before me, KIMBERLEE SCHROEDER, a Certified Shorthand Reporter in and for the State of Texas and the State of California, duly authorized to administer oaths pursuant to Section 30(c) of the Federal Rules of Civil Procedure and the Texas Rules of Civil Procedure, personally appeared.

LINTON A. MOHAMMED, PhD,

called as a witness herein by the Defendants, who, having been duly sworn, was thereupon examined as hereinafter set forth.

P R O C E E D I N G S

Monday, May 4th, 2020 11:17 a.m.

---oOo---

THE REPORTER: This is the deposition of Linton Mohammed in the matter of Dr. George Richardson, Rosalie Weisfeld, Austin Justice Coalition, Coalition of Texans with Disabilities, Move Texas Civic Fund, League of Women Voters of Texas, and American GI Forum of Texas, Inc. v. Texas Secretary of State, Trudy Hancock, in her official capacity as Brazos County Elections Administrator and Perla Lara in her official capacity as City of McAllen, Texas Secretary.

We are appearing via remote videoconferencing due to the COVID-19 Pandemic. We are on the record at 11:17 a.m. My name is Kimberlee Schroeder, and I am the Certified Shorthand Reporter, reporting for Integrity Legal Support Solutions, P.O. Box 245, Manchaca, Texas 78652.

Would all persons present please introduce themselves for the record?

MS. MACKIN: This is Anna Mackin with the Texas Attorney General's Office, and I represent the defendant Texas Secretary of State.

MR. MIRZA: This is Hani Mirza with the Texas Civil Rights Project, and I represent the plaintiffs in

in this case.

MR. COX: Ryan Cox, also on behalf of plaintiffs.

MR. KALAR: This is Samuel Kalar of the law firm Willkie, Farr & Gallagher, also on behalf of the plaintiffs.

MS. SURIANI: This is JoAnna Suriani, also of the law firm Willkie, Farr & Gallagher, on behalf of plaintiffs.

MR. TAWIL: This is Isaac Tawil representing Perla Lara in her individual capacity as Secretary of the City of McAllen.

MR. MIRZA: I don’t think there’s anybody else on plaintiffs’ side.

THE REPORTER: Mr. Dolling or...

Should I just swear in the witness if they’re shy?

MR. MIRZA: Yes.

THE REPORTER: Okay. Sir, would you raise your right hand to be sworn?

THE WITNESS: Yes.

LINTON A. MOHAMMED, PhD,

after being first duly sworn remotely by the Certified Shorthand Reporter, was examined and testified as follows:

EXAMINATION

BY MS. MACKIN:

**Q. Good morning.**

**Will you please speak and spell your name one more time for the record?**

A. Yes. My name is Linton Mohammed, L-i-n-t-o-n, M-o-h-a-m-m-e-d.

**Q. Thank you for that.**

**My name is Anna Mackin. I represent the Texas Secretary of State in her official capacity, a defendant in this lawsuit. I'm going to be asking you some questions today.**

A. Sure.

**Q. I understand that you have been deposed several times before; is that right?**

A. That's correct.

**Q. Okay. So have you been deposed by video conference before?**

A. Yes, I have.

**Q. Oh, okay. Then these ground rules should be very quick. Just a couple of reminders. Try to give a yes/no answer to my question so that it comes across clearly in the transcript, and I will endeavor to allow you to finish an answer before I ask you another question. And if you'll please also try to let me**

**finish my question before you answer.**

**Is that fair?**

A. Yes. Thank you.

**Q. And if you don't understand one of my questions, will you tell me so that I can rephrase it?**

A. Yes.

**Q. Thank you for that.**

**And is there any reason you might not be able to answer my questions honestly, completely and accurately today?**

A. No.

**Q. Now that the deposition is underway, please tell me if you communicate with anyone, including your counsel, about the substance of your testimony in this case before I conclude the deposition. Okay?**

A. Okay.

**Q. And do you have any documents in front of you?**

A. No.

**Q. I'll be showing you some documents today. Since we are situated remotely, please do let me know if you are referring to any document, website, text message or other source of information to answer my question. Okay?**

A. Okay.

**Q. So to show you documents, I propose that I**

**share them in the chat box in this Zoom platform, if that is okay with you and your counsel. That way, you can scroll through as-needed, zoom in, zoom out, et cetera.**

**I will go ahead and practice by showing you Exhibit 1 just to make sure that you are able to access it.**

(Exhibit No. 1 was marked for identification.)

MS. MACKIN: Q. Please let me know if that document came up, and you are able to open it up.

A. Yes, it's open.

**Q. Thank you.**

**Have you seen that document before?**

A. Yes.

**Q. What is it?**

A. It is a notice of my deposition in this matter.

**Q. Okay. So you understand that you are here today pursuant to this notice?**

A. Yes.

**Q. What did you do to prepare for today's deposition, Dr. Mohammed?**

A. I reviewed my declaration, and I had a pre-deposition meeting with some attorneys from the plaintiffs two days ago -- two days ago.

**Q. And how long did you meet with the plaintiffs' attorneys?**

A. About 15 minutes.

**Q. Did you review any documents with them?**

A. No.

**Q. All right. I'm going to share what will be Exhibit 2 to this deposition, which is your expert witness report in this case.**

(Exhibit No. 2 was marked for identification.)

