1    Q.   Yes.  Yes, sir.

2    A.   Okay.  Right.  So in the Australian case, they

3  had the adequate amount of signature samples, at least

4  10 I would think, and they had enough time to do the

5  comparisons.  In fact, they had as much time as they

6  required.

7        So if -- if these are the error rates when you

8  have optimum conditions, considering they're using

9  copies and so on, if you reduce the amount of standard

10  specimens and you reduce the amount of time available,

11  then this, presumably, the error rates will be bigger.

12    Q.   **Do you know what question the participants in**

13  **the study cited in footnote 7 were asked?**

14    A.   Similarly -- again, similar to the study

15  above, they were given genuine signatures and simulated

16  signatures, and they were asked to compare them with

17  specimen signatures of the individuals concerned.  And

18  just simply asked if they were genuine or non-genuine to

19  some degree of confidence.

20    Q.   **And so did it ask the participants to evaluate**

21  **the signatures using the standard for expressing**

22  **conclusions of forensic document examiners?**

23    A.   It would have been a conclusion of that.  I

24  would think it probably used maybe a 5-point scale with

25  wrote, probably wrote, inconclusive, probably did not

1  write, did not write.  That, again, that would be for

2  the purposes of making the data crunching easier.

3      **Q.  So are you aware of whether the Sita study**

4  **from 2002 cited in note 7, are you aware of whether the**

5  **participants in that study had to make a forced call?**

6      A.   Yes.  I think they would have had to make a

7  forced called.  I know that Dr. Found and Dr. Rogers,

8  who are two of my PhD supervisors, they pretty much had

9  forced calls in all of their studies like this.

10     **Q.   So I just want to make sure I understand.**

11         **When you say "forced call," what do you mean?**

12     A.   So if you have -- if you have -- if you're

13  comparing two signatures, one questioned against

14  specimen signatures, and let's say it's a very simple

15  signature and anyone could write that, it would probably

16  be inconclusive.  That would be -- that would be where

17  you are on the conclusion scale.

18         The forced call will make you go up one level

19  or go down one level or two levels.  So you have to make

20  a call.  Otherwise, what may happen is if you have too

21  many inconclusive results, which doesn't help, help the

22  study in any way.

23     **Q.   So like, for example, based on your**

24  **understanding of Texas election law, does the Signature**

25  **Verification Committee or Early Voting Ballot Board have**

Linton Mohammed - 5/4/2020

56

 1  **to make a forced call when they're comparing the**
 2  **signature on a carrier envelope and a mail-in ballot**
 3  **application?**

 4       A.   Yes.  I think they -- they do have to because
 5  any other conclusion, based upon what they're comparing
 6  and the time that they have to compare them, I don't
 7  think it can be the result of anything but a forced
 8  call.

 9       **Q.   And so wouldn't the study cited in note 7 be**
10  **slightly different insofar as it allows for evaluation**
11  **of signatures on that 5-point scale?**

12       A.   Well, do you mean if there were no forced
13  calls?

14       **Q.   Right.  And as I understood your testimony,**
15  **the study cited in note 7 asked participants to evaluate**
16  **signatures on a 5-point scale from -- based on their**
17  **level of confidence.**

18       A.   Yes.

19       **Q.   If I misunderstood that, please correct me.**

20       A.   Yes.  I think that's my -- that's my recall of
21  how the study was conducted.  So, in other words, to
22  prevent too many inconclusive answers.

23            For example, if you go back into
24  Dr. Richardson's signatures, my answer for there would
25  be inconclusive until I get additional specimens;

Appx._351

1  whereas, the election officials apparently have to make

2  a call.  So I would call that a forced call.  And that

3  would increase the error rate.

4      Q.  **Also, just so that I understand, if we can**

5  **jump back to the Kam study from 2001 --**

6      A.  Sure.

7      Q.  **-- cited in note 5, do you know whether those**

8  **participants were asked to answer just yes or no, or**

9  **whether they could give some type of inconclusive**

10  **result?**

11     A.  I don't recall offhand.  I suspect that that

12  would have had forced calls as well.  But I would have

13  to actually go back to the data to review what was --

14  what was produced.

15     Q.  **Are you aware of any criticisms of the study**

16  **cited in note 7?**

17     A.  No.  That was a study in Australia.  So I'm

18  not aware of what critics in the U.S. knew about it.

19  Basically, what these professors were trying to do was

20  to exclude testimony of document examiners and say they

21  know better than laypersons in comparing signatures.  So

22  the Kam test and the Sita/Found/Rogers tests provided

23  data to show that the FDEs had more expertise than the

24  laypersons.

25     Q.  **And the Sita study, it did not classify errors**

 1  as Type I or Type II; is that right?

 2      A.   That's correct.  I just gave basic error rates

 3  between the FDEs and the laypersons.  They did not give

 4  a further breakdown into Type I and Type II.  That is

 5  correct.

 6      Q.   Moving on to the next page, page 15, paragraph

 7  39 begins, "To make such a judgment reliably requires,

 8  at a minimum," then it lists a few items below that.

 9          What do you mean by "such a judgment" in this

10  context?

11      A.   The such a judgment would be did someone write

12  the signature or did they not write the signature.

13      Q.   Okay.

14      A.   That's -- that's the judgment I think the

15  election officials are being asked to make.

16      Q.   Okay.

17      A.   The FDEs are being asked to make as well.

18      Q.   So when you're thinking about a judgment on a

19  signature comparison, are you thinking of it in terms of

20  a forensic judgment with the requisite degree of

21  certainty that you would want to have as a forensic

22  document examiner?

23      A.   Yes.  If I'm going to say that something is

24  genuine or non-genuine, I would need to have all of the

25  factors considered -- all the factors and all the

1  materials that I need to make that sort of call.

2     **Q.   Moving on to footnote 9, this is the third**

3  **study that you've cited as comparing laypersons to FDEs**

4  **in evaluating the genuineness of signatures; is that**

5  **right?**

6     A.   That's correct, yes.

7     **Q.   This study was funded by a Department of**

8  **Justice grant; correct?**

9     A.   Yes.

10    **Q.   I was able to find this study online, and this**

11 **isn't to try to cast doubt on it, I'm just curious.  It**

12 **said this study was not published by the Department of**

13 **Justice.  What is -- do you know what the significance**

14 **of that is?**

15        MR. MIRZA:  Objection.  Form.

16        THE WITNESS:  I don't -- I thought it was

17 published, but I haven't checked -- I haven't checked

18 recently.  If it's not published, I don't know what that

19 means.

20        MS. MACKIN:  Q.  Okay.  That's fine.

21    A.   There's also -- the main study, like almost

22 40, 50 pages, you can also look for like a 10-page

23 synopsis of the study as well on the NIJ website.

