# Ballot By Mail Request Form

Registration Address
George Adams Richardson
4070 Sweetwater Dr
College Station, TX 77845

**OFFICE USE ONLY**
Voter ID 1040885456
Precinct:



1040865456

I am over 65 years of age and requesting an **Annual Ballot By Mail** to receive a ballot for all elections in 2018, including any **Democratic Party** elections, local elections, and the November 2018 General Election. Mail my ballots to the address indicated above (unless noted otherwise below).

## SIGNATURE (FIRMA)

*Must be signed. Do not print. If you cannot sign, make a mark and have witness fill out the box to the right.*

I certify that the information given in this application is true, and I understand that giving false information in this application is a crime.

If you are not able to receive ballots at the address where you are registered to vote, the ballot may be mailed to an alternate address. This address may only be one of the following. Check which address you are using:

- ☐ A hospital, nursing home, retirement center or other long-term care facility.
- ☐ The address of a person related to applicant. Relationship: _____
- ☐ Mailing Address listed on applicant's voter registration card.

Mailing Address
George Richardson
4070 Sweetwater Dr
College Station, TX 77845

Address where ballot
should be sent, if different:

_____
_____
_____

**FOR WITNESS (Only if Applicant Cannot Sign):**
If applicant is unable to make mark,
Witness shall check here: ☐
Witness Name _____
Witness Address _____

Relationship to Applicant *(Check One)*
☐ spouse ☐ child ☐ reside at same address as applicant
☐ other: _____
Witness Signature _____
Date _____

If you are unable to sign your name (due to a physical disability or illiteracy), the application may be signed for you by a Witness. You must affix your mark to the application or, if you are unable to make a mark, then the Witness must sign and provide his or her printed name and residence address. Unless the Witness is a close relative of the voter (parent, grandparent, spouse, child or sibling), it is a Class B misdemeanor for a person to witness more than one application in a calendar year.

Appx._449



**TRUDY HANCOCK, REO, CERA**
ELECTIONS ADMINISTRATOR
300 E WM J BRYAN PRKWY,
SUITE 100
BRYAN TX 77803
(979) 361-5770
(979) 361-5779 (Fax)

# BRAZOS COUNTY

November 26, 2018

Mr. George Richardson
4070 Sweetwater Drive
College Station, Texas 77845

RE:    Ballot By Mail

Dear Mr. Richardson:

I saw in The Eagle that you had some concerns of how your ballot by mail was qualified for the November 6 General Election. I understand that you were upset but I want to assure you that we follow the Texas Election Code in the processes of qualifying a ballot that is received in the mail.

The early voting ballot board is comprised of individuals appointed by both parties. A team of two volunteers from opposite parties work together. The team compares the signature on the courier envelope to the signature on the application for ballot by mail to determine if the person that voted and returned the ballot is the same person who requested it. It is up to that team to make the determination if the signatures are similar enough to accept the ballot. This is the procedure that is set up in the Texas Election Code.

I hope this explanation helps ease your confusion and frustration with voting by mail. I have enclosed a copy of your application for ballot by mail and your courier envelope.

If you should have any questions, please feel free to contact me at any time.

Sincerely,

Trudy R. Hancock, REO, CERA
Elections Administrator

Enc.

Appx._450

Instructions: This envelope must be sealed and signed by the voter before it leaves the voter's hands. Do not sign this envelope unless the ballot has been marked by you or at your direction. This carrier envelope may not be used to return more than one voter's ballot. For instructions on the methods and deadlines to deliver this carrier envelope, see the "Information About Returning your Carrier Envelope," included with the materials sent to you with your ballot. (Instrucciones al Votante: Selle este sobre y después firme su nombre en el espacio proporcionado abajo. Este sobre debe de ser sellado y firmado por el votante antes de que el votante lo entregue. No firme este sobre a menos de que la boleta haya sido llenada por usted o bajo su dirección. Este sobre de envío no debe ser utilizado para entregar la boleta de más de un solo votante. Para obtener instrucciones sobre los métodos y plazos para entregar este sobre de envío, vea la "Información Sobre Cómo Devolver su Sobre de Envío," incluido con los materiales enviados a usted con su boleta.)

certify that the enclosed ballot expresses my wishes independent of any dictation or undue persuasion by any person. (Certifico que la boleta adjunta expresa mis deseos dependientemente de ningún dictado o persuasión indebida por parte de cualquier persona.)

| | |
|---|---|
| SEAL ENVELOPE AND SIGN OVER SEALED FLAP<br>(SELLE EL SOBRE Y FIRME ENCIMA DE SOLAPA DEL SOBRE) | X _George A. Richardson_<br>SIGNATURE OR MARK OF VOTER (FIRMA O MARCA DEL VOTANTE) |

structions to Assistant: A voter may only be assisted with reading or marking the ballot if they have a physical disability that renders them unable to write or see, or have an inability read the language in which the ballot is written. If you are assisting the voter, you must read the oath and complete the section below, before assisting the voter. (Instrucciones al sistente: Un votante puede recibir ayuda para leer o llenar la boleta solamente si él o ella tiene una discapacidad física la cual le impide escribir o ver, o si no tiene la habilidad de r el lenguaje en el cual la boleta está escrita. Si usted le proporciona ayuda a un votante, usted debe leer el juramento y llenar la siguiente sección abajo, antes de asistir al tante.)

Oath of Person Assisting Voter: I swear (or affirm) that I will not suggest, by word, sign, or gesture, how the voter should vote; I will confine my assistance to answering the voter's uestions, to stating propositions on the ballot, and to naming candidates and, if listed, their political parties; I will prepare the voter's ballot as the voter directs; and I am not the voter's mployer, an agent of the voter's employer, or an officer or agent of a labor union to which the voter belongs. (Juramento de la Persona Asistiendo al Votante: Juro (o afirmo) que no ugeriré con palabras, señales, o gestos, la manera en la cual el votante debe votar; limitaré mi asistencia a responder las preguntas del votante, leer propuestas en la boleta, nombrar los candidatos, y si es mencionado, su partido político; prepararé la boleta de acuerdo a sus instrucciones; y yo no soy el empleador del votante, un agente del empleador el votante, o un oficial o agente de un sindicato al cual el votante pertenece.)

structions to Witness: You are serving as a witness for _____ (name of voter). You must complete the section below if you witness the rk of the voter, or if the voter cannot make a mark. If the voter cannot make a mark, check here _____. (Instrucciones al Testigo: Usted está fungiendo como testigo para _____ (nombre del votante). Usted debe llenar la siguiente sección abajo si usted fue testigo de que el votante firmó, o de que el votante no ede firmar. Si el votante no puede firmar, marque sus iniciales aquí _____).

structions to Person Depositing Carrier Envelope In Mail or to Common or Contract Carrier: If you are assisting a voter by depositing the carrier envelope in the mail or with a mmon or contract carrier, you must complete the section below. (Instrucciones a la Persona Quien Deposita el Sobre de Envío en el Correo o Entrega al Transportista Público Comercial: Si usted asistirá a un votante a depositar el sobre de envío en el correo o con un transportista público o comercial, usted debe llenar la sección que aparece abajo.)

