UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES, MOVE TEXAS CIVIC FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, and AMERICAN GI FORUM OF TEXAS, INC., | § § § § § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Civil Case No. 5:19-cv-00963-OLG |
| TEXAS SECRETARY OF STATE, TRUDY HANCOCK, in her official capacity as BRAZOS COUNTY ELECTIONS ADMINISTRATOR, and PERLA LARA in her official capacity as CITY OF MCALLEN, TEXAS SECRETARY, | § § § § § § § | |
| *Defendants*. | § § | |

**PLAINTIFFS' COMBINED RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

I. PLAINTIFFS HAVE STANDING AS TO DEFENDANT SOS AND DEFENDANT
SOS IS A PROPER PARTY IN THIS CASE .................................................................... 2

   A.  Organizational Plaintiffs Have Suffered an Injury-In-Fact ........................................ 3

   B.  Plaintiffs Satisfy Causation and Redressability Requirements as to Defendant SOS .... 13

   C.  Sovereign Immunity Does Not Bar Plaintiffs' Claims Against Defendant SOS .......... 14

   D.  Organizational Plaintiffs Have Standing Under 42 U.S.C. § 1983 to Assert Their
       Constitutional Claims ............................................................................................... 18

II. PLAINTIFFS HAVE STANDING AS TO LOCAL DEFENDANTS AND LOCAL
DEFENDANTS ARE PROPER PARTIES IN THIS CASE ............................................... 19

   A.  Plaintiffs Each Have Article III Standing Against Local Defendants ........................... 19

       1.  Individual Plaintiffs ............................................................................................ 19

           a.  Dr. Richardson ............................................................................................. 19

           b.  Rosalie Weisfeld .......................................................................................... 22

       2.  Organizational Plaintiffs ..................................................................................... 23

   B.  Local Defendants' Remaining Arguments .................................................................. 26

       1.  Adherence to the Texas Election Code Does Not Absolve Defendants of
           Responsibility .................................................................................................... 26

       2.  Local Defendants Can Provide the Relief Requested .......................................... 29

III. ASSOCIATIONAL PLAINTIFFS HAVE STANDING AS TO ALL DEFENDANTS .. 29

IV. DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE
MERITS OF PLAINTIFFS' CONSTITUTIONAL AND ADA AND RA CLAIMS .......... 33

   A. Plaintiffs—Not Defendants—Are Entitled To Summary Judgment on the Merits of
      Plaintiffs' Constitutional Claims ................................................................................ 33

       1.  The *Mathews* Test, and Not *Anderson-Burdick*, Applies to Plaintiffs' Procedural
           Due Process Claims ........................................................................................... 34

       2.  Plaintiffs Satisfy the *Mathews* Test for Their Procedural Due Process Claims ......... 36

       3.  Defendant SOS Is Not Entitled To Summary Judgment on Plaintiffs' Equal
           Protection Claims ............................................................................................... 39

           a.  Plaintiffs' Claims Succeed Under *Anderson-Burdick* ................................... 41

           b.  The Severe Burden Imposed by Texas's Signature Comparison Procedure is the
               Right to Vote, Not the Requirement that Mail-In Voters Sign Ballot
               Applications and Carrier Envelopes .............................................................. 42

           c.  Texas's Interests Do Not Justify the Severe Burden Placed on Mail-In Voters'
               Fundamental Right to Vote ............................................................................ 45

   B. Neither of Defendant SOS's Purported Accommodations Constitute Reasonable
      Accommodations Under the ADA and RA .................................................................. 47

CONCLUSION ..................................................................................................................................49

# TABLE OF AUTHORITIES

**Cases**

*Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507 (5th Cir. 2017) ................................................................................................................................. 14

*Alexander v. Choate*, 469 U.S. 287 (1985) ................................................................. 49

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ............................................. 34, 42, 45

*Ass'n of Cmty Orgs. for Reform Now v. Fowler*, 178 F.3d 350 (5th Cir. 1999) ................ 3, 11, 12

*Ballas v. Symm*, 351 F. Supp. 876 (S.D. Tex. 1972), *aff'd*, 494 F.2d 1167 (5th Cir. 1974) ......... 17

*Biener v. Calio*, 361 F.3d 206 (3d Cir. 2004) .............................................................. 35

*Burdick v. Takushi*, 504 U.S. 428 (1992) ..................................................... 34, 42, 45

*Bush v. Gore,* 531 U.S. 98 (2000) ............................................................................... 40

*Church of Scientology of California v. Cazares*, 638 F.2d 1272 (5th Cir. 1981) ......... 18

*City of Austin v. Paxton*, 943 F.3d 993 (5th Cir. 2019) ........................................ 14, 15

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ....................................... 43

*Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007) ...................... 2, 12

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) ............................... passim

*Democratic Executive Comm. of Florida v. Lee*, 915 F.3d 1312 (11th Cir. 2019) .......... 15, 43, 46

*Dubox v. Twp. of Green Oak,* 406 F. App'x 983 (6th Cir. 2011) ................................ 43

*Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214 (1989) ................... 35

*Fair Elections Ohio v. Husted, 770* F.3d 456 (6th Cir. 2014) .................................... 10

*Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153 (11th Cir. 2008) ............... 12

*Florida Democratic Party v. Detzner*, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016) ...... 17, 43, 46

*Friends of the Earth, Inc. v. Chevron Chemical Co.,* 129 F.3d 826 (5th Cir. 1997) ................ 31

*Gill v. Whitford,* 138 S. Ct. 1916 (2018) .................................................................... 10

*Grizzle v. Kemp*, 634 F.3d 1314 (11th Cir. 2011) ...................................................... 16

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) .......................................... 3, 12

*Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003) ........................................... 49

*Herrell v. Benson,* 261 F.Supp.3d 772 (E.D. Ky. 2017) .............................................. 44

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977) ............... 18, 30

*K.P. v. LeBlanc*, 627 F.3d 115 (5th Cir. 2010) .......................................................... 14

*League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224 (4th Cir. 2014) ... 43

*League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008)................... 16, 19, 31

*Lemons v. Bradbury,* 538 F.3d 1098 (9th Cir. 2008).................................................... 47

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ..................................................... 3

*Martin v. Kemp*, 341 F.Supp.3d 1326 (N.D. Ga. 2018)................................. 9, 12, 17, 35

*Mathews v. Eldridge*, 424 U.S. 319 (1976)........................................................... 34, 36

*Mays v. LaRose*, 951 F.3d 775 (6th Cir. 2020) ........................................................... 35

*McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802 (1969) ..................... 35, 36

*Michigan State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342 (6th Cir. 2018)............ 35

*Morris v. Livingston*, 739 F.3d 740 (5th Cir. 2014)...................................................... 15

*N.A.A.C.P. v. City of Kyle,* 636 F.3d 233 (5th Cir. 2010)............................................ 11

*Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494 (4th Cir. 2016) .............................. 49

*National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012)........................................................ 31, 32, 33

*OCA-Greater Houston v. Texas*, 1:15-CV-00679-RP, 2016 WL 9651777 (W.D. Tex. Aug. 12, 2016)........................................................................................................... 15, 16

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017)............................. passim

*Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc) .................................. 14, 15

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ..................................................................... 35

*Sandusky Co. Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004) .............. 32

*Santana v. City of Tulsa*, 359 F.3d 1241 (10th Cir. 2004)........................................... 43

*Saucedo v. Gardner,* 335 F. Supp. 3d 202 (D. N.H. 2018)......................................... 35

*Scott v. Schedler*, 771 F.3d 831 (5th Cir. 2014).......................................................... 10

*Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020)................... 14, 15, 35

*Texas Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir.2006)............................... 2

*Texas Indep. Party v. Kirk*, 84 F.3d 178 (5th Cir. 1996) ............................................ 35

*Tiller v. Martinez*, 974 S.W.2d 769 (Tex.App.-San Antonio 1998, pet. dism'd w.o.j.)............... 37

*United States v. State of Texas*, 445 F. Supp. 1245 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979)........................................................................ 17

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669 (1973) ..................................................................................................................... 3

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016)......................................................... 35

*Zessar v. Helander*, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006) ............................... 35

**State Statutes**

Fla. Stat. § 97.012 ................................................................................................ 16

Tex. Elec. Code § 1.011(a) .................................................................................... 48

Tex. Elec. Code § 31.001(a) ........................................................................... 14, 15

Tex. Elec. Code § 31.003 ....................................................................................... 14

Tex. Elec. Code § 31.091(1) ................................................................................... 37

Tex. Elec. Code § 61.033 ....................................................................................... 13

Tex. Elec. Code § 87.041(b)(2) .............................................................................. 21

Tex. Elec. Code § 87.0431 ..................................................................................... 45

Tex. Elec. Code § 87.127(a) ............................................................................ 23, 37

Tex. Elec. Code §§ 87.041(e)-(f) ........................................................................... 41

**Federal Statutes**

42 U.S.C. § 1983 .................................................................................................... 18

**Other Authorities**

Schwartz, Section 1983 Litigation: Claims and Defenses § 201[C][3] (2020-1 Supp.)............... 18

## INTRODUCTION

As explained in detail in Plaintiffs' Motion for Summary Judgment, Texas's arbitrary signature comparison procedure disenfranchises thousands of voters every election. Because no meaningful pre-rejection notice or opportunity to cure is provided to mail-in voters, those whose ballots are improperly rejected for signature mismatch suffer the severe burden of disenfranchisement without any recourse to challenge the rejection. Further, due to the COVID-19 pandemic, election officials are already seeing a spike in voting by mail, which means the upcoming November General Election will subject more voters than ever before to an unlawful signature comparison procedure if the status quo remains. Thus, this issue must be resolved as quickly as possible to avoid the continued—and increased, given the uptick in vote by mail numbers—violation of voting rights.

Defendants Texas Secretary of State ("SOS"), Trudy Hancock, in her official capacity as Brazos County Elections Administrator ("Brazos County EA"), and Perla Lara, in her official capacity as City of McAllen, Texas Secretary ("McAllen City Secretary") continue to insist that they and Plaintiffs are not the proper parties to this action. But Plaintiffs include individuals whose mail-in ballots were erroneously discarded under Texas's signature comparison procedure and a diverse collection of organizations that expend resources combatting this unconstitutional system and/or whose members include mail-in voters, while Defendants are responsible for administering mail-in voting in their respective jurisdictions. If the parties to this action are improper, then there is no plaintiff capable of challenging Texas's signature comparison procedure, and there is no defendant capable of providing redress for mail-in voters. This is not the law.

Each Defendant's Motion for Summary Judgment mostly recycles the same legal arguments made a year ago in their respective Motions to Dismiss. This Court rejected these legal

arguments then, and Defendants advance no reason—or evidence—why the Court should not reject them again on summary judgment. As described below, the record and applicable law show that Plaintiffs have standing to bring their claims, Defendants are proper parties in this case, and the signature comparison procedure enshrined in Texas law violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution, the Americans with Disabilities Act of 1990 ("ADA"), and the Rehabilitation Act of 1973 ("RA"). Accordingly, the legal analysis previously conducted by this Court remains strongly persuasive. Additionally, all parties believe this lawsuit can be resolved on summary judgment without the need for further factual development. For these reasons and as set out below, each Defendant's Motion for Summary Judgment should be denied.

## I.   PLAINTIFFS HAVE STANDING AS TO DEFENDANT SOS AND DEFENDANT SOS IS A PROPER PARTY IN THIS CASE

Defendant SOS incorrectly claims in her Motion for Summary Judgment that Organizational Plaintiffs have not suffered an injury-in-fact and do not have statutory standing to bring their claims, Associational Plaintiffs do not have standing to bring claims on behalf of their members, and Plaintiffs' claims are not caused or redressable by Defendant SOS. Defendant SOS also argues that the *Ex parte Young* sovereign immunity exception does not apply in this case. As explained in this section and Section III, all these arguments are unavailing and Plaintiffs have standing to bring their claims against Defendant SOS.[1]

---

[1] When "[o]nly injunctive relief is sought . . . only one plaintiff with standing is required." *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (citing *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 585–86 (5th Cir.2006)) (other citations omitted).

### A. Organizational Plaintiffs Have Suffered an Injury-In-Fact

"[T]he injury in fact requirement under Article III is qualitative, not quantitative, in nature." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017) (citing *Ass'n of Cmty Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 357–58 (5th Cir. 1999)) (internal quotation marks and brackets omitted). So while an injury-in-fact must be (a) concrete and particularized and (b) "actual or imminent, not conjectural or hypothetical," *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted), "it need not measure more than an 'identifiable trifle.'" *OCA-Greater Houston*, 867 F.3d at 612 (quoting *Fowler*, 178 F.3d at 358); *see United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) (noting that the Court has upheld standing where plaintiffs have "no more at stake in the outcome of an action than a fraction of a vote, . . . a $5 fine and costs, . . . and a $1.50 poll tax") (citations omitted).

Applying this understanding in the context of organizational standing, the Fifth Circuit has explained that "an organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices." *Fowler*, 178 F.3d at 360. If a defendant's actions perceptibly impair an organization in such a way, "there can be no question that the organization has suffered injury in fact." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Thus, in *OCA-Greater Houston*, the Fifth Circuit held that an advocacy organization—the Organization for Chinese Americans ("OCA")—had standing to challenge a Texas law restricting the "interpretation assistance that English-limited voters may receive." 867 F.3d at 606, 612. The court held that the organization had suffered an injury-in-fact, even though the "injury was not large," because the Texas statute at issue "'perceptibly impaired' [the organization's] ability to

3

'get out the vote'" when the organization "went out of its way to counteract the effect of Texas's allegedly unlawful" statute by "educat[ing] voters" on how to avoid being negatively impacted by the statute. *Id.* at 612.

Like the organizational plaintiffs in *OCA-Greater Houston*, Plaintiffs Austin Justice Coalition ("AJC"), MOVE Texas Civic Fund ("MOVE"), Coalition of Texans with Disabilities ("CTD"), and the League of Women Voters of Texas ("LWV") have standing to challenge Defendant SOS's actions. Each Organizational Plaintiff's mission and initiatives are frustrated by Texas's signature comparison procedure and its lack of procedural safeguards for voters. These Plaintiffs also do not merely engage in "voter-related activity," but have specifically gone "out of [their] way to counteract Texas's allegedly unlawful [mail-in ballot process]," *id.*, by diverting resources from their traditional activities toward warning, instructing, and guiding voters to write out their signatures neatly, clearly, or legibly, and/or have signatures match each other as much as possible in order to reduce the chance of improper rejection.

