## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES MOVE TEXAS CIVIC FUND, AND LEAGUE OF WOMEN VOTERS OF TEXAS, *Plaintiffs*, | § § § § § § § | |
| v. | § § | No. 5:19-cv-00963 |
| TEXAS SECRETARY OF STATE; TRUDY HANCOCK IN HER OFFICIAL CAPACITY AS BRAZOS COUNTY ELECTIONS ADMINISTRATOR; AND PERLA LARA IN HER OFFICIAL CAPACITY AS CITY OF MCALLEN, TEXAS SECRETARY, *Defendants*. | § § § § § § § § | |

### DEFENDANT SECRETARY OF STATE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The Secretary's Motion for Summary Judgment (MSJ), Dkt. 70, explains why sovereign immunity and the Plaintiffs' lack of standing deprive this Court of jurisdiction, and further sets out the reasons Plaintiffs' claims fail on the merits. Rather than rebut this showing, Plaintiffs' MSJ, Dkt. 65, emphasizes that this suit cannot proceed against the Secretary, that Plaintiffs lack any cognizable injury-in-fact, and that Plaintiffs' claims are fatally flawed on the merits. Plaintiffs' case against the Secretary should be dismissed for the reasons already briefed, as well as those here.

## I.    Sovereign Immunity Bars Plaintiffs' Case Against the Secretary.

Sovereign immunity bars Plaintiffs' claims against the Secretary because there is not a "sufficient connection between the defendant state officials and the challenged statute." *Okpalobi v. Foster*, 244 F.3d 405, 415 (5th Cir. 2001) (en banc) (plurality); Dkt. 70 at 11-13. Plaintiffs' MSJ emphasizes this result, stating that "[the] Secretary[], Trudy Hancock, in her official capacity as Brazos County Elections Administrator ("Brazos County EA"), and Perla Lara, in her official capacity as City

1

of McAllen, Texas Secretary ("McAllen City Secretary") are responsible for enforcing the signature comparison procedure *in their respective jurisdictions*." Dkt. 65 at 8. But the Secretary lacks jurisdiction to enforce the signature-verification process—in Brazos County, in the City of McAllen, in *any* jurisdiction. Rather, as Plaintiffs explain, every step in the process (including applying for, receiving, marking, returning, reviewing, and counting mail-in ballots) is carried out by an early voting clerk ("EVC"), early voting ballot board ("EVBB"), EVBB presiding judge, or the voter themselves. Dkt 65 at 12-16, 14 ("[t]he Texas Election Code tasks the EVC with handling virtually every aspect of early voting within their respective jurisdictions."), 9 ("Because the EVC generally controls every other aspect of the early voting process, the EVC also has authority to manage the EVBB . . .").

Plaintiffs' MSJ makes plain that the Secretary lacks "the *particular duty* to enforce the statute in question," *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (citation omitted), and sovereign immunity bars this case against her for the reasons already briefed. Dkt. 70 at 11-13.

Moreover, even if the Secretary had the authority Plaintiffs claim, sovereign immunity would bar the Court from ordering her to fulfill state-law obligations. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). The *Ex parte Young* exception to immunity is limited to injunctions "prevent[ing] [a state official] from doing that which he has no legal right to do." 209 U.S. 123, 159 (1908). It does not authorize injunctions directing "affirmative action." *Id.*; *see also Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949) (noting that sovereign immunity applies "if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign"). Put differently, sovereign immunity bars "cases where the [defendant] sued could satisfy the court decree only by acting in an official capacity." *Zapata v. Smith*, 437 F.2d 1024, 1026 (5th Cir. 1971). As such, "an injunction ordering the Secretary to promulgate a rule" would be "extraordinary relief" that "raised serious federalism concerns, and it is doubtful that a federal court would have authority to order it." *Jacobson v. Fla. Sec'y of State*, 957 F.3d

1193, 1211–12 (11th Cir. 2020). *See also, e.g., Painter v. Shalala*, 97 F.3d 1351, 1359 (10th Cir. 1996) (Sovereign immunity bars a claim for which "the requested relief . . . . would require us to order the Secretary to take various forms of affirmative action.").

## II.    Plaintiffs Lack Standing to Maintain this Case Against the Secretary.

Courts cannot issue an injunction covering multiple Plaintiffs without determining that each one has standing. *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) (holding a remedy must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established"). And as the Secretary has explained, no Plaintiff has standing because none can show injury-in-fact, causation, and redressability. Dkt. 70 at 13-21. In a last-ditch effort to revive their case, Plaintiffs append conclusory, self-serving affidavits to their MSJ. *E.g.*, Dkt. 65-1 at 527, 578, 614, 659, 728, 796. The Federal Rules of Civil Procedure require that the Court disregard these declarations to the extent they are not corroborated elsewhere in the record. *See, e.g.*, FED. R. CIV. P. 37(c)(1) ("If a party fails to provide information [during discovery], the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial . . . .").