MS. MACKIN: Q. Please let me know if you're able to access that document.

A. Yes, I have it.

**Q. All right. Thank you.**

**And do you recognize this document?**

A. Yes. This is the declaration I prepared in this case.

**Q. Okay. And that is your signature down on page 30, it looks like?**

A. Yes.

**Q. Okay. And does that signature indicate that you reviewed this report and that its contents reflect the expert opinion that the plaintiffs have retained you to provide in this case?**

A. Yes.

**Q. Okay. And there are three exhibits to your**

**report; correct?**

A. Yes. There should be a copy of my CV, a testimony listing, and documents in Dr. Richardson's ballots.

**Q. Okay. So Exhibit A, your CV, is that a complete and accurate statement of your qualifications and experience?**

A. Yes.

**Q. And Exhibit B, your "Trial and Deposition Record from 2013 to the present," is that a complete and accurate statement of the testimony you have given in court since 2013?**

A. Yes.

**Q. May I ask, what is the significance of 2013? Why does this report begin in 2013? I think I have an idea based on your history, but I'll let you tell me.**

A. Right. The Rule 26 listing says five years, yeah.

**Q. Okay. On Exhibit C, why is Exhibit C included in your report?**

A. Two signatures from Exhibit C, there are two images of two documents in Exhibit C, and images from two of those documents are included as part of the declaration.

**Q. Okay. And did you -- okay. That's all I have**

**for now. All right. And so I'm just going to walk through your report.**

A. Okay.

**Q. And ask you a couple of questions about it.**

**Starting in the first paragraph on the second page, it says that you've been retained to "...opine on the reliability of the procedures and techniques of the Texas signature verification process for mail-in ballot applications and mail-in ballot return envelopes as set forth in Texas elections laws and guidance."**

**Did I read that correctly?**

A. That's correct, yes.

**Q. And that is the subject on which you were retained to opine in this case?**

A. Yes.

**Q. Were you retained to provide any other type of expert opinion in this case?**

A. No.

**Q. You were not retained to give the Court any legal opinions; were you?**

A. No.

**Q. Okay. I would like to direct you now to section I of your report titled "Qualifications." Paragraphs 2 through 12 list your qualifications as a forensic document examiner; is that correct?**

A. That's correct, yes.

**Q. And so during this deposition, I may use the abbreviation "FDE." When I'm doing that, I mean forensic document examiner, unless I tell you otherwise. If you use that acronym, I will understand you to mean forensic document examiner unless you tell me otherwise. Okay?**

A. Okay.

**Q. You have quite a few qualifications and lots of experience. Other than the qualifications and experience listed in section I of your report, are there any other qualifications, education or experience on which you based the expert opinions in this report?**

A. No.

**Q. Moving on to paragraph 7 -- I'm sorry, yes, paragraph 7. You mention you published 16 articles --**

A. Yes.

**Q. -- on signature and handwriting examination.**

A. Yes.

**Q. Did any of those articles involve election administration?**

A. No.

**Q. Did any of those articles consider the ability of laypeople to determine that signatures were not made by the same person?**

A. No.

**Q. Then moving on to the next page, paragraph 8, mentions two books, one that you authored and one that you coauthored. And they are cited down in footnotes 1 and 2; correct?**

A. That's correct.

**Q. Do either of those books discuss election administration?**

A. No.

**Q. Do either of these books discuss the ability of laypeople to determine that signatures were not made by the same person?**

A. Yes. In the Forensic Examination of Signatures, that would have been discussed in that book.

**Q. Okay. At a high level --**

A. I'm sorry, I didn't get that.

**Q. I didn't finish my question. My fault, not yours.**

A. Oh, okay.

**Q. At a high level, what did Forensic Examination of Signatures say about the ability of laypeople to determine that signatures were not made by the same person?**

A. It would have summarized research done by other researchers into the -- into comparing the ability

of laypersons and FDEs, and those research that was discussed is actually referenced in this declaration in other chapter (technical difficulties) --

THE REPORTER: Ms. Mackin, do you want me to go off the record?

MS. MACKIN: Sure. We might as well just for a second until he comes back.

(Off the record 11:30 a.m. - 11:37 a.m.)

MS. MACKIN: Back on.

(Record read.)

THE WITNESS: That's fine. I will start over.

Yeah, the book Forensic Examination of Signatures discusses briefly the comparability of laypersons and FDEs and signature comparisons. That research is actually detailed later on in this declaration researched by Dr. Kam and his group, Dr. Found and his group, and Dr. Merlino and her group.

MS. MACKIN: Q. All right. Thank you for that.

Moving down to paragraph 9, you mentioned that you received the Ordway Hilton award "In Recognition of Outstanding Forensic Contributions to Forensic Document Examination."

A. Yes.

**Q. I noticed the name Ordway Hilton in some of**

**the sources that you cited. Can you briefly tell me who, who is Mr. Hilton?**

A. Yes. Ordway Hilton was one of the foremost document examiners or FDEs of his time. He wrote at least two books on document examination. One of the texts, Scientific Examination of Questioned Documents, is considered to be one of the major texts.

Mr. Hilton was also a founding member of the American Academy of Forensic Sciences, and he's also a past president of the American Academy of Forensic Sciences. So the Questioned Documents Section award was named in his honor.