24    **Q.   I did find it there.  But what I found was**

25 **like 1,400 pages.  It was huge.**

1        A.   Exactly.

2        **Q.   Do you know if the participants in this study**

3   **were required to say that signatures were either genuine**

4   **or non-genuine, or do they have other options in**

5   **between?**

6        A.   Yes.  I think this was genuine, disguised, and

7   forged or simulated.

8        **Q.   So the participants in the Merlino study were**

9   **not asked to evaluate the genuineness of signatures**

10   **using the standard for expressing conclusions of**

11   **forensic document examiners?**

12        A.   No.  Again, I was a participant in this study.

13   As I recall, you have to give -- it was, again, maybe a

14   5-point scale:  wrote, probably wrote, inconclusive,

15   probably did not write, and did not write.  And as I

16   recall, there was also a forced call.

17        So you can say inconclusive as your opinion,

18   but then you have to make a call one way or the other.

19        **Q.   And do you know if this study classified**

20   **errors as Type I or Type II as described in this study**

21   **cited in note 5?**

22        A.   You know, I don't -- I don't recall offhand if

23   it did.  I don't think so.

24        **Q.   Are there any other studies comparing the**

25   **abilities of FDEs and laypersons in assessing the**

1   **genuineness of signatures other than the three cited in**

2   **this report and the one you mentioned earlier from like**

3   **the '60s?**

4        A.   Not that I'm aware of.  There was once another

5   study in Australia that used calligraphers as the

6   forgers.  But I don't recall if there were laypeople who

7   were involved in that.  I think that was just FDEs.

8        **Q.   All right.**

9             **Can we go off the record for a moment?**

10            MR. MIRZA:  Sure.

11            THE REPORTER:  Yes.  We're off the record.

12            (The lunch recess was taken at 12:56 p.m.)

13                     ---oOo---

14                 AFTERNOON SESSION

15             (Time noted: 1:34 p.m.)

16            MS. MACKIN:  Q.  All right, Dr. Mohammed.

17        A.   I'm here.

18        **Q.   All right.  Just to be clear, picking back up**

19   **on page 17 of your report, did you observe the Early**

20   **Voting Ballot Board that determined Dr. Richardson's**

21   **signature on the mail-in ballot application and carrier**

22   **envelope were not made by the same person?**

23            MR. MIRZA:  Objection.  Form.

24            THE WITNESS:  I don't recall.  Go ahead.

25            MR. MIRZA:  I was just making an objection.

1  Objection, form.  You can answer the question.

2           THE WITNESS:  Yeah.  I'm not sure --

3           Are you guys still hearing me?

4           MS. MACKIN:  Q.  Yes.  Can you hear me all

5  right?

6       A.   Yeah, I'm hearing, yeah.

7           I'm not sure if I saw the actual decision by

8  the EVBB or the SVC, but I did review it in the

9  complaint.

10      **Q.   Do you know what the election officials who**

11 **evaluated Dr. Richardson's signatures considered?**

12      A.   No.

13      **Q.   Moving right along to page 18, paragraph 41,**

14 **you discuss a textbook on handwriting examination by Roy**

15 **Huber and A.M. Headrick?**

16      A.   Headrick.  Headrick, yeah.

17      **Q.   Have you provided a citation to that textbook**

18 **in your report?**

19      A.   I should have.

20      **Q.   Is that the same -- well, let me just ask it**

21 **in a way that might be easier.**

22           **Is that the same textbook that you cite in**

23 **note 16 of your report?**

24      A.   16.  Yes, footnote 16, that's correct, yes.

25      **Q.   Okay.  Just because there might be variation**

63

1  **between two signatures, that doesn't necessarily mean**

2  **that someone comparing the two will determine that**

3  **they're not a match; does it?**

4          MR. MIRZA:  Objection.  Form.

5          THE WITNESS:  No.  In fact -- in fact, that's

6  why you need multiple specimen signatures because you

7  have to determine the writer's range of variation, and

8  then when you examine with it the questioned signature,

9  you have to determine if any feature in that signature,

10 let's call it the questioned signature, falls outside of

11 the range of variation you observe in the specimen

12 signatures.

13         And then you have to determine is that

14 variation, extra variation, can it be reasonably

15 explained, or is there no reasonable explanation for it.

16 And if it's the latter, then it becomes a difference,

17 and you're talking about two different writers.

18         MS. MACKIN:  Q.  All right.  Thank you.

19         Let's move now to page 20.  You talk in

20 paragraph 41, which begins on page 18, about a

21 distinction between difference and variation.  And then

22 you say at the end of paragraph 41, you say, "It is very

23 unlikely that a Texas election official will have the

24 knowledge, training and experience to properly account

25 for these factors."

Linton Mohammed - 5/4/2020

64

1             Did I read that right?

2      A.    That is -- that is correct.

3      **Q.    And what is your basis for that statement?**

4      A.    The basis is my own training as a forensic

5  document examiner.  When I was trained -- excuse me --

6  my continuing education, when I have trained examiners

7  and what the examiner needs to be trained in, they need

8  to see multiple signatures of all different types over

9  at least 18 months to two years.  They have to

10  understand and appreciate causes of variation.  Huber

11  and Headrick mentioned 20 possible causes in their book.

12            So I doubt it very much, and please correct me

13  if I'm wrong, that a Texas election official or any

14  layperson will have the sort of training and experience.

15  Even people who work in banks and see many, many

16  signatures, even some of them don't have the proper

17  experience to look for and assess whether there is a

18  difference or a variation.

19            And that's -- that's the key point.  Variation

20  is one writer; difference, two writers.

21      **Q.    Okay.  Did you independently verify whether**

22  **Texas election officials receive any training other than**

23  **the 2018 handbook that you considered?**

24      A.    I look at the handbook, and also -- I think I

25  also did a Google search to see if there was anything

1  else on Texas instructions.  Only one state it is done.

2  But Colorado actually has a training manual, which is

3  not bad at all.  Still not good enough.  But I cannot

4  find anything in Texas that would talk about how the

5  officials are trained.

6      **Q.   Other than the Google search, did you**

7  **investigate that any further?**

8      A.   No.

9      **Q.   All right.  Paragraph 42 states that,**

10  **"Laypersons are significantly more likely than FDEs to**

11  **incorrectly reject authentic signatures of illiterate**

12  **writers."  And for that proposition, you cite a 1965**

13  **article by O. Hilton.**

14          **Is that the same article cited in note 3 of**

15  **your report?**

16      A.   Yes.  That would have been the same -- the

17  same article.

18      **Q.   Did that article discuss the ability of**

19  **laypersons to evaluate signatures?**

20      A.   It actually discusses the ability of FDEs to

21  evaluate signatures of people who have problems --

22  problems signing for various reasons.  And it discusses

23  the need for even more standards, specimen signatures,

24  when writers like these are involved.