you are an assistant or witness, check the appropriate box below and provide information: (Si usted es un asistente o testigo, marque la casilla correcta y proporcione su información):

| ☐ Assistant/<br>Asistente<br>☐ Witness/<br>Testigo | Signature (Firma) | Printed Name (Nombre Impreso) | Street Address (Domicilio residencial) |
|---|---|---|---|
| ☐ Assistant/ | | Printed Name (Nombre Impreso) | Street Address (Domicilio residencial) |

L040885456 (BS11)
SOS33.73120     2
RICHARDSON, GEORGE ADAMS
070 SWEETWATER DR
COLLEGE STATION, TX 77845

Nombre de Elección: _____

Date of Election (Fecha de Elección): ___/___/___

The University of Southern Mississippi

# The Aquila Digital Community

Honors Theses                                                        Honors College

Spring 5-2016

# Form-Blindness and Its Implications: A Verification Study

Meredith G. Moody
*University of Southern Mississippi*

Follow this and additional works at: https://aquila.usm.edu/honors_theses

 Part of the Forensic Science and Technology Commons

**Recommended Citation**
Moody, Meredith G., "Form-Blindness and Its Implications: A Verification Study" (2016). *Honors Theses.* 388.
https://aquila.usm.edu/honors_theses/388

This Honors College Thesis is brought to you for free and open access by the Honors College at The Aquila Digital Community. It has been accepted for inclusion in Honors Theses by an authorized administrator of The Aquila Digital Community. For more information, please contact Joshua.Cromwell@usm.edu.

Exhibit
Dr. Lonton Mohammed

**3**

Appx. 452

The University of Southern Mississippi

FORM-BLINDNESS AND ITS IMPLICATIONS: A VERIFICATION STUDY

by

Meredith G. Moody

A Thesis
Submitted to the Honors College of
The University of Southern Mississippi
In Partial Fulfillment
of the Requirements for the Degree of
Bachelor of Science
in the School of Criminal Justice

May 2016

ii

Approved by

_____
Dean Bertram, Ph.D., Thesis Adviser
Professor of Forensic Science
School of Criminal Justice

_____
Lisa Nored, Ph.D., Director
School of Criminal Justice

_____
Ellen Weinauer, Ph.D., Dean
Honors College

iii

Abstract

Form-blindness is not an eye problem. It is a perceptual inability to distinguish the small differences between shapes, colors, and patterns. This research examines this phenomenon by using a previously-established exam to study form-blindness and its implications. Demographic variables such as age, major, GPA, and sex are also looked at to see what potential impact they might have on a person's performance on the exam. The form-blindness tests administered during this study were graded and then analyzed using descriptive statistics and multiple linear regression. In the end, no statistical significance was found for the demographic variables of age, GPA, major, 20/20 vision, LASIK eye surgery, and dyslexia. However, the demographic variables of sex, fingerprint training, and use of medication were found to have statistical significance in the study, meaning that a potential administrator of the test might want to more heavily consider these variables than the other demographic variables when determining whether or not to hire a potential fingerprint examiner.

Keywords: Form-blindness, Latent fingerprints, Perception, Vision, Aptitude

iv

Acknowledgements

I would like to thank my thesis advisor and mentor, Dr. Dean Bertram, for introducing me to this fascinating topic and for guiding me through this process. A big thank you to Ron Smith & Associates for so graciously allowing me to use their form-blindness exam in the pursuit of my research. Thank you to Dr. Joshua Hill for his tremendous help with my statistics and also to Dr. Thomas Panko for his help during the data-collecting process. Thank you to Dr. Lisa Nored and the School of Criminal Justice for their gracious support. Thank you to my family and friends for supporting me and encouraging me in this endeavor. Lastly, thank you God for giving me the grace and strength to do this thesis and to do it well.

v

TABLE OF CONTENTS

LIST OF TABLES ................................................................................................................. vii

CHAPTER 1—PROBLEM STATEMENT ........................................................................1

CHAPTER 2—LITERATURE REVIEW .........................................................................3

CHAPTER 3—METHODOLOGY ...................................................................................10

CHAPTER 4—RESULTS ................................................................................................14

CHAPTER 5—DISCUSSION/CONCLUSION ................................................................18

REFERENCES .................................................................................................................21

APPENDICES

      Appendix A: Approval Letter from Institutional Review Board (IRB)................23

      Appendix B: Approval Letter from Ron Smith and Associates ...........................24

      Appendix C: Consent Form .................................................................................25

      Appendix D: Glossary..........................................................................................27

Appx._458

List of Tables

Table I—Descriptive Statistics ........................................................................................16

Table II—Regression Results ...........................................................................................17

Appx._459

Chapter 1—Problem Statement

Form-blindness is a problem that affects a very small percentage of the population. It is not a sight issue or an eye problem, rather it is a misfiring in the way that a person's brain perceives images and information. Perception is the issue, not sight. Since form-blindness is so rare, the people who have it are often unaware of it because this defect does not hamper day-to-day life. However, if a person has never undergone form-blindness testing or does not realize he or she has a perception problem when applying for latent fingerprint certification, this brain irregularity could pose a problem for both the person and the forensic science laboratory hiring them.

The average person has probably never heard of form-blindness, but he or she would most likely be familiar with perception issues. One example of this is when a car collides with a motorcycle, and the driver of the car claims that they never saw the motorcycle coming before they pulled out onto the road. Another example of a perception issue is a photo of a blue-and-black dress that went viral on the Internet about a year ago, sparking social media hashtags such as #TheDress, #Dressgate, #teamblueandblack, #teamwhiteandgold, and so on and so forth. When presented with the image, many people saw either a blue-and-black dress or a white-and-gold dress. Even though the designer of the much debated frock has released a statement saying that the dress is blue-and-black, there is still much sparring over the dress' actual color. This is not to say that those who see white and gold are wrong in what they see; their brain simply perceived the dress differently than those who see the dress as black and blue.

1

Take this concept, make it extremely rare, and apply it to the world of forensic science and fingerprint analysis, and one can appreciate the problem. For a person with form-blindness, his or her brain cannot tell the minute differences between shapes, color, and patterns but perceives them all as being the same because the person's brain is trying to make the image make sense. It is not that the person knows that they are viewing the image incorrectly; they genuinely believe that what they are seeing is actually correct. So if a latent fingerprint examiner with form-blindness is looking at two fingerprints for comparison, the fingerprints will look uniform. When a person's exoneration or incarceration hangs in the balance, mistakes in identification and comparison cannot be afforded, or there could be very grave consequences.

The purpose of this study is to demonstrate the applicability of form-blindness testing in forensic laboratory arenas by validating a form-blindness exam already being administered. Different variables such as eyesight, training, and age were studied to examine whether or not they have an impact on form-blindness. These variables were also looked at to determine their possible impact on aptitude and how capable of a fingerprint examiner a potential test-taker would be.

Chapter 2—Literature Review

Perception is something that has fascinated philosophers, doctors, and scholars for thousands of years. Plato theorized and reasoned about it, Aristotle observed it through experiments and analysis of the senses, and Galen studied it through dissections of the human body.[1] These men and others sought to understand perception and how it works because it gives an insight into the realm of the human mind, a feat of nature that many scientists seek to understand to this day.  Discerning how perception works is vital [2] because of how it impacts day-to-day life. Without it, trying to make sense of a constantly changing world would result in chaos. [3] In order to adapt and respond to the changes in our environment, we must have something to interpret the information given us and to help guide us.