AJC is a non-partisan, non-profit organization "dedicated to serving people who are historically and systematically impacted by gentrification, segregation, over policing, a lack of educational and employment opportunities, and other institutional forms of racism in Austin."[2] As part of this mission, AJC operates Project Orange, a coordinated campaign to enter the Travis County Jail, register eligible voters, and guide them in requesting and submitting mail-in ballots.[3] AJC's Project Orange mission is to ensure that eligible voters are able to vote, despite their present confinement in county jails.[4] AJC's mission is frustrated by state laws that result in the improper

---

[2] Ex. 35, Rodionov Dec. ¶ 3 (internal quotation marks omitted); Ex. 34, AJC 30(b)(6) Dep. 25:11–20 ("AJC is a black-led organization that serves the black and brown populations of Austin, Texas, in helping them liberate themselves from the systemic racism in our society.").
[3] Ex. 35, Rodionov Dec. ¶ 4, 6–9; Ex. 34, AJC 30(b)(6) Dep. 43:14–46:23.
[4] Ex. 35, Rodionov Dec. ¶¶ 4, 6–9; Ex. 34, AJC 30(b)(6) Dep. 43:14–46:23.

rejection of an inmate voter's mail-in ballot, which undermine the very means of empowerment—voting—championed by Project Orange.[5] AJC, through its representatives, expends resources by educating inmate voters on how to fill out the Application for Ballot by Mail ("ABBM") and carrier envelope section by section and, in order to reduce the chance of improper rejection, instructs each inmate voter to write out their signature neatly and legibly.[6]

CTD is a non-partisan, non-profit membership organization that works to ensure that people with disabilities may "live, work, learn, play, and participate fully in the community of their choice."[7] CTD organizes events about, advocates around, and educates the public on subjects such as accessible voting, civil rights, and new state level initiatives with the potential to affect the disability community.[8] Depending on the election, CTD informs voters statewide about their ability to cast a mail-in ballot, explains the rules and deadlines related to mail-in ballots, and encourages voters who are eligible to utilize mail-in ballots if they cannot vote in-person.[9] Persons with disabilities are especially likely to have variations in signatures due their disability.[10] As a result, CTD's mission is frustrated by state laws that result in the improper rejection of mail-in

---

[5] Ex. 35, Rodionov Dec. ¶¶ 11–12.

[6] Ex. 35, Rodionov Dec. ¶ 9; Ex. 34, AJC 30(b)(6) Dep. 44:11–14, 45:25–46:23, 61:1–62:14; Ex. 36 (Project Orange reminder sheet for volunteers carrying out vote by mail drives at jail, to ensure that volunteers instruct inmates to print and sign legibly so the county can read their signature).

[7] Ex. 37, CTD 30(b)(6) Dep. 25:9–26:21; Exs. 44, 45; Ex. 74, Bearden Dec. ¶ 2.

[8] Ex. 37, CTD 30(b)(6) Dep. 34:5–35:22, 37:9–39:21, 71:4–72:25 (discussing legislative development and community organizing conferences and voter training efforts, including mail-in ballot trainings); Ex. 74, Bearden Dec. ¶ 4.

[9] Ex. 37, CTD 30(b)(6) Dep. 38:13–39:21, 71:5–72:25; Exs. 40, 46 (CTD Facebook posts reminding public of vote by mail deadlines); Ex. 41 (CTD electronic newsletters sent to members and member organizations encouraging people to vote and explaining methods of doing so including vote by mail) Ex. 74, Bearden Dec. ¶ 5.

[10] *See* Dkt. 65 at 11–12 & nn. 26–28 (Plaintiffs' expert's testimony regarding greater variation in disabled persons' signatures); *see also* Ex. 37, CTD 30(b)(6) Dep. 19:6–14, 67:11–24, 71:21–25 (CTD's 30(b)(6) witness, Chase Bearden, explaining how his disability—paralysis from the neck down—often makes "my writing look[] different"), 15:1–8 (CTD members "are the people that a lot of them tend to have signature issues"). Ex. 74, Bearden Dec. ¶ 6.

ballots submitted by voters with disabilities, which undermine the very means of participation—voting—championed by CTD.[11] CTD specifically diverts resources to warn mail-in voters about Texas's signature comparison procedure and educate them on how to sign ABBMs, carrier envelopes, and other documents on file with local election officials in order to reduce the chance of improper rejection.[12]

MOVE is a non-partisan, non-profit, and grassroots organization that builds power in underrepresented youth communities through civic education, leadership development, and issue advocacy.[13] "MOVE" stands for Mobilize, Organize, Vote, Empower.[14] MOVE works with several distinct groups of students in relation to mail-in ballots: (1) eligible students who attend schools outside of Texas and away from their county of residence; (2) eligible students who attend a Texas school outside of their county of residence; (3) eligible students who attend a Texas school and consider their address at or near school as their residence, but are nevertheless away from school during an election for summer work, holidays, or another conflict; and (4) students with

---

[11] Exs. 44; Ex. 45; Ex. 74, Bearden Dec. ¶¶ 2, 6.

[12] Exs. 46–47 (CTD Facebook posts, including video, reminding voters to make sure mail-in ballot-related signatures match); Ex. 42 at CTD-00000040, 43 (2019 Annual Report containing reminder and warning about potential for disenfranchisement); Ex. 43 at CTD-00000066 (online version of report with similar reminder); Ex. 44 at CTD-00000070 (similar reminder on CTD website); Ex. 37, CTD 30(b)(6) Dep. 71:10–25 (explaining that CTD pays special attention to instructing people "to make sure your signature matches as close as possible[], [t]hat way people realize that's an issue[,] [b]ecause for many of them, it's someone holding a piece of paper for them"), 73:18–74:6; Ex. 74, Bearden Dec. ¶¶ 7, 8; July 4, 2019 CTD Facebook post, available at https://www.facebook.com/TxDisabilities/posts/2531941590170011 (accessed July 6, 2020).

[13] Ex. 49, Galloway Dec. ¶ 3; Ex. 48, MOVE 30(b)(6) Dep. 25:17–20, 52:21–53:3; Ex. 58 (organizational slides describing MOVE's mission and areas of priority, including civic education and leadership development). MOVE shares staff with MOVE-Texas Action Fund. Ex. 73, MOVE 30(b)(6) Dep. 12:14—20. MOVE utilizes volunteers and pays the MOVE-Texas Action Fund for services rendered in order to conduct and complete its work. "Volunteer with MOVE!" available at https://movetexascivicfund.org/volunteer/ (accessed July 3, 2020); *see* Br. for Appellee at 16 n. 3, *OCA-Greater Houston*, 867 F.3d 604 (5th Cir. 2017) (No. 16-51126).

[14] Ex. 48, MOVE 30(b)(6) Dep. 26:4–8.

disabilities.[15] The risk of improper rejection of a student's mail-in ballot directly undermines the efforts MOVE takes to educate eligible voters on how to use mail-in ballots, and wastes MOVE's time and resources spent encouraging eligible students to vote by mail.[16] In order to mitigate or preempt the risk of improper rejection of mail-in ballots[17] under the current mail-in ballot process, MOVE diverts resources to educate and warn mail-in voters about Texas's signature comparison procedure, and how to take steps to try to prevent such a rejection.[18] In addition to in-person

---

[15] Ex. 49, Galloway Dec. ¶ 9.

[16] *Id.* ¶ 12.

[17] A particular difficulty in MOVE's work, evidenced by thousands upon thousands of one-on-one interactions with students, is convincing young people that their vote matters. Overcoming this perception in young people is critical to MOVE achieving its goals of increased voter participation. The risk of an improper rejection or even knowledge of the improper rejection of other voters' ballots undermines this work, reduces confidence in elections, and reinforces some students' perception that their votes do not matter. Such perception makes it difficult for MOVE to register or otherwise encourage participation in elections, and as to a particular voter, can take months or years to reverse in MOVE's efforts to create life-long voters.

Based on years of experience and the registering and tracking of voting habits of more than 80,000 new voters registered by MOVE, MOVE estimates that it takes six interactions with a new or young voter to turn them out to vote one time. MOVE additionally estimates that a new or young voter must vote in three consecutive elections before they become a regular or "life-long" voter without the need for further outreach or convincing (80% of voters that MOVE has tracked who vote in three consecutive elections continue to vote in all or most subsequent elections without additional outreach). If external factors disrupt this streak, MOVE's efforts to create life-long voters usually have to start from scratch. The external factors that can play into a voter's confidence in elections, and whether they achieve a streak of voting in three consecutive elections, often have nothing to do with their own effort, but remain extremely detrimental to MOVE's work to make them a life-long voter. These can include a young or new voter who has their voter registration processed late, who could not wait in excessively long lines, who was turned away from the polls for lack of ID or because they appeared at the wrong polling place, who could not vote because of work or family obligations, who received their ballot by mail too late to submit, or had their ballot—either a mail-in or provisional ballot—rejected by election officials. In MOVE's experience, when voters encounter these issues, they lose confidence in the electoral process, the fairness of elections, and the importance of their own role in voting, and MOVE must expend significant resources to convince them otherwise through continued contact and education. *See* Ex. 49, Galloway Dec. ¶¶ 13–15.

[18] *See id.* ¶ 13–17; Ex. 48, MOVE 30(b)(6) Dep. 46:21–47:5 ("We also commonly have to educate young people . . . of the importance of making sure that their signature is the same because of the situation in Texas."); Exs. 50, 53 (MOVE drafting text message to voters regarding mail-in ballot

guidance on how to write signatures to reduce the risk of improper rejection, MOVE sends messages through social media posts and paid texts to specifically warn voters to sign mail-in ballots as clearly and legibly as possible to avoid improper rejection.[19] The resources diverted for these purposes—staff time in drafting, ad buys on social media, and paid text-messaging services—are transferred away from MOVE's in-person voting and voter registration activities, its other education activities, and its limited mail registration drives.[20]

LWV is a non-partisan, non-profit member organization dedicated to "empowering voters and defending democracy."[21] LWV envisions "a democracy where every person has the desire, the right, the knowledge and the confidence to participate" in the democratic process.[22] LWV actively works to educate voters, provide training materials, register eligible people to vote, and ensure that they actually cast a ballot that counts.[23] The improper rejection of mail-in ballots decreases overall confidence in the mail-in ballot process, and elections generally, which directly undermines the efforts LWV takes to encourage eligible voters to use mail-in ballots and assist said voters with those mail-in ballots.[24] LWV diverts resources to educate and warn mail-in voters about Texas's

---

process and deadlines and reminding voters that "[t]he application must be signed, so make sure your signature is consistent to ensure your vote is counted").
[19] Ex. 49, Galloway Dec. ¶ 18.
[20] *Id.*
[21] Ex. 59, LWV 30(b)(6) Dep. 28:8–29:8; Ex. 60, Chimene Dec. ¶¶ 3, 16; Ex. 72, LWV 30(b)(6) Dep. 29:8–32:8 (the League of Women Voters is a "three-tiered organization" made up of the national, state, and local leagues).
[22] Ex. 60, Chimene Dec. ¶ 3.
[23] Ex. 60, Chimene Dec. ¶¶ 6–8; Ex. 59, LWV 30(b)(6) Dep. 41:21–42:21, 43:3–47:6, 68:14–70:20 (discussing voter education and registration efforts and resources LWV provides across Texas to local communities for use in voter education, such as volunteer hours, PowerPoints, YouTube videos, social media posts, a website, and other materials).
[24] Ex. 60, Chimene Dec. ¶¶ 11, 16–18.

signature comparison procedure, specifically instructing voters to make sure their signatures look exactly the same.[25]

Such counteracting efforts by these Organizational Plaintiffs help to reduce the chance of an improper mail-in ballot rejection based on a signature mismatch because each Organizational Plaintiff's instructions alert voters to the abnormal scrutiny applied to ABBM and carrier envelope signatures, and, further, each instruction provides guidance for voters to use when writing out their signatures, which, if followed, can help to build some consistency among a voter's signatures. If the signature comparison procedure is struck down or if the mail-in ballot process provided the requested safeguards of meaningful pre-rejection notice and an opportunity to cure, Plaintiffs AJC, MOVE, CTD, and LWV would not need to expend resources instructing and warning voters to write out their signatures neatly, clearly, or legibly, and/or have signatures match each other as much as possible.[26] *See Martin v. Kemp*, 341 F.Supp.3d 1326, 1335 (N.D. Ga. 2018) (finding that organizational plaintiffs "will not bear the same burden of assisting and warning voters once the

---

[25] *Id*. ¶¶ 9–10, 17–18; Ex. 59, LWV 30(b)(6) Dep. 114:20–115:9 (both the LWV website and its YouTube videos tell voters to make sure their signatures match for mail-in ballot purposes); Ex. 61 at LWV-000000282-291 (portion of "Get in the Game" voter education PowerPoint covering how to apply for and cast a mail-in ballot, including reminders that "[y]our signature [on the Application for Ballot by Mail] MUST match the one on your voter registration card," to "[b]e sure this signature [on the carrier envelope] is exactly the same as the signature on your Application for Ballot by Mail," and that a ballot may be rejected if "[t]he signature on the [carrier] envelope and on the Application for Mail Ballot are different"); Ex. 62 at LWV-000000356-365 (portion of "Vote by Mail: Step by Step" PowerPoint used in trainings which reminds voters that "[y]our signature [on the Application for Ballot by Mail] MUST match the one on your voter registration card," to "[b]e sure this signature [on the carrier envelope] is exactly the same as the signature on your Application for Vote by Mail," and that a ballot may be rejected if "[t]he signature on the [carrier] envelope and on the Application for Mail Ballot are different"); Ex. 63 (LWV website page on voting by mail, including a reminder for voters to "[a]void any confusion by election officials and sign both your application and ballot in the same way").