But even if these declarations could properly be considered to establish Plaintiffs' standing to maintain this case, they would not accomplish that purpose.

### A.    Individual Plaintiffs Lack Standing.

As the Fifth Circuit recently explained,

Requests for injunctive and declaratory relief implicate the intersection of the redressability and injury-in-fact requirements. The redressability requirement limits the relief that a plaintiff may seek to that which is likely to remedy the plaintiff's alleged injuries. Because injunctive and declaratory relief "cannot conceivably remedy any past wrong," plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury. That continuing or threatened future injury, like all injuries supporting Article III standing, must be an injury in fact. To be an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) "concrete and particularized," not abstract; and (3) "actual or imminent, not 'conjectural' or 'hypothetical.'" The purpose of the requirement that the injury be "imminent" is "to ensure that the alleged injury is not too speculative for Article III

purposes." For a threatened future injury to satisfy the imminence requirement, there must be at least a "substantial risk" that the injury will occur.

*Stringer v. Whitley*, 942 F.3d 715, 720–21 (5th Cir. 2019) (citations omitted).

The Individual Plaintiffs cannot meet this standard. Their MSJ claims injury based upon (1) the rejection of one mail-in ballot in the past, and (2) the possibility that each might vote by mail in the future. *See* Dkt. 65 at 23-26. The asserted "past wrong" of ballot-rejection "cannot conceivably [be] remed[ied]" by the declaratory and injunctive relief sought here. *Stringer*, 942 F.3d at 720 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 108 (1998)). And alleging that they might vote by mail in the future does not show "certainly impending" injury-in-fact—not only is it speculative that Individual Plaintiffs will vote this way, there is no basis to conclude that their hypothetical future ballots will be rejected. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *see also Stringer*, 942 F.3d at 721 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)) (requiring that injury be "actual or imminent, not 'conjectural' or 'hypothetical'" in order to confer standing).

Indeed, standing "does not follow from the conclusion that the injunctive relief sought by a plaintiff would prevent the plaintiff from suffering the same injury in the future, **which is always true** when a plaintiff seeks an injunction prohibiting a defendant from repeating an action that injured the plaintiff in the past." *Stringer*, 942 F.3d at 721 (emphasis added). Instead, "Plaintiffs must also show that there is a substantial risk that they will suffer the potential future injury absent their requested relief." *Id.* The only attempt at such a showing in Plaintiffs' MSJ is an ad hoc calculation of how many ballots cast under the Uniformed & Overseas Citizens Absentee Voting Act were rejected "for signature issues" in 2016 and 2018. Dkt. 65 at 8 n.1. There is no evidence that either Individual Plaintiff votes under that Act. And even if there were such evidence, "general data . . . does not establish a substantial risk that Plaintiffs themselves will" be injured. *Stringer*, 942 F.3d at 722. Rather, "Plaintiff-specific [proof is] needed before Plaintiffs' claims can be properly characterized as an attempt to remedy an imminent injury to Plaintiffs instead of a generalized grievance available to all Texans." *Id.*

4

Here, there is no evidence to suggest that either Individual Plaintiff will have a mail-in ballot rejected for signature mismatch. (In fact, Dr. Richardson has affirmatively disavowed the notion that any mail-in ballot he casts in the future will be rejected. Richardson Dep. 38:4, 6-20 (Dkt. 70-1 at 17). Neither Individual Plaintiff has standing because neither can show certainly impending injury as required for Article III standing. Dkt. 70 at 13-15.

**B.    CTD and LWV Lack Associational Standing.**

CTD and LWV seek to maintain this case "on behalf of [their] members who use the mail-in ballot process." Dkt. 65 at 27 (CTD), 33 (LWV). As already briefed, neither meets the standard for associational standing, Dkt. 70 at 18-20. Plaintiffs' MSJ confirms this result.

The only purported members CTD identifies are four people who "intend to vote by mail due to their disability in the future." Dkt. 65 at 27 n.85. LWV asserts that "it has named multiple members who will use mail-in ballots in upcoming elections," and refers to a survey it circulated in May, 2020, where anonymous responders (who LWV has not proven are "members") "indicated use of mail-in ballots in the past, or both the use of mail-in ballots in the past and an intent to do so in the future." Dkt. 65 at 33-34, n.118. For the same reasons such allegations are insufficient to give the Individual Plaintiffs standing, they also fail to establish CTD's or LWV's organizational standing to sue on behalf of others. Dkt. 70 at 19-20; *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (recognizing that an "organization lack[s] standing" to sue on behalf of its members unless it provides evidence "showing, through specific facts[,] that one or more of its members would be directly affected by the allegedly illegal activity.") (cleaned up).