**Q. When was he active?**

A. Probably from the '50s until maybe the early '70s.

**Q. Would it be fair to say that the field of forensic document examination has developed in some respects since Mr. Hilton's time?**

A. Yes. It certainly has, but the principles in his book remain the same.

**Q. I would like to move down to paragraph 10 where you mentioned that you testified as an expert witness in depositions.**

A. Yes.

**Q. Have you testified in any case involving**

**election administration?**

A. Yes, I have.

**Q. On how many times?**

A. I've testified in one trial in Missouri last year and maybe four or five depositions.

**Q. And then paragraph 11, you talk about your PhD and your thesis.**

A. Yes.

**Q. Your thesis involves signature examination; is that right?**

A. That's correct.

**Q. Did it study the ability of laypeople to determine that signatures were not made by the same person?**

A. No. It basically explored the -- what was happening was people actually wrote disguised signatures and forged signatures and genuine signatures. It didn't talk -- there was no testing between laypeople and experts.

**Q. Turning away from the report for just a moment, have you had any prior dealings with the counsel in this case?**

A. No.

**Q. Have you had any prior dealings with any of the plaintiffs in this case?**

A. No.

**Q. And has your expert opinion ever been excluded from any court case?**

A. No.

**Q. Are your fees in this case contingent in any respects?**

A. No.

**Q. Have you ever, to your knowledge, assisted in the preparation of an amicus brief?**

A. No.

**Q. Are you prepared to give your final expert opinions on the topics in your report?**

A. Yes.

**Q. Do you plan to do any additional work before providing testimony in court about your expert opinions in this case?**

A. Only if I'm asked to by counsel.

**Q. Okay. Have you been promised any additional information about this case that has not yet been provided?**

A. No.

**Q. Have you been asked to make any assumptions in preparing your report?**

A. No.

**Q. Have you done all the work necessary to reach**

**the conclusions in your report?**

A. Yes.

**Q. And does your written report, the declaration that is Exhibit 2, contain all the opinions that you plan to give at trial?**

A. Yes.

**Q. Have you provided all the reasons for those opinions in your report?**

A. Yes.

**Q. Were there any limitations placed on your work in this case?**

A. No.

**Q. How much time have you spent on this matter?**

A. Can I check my case files?

**Q. Oh, sure.**

A. Thank you.

About 45 hours.

**Q. Okay. Thank you for tracking down that information for me.**

**How was your report prepared in this matter?**

A. I was provided -- I was provided information on the voting statutes in Texas, and I reviewed those statutes and then applied principles of signature examination to those statutes to see whether the people who conducted the signature verifications, how they

matched up against the training that the FDE receives.

**Q. And did you draft your report? Were you the primary writer, or did someone else assist you in writing it?**

A. No, I was the primary -- I'm sorry, was there an objection?

MR. MIRZA: No.

THE WITNESS: No, okay.

Yes, I was the primary drafter. I did receive some assistance from some of the plaintiffs' attorneys in terms of the way -- the way the statutes should actually be written in the report.

MS. MACKIN: Q. Okay. So the discussions of the Texas election laws at issue, you received some assistance from counsel in drafting that portion of the report; is that right?

A. Yes, yes. More -- I guess I would say more of the legal terminology and those statutes.

**Q. Okay. And did you receive any other assistance in drafting your expert report in this matter?**

A. No, no.

**Q. All right. So moving ahead to paragraph 13 under section II, "Background," you note that in preparing your report, you reviewed the plaintiffs'**

**original complaint in this case, the State of Texas Early Voting Ballot Board Handbook for Election Judges and Clerks, Updated January 2018, and relevant academic literature; is that right?**

A. That's correct.

**Q. Is that a complete list of what you reviewed in preparing your report?**

A. Yes.

**Q. What relevant academic literature did you review?**

A. The research with regard to the ability of laypersons and experts to examine and compare signatures, and error rates that was found in those studies. I reviewed others' material on form-blindness and lay individuals and experts and testing for form-blindness. And I reviewed some of the major texts and document examination that discussed natural variations in signature -- in signatures and possible causes of dissimilarities and signatures that have to be assessed by the FDE.

**Q. Is all of the academic literature that you reviewed cited in your report?**

A. Yes.

**Q. How did you determine what academic literature was relevant to prepare your report?**

A. As I said, my PhD thesis was on examination of signatures, so I had fairly comprehensive knowledge of the research material on signatures that has been published and presented. So I used that to base my -- to support my opinions.

**Q. Did you review all of the academic literature that's relevant to the topics in your report?**

A. I think so, yes.

**Q. Okay. And how did you obtain the Early Voting Ballot Board Handbook For Election Judges and Clerks, Updated 2018?**

A. That would have been sent to me by plaintiffs' counsel.

**Q. Are you aware that the Texas Secretary of State updated the Early Voting Ballot Board Handbook for Election Judges and Clerks in January of 2020 --**

A. I think you dropped off just at the end there.

**Q. Sure.**

**Are you aware that the Texas Secretary of State updated the Early Voting Ballot Board Handbook for Election Judges and Clerks in January of 2020?**

A. No.

**Q. In preparing your report, did you study the process for reviewing signatures on mail-in ballots in any particular Texas county?**

A. Just the ones that were listed in the Early Voting -- in the EVBB Handbook. And also I had testified -- in fact, I was deposed last year in another case in Austin, Texas, for a county. I don't recall the name of the county, though.