25          So the FDE would tend to know what to ask for,

1  what to look for, and then if they don't have enough

2  material, then they would go inconclusive.  A layperson

3  may not have this knowledge, and probably will make a

4  call -- make a call on what they see -- what they have

5  in front of them, and they incorrectly interpret a

6  variation as a difference.

7      **Q.   But I just want to make sure I'm clear.**

8          **This 1965 article by Hilton, it didn't**

9  **specifically discuss the ability of laypersons to**

10 **evaluate signatures; did it?**

11     A.   No.  It discussed the ability -- the ability

12 of trained examiners to examine the signatures of

13 illiterate writers and people like that.

14     **Q.   All right.  And then you continue that,**

15 **"...writers for whom English is a second language,**

16 **elderly writers, disabled writers, and writers with**

17 **health conditions."**

18     A.   Yes.

19     **Q.   And for that, for all of those propositions,**

20 **you have two citations.  Notes 13 and 14, which are both**

21 **additional articles by Hilton.**

22     A.   Yes.

23     **Q.   Okay.  Did you look at anything more recent to**

24 **support the assertion that laypersons are more likely**

25 **than FDEs to incorrectly reject authentic signatures**

```
 1  from these groups of people?

 2       A.   No.  What I based that on is that FDE -- I'm

 3  sorry.  Was there an -- an objection?

 4            MR. MIRZA:  No.

 5            THE WITNESS:  Okay.  Sorry.  Okay.

 6            What I based that sentence on was that FDEs

 7  have problems with signatures of these types of people,

 8  elderly writers, disabled writers with health

 9  conditions, and trained FDEs who know what to look for

10  and how to assess features, and they make errors with

11  these types of signatures, especially if they have

12  inadequate specimens.

13            So from that, I'm extrapolating to say that if

14  the trained FDE has made errors, then the layperson will

15  probably make more errors based on the previous research

16  where they used signatures of healthy signers.

17            MS. MACKIN:  Q.  Okay.  So the article cited

18  in notes 13 -- in notes 13 and 14 addressed the ability

19  of FDEs to evaluate the authenticity of signatures, but

20  not the ability of laypersons to do so; is that right.

21       A.   That's correct, yes.

22       Q.   Have you done any research or published any

23  studies about the ability of persons with certain health

24  conditions to provide consistent signatures over time?

25       A.   The most recent, I was a co-author, was
```

Linton Mohammed - 5/4/2020

68

1  signatures of people with both Alzheimer's and dementia.

2  That was published, I think, earlier this year.

3          And the result from that was that dementia

4  doesn't make much of a difference to the execution of

5  signatures.

6      Q.   Have you done any other studies in a

7  similar --

8      A.   No.

9      Q.   Okay.  At the end of paragraph 42, you mention

10  laypersons, and you reference "...laypersons' tendencies

11  to err on the side of incorrectly finding authentic

12  signatures to be non-genuine."

13      A.   Yes.

14      Q.   What is the basis for your statement that

15  laypersons tend to err on the side of incorrectly

16  finding authentic signatures to be non-genuine?

17      A.   Those are the Type II errors that we discussed

18  earlier where the -- the person would say a genuine

19  signature is non-genuine.  The Kam study that talked

20  about the Type II errors used, again, signatures of

21  healthy people, but there's no issues with the

22  handwriting or the signatures.

23          So the variation would have been more

24  consistent on like people who are ill, elderly.  The

25  derivation would be even expanded, much greater than the

Appx._363

1  healthy people.  So since laypersons had more issues

2  than FDEs with healthy people, it stands to reason that

3  they would have more issues with unhealthy people, since

4  there's much greater variation in the signatures of

5  unhealthy individuals.

6      **Q.   Now, I just want to make sure that I**

7  **understand something.  The three studies that you cited**

8  **for that proposition -- let's see -- the Kam study from**

9  **2001, the Sita study from 2002, and then the Merlino**

10  **study from January of 2015.**

11      **For the Kam study, how -- were the**

12  **participants asked to use the standard for expressing**

13  **conclusions of forensic document examiners in providing**

14  **their responses?**

15      A.   I think they would have been asked to use a

16  condensed version, maybe nine levels, or they would have

17  been asked to use five.

18      **Q.   Okay.  And then the Sita study, were the**

19  **participants in that study asked to use the standard for**

20  **expressing conclusions of forensic document examiners in**

21  **providing their responses?**

22      A.   Again, I don't recall offhand what they used.

23  It would have been a similar scale.  That's what they

24  used in Australia at that time.

25      **Q.   All right.  Then how about the Merlino study?**

1     A.   The Merlino study -- sorry, go ahead.

2     **Q.   Were the participants in that study asked to**

3  **use the standard for expressing conclusions of forensic**

4  **document examiners in providing their responses?**

5     A.   Yes.  Again, it would have been a condensed

6  level.  If I recall, it was five -- it was five levels:

7  wrote, probably wrote, inconclusive, probably did not

8  write, and did not write.

9     **Q.   In forming the opinions of your report, how**

10  **did you factor in the probably wrote or probably did not**

11  **write answers?**

12     A.   I'm not sure if I understand that question.

13     **Q.   Okay.  So what did these studies to form the**

14  **opinion that laypersons tend to err on the side of**

15  **incorrectly finding authentic signatures to be**

16  **non-genuine, and so I'm curious as to how -- I mean, I**

17  **think it's pretty clear that, you know, the very -- the**

18  **ones on the very end, whether it's 1 or 5, how that**

19  **would factor into that analysis.  But I'm wondering how**

20  **the 2s and 4s played into your thinking.**

21     A.   Right. I think what they did is, if there was

22  a 2, 2s and 1s would have been grouped together.  Not

23  only 1 and 2.  1 and 3 would have been grouped together,

24  probably wrote.  And 7 and 9 would have been grouped

25  together, probably did not write and did not write, for

1    the difference of the study.

2            So if you went -- starting at inconclusive.

3    So if the signature is genuine and you went on the side

4    of did not write, either probable or did not write, that

5    would be grouped as did not write as an error.

6        **Q.   Okay.  And for inconclusive, did those, how**

7    **did you factor those into your --**

8            MR. MIRZA:  Objection.  Form.

9            THE WITNESS:  The inconclusive results were

10   stated, but again, I think the -- the participants had

11   to make a forced call.

12           MS. MACKIN:  Q.  Okay.  So if they had to make

13   a forced call, does that mean they weren't allowed to

14   select inconclusive?

15       A.   No.  I think they could select inconclusive,

16   but they had to make a forced call so that the

17   researchers had some -- some numbers to work with.