Perception is a process that all humans possess and make use of. It is "not only a basic psychological process, but also a very powerful one" and allows us to interact with our world. [1] For example, discriminating between colors is a form of perception. This ability may have developed from the need for organisms to be able to tell ripened fruit from unripe fruit, allowing humans to have better-tasting food and the potential capability of applying this skill to other areas for survival.[4] Perception also influences behavior. [1] If a person perceives a change in his or her environment, such as the presence of a possible predator, they will respond accordingly in order to resolve the situation. Perception involves the use of all five senses in order to make sense of the world so that humans can live comfortably in it.

One of the senses involved in perception—and arguably one of the most important—is vision. Visual perception is how "the brain interprets visual information sent to it by the eye."[5] The human eye is the pathway through which brightness, color, details, shapes, and textures can be seen and then perceived.[5] The Greeks and Egyptians believed that "the eyes were not only windows to the world, they were also through which the world was thought to be illuminated!"[1] They recognized the importance of eye sight and the role that it plays in defining the constancy of shapes, colors, etc. in our environment so that our perception of the world is stabilized.[3]

Since science has evolved, the path of an image from the eye to the brain can now be traced. When an image enters the eye, it must go through several orifices to make it to the brain. The iris determines how much light can enter the eye, which can influence how well the image is seen and retained. After this, the cornea, the ocular media, and an elastic lens focus the light coming from the iris and the image coming from the outside world onto the retina.[5] The retina, which is also a part of the brain, acts as the catalyst that starts the analysis of the image focused upon it and sends this information to the higher levels of the brain. It is also the site in which visual perception actually begins.[4] It is at the retina that information about the image—such as color, texture, and size—begins to be extricated by "electrical and chemical synthesizers" to be combined with other sensory information in order to create a visual perception.[5]

Most of the time this process works harmoniously and without issue. However, there are instances where something misfires and causes a problem in perception.  This is where form-blindness presents an issue. It is a disturbance of the pathways from the eyes to the brain that renders a person unable to determine the small differences between

4

shapes, colors, and patterns. Most of the time, a person with form-blindness does not know that he or she has it because it does not impact day-to-day life. It is similar to color blindness in that the person with it becomes so used perceiving the world through such a lens that they adapt and take no notice of it. But this can also make such a problem extremely difficult to uncover. When there is an interruption or derailment in these visual pathways, perception *will* be affected.[6]

In 1885, the author of an article in the Christian Union noted an odd visual phenomenon—there were people who could not tell the difference between shapes, colors, and patterns. The author was amazed at this, for he knew that this anomaly was similar to color blindness yet completely different.[7] Several years later, A.S. Osborn observed a judge who could not tell the difference between pieces of evidence in a forged documents trial. [8] More recently, the case of a student studying to obtain her Ph.D. failing a latent fingerprint course due to having this same problem. [9] The phenomenon occurring in all three cases was later determined to be form-blindness, a problem that had nothing to do with a person's eyesight but with how his or her brain perceived incoming images. It was an interruption of visual pathways that affected perception.

The words *sight* and *vision* are used synonymously yet have two different meanings. Sight can be simply described as an image being viewed by the eye and made as clear as possible.  The term *vision*, however, can be described as the way an individual senses changes in his or her environment via their eyes and responds to these changes accordingly. [10] For example, sight would be when a hiker is walking along a trail and sees a flash of brown movement out of the corner of his eye. Vision would be the hiker's eyes taking this movement in along with remembering the posted warning about grizzly

5

bears and responding to this change in his environment by either preparing to fight the possible threat or flee from it.  When it comes to form-blindness, a person can have perfect eyesight yet still be affected by a vision problem. In the cases of form-blindness described above, the problem did not lie in whether or not any of these people were near-sighted, far-sighted, had perfect eyesight, or were blind. It lay in the fact that their brains were physically not able to process the information being visually presented to them and interpret it correctly.

In the case of an analyst who was examining two latent fingerprints for a possible match, their eyes would see the images and try to clarify them. Then, they would make a judgment about whether or not the two prints were a match based upon what they were seeing. If the analyst had form-blindness, any minute differences would be obscured by his or her brain due to their being unable to respond to a change in the images because the images look identical. These obscurities would make it extremely difficult for the examiner to conduct a proper comparison analysis and would contribute to the analyst ultimately making a decision that could negatively impact his or her career and reflect poorly on the agency that employed them. And it would also make it extremely difficult to meet the certification standards set forth by the International Association for Identification.

In their guidelines for certification as a latent fingerprint examiner, the International Association for Identification lays out several requirements. Before even being eligible to take the certification exam, the hopeful examiner must have a bachelor's degree with two years latent fingerprint analysis experience, an associate's degree with three years latent fingerprint analysis experience, or four years latent fingerprint analysis

experience. After this requirement has been met, the certification requires the successful completion of an exam comprised of three parts: (1) 12 out of 15 prints compared or eliminated, (2) 32 out of 35 prints identified, and (3) 85% true/false, multiple choice, etc. answered correctly. The applicant must also submit to an oral exam or present a case for review in order to qualify as an identification expert. [11]

The applicant must also be able to competently fulfill the duties of a latent fingerprint examiner. One part of being a latent print examiner is being able to analyze fingerprints and determine if the prints are a probable match, not a probable match, or inconclusive. In addition to comparing prints, a latent print examiner must be able to process crime scenes as well as gather and document inked prints.[12] A latent print examiner must also be able to testify in court and explain the analysis of the evidence to a jury in an easy-to-understand manner.

Due to these stringent requirements and standards, one could see how it would be problematic for a forensic laboratory who had invested a great deal of time, money, and resources into someone who would never be able to successfully and aptly complete their job, even if the person was willing and invested in becoming a latent fingerprint examiner. Case in point: a student who was studying to obtain her doctorate in criminal justice was unable to successfully pass a latent fingerprint examination training course due to having form blindness. She was a dedicated student who was diligent in her studies and always present in class but was unable to fully understand and grasp the material.[9] This student would never have been able to fulfill the International Association for Identification certification requirements and, if hired by a forensic laboratory to be a latent fingerprint analyst, would have failed. This scenario, along with

7

others, supports the argument set forth by Dean Bertram et al. that tests such as a form-blindness examination would help to prevent bad investments by law enforcement agencies and also keep potential examiners from feeling as if they have wasted two-plus years of their time, energy, and abilities. [13]

Even though the idea of perception can seem to be only theoretical, it is actually possible to measure it empirically. Noted scholars such as Hermann von Helmholtz developed ways of measuring "color, motion, and depth…experimentally…"[1] Leonard Zusne notes that "humans already seem to use curves, angles, and slopes of lines to identify patterns," an ability which can be tested.[14] There are already assessments in place that test a person's perception of form, tests such as Koh's blocks, perceptual speed, and picture completion. These assessments can be used to "imply or predict form perception as one aspect of intellectual functioning." [14] So it is neither impossible nor impractical to use something such as a form-blindness exam to test a person's perceptual capabilities and potential aptitude (or possible lack thereof) for something like latent fingerprint examination, especially since the stakes can be so high.