[26] *See* Ex. 35, Rodionov Dec. ¶ 9; Ex. 37, CTD 30(b)(6) Dep. 73:18–74:6; Ex. 49, Galloway Dec. ¶ 18; Ex. 60, Chimene Dec. ¶¶ 9–10, 17–18; Ex. 74, Bearden Dec. ¶¶ 7, 8.

State is required to assist voters whose ballots are challenged as illegitimate and once the urgency

of warning voters is diminished by way of due process protections").

Nevertheless, Defendant SOS incorrectly claims that no Organizational Plaintiff can

"identify any expenditures specifically attributable to voter-registration activities—
let alone resources dedicated to mail-in ballots generally or signature-matching in
particular. And merely engaging in voter-related activity is not enough to establish
a cognizable interest."[27]

As an initial point, monetary resources are not required to confer organizational standing and

Organizational Plaintiffs are not required to show any exact amount of money spent countering

the unlawful signature comparison procedure. *See OCA-Greater Houston*, 867 F.3d at 612; *Scott*

*v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014). Further, Defendant SOS's claim that Organizational

Plaintiffs fail to identify resources dedicated to mail-in ballots or counteracting the signature

---

[27] Dkt. 70 at 16. Defendant SOS cites *Gill v. Whitford* and *Fair Elections Ohio v. Husted* along with parentheticals containing their specific holdings on standing to support this proposition. 138 S. Ct. 1916 (2018); 770 F.3d 456, 459–60 (6th Cir. 2014). Both are inapposite to this case. *Gill* is inapposite because the parties bringing the lawsuit were individual Democratic voters, not non-partisan and non-profit organizations like Organizational Plaintiffs. And the Supreme Court's holding denying standing centered around those Democratic voters being unable to vindicate their generalized partisan preferences, which, as the Supreme Court explained, were not specific to individual legal rights. 138 S. Ct. at 1933. *Fair Elections Ohio* does not apply because *OCA-Greater Houston* is controlling on the issue of conferring standing through education efforts and also a later decided case. *Fair Elections Ohio*, 770 F.3d 459; *OCA-Greater-Houston*, 867 F.3d at 604, 610; Br. for Appellee at 5, 14 n. 2, *OCA-Greater Houston*, 867 F.3d 604 (5th Cir. 2017) (No. 16-51126). *Fair Elections Ohio* is also inapposite because the plaintiff organization in that case failed to provide correct information on the allegedly unlawful procedure at issue and did not offer instruction on how to navigate that procedure in order to avoid disenfranchisement or a suppressed vote. 770 F.3d 459–60. In contrast, Organizational Plaintiffs in this case provide a plethora of evidence, including but not limited to social media posts featuring videos and/or messages educating voters on how to navigate the signature comparison procedure and/or individualized and/or group guidance on the same topic.

comparison procedure ignores the documentary evidence and deposition testimony in this case, some of which is cited in the previous paragraphs of this section.[28]

Defendant SOS also mischaracterizes the Fifth Circuit's decision in *N.A.A.C.P. v. City of Kyle* as requiring that an organizational plaintiff must "identify any expenditures that 'differ from the [organization's] routine . . . activities,' or point to any 'specific projects' they have 'had to put on hold or other-wise curtail in order to respond' to the Secretary's conduct."[29] Indeed, the Fifth Circuit in *OCA-Greater Houston* disagreed with this very interpretation of the language from *City of Kyle* and clarified that the court's "remark in *City of Kyle* . . . was not a heightening of the *Lujan* standard, but an example of how to satisfy it by pointing to a non-litigation-related expense." 867 F.3d at 612. Defendants also incorrectly claim that *City of Kyle* requires an organizational plaintiff to divert "significant resources to counteract the defendant's conduct [such that] . . . any defendant's conduct significantly . . . impaired the organization's ability to conduct its routine activities."[30] However, the *OCA-Greater Houston* panel explained that "the Supreme Court has commanded that, in determining whether an organization has organizational standing, 'we conduct the same inquiry as in the case of an individual,'" which requires that an "injury alleged as an

---

[28] Additionally, MOVE's, AJC's, LWV's, CTD's declarations further explain resources used by each to counteract the unlawful signature comparison procedure. *See generally* Ex. 60, Chimene Dec.; Ex. 49, Galloway Dec.; Ex. 35, Rodionov Dec.; Ex. 74, Bearden Dec.

[29] *See* Dkt. 70 at 17 (quoting 626 F.3d 233, 238 (5th Cir. 2010) (citation omitted)). Educating voters on how to sign their ballots to avoid improper rejection is not part of any Organizational Plaintiff's daily operations, and is dissimilar to a "vice president's spending time reviewing ordinances." *OCA-Greater Houston*, 867 F.3d at 612. The guidance Organizational Plaintiffs provide is specialized, not conducted daily, and, regardless, exists solely to reduce improper rejections that occur because of Texas's unlawful signature comparison procedure. *See Fowler*, 178 F.3d at 361 (Even though voter registration was one of ACORN's central initiatives, the Fifth Circuit found that it alleged an injury-in fact because it "expended resources registering voters . . . who would have already been registered if the [state] had complied with the requirement under the NVRA that [the state] must make voter registration material available at public aid offices.").

[30] Dkt. 70 at 15 (quoting *City of Kyle*, 626 F.3d at 238) (quotation marks and citation omitted).

Article III injury-in-fact need not be substantial." 867 F.3d at 612 (quoting *Havens Realty Corp.*, 455 U.S. at 378; citing *Fowler*, 178 F.3d at 358) ("[T]o the extent that Texas would read *City of Kyle* as imposing a higher burden on organizations seeking to establish standing, we must disagree.").

Organizational Plaintiffs' efforts need not fall outside the scope of their mission or central initiatives to be actions that counteract Defendants' unlawful conduct. *See, e.g.*, *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008) (quoting *Crawford*, 472 F.3d at 951 ("[A]n organization suffers an injury in fact when a statute 'compel[s]' it to divert more resources to accomplishing its goals" and "'[t]he fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury.'")); *see also Martin*, 341 F. Supp. 3d at 1335.

The injury in *OCA-Greater Houston* is especially similar to the injury suffered by Organizational Plaintiffs, particularly in how it relates to OCA's mission and central initiatives. Even though "[o]ne of [OCA's] primary missions [was] to promote civic participation and provide civic education, which it carrie[d] out through a 'Get Out the Vote' initiative," the Fifth Circuit found it alleged an injury-in fact because, through its educational efforts, OCA had to advise voters on how to "reduce the chance" of denial of their choice of interpreter due to the existence of the Texas law at issue. *OCA-Greater Houston*, 867 F.3d at 609, 612. Here, although Organizational Plaintiffs all generally participate in voter education and outreach,[31] were Defendants to comply

---

[31] Ex. 35, Rodionov Dec. ¶¶ 3—4; Ex. 34, AJC 30(b)(6) Dep. 25:11–20, 43:14–46:23; Ex. 37, CTD 30(b)(6) Dep. 25:9–26:21; 34:5–35:22, 37:9–39:21, 71:4–72:25 (discussing legislative development and community organizing conferences and voter training efforts, including mail-in ballot trainings); Ex. 49, Galloway Dec. ¶¶ 3, 7; Ex. 48, MOVE 30(b)(6) Dep. 25:17–20, 52:21–53:3; Ex. 58 (organizational slides describing MOVE's mission and areas of priority, including civic education and leadership development); Ex. 59, LWV 30(b)(6) Dep. 28:8–29:8, 41:21–42:21, 43:3–47:6, 68:14–70:20; Ex. 60, Chimene Dec. ¶¶ 3, 6–8, 16.

with the law, none would have to educate voters on how to sign an ABBM and/or carrier envelope to reduce the chance of improper rejection, and all could, therefore, use the resources they now divert to these efforts to instead advance their respective missions and initiatives in other ways.[32] Therefore, these Plaintiffs sufficiently allege—and the undisputed facts prove—an injury-in-fact as to the constitutional claims brought on their own behalf against Defendant SOS.

**B. Plaintiffs Satisfy Causation and Redressability Requirements as to Defendant SOS**

Defendant SOS contends that Plaintiffs' injuries are not caused or redressable by Defendant SOS. The Fifth Circuit has squarely rejected Defendant SOS's argument, even when the injuries are also redressable through local election officials. Defendant SOS insists on making this argument through her attorneys time and again, despite Fifth Circuit precedent. Citing and explaining its prior decision in *OCA-Greater-Houston*, specifically in the context of mail-in ballots, the Fifth Circuit—last month—made it clear that when the validity of a provision of the Texas Election Code is at issue, such claims are both "caused" and "redressable" by Defendant SOS:

> The state officials assert that the plaintiffs cannot satisfy [causation and redressability], because "[a]cceptance or rejection of an application to vote by mail falls to local, rather than state, officials." Our precedent, however, poses a significant obstacle. In *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612–13 (5th Cir. 2017), we considered a challenge to Texas Election Code section 61.033, which requires an interpreter to "be a registered voter of the county in which the voter needing the interpreter resides." Texas averred that the second and third

---

[32] *See* Ex. 35, Rodionov Dec. ¶¶ 9; Ex. 37, CTD 30(b)(6) Dep. 73:18–74:6; Ex. 49, Galloway Dec. ¶ 18; Ex. 60, Chimene Dec. ¶¶ 9–10, 17–18; Ex. 74, Bearden Dec. ¶¶ 7, 8. Defendant SOS claims that no "purported member has had a ballot rejected for signature mismatch, or that [Organizational Plaintiffs have] expended any resources assisting or registering any voter whose mail-in ballot was rejected for that reason." Dkt. 70 at 17. Since the arbitrary and final signature comparison procedure does not allow an opportunity to cure or contest a signature rejection decision, there is no remedy available for a voter or any organization representing or assisting them to salvage that individual's vote. To help reduce improper rejections, Organizational Plaintiffs can only guide voters on how to sign their names in some consistent fashion before voters submit their ABBM and/or carrier envelope.

standing factors were not satisfied, because the plaintiff's injury was caused by local election officials—who determined whether a voter could serve as an interpreter—not the state or its Secretary of State. *Id*. at 613. The panel rejected that position, holding that the "invalidity of a Texas election statute is, without question, fairly traceable to and redressable by . . . its Secretary of State, who serves as the "chief election officer of the state."' *Id*. (quoting Tex. Elec. Code § 31.001(a)). So too here. Texas's vote-by-mail statutes are administered, at least in the first instance, by local election officials. But the Secretary of State has the duty to 'obtain and maintain uniformity in the application, operation, and interpretation of' Texas's election laws, including by "prepar[ing] detailed and comprehensive written directives and instructions relating to" those vote-by-mail rules. Tex. Elec. Code § 31.003. And the Secretary of State has the power to 'take appropriate action to protect' Texans' voting rights "from abuse by the authorities administering the state's electoral processes." Based on that, the state officials have not shown—at least as to the Secretary of State—that they are likely to establish that the plaintiffs lack standing."

*Texas Democratic Party v. Abbott*, 961 F.3d 389, 399 (5th Cir. 2020) (footnotes omitted).[33]

## C.   Sovereign Immunity Does Not Bar Plaintiffs' Claims Against Defendant SOS

Defendant SOS is a proper defendant under *Ex parte Young* and sovereign immunity does not bar Plaintiffs' claims. *Ex parte Young* applies when the named defendant has "'some connection' to the state law's enforcement," which means "there is significant overlap between standing and *Ex parte Young*'s applicability." *Air Evac EMS, Inc. v. Texas, Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 513–14, 517 (5th Cir. 2017) (citations omitted).[34]

---

[33] *See also* Dkt. 41 at 14 ("[I]t is apparent that—if valid—Plaintiffs' alleged complaints are both traceable to the action (or inaction) of the Secretary and redressable by the Secretary.").

[34] Defendant SOS maintains that "some connection" necessarily means a "particular duty to enforce the statute in question." *See* Dkt. 70 at 12. This heightened "particular duty" standard was endorsed by a plurality of the Fifth Circuit in *Okpalobi v. Foster*, 244 F.3d 405, 416 (5th Cir. 2001) (en banc), but as later panels of the Fifth Circuit have noted, "[b]ecause that part of the [*Okpalobi*] en banc opinion did not garner majority support . . . [its] analysis is not binding precedent." *Air Evac EMS*, 851 F.3d at 518 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)). The Fifth Circuit has so far not been required to resolve the tension between these two standards. *See City of Austin v. Paxton*, 943 F.3d 993, 1000 (5th Cir. 2019). However, as discussed in this section, Defendant SOS's connection to the mail-in ballot provisions at issue is sufficient under either standard because her enforcement connection is explicitly set out by the Texas Election Code,

In this case, it would make no sense if "[t]he facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the . . . Secretary of State, who serves as the 'chief election officer of the state,'" *OCA-Greater Houston*, 867 F.3d at 613 (quoting Tex. Elec. Code § 31.001(a)), but for Defendant SOS to nevertheless be an improper defendant under *Ex parte Young*. This is why the Fifth Circuit recently held that its holding in *OCA-Greater Houston*

> suggests that the Secretary of State bears a sufficient connection to the enforcement of the Texas Election Code's vote-by-mail provisions to support standing. . . . [which], in turn, suggests that *Young* is satisfied by the Secretary of State [with respect to the vote-by-mail provisions].

*Texas Democratic Party*, 961 F.3d at 401 (citing *OCA-Greater Houston*, 867 F.3d at 613).

Accordingly, this is not a situation in which the Texas Election Code can be read to suggest that Defendant SOS will not play any role at all in its enforcement, but one where the Texas Election Code specially tasks her with the enforcement of its provisions. As a result, Plaintiffs satisfy the requirements of *Ex parte Young*. *See, e.g.*, *Texas Democratic Party*, 961 F.3d at 401; *OCA-Greater Houston v. Texas*, 1:15-CV-00679-RP, 2016 WL 9651777, at *7 (W.D. Tex. Aug. 12, 2016), *aff'd*, 867 F.3d 604 (5th Cir. 2017) (Defendant SOS was proper *Ex parte Young* defendant in lawsuit challenging provisions of the Texas Election Code); *Democratic Executive Comm. of Florida v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019) (in lawsuit challenging similar

---

which satisfies even the stricter "particular duty" rule set out by the *Okpalobi* plurality. *See* 244 F.3d at 418–19.