Plaintiffs' ad hoc tabulation, discussed above, does not save CTD's or LWV's assertion of associational standing. Even if there were evidence that CTD or LWV assisted or otherwise represented uniformed or overseas voters (there is not), the Supreme Court has rejected the notion that standing can be established by "'accepting the organization's self-description of the activities of

its members' and determining that 'there is a statistical probability that some of those members are threatened with concrete injury.'" *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 343-44 (5th Cir. 2012) (quoting *Summers*, 555 U.S. at 497). Because this is all CTD and LWV have done here, they have not shown associational standing to maintain this case.

### C. Plaintiff Organizations Lack Direct Standing.

No Plaintiff Organization has standing to sue in its own right. Dkt. 70 at 15-18. They do not even attempt to show that their alleged injury—predicated upon their everyday voter-registration and voter-education activities—is caused by or redressable through the Secretary. Dkt. 70 at 14-15. And their attempt to show injury on a diversion-of-resources theory fails under settled Fifth Circuit caselaw.

Plaintiff Organizations' voter-registration and voter-education efforts are not, and have never been, designed to counteract allegedly erroneous rejections of mail-in ballots for signature mismatch. Dkt. 70 at 17, n.75. It is unsurprising, then, that no Plaintiff Organization presents evidence that it diverted resources from its normal activities to combat the allegedly unlawful effects of the signature-verification procedure at issue in this lawsuit. Dkt. 70 at 17 nn.75, 76. Rather, after thousands of pages of discovery and nearly a dozen depositions, Plaintiff Organizations show—at most—that they occasionally discuss mail-in-ballots in the course of their everyday voter-education and voter-registration activities. It is not an injury to address mail-in ballot procedures when providing training on voter-registration in general. *See, e.g.*, *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459-60 (6th Cir. 2014); *see also* Dkt. 70 at 15-19.

This is a dispositive distinction. *ACORN v. Fowler*, 178 F.3d 350 (5th Cir. 1999), considered three National Voter Registration Act ("NVRA") challenges to Louisiana's voter registration procedures. ACORN proved that it "engages in voter registration drives in Louisiana, that it provides voter registration applications to unregistered potential members, and that it makes voter registration applications available at housing fairs that it attends throughout the year." *Id.* at 359. ACORN also

established that it "hired [and supervised] staff" to conduct voter registration training and "coordinated voter registration drives," among similar activities, *id.* claiming "that its efforts registering voters in Louisiana counteract the appellees' failure to properly implement the NVRA." *Id.* at 360.

The Fifth Circuit found no injury with respect to two of ACORN's NVRA claims, holding that hiring and supervising voter-registration staff was no injury because ACORN could not prove that it undertook these activities as "a direct result of Louisiana's alleged failure to properly implement the NVRA." *Id.* at 360. The court also rejected "ACORN's allegations of injury due to including voter registration applications with its membership applications or 'set[ting] up' a voter registration table at housing fairs that it already attends" because ACORN could not show "any concrete or identifiable resources that ACORN could reallocate to other uses, if Louisiana were to properly implement the NVRA, that it now spends engaging in these activities." *Id.* Thus, the court held that ACORN was not "'perceptibly impaired' by the appellees' purported failure to implement the NVRA." *Id.* (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)) (finding sufficient injury where defendants' actions had "perceptibly impaired" organization).

The Court did find a fact question regarding ACORN's third NVRA claim, because ACORN had "concentrated" a voter-registration program to specifically target "a population directly affected by one of the NVRA requirements that ACORN claims Louisiana has failed to implement." *Id.* at 361. Such a targeted attempt could amount to injury, the court reasoned, if ACORN could prove that its voter-registration program specifically "counteract[ed] Louisiana's alleged failure to implement the [NVRA]." *Id.* This was the only injury that the court found "concrete and demonstrable" for standing purposes. *Id.* at 362. For ACORN's other voter-registration activities, the Court concluded that "[t]here is simply no suggestion in the record that anyone it has registered through its voter registration drives would already have been registered to vote if Louisiana implemented the NVRA requirements that form the basis of its first two claims." *Id.*

7

The evidence here compels this same result. Because no Plaintiff Organization can prove that it "went out of its way to counteract the effect of Texas's allegedly unlawful" signature-comparison procedure, none can establish standing on a diversion-of-resources theory. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017); Dkt. 70 at 15-18.

Perhaps aware of this deficiency, MOVE and LWV attempt an eleventh-hour pivot, urging that their mail-in-ballot-related activities have increased for reasons unrelated to the Secretary—specifically, an increase in mail-in voting that Plaintiffs predict as a result of the COVID-19 pandemic. *See* Dkt. 65-1 at 731, ¶ 11; 800, ¶ 15. Even if this information—which was not disclosed in discovery—could properly be considered at this stage (it cannot), it would not establish standing, for two reasons. First, any plaintiff must have standing not only throughout the life of the litigation, but at the time they filed suit. *Pluet v. Frasier*, 355 F.3d 381, 386 (5th Cir. 2004); *Soc'y of Separationists, Inc. v. Herman*, 959 F.2d 1283, 1288 (5th Cir. 1992). Thus, a plaintiff's 2020 activities cannot retroactively give them standing to maintain this 2019-filed suit. Second, because they admit that these activities are taken in response to COVID-19—and not in response to any action by the Secretary—such activities do not confer standing to sue *her. See Town of Chester, N.Y. v. Laroe Estates*, 137 S. Ct. 1645, 1650-51 (2017) (Standing is "not dispensed in gross," and Court "cannot hold" either dangers posed by an act of nature or "private citizens' decisions to stay home . . . against the State."). And, in any event, Plaintiffs have still not shown these activities are targeted to the allegedly unlawful signature-verification process at issue here.