**Q. Okay. I just want to make sure that I understand your answer. You talked about the Early Voting Ballot Board Handbook.**

A. Yes.

**Q. And I'm wondering, when you say that -- did that handbook discuss the process for reviewing signatures on mail-in ballots in any particular Texas county, or did it discuss the process just generally?**

A. It discussed the process -- in some counties, the -- the -- there is an Early Voting Ballot Board, and some of the counties, there's a Signature Verification Committee. That is one of the differences in the -- in the Election Handbook.

But the process for signature comparison or verification that were described was the same for both, both entities.

**Q. Did you visit any Texas county and observe the signature verification process?**

A. No, I have not.

**Q. Have you had any communications with any local**

**election officials to assist you in preparing your report?**

A. No.

**Q. Other than the items that we've already discussed, did the plaintiffs' counsel provide you with any additional information that you considered in preparing your report?**

A. No.

**Q. Is there any other way that we haven't talked about that you learned about the process for verifying signatures on mail-in ballots in Texas?**

A. No. I just went -- went by -- by the -- the matters described in the -- in the documents we've spoken about.

**Q. Okay. Have you ever been to Texas?**

A. Yes.

**Q. How recently?**

A. Last year. I was in Austin for a deposition.

**Q. Oh. Well, we hope to have you back sometime after the pandemic is over.**

A. Yes. I look forward to that.

**Q. Okay. And so just to be clear, you have never observed any Early Voting Ballot Board in Texas conducting signature verification?**

A. That is correct.

**Q. And you have never observed any signature verification county in Texas conducting signature verification?**

A. That is correct.

**Q. So it appears from your report that you reviewed Dr. George Richardson's mail-in ballot application and carrier envelope; is that right?**

A. Yes, images of them.

**Q. Images, sure.**

**And when did you review those images?**

A. That would have been about the time that the report -- the declaration was written. Maybe a week before.

**Q. So January or February of 2020?**

A. Yes.

**Q. And how long did you spend reviewing the images of Dr. George Richardson's mail-in ballot application and carrier envelope?**

A. Probably about five minutes.

**Q. What did you examine?**

A. I looked at the images on the -- on both documents and just did a quick comparison.

**Q. Did you use any particular tools in doing that?**

A. No. If you're looking at images, if you use a

microscope on -- on an image printed with toner, all you see are pretty much bigger toner particles. It doesn't really help very much. It's called MT magnification. So --

THE REPORTER: I'm sorry, I'm sorry. Doctor --

THE WITNESS: It's called MT magnification. Okay, I'll slow down.

(Discussion off the record for Reporter clarification.)

THE WITNESS: No, I did not -- if you are looking at printed images, if you use a microscope, all you see are pretty much bigger toner particles, and it's a method called MT -- MT magnification. So I just enlarged the images on my screen, and that was it.

MS. MACKIN: Q. So other than Dr. Richardson, did you review the signatures on any other Texas mail-in ballots or carrier envelopes in preparing your report?

A. I don't believe so.

**Q. Did you consider any information about the plaintiffs that we haven't already discussed in reaching the conclusions in your report?**

A. I think I would ask you to explain that question in some more detail.

**Q. Okay. I guess I'm trying to understand kind**

**of everything that went into the pot when you prepared your report. So if there is any other information about the plaintiffs that we haven't already talked about that you considered.**

A. No. The only thing I had asked plaintiffs' counsel was whether Dr. Richardson was a medical doctor.

**Q. And why did you want to know that?**

A. When I looked at both signatures, the first signature, I guess on the mail-in ballot or the application, was a very quickly written, what I call a mixed-style signature.

The second signature on the ballot itself was a more, what I call a more readable text-based styled signature. So I inquired if Dr. Richardson was a medical doctor because the first signature would have been more what I'm used to seeing from medical doctors on prescriptions: a very hastily written, scribbled signature. Whereas, the second signature was more -- was a signature of what I would term better quality.

**Q. And why was that relevant?**

A. Because it would give an explanation as to why Dr. Richardson had two different signature styles. One was his, what I would call his prescription-style signature. And the other one was a more formal signature.

**Q. In your expert opinion as a forensic document examiner, were the two signatures made by Dr. Richardson a match?**

A. No. I would say they were pictorially dissimilar.

**Q. Okay.**

MR. MIRZA: I just want to note for the record I put in an objection.

Mr. Mohammed, just wait a couple of seconds so I can add my objections in.

THE WITNESS: Okay. Sure.

MS. MACKIN: Q. On your report, Dr. Mohammed, it mentions that you reviewed the plaintiffs' complaint in this case; correct?

A. Yeah.

**Q. Have you reviewed any other pleadings in this case?**

A. No.

**Q. What is your understanding -- and I'm not asking for a legal conclusion. I know you're not here to offer that. But what is your understanding of the complaints that the plaintiffs are making in this case?**

A. That they -- they signed -- they signed the mail-in ballot application, and they signed the ballots, and the signatures on the ballots were rejected, and

they were not happy about that.

**Q. Were you asked to consider the specific activities taking place in any particular Texas city or county in preparing your report?**

A. No.

**Q. And I think we're clear on this, but I just want to be overly thorough. Paragraphs 13 through 21 of your report cite a few provisions of the Texas Election Code. Just to be clear, you're not offering an expert opinion on what those provisions mean; are you?**

A. No, no, certainly not. I have no expertise in the way elections are conducted.

**Q. All right. When evaluating signatures, what conclusions might a forensic document examiner draw?**

MR. MIRZA: Objection. Form.