18       **Q.   I see.  They had to give an answer?**

19       A.   Yeah.  They had to give an answer, yes.  But

20   the number of inconclusive were given as well.

21       **Q.   And in determining that laypeople tend to err**

22   **on the side of incorrectly finding authentic signatures**

23   **to be non-genuine, did you consider an inconclusive**

24   **answer as a finding of non-genuineness?**

25           MR. MIRZA:  Objection.  Form.

1          THE WITNESS:  No.  The inconclusives would not

2   have counted in the data -- in the stats.

3          MS. MACKIN:  Q.  Okay.

4      A.   Just in the forced calls, yeah.

5      **Q.   Thank you.  I appreciate that.  Thank you for**

6   **bearing with me on that.**

7      A.   No, no.  Not at all.  Not at all.

8      **Q.   Okay.  Moving on to paragraph 43, you are**

9   **discussing writers for whom English is a second language**

10  **and stating that they're more likely to have wide ranges**

11  **of variation in their signatures.**

12         **What is your basis for that statement?**

13     A.   If you look at the first line, "Since

14  signatures are developed as a motor program in the

15  brain," as I mentioned before, once the signature is

16  developed when you sign, you don't even think about it.

17  What you're doing is done unconsciously.

18         If, for example, you write in a different

19  language or you speak a different language, the examples

20  I give here, for example, Chinese, where you use

21  ideograms, or in Arabic, where they go from right to

22  left.  Now they have to go from right -- from left to

23  right in our script.

24         So that is going to make a difference in the

25  motor program.  They have to relive the motor program

1  for the new signature.  Because of that, you may find

2  that -- you're going to find that you're going to have

3  more variation in a signature until they learn to write

4  this new signature properly, and that might take a few

5  years.

6       Q.   Moving on to page 23.  About halfway down the

7  page, "Young writers will presumably need to sign less

8  often due to the increased use of personal

9  identification numbers and other non-handwritten forms

10 of identification."

11           What is your basis for that statement?

12      A.   That's just based on my -- on my experience

13 in -- in casework.  I did look for a published piece.  I

14 couldn't find any.  I don't think any research has been

15 done.  If you think, people of my age would be used to

16 signing lots of checks and so on.  So their signatures

17 would develop more experience writing their signatures.

18           Younger people who tend to use, like,

19 chip-and-PIN cards, things like that, don't even use

20 checks.  You find that they have less practice writing

21 their signature.  So they tend to have a less-developed

22 signature than a person maybe 20, 30 years ago.

23      Q.   All right.  Then towards the end of the

24 paragraph, you state that, "This will lead to an

25 increased range of variation in a young writer's

1  signature."

2        So is it the case that the less experienced

3  someone is in writing their signature, the more

4  variation there will be in their signature?

5        MR. MIRZA:  Objection.  Form.

6        THE WITNESS:  Yes.  I think the less

7  experienced they are, it will be a less -- or a more

8  conscious effect -- effort to execute the signature.  So

9  you're going to get more variation than a person who was

10  used to writing their signature.

11        MS. MACKIN:  Q.  So just to make sure I'm

12  understanding your testimony, correct me if I'm wrong,

13  are you saying that there's less variation in a

14  signature once it becomes memorized to the point that

15  the person doesn't have to think about it?

16     A.   Again -- again, it depends on the -- on the

17  individual writer.  Some people have a very narrow range

18  of variation.  Some people have a very wide range of

19  variation.  So it really depends on the individual.

20     Q.   Then the next sentence says, "The handwriting

21  of adolescents can cause difficulties even for trained

22  FDEs."  What do you mean by "adolescents" in this

23  sentence?

24     A.   In this case, it will be someone between 18

25  and 19, because, I mean, those are people who can vote.

1  I actually talk about people who are much younger, 13,

2  14.  In this context, it wouldn't have mattered that

3  much.  I can tell you from a document examiner point of

4  view, if I'm asked to look at writing -- handwritings of

5  people who are 12, 13, 14, my answer is no because their

6  writing is not developed, and there's also lots of

7  variation in there.

8       **Q.   Okay.  Moving to page 24, at the very end of**

9  **what would be paragraph 45, it states, "Unfamiliarity**

10  **with the different signature styles may impact a**

11  **reviewer's ability to determine whether two signatures**

12  **come from the same person and would likely cause a**

13  **layperson to decide that the compared signatures exhibit**

14  **differences when the changes in features are simply**

15  **variations."**

16          **What is your basis for that statement?**

17       A.   Well, let's go back up to page 23, paragraph

18  45.  So you can see there the three images of three

19  different styles of signatures.

20       **Q.   Yes.**

21       A.   So for the first style where it's text-based,

22  people can read that.  The second part, partially

23  text-based, partially stylized.  And then the third one

24  is totally stylized.  But a totally stylized signature

25  is purely a pattern.  The mixed style signature is

1  partly a pattern.

2          So if the reviewer or the election official is

3  unfamiliar with these different styles of signatures,

4  they may tend to evaluate them differently.  And for

5  example, so in the -- in the Dr. Richardson case, one

6  signature was mixed style, one signature was text-based.

7  They shouldn't really be comparing those signatures, but

8  they did.

9          And they evaluated differences of variations.

10  I'm sorry.  That's the wrong way.  They evaluated

11  variations as differences.

12      Q.   Okay.  Is there any other basis for your

13  statement in the last paragraph -- in the last sentence

14  of paragraph 45?

15      A.   From my own research, I looked at different

16  signature styles for my pdf thesis.  I know the

17  kinematic factors on the lines from these signatures,

18  for example, stylized signatures.

19          By "kinematics," I mean things like speed, pen

20  pressure, smoothness tend to vary more in stylized

21  signatures than in text-based signatures.  So you expect

22  to get more variation in a stylized signature.  And as

23  an examiner or someone reviewing signatures, you need to

24  appreciate that and understand it.

25      Q.   Fair enough.  Moving on to the study that you

1  cite at note 23.

2      A.   Okay.

3      Q.   **That study considered fingerprint**

4  **identification, not signature comparison; correct?**

5      A.   That's correct, yes.

6      Q.   **Moving on to page 26, in further discussing**

7  **form-blindness, you cite in note 24 an Honors Theses by**

8  **Meredith G. Moody; is that right?**

9      A.   Are you still hearing me?

10     Q.   **Yes.  I don't see you anymore, though.**

11     A.   Yeah.  My Zoom is connecting.

12          Okay.  Yes, that was a master's thesis.

13     Q.   **Okay.  And that thesis also involved**

14  **fingerprint comparison, not signature comparison; is**

15  **that right?**

16     A.   Right.  Yes.  If you think of it, a

17  fingerprint comparison is a comparison of different

18  persons.  Stylized signature is a comparison of

19  different patterns.  So the underlying principle is the

20  same.  Can you differentiate between curvatures,

21  thickness of lines, angles, things like that.  That's as

22  to both fingerprints and signatures.