While there are those who argue that different forms of therapy can help a person to somewhat overcome form-blindness, more experts are claiming that the chances of overcoming form-blindness in order to successfully complete the job of a latent fingerprint examiner are next to none. When asked about the possibility of perception rehabilitation, ophthalmologist and retired military surgeon Dr. Woody Davis responded, "Either you have it or you don't." [15] Dr. R. Pharr and Dr. W.C. Ashford second this statement by agreeing that perception is not something that can be so easily fixed. [16] Since form-blindness is a perception issue rather than a physical eye problem, it cannot

8

be remedied simply by prescribing new glasses or contacts or by training the eye to make up for what it lacks. It is physically impossible. Due to this defect being permanent in those who possess it, it is vital to test for form-blindness in individuals desiring to be latent fingerprint examiners so that potential employers and employees both do not squander valuable time, efforts, and resources in a wasted endeavor.

9

Chapter 3—Methodology

*Section 3.1—Overview*

The question being asked in this study is, "Are there any demographic variables such as age, major, and sex that indicate how well a person performs on a form-blindness examination?" The purpose of this inquiry is to investigate whether or not form-blindness testing is a viable and helpful tool for forensic science laboratories to employ. It is the hope of this research to demonstrate that using a form-blindness test, such as the one used in this study, as a predictor of performance and aptitude in latent fingerprint analysis would be useful in determining if an applicant should be hired or not.

Permission to use this form-blindness test was granted by its creator, Ron Smith and Associates, and the test is broken into two parts. The first part is generally testing the test taker's ability to distinguish the minute details between shapes, colors, and patterns. It involves exercises such as a curved line test, ranking colors in the same color family from darkest to brightest, and matching images together. The second part is more tailored to latent fingerprint analysis. It involves tasks such as canceling out background noise in order to match one fingerprint to another, matching two fingerprints in the same row, and analyzing a palm print. In addition to the form-blindness test, a piece of paper asking questions about the demographic variables being studied in this research were given to each of the participants; these answers were used to analyze the demographic information.  These demographic variables are age, sex, grade point average (GPA), science or non-science major, eyesight, type of corrective vision, possible fingerprint training, color-blindness, and use of medication. Care will be taken to ensure the privacy

10

of each of the participants by having them put their respective USM identifier instead of their name on the exam.

*Section 3.2—Test Administration and Sample Collection*

Adults ages 18 and over at the University of Southern Mississippi were sought to take part in this study, with there being 79 participants. The participants in this research were part of a convenience sample. In order to get as many participants as possible, the test was administered several times. The form-blindness test was administered on campus and the data collected from the test-taker by the researcher once he or she completed the exam. Consent forms were given to each of the participants and collected by the researcher as well. In addition to the actual test, the demographic variables being studied were collected on a separate sheet of paper attached to the exam. After the test was administered, it was collected—along with the demographic information and consent forms—and everything was stored in a locked cabinet in a secure office until needed for analysis. Once analysis was completed, the paper copies of the exam were destroyed while the electronic data will be kept on file for two years.

Section 3.3—Sample Analysis

Once the test were completely administered and collected, the results were graded and analyzed. They were graded using an answer key provided by the private company that created the form-blindness exam. Each score fell numerically in one of four categories—Poor, Below Average, Average, and Excellent. Poor was 0-69, Below Average was 70-79, Average was 80-89, and Excellent was 90-100. After being graded, the results were analyzed using multiple linear regression.

11

Linear regression is a type of analysis that can be used to predict the impact that one variable (the independent variable) will have on another (the dependent variable), an example of this being how a person's age might impact their score on the form-blindness exam. It is based off of slope of a line—y=mx+b—and uses something similar to a best-fit line. However, with regression, the equation is:

$$y = \alpha + \beta x.$$

Y represents the "predicted score", $\alpha$ represents the "Y intercept or place where the regression line crosses the Y axis," and $\beta$ represents "the slope of the line (slope coefficient)." [17] In the case of multiple variables being analyzed, which is the case in this study, an analysis technique called multiple regression is used.

Multiple linear regression involves predicting the impact of multiple variables (the independent variables) onto another variable (the dependent variable). In this study, the independent variables are the different demographic variables, and the score on the form-blindness exam is the dependent variable. The formula used for multiple linear regression is:

$$Y = \alpha + \beta_1 X_1 + \beta_2 X_2 \,{}_{...}\, \beta_K X_K + e$$

In this instance, y represents the "estimated value of Y," $\alpha$ represents the "y intercept…where the regression line crosses the Y axis," $\beta$ represents the "partial slope coefficient,", and e represents the "residual error term." The subscripts represent the number of variables that are studied in the analysis. [17] The line with the smallest number of residuals (or e) acts as the best-fit line. In addition to analyzing this data using multiple linear regression, descriptive statistics were also used to analyze this data. This type of

Appx.__471

statistics show the frequency at which variables occur and show other statistical variables, such as standard deviation, mean, and range.

Chapter 4—Results

Multiple linear regression was used to analyze this data. The dependent variable was the score on the form-blindness exam. The independent variables were the different demographic values such as age, sex, major, etc. Before the linear regression was started, descriptive statistics were run on the data, as shown in Table I. The highest percentage of test-takers (91.1%) were between 18-22 years old. More women than men took this test. Most test-takers had a GPA between 3.0-4.0 (57%), and there was a higher percentage of science majors that took the test than non-science majors (51.9% and 46.8%, respectively). Most of the people who took this form-blindness exam used some form of corrective vision and did not have perfect eyesight (75%). Most of the people who took this exam also did not have any type of fingerprint training (68.4%). The majority of test-takers did not have dyslexia (94.8%) nor were on any medication (53.2%), and no one reported being color-blind. The highest percentage of test-takers also scored a 79 or below out of 100 (53.2%).

After the descriptive statistics were completed, linear regression was run on the data. The model was statistically significant, as shown in Table II. Age, GPA, major, 20/20 vision, LASIK eye surgery, and dyslexia were not found to have any statistical significance. Sex, fingerprint training, and use of medication, however, were found to have statistical significance. Sex had a statistical significance of p=0.030. A man taking the test did statistically 7.265 points better than a woman taking the form-blindness exam. Fingerprint training had a statistical significance of p=0.002. A person with fingerprint training did statistically 13.356 points better than a person with no fingerprint training on

14

the exam. Use of medication had a statistical significance of p=0.035. A person on medication did statistically 9.296 points better than a person not on medication while taking the test.

The Beta values in this model are standardized coefficients and can be interpreted to indicate which predictors contribute most to the overall model. They are interpreted in terms of their size, relative to one another. The beta values for sex of participant, fingerprint training, and use of medication were 0.263, 0.455, and 0.236, respectively. Fingerprint training was found to have the highest beta value, meaning it was the strongest predictor of scores in the model.

The $R^2$ value for this model was 0.270, and the adjusted $R^2$ value was 0.169. This study provided only a very weak model, meaning that there were things that would explain the variation yet were not being captured in the model.