Further, the language "a demonstrated willingness to exercise that duty" Defendant SOS cites also comes from the *Okpalobi* plurality's heightened *Ex parte Young* standard. Dkt. 70 at 12; *see Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014). The Fifth Circuit in *Texas Democratic Party v. Abbott* has recently clarified that at "the bare minimum" this requires "'some scintilla' of affirmative action by the state official," and as discussed in this section, ultimately held that Defendant SOS meets this requirement with regard to mail-in ballot provisions. 961 F.3d at 401 (quoting *City of Austin*, 943 F.3d at 1002).

mail-in ballot scheme, Florida SOS was proper *Ex parte Young* defendant as "state's chief election officer" under Fla. Stat. § 97.012, which sets out similar powers and responsibilities for the Florida SOS); *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 n.16 (6th Cir. 2008).

Additionally, throughout this litigation, Defendant SOS has insisted that because local officials are responsible for certain mail-in ballot procedures and because she does not have the authority to compel local election officials to take any particular action, the *Ex parte Young* exception does not apply to her.[35] That Defendant SOS may not want to utilize her authority under the Texas Election Code does not mean she lacks that authority. The Fifth Circuit in *OCA-Greater Houston* held as a matter of law that the Texas Election Code gives Defendant SOS the statewide power to redress Texas Election Code-related violations of the law, even when local election officials are also responsible for enforcing the statute in question. 867 F.3d at 612–13. In doing so, the Fifth Circuit vacated the district court's injunction and instructed the district court to craft a new one—not because Defendant SOS could not implement the relief ordered, but because the injunction was too broad in scope. *Id.* at 615–16. On remand, the district court—consistent with Plaintiffs' position here—entered an injunction ordering Defendant SOS to "distribute notice to all county elections departments clarifying that they are not to enforce [certain provisions of the Texas Election Code]" and to "explicitly explain" the proper interpretation of the law. *OCA-Greater Houston v. Texas*, 1:15-CV-679-RP, 2018 WL 2224082, at *5 (W.D. Tex. May 15, 2018).

---

[35] Dkt. 70 at 12–13. In actuality, Defendant SOS has taken affirmative action with regard to the signature comparison procedure as well as the mail-in ballot process generally. Apart from the action described in this section, Defendant SOS, for example, prescribed a new notice of rejection form this year that instructs voters who believe their mail-in ballot was rejected in error to contact their EVC to determine remedies available to them. Ex. 5. Defendant SOS is also responsible for multiple additional parts of the mail-in ballot process relevant to Plaintiffs' case. *See* Dkt. 32 at n.5.

This relief is consistent with that ordered in other cases naming defendant secretaries of state with similar statutorily-provided authority in lawsuits challenging similar mail-in ballot provisions. *See, e.g.*, *Florida Democratic Party v. Detzner*, 4:16CV607-MW/CAS, 2016 WL 6090943, at *5–6, 9 (N.D. Fla. Oct. 16, 2016) (rejecting Florida SOS's argument that he did not have authority under Florida's election code to order the supervisors of elections to perform specific duties and ordering him to issue a statewide directive implementing relief); *Martin*, 341 F. Supp. 3d at 1341 (ordering Georgia SOS to issue instructions to local election officials).

Ultimately, Defendant SOS's argument is that any mandate she issues is "advice" simply because she will refuse to enforce it despite having the power to do so. Under that interpretation, no government entity has any power to enforce anything. The Court should reject this argument.[36]

---

[36] Defendant also cites two non-binding opinions from the 1970s that supposedly demonstrate her lack of authority. Dkt. 70 at 12–13. In the first, a three-judge panel merely noted that one of the defendants had chosen to ignore the advice of the Secretary of State. *United States v. State of Texas*, 445 F. Supp. 1245, 1261 (S.D. Tex. 1978), *aff'd sub nom. Symm v. United States*, 439 U.S. 1105 (1979). That may have been true, but Plaintiffs are mainly asking the Court to order her to utilize her authority to enforce compliance with the Constitution and other federal law.

The second case is also distinguishable. In that case, the "Plaintiff *admit[ted]* that the Secretary's opinions are unenforceable at law and are not binding"—a distinction elided by Defendant SOS in her Motion for Summary Judgment. *See Ballas v. Symm*, 351 F. Supp. 876, 888 (S.D. Tex. 1972), *aff'd*, 494 F.2d 1167 (5th Cir. 1974) (emphasis added). That is obviously not the case here. Furthermore, *Ballas* presented the unusual circumstance in which two district courts (the *Ballas* court and an Eastern District of Texas court) had previously reached conflicting determinations as to the constitutionality of the statute at issue, after which the Texas Secretary of State issued a bulletin ignoring the *Ballas* court's prior decision and misstating the decision of the other court. *Id.* at 887–88. The *Ballas* court found this particularly egregious because the Texas Secretary of State had been a defendant in the *Ballas* court's previous case and it was inexplicable as to why he would have ignored the court's decision in issuing his bulletin. *Id.* This led the *Ballas* court to characterize the Secretary's bulletin as "utterly lacking in candor or credibility; legally incorrect; misleading; in excess of his statutory authority; and, irrelevant." *Id.* at 888. The differences between *Ballas* and the case at hand are manifest. Moreover, Defendant SOS fails to grapple with binding and more modern authority from the Fifth Circuit such as *OCA-Greater Houston*.

**D. Organizational Plaintiffs Have Standing Under 42 U.S.C. § 1983 to Assert Their Constitutional Claims**

Defendant SOS also seeks to avoid responsibility for Organizational Plaintiffs' constitutional claims through a misapplication of 42 U.S.C. § 1983's standing requirements.[37] According to her, Section 1983 prohibits the use of third-party standing, Organizational Plaintiffs are exclusively litigating the rights of third parties not before the Court, and Organizational Plaintiffs therefore cannot maintain their constitutional claims.[38] However, the controlling law in this circuit is clear: entities such as Organizational and Associational Plaintiffs are authorized to bring suit under Section 1983 on behalf of themselves or their members, and Defendant SOS is not entitled to summary judgment dismissing Organizational Plaintiffs' claims on this basis.

All Organizational Plaintiffs—AJC, MOVE, CTD, and LWV—bring constitutional claims on their own behalf. Courts routinely find that organizational and associational plaintiffs have standing to adjudicate voting-rights related constitutional claims, both on their own behalf—with their injury being a diversion of resources to counteract the defendants' unlawful activities—and on behalf of their members,[39] who have been disenfranchised or otherwise had their right to vote severely burdened. *See, e.g.*, *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 189, n.7 (2008)

---

[37] Dkt. 70 at 20.

[38] *Id.* at 20–21.

[39] It is unclear whether Defendant SOS intended to additionally argue that Section 1983 prohibits Associational Plaintiffs from utilizing the doctrine of associational standing to bring Section 1983 claims on behalf of their members. If she did, Fifth Circuit precedent makes it clear she is incorrect and that associational plaintiffs may bring Section 1983 claims on behalf of their members once they have met the requirements for associational standing. *See Church of Scientology of California v. Cazares*, 638 F.2d 1272, 1279 (5th Cir. 1981) (citing *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342—43 (1977)) (expressly applying associational standing analysis to claims under Section 1983 brought by an organization on behalf of its members); *see also* Schwartz, Section 1983 Litigation: Claims and Defenses § 201[C][3] (2020-1 Supp.) (while there is a circuit split on this issue, the Fifth and Sixth Circuits "have taken the position that an organization may [also] assert the civil rights of its members provided that it meets the test of [associational] standing."). As discussed *infra* in Section III, those requirements are met here for both Plaintiffs CTD and LWV.

(agreeing with appellate court below that political party had standing to challenge state law on constitutional grounds both on behalf of itself and its members; no discussion of third-party standing); *League of Women Voters of Ohio*, 548 F.3d at 466–467, 469–70, 76–78 (non-profit organization had standing to bring constitutional claims both on its own behalf and on behalf of its members; no discussion of third-party standing).

## II.     PLAINTIFFS HAVE STANDING AS TO LOCAL DEFENDANTS AND LOCAL DEFENDANTS ARE PROPER PARTIES IN THIS CASE

Defendants Brazos County EA and McAllen City Secretary (together "Local Defendants") each argue that all Plaintiffs lack Article III standing to pursue their claims and/or that they are improper defendants for other reasons. They are incorrect.

### A.  Plaintiffs Each Have Article III Standing Against Local Defendants

Plaintiffs are two individuals and four organizations. Each has standing against Local Defendants except that Plaintiffs admit Dr. George Richardson does not have standing against Defendant McAllen City Secretary and Rosalie Weisfeld does not having standing against Defendant Brazos County EA.[40]

#### 1.  Individual Plaintiffs

##### a.  Dr. Richardson

Defendant Brazos County EA cannot contest that Dr. Richardson properly signed and mailed his ballot in compliance with the Texas Election Code during the November 2018 General Election in Brazos County.[41] Nor can she contest that the Brazos County Early Voting Ballot Board ("EVBB") erroneously determined that Dr. Richardson's signatures on his ABBM and his carrier

---

[40] *See supra* n. 1.
[41] Doc. 65 at 16–17 (undisputed facts and record citations with respect to Dr. Richardson).

envelope were made by different people, and therefore improperly disenfranchised him during that election.[42]

Nevertheless, she appears to argue that Dr. Richardson did not suffer an injury-in-fact sufficient to establish Article III standing because she believes Dr. Richardson either did not sign his ABBM and/or carrier envelope at all or did not sign both or one of those documents properly. She characterizes his ABBM and carrier envelope as "purported to be from [him]," and states that Plaintiffs' expert testified that "the two signatures were not a match" because they were "'pictorially dissimilar.'"[43] These cherry-picked lines from Plaintiffs' expert's deposition are taken out of context and Defendant Brazos County EA has not, and cannot, produce any evidence to suggest that Dr. Richardson did not in fact sign both his ABBM and his carrier envelope.[44]

Plaintiffs' expert did testify that he did not consider Dr. Richardson's two signatures a "match" because they were "pictorially dissimilar."[45] But he made this statement in the broader context of discussing how Dr. Richardson might have "two different signature styles."[46] As an expert in handwriting analysis, Plaintiffs' expert recognized that the signature on Dr. Richardson's application "was a very quickly written . . . mixed-style signature," while the signature on Dr. Richardson's carrier envelope was "a more readable text-based styled signature."[47] Plaintiffs' expert elaborated on the concept of "signature styles" later in his deposition, explaining that there are three types of signature style and that

---

[42] *Id.*
[43] Dkt. 66 at 11 (quoting Mohammed Expert Rep. at 29:1–5).
[44] When Dr. Richardson's ballot was rejected, Defendant Trudy Hancock sent him a letter stating that she "underst[ood] that [he was] upset" and that she hoped her explanation of how the signature comparison procedure worked "help[ed] ease [his] confusion and frustration with voting by mail." Plaintiffs' MSJ, Ex. 25 at Richardson-00000011.
[45] Ex. 70, Mohammed Dep. 29:1–5.
[46] *Id.* at 28:5–25.
[47] *Id.*

you basically cannot—cannot compare signatures of different styles. . . . [s]o that's why with Dr. Richardson's case where the first signature was a mixed-style, the second signature was a text-based style, there's not much to compare with those signatures.[48]

But at no point did Plaintiffs' expert suggest that Dr. Richardson did not execute both the signature on his ABBM or his carrier envelope, which is what the mail-in ballot provisions at issue in this lawsuit require layperson EVBB members to determine.[49] Tex. Elec. Code § 87.041(b)(2). Rather,

> [u]nfamiliarity with the different signature styles may impact a reviewer's ability to determine whether two signatures come from the same person, and would likely cause a lay person to decide that the compared signatures exhibit "differences" when the changes in features are simply "variations."[50]

Plaintiffs' expert illustrated this principle in his expert report by comparing Dr. Richardson's ABBM and carrier envelope signatures and concluding that this is an example of a "signature [that] was incorrectly rejected."[51] As Plaintiffs' expert explained, "[w]hile there are pictorial dissimilarities between [Dr. Richardson's] two signatures, the EVBB may not have considered the possible reasons for these apparent differences,"[52] given that

> Texas election officials are likely to misconstrue legitimate and expected "variations" between one individual's signatures for "differences" in signatures between two individuals, and conclude incorrectly that someone other than the registered voter signed the mail-in ballot or ballot application.[53]

Defendant Brazos County EA presents no other evidence to suggest Dr. Richardson was not improperly disenfranchised during the November 2018 General Election. As a result, the undisputed record reflects that Dr. Richardson did suffer an injury-in-fact due to the Brazos County EVBB's erroneous determination that his ABBM and carrier envelope had been signed by different

---

[48] *Id.* at 46:2–47:11.
[49] *See id.*
[50] Ex. 14, Mohammed Expert Rep. ¶ 45
[51] *Id*. at ¶ 40.
[52] Id.
[53] *Id*. at ¶ 39.

people. Furthermore, Dr. Richardson intends to continue voting by mail in the future[54] and, absent the relief sought in this lawsuit, all of his future mail-in ballot materials will be subject to the exact same error-prone signature comparison process that previously disenfranchised him, exposing him to a continued substantial risk of disenfranchisement. He therefore has Article III standing to pursue his claims against Defendant Brazos County EA.

### b.  Rosalie Weisfeld

Plaintiff Rosalie Weisfeld has Article III standing to pursue her claims against Defendant McAllen City Secretary for similar reasons. The undisputed facts reflect that Ms. Weisfeld properly signed and mailed her ballot in compliance with the Texas Election Code during the 2019 run-off election in McAllen.[55] They also show that the McAllen EVBB erroneously determined that Ms. Weisfeld's signatures on her ABBM and her carrier envelope were made by different people, and, as a result, she was improperly disenfranchised during that election.[56] Ms. Weisfeld intends to continue to vote by mail in the future for myriad reasons, most immediately due to a traumatic brain injury suffered in a car accident, but also if she happens to be out of the county due to her frequent travel to visit family.[57] Additionally, Ms. Weisfeld is currently 63 years old and intends to exclusively vote by mail once she reaches the age of 65.[58] Absent the relief sought in this lawsuit, all of her future mail-in ballot materials will be subject to the error-prone signature comparison procedure at issue and she will continue to be exposed to a substantial risk of disenfranchisement. She therefore has Article III standing to pursue her claims against Defendant McAllen City Secretary.