A Louisiana district court recently recognized both of these principles in a challenge to Louisiana's mail-in ballot framework in the context of COVID-19, rejecting the notion that the activities described in MOVE's and LWV's eleventh-hour affidavits can confer organizational standing. *Clark v. Edwards*, No. CV 20-283-SDD-RLB, 2020 WL 3415376, at *12 (M.D. La. June 22, 2020). The court first held that where challenged provisions "were already part of Louisiana law . . .

[an] organization cannot claim to be expending resources to research, understand, and educate the public on new laws" for purposes of establishing organizational injury. *Id.* And despite the fact that policies "related to the [corona]Virus are new . . . the Court [wa]s unpersuaded that conducting voter education on those [changes] is 'out of the way' for an organization with a self-described mission to 'increase voter participation.'" *Id.* The court also touched on causation, concluding that, "even assuming that [the plaintiff organization] had alleged an injury, that injury is traceable to the Virus, not to the State actions of Defendants." *Id.* These principles apply with equal force here.

Plaintiff Organizations' voter-registration efforts are, plainly, part and parcel of their "daily operations." *OCA-Greater Hous.*, 867 F.3d at 612. And they have done nothing to target those activities specifically toward remedying the alleged wrong in this case: rejection of mail-in ballots during the signature-verification process. This is fatal to Plaintiff Organizations' assertion of injury based on a diversion-of-resources theory. *See, e.g.*, *Fowler*, 178 F.3d at 359, Dkt. 70 at 15-18.

## III.   Plaintiffs' Constitutional Claims Fail on the Merits.

Even if the Court ignores sovereign immunity and the Plaintiffs' failure to establish Article III standing, it should still enter summary judgment dismissing the Secretary as a defendant. This is because, on its face and as applied to Plaintiffs, Texas's signature-verification process satisfies both the rational basis review applicable to mail-in ballot restrictions and *Anderson-Burdick*. Dkt. 70 at 21-30. Plaintiffs' MSJ offers nothing that might alter that result.

### A.   Due Process

As set forth in the Secretary's MSJ, Plaintiffs' due process challenge fails on the merits. Dkt. 70 at 21-27. Two points merit further emphasis in light of the arguments in Plaintiffs' MSJ.

<u>First</u>, the right to vote is not a liberty or property interest capable of triggering the Due Process Clause. In *Johnson v. Hood*, "voters whose ballots were rejected" argued that they "had been deprived of due process of law" because the procedures had been "arbitrary." 430 F.2d 610, 611–12 (5th Cir.

1970) (per curiam). The Fifth Circuit rejected their claim because "even an improper denial of the right to vote for a candidate for a state office achieved by state action is not a denial of a right of property or liberty secured by the due process clause." *Id.* at 612 (quotation omitted). *See also, e.g., Welch v. McKenzie*, 765 F.2d 1311, 1317 (5th Cir. 1985) ("due process claims of denial of the right to vote" including those that involve, for example, a "'dispute over the counting and marking of ballots' . . . are not actionable in federal court because of our federal system's recognition that states are primarily responsible for regulating their own elections.") (citations omitted); U.S. CONST. art. I § 4, cl. 1.

But even if Plaintiffs' had a procedural due process interest in voting a mail-in ballot that was cognizable in federal court, Texas's process is sound. Texas law empowers county election officers to "determine[] that a ballot was incorrectly rejected or accepted by the [EVBB] before the time set for convening the canvassing authority," and, if the chair of each party agrees, "petition a district court for injunctive or other relief as the court determines appropriate." TEX. ELEC. CODE § 87.127. Unsatisfied with this option despite their failure to pursue it, Plaintiffs complain that this option is available "to the county official, not the voter," and is "difficult to utilize to correct an error." Dkt. 65 at 17. But they cite no authority for the proposition that empowering county officials to seek judicial relief somehow undermines the adequacy of this corrective process. Instead, tellingly, Plaintiffs' purported "evidence" of inadequacy is simply that § 87.127 is rarely invoked—not that it *cannot* be invoked, and certainly not that Plaintiffs invoked it to no avail. *See* Dkt. 65 at 17-18 n.23.