MS. MACKIN: Q. And I'm sorry. If that question is a little unclear, maybe I can unpack it. But if you understand it, you can go ahead and answer.

A. Yeah, I think -- I think it's okay.

In my practice and practice of any FDE, a signature it's called a questioned signature or a signature that's been disputed. Someone says that's a genuine signature; someone else says that's a forged signature. And I'm asked -- I'm asked to make a determination as to which one it is on balance of

probabilities.

So I also have to consider the possibility of a signature that has been disguised. It is a genuine signature, but the person deliberately changed the signature so as to deny it afterwards.

So genuine, disguised, forged.

So to come to a conclusion, we have a -- we use a 9-point scale where 1 is identification, it's a genuine a signature; 2, it's highly probable; 3, probable; 4 is indications it's genuine; 5 is inconclusive, which is where we start from -- excuse me -- 6, indications did not write; 7, probably did not write; 8, highly probable did not write; and 9, did not write.

**Q. So in addition to replacing the questioned signature somewhere on that continuum from did write to did not write -- and did I state that correctly? Those are the --**

A. Yes, that's fine.

**Q. Okay. In addition to kind of reaching that determination, does a forensic document examiner comparing signatures typically also offer a degree of certitude? Or do they say, "I'm very confident," "I'm somewhat confident," "I'm not confident at all"? Is that standardized?**

A. Well, that's the 9-point scale I just referred to. So 1, identification, means yes, I'm certain that that person wrote the signature. If I'm asked how certain are you, I would say the only way I can be more certain is to actually witness the person writing the signature. So yes -- I'm sorry, go ahead.

**Q. No, no, please. I'm sorry.**

A. As we go down the scale, so 1 is where we are most certain; 2, highly probable; 3, probable; 4, indications. So you go down. And then 5 is inconclusive. And then you go the other way. So from 6 to 9, it increases in the strength of different writers.

**Q. So the level of confidence that the forensic document examiner has is reflected in where it places the questioned signature on that 9-point scale?**

A. Yes.

**Q. So they're very confident if it's a 1 or a 9, and then as you approach the middle, it gets less confident?**

A. Right. So with a 1, is very confident, same writer. With 9, very confident it's a different writer. Then as you quite correctly said, as you go to the middle, it gets weaker.

**Q. Thank you for that explanation. I appreciate that. In your experience, are -- I don't know if you**

**know this, but are individuals more likely to produce consistent signatures if they are trying?**

MR. MIRZA: Objection. Form.

THE WITNESS: Did you say -- did you say assisted?

MS. MACKIN: Q. I'm sorry, consistent.

A. Consistent. If they are trying? So when people -- I would say when healthy people write their signatures, natural signatures, they don't really try. A signature is a part of a motor program that's built into -- into your brain. And when you sign your name, you don't even think about what you're writing.

For someone who has -- may have problems writing, they may concentrate more on the signature to try to get it right. And again, it depends on the individual, the amount of consistency that individual has. For example, if an individual is on a medication, let's say they have Parkinson's, they're shaking, whether they sign before the medication or on the medication or as the medication is wearing off, that may produce inconsistencies into their signature style.

**Q. Is there a name for that 9-point scale that we talked about?**

A. Yeah. It's called the standard for expressing conclusions of forensic document examiners. And you can

download it at www.SWGDOC.org. SWGDOC.org.

**Q. Okay. So for a shorthand going forward, I am going to try to refer to it as the standard for expressing conclusions.**

A. Yes.

**Q. So that I don't -- when I say 9-point scale, it sounds kind of random and imprecise, but so you'll know what I'm referring to.**

A. Okay. Yes.

**Q. Okay. Has the standard for expressing conclusions of forensic document examiners, how -- how long has that standard been used in evaluating signatures?**

A. I would say at least 20 years. It used to be an ASTM standard. But then it was moved from ASTM because the Questioned Document subcommittee was kicked out from the ASTM for reasons we don't have to go through in this deposition.

Let me step back.

So SWGDOC was one of, I think, 20 scientific working groups that was developed and run to develop standards in forensic sciences. For example, the DNA people are SWGDNA, and there's SWGGUN, things like that. So we are SWGDOC. So we developed standards of SWGDOC, and then take it to ASTM, who is the standards

development organization, who would publish the standard.

After -- and through ASTM, we published about I think, 20 standards in questioned documents, one of which was the conclusion standard. After ASTM, E30.02, which is the Questioned Document subcommittee, was disbanded and went back to SWGDOC.

And now again, it's going through the OSAC, the Organization of Scientific Area Committees. They have a consensus body working on the conclusions. And then hoping that will go through the Academy Standards Board and again be republished as a forensic science standard, the conclusions for document examiners.

**Q. Okay. So what was the standard before the standard for expressing conclusions of forensic document examiners was adopted?**

A. That's a great question. The short answer is there was no -- no -- no standard. Some people would use a 5-point scale. When I was trained, we said wrote; evidence indicates wrote; inconclusive; evidence indicates did not write; did not write. So it's five points.

I know of some labs, this would have been many, many years ago, who use three: match; no match; inconclusive. So that's one reason the standard was

developed, to sort of bring everyone to the same page.