23     Q.   **But it doesn't specifically talk about**

24  **comparing signatures; does it?**

25     A.   No, no.  It's about fingerprints.

Linton Mohammed - 5/4/2020

78

1      Q.   Then in a note 25, that's another citation to
2  the Moody thesis.  And note 26 is a study from 1946,
3  which you cite for the proposition that forensic
4  document examiners must pass a form-blindness test.
5      A.   Yes.
6      Q.   Is there anything more current?
7      A.   No.  In fact, the tests that Albert Osborn
8  designed and is in this book, Questioned Document
9  Problems, is still used by document examiners when
10  they're tested for form-blindness before beginning
11  training.
12      Q.   And are you aware of any specific Texas
13  election officials who are afflicted with
14  form-blindness?
15      A.   No.
16           MR. MIRZA:  Objection, form.
17           THE WITNESS:  I don't know if anyone has been
18  tested, but I don't know if anyone has form-blindness.
19           MS. MACKIN:  Q.  I would like to show you a
20  document on Zoom, but I'm not sure it's going to come
21  through if your video is not working.
22      A.   My video is not working.
23           MR. MIRZA:  Is it still saying "connecting"?
24           THE WITNESS:  I keep losing my internet
25  connection.  I'm not sure why.

Appx._373

 1              MS. MACKIN:  I'm sorry, that's really

 2    frustrating.  It's terrible at my house.  I'm in my

 3    office right now, and it's maddening, so I empathize.

 4              THE WITNESS:  That's okay.  Let's see if I can

 5    connect again.  I think I may need to rejoin the

 6    meeting.

 7              MS. MACKIN:  Can we go off the record?

 8              THE REPORTER:  Sure.

 9              (Brief recess taken:  2:07 p.m. to 2:09 p.m.)

10              MS. MACKIN:  Back on the record.

11              MR. MIRZA:  Yep.

12              MS. MACKIN:  Q.  All right.  I am sharing a

13    document in the chat box.  Please let me know when you

14    are able to access it.

15              (Exhibit No. 3 was marked for identification.)

16              THE WITNESS:  Yes, I have it.

17              MS. MACKIN:  Q.  Is that the thesis you are

18    citing in notes 24 and 25 of your report?

19         A.  Yes, it is.

20         **Q.  And I would like you to scroll down to page --**

21              MR. MIRZA:  Real quick.  Dr. Mohammed, if you

22    could give me a couple of seconds to object.  Just

23    answer the questions after like a two- or three-second

24    pause.

25              THE WITNESS:  Okay.

1          MS. MACKIN:  Q.  So it's labeled page 1 on the

2   report, but it's actually page 9 of the pdf file.

3      A.   Oh, just one correction.  I think this was for

4   a bachelor's degree, not for a master's degree.

5      **Q.   Okay.  Thank you for that clarification.**

6      A.   Yeah, page 9.  I have it.

7      **Q.   The first sentence on the "Problem Statement,"**

8   **says, "Form-blindness is a problem that affects a very**

9   **small percentage of the population."**

10         **Did I read that correctly?**

11     A.   Yes.

12     **Q.   That's all that I have on that.**

13         **Returning to your report, note 27 cites a**

14  **study from 1910 for the proposition that "...no complex,**

15  **skillfully written, genuine signatures of one writer**

16  **have ever been found to be exactly alike, but such a**

17  **statement should be understood to be true speaking**

18  **microscopically and not as the carpenter measures."**

19         **Did I read that write?**

20     A.   Yeah.  That's not actually a study.  This is a

21  quote from Osborn's book.

22     **Q.   Whole book, okay, thank you.**

23     A.   Yeah.

24     **Q.   What do you mean by -- it seems you're drawing**

25  **a distinction between speaking microscopically and as**

1   the carpenter measures.  Can you explain that to me a

2   little bit more, please?

3        A.   I'm sorry.  Okay.  Yes, any -- if you look at

4   the signature, we talk about the wet-ink signature under

5   a microscope, then you tend to see more really fine and

6   subtle details.  You can look at very small features

7   such as what's called the -- the area within a circle,

8   for example, in an uppercase "b" or in an "o," and look

9   at them microscopically and see and compare them.

10            If you measure with a carpenter's rule, you

11  probably would not have any statistical difference

12  between them or measurable difference between them.  I

13  shouldn't say "statistical."  Measurable.

14            So basically looking through the microscope

15  adds a lot more to the signature.  So you may have two

16  signatures that look alike when you look at them with

17  your naked eye.  But under a microscope, you can see --

18  you will see the very small variations between those

19  signatures.

20       Q.   Okay.  Thank you for that, Doctor.

21            The last sentence of paragraph 49 talks about

22  how, "Inadequate standards or failure to use adequate

23  specimens fully representing the range of variation in a

24  writer's signature is a well-known source of error."

25            Is that in the context of forensic document

 1  examination?

 2       A.   Yes.

 3       Q.   All right.  Moving forward to page 29.  You

 4  state in the second to the last sentence of your

 5  conclusion on paragraph 55, "The use of digitized

 6  signatures as a reference sample for comparison with an

 7  original wet-ink signature will most likely exacerbate

 8  the error rate."

 9            What is the basis for that statement?

10       A.   Again, that comes from experience.  In fact,

11  we now are planning a study just to look at that, the

12  electronic signatures and the differences between

13  signing with a stylus on a plastic substrate and signing

14  with an ink pen.

15            People, for example, for driver's licenses,

16  especially here in California, you sign on an electronic

17  tablet with the stylus and on the plastic surface and

18  create an image.  Sometimes those signatures -- not

19  sometimes.  Quite often, those signatures are submitted

20  for specimens.  And they're pretty much useless as a

21  specimen signature because they're just -- to use a

22  baseball term, it's out in left field because of the

23  writing conditions.

24       Q.   Did you consider any studies on the

25  suitability of digitized signatures for identity

1  **verification?**

2     A.   Those -- those studies are underway now.

3  Nothing has been published so far as far as I'm aware.

4     **Q.   Did you attempt to find such studies?**

5     A.   Yes.

6     **Q.   Are you familiar with a 2017 study published**

7  **in Forensic International that found no indications that**

8  **digitized signatures are less well-suited than**

9  **conventional signatures for examining authenticity?**

10          MR. MIRZA:  Objection, form.  Objection, form.

11  You can answer the question.

12          THE WITNESS:  Is that Forensic Science

13  International?

14          MS. MACKIN:  Q.  Yes.

15     A.   Okay.  What was the name of the article?

16     **Q.   "Examining authenticity:  An initial**

17  **exploration of the suitability of handwritten electronic**

18  **signatures."**

19     A.   No, I don't think so.

20     **Q.   Okay.  Are -- do you have an opinion on**

21  **whether laypeople are more likely to mistakenly evaluate**

22  **the same signatures as opposed to being more likely to**

23  **mistakenly evaluate different signatures?**

24          MR. MIRZA:  Objection.  Form.

25          THE WITNESS:  If I understand your question,

Appx._378

1  is it more likely that laypersons would associate

2  signatures written by the same person and have a high

3  error rate in associating signatures by different

4  writers?