15

Table I

*Descriptive Statistics*

| Variable | N | Percent | Average | Minimum | Maximum |
|---|---|---|---|---|---|
| Score on Form-Blindness Exam | | | 76.759 | 41 | 99 |
| 0-69 | 21 | 26.6 | | | |
| 70-79 | 21 | 26.6 | | | |
| 80-89 | 16 | 24 | | | |
| 90-100 | 18 | 22.8 | | | |
| Age | 79 | | 20.722 | 18 | 46 |
| GPA | 79 | | 3.1633 | 2.00 | 4.00 |
| Sex | | | | | |
| Female | 51 | 64.6 | | | |
| Male | 28 | 35.4 | | | |
| Major | | | | | |
| Non-Science | 37 | 46.8 | | | |
| Science | 41 | 51.9 | | | |
| Eyesight | | | | | |
| Near-Sighted | 42 | 46.2 | | | |
| Far-Sighted | 9 | 11.5 | | | |
| 20/20 | 28 | 35.9 | | | |
| Corrective Vision | | | | | |
| None | 49 | 62 | | | |
| Contacts | 25 | 31.6 | | | |
| Glasses | 33 | 41.8 | | | |
| LASIK | 1 | 1.3 | | | |
| Other | 0 | 0 | | | |
| Any Fingerprint Training | | | | | |
| No | 54 | 68.4 | | | |
| Yes | 25 | 31.6 | | | |
| Dyslexic | | | | | |
| No | 73 | 94.8 | | | |
| Yes | 4 | 5.2 | | | |
| Color-Blind | | | | | |
| No | 79 | 100 | | | |
| Yes | 0 | 0 | | | |
| On Any Medication | | | | | |
| No | 67 | 87 | | | |
| Yes | 10 | 13 | | | |

16

Table II

*Regression Results*

|  | B | SE | Beta | t |
|---|---|---|---|---|
| Age of Respondent | -0.684 | 14.408 | -0.177 | -1.541 |
| Sex of Respondent | 7.265* | 0.444 | 0.263 | 2.218 |
| GPA of Respondent | 1.989 | 3.275 | 0.084 | 0.71 |
| Major of Respondent | -2.699 | 2.802 | -0.101 | -0.688 |
| 20/20 | -3.455 | 3.922 | -0.123 | -1.072 |
| LASIK | 1.434 | 3.222 | 0.012 | 0.112 |
| Any Type of Fingerprint Training | 13.356** | 4.122 | 0.455 | 3.24 |
| Dyslexic | 2.514 | 6.508 | 0.042 | 0.386 |
| Medication | 9.296* | 4.308 | 0.236 | 2.158 |

n=79, $R^2$=0.270, adj. $R^2$=0.169

*$p<.05$; **$p<.01$; ***$p<.001$

17

Appx._476

Chapter 5—Discussion/Conclusion

The central question being examined in this study was whether or not any of these demographic variables influence how well a person performed on this form-blindness exam. During the course of this research, there was no statistical significance found for the variables of age, GPA, major, 20/20 vision, LASIK corrective eye surgery, and dyslexia. The variables of sex, fingerprint training and use of medication were, however, found to have statistical significance. Sex of participant was found to have a statistical significance of $p=0.030$. Fingerprint training was found to have a statistical significance of $p=0.002$. Use of medication was found to have a statistical significance of $p=0.035$. When looking at the overall performance on the form-blindness exam, there were scores low enough (69 and below) that could indicate either a person was form-blind or that he or she simply would not do well as a latent fingerprint examiner, something that should be kept in mind when screening potential latent print examiners.

The results of the study were interesting. It was not surprising to the researcher that the variables of age, GPA, major, 20/20 vision, LASIK eye surgery, and dyslexia were found to have no statistical significance regarding performance on the form-blindness exam. It, too, was no surprise to the researcher that fingerprint training was statistically significant and contributed the most to performance on the exam. It is logical to presume that a person who has had some sort of fingerprint training would perform better than someone without given that the trained person's brain is wired to analyze details, patterns, and small differences. It was unexpected, however, that the demographic variables of sex and use of medication were statistically significant predictors. While

18

unusual, one could reason that there might be something logical to account for this outcome. Functional processing in men and women, for example, might differ enough to account for this paradox. Concerning the use of medication, it is possible that drugs could cause a person's brain to work faster or focus better, helping them to score better on the form-blindness exam.

There were some limitations to this research. One was that there was a lower number of test-takers and thus a narrower data pool. Only 79 people participated in this research. Another limitation was that some of the variables were very disproportionate. For example, nearly two-thirds (64.6%) of the test-takers were women while an even higher proportion (87%) of people reported no present use of medication. Three, collinearity concerns necessitated the removal of the data concerning contact lens and glasses before producing the final multiple linear regression. Specifically, collinearity is when two variables are perfectly correlated and are not uniquely determined. [180p'] This statistical condition presents a problem in multiple linear regression because the analysis cannot reasonably differentiate between two variables. It is akin to trying to measure the same thing twice. Since the variables are so tightly intertwined, the regression cannot separate the two in order determine if there one variable has statistical significance over another, which is what happened in this case with contact lens and glasses.

Future research could further shed a light on form-blindness and its implications. One possibility could be replicating this study but on a much larger scale. It could also include administering this test again but with more proportionate variables, such as having a more equal ratio of men to women and science majors to non-science majors. Another future study could look at one demographic variable and its impact on

19

performance instead of several. Medication, for example, was shown to have some statistical significance on how high a person scored. Specifically looking at different kinds of medication (such as focus-enhancing drugs or allergy medication) and how they impact a person's score on the form-blindness exam could be helpful in determining why medication plays a possible role in aptitude on the form-blindness examination.

Appx._479

References

1. Swade, N. *Perception and Illusion: Historical Perspectives*. 2005. New York, NY: Springer Science+ Business Media, Inc.

2. Schwab, E., Nusbaum, H. *Pattern Recognition by Humans and Machines* (Volume 2: Visual Perception). 1986. Orlando, FL: Academic Press, Inc.

3. Leibowitz, H. *Visual Perception*. 1965. New York: The MacMillan Company.

4. Schwartz, S. *Visual Perception: A Clinical Orientation* (4th ed.) 2010. China: McGraw-Hill.

5. Padgham, C. A., Saunders, J. E. *The Perception of Light and Colour*. 1975. New York, NY: Academic Press, Inc.

6. Davidoff, J. *Differences in Visual Perception*. 1975. New York, NY: Academic Press, Inc.

7. http://query.nytimes.com/mem/archive-free/pdf?res=990DEFDA1F3BE033A25751C2A9679C94649FD7CF

8. Personal Communication cited in Form-Blindness. Byrd, J., Bertram, D. *J. For. Identification*. 2003, *53* (3), 315-341.

9. Form-Blindness. Byrd, J., Bertram, D. *J. For. Identification*. 2003, *53* (3), 315-341.

10. Leisman, G. *Basic Visual Processes and Learning Disabilities*; Charles C. Thomas: Springfield, IL, 1976.

Appx._480

11. International Association for Identification (IAI) (n.d.) New Latent Print Certification Requirements. Retrieved March 8, 2015, from

   https://www.theiai.org/certifications/certification_manual_20141217.pdf

12. International Association for Identification (IAI) (n.d.) Latent Print Certification: An Introduction. Retrieved April 8, 2016, from

   https://www.theiai.org/certifications/latent_print/intro.php

13. Screening Potential Latent Fingerprint Examiner Trainees: The Viability of Form Blindness Testing. Bertram, D., Carlan, P., Byrd, J., and White, J. *J. For. Identification*. 2010, *60* (4), 460-476.