---

[54] Ex. 17, Richardson Dep. 37:14–38:1; Ex. 21, Richardson Dec. ¶ 12.
[55] Dkt. 65 at 17–19 (undisputed facts and record citations with respect to Ms. Weisfeld).
[56] *Id.*
[57] *Id.* at 19 & nn.73–75.
[58] *Id.* at 9 & n.76.

Defendant McAllen City Secretary raises only one new argument in the face of this undisputed evidence.[59] She states that Ms. Weisfeld cannot establish injury-in-fact because she "testified that she never provided notice to Ms. Lara; without said notice, Ms. Lara would have no reason or information to exercise [Ms. Lara's] authority to seek relief from a District Court under the Texas Election Code."[60] Defendant McAllen City Secretary provides no explanation—and there is none—as to why Ms. Weisfeld must notify her in order for Ms. Weisfeld's disenfranchisement to constitute an injury-in-fact. Moreover, in her testimony as McAllen's 30(b)(6) witness, Perla Lara stated that McAllen never sought relief from a District Court on behalf of any voter.[61] Regardless, the City Secretary is not even a county election officer qualified to do so under the statute. Tex. Elec. Code § 87.127(a).

## 2.  Organizational Plaintiffs

Local Defendants appear to argue that Organizational Plaintiffs do not have standing against them because Organizational Plaintiffs cannot point to specific expenditures related to activity in Brazos County or the City of McAllen.[62]

---

[59] As addressed shortly *infra*, Local Defendants additionally raise a litany of arguments regarding causation and redressability that were previously rejected by the Court in denying their Motions to Dismiss.

[60] Dkt. 64 at 8.

[61] Ex. 11, McAllen 30(b)(6) Dep. 53:20–25, 56:9–24.

[62] *See* Dkt. 64. at 6–7; Doc. 66 at 13–18. Local Defendants also broadly state that none of the Organizational Plaintiffs have established injury-in-fact as a general matter, but do little to explain the supposed lack of evidence in the record. *See* Dkt. 64 at 4–7 (vaguely stating that "Plaintiffs cite no record evidence of significant, concrete, and identifiable resources" spent that could constitute injury-in-fact); Doc. 66 at 13–18 (beginning the second paragraph of each subsection dedicated to an Organizational Plaintiff by stating that the organization "cannot establish that a concrete and particularized injury occurred or that there is any actual or imminent threat of injury that is not conjectural or hypothetical" with no citations to the record or case law). To the extent these broad, vague statements properly place these issues before the Court, they are addressed in Plaintiffs' response to Defendant SOS's same arguments. This section of Plaintiffs' response instead focuses on Local Defendants' specific arguments that none of the Organizational Plaintiffs

Local Defendants point out that Plaintiff MOVE's 30(b)(6) witness, Drew Galloway, testified that MOVE had not had prior dealings with either Defendant regarding mail-in ballots and could not identify any particular voter it had assisted after that voter's mail-in ballot had been rejected for signature-matching reasons. However, it is irrelevant to Article III standing whether or not MOVE can identify any particular voter it has assisted after the voter's mail-ballot was rejected,[63] and whether or not MOVE has ever interacted with either Local Defendant with respect to mail-in ballots. The operative question is whether MOVE, which brings claims on its own behalf in this lawsuit, has established that it has and will devote resources to counteract Local Defendants' unlawful practices.[64] And as Mr. Galloway testified at deposition, although MOVE has no physical office in Hidalgo or Brazos County, the organization does "interact with students who are from Hidalgo County that are at a separate college campus."[65] More specifically,

> MOVE engages with voters throughout the State of Texas regularly. In Brazos County, MOVE regularly conducts activities at Texas A&M University, registering hundreds of students to vote. Organizers from MOVE's offices in Houston regularly travel to Brazos County for this work and are certified Volunteer Deputy Registrars in Brazos County. Additionally, MOVE works with students at college campuses all across Texas that maintain their primary residence in other areas of the State and intend to maintain those addresses rather than designate their school address as their primary residence. This includes students from McAllen, Texas and Brazos County. MOVE additionally educates young voters all over the state through its social media and digital campaigns.[66]

---

identified any specific connection to Local Defendants' jurisdictions, i.e., Brazos County and the City of McAllen.

[63] Dkt. 64 at 6; Dkt. 66 at 16–17.

[64] *See* Section I, A.

[65] Ex. 73, MOVE 30(b)(6) Dep. 53:18–23. For example, MOVE helped a student who had to return home to Hidalgo County from the University of Texas at San Antonio (where MOVE does have a physical presence) with questions about advocating for student housing in Hidalgo County. *Id.* at 57:1–17.

[66] Ex. 49, Galloway Dec. ¶ 6.

Moreover, MOVE helps students who are absent from their counties of residence while attending school, while on school vacations, or because of summer internships or jobs, in applying for mail-in ballots, and instructs students statewide to make sure their signatures match if they intend to use a mail-in ballot.[67] The undisputed evidence therefore demonstrates that MOVE has devoted resources to counteract the signature comparison procedure at issue in this case in Local Defendants' jurisdictions and therefore has organizational standing against both.

Similarly, Local Defendants argue that Plaintiff LWV's 30(b)(6) witness, Grace Chimene, testified that LWV had not had prior dealings with either Local Defendant regarding mail-in ballots, and could not name any specific members who have had their mail-in ballots rejected based on a signature mismatch or any voters that LWV had helped after a similar rejection.[68] But again, these facts are irrelevant to whether LWV may bring claims against Local Defendants on its own behalf; the operative question is whether LWV has established that it has and will devote resources to counteract Local Defendants' unlawful practices.[69]

As Ms. Chimene testified, while there is no "local league" in Brazos County, she knows there are at least three "individual state members" who reside therein.[70] Furthermore, LWV provides "any community that doesn't have a local league"—which includes Brazos and Hidalgo County—with "the service the best we can."[71] This includes providing Voter Guides and voter education.[72] LWV is committed to conducting these efforts—voter registration, voter education, get-out-the-vote, and election protection efforts—"across Texas" and reaches "thousands of

---

[67] *Id.* ¶¶ 8–9, 11–12, 16–18.
[68] Dkt. 64 at 6; Dkt. 66 at 17—18.
[69] *See* Section I, A.
[70] Ex. 72, LWV 30(b)(6) Dep. 101:5–18
[71] *Id.* at 109:6–18.
[72] *Id.*

Texans each year."[73] This includes having its "chapters" and "members" spend time educating voters about the signature comparison procedure.[74] Accordingly, LWV has devoted resources to counteract the signature comparison procedure in Brazos and Hidalgo County and has organizational standing against both Local Defendants.[75]

### B.  Local Defendants' Remaining Arguments

Local Defendants re-raise several additional arguments rejected by this Court when it denied their Motions to Dismiss. None of these arguments carries any additional water at the summary judgment stage. They boil down to two basic and overlapping premises: Local Defendants are improper defendants because (1) they merely adhere to state law and (2) they cannot provide the relief requested. Plaintiffs address each argument below.

### 1.  Adherence to the Texas Election Code Does Not Absolve Defendants of Responsibility

First, Local Defendants maintain that they have simply followed Texas law and are therefore improper parties to this lawsuit. They frame this both as demonstrating a challenge to Article III causation and redressability as well as Plaintiffs' failure to state any claims against them.[76] But the Court previously rejected this argument in denying Local Defendants' Motions to Dismiss for lack of standing, writing that

> the allegations indicate both that the Election Code provides [Local Defendants] with broad authority over the mail-in ballot voting process and that [Local Defendants] have the authority to implement additional safeguards that may have

---

[73] Ex. 60, Chimene Dec. ¶¶ 6–8, 17.

[74] *Id.* ¶ 9.

[75] Local Defendants also challenge CTD and AJC's standing against them. Like LWV, CTD is a multi-thousand member organization that operates across the state, and also has organizational standing against Local Defendants for that reason. And as AJC's 30(b)(6) witness testified, AJC simply does not know whether it helped any individuals from Local Defendants' jurisdictions because "the jail population can include people from all over Texas" and AJC does not "keep records of where they are all from." Ex. 71, AJC 30(b)(6) Dep. 67:21–68:21, 70:20–71:2.

[76] Dkt. 64 at 8–12; Dkt. 66 at 20–22.

prevented Plaintiffs' injuries in this case and may provide forms of relief going forward.[77]

Thus, Plaintiffs' alleged injuries "are both traceable to actions (and/or inaction) by the Local Defendants and redressable by the Local Defendants' future conduct."[78]

Similarly, in finding that Plaintiffs had stated a Due Process claim against Local Defendants, this Court explained that "it is the [Local Defendants] . . . who allegedly enforce Texas election laws in a manner that has violated Plaintiffs' due process rights," despite having "broad powers under the Election Code that provide them with the authority to afford Plaintiffs additional procedural protections such as pre-rejection notice and an opportunity to cure."[79] In the same vein, in determining that Plaintiffs had stated an *Anderson-Burdick* Equal Protection claim against Local Defendants for substantially the same reasons, the Court stated:

> [T]he Court recognizes that the Local Defendants did not draft the Texas Election Code and their alleged conduct may have been consistent with the explicit requirements of the Election Code. However, the allegations indicate that—through the enforcement of the Election Code's provisions—the Local Defendants played an active role in the disenfranchisement of Plaintiffs and/or Plaintiff's members. Further, the allegations indicate that nothing in the Texas Election Code prohibits [Local Defendants] from providing pre-rejection notice of a signature mismatch and/or an opportunity to cure.[80]

Now, at summary judgment, the undisputed record supports these allegations. The Texas Election Code has not changed, and testimony from Local Defendants establishes that each is the Early Voting Clerk ("EVC") responsible for handling virtually every aspect of early voting within

---

[77] Dkt. 41 at 16–17.

[78] *Id.* at 17–18.

[79] *Id.* at 25–26. The Court performed this due process analysis pursuant to the *Anderson-Burdick* framework but noted that "[i]n the event the *Matthews* test is the appropriate standard, it is even *more* apparent that Plaintiffs have adequately alleged a due process claim against Defendants." *Id.* at 26 n.20.

[80] Dkt. 41 at 30–31.

their respective jurisdictions.[81] These duties are extensive, and, as EVCs, each Local Defendant manages the EVBB by providing EVBB committee members with the EVBB Handbook, a space to convene, and all the office supplies necessary to carry out their tasks; is required to provide assistance whenever the EVBB needs help in making a signature determination (for example, by providing more signatures for review); and mails out rejection notices for the EVBB.[82] The Local Defendants, as permitted under the Texas Election Code, also regularly correspond with voters for a multitude of reasons related to the mail-in ballot process—via e-mail, text messages, phone calls, and/or physical mail,[83] and the updated notice of rejection form recently distributed by Defendant SOS specifically contemplates communication between local election officials and voters about mail-in ballots.[84]

In sum, the Texas Election Code and the undisputed summary judgment evidence make it clear that Local Defendants cannot evade responsibility for the role each plays in the unlawful signature comparison procedure at issue in the case simply because they otherwise adhere to Texas law. Plaintiffs have established Article III causation and redressability and have stated a claim against Local Defendants for each count of their Complaint.[85]

---

[81] *See* Doc. 65 at 7 & n.14 (citing to relevant deposition testimony).

[82] *Id.* at 10 & n.21 (Plaintiffs' Motion for Summary Judgement provided the incorrect citation for this statement. This is the correct citation: Ex. 9, Brazos 30(b)(6) Dep. 14:5–14, 15:4–16; Ex. 10, Hancock Dep. 73:9–74:4; Ex. 11, McAllen 30(b)(6) Dep. 26:6–20; Ex. 12, Lara Dep. 26:16–27:4, 78:3–79:8; Ex. 77, Hancock Dep. 75:20–25, 89:3–90:1, 90:13–91:6, 92:12–93:8; 93:9–16; Ex. 78, Brazos 30(b)(6) Dep. 43:2–44:25; Ex. 79, Lara 31:15–33:15, 51:1–19, 112:5–113:20; Ex. 80, McAllen 30(b)(6) 13:16–14:23; Ex. 76, SOS 30(b)(6) 45:11–46:7, 47:9–5.

[83] *Id.* at 7 & n.17, 36 & n.146

[84] *Id.* at 36 & nn. 147–148.

[85] Defendant Brazos County EA additionally argues that Plaintiffs cannot maintain a claim against her under Count III and Count IV. With respect to Count III—concerning the failure to provide uniform guidelines for signature comparison—she argues that Plaintiffs' Complaint states that "Texas has not promulgated any procedures to assist individual counties or the EVBB or SVCs within those counties" in carrying out the signature comparison process, and does not mention her by name. Dkt. 66 at 21 (emphasis added) (quoting Dkt. 1, ¶ 72). The Court already rejected this

## 2.  Local Defendants Can Provide the Relief Requested

Second, Local Defendants insist that they cannot provide the relief requested because they cannot "rewrite Texas law."[86] As the discussion above makes clear, however, this argument is simply not true with respect to Plaintiffs' request for the implementation of a meaningful pre-rejection notice and opportunity to cure for mail-in ballot voters whose signatures are questioned. The Texas Election Code and the undisputed summary judgment evidence make it clear that this relief does not require anything of Local Defendants that they do not already do in practice, and which they are empowered and permitted to do under the Texas Election Code.[87]

## III.  ASSOCIATIONAL PLAINTIFFS HAVE STANDING AS TO ALL DEFENDANTS

Defendants SOS and Local Defendants[88] each contend that Plaintiffs CTD and LWV do not have standing to bring claims on behalf of their members. The doctrine of associational

argument. Dkt. 41 at 30 n.25. With respect to Count IV—the claim that Local Defendants violated the ADA and the RA—she argues that Plaintiff CTD does not know of any members that have had a mail-in ballot rejected because of a signature mismatch and "testified that none of its members with concerns about the mail-in ballot process are registered voters in Brazos County." Dkt. 66 at 22. Although the first statement is supported by the record, the second is incorrect. CTD's 30(b)(6) witness testified that four particular CTD members (out of thousands) are not registered to vote in Brazos County, and that he knew of no members whose mail-in ballots had been rejected for signature reasons. *See* Dkt. 66-2, CTD Dep. 77:2–17. This does not mean there are no CTD members who are registered to vote in Brazos County.