Moreover, Texas law provides means to contest the outcome of an election, which offer additional avenues for review and evaluation of ballots, including those voted by mail. *See, e.g.,* TEX. ELEC. CODE §§ 221.001-243.013, 221.003(a) (scope of election contest inquiry includes review of whether an election officer "failed to count legal votes" or "engaged in other fraud or illegal conduct or made a mistake.") There is no evidence that any Plaintiff pursued such an option here, nor is there a basis to conclude that the election-contest process—particularly coupled with the option available

to county election officers under § 87.127—is anything but a fair and adequate avenue to obtain corrective action in state court. This provides an independently dispositive reason why Plaintiffs' due process claim is not cognizable under § 1983. *See Gamza v. Aguirre*, 619 F.2d 449, 453 (5th Cir. 1980) ("If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral process, would be superseded by a [§] 1983 gloss.").

Second, Plaintiffs argue that the appropriate standard of review for their procedural due process claim is *Mathews v. Eldridge*. Dkt. 65 at 36 (citing 424 U.S. 319, 335 (1976)). The Secretary has explained that, because it arises in the context of mail-in ballots (rather than the right to vote itself) Texas's signature-verification process survives the applicable rational basis review and why, even if *Anderson-Burdick* applied, it would satisfy that standard, too. Dkt. 70 at 21-30. Texas's signature-verification process would also survive *Mathews*, if that standard applied.

Under *Mathews*, a court determining what process is due in connection with the deprivation of a liberty or property interest must balance three considerations:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335. The first factor would require Plaintiffs to show a protected liberty interest in casting a mail-in ballot. *Id.* at 332. The Supreme Court has held that, where other means of voting are available, no such liberty interest exists. *See, e.g.,* Dkt. 70 at 23.

As to the second factor, Plaintiffs wholly fail to prove any "risk of an erroneous deprivation of" their claimed interest in mail-in voting "through the procedures used," *Mathews*, 424 U.S. at 335. Individual Plaintiffs have not even availed themselves of the procedures available, and therefore

cannot demonstrate whether they are effective for remediation. Plaintiffs' calculation of ballots rejected for signature mismatch is similarly unhelpful. It is not proper summary judgment evidence, and even if it were, it shows only that ballots were rejected—not that any of those ballots should have been accepted, not that any of those ballots would have been accepted if reviewed by a different EVBB, and not that any voters who cast one of those ballots sought recourse from a county election official or court but was unsuccessful. The evidence therefore shows, at the very most, that (1) two individuals' ballots were rejected, (2) those individuals believe their ballots were incorrectly rejected, and (3) those individuals did not contact local election officials to request corrective court action or attempt to pursue an election contest. This paltry showing is insufficient.

Nor do Plaintiffs show "the probable value, if any, of additional or substitute procedural safeguards," *Mathews* at 335. This is perhaps unsurprising, as Plaintiffs have not offered a concrete proposal for such safeguards—either in discovery or in their MSJ—instead parroting a purported entitlement to "pre-rejection notice and an opportunity to cure." *E.g.*, Dkt. 65 at 9, 36. But Plaintiffs do not dispute that voters receive notice when their mail-in ballot is rejected. And without a specific cure proposal, Plaintiffs cannot show that such procedure would, in fact, result in any erroneously rejected ballot being accepted, or create any value over and above what is already available via an election contest or other court action.

For this reason, Plaintiffs cannot establish the third *Mathews* factor. Without knowing, in any concrete sense, the additional steps Plaintiffs would have local election officials take, the fiscal and administrative burdens are unknown at best. It is clear, however, that Texas law expressly permits local election officials up to ten days to deliver a rejection notice to a voter, TEX. ELEC. CODE § 87.0431. It is also clear that Texas law contains specific timeframes in which election results must be canvassed, *see, e.g.*, *id.* §§ 67.003(b), (c), 67.012(a). There is potential for an additional step to work

chaos into this process, including by potentially preventing the timely canvassing of election results so that they may be reported to the people of Texas.

### B.   Equal Protection

Plaintiffs argue that *Anderson-Burdick* applies to their equal protection claim, and that under this framework, the relevant burden is "the irreversible disenfranchisement caused by Defendants' rejection of mail-in ballots for perceived signature mismatches without any viable notice and opportunity for correction." Dkt. 65 at 60. Even "[t]he unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination." *Snowden v. Hughes*, 321 U.S. 1, 8 (1944).

Plaintiffs' equal protection claim fails for at least four reasons.

First, Plaintiffs have not proven the most basic and essential requirement of any § 1983 equal protection claim—intentional and purposeful discrimination. The Fifth Circuit has held that proof of intentional or purposeful discrimination is an essential element of an equal protection challenge to the manner in which a state conducts elections. "In the absence of evidence that [an] alleged maladministration of the local election procedures was attended by the intention to discriminate against the affected voters or motivated by a desire to subvert the right of the voters to choose their [] representative, we cannot conclude that [an] error constituted a denial of equal protection of the laws." *Gamza*, 619 F.2d at 454. Caselaw from around the country confirms this result. *See, e.g., Gold v. Feinberg*, 101 F.3d 796, 800 (2nd Cir. 1996) ("a § 1983 action to remedy errors in the election process allegedly violating the equal protection clause does not exist unless the state action constituted 'intentional or purposeful discrimination.'"), *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970) ("[u]neven or erroneous application of an otherwise valid statute constitutes a denial of equal protection only if it represents 'intentional or purposeful discrimination.'") (both quoting *Snowden*, 321 U.S. at 8).