**Q. Do you know -- and it's okay if the answer is no, but do you happen to know what year the standard for expressing conclusions of forensic document examiners was adopted?**

A. No. I don't recall offhand.

**Q. That's fine. I would like to go back to your report.**

A. Okay.

**Q. In paragraph 16, you state that, "The SVC," Signature Verification Committee, "may use electronic copies of the mail ballot application and carrier envelope for comparing signatures."**

A. Yes.

**Q. Is the basis for that understanding communications with your counsel and looking at the statutes?**

A. No. I would have found that in the Elections Handbook.

**Q. Okay. What's your understanding of the phrase "electronic copies" as you use it in this sentence?**

A. So an electronic copy could be, for example, a pdf image or a jpeg image that someone is looking at on the screen. It could be a printed, paper-printed version of those signatures. It could be a signature

collected on a signature tablet. So no paper signatures, just an image of the signature. So that's what I would understand by "electronic signatures."

**Q. And just to be clear, the phrase in the sentence I believe was "electronic copies."**

A. Yes.

**Q. Okay.**

A. Yes, electronic copies, yeah. So -- go ahead.

**Q. No, no, please.**

A. An electronic copy will be some sort of image -- an image of the signature that's maintained on the file or imprinted from a file. But if you think of an electronic copy, an electronic image is something that someone is looking at on a monitor.

**Q. And that would be as distinct from a wet-ink signature?**

A. Yes. A wet-ink signature, the term "wet ink" is a term that attorneys seem to like. It's a signature written with a ballpoint pen or a fountain pen, gel pen, but really ink on paper.

So, for example, if you -- if you have an electronic signature that's written on a -- on a signature tablet, it can be someone signing with a stylus on a -- on a plastic surface.

**Q. Okay.**

A. That would be different from a wet-ink signature, yeah.

**Q. Down in paragraph 17, the last sentence says, "The EVBB," or Early Voting Ballot Board, "can overturn, by majority vote, a decision of the SVC that the signatures were completed by different writers."**

**Did I read that correctly?**

A. Yes.

**Q. Do you have an opinion on whether that makes the process more or less reliable?**

MR. MIRZA: Objection. Form.

THE WITNESS: Well, I don't think it really adds anything, because what you basically have is still a lay -- laypersons on the EVBB or the SVC comparing signatures, and then you have the laypersons on the EVBB overturning the decisions of the laypersons on the SVC. So it really doesn't add anything -- anything to the process.

MS. MACKIN: Q. So the EVBB, though, can only overturn a decision if the signatures were made by different writers; right?

A. That's correct.

**Q. So I hear what you're saying that that doesn't necessarily make the process any more reliable.**

**Does that make the process more likely to**

**result in either, to use a term you use later in your report, Type I versus Type II errors?**

MR. MIRZA: Objection. Form.

THE WITNESS: Yeah, that would be difficult to know without testing. I mean, it depends on who -- who are the better assessors. The SVC? The SVC could make a correct decision, and the EVBB could make an incorrect decision. So it's difficult to know.

MS. MACKIN: Q. Moving on to section III of your report, "Summary of Conclusions," the first paragraph, paragraph 22, the first paragraph of this section rather, says that, "The Texas signature match procedures do not set forth sufficient standards for determining whether a signature on a mail-in ballot application or return envelope match each other or match a voter signature displayed in the qualified voter file or on the voter's registration card, which results in error-prone determinations."

Did I read that correctly?

A. Yes, you did.

**Q. What did you mean by the phrase "sufficient standards"?**

A. Well, in fact, they don't give any standards at all. What should the members of the EVBB and the SVC, what should they look at? What are they -- what

features are they going to use to determine whether a signature is authentic or inauthentic.

From what I read in the procedures, there was no guidance given -- given to the election officials.

**Q. And so what would be sufficient guidance, in your opinion?**

A. In these cases, not much is going to help, because you have -- the officials are comparing one signature with one or maybe two or three other signatures. They have a very limited amount of time and even -- I have a number of years of experience in document -- as an FDE, and I wouldn't do it. It's just not enough comparison material.

You have to remember, a signature is a very small amount of handwriting, as you can see. You have many factors that can affect the way signatures are executed. And given what the Texas officials have to work with, I think no amount of guidance will help them.

For example -- if you use the example in the declaration of Dr. Richardson's signature, yes, those signatures are dissimilar, pictorially dissimilar. What could possibly cause those dissimilarities? And I think the only way to do it is to contact the applicant or the voter.

**Q. Moving down to paragraph 25, you mention --**

**the second sentence says, "An individual's signatures may vary for a myriad of reasons, including age, health, native language, and writing conditions."**

**Did I read that correctly?**

A. Yes. That's correct.

**Q. What are -- so are all of the authorities you relied on to support this statement cited in your report?**

A. Yes.

**Q. And then paragraph 26 talks about diminished eyesight or form-blindness.**

A. Yes.

**Q. Something I meant to clarify earlier, are you a medical doctor, Dr. Mohammed?**

A. No, I am not.

**Q. So, you don't have one of those fast prescription signatures? I'm just kidding. That wasn't a real question.**

**So are you aware of how prevalent form-blindness is in the United States or in Texas?**

A. No. And no one knows because it's not generally tested for people. Certainly for people coming in to patent evidence, scientists like fingerprint examination and certainly handwriting document examination, all trainees for handwriting

examination are tested for form-blindness. And if you -- if they don't pass, then they don't go any further.