5          MS. MACKIN:  Q.  No I'm sorry.  I asked that

6  question very poorly.  So let me try.  It's not your

7  fault that it did not make sense.

8      A.   Okay.

9      **Q.   The error is on this end.**

10         **So let's say if -- maybe you don't have an**

11 **opinion on this, which is fine.  If six people are**

12 **evaluating the same six signatures, do you think that**

13 **it's more likely that one of those signatures is going**

14 **to be misidentified by all six of the people?**

15     A.   Yeah, I really -- I really have no opinion on

16 that.  Again, from the testing done, between laypersons

17 and an experts, the laypersons have a high error rate.

18 But laypersons, they are not -- they are good at

19 identifying genuine signatures.  But when it comes to

20 signatures that have issues, then they have more

21 problems.  So you may have one or two or three persons

22 of six who have -- who have good eyesight, good eyes and

23 some experience, and they may get all six right.  I

24 don't know.

25     **Q.   Okay.  Do you have an opinion about whether**

Linton Mohammed - 5/4/2020

85

1  **people tend to sign more consistently when they know**

2  **that their signature is going to be used to verify their**

3  **identity, for example, the last will and testament --**

4          MR. MIRZA:  Objection, form.

5          MS. MACKIN:  Q.  -- the example you gave

6  earlier today?

7          MR. MIRZA:  Sorry.  Objection, form.

8          THE WITNESS:  Yes.  In general -- in general,

9  you find that people who write or cancel documents, last

10 will and testament, sometimes healthcare directives and

11 DNR documents, do not resuscitate, there tends to

12 concentrate of mind and is a more formal signature.

13 That's another reason why when we -- when we have

14 questionables and so on, we request similar types of

15 documents.

16          If you are looking at a contract, I would want

17 to see specimen contracts.  If we are looking at checks,

18 I would want to see specimen checks.  If you get all of

19 them, that would be fine.  You can determine what the

20 person writes like on different documents.

21          To answer your question, in general, yes, they

22 tend to write more carefully.

23          MS. MACKIN:  Q.  All right.  Those are all the

24 questions that I have on your report.  But I would like

25 to just ask you a few questions on Exhibit B.  I'm

Appx._380

1  almost -- I'm almost done.

2        A.    That's okay.   What's Exhibit B?

3        Q.    **Exhibit B to --**

4        A.    My CV.

5        Q.    **It is your listing of trial and deposition**

6  **record.**

7        A.    Okay, "Testimony Listing," okay.

8        Q.    **Do you have that in front of you?**

9        A.    I don't.   I can pull it up on my laptop,

10 unless you want to -- to --

11       Q.    **I can send it as well.**

12       A.    Yeah, that would -- that would be easier.

13       Q.    **Be a little easier, okay.**

14       A.    Yeah.

15       Q.    **And I don't have Exhibit B separated out, so I**

16 **had to resend the whole file.**

17       A.    That's fine.   (Reviewing document.)

18       Q.    **Are you there?   I'm sorry.   I'm not trying to**

19 **rush you.**

20       A.    I have it.

21       Q.    **I wanted to make sure you aren't waiting on**

22 **me.**

23             Dr. Mohammed, can you please identify which of

24 these cases related to election administration?

25       A.    Okay.   Okay.   If we start on page 5 of 7.

1          Q.    Yes, sir.

2          A.    The date 09/18/18, deposition St. Louis,

3    Missouri, that was an election case.

4          Q.    Okay.  At a very high level, what was the

5    nature of your testimony?

6          A.    Pretty much what I testified to here today.

7          Q.    Was your -- did you prepare an expert report

8    in that case?

9          A.    Yes, I did.  Yes.

10         Q.    Was it --

11         A.    Go ahead.

12         Q.    I'm sorry.

13               Was that report different from the report that

14   you prepared in this case?

15         A.    Most of the report would have been the same

16   except for the differences in the election statutes and

17   how the signature verifications are treated in Missouri

18   as compared with Austin.

19         Q.    Okay.

20         A.    That would have been the only difference,

21   yeah.

22               Go down to second to the last entry on page 5,

23   11/20/18, deposition, Austin, Texas, that was an

24   election case.

25         Q.    Did you prepare an expert report in that case?

1    A.    Yes.

2    **Q.    This is the Galvan vs. Pablos case?**

3    A.    Right.  That's correct.

4    **Q.    And was the expert report you prepared in that**

5    **case different from the one that you prepared in this**

6    **matter?**

7    A.    Yeah.  Again, I've done maybe ten states or

8    ten of these before, and the reports are very -- very

9    much the same except that the way the different statutes

10   are written, different guidance is given to officials in

11   respective states and counties.  That's the only

12   changes, really.

13   **Q.    All right.  And my colleague Michael Abrams, I**

14   **believe, took your deposition in that case.  I mentioned**

15   **to him yesterday that -- oh, his feelings are going to**

16   **be so hurt if you don't remember him.**

17   A.    Was that the one in Austin?

18   **Q.    Yes, yes.**

19   A.    Yeah, okay.

20   **Q.    I mentioned to him yesterday that I was taking**

21   **your deposition today, and he said that it would be a**

22   **pleasant deposition, and that you were very, very nice**

23   **to deal with.  So...**

24   A.    Yeah.  I think there were three or four

25   attorneys.  I don't recall the names.  But it was a good

Linton Mohammed - 5/4/2020

89

1  deposition.  Everyone was fine.

2        Let's go back down.  Page 6, 6/29/19 [sic],

3  Polk County District Court, Des Moines, Iowa.  And that

4  was an election case again.  Again, very similar to the

5  one we're discussing here today.

6        **Q.   You prepared an expert report in that case as**

7  **well?**

8        A.   Yes and testified.

9        **Q.   Okay.  And it was of a similar nature to**

10 **your --**

11       A.   Very similar, yes.

12       **Q.   -- testimony in this case?**

13       A.   Oh.  Yeah, before that, I think I missed the

14 one on page -- page 5, 9/24/18.  Again, there was a

15 deposition on the 18th, and I testified on the 24th in

16 Missouri.

17       **Q.   Okay.**

18       A.   Again, that was an election case, yeah.

19       **Q.   All right.  Any others?**

20       A.   There would have been one -- what day was

21 that?  I knew there was one out of New Hampshire, which

22 I did by video.  Oh, there you go.  Page 4 of 7,

23 2/28/18, a deposition, Burlingame, California, via

24 video, Saucedo vs. State of New Hampshire.