14. Zusne, L. *Visual Perception of Form*. 1970. New York, NY: Academic Press, Inc.

15. Personal Communication cited in Form-Blindness. Byrd, J., Bertram, D. *J. For. Identification*. 2003, *53* (3), 315-341.

16. Personal Communication cited in Chapter III: Review of Related Literature. *Form Blindness Testing: Assessing the Ability to Perform Latent Print Examination by Traditional versus Nontraditional Students* (Doctoral Dissertation). Bertram, D.J. (2009)

17. Hagan, F. *Research Methods in Criminal Justice.*2006. Boston, MS: Allyn and Bacon.

18. Fox, J. *Applied Regression Analysis and Generalized Linear Models*. 2008. CA: SAGE Publications, Inc.

Appx._481

Appendices

Appendix A: Institutional Review Board (IRB) Approval Letter



**THE UNIVERSITY OF**
**SOUTHERN MISSISSIPPI**

**INSTITUTIONAL REVIEW BOARD**
118 College Drive #5147 | Hattiesburg, MS 39406-0001
Phone: 601.266.5997 | Fax: 601.266.4377 | www.usm.edu/research/institutional.review.board

### NOTICE OF COMMITTEE ACTION

The project has been reviewed by The University of Southern Mississippi Institutional Review Board
in accordance with Federal Drug Administration regulations (21 CFR 26, 111), Department of Health
and Human Services (45 CFR Part 46), and university guidelines to ensure adherence to the following
criteria:

- The risks to subjects are minimized.
- The risks to subjects are reasonable in relation to the anticipated benefits.
- The selection of subjects is equitable.
- Informed consent is adequate and appropriately documented.
- Where appropriate, the research plan makes adequate provisions for monitoring the data
  collected to ensure the safety of the subjects.
- Where appropriate, there are adequate provisions to protect the privacy of subjects and to
  maintain the confidentiality of all data.
- Appropriate additional safeguards have been included to protect vulnerable subjects.
- Any unanticipated, serious, or continuing problems encountered regarding risks to subjects must
  be reported immediately, but not later than 10 days following the event.  This should be reported
  to the IRB Office via the "Adverse Effect Report Form".
- If approved, the maximum period of approval is limited to twelve months.
  Projects that exceed this period must submit an application for renewal or continuation.

PROTOCOL NUMBER: 15091001
PROJECT TITLE:  Form-Blindness and Its Implications: A Verification Study
PROJECT TYPE: New Project
RESEARCHER(S):  Meredith Moody
COLLEGE/DIVISION:  College of Science and Technology
DEPARTMENT: Forensic Science
FUNDING AGENCY/SPONSOR: N/A
IRB COMMITTEE ACTION:  Expedited Review Approval
PERIOD OF APPROVAL: 10/30/2015 to 10/29/2016
**Lawrence A. Hosman, Ph.D.**
**Institutional Review Board**

23

Appendix B: Approval Letter from Ron Smith and Associates



**Headquarters Laboratory**
P.O. Box 670
Collinsville, MS 39325

Office (601) 626-1100
Fax (601) 626-1122

**Ron Smith & Associates, Inc.**
Toll Free: 1-866-832-6772
www.ronsmithandassociates.com

**Florida Laboratory**
8118 118th Avenue North
Largo, FL 33773

Office (727) 544-1816
Fax (727) 546-4086

To Whom It May Concern:

We at Ron Smith & Associates give Meredith Moody the express and official permission for the use of our form-blindness examination to be used in the pursuit of her research for her Honors Thesis.

Sincerely,

Brian Dew, CLPE
Testing Coordinator / Senior Consultant

24

Appendix C: Consent Form



INSTITUTIONAL REVIEW BOARD

## SHORT FORM CONSENT

| SHORT FORM CONSENT PROCEDURES |
|---|
| This document must be completed and signed by each potential research participant before consent is obtained.<br><br>• All potential research participants must be presented with the information detailed in the Oral Procedures before signing the short form consent.<br>• The Project Information section should be completed by the Principal Investigator before submitting this form for IRB approval.<br>• Copies of the signed short form consent should be provided to all participants.<br>• The witness to consent must be someone other than the Principal Investigator or anyone else on the research team.<br><div align="right">Last Edited</div>July 22nd, 2014 |

| Today's date: | | |
|---|---|---|
| **PROJECT INFORMATION** | | |
| Project Title: Form-Blindness and Its Implications: A Verification Study | | |
| Principal Investigator: Meredith Moody | Phone: 601-508-2502 | Email: meredith.moody@eagles.usm.edu |
| College: Science and Technology, Honors College | Department: Forensic Science | |
| **CONSENT TO PARTICIPATE IN RESEARCH** | | |

25

Participant's Name:  _____

Consent is hereby given to participate in this research project. All procedures and/or investigations to be followed and their purpose, including any experimental procedures, were explained. Information was given about all benefits, risks, inconveniences, or discomforts that might be expected.

The opportunity to ask questions regarding the research and procedures was given. Participation in the project is completely voluntary, and participants may withdraw at any time without penalty, prejudice, or loss of benefits. All personal information is strictly confidential, and no names will be disclosed. Any new information that develops during the project will be provided if that information may affect the willingness to continue participation in the project.

Questions concerning the research, at any time during or after the project, should be directed to the Principal Investigator using the contact information provided above. This project and this consent form have been reviewed by the Institutional Review Board, which ensures that research projects involving human subjects follow federal regulations. Any questions or concerns about rights as a research participant should be directed to the Chair of the Institutional Review Board, The University of Southern Mississippi, 118 College Drive #5147, Hattiesburg, MS 39406-0001, (601) 266-5997.

_____        _____

**Research Participant**                              **Witness to Consent**

_____        _____

**Date**                                                       **Date**

26

Appendix D: Glossary

- ❖ <u>Age</u>—how old a person is in years as reported by the test taker

- ❖ <u>Form-blindness</u>—the inability to determine the small differences between shapes, colors, and patterns.