[86] Doc. 66 at 19; Doc. 64 at 10–12.

[87] Defendant Brazos County EA devotes a substantial portion of her Motion for Summary Judgment emphasizing that it is the EVBB's responsibility to compare signatures and decide to reject mail-in ballots. Doc. 66 at 66–11. This misconstrues the nature of Plaintiffs' claims against Local Defendants in this case. Local Defendants are liable for failing to institute a meaningful pre-rejection notice and opportunity to cure before a mail-in voter's ballot is rejected for signature mismatch. As already discussed, the Court has already ruled that Local Defendants' involvement in this process—as alleged, and now supported by the record—is sufficient to render them subject to liability.

[88] LWV has associational standing against Defendant Brazos County EA because it is a multi-thousand member organization that has statewide reach and there are LWV members in Brazos County. Like LWV, CTD is also a multi-thousand member organization that operates across the State, and has associational standing against Brazos County EA for that reason.

standing permits such claims and "is derivative of the standing of the association's members."

*OCA-Greater Houston*, 867 F.3d at 610. To establish associational standing, an association must

show

> "(a) its members would otherwise have standing to sue in their own right; (b) the
> interests it seeks to protect are germane to the organization's purpose; and (c)
> neither the claim asserted nor the relief requested requires the participation of
> individual members in the lawsuit."

*Hunt*, 432 U.S. at 343. Defendants challenge only the first prong of this analysis. In considering

whether individual members would have standing, the traditional injury-in-fact analysis is applied

to members of the association. *OCA-Greater Houston*, 867 F.3d at 610.

As a preliminary matter, Defendant SOS wrongly contends that Plaintiffs CTD and LWV

do not actually have "members" as contemplated by the associational standing doctrine. The

requirement that an entity have "members" is generally satisfied by showing some "indicia of

membership" indicating that the entity "represents [its constituents] and provides the means by

which they express their collective views and protect their collective interests." *Hunt*, 432 U.S. at

344–45. In *Friends of the Earth, Inc. v. Chevron Chemical Co.*, the Fifth Circuit rejected a

"formalistic" analysis like the one Defendant SOS appears to require from Associational

Plaintiffs,[89] applied the "indicia of membership" test, and considered a variety of factors, such as

"who elected the governing body of the organization and who financed its activities," whether

purported members "voluntarily associated themselves" with the organization, whether individuals

---

Defendant McAllen City Secretary does not address the associational standing of
Associational Plaintiffs LWV and CTD, wrongly concluding that the Associational Plaintiffs do
not bring claims on behalf of their members against the City of McAllen because the Individual
Plaintiffs are not members of these associations. *See* Dkt. 64 at 5. However, this ignores the claims
brought on behalf of members of LWV and CTD who are not individually named as Plaintiffs in
this lawsuit. For the same reasons described in this section, LWV and CTD each have standing to
bring their claims against the City of McAllen on behalf of their respective members.
[89] Dkt. 70 at 18-19.

testified that they were members, and whether the entity had "a clearly articulated and understandable membership structure." 129 F.3d 826, 829 (5th Cir. 1997). These indicia of membership are clearly apparent as to both CTD, an organization with 2,200 active members across the state who joined by subscribing to CTD's e-newsletter mailing list, donating money, volunteering, or attending events,[90] and LWV, an organization with 33 chapters covering 39 Texas counties and approximately 3,000 individual members across the state who joined by paying a fee to LWV.[91]

Next, Defendants contend that Plaintiffs CTD and LWV cannot show that their members would have standing to bring these claims in their own right. CTD and LWV need not name individual members who will certainly have their mail-in ballot improperly rejected in order to satisfy associational standing requirements. *National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191–92 & n.5 (5th Cir. 2012). Each

---

[90] Ex. 37, CTD 30(b)(6) Dep. 36:9–23 (CTD has about 2,200 active members across the state), 73:1–16 (CTD is suing on behalf of "any and every one of our members that [the mail-in ballot signature comparison process] would affect"), 13:6–15:15, 75:13–76:13 (naming at least four CTD members who intend to vote by mail due to their disability in the future and deponent testifying that he is a member to intends to vote by mail due to his disability in the future); *see also* "Coalition for Texans with Disabilities – Get Involved," available at https://www.txdisabilities.org/get-involved (accessed July 1, 2020) (describing ways that an individual can become a member and be involved with CTD's work); "Coalition of Texans with Disabilities – Our Board," available at https://www.txdisabilities.org/about-us/our-board (accessed July 3, 2020) (indicating that "at large members" are part of leadership); Ex. 74, Bearden Dec.

[91] Ex. 60, Chimene Dec. ¶¶ 4, 13–15; Ex. 72, LWV 30(b)(6) Dep. 29:8–32:8 (LWV members are automatically members of their local league, state league, and the national league, with portions of their per-member payment distributed to each); Ex. 59, LWV 30(b)(6) Dep. 28:8–29:8; Exs. 65, 67, 68; *see also* "League of Women Voters of Texas – Join," available at https://my.lwv.org/texas/join (accessed July 1, 2020) (describing LWV membership and payment information); "Convention—MyLO," available at https://my.lwv.org/texas/league-members/convention (accessed July 3, 2020) ("As a grassroots organization the members are responsible for the guidance and oversight of the organization and the biennial convention is the vehicle for that to happen"). Additionally, courts have permitted other identically structured state league affiliates of the national League of Women Voters to bring voting rights claims on behalf of their members. *See*, *e.g.*, *League of Women Voters of Ohio*, 548 F.3d at 466—67.

Associational Plaintiff has demonstrated by undisputed evidence that it has thousands of members across the state,[92] that subsets of those members are eligible to vote by mail, that named and unnamed members wish to do so in the future,[93] that, due to disability and/or old age, a large number of these members are particularly likely to have increased signature variances that further raise the risk of improper rejection,[94] and that elections administrators reject thousands of ballots every major election because of perceived signature variances.[95] As a result, each member of CTD and LWV who uses a mail-in ballot in the future will necessarily be subjected to the uncertainty of an arbitrary signature review process conducted by laypersons without any training, and members of these organizations—though it is impossible to determine precisely which ones prior to those members being actually disenfranchised—are at substantial risk of having their ballot improperly rejected. *See Sandusky Co. Democratic Party v. Blackwell*, 387 F.3d 565, 573–74 (6th Cir. 2004).

Furthermore, in *National Rifle Association of America, Inc*., the Fifth Circuit explicitly permitted the plaintiffs to establish associational standing based on undisputed facts that

---

[92] *See supra* at nn. 90–91.

[93] Ex. 37, CTD 30(b)(6) Dep. 13:6–15:15, 75:13–76:13 (deponent naming himself and other CTD members who intend to vote by mail due to their disability in the future); Ex. 60, Chimene Dec.. ¶¶ 13–14; Exs. 65, 67 (filed under seal) (e-mails between LWV President Grace Chimene and six named LWV members); Ex. 68 (filed under seal) (recording hundreds of survey responses from LWV members indicating use of mail-in ballots in the past or both past use and plans to use them in the future, and most responses indicating eligibility based on 65 or older exception).

[94] *See supra* at n. 93; *see* Dkt. 65 at 11–12 & nn. 26–28; Ex. 14, Mohammed Expert Rep. ¶ 25, 28, 32, 42 (Plaintiffs' expert's undisputed testimony regarding greater variation in disabled and elderly persons' signatures); Ex. 15, Mohammed Dep. 68:23–69:5, 72:8–73:5; *see also* Ex. 37, CTD 30(b)(6) Dep. 19:6–14, 67:11–24, 71:21–25 (CTD's 30(b)(6) witness, Chase Bearden, explaining how his disability—paralysis from the neck down—often makes "my writing look[] different"), 15:1–8 (CTD members "are the people that a lot of them tend to have signature issues"), 73:1–16.

[95] Dkt. 65 at 4 & n.1; Ex. 16, Rainbolt Dec. ¶¶ 2–3, 6–7; *see also* Dkt. 41 at 12–13 ("[I]t is clear that Plaintiffs allege that the individual members . . . regularly vote by mail [and] membership of these organizations is comprised in significant part by individuals who are likely to be impacted by the relevant policies at issue."); Ex. 14, Mohammed Expert Rep. ¶¶ 25, 28, 32, 42.

significant segments of the organization's membership would be subject to the particular law at issue without the need to name individual members injured. 700 F.3d at 188, 191–92 & n.5. There, the court held that associational standing existed because the National Rifle Association ("NRA") could demonstrate that its members of certain ages were necessarily affected by the law at issue— even if the NRA could not prove that any particular member had actually been harmed by attempting to purchase a firearm in the manner prohibited and then being denied. *Id*. That group of members merely being subjected to the prohibition was sufficient to confer associational standing as to the NRA. Similar to that case, Associational Plaintiffs have subsets of their membership that will necessarily be subjected to the unlawful signature comparison procedure, and are susceptible—a large number more so due to greater variance in their signatures because of a disability and/or old age—to improper rejections.[96] This is more than a bare calculation of mathematical probability, and clearly establishes CTD[97] and LWV's standing to bring claims on behalf of their members.

## IV.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON THE MERITS OF PLAINTIFFS' CONSTITUTIONAL AND ADA AND RA CLAIMS

### A. Plaintiffs—Not Defendants—Are Entitled To Summary Judgment on the Merits of Plaintiffs' Constitutional Claims

In seeking summary judgment on the merits of Plaintiffs' constitutional claims, Defendant SOS not only relies on an improper legal framework, she then erroneously applies these improper standards. First, she ignores entirely the *Mathews* test applicable to Due Process violations, and

---

[96] *See supra* at nn. 90–95.

[97] Defendant SOS also claims that CTD fails to show associational standing "[b]ecause the evidence does not identify even one individual CTD member who has been injured within the meaning of the ADA or RA." Dkt. 70 at 20. However, as explained in Plaintiffs' Motion of Summary Judgement and in this section and Section IV of this brief, CTD has associational standing under the ADA and the RA through named and unnamed members on whose behalf it brings those claims.

instead incorrectly asserts that both Due Process and Equal Protection claims are to be analyzed under *Anderson-Burdick*.[98] Then, despite properly identifying that the *Anderson-Burdick* test is applicable to Plaintiffs' Equal Protection claims, she ignores this standard in lieu of the exact same "similarly situated" analysis this Court rejected in denying Defendants' Motions to Dismiss.[99] It is clear that Defendant SOS's misapplication of constitutional principles does not warrant summary judgment in her favor, but instead further shows that it is Plaintiffs who are entitled to summary judgment on these claims.[100]

### 1. The *Mathews* Test, and Not *Anderson-Burdick*, Applies to Plaintiffs' Procedural Due Process Claims

Defendant SOS's use of the standard laid out in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992) to evaluate Plaintiffs' procedural due process claim is incorrect.[101] While Defendant SOS correctly states that "*Anderson-Burdick*'s 'flexible standard' generally governs First and Fourteenth Amendment challenges predicated on voting rights,"[102] the Supreme Court laid out a different test for procedural due process claims in *Mathews v. Eldridge*, 424 U.S. 319 (1976).[103] *Mathews* is the proper test here.

Accordingly, district courts deciding similar actions have employed *Mathews* to evaluate procedural due process claims challenging mail-in ballot signature comparison laws nearly

---

[98] Dkt. 70 at 23.

[99] *Id.* at 28.

[100] Defendants Brazos County EA and McAllen City Secretary generically seek summary judgment on Plaintiffs' Due Process and Equal Protection claims, but on standing and related grounds, not on the merits. *See* Dkt. 64 at 8; Dkt. 66 at 20-21. These arguments are similarly without merit. *See supra* at Section II.

[101] Dkt. 70 at 23–27.

[102] *Id.* at 22.

[103] Dkt. 41 at 21 ("The argument for applying the *Mathews* test to Plaintiffs' due process claim is a strong one . . . [The *Mathews*] standard appears to be more directly applicable to due process claims premised on mail-in ballot procedures and/or the lack of procedural safeguards related to the mail-in voting process.").

identical to those at issue in this litigation. *See, e.g.*, *Saucedo v. Gardner,* 335 F. Supp. 3d 202, 214 (D. N.H. 2018) (applying *Mathews* to strike down New Hampshire's signature-matching law on procedural due process grounds); *Martin*, 341 F. Supp. 3d at 1338 (same in Georgia); *Zessar v. Helander*, 2006 WL 642646, at \*7 (N.D. Ill. Mar. 13, 2006) (same in Illinois). By contrast, Defendant SOS attempts to avoid *Mathews* by citing the same string of Supreme Court and Fifth Circuit cases she previously relied on in her Motion to Dismiss—cases which are not only factually distinguishable, but did not consider procedural due process claims.[104]

Nor does Defendant SOS's reliance on the Fifth Circuit's recent opinion in *Texas Democratic Party* support her effort to push for a non-*Mathews* rational basis standard within the *Anderson-Burdick* framework.[105] *Texas Democratic Party* involved neither a procedural due process claim nor the severe burden of disenfranchisement through the discarding of properly cast ballots due to an arbitrary procedure. *See* 961 F.3d at 395-96. Defendant SOS further supports its argument with selective and inapposite quotations from *Texas Democratic Party*'s discussion of *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802 (1969), then relies on *McDonald* for the proposition that "[t]he caselaw suggests a rational basis standard" applies to claims under the Due Process Clause.[106] But *McDonald* is not only a pre-*Mathews* decision, it also did not involve

---

[104] Dkt. 70 at 21–22, 26 (citing *Texas Indep. Party v. Kirk*, 84 F.3d 178, 181—82 (5th Cir. 1996) (regarding requirements for nominating petitions); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. at 185, 191 (regarding voter ID requirements); *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 218, 231—33 (1989) (regarding primary endorsement laws); *Purcell v. Gonzalez*, 549 U.S. 1, 2 (2006) (regarding proof of citizenship laws); *Veasey v. Abbott*, 830 F.3d 216, 225, 307 (5th Cir. 2016) (regarding voter identification laws)). The same is true of the decisions outside of the Supreme Court and the Fifth Circuit invoked by Defendant SOS: none evaluated procedural due process claims. *See* Dkt. 70 at 23 (*citing Mays v. LaRose*, 951 F.3d 775, 783 (6th Cir. 2020); *Biener v. Calio*, 361 F.3d 206, 214 (3d Cir. 2004); *Michigan State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 350 (6th Cir. 2018)).
[105] Dkt. 70 at 22-23 (*citing Texas Democratic Party*, 961 F.3d at 404).
[106] *Id*. at 23 (citing *McDonald*, 394 U.S. at 807).

a procedural due process claim or the arbitrary rejection of properly cast ballots, like in this case. *McDonald*, 394 U.S. at 806. In sum, the authority on which Defendant SOS relies is irrelevant to a procedural due process claim, and does not support the argument that some other standard should displace *Mathews*. Therefore, the *Mathews* test applies to Plaintiffs' procedural due process claims.