"[T]he determination that particular conduct constitutes a constitutional deprivation" involves considering "whether it was inflicted intentionally or accidentally," and "whether state officials have succumbed to 'temptations to control ... elections by violence and by corruption.'" *Id.* at 453. (quoting *Ex parte Yarbrough*, 110 U.S. 651, 666 (1884)). There is no evidence to support such a finding here, and as a result, Plaintiffs' equal protection claim fails.

<u>Second</u>, even if evidence of discriminatory intent were not required to establish an equal protection violation, Plaintiffs have presented absolutely no evidence of any discriminatory effect. The signature-verification process applies equally to all voters who choose to vote by mail. It requires local election officials to accept ballots if the signature on the ABBM and carrier envelope "could [] have been made by the same person," Ingram Dep. 50:9-10 & Ex. 6 (Dkt. 71-1 at 41, 44-48), unless signed by a witness. TEX. ELEC. CODE §§ 87.041(b)(1)-(2). There is no evidence that county election officials enforce this facially neural statute in a discriminatory way. *Cf. Washington v. Davis*, 426 U.S. 229, 241 (1976) ("A statute, otherwise neutral on its face, must not be applied so as invidiously to discriminate on the basis of [a protected characteristic].")

<u>Third</u>, Texas's signature-verification procedure easily survives *Anderson-Burdick*, *see* Dkt. 70 at 21-30. Voting-related associational rights "are not absolute and are necessarily subject to qualification if elections are to be run fairly and effectively." *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986). As to the "right" to vote, the Supreme Court has noted that the Constitution "does not confer the right of suffrage upon any one," *Minor v. Happersett*, 88 U.S. 162, 178 (1874), and that "the right to vote, *per se*, is not a constitutionally protected right." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 n.78 (1973). To the extent the Equal Protection Clause applies to those voting by mail, Texas's signature-verification requirement is supported by numerous important state interests which are amply sufficient to justify any burden on the right to vote. Dkt. 70 at 25-27.

14

And as the Secretary has briefed, rational basis applies to the signature-verification process at issue. Dkt. 70 at 21-23. In conducting rational basis review, the Supreme Court will not overturn government action unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the government's actions were irrational. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83–84 (2000) (quotation and brackets omitted). Texas's signature-verification process survives rational-basis review for the same reasons it survives under the *Anderson-Burdick* framework.

Fourth, *Bush v. Gore* is wholly inapposite. 531 U.S. 98 (2000). That case involved evidence that

> Palm Beach County . . . began the [recount] with a 1990 guideline which precluded counting completely attached chads, switched to a rule that considered a vote to be legal if any light could be seen through a chad, changed back to the 1990 rule, and then abandoned any pretense of a per se rule, only to have a court order that the county consider dimpled chads legal.

*Id.* at 106-07. Per the Court, "*this* is not a process with sufficient guarantees of equal treatment." *Id.* at 107. The issue was not that the standard itself was vague, but that there was really no standard at all. *See id. Bush* also identified equal protection problems insofar as some counties included overvotes and undervotes in their recounts while others did not, and some completed their recounts while others didn't. *Id.* at 108-09. None of these circumstances is present here. Rather, Texas's process is akin to the Oregon law upheld in *Lemons*, where "county elections officials use a uniform standard: whether a [] signature matches the [signer's previous] signature." 538 F.3d 1098, 1105 (9th Cir. 2008). "[T]his standard is uniform and specific enough to ensure equal treatment of voters." *Id.*

Plaintiffs protest that, according to forensic document examiner (FDE) Dr. Linton Mohammed, election officials are likely to make erroneous determinations when comparing signatures. Dkt. 65 at 46. Dr. Mohammed's testimony is unhelpful in assessing Texas's signature-verification process, because FDEs and Texas election officials do not utilize the same standard. Texas EVBBs and SVCs assess whether signatures "could [] have been made by the same person" based on the ABBM, carrier envelope, and signatures on file from the past six years. Ingram Dep. 50:9-10 &

15

Ex. 6 (Dkt. 71-1 at 41, 44-48); *see also* Dkt. 65-1 at 57-106 (2020 EVBB & SVC Handbook); TEX. ELEC. CODE §§ 87.041(e), (f), 87.027(i). FDEs, on the other hand, assess signatures on a nine-point scale, where 1 means the FDE is "very confident" two signatures are by the same writer, 9 means the FDE is "very confident" two signatures are by a different writer, and the level of certainty weakens as the FDE's score nears 5. Mohammed Dep. 32:1-23 (Dkt. 70-7 at 29). Dr. Mohammed's testimony is further unhelpful because he did not visit any Texas county to observe signature verification, did not consider any studies applying Texas's signature-verification standard, and did not review the current guidance promulgated by the Secretary of State for local election officials responsible for signature-verification. Mohammed Dep. 24:22-24, 25:22-26:4 (Dkt. 70-7 at 21-23).