But to answer your question, no one knows.

**Q. All right. Jumping ahead to paragraph 28. This is where the bulk of your citations begin. At footnote 3, Mr. Hilton's 1965 article in The Journal of Criminal Law, Criminology and Political [sic] Science called "A further look at writing standards."**

**You cited that authority for the proposition that, at a minimum, 10 sample signatures are usually required for an accurate signature determination.**

A. Yes.

**Q. Is 10 signatures still the standard in the FDE community for determining whether signatures were executed by the same person?**

A. Generally, people tend to ask for 15 to 20.

When Mr. Hilton wrote this, you had more people in the community who were trained to write, and they had better-quality signatures. In today's world where people are not taught to write, you're going to get more variation in signatures. So you tend to require more specimen signatures.

For example, people back to Dr. Richardson's case, if I got a case like that, if one of the signatures are questioned, I would ask for specimen

signatures. Depending if he was a medical doctor signing prescriptions, I would ask for specimen signatures of him writing more formal documents because of what's called, it's called a range of variation.

And I can give you an example of a range of variation. Let's say, you know, you are in a garden or if you're in the house doing something and someone comes to the door with a FedEx package, especially in these times, you know.

**Q. I was going to say, that happens a lot lately.**

A. Right. Exactly. You probably give them a very scribbled signature using a stylus on a substrate.

Let's say times have improved, and afterwards, you go down to your attorney's office to sign your last will and testament. The signature on the FedEx -- the FedEx courier got and the signature on your last will and testament, they may represent your range of variation. Generally, you sign something somewhere between those each time you sign.

So that's why you need to get not just ten signatures, but ten contemporaneous signatures, and ten signatures that are on like documents.

MR. MIRZA: I just want to note for the record the citations name is The Journal of Criminal Law, Criminology, and Police Science.

MS. MACKIN: Oh, I'm sorry. Thank you for that. That's a strange Freudian slip. I didn't study government, nothing like that.

**Q. Okay. Moving down to paragraph 30, Dr. Mohammed, you note that a signature comparison may normally take a minimum of two hours.**

A. Yes.

**Q. A comparison for what purpose?**

A. In my field, I have to talk about a forensic examination of signatures.

**Q. Okay.**

A. So I have to compare the signatures. I have to sketch the signatures out, go through my checklists and look for the various species to see what's similar, what's dissimilar, look at the line quality. Several things like that. So a minimum two hours, normally about four hours.

**Q. In this case, in looking at Dr. Richardson's signature, you mentioned a moment ago that it only took you a few minutes to look at those two signatures; is that right?**

A. That's correct.

**Q. And how are you able to make your determination so quickly?**

A. Well, they were -- they were pictorially dis-

-- dissimilar. If you look at the sig- -- I'm sorry, go ahead.

**Q. No, no, please. I'm sorry.**

A. No, I -- I -- I was done.

**Q. So not -- not every signature comparison takes a minimum of two hours; does it?**

A. Well, if I was doing that comparison, it wouldn't have stopped there. I would have requested additional specimen signatures and then do a full comparison.

**Q. So a comparison for, to meet the industry standards in the forensic document examiner context, could take a minimum of two hours; is that right?**

A. Yes. That's correct.

**Q. Just one last thing on the study cited in note 3, did that study compare laypersons to trained forensic document examiners?**

A. No. That just simply looked at the types of the model standards that should be used in signature and handwriting comparison.

**Q. Moving on to, it starts on page 12, the sentence that begins -- it's the last sentence on page 12. It begins, "Third, untrained elections officials also failed to account for the different signature styles and features, leading to erroneous**

**rejections."**

**What did you mean by the phrase "different signature styles and features"?**

A. Okay. So signatures can be classified into three types. First one is called a text-based signature where you can look at the signature and know the person’s name, and in Dr. Richardson’s example which is in front of us, the second signature on the ballot would be a text-based signature. You can look at that signature and read the name "George A." -- excuse me -- "George A. Richardson."

The top signature, or the first signature on the application, is what I would call a mixed-style signature. There’s a second classification where you can look at the signature, and you can read about two or three legible features in the signature, and the rest you can’t see what it means.

And then the third type is called a stylized signature, which can read anything, any characters in the signature. That is basically a pattern. For example, you find that people who write stylized signatures have more variations in their signatures than people who write text-based signatures.

So someone looking at signatures who is unaware of this may not be able to assess the variation

in the stylized signatures as much as they should.

**Q. Is it more difficult to compare signatures of different styles than it is to compare signatures of the same style?**

A. You basically cannot -- cannot compare signatures of different styles. It has to be like with like, apples with apples, oranges with oranges. So that's why with Dr. Richardson's case where the first signature was a mixed-style, the second signature was a text-based style, there's not much to compare with those signatures.

**Q. Then moving to paragraph 33, so there you describe Type I errors, which the report indicates occur when a non-genuine signature is deemed genuine. Type II errors occur when a genuine signature is deemed non-genuine.**

**Then you say, "Type II errors are considered more egregious than Type I." By whom?**

A. By FDEs because, as an FDE who spent most of my career in crime labs, if I'm -- let's say a check was written, and someone said, "Oh, this signature has been forged," and I opine incorrectly that it's genuine, then the person gets away with it.