25       **Q.   And you prepared an expert report in that case**

 1  as well?

 2       A.   Yes.  Yes.  I think those are the ones that I

 3  testified in.

 4       Q.   Okay.  Dr. Mohammed, have I treated you

 5  courteously today?

 6       A.   Oh, very much so.  I apologize for my

 7  difficulties with Zoom.  Sorry for the delays.

 8       Q.   Happens to the best of us.

 9       A.   Yeah.  I need to make one correction.

10       Q.   Okay.

11       A.   You had asked me earlier about the amount of

12  time I've spent on this case.  I think I said 45 hours.

13  I got my math totally wrong.

14            So far, I've billed for 10.5 hours, which has

15  been paid, and another maybe two hours outstanding from

16  preparation for this deposition.

17       Q.   All right.

18       A.   For a total of about maybe 12, 12 and a half

19  hours.

20       Q.   At $400 per hour?

21       A.   Yes, yes.

22       Q.   Thank you for that clarification, and I'll

23  pass the witness.  I've enjoyed speaking with you today,

24  Dr. Mohammed.

25       A.   Same here.  Thank you.

Linton Mohammed - 5/4/2020

91

```
 1          MR. MIRZA:  Can we take a -- I think I will

 2  only need maybe five -- maybe a ten-minute break, if

 3  that's okay with everybody.

 4          MS. MACKIN:  It would be.

 5          THE WITNESS:  Sure.

 6          THE REPORTER:  Off the record.

 7          (Recess taken:  2:30 p.m. - 2:40 p.m.)

 8          THE REPORTER:  Back on the record.

 9                      EXAMINATION

10  BY MR. MIRZA:

11      Q.   Dr. Mohammed, if you could go to -- I think it

12  was State's Exhibit B, the expert report, paragraph 40,

13  it's on page 17.  Just let me know when you're there

14  yet.

15      A.   Yes, I have it.

16      Q.   Okay.  Great.

17           And so the image on paragraph 40 are the two

18  images of George Richardson's signatures that you

19  reviewed for five minutes; correct?

20      A.   Right.  That's correct.

21      Q.   Okay.  And when you were reviewing these

22  signatures, were you performing an FDE examination about

23  whether the signatures were signed by the same person?

24      A.   No, I could not, because they're two different

25  styles of signatures.  So there's very little
```

Appx._386

Linton Mohammed - 5/4/2020

92

1  comparability between the two of them.

2       Q.   Okay.  And what was -- sorry.

3            And so your report cites various studies to

4  support your opinions; correct?

5       A.   That's correct.

6       Q.   And in addition to these studies, are all of

7  your opinions based on your own personal knowledge,

8  experience, expertise and research?

9       A.   Yes.

10           MS. MACKIN:  Objection, form.

11           MR. MIRZA:  Q.  You can answer the question.

12      A.   Yes.

13           MR. MIRZA:  Okay.  I think those were all the

14  questions I had.  I'll pass the witness.

15           Anna, are you still there?

16           MS. MACKIN:  I'm still here.  I do not have

17  anything else.  Isaac?

18           MR. TAWIL:  I'll reserve any questions I have

19  for later testimony, if there is any.  I have nothing

20  today.

21           THE REPORTER:  Mr. Mirza, did you need first a

22  read and sign?

23           MR. MIRZA:  We would like to read and sign.

24           THE REPORTER:  And did you need a copy of the

25  transcript?

Appx._387

1          MR. MIRZA:  Yes.  Yeah.

2          THE REPORTER:  And then Isaac?

3          MR. TAWIL:  Yes.  I'll take a copy, please.  I

4    don't like paper, so digital only, if that's possible.

5          THE REPORTER:  That is possible.

6          All right.  Going off the record.

7          (Deposition adjourned at 2:44 p.m.)

8                         --oOo--

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      ERRATA AND SIGNATURE

2   WITNESS NAME:                  DATE OF DEPOSITION:

3   LINTON A. MOHAMMED, PhD     MONDAY, MAY 4, 2020

4   PAGE/LINE      CHANGE                  REASON

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

1          I, LINTON A. MOHAMMED, PhD, have read the

2     foregoing deposition and hereby affix my signature that

3     same is true and correct, except as noted herein.

4

5              _____

6              LINTON A. MOHAMMED, PhD

7

8     THE STATE OF _____   )

9          Before me, _____, on

10    this day personally appeared LINTON A. MOHAMMED, PhD,

11    known to me (or proved to me under oath or through

12    _____) (description of identity card or other

13    document) to be the person whose name is subscribed to

14    the foregoing instrument and acknowledged to me that

15    they executed same for the purposes and consideration

16    therein expressed.

17          Given under my hand and seal of office on

18    this _____ day of _____, _____.

19

20

21              _____

22              NOTARY PUBLIC IN AND FOR

23              THE STATE OF _____

24              My Commission Expires:_____

25

Appx._390

1   STATE OF TEXAS      )

2                       REPORTER'S CERTIFICATION

3            I, KIMBERLEE SCHROEDER, CSR, RPR, CCRR,

4   Certified Shorthand Reporter for the State of Texas,

5   License No. 10925 and the State of California, License

6   No. 11414, hereby certify that the witness was duly

7   sworn and that this transcript is a true record of the

8   testimony given by the witness.

9            I further certify that I am neither counsel

10  for, related to, nor employed by any of the parties or

11  attorneys in the action in which this proceeding was

12  taken.  Further, I am not a relative or employee of any

13  attorney of record in this cause, nor am I financially

14  or otherwise interested in the outcome of the action.

15           Subscribed and sworn to by me this day, the

16  21st day of May, 2020.

17

18

19

20  _____

21  KIMBERLEE SCHROEDER, CSR, RPR, CCRR
    TX CSR No. 10925 - CA CSR No. 11414

22

23

24

25

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES, MOVE TEXAS CIVIC FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, and AMERICAN GI FORUM OF TEXAS, INC., | § § § § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | No. 5:19-cv-00963 |
| | § | |
| TEXAS SECRETARY OF STATE, TRUDY HANCOCK, IN HER OFFICIAL CAPACITY AS BRAZOS COUNTY ELECTIONS ADMINISTRATOR, AND PERLA LARA IN HER OFFICIAL CAPACITY AS CITY OF MCALLEN, TEXAS SECRETARY, | § § § § § § | |
| *Defendants*. | § | |

## DEFENDANT SECRETARY OF STATE'S NOTICE OF ORAL DEPOSITION OF DR. LINTON A. MOHAMMED

TO:   Dr. Linton A. Mohammed, by and through Plaintiffs' attorneys of record, Hani Mirza, Zachary D. Dolling, Beth Stevens, Ryan Cox, and Chris Rainbolt, Texas Civil Rights Project, 1405 Montopolis Drive, Austin, Texas 78741; and Joanna Suriani, Willkie Farr & Gallagher LLP, 1875 K Street, N.W., Washington, DC 20006.