- ❖ <u>Grade Point Average (GPA)</u>—grade based on a 4.0 scale as reported by the test-taker

- ❖ <u>Institutional Review Board</u>—ethical research board that reviews proposed methods in research in order to ensure that no humans are harmed during course of gathering data

- ❖ <u>Latent fingerprint</u>—a fingerprint that was not visible to the naked eye and has been developed and enhanced in order to be seen better

- ❖ <u>Medication</u>—over-the-counter or prescription drugs that were taken for long periods of time; excludes drugs such as Tylenol or Aleve

- ❖ <u>Science</u>—student enrolled in the College of Science and Technology at the University of Southern Mississippi with the exception of the majors of criminal justice, interior design, construction engineering, geography, and geology

- ❖ <u>Training</u>—having taken any form of latent fingerprint examination instruction, such as the course offered in the Department of Forensic Science at the University of Southern Mississippi

- ❖ <u>Vision acuity</u>—how well a person can see as reported by the test taker

Appx._486

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES MOVE TEXAS CIVIC FUND, AND LEAGUE OF WOMEN VOTERS OF TEXAS, <br> *Plaintiffs*, <br><br> v. <br><br> TEXAS SECRETARY OF STATE, TRUDY HANCOCK IN HER OFFICIAL CAPACITY AS BRAZOS COUNTY ELECTIONS ADMINISTRATOR, AND PERLA LARA IN HER OFFICIAL CAPACITY AS CITY OF MCALLEN, TEXAS SECRETARY, <br> *Defendants*. | § § § § § § § § § § § § § § § § § | No. 5:19-cv-00963 |

**DEFENDANT SECRETARY OF STATE'S MOTION FOR SUMMARY JUDGMENT**

**Tab 8**

**Brian Keith Ingram**

RICHARDSON: BRIAN KEITH INGRAM

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

```
 1    UNITED STATES DISTRICT COURT
         WESTERN DISTRICT OF TEXAS
 2          SAN ANTONIO DIVISION

 3   DR. GEORGE RICHARDSON;          )
     ROSALIE WEISFELD; AUSTIN JUSTICE )
 4   COALITION; COALITION OF TEXANS   )
     WITH DISABILITIES; MOVE TEXAS    )
 5   CIVIC FUND; LEAGUE OF WOMEN      )
     VOTERS OF TEXAS; and AMERICAN GI )
 6   FORUM OF TEXAS, INC.,           )
                                     )
 7          Plaintiffs,             )
                                     )Civil Case No.
 8   v.                              )5:19-cv-00963-OLG
                                     )
 9   TEXAS SECRETARY OF STATE; TRUDY )
     HANCOCK, in her official        )
10   capacity as BRAZOS COUNTY       )
     ELECTIONS ADMINISTRATOR; and    )
11   PERLA LARA, in her official     )
     capacity as CITY OF McALLEN,    )
12   TEXAS, SECRETARY,               )
                                     )
13          Defendants.             )

14        ********************************
            REMOTE VIDEOTAPED DEPOSITION OF
15              BRIAN KEITH INGRAM
                  May 11, 2020
16        ********************************

17        REMOTE VIDEOTAPED DEPOSITION OF BRIAN KEITH

18    INGRAM, produced as a witness at the instance of

19    the Plaintiffs, and duly sworn, was taken in the

20    above-styled and numbered cause on May 11, 2020,

21    from 9:32 a.m. to 12:38 p.m., remotely before

22    Rebecca A. Graziano, CSR, RPR, CRR, in and for the

23    State of Texas, reported by machine shorthand,

24    pursuant to the Federal Rules of Civil Procedure

25    and the provisions stated on the record.
```

**CERTIFIED TRANSCRIPT**

RICHARDSON: BRIAN KEITH INGRAM

Page 50

```
 1   those, then the ballot is accepted.
 2    Q      Is there any training -- so you mentioned
 3   that they can -- that the types of signatures that
 4   they are supposed to compare -- or the
 5   signatures -- the documents with the signatures
 6   that they're supposed to compare.  Can you -- do
 7   you know of any standards that SOS recommends or
 8   how those signatures should be compared?
 9    A      Our standard is could they have been made
10   by the same person.
11    Q      Okay.  And what kind of -- did -- what
12   kind of recommendation -- let me rephrase that.
13              Does SOS help local -- the EVBB
14   members or SVC members -- scratch that.
15              Are there any guidelines on how to
16   determine whether a signature was signed by the
17   same person or not, that the SOS provides?
18    A      So it is at the discretion of the
19   committee members to use their best judgment and
20   to verify that the signatures are made by the same
21   person.  The committee members must use their best
22   judgment if the signatures match, and they can
23   look at other signatures on file from the same
24   voter in the past six years, either from other
25   applications and carrier envelopes or voter
```

Page 109

```
 1                 UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3   DR. GEORGE RICHARDSON;          )
     ROSALIE WEISFELD; AUSTIN JUSTICE )
 4   COALITION; COALITION OF TEXANS   )
     WITH DISABILITIES; MOVE TEXAS    )
 5   CIVIC FUND; LEAGUE OF WOMEN      )
     VOTERS OF TEXAS; and AMERICAN GI )
 6   FORUM OF TEXAS, INC.,            )
                                      )
 7           Plaintiffs,              )
                                      )Civil Case No.
 8   v.                               )5:19-cv-00963-OLG
                                      )
 9   TEXAS SECRETARY OF STATE; TRUDY  )
     HANCOCK, in her official         )
10   capacity as BRAZOS COUNTY        )
     ELECTIONS ADMINISTRATOR; and     )
11   PERLA LARA, in her official      )
     capacity as CITY OF McALLEN,     )
12   TEXAS, SECRETARY,                )
                                      )
13           Defendants.             )

14

15                  REPORTER'S CERTIFICATION
                REMOTE VIDEOTAPED DEPOSITION OF
16                    BRIAN KEITH INGRAM
                        May 11, 2020

17           I, Rebecca A. Graziano, Certified Shorthand

18     Reporter in and for the State of Texas, hereby

19     certify to the following:

20           That the witness, BRIAN KEITH INGRAM, was

21     duly sworn and that the transcript of the oral

22     deposition is a true record of the testimony given

23     by the witness;

24           I further certify that pursuant to FRCP Rule

25     30(f)(1) that the signature of the deponent:
```



1      ____ was requested by the deponent or a

2   party before the completion of the deposition and

3   returned within 30 days from date of receipt of

4   the transcript.  If returned, the attached Changes

5   and Signature Page contains any changes and the

6   reasons therefor.

7      _X_ was not requested by the deponent or a

8   party before the completion of the deposition.

9      I further certify that I am neither attorney

10  nor counsel for, related to, nor employed by any

11  of the parties to the action in which this

12  testimony was taken.

13     Further, I am not a relative or employee of

14  any attorney of record in this cause, nor do I

15  have a financial interest in the action.

16     Subscribed and sworn to on this _26 day of

17  _MAY_____, 2020.

18

19

20

21  _____

    Rebecca A. Graziano, CSR, RPR, CRR
22  Texas CSR No. 9306
    Expiration Date:  07/31/22
23  Dallas 69

24

25

| From: | Elections Internet |
|---|---|
| To: | Elections Internet |
| Subject: | MASS EMAIL ADVISORY (CC/EA- 660)- 2020-07 - Ballot By Mail Reminders |
| Date: | Wednesday, February 12, 2020 8:11:22 AM |
| Attachments: | image001.png |
| | ADV2020-07 - Ballot by Mail Reminders.pdf |
| | 5-42 - Notice of Rejected Ballot (rev02.2020).pdf |
| Sensitivity: | Personal |

Dear Election Officials,

Our office has issued Advisory 2020-07 – Ballot by Mail Reminders. In addition to this advisory, we have also released a revised version of our Notice of Rejected Ballot. Both the advisory and the revised form have been posted to our website. I've also attached them to this email for your convenience.

This advisory and other resources are located on our Conducting Elections pages.