### 2.  Plaintiffs Satisfy the *Mathews* Test for Their Procedural Due Process Claims

As laid out in detail in Plaintiffs' Motion for Summary Judgment on pages 29 to 37, Plaintiffs satisfy the *Mathews* test for their procedural due process claims and are entitled to summary judgment under Count I. In determining whether a state-created process is adequate, *Mathews* instructs courts to balance the following considerations:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335. The *Mathews* Court also urged courts to recognize that "procedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." *Id.* at 344.

Application of the three *Mathews* factors compels a ruling in Plaintiffs' favor, and likewise denial of Defendants' Motion for Summary Judgment.[107] First, the private interest at issue—the fundamental right to vote, upon which Texas's current signature comparison scheme violates without meaningful opportunity for recourse—weighs heavily in Plaintiffs' favor. Second, the risk of erroneous deprivation of that fundamental right under Texas's current scheme—through which thousands of ballots are irreversibly discarded every major election for perceived signature mismatches—is great, while the probable value of the procedural safeguards sought by Plaintiffs—

---

[107] *See* Dkt. 65 at 29-37.

procedures to provide voters pre-rejection notice and allow voters to cure erroneously rejected ballots—is high.[108] Finally, the government interests at issue—in particular the prevention of fraud—do not weigh in Defendants' favor, as those interests would actually be enhanced by the added procedures Plaintiffs seek.

Defendant SOS argues that Plaintiffs' procedural due process claim must fail because Plaintiffs "disregarded the process available to them."[109] Defendant SOS points to no process of which a voter can avail themselves if their ballot has been erroneously rejected for an alleged signature mismatch. In fact, no such process exists.

Nevertheless, Defendant SOS insists that Dr. Richardson and Ms. Weisfeld were provided sufficient due process because they "could have raised their concerns of improper rejection to their county election officer and requested that the officer file suit to challenge the EVBB's determination."[110] This "process" is insufficient for several reasons. First, the plain language of the Texas Election Code makes clear that the right to challenge an EVBB's signature determination belongs to the county official, not the voter or even an EVC from a local entity that is not a county. *See* Tex. Elec. Code §§ 87.127(a), 31.091(1). The voter has no avenue under this or any provision of the Texas Election Code to challenge the improper rejection of a ballot for alleged signature mismatch. Instead, the decision is left to the county official's sole discretion. As was the case at

---

[108] Indeed, such procedures would have prevented the disenfranchisement of both individual Plaintiffs in this case. *See, e.g.*, Ex. 21, Richardson Dec. ¶ 11 (Plaintiff Dr. Richardson would have readily confirmed that it was his signature on his ABBM and his carrier envelope had election officials contacted him at any time prior to rejecting his ballot); Ex. 30, Weisfeld Dec. ¶ 12 (same).
[109] Dkt. 70 at 27.
[110] *Id*. Defendant SOS also states that "misapplication of the signature-verification process can support an election contest." *Id*. at 24. However, election contests provide no real recourse for voters attempting to reverse a mail-in ballot rejection. *Tiller v. Martinez*, 974 S.W.2d 769, 772 (Tex.App.-San Antonio 1998, pet. dism'd w.o.j.) ("To overturn an election, the contestant has the burden of proving by clear and convincing evidence that voting irregularities materially affected the election results.").

the motion to dismiss stage, "the Secretary fails to cite precedent for the proposition that an election officer's *discretionary* ability to seek judicial relief affords process sufficient to cure the deprivation of the fundamental right to vote."[111]

Second, in practice, the county election official's ability to challenge a signature determination is extremely difficult. Defendant Perla Lara testified that McAllen has never challenged a signature determination, and, regardless, the McAllen City Secretary is not even a county election officer authorized to do so under the statute.[112] Similarly, Defendant Trudy Hancock testified in her deposition that she has never utilized her right to challenge a determination by an EVBB, she claims it is "not [her] responsibility" to "check [the EVBB's] work," and it is literally "impossible" for her to utilize this process in a manner that would result in the counting of a ballot that was previously rejected in error.[113] Furthermore, Plaintiff Dr. Richardson did notify an election official of Brazos County's error in rejecting his mail-in ballot, but the office did not pursue any relief.[114] Indeed, a "process" premised on making a discretionary request of a local election official, with no actual ability to gain meaningful recourse even if that discretion were to be exercised, is no process at all.[115]

---

[111] Dkt. 41 at 25 (emphasis in original).

[112] Ex. 11, McAllen 30(b)(6) Dep. 53:20–25, 56:9–24.

[113] Ex. 10, Hancock Dep. 103:25–107:19. This further shows that notice of an improper rejection would hardly be considered "prompt" (as Defendant SOS described it in her Motion for Summary Judgment) for even a county official—in this case Defendant Brazos EA—authorized to bring a signature comparison determination issue to a District Court. Dkt. 70 at 24.

[114] *See* Dkt. 65 at 33, 40 n.137 (collecting relevant exhibits).

[115] Also, the existence of an added layer of review when Signature Verification Committees are appointed is similarly ineffective, as voters' signatures are still subjected to the same flawed signature comparison procedure and Plaintiffs still fail to receive meaningful notice or an opportunity to cure.

### 3. Defendant SOS Is Not Entitled To Summary Judgment on Plaintiffs' Equal Protection Claims

As laid out in detail in Plaintiffs' Motion for Summary Judgment on pages 37 to 44, Plaintiffs satisfy the *Anderson-Burdick* standard for their Equal Protection Clause claims. Defendant SOS seeks summary judgment on the merits of Plaintiffs' Equal Protection claims using the same misguided rationale the Court repudiated at the motion to dismiss stage. Under a proper Equal Protection analysis, and for reasons including those previously identified by the Court, Plaintiffs—not Defendants—are entitled to summary judgment on Counts II or III.

Although Defendant SOS appears to recognize that the *Anderson-Burdick* standard applies to Plaintiffs' Equal Protection claims,[116] she nevertheless seeks summary judgment by returning to the incorrect and already-rejected "similarly situated" analysis from her Motion to Dismiss.[117] Her analysis begins by mischaracterizing Count II as relying on a "theor[y]" that Texas's "mail-in ballot framework . . . treats mail-in voters differently than in-person voters."[118] As the Court previously recognized,

> the crux of Plaintiffs' equal protection claim is not a complaint that the Election Code contains different provisions for in-person and mail-in voting. Instead, Plaintiffs alleged that the State's mail-in voting procedures (and their implementation by local officials) result in the disenfranchisement of eligible voters who attempt to vote by mail.[119]

It is this disenfranchisement that must form the foundation of a proper Equal Protection analysis under *Anderson-Burdick*.[120]

Ignoring these requirements entirely, Defendant SOS instead reiterates her mischaracterization of Plaintiffs' claims and simply concludes that "any differences [between

---

[116] Dkt. 70 at 22.
[117] *Id.* at 29.
[118] *Id.* at 28.
[119] Dkt. 41 at 28.
[120] Dkt. 65 at 37—44.

mail-in and in-person voting] processes do not violate equal protection, because they treat all persons similarly situated alike."[121] In essence, Defendant SOS argues that mail-in ballot procedures are immune from Equal Protection scrutiny as long as all mail-in voters are subject to the same process. This is not the law. Under *Anderson-Burdick*, any burden placed on voters, "[h]owever slight that burden may appear," must be justified by "relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191 (citation and quotation marks omitted). This is why Plaintiffs are entitled to summary judgment: the burden—disenfranchisement—is severe, and Defendant SOS provides no sufficient justification.

Similarly untenable is Defendant SOS's position that "*Bush v. Gore* does not save Plaintiffs' equal protection claim."[122] However, *Bush v. Gore* merely stands for the unobjectionable premise that a lack of "specific standards to ensure its equal application" renders a voting procedure problematic—i.e., voting procedures lacking "sufficient guarantees of equal treatment" and "minimal procedural safeguards" run afoul of the Equal Protection Clause. 531 U.S. 98, 105-109 (2000). As this Court already recognized, this claim, when applied to the *Anderson-Burdick* undue burden framework, shows a violation of the Equal Protection Clause.[123]

In addition to her faulty legal premise, Defendant SOS also inaccurately describes the signature comparison regime by insisting that "Texas's standard for verifying mail-in ballot signatures would be sufficiently uniform to ensure equal treatment of voters, because local election

---

[121] Dkt. 70 at 29.

[122] *Id.*

[123] Dkt. 41 at 27 n.21 ("This Court interprets the second equal protection claim (Count III) to assert the Texas Election Code places an undue burden on the right to vote to the extent it does not require the promulgation of uniform standards and/or training with respect to signature comparison such that signature comparisons are conducted in a consistent manner."); *see also* Dkt. 65 at 41 n.157 (discussing *Bush*).

officials employ a uniform process provided by statute."[124] Defendant SOS's entire basis for this purported uniformity is Sections 87.041(e)[125] and (f) of the Texas Election Code, but these provisions guarantee no such thing. As this Court already recognized,

> these sections provide guidance as to which signatures an EVBB or SVC should use for the purposes of signature comparison, but the sections provide no guidance as to the appropriate procedure or standard for determining that a voter's signatures do not match.[126]

In short, Defendant SOS's Equal Protection analysis is as unavailing now as it was at the motion to dismiss stage. Her continued refusal to engage with the legal or factual substance of Plaintiffs' claims highlights that there is no basis for summary judgment in her favor on Counts II and III. As detailed in Plaintiffs' Motion for Summary Judgment and below, proper application of *Anderson-Burdick* compels summary judgment in favor of Plaintiffs.[127]

### a.  Plaintiffs' Claims Succeed Under *Anderson-Burdick*

The undisputed facts meet the *Anderson-Burdick* standard as to all of Plaintiffs' constitutional claims, even assuming, *arguendo*, that the test applies to both Plaintiffs' Due Process and Equal Protection claims. Under *Anderson-Burdick*:

> A court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its

---

[124] Dkt. 70 at 30.

[125] Citing to this provision, Defendant SOS claims voters can "update their signature on file." Dkt. 70 at 24. However, the provision does not provide this option to voters at all. Instead, a voter "update[ing] their signature" would most likely result in an increased risk of rejection by local officials who mistake the change in signatures as evidence of signatures not signed by the voter. Ex. 14, Mohammed Expert Rep. ¶ 45.

[126] Dkt. 41 at 29 n. 23.

[127] *See* Dkt. 65 at 37-44. Defendant SOS's additional claim that Plaintiffs somehow erred by not "contact[ing] the Secretary's office regarding the allegedly erroneous rejections of their ballots prior to filing this lawsuit" is immaterial, as Defendant SOS cites no requirement that Plaintiffs pursue such a course of action before seeking a judicial remedy.

rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789). The *Anderson-Burdick* standard is flexible, and there is no "litmus test for measuring the severity of a burden." *Crawford*, 553 U.S. at 191. Instead, any burden whatsoever must be justified by "relevant and legitimate state interests sufficiently weighty to justify the limitation." *Id.* (citation and quotation marks omitted).

Defendant SOS misapplies both steps in the *Anderson-Burdick* test. We consider each in turn.

### b. The Severe Burden Imposed by Texas's Signature Comparison Procedure is the Right to Vote, Not the Requirement that Mail-In Voters Sign Ballot Applications and Carrier Envelopes

The first step in the *Anderson-Burdick* analysis is assessing the burden placed on mail-in voters. Defendant SOS identifies the relevant burden as "provid[ing] signatures recognizable as having been signed by the same person, or, if unable to do that, hav[ing] a witness sign the ABBM and carrier envelope."[128] Defendant SOS grossly misapprehends the burden at issue here, arguing that Texas's signature comparison scheme creates only "[o]rdinary and widespread burdens, such as those requiring 'nominal effort' of everyone."[129] However, unlike the "merely inconvenient" burdens at issue in *Crawford*—taking a trip to the Bureau of Motor Vehicles, collecting documents, and posing for a photograph—the burden borne by Plaintiffs is not a matter of administrative or logistical hurdles, but the irreparable disenfranchisement suffered when a mail-

---

[128] Dkt. 70 at 25. Plaintiffs' Motion for Summary Judgment, Combined Response to Motions to Dismiss, and Section IV, B of this brief discuss in detail why the witness signature option and/or the late ballot option fail to satisfy the procedural due process and equal protection requirements. Dkt. 65 at 33-34; Dkt. 32 at 30 n. 19.

[129] Dkt. 70 at 23 (*citing Crawford,* 553 U.S. at 205 (Scalia, J., concurring)).

in ballot is rejected for perceived signature mismatches through an arbitrary and unappealable process.[130]

Again, disenfranchisement itself is the burden. As courts examining other states' nearly identical signature comparison laws have all concluded, this burden is "severe." *Fla. Democratic Party v. Detzner*, 2016 WL 6090943, at \*6 (Florida's signature matching provisions place "a severe burden on the right to vote"); *Lee*, 915 F.3d at 1321 ("[W]e have no trouble finding that Florida's [vote-by-mail signature comparison] scheme imposes at least a serious burden on the right to vote."); *see also League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) (stating that it is a "basic truth that even one disenfranchised voter—let alone several thousand—is too many").

Defendant SOS's efforts to downplay the burden caused by Texas's signature comparison procedure is further undercut by her misconstruing of several of the undisputed facts on which she relies. For example, mail-in voters do not "receive notice that their signatures are required and must match."[131] To the contrary, nowhere on the ABBM, mail-in ballot, or accompanying

---

[130] Plaintiffs elaborate on this analysis in their own Motion for Summary Judgment. *See* Dkt. 65 at 38.