Plaintiffs cannot rely upon Dr. Mohammed's testimony to establish a constitutional violation.

## C.    Relief

"A facial challenge to a legislative Act is [] the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Plaintiffs have not even attempted to prove that Texas's signature-verification process creates an unconstitutional burden in all circumstances (as they must for a facial claim). Nor have they shown that the process creates an unconstitutional burden when considered "categorically" rather than based on "the peculiar circumstances of individual voters" (as is necessary for all claims). *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 206 (2008) (Scalia, J., concurring in the judgment). They are not entitled to as-applied relief.

Every election law "invariably impose[s] some burden upon individual voters," *Burdick v. Takushi*, 504 U.S. 428, 433 (1992), and there is no constitutional right to be free from "the usual burdens of voting." *Crawford*, 553 U.S. at 198. Thus, when assessing an alleged burden, courts must assess its impact "categorically" upon all voters, without "consider[ing] the peculiar circumstances of individual voters." *Crawford*, 553 U.S. at 206 (Scalia, J., concurring in the judgment). This follows from

numerous Supreme Court cases. For example, in holding that Hawaii's ban on write-in voting "impose[d] only a limited burden on voters' rights to make free choices and to associate politically through the vote," the Court looked to the ban's effect on Hawaii voters generally, not the plaintiff specifically. *Burdick*, 504 U.S. at 439, 436-37. In rejecting the New Party's challenge to Minnesota's ban on fusion candidates, the Court examined the ban's effect on "minor political parties" generally, not on the New Party in particular. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 361-62 (1997). And in rejecting a voter challenge to Oklahoma's semi-closed primary system, the Court emphasized that such "primary system does not severely burden the associational rights of the state's citizenry" generally—irrespective of its effect on the individual plaintiffs. *Clingman v. Beaver*, 544 U.S. 581, 593 (2005). This line of cases "refute[s] the view that individual impacts are relevant to determining the severity of the burden" that "a generally applicable, nondiscriminatory voting regulation" imposes. *Crawford*, 553 U.S. at 205 (Scalia, J., concurring in the judgment).

That precedent requires assessing burdens categorically should be no surprise; the Equal Protection Clause itself compels this approach, and "weighing the burden of a nondiscriminatory law upon each voter and concomitantly requiring exceptions for vulnerable voters would effectively turn back decades of equal-protection jurisprudence." *Id.* at 207. "A voter complaining about such a law's effect on him has no valid equal-protection claim because, without proof of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional." *Id.* (citing *Washington v. Davis*, 426 U.S. at 248). In short, the "Fourteenth Amendment does not regard neutral laws as invidious ones, *even when their burdens fall disproportionately on a protected class.*" *Id.*

If it imposes any burden at all, the burden of Texas's signature-verification requirement is "[o]rdinary and widespread, ... requiring 'nominal effort' of everyone." *Id.* (quoting *Clingman*, 544 U.S. at 591). Indeed, all Texas mail-in voters "have the same right as any voter to read the instructions in front of them and to follow them to ensure their intended vote is recorded." *Tex. Democratic Party v.*

*Williams*, No. 1:07-cv-115-SS, 2007 WL 9710211, at *5 (W.D. Tex. Aug. 16, 2007), aff'd, 285 F. App'x

194 (5th Cir. 2008). Any idiosyncratic effects this might have on particular voters thus "are not severe,"

*Crawford*, 553 U.S. at 205, and are amply justified by the State's important interests.

 Finally, even if any as-applied relief were appropriate (it is not), the Supreme Court has rejected

the notion "that the proper remedy–even assuming an unjustified burden on some voters—would be

to invalidate the entire statute." *Id.* at 203; *see also Veasey v. Abbott*, 830 F.3d 216, 249 & n.40 (5th Cir.

2016). Where "equal treatment can be achieved either by 'withdrawal of benefits from the favored

class' or by 'extension of benefits to the excluded class . . . [h]ow equality is accomplished ... is a matter

on which the Constitution is silent." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 416–17 (5th Cir.

2020) (quoting *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1698 (2017)). In such circumstances, courts

must "look to the legislature's intent, as revealed by the statute at hand," and "if the discriminatory

exception consists of *favorable* treatment for a discrete group, strike the discriminatory exception and

extend the general rule to cover the previously favored group." *Id.* (cleaned up).