If, on the other hand, they bring the signature and said it is forged and I opine it is

forged, in fact it is a genuine signature, then that person may be charged with a crime.

So in cases of election, election officials, for example, election cases, if a genuine signature is deemed to be non-genuine, then a person can be disenfranchised. We consider that Type II to be more egregious than Type I.

**Q. All right. So the next authority that you cite is in paragraph 5, an article from The Journal of Forensic Science.**

A. Yes.

**Q. And that article is from 2001; correct?**

A. That's correct.

**Q. Was the study cited in note 5 of your report, was it the first controlled study comparing the abilities of FDEs and laypersons in the area of signature examination?**

A. I would say it was the first properly controlled studies. There was another study that was done several years ago that only used, I think, three FDEs. Statistically, it was not significant. But this is the first one that I would say was a controlled study, academically controlled study of FDEs and lay -- lay -- laypersons.

**Q. The study that you mentioned that occurred**

**earlier that in your opinion was not statistically significant, do you recall --**

A. That's correct.

**Q. -- do you recall anything else about that study, like the year or who conducted it or where it was published? And it's not in your report, so it's okay if you don't.**

A. Yes, it would have been published -- it would have been done in the '60s, I would think. It was a very old study.

**Q. And do you know what question or questions the participants in the 2001 study in The Journal of Forensic Science were asked?**

A. Yes. As far as I know, they were given what's called questioned signatures, which are disputed, and specimen signatures of the writers, and simulations of those -- some of those writers' signatures. And then they were asked to determine whether the questioned signatures, were they genuine signatures or were they non-genuine.

So they were comparing them, some of the similar signatures were mixed in with the genuine signatures. So they were asked to determine whether they were genuine or non-genuine. That was the basic task.

**Q. Do you know if they had any other options, or was it just the two choices: genuine and non-genuine?**

A. Offhand, I don't know. They may have been given an inconclusive option, but they may have had to make what's called a forced call for the purposes of the study.

**Q. So the participants in this study did not evaluate signatures using the standard for expressing conclusions of forensic document examiners?**

A. I don't recall offhand. 2001, there probably would have. I know this study was conducted using FBI examiners, and they use a 7-point scale. They don't use indications. So they may have used 7.

But what I suspect they did was anything from probable to wrote, that was taken as a positive opinion. Probably not to did not write was taken as a negative opinion.

**Q. Do you know if they were asked whether the signatures could have been made by the same person?**

A. Yes. Yes. The thing is, as I said, the questioned signatures were a mixture of genuine signatures and non-genuine signatures, and they were compared against specimen signatures against the -- the real individuals.

But the question was: Were these questioned

signatures, are they genuine, or are they non-genuine?

**Q. And this study, it looks like, used six specimen signatures; is that right?**

A. Six genuine signatures, yes.

**Q. And do you know why it wouldn't have used the ten signatures that you mentioned was the industry standard?**

A. I think one might have been cost in collecting the specimen signatures, but the specimen signatures were collected from laypeople. So there was some cost to researchers in getting those signatures. I think that was -- that was a criticism of the study as well was that, you know, they use more specimen signatures, which I agree with.

**Q. Are you aware of any other criticisms of this study.**

A. Yes. There were some criticisms about the FDEs had more often an interest in getting the right answer; whereas, the laypersons didn't matter that much.

In a subsequent study by the same researchers, at least by Professor Kam, Moshe Kam, as well as his other students, the laypersons were actually paid for providing correct answers. And it made no difference to the results.

**Q. Any other criticisms you're aware of of this**

**2001 Kam study?**

A. Yes. There were criticisms I'm aware of by some other academics and law professors. They basically criticized the methodology of the study.

**Q. What about the methodology did they criticize?**

A. Again, using only six -- six -- six specimen signatures. That's going to be an issue. I think -- these -- these academics are critics or were critics of forensic document examination. So they basically try to throw as much mud as possible at that study.

The main one they had were the laypersons were not as involved in the results as the FDEs would have been. That was -- that was why the -- the subsequent study, the laypersons were paid. So that took care of that critique.

**Q. Okay. Any other critiques of this 2001 study that you're aware of?**

A. Yeah, not that -- not that I can recall offhand.

**Q. All right. And then moving down to paragraph 35, you mention that this 2001 study also considered whether the participants were making Type II errors or Type I errors.**

A. That is correct.

**Q. Did you look at any other studies that**

**considered whether laypeople and forensic document examiners were -- strike that. Sorry, I did not ask that very well.**

**Do any other studies separate these types of signature-matching errors into Type I and Type II in the same way that this 2001 Kam study did?**

A. The only other study might have been Dr. Merlino's study, which was further on this -- in this document.

**Q. Okay.**

A. The study mentioned in chapter 36 looked at the error rates between laypersons and the FDEs, but didn't specify further about Type II or Type I errors.

**Q. And just to be clear, you mentioned the -- actually, that's fine. We'll cover that. All right.**

**In paragraph 36, second to the last sentence says, "It must be noted that these error rates occurred when adequate signature samples and examination time were available."**

**What do you mean by "adequate signature samples" in this paragraph?**

A. I'm sorry, is that the second to the last paragraph?

**Q. The last --**

A. The second to the last sentence?