Defendant Texas Secretary of State will take the videoconference deposition of

Dr. Linton Mohammed pursuant to Federal Rule of Civil Procedure 30. The

deposition will commence on May 4, 2020 at 10:30 AM and be held virtually via Zoom

videoconference and will continue from day to day until completed. The deposition

will be transcribed by a certified court reporter designated by the Defendant Texas

1



Secretary of State, who reserves the right to use the deposition for any purpose permitted under the Federal Rules of Civil Procedure or Federal Rules of Evidence.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Texas Bar No. 24078898
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov

**ATTORNEY FOR DEFENDANT
TEXAS SECRETARY OF STATE**

2

CERTIFICATE OF SERVICE

I certify that that on April 29, 2020 this notice was served upon counsel listed

below via email.

**Hani Mirza**
hani@texascivilrightsproject.org

**Zachary D. Dolling**
zachary@texascivilrightsproject.org

**Rebecca Harrison Stevens**
beth@texascivilrightsproject.org

**Ryan V. Cox**
ryan@texascivilrightsproject.org

**Chris Rainbolt**
chris@texascivilrightsproject.org

**Joanna Suriani**
jsuriani@willkie.com

**Eric Magee**
e.magee@allison-bass.com

**Isaac J. Tawil**
itawil@mcallen.net

**Austin Stevenson**
astevenson@mcallen.net

**C. Robert Heath**
bheath@bickerstaff.com

**Gunnar P. Seaquist**
gseaquist@bickerstaff.com

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Assistant Attorney General

3

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

|  |  |
|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES, MOVE TEXAS CIVIC FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, and AMERICAN GI FORUM OF TEXAS, INC., | |
| Plaintiffs, | Civil Case No. 5:19-cv-00963 |
| v. | |
| TEXAS SECRETARY OF STATE, TRUDY HANCOCK, in her official capacity as BRAZOS COUNTY ELECTIONS ADMINISTRATOR, and PERLA LARA in her official capacity as CITY OF MCALLEN, TEXAS SECRETARY, Defendants. | |

## DECLARATION OF DR. LINTON A. MOHAMMED

LINTON A. MOHAMMED, acting in accordance with 28 U.S.C. § 1746, Federal Rule of Civil Procedure 26(a)(2)(B), and Federal Rules of Evidence 702 and 703, does hereby declare and say:

1.      I am a Forensic Document Examiner ("FDE"), certified by the American Board of Forensic Document Examiners. I have been engaged in this matter on behalf of Plaintiffs Dr. George Richardson, Rosalie Weisfeld, Austin Justice Coalition, Coalition of Texans With Disabilities, Move Texas Civic Fund, League

Exhibit
Dr. Lonton Mohammed
**2**

Appx. 395

of Women Voters of Texas, and American GI Forum of Texas, Inc.,  to opine on the reliability of the procedures and techniques of the Texas signature verification process for mail-in ballot applications and mail-in ballot return envelopes as set forth in Texas elections laws and guidance.

## I.    QUALIFICATIONS

2.      I am a U.S.-certified and internationally recognized FDE, and the focus of my research and professional experience is on handwriting and signature identification and the scientific approach to analyzing questioned signatures. I am, and since 1998 continuously have been, certified by the American Board of Forensic Document Examiners (ABFDE), a certifying board for FDEs in North America. I am also certified in document examination by the Chartered Society of Forensic Sciences (United Kingdom). I specialize in the forensic science of analyzing genuine, disguised, and simulated signatures.

3.      I co-founded and I am currently the principal at Forensic Science Consultants, Inc., where I conduct forensic document examination casework and research on handwriting and signature examination as well as other forensic document examination (e.g., document alterations, obliterations, indented impressions, or pages added or removed). I am also an adjunct professor at Oklahoma State University, where I teach graduate courses on the scientific examination of questioned documents.

Appx.__396

4.      During and prior to my time with Forensic Science Consultants, Inc., and for nearly fourteen years, I worked as Forensic Document Examiner and Senior Document Examiner for the San Diego Sherriff's Department Regional Crime Laboratory. There, I conducted examinations of signatures and handwriting for cases investigated by San Diego County agencies as well as by local police, state, and federal agencies. I also served as Technical Lead of the Questioned Documents Section of the Regional Crime Laboratory, trained investigators and attorneys, provided expert testimony, conducted research, and produced the Questioned Documents Section Quality Manuals. Prior to that, I worked internationally as an FDE at the Laboratory of the Government Chemist (England), the Caribbean Institute of Forensic Investigations Ltd. (West Indies), and the Trinidad and Tobago Forensic Science Center (West Indies). In those roles, I conducted forensic document examinations and testified in criminal and civil cases for multiple police forces and other government agencies.

5.      I am a Fellow of the Questioned Documents Section of the American Academy of Forensic Sciences (AAFS), a member and diplomate of the Chartered Society of Forensic Sciences, and a member of the Canadian Society of Forensic Science. I served as the Chair of the AAFS Questioned Documents Section from 2016 to 2018. I am an appointed member and Vice Chair of the Academy Standards Board, which was formed by the AAFS to develop documentary standards for the

forensic sciences. I served as a member of the National Institute of Standards and Technology's Expert Working Group on Human Facts in Handwriting Examination, the National Institute of Standards and Technology Organization of Scientific Area Committees' Physics/Pattern Interpretation Scientific Area Committee, and the Scientific Working Group on Documents. I have previously served as President, Vice President, Treasurer, and Director of the American Society of Questioned Document Examiners (ASQDE).

6.     I am the editor of the Journal of the American Society of Questioned Document Examiners. I am an editorial review board member of Forensic Science and Technology and I have served on the editorial review board of the Journal of Forensic Sciences. I am also a guest reviewer for the following journals: Forensic Science International, Science & Justice, Australian Journal of Forensic Science, Egyptian Journal of Forensic Sciences, and IEEE Transactions on Cybernetics.

7.     I have published sixteen articles on signature and handwriting examination, and forensic document examination. Many of my articles focus on the analysis of genuine and forged signatures and handwriting examination. I have also given numerous presentations and workshops on signature and document examination worldwide, including the United States, Australia, Brazil, Canada, China, Latvia, Poland, Portugal, Saudi Arabia, Scotland, and Turkey.

Appx._398