**Christina Worrell Adkins**

Legal Director – Elections Division

Office of the Texas Secretary of State

1019 Brazos Street | Rudder Building, 2nd Floor | Austin, Texas 78701

1.800.252.VOTE (8683)

elections@sos.texas.gov | www.sos.texas.gov

**For Voter Related Information, please visit:**



*The information contained in this email is intended to provide advice and assistance in election matters per §31.004 of the Texas Election Code. It is not intended to serve as a legal opinion for any matter. Please review the law yourself, and consult with an attorney when your legal rights are involved.*

EXHIBIT

Ingram 6

exhibitsticker.com

# The State of Texas



Elections Division
P.O. Box 12060
Austin, Texas 78711-2060
www.sos.texas.gov

Phone: 512-463-5650
Fax: 512-475-2811
Dial 7-1-1 For Relay Services
(800) 252-VOTE (8683)

**Ruth R. Hughs**
Secretary of State

## ELECTION ADVISORY
## No. 2020-07

**TO:**      County Clerks/Elections Administrators

**FROM:**   Keith Ingram, Director of Elections

**DATE:**   February 11, 2020

**RE:**      Ballot by Mail Reminders

---

The purpose of this advisory is to remind county election officials of certain steps that must be taken with respect to the processing and rejection of mail ballots.

**Timing of Processing Mail Ballots**

Pursuant to Section 87.0241 of the Texas Election Code, the early voting ballot board may determine whether to accept early voting ballots voted by mail at any time after the ballots are delivered to the board. (Sec. 87.0241(a)). The early voting ballot board may begin to count early voting ballots (1) when the polls open on election day; or (2) at the end of the early voting period, in the case of an election conducted by an authority of a county with a population of 100,000 or more or an election conducted jointly with such a county. (Sec. 87.0241(b)).

**Notice of Rejected Ballot**

Section 87.0431 of the Texas Election Code outlines certain requirements for providing a voter with notice of a rejected mail ballot. If the early voting ballot board rejects a voter's ballot, the presiding judge of the early voting ballot board must notify the voter in writing of the reason for the rejection. This notice must be sent to the voter, at the residence address listed on the ballot by mail application, no later than the 10th day after election day. However, **our office recommends mailing notices of rejected ballots to affected voters as soon as possible**. For voters who requested a mail ballot with a Federal Postcard Application (FPCA), and receive their balloting materials via e-mail, the presiding judge shall also provide notice of the rejected ballot to the e-mail address to which the ballot was sent.

In accordance with Section 87.0431, the Secretary of State has prescribed a form for this purpose (Notice of Rejected Ballot, AW5-42). We are issuing a revised version of the Notice of Rejected Ballot along with this advisory. The revised notice includes an additional sentence advising the voter: "If you believe that your mail ballot was rejected in error, please contact your early voting clerk to determine what remedies may be available to you."

Page 2

**Resolution of Incorrect Determination by Early Voting Ballot Board**

As a reminder, if a county election officer determines that a ballot was incorrectly rejected or accepted by the early voting ballot board before the time set for convening the canvassing authority, the county election officer may petition a district court for injunctive or other relief as the court determines appropriate.  (Sec. 87.127(a)).

In an election ordered by the governor or the county judge, the county election officer must confer with and establish the agreement of the county chair of each political party before petitioning the district court. (Sec. 87.127(b)).

Please contact us at 1-800-252-VOTE (8683) or at elections@sos.texas.gov if you have any questions.

KI:CA

SOS-5
Prescribed by Secretary of State
Sec. 87.0431, Texas Election Code
2/2020

## NOTICE OF REJECTED BALLOT

This is to serve as notice that your ballot for the _____Election was rejected by the early voting ballot board and was not counted.  If you believe that your mail ballot was rejected in error, please contact your early voting clerk to determine what remedies may be available to you.

Name of Voter _____

VUID Number_____

Reason for Rejection: (Check As Appropriate)

_____   1)   Certificate on carrier envelope was not properly executed.
_____ You failed to sign your signature or make your mark.
_____ The witness failed to indicate on the envelope that you could not make a mark.
_____ The assistant or witness failed to print their name.
_____ The assistant or witness failed to sign their name.
_____ The residence address of the assistant or witness was not given.

_____   2)   It was determined that the signature on the application for ballot by mail and carrier envelope was not signed by the same person.

_____   3)   Application for ballot by mail did not state a legal ground for voting by mail.

_____   4)   Voter registration records indicated you did not have an effective registration for this election.

_____   5)   Address to which ballot was mailed was not outside the county.  Voting early by mail due to expected absence from the county requires balloting materials be mailed to an address outside the county.

_____   6)   The residence address on the statement of residence is not located in the political subdivision conducting the election.

_____   7)   The mailing address on the application for ballot by mail did not match your voter registration address nor did the mailing address match any addresses provided on your statement of residence.  Since you did not indicate on your application for a ballot by mail that you were having your ballot mailed to a hospital, retirement center, long term care facility, nursing home, jail, or a relative, your ballot was rejected.

_____   8)   The statement of residence was not included in the carrier envelope.

_____   9)   No identification was included with your mail ballot.

_____   10)   Other:_____

_____
Signature of Early Voting Ballot Board Judge


_____
Date

SOS 5-15
Requerido por la Secretaría de Estado
Sección 87.0431, Código Electoral de Texas
2/2020

## AVISO DE BOLETA RECHAZADA

Esto sirve como aviso de que su boleta para la Elección _____ fue rechazada por la Junta de Votación Anticipada y no fue contada. Si cree que su boleta por correo fue rechazada por error, comuníquese con su secretario de votación anticipada para determinar qué remedios pueden estar disponibles para usted.

Nombre del votante _____

VUID (número único de identificación de votante) _____

La razón del rechazo fue (a continuación indique las razones):

_____    1)    La constancia que aparece en el sobre de envío no se ejecutó en forma apropiada.
               _____ Le falta su firma o marca.
               _____ El testigo no anotó en el sobre que Ud. no podía hacer su marca.
               _____ El asistente o testigo no imprimió su nombre.
               _____ El asistente o testigo no firmó su nombre.
               _____ No se dio la dirección de residencia del asistente o testigo.

_____    2)    Se determinó que la firma en la solicitud de boleta postal y el sobre de envío no estaba firmada por la misma persona.

_____    3)    La solicitud de boleta postal no estableció un fundamento legal para votar por correo.

_____    4)    Las actas del registro electoral indican que en la fecha en que celebraron estas elecciones, usted no estaba inscrito como votante.

_____    5)    La dirección a la cual se envió la boleta no está ubicada fuera de este condado. Votar por anticipado por correo debido a la ausencia esperada del condado requiere que los materiales de votación sean enviados por correo a una dirección fuera del condado.

_____    6)    La dirección de residencia indicada en la declaración de residencia no se encuentra en la subdivisión política que lleva a cabo la elección.

_____    7)    La dirección postal indicada en la solicitud de boleta postal no coincidía con su dirección de registro de votante ni con la dirección postal incluida en su declaración de residencia. Dado que no indicó en su solicitud de boleta postal que estaba teniendo su boleta enviada por correo a un hospital, centro de jubilación, centro de cuidado a largo plazo, hogar de ancianos, cárcel o un pariente, su boleta fue rechazada.

_____    8)    La declaración de residencia no vino incluida en el sobre de envío.

_____    9)    No incluyó ninguna identificación con su boleta por correo.

_____    10)    Otra: _____

_____
Firma del Juez de la Junta de Votación Anticipada

_____
Fecha