[131] Dkt. 70 at 23. The cases Defendant SOS cites in her Motion for Summary Judgment are still unavailing. From *Santana v. City of Tulsa*, Defendant SOS omits the immediately preceding and following sentences that work strongly in Plaintiffs' favor—that

> the [government's] requirements are reasonable and give the aggrieved party adequate notice and an opportunity to meaningfully participate . . . [The plaintiff in the case] was provided with notice of the [government's] proposed action and was offered an opportunity for a hearing. [And h]e declined to initiate an administrative appeal.

*Santana*, 359 F.3d 1241, 1244 (10th Cir. 2004) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)). Texas law requires no such notice or opportunity. In *Duboc v. Twp. of Green Oak*, the procedure at issue provided owners actual notice of an impending determination and multiple opportunities to be heard, in contrast to the complete lack of notice of a mail-in ballot determination until up to 10 days after an election and the complete lack of an opportunity to cure for Texas mail-in voters. *See* 406 F. App'x 983, 987 (6th Cir. 2011). Finally, *Herrell v. Benson* involved a disciplinary policy that

instructions are voters informed that their signatures will be compared and rejected if a mismatch

is perceived.[132] To the extent Defendant SOS is implying that voters are familiar with the Texas

Election Code—a questionable proposition at best—even the Code itself does not state that mail-

in ballots will be rejected if the relevant signatures do not "match." Nor was Plaintiff George

Richardson "aware of the signature requirement," as Defendant SOS now alleges.[133] In the

deposition testimony cited by Defendant SOS, Plaintiff Dr. Richardson merely stated that he was

aware that they had to provide some form of identification to vote in person or by mail, but he did

not testify that he was aware that his signatures had to match or that his ballot would be subject to

a signature comparison analysis.[134] Even though Ms. Weisfeld has been appointed to an EVBB in

the past and, thus, signed the carrier envelope the same way as her ABBM as much as possible

based on her memory, the EVBB still made the arbitrary decision to reject her ballot for signature

---

provided Herrell with the opportunity to challenge all of the factual allegations against him and, more to the point, afforded him the opportunity to attend the sanctions hearing and to appeal any sanction rendered

—again, a wholly different process and set of remedies than what is made available to disenfranchised Texas mail-in voters. 261 F.Supp.3d 772, 779–80 (E.D. Ky. 2017).

[132] *See* Dkt. 65 at 6 n.11.

[133] Dkt. 70 at 25.

[134] *See* Dkt. 70-1, Richardson Dep. 21:7–12 ("Q. Okay. Do you remember the last time you voted whether you had to do anything to verify that you were Dr. George Richardson? A. You mean voting in person? Q. Yes. A. Yeah. I had to show a – a valid picture ID."), 22:11–14 ("Q. Do you recall an occasion when you voted in person in Texas when you didn't either have to show a form of identification or provide a signature? A. No."), 24:23–25:20 ("Q. Does this appear to be the ballot-by-mail application that you submitted to Brazos county for the– A. Yes. Q. –2018 elections? A. Yes. Q. Okay. And that is your signature on the line that says "Signature"? A. Looks like it, yep. Q. Okay. Underneath your signature, there's a line of text. Will you please read that into the record. A. "Must be signed. Do not print. If you cannot sign, make a mark and have witness fill out the box to the right. I certify the information given in this application is true, and I understand that giving false information in this application is a crime.""").

Furthermore, Dr. Richardson cannot avoid risking future disenfranchisement just by knowing about the signature comparison procedure, since the procedure is flawed and there is no guarantee that the people reviewing his signature will know him or about his previous disenfranchisement. Ex. 81, Richardson Dep. 43:21–44:6.

mismatch.[135] Notice of an arbitrary procedure alone cannot ensure a voter's ballot is properly counted.[136]

### c.  Texas's Interests Do Not Justify the Severe Burden Placed on Mail-In Voters' Fundamental Right to Vote

The second step under *Anderson-Burdick* requires weighing the burden placed on voters against the "precise interests" offered by the state as justification. *Burdick*, 504 U.S. at 434 (citing *Anderson*, 460 U.S. at 789).[137] The interest on which Defendant SOS now relies is the same red herring offered in her Motion to Dismiss: the alleged prevention of "voter fraud." Once again, though, she refuses to engage with the reality that any interest in fraud prevention is in fact furthered, not hindered, by the notice and cure remedy that Plaintiffs seek.[138]

As a preliminary matter, Plaintiffs do not dispute that fraud prevention—like the other two interests proffered in passing by Defendant SOS ("orderly and efficient administration of elections" and "safeguarding public confidence in election integrity")—may be legitimate government interests.[139] But Defendant SOS begins and ends her analysis with the broad proclamation that "Texas's weighty and undeniable interest in ensuring that only eligible voters cast ballots necessitates laws to guarantee that mail-in ballots are genuine."[140] *Anderson-Burdick* requires more—specifically, that the burden at issue is relevant to and actually furthers the stated

---

[135] Ex. 75, Weisfeld Dep. 70:4–6; Ex. 30, Weisfeld Dec. ¶ 7–12.

[136] Additionally, because local officials are allowed to deliver notices of rejection up to 10 days after an election, only mail-in voters who receive their notice of rejection before Election Day and are not outside of their county of residence during early voting and Election Day, not confined in jail during that time, and do not have a disability that makes them unable to vote in-person have the option to vote in-person. Tex. Elec. Code § 87.0431

[137] Like the first prong of *Anderson-Burdick*, Plaintiffs also undertake a detailed analysis of the state interests at issue here in their Motion for Summary Judgment. *See* Dkt. 65 at 41–44.

[138] *See* Dkt. 41 at 23-24 ("Importantly, the Secretary's Motion offers no argument as to how the State's interest in preventing voter fraud is furthered by failing to provide pre-rejection notice and an opportunity to cure").

[139] Dkt. 70 at 23.

[140] *Id*. at 26.

interest. *Crawford*, 553 U.S. at 191 ("However slight that burden may appear . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.") (citation and quotation marks omitted).

As the experiences of Dr. Richardson and Ms. Weisfeld show, Texas's signature comparison procedure does not ensure that accepted mail-in ballots are genuine, but instead facilitates precisely the opposite. Like those of all other similarly disenfranchised mail-in voters, Individual Plaintiffs' ballots were improperly rejected because election officials failed to undertake any steps to verify whether the ballots were legitimately cast. The notice and cure remedy Plaintiffs seek would prevent erroneous determinations such as this from happening again, and would serve as a layer of protection to confirm the validity of mail-in ballots. As this Court succinctly put it, "the Secretary's stated concerns regarding voter fraud appear to be *inconsistent* with the state's apparent objections to the due process protections sought by Plaintiffs."[141] *See also Detzner*, 2016 WL 6090943 at *7 (N.D. Fla. Oct. 16, 2016) ("[L]etting mismatched-signature voters cure their vote by proving their identity *further* prevents voter fraud—it allows supervisors of elections to confirm the identity of that voter before their vote is counted.") (emphasis in original); *Lee*, 915 F.3d at 1322 ("Defendants offer no satisfying explanation for why Florida cannot have both a robust signature-match protection and a way to allow every eligible vote-by-mail and provisional voter whose ballot is mistakenly rejected an opportunity to verify their identities and have their votes count.").

Finally, Defendant SOS again relies heavily on *Lemons v. Bradbury*, in which the Ninth Circuit rejected due process and equal protection challenges to Oregon's signature-matching procedures for petitions referring legislative acts to the ballot for a popular vote. 538 F.3d 1098

---

[141] Dkt. 41 at 24 (emphasis in original).

(9th Cir. 2008). As Plaintiffs previously argued, *Lemons* is readily distinguishable for several reasons.[142] Here, Defendant SOS argues particularly that *Lemons* "illustrates that courts applying *Anderson/Burdick* consider the totality of voting procedures—and what is to be gained by any 'additional procedures' plaintiffs seek."[143] However, the signature verification process in *Lemons* was far more robust than Texas's and provided voters with certain protections against rejection. Under the Oregon system, every county "had a system for reviewing initially rejected signatures" and "[a]ll counties provide that higher county elections authorities review all signatures that are initially rejected." *Lemons*, 538 F.3d at 1102, 1104. Further, "members of the public observe the [signature comparison] process and can object to signature verification decisions." *Id.* at 1104. Texas voters enjoy no such protections. For this reason and others recognized by this Court at the motion to dismiss stage, *Lemons* does not support a grant of summary judgment in favor of Defendant SOS.[144]

## B.  Neither of Defendant SOS's Purported Accommodations Constitute Reasonable Accommodations Under the ADA and RA

As laid out in detail in Plaintiffs' Motion for Summary Judgment on pages 44 to 53, Plaintiffs satisfy the requirements of the ADA and the RA and are entitled to summary judgment under Count IV. Defendant SOS seeks summary judgment dismissing Plaintiff CTD's claims under the ADA and the RA on the basis that "any voter with a disability can avoid having the signatures on her ABBM and carrier envelope used for identification—she need only have a

---

[142] *See* Dkt. 32 at 31—32 (distinguishing *Lemons*).  Further, as Defendant SOS points out, "*Lemons* also noted that 'referendum petition cover sheets instruct voters to "[s]ign your full name, as you did when you registered to vote,"' and that Oregon's procedures allow for 'challenges to decisions by county elections officials.'" Dkt. 70 at 27 (citing *Lemons,* 538 F.3d at 1104, 1105). As discussed earlier, none of the election materials provided to voters by Defendants instruct them that their signatures must match or allow voters themselves to challenge the decisions of local election officials.

[143] Dkt. 70 at 27.

[144] Dkt. 41 at 24 n.16.

witness mark her ABBM and/or carrier envelope after she has cast her ballot."[145] Defendant SOS further argues that disabled voters may instead vote in person or curbside under the Texas Election Code.[146] Neither of these options constitute a "reasonable accommodation" under the ADA and the RA.[147]

First, Defendant SOS is incorrect that "any voter with a disability can avoid having the signatures on her ABBM and carrier envelope used for identification . . . [by having] a witness mark her ABBM and/or carrier envelope after she has cast her ballot."[148] Rather, only voters who are actually unable to sign a ballot "because of a physical disability or illiteracy" qualify to utilize the witness signature procedure under Tex. Elec. Code § 1.011(a).[149] As Plaintiff CTD testified, certain disabled voters, including some CTD members, are able to sign their ballots—and therefore ineligible to use a witness under the Texas Election Code—but, due to their disabilities, are unable to ensure that their signatures will be consistent enough to meet Texas's uncertain signature comparison standards.[150]

Second, Defendant SOS claims that in-person or curbside voting constitutes a reasonable accommodation for CTD members who are unable to guarantee a consistent signature.[151] But directing disabled voters away from the mail-in voting process to which they seek access is no accommodation at all, to say nothing of the disabled voters who would require additional

---

[145] Dkt. 70 at 31.

[146] *Id.*

[147] Plaintiffs elaborate on these arguments in their own Motion for Summary Judgment. *See* Dkt. 65 at 47-53.

[148] Dkt. 70 at 31.

[149] *See also* Dkt. 41 at 22–23 n.15 ("[A] review of the [witness] provision indicates that only certain individuals who vote by mail—namely those who certify that they are unable to sign the ballot 'because of a physical disability or illiteracy'—are able to utilize the witness signature procedure.").

[150] *See* Ex. 37, CTD 30(b)(6) Dep. 67:11–68:11, 71:10–25.

[151] Dkt. 70 at 31.

assistance to vote in person. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 282 (2d Cir. 2003) ("A reasonable accommodation is one that gives the otherwise qualified plaintiff with disabilities meaningful access to the program or services sought.") (internal citation and quotation marks omitted); *see also Alexander v. Choate*, 469 U.S. 287, 301 (1985) ("The benefit itself, of course, cannot be defined in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled."). Overall, Defendant SOS proposes a callous set of alternatives for many disabled Texas voters, particularly now, given the realities of COVID-19 and its risk to voters with underlying health issues: either risk disenfranchisement by subjecting your vote to an unpredictable signature comparison scheme, or forgo entirely your right to vote independently by mail. *See Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 507 (4th Cir. 2016) ("The right to vote should not be contingent on the happenstance that others are available to help."). These purported accommodations do not meet the requirements of the ADA and the RA, and do not entitle Defendant SOS to summary judgment on these claims.

**CONCLUSION**

Contrary to Defendants' arguments, Plaintiffs have statutory and Article III standing and Defendants violated and will continue to violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution, the ADA, and the RA. Therefore, this Court should deny Defendants' Motions for Summary Judgment and grant Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

/s/      *Hani Mirza*

**TEXAS CIVIL RIGHTS PROJECT**

Mimi M.D. Marziani
Texas Bar No. 24091906

mimi@texascivilrightsproject.org
Hani Mirza
Texas Bar No. 24083512
hani@texascivilrightsproject.org
Ryan V. Cox
Texas Bar No. 24074087
ryan@texascivilrightsproject.org
Zachary D. Dolling
Texas Bar No. 24105809
zachary@texascivilrightsproject.org

1405 Montopolis Drive
Austin, Texas 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)

**WILLKIE FARR & GALLAGHER LLP**

Richard Mancino (NY Bar No. 1852797)
Samuel Kalar (NY Bar No. 5360995)
JoAnna Suriani (NY Bar No. 5706395)

787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: rmancino@willkie.com
       skalar@willkie.com
       jsuriani@willkie.com

-AND-

Jennifer J. Hardy (TX Bar No. 24096068)
Denis A. Fallon (TX Bar No. 24059731)
Garrett Johnston (TX Bar No. 24087812)
Audra White (TX Bar No. 24098608)

600 Travis Street, Suite 2100
Houston, Texas 77002
Telephone: (713) 510-1700
Facsimile: (713) 510-1799
Email: jhardy2@willkie.com
       afallon@willkie.com
       gjohnston@willkie.com
       awhite@willkie.com

50

*COUNSEL FOR PLAINTIFFS*

**CERTIFICATE OF SERVICE**

By my signature below, I certify that a true and correct copy of the foregoing has been served on all counsel of record on July 6th, through the Electronic Case File System of the Western District of Texas.

/s/ *Hani Mirza*

51