 Judge Ho recently applied this principle in the context of mail-in voting for voters under 65:

> Under Texas law, in-person voting is the rule, and mail-in voting is the exception. And that is
> consistent with the judicial consensus that "fraud is much greater in the mail-in ballot context
> than with in-person voting." So if Plaintiffs are entitled to relief, it is presumably the "leveling-
> down" injunction noted by Texas—an injunction "requiring all to vote in person," not one
> "extend[ing] mail-in voting to those under 65."

*Id.* (quoting *Veasey*, 830 F.3d at 239) (citing *Olsen v. DEA*, 878 F.2d 1458, 1464 (D.C. Cir. 1989)

("[W]hich would the political branches choose? It would take a court bolder than this one to predict

... that extension, not invalidation, would be the probable choice.").

 Thus, assuming merely for the sake of argument that due process or equal protection warranted

any relief (and they do not), the only avenue would be to "level down" the allegedly discriminatory

provisions by requiring all Texas voters to vote in-person.

## IV.   CTD's Claims Under the ADA/RA Similarly Fail.

The Secretary's prior briefing on CTD's ADA/RA claims, Dkt. 70 at 30-32, is amply sufficient for the Court to enter summary judgment dismissing those claims, but the Secretary responds briefly to correct several misrepresentations in Plaintiffs' MSJ.

<u>First</u>, CTD claims that it is "undisputed" that they have "members" who are qualified individuals with disabilities for purposes of the ADA/RA. Dkt. 65 at 53. The Secretary has argued— and maintains—that the record lacks sufficient evidence to support this notion. *E.g.*, Dkt. 70 at 18-20. And even if it were undisputed, that would not suffice to meet Plaintiffs' burden of proof. *See Summers*, 555 U.S. at 499.

<u>Second</u>, Plaintiffs' MSJ makes absolutely no effort to show how Texas's accommodations for voters with disabilities are inadequate. As the Secretary has explained, voters with disabilities may vote by having a witness sign the carrier envelope (after the ballot is inside, preserving the secrecy of the ballot). Voters with disabilities also have the option to vote in-person, a process which accommodates voters by, *inter alia*, allowing for curbside voting, allowing a voter to be assisted by an assistant of their choosing if they wish, and allowing local election officers to modify procedures as necessary to ensure Texans with disabilities are able to vote. TEX. ELEC. CODE § 64.009. Texas law also requires polling places to provide voting stations that comply with the RA and ADA Title II and "provide[] a practical and effective means for voters with physical disabilities to cast a secret ballot." *Id.* § 61.012.

Plaintiffs make no meaningful effort to overcome this showing, instead citing a string of irrelevant, out-of-circuit cases. For example, *National Federation of the Blind v. Lamone* challenged an "absentee voting program [that did] not allow disabled individuals . . . to mark their ballots without assistance." 813 F.3d 494, 506 (4th Cir. 2016). According to Plaintiffs' own characterization, *California Council of the Blind* involved those same circumstances. Dkt. 65 at 57 (citing 985 F. Supp. 2d 1229, 1239 (N.D. Cal. 2013). Texas's signature-verification process imposes no such limitation. A voter who is

unable to provide a required signature because of disability may mark the ballot in private and simply have a witness sign the carrier envelope after the ballot is already inside. TEX. ELEC. CODE § 87.041(b)(1)-(2)*; see also id.* § 1.011(a). *Disabled in Action v. Bd. of Elections in City of New York* is similarly unhelpful because in that case "[t]he steps required by the [ADA and RA] include the very accommodations that plaintiffs propose—providing accessibility equipment and ramps, assigning individuals to assist those with disabilities, and relocating services to accessible locations." 752 F.3d 189, 201 (2d Cir. 2014). There is no evidence that Texas is failing to comply with these requirements.

Plaintiffs' ADA/RA argument boils down to the notion that, no matter how a Texan with a disability chooses to vote, there may be a burden involved. For those who choose to vote by mail, they will need a witness to sign if they are unable to satisfy the State's signature requirements themselves. Those who vote in person at a polling place may utilize curbside, assisted, and/or ADA-compliant voting, but it is not always easy for Texans with disabilities to visit the polling place. Still, Plaintiffs have failed to identify any Texas voter who is unable to use either of these options. Moreover, ADA Title II and the RA require only "reasonable modifications" that would not fundamentally alter the nature of the government program. *See, e.g., Tennessee v. Lane*, 541 U.S. 509, 532 (2004).

Plaintiffs therefore fail to show that the opportunities Texas provides voters with disabilities to cast a ballot denies them any rights secured under the ADA or RA.

CONCLUSION

For the foregoing reasons, the Court should enter summary judgment dismissing the Secretary as a defendant in this case.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Texas Bar No. 24078898
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov

**ATTORNEY FOR DEFENDANT
TEXAS SECRETARY OF STATE**

CERTIFICATE OF SERVICE

I certify that that on July 7, 2020, this document was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Assistant Attorney General