# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | |
|---|---|
| DR. GEORGE RICHARDSON, *et al.* § <br> *Plaintiffs*, § <br> § <br> v. § <br> § <br> TEXAS SECRETARY OF STATE, *et al.*, § <br> *Defendants*. § | No. 5:19-cv-00963 |

## DEFENDANT SECRETARY OF STATE'S
## REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

For the reasons in the Motion for Summary Judgment, Dkt. 70, and Response in Opposition to Plaintiffs' Motion for Summary Judgment, Dkt. 75, filed by Defendant Texas Secretary of State (Secretary), Plaintiffs' claims against the Secretary fail as a matter of law. Not only does sovereign immunity bar this case, no Plaintiff has shown any ongoing injury-in-fact or established that their grievances are caused by or redressable through the Secretary. Moreover, Associational Plaintiffs cannot show that they are membership organizations under associational standing jurisprudence, and neither has identified any purported member with standing to sue. Plaintiff Organizations also lack statutory standing under § 1983. For all these reasons, the Court lacks jurisdiction.

Plaintiffs' claims fail on the merits, too. There is no procedural due process right to a mail-in ballot that is cognizable in federal court, but even if there were, Plaintiffs have not shown that Texas's signature-verification requirement denies them any process that is due. Similarly, there is no evidence that any Plaintiff is denied any right under the Equal Protection Clause, Americans with Disabilities Act (ADA) or Rehabilitation Act (RA).

Plaintiffs' Response in Opposition to the Secretary's Motion for Summary Judgment, Dkt. 74 ("Response") provides no basis from depart from these clear showings. The Court should enter summary judgment dismissing Plaintiffs' case against the Secretary.

1

I. **Plaintiffs Cannot Overcome Their Lack of Standing.**

For the reasons the Secretary has briefed, the Court should enter summary judgment that Individual Plaintiffs and all Plaintiff Organizations lack standing. Dkt. 70 at 11–21; 75 at 3–9. *See also, e.g.*, *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945 (2019) ("as a jurisdictional requirement, standing cannot be waived or forfeited."). The Response's attempts to refute this fail.

    a. **Organizational Injury-In-Fact**

The Response insists that Plaintiff Organizations have standing because injury-in-fact need not be "large." Dkt. 74 at 9–10. But Plaintiffs do not (and cannot) contest that they still bear the burden to show some "diversion of resources" taken in response to the Secretary's allegedly unlawful conduct which "concretely and 'perceptibly impaired' the [organization's] ability to carry out its purpose." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 611 (5th Cir. 2017) (quoting *NAACP v. City of Kyle*, 626 F.3d 233, 238–39 (5th Cir. 2010)). The Response offers no new evidence to support such a finding, instead citing the same conclusory, self-serving, and in some cases inadmissible sources that are legally insufficient for the reasons already briefed. Dkt. 70 at 11–21; 75 at 3–9.

The Response's sole attempt to show "concreteness" or "perceptibility" is by citing *Martin v. Kemp*—a non-controlling case where "Defendants conceded during oral argument that Plaintiffs' additional affidavit evidence submitted the day prior likely suffices to meet the injury requirement." 341 F. Supp. 3d 1326, 1334 (N.D. Ga. 2018), *appeal dismissed sub nom. Martin v. Sec'y of State of Ga.*, No. 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018). *Martin* is unhelpful for myriad reasons, not least that the Secretary *does* contest that Plaintiffs' eleventh-hour affidavits show injury-in-fact.[1] And on closer examination, *Martin* undermines Plaintiffs' position, because the evidence there provided "thoroughly detailed accountings of the specific activities from which the organizations have

---

[1] These affidavits are also not proper summary judgment evidence. *See* Dkt. 75 at 3; FED. R. CIV. P. 37(c)(1)).

2

had to divert resources to address absentee ballot rejection." *Id.* at 1335. Plaintiff Organizations have no such evidence, and thus, lack standing. *OCA*, 867 F.3d at 611; *City of Kyle*, 626 F.3d at 238–39.

Plaintiffs also urge the Court to disregard the Sixth Circuit's recognition that "it is not an [organizational] injury to instruct election volunteers about absentee voting procedures when the volunteers are being trained in voting procedures already." *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014). Plaintiffs argue that *OCA* "is controlling on the issue of conferring standing through education efforts and also a later decided case." Dkt. 74 at 16 n. 27. But *OCA* did not address the facts here and is wholly consistent with *Fair Elections Ohio*. The evidence in *OCA* showed that: (1) OCA's "primary mission" was "'getting out the vote' among its members;" (2) "a substantial portion of OCA's membership consists of people with limited English proficiency;" (3) "Texas's voter interpreter restriction has deterred some of them from voting;" (4) "[i]n response, OCA calibrated its outreach efforts to spend extra time and money educating its members about [the interpreter restriction]," *and* (5) as a consequence, "OCA must spend more time on each call (and reach fewer people in the same amount of time) because of Texas's law." 867 F.3d at 610 (emphasis added).

Thus, the evidence showed that redirecting resources to these "in-depth conversations . . . 'perceptibly impaired' OCA's ability to" fulfill its mission to "'get out the vote' among its members." *Id.* (citation omitted). There is no evidence that, because of Texas's signature-verification requirement, any Plaintiff Organization had to "spend more time" on voter interaction in a manner that "perceptibly impaired" its ability to fulfill its mission. And Plaintiff Organizations concede that they have made no effort whatsoever to assist any voter whose ballot was rejected for failure to satisfy the signature-verification requirement. Dkt. 74 at 19, n. 32. Thus, no Plaintiff Organization has suffered direct organizational injury as required to establish standing. Dkt. 70 at 15–17; 75 at 6–9.[2]

---

[2] *See also, e.g., Fair Hous. Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 78 (3d Cir. 1998) (organization lacked standing where "[t]he record [did] not establish that the [plaintiff] altered its operations in any way as a result of the [challenged activity] or diverted any of its resources . . ."); *Mental Hygiene Legal Serv. v. Cuomo*, 13 F.Supp.3d 289, 299

3

### b. Causation & Redressability

In response to the Secretary's causation and redressability argument, Plaintiffs cite *Texas Democratic Party v. Abbott* for the sweeping proposition that, as the State's chief election officer, the Secretary of State is always a proper party to a voting-related lawsuit. Dkt. 74 at 19–20 (citing 961 F.3d 389, 399 (5th Cir. 2020)). But in that case, the Court of Appeals considered that "the Secretary of State has the power to 'take appropriate action to protect' Texans' voting rights 'from abuse by the authorities administering the state's electoral processes.'" Dkt. 74 at 20 (quoting 961 F.3d at 399). Here, the Secretary has taken the available steps within her authority. *See* Dkt. 70 at 13 (citing advisory to local election officials urging them to mail notices of rejected ballots to affected voters as soon as possible). Plaintiffs have identified no authority that the Secretary has exercised or could exercise in a manner capable of causing or redressing their asserted injuries. Dkt. 70 at 14–15.

Instead, Individual Plaintiffs' alleged injuries were caused by and thus could only be redressable through local election officials. For Plaintiff Organizations—who will continue their voter-registration and voter-education activities regardless of the Secretary's actions—[3] "any likely redress by this court would simply substitute a different procedure, which" Plaintiff Organizations will educate voters about instead. *Fair Elections Ohio*, 770 F.3d at 460. Causation and redressability are absent.

### c. Statutory Standing

Plaintiff Organizations identify no authority for the proposition that they can assert constitutional rights which they, as artificial entities, do not enjoy, instead citing inapposite cases that arose in other contexts. Dkt. 74 at 24. In *Crawford v. Marion County Election Board*, the Supreme Court affirmed without discussion the Seventh Circuit's determination that the Democratic Party had standing to challenge Indiana's voter ID law. 553 U.S. 181, 188 (2008). The Seventh Circuit did not

---

(S.D.N.Y. 2014) (organizational plaintiff who "ha[d] not indicated that its activities [] detracted the attention of [its] staff members from their regular tasks" lacked standing).
[3] Dkt. 70 at 17 n.76.

find standing based upon any constitutional injury to the Party; rather, it found that the Party had established associational standing to sue on behalf of its members who the new voter ID law would certainly prevent from voting. *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008). To the extent it found that the Party had organizational standing in its own right, the Seventh Circuit did so under a diversion-of-resources theory based on evidence in the record. *Id.* Similarly, *League of Women Voters of Ohio v. Brunner* found organizational standing to sue (1) under the associational standing test on behalf of their members, and (2) as an organization on a diversion-of-resources theory, but not independently under § 1983. *See* 548 F.3d 463, 466–67 (6th Cir. 2008).

Plaintiff Organizations lack statutory standing. Dkt. 70 at 20–21.

### d. Associational Standing

The Response cannot cure CTD's or LWV's lack of associational standing. Dkt. 70 at 18–20.

Rather than establish the indicia of membership required under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 344 (1977), the Response offers a conclusory allegation of "members" without establishing "a clearly articulated and understandable membership structure," as they concede they must. Dkt. 74 at 37 (quoting *Friends of the Earth, Inc. v. Chevron Chemical Co.*, 129 F.3d 826, 829 (5th Cir. 1997)).[4] This defeats associational standing.

Plaintiffs' assertion that they "need not name individual members who will certainly have their mail-in ballot improperly rejected in order to satisfy associational standing requirements," Dkt. 74 at 37, badly misunderstands the law. An association seeking to "bring suit on behalf of its members" has standing only if—among other things—"its members would otherwise have standing to sue in their own right." *Hunt*, 432 U.S. at 343. This, in turn, requires proof of injury-in-fact to an identifiable

---

[4] Plaintiffs also cite *Brunner* for the proposition that "courts have permitted other identically structured state league affiliates of the national League of Women Voters to bring voting rights claims on behalf of their members." Dkt. 74 at 37, n.91 (citing 548 F.3d at 466–67). This case would not save LWV's associational standing even if it bound this Court, because it was brought on behalf of members who established independent standing to sue in their own right. 548 F.3d at 466–67.

member. *Id.*; *see also, e.g.*, *United Food & Comm. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555 (1996) (An "association 'can establish standing only as representatives of those of their members who have been injured in fact, and thus could have brought suit in their own right.'") (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 (1976)).

Plaintiffs offer no evidence that any identifiable member of CTD or LWV has had or will have their mail-in ballot rejected under Texas's signature-verification requirement (and CTD offers no evidence that any member has been or will be denied any right under the ADA or RA). Thus, neither meet the requirement for "plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm" under the challenged law. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (citing *Lujan v. Def. of Wildlife*, 504 U.S. 555, 563 (2009) (organization lacked standing because it offered no evidence "showing, through specific facts, that one or more of its members would be directly affected by the allegedly illegal activity.") (cleaned up)).

Plaintiffs' citations do not change this result. In *National Rifle Association v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, the NRA had associational standing because it proved that the law at issue prohibited federal firearms licensees (FFLs) from selling handguns to specific NRA members, thereby "caus[ing] those persons a concrete, particularized injury—i.e., the injury of not being able to purchase handguns from FFLs." *NRA Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 191–92 (5th Cir. 2012) (citation omitted). Here, neither CTD nor LVW has shown that any member will be denied the ability to vote or have their ballot rejected under the signature-verification requirement.[5] Instead, at most, they demonstrate a risk that an unknown person might have a ballot rejected for failure to satisfy this requirement. "The Supreme Court has rejected

---

[5] Nor does *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004) (per curiam) support associational standing. The record there showed that it was "inevitable" defendants would deny plaintiffs' members the right to vote in violation of federal law. *Id.* at 574. "Here, by contrast, plaintiffs allege only policies that add risk to the ever present possibility that an election worker will make a mistake. No injury may occur at all. Any analogy to *Sandusky* falls short." *Shelby Advocates for Valid Elections v. Hargett*, 947 F.3d 977, 982–83 (6th Cir. 2020), *cert. pet. dkt'd* No. 19-1399 (June 22, 2020).

the contention that standing can be established by . . . 'a statistical probability that some of [association's] members are threatened with concrete injury.'" *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 343–44 (5th Cir. 2012) (quoting *Summers*, 555 U.S. at 497).[6]

CTD and LWV have also failed to establish that Texas's signature-verification requirement for mail-in ballots is germane to their purpose. CTD's efforts to ensure Texans with disabilities have access in the communities of their choice are unrelated to mail-in ballot signatures. Dkt. 70 at n.29–34. And while LWV's mission of "empowering voters and defending democracy" ensures regular interaction with voters, there is no evidence that these interactions are dedicated to the use of mail-in ballots. Dkt. 70 at nn.46–61.

## II. Plaintiffs' Claims Fail on the Merits as a Matter of Law.

### a. Procedural Due Process

The Secretary has explained why Texas's signature-verification requirement survives any legal standard that might possibly apply to Plaintiffs' procedural due process claim. Dkt. 70 at 23–25; 75 at 9–13. The Response does not change this result but raises two points worthy of brief mention.

**First**, the Response insists that cases applying either rational basis or *Anderson-Burdick* to states' voting procedures are inapposite because they did not involve "arbitrary rejection of properly cast ballots." Dkt. 74 at 42. But even if this were a dispositive distinction (and Plaintiffs do not explain that it is), the evidence does not show "arbitrary rejection of properly cast ballots." Rather, it shows that some ballots have been rejected, and that the available remedial measures are untested by Plaintiffs. Dkt. 75 at 10–12. Thus, if *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), supplied the applicable

---

[6] The third *Hunt* factor considers whether an individualized assessment of damages is necessary. 432 U.S. at 343. But this is distinct from whether a plaintiff has shown injury-in-fact to an identifiable member (the first *Hunt* factor). *Id.* Failure to show either is sufficient to defeat associational standing. *Id.*; *Ass'n of Am. Phys. & Surgeons v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (noting that "[t]he first two components of *Hunt* address constitutional requirements, while the third prong is solely prudential.") Absent proof that "its members would otherwise have standing to sue in their own right," injury-in-fact is missing, and it is immaterial whether—from a prudential standpoint—granting relief requires participation of any individual member. *Cf. Hunt*, 432 U.S. at 343.

standard, Plaintiffs cannot satisfy its first factor because they have not shown a protected liberty interest violated by official action. *Id.* at 335; Dkt. 70 at 21–27; 75 at 9–13.

This is because mistakes in election administration do not give rise to procedural due process claims. For example, in *Brunner*, individual and associational plaintiffs alleged election irregularities in various Ohio counties including malfunctioning ballot machines that caused miscounting, election worker failure to provide absentee and/or provisional ballots, inaccurate instructions from poll workers, and failure to provide accessible voting to voters with disabilities. 548 F.3d at 486–69. Plaintiffs claimed that these events violated procedural due process by denying them "their liberty interest in voting" without "adequate pre– or post-deprivation process." *Brunner*, 548 F.3d at 479. The Sixth Circuit stated that even though the voting system "impinge[d] on the fundamental right to vote," it did not implicate procedural due process and plaintiffs failed to allege a constitutionally protected interest. *Id.* This emphasizes what the Secretary has already briefed—there is no constitutionally protected interest in voting a mail-in ballot, and even rejection of such a ballot does not give rise to a procedural due process claim under § 1983. Dkt. 75 at 9–11; *see also Johnson v. Hood*, 430 F.2d 610, 611–12 (5th Cir. 1970) (per curiam). Plaintiffs offer no controlling contrary authority.

**Second**, even if Plaintiffs had a procedural due process interest at issue here and *Mathews* supplied the appropriate standard, Plaintiffs utterly fail to demonstrate the other *Mathews* factors. 424 U.S. at 335 (requiring a showing of the risk of erroneous deprivation of a protected liberty interest, and the value and burdens of the additional procedures requested). Plaintiffs make the soaring assertion that "thousands of ballots are irreversibly discarded every major election for perceived signature mismatches," but offer no evidence in support. Dkt. 74 at 42. And they claim that "the probable value of the procedural safeguards sought by Plaintiffs—procedures to provide voters pre-rejection notice and allow voters to cure erroneously rejected ballots—is high." Dkt. 75 at 42–43. But their only supporting evidence is Individual Plaintiffs' statements that they would have "readily

8

confirmed that it was [their] signature on [the] ABBM and [] carrier envelope had election officials contacted [them] at any time prior to rejecting [their] ballot." Dkt. 74 at 43 n.108. This is insufficient to show the probable value of any additional process.

The availability of relief in state court via an election contest or local election official further emphasizes this result. Dkt. 70 at 27–28; 75 at 9–13; *see also* TEX. ELEC. CODE §§ 221.001-243.013 (providing for election contests), 87.127 (providing for state court action by county election officer). A means to obtain relief in state court is sufficient to satisfy procedural due process. *See, e.g., Schmitt v. LaRose*, 933 F.3d 628, 642 (6th Cir. 2019) (holding that "the State affords aggrieved ballot-initiative proponents adequate procedural rights through the availability of mandamus relief in the state courts.") The district court cases Plaintiffs describe as "identical" to this one did not consider situations like Texas's, where the existing statutory framework specifically provides an avenue for court intervention in the case of a mail-in ballot. *Cf. Saucedo v. Gardner*, 335 F. Supp. 3d 202, 206 (D.N.H. 2018) (signature comparison done by a single moderator, and "the moderator's assessment is final, without any review or appeal"); *Martin*, 341 F. Supp. 3d at 1338 (no mention of review available in state court); *Zessar v. Helander*, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006) (same). Thus, even if they carried weight here, these cases do not save Plaintiffs' due process claim.

    b. **Equal Protection**

The Response also does not save Plaintiffs' equal protection claim.

**<u>First</u>**, it is not clear that the *Anderson/Burdick* line of cases applies to a claim that "the State's mail-in voting procedures (and their implementation by local officials) result in the disenfranchisement of eligible voters who attempt to vote by mail." Dkt. 74 at 45 (quoting Dkt. 41 at 28). In *Anderson*, *Burdick*, and their progeny, courts considered the constitutionality of state practices that *burden the right to vote*, not mistakes by election officials. *See, e.g., Burdick*, 504 U.S. at 433 (applying balancing test to "voting regulation"). Here, Plaintiffs argue that Texas's signature-verification

9

requirement is a "severe burden placed on mail-in voters' fundamental right to vote." Dkt. 74 at 45 (capitalization altered). But this makes sense only if all or a substantial number of mail-in ballots were rejected due to Texas's signature-verification requirement, which the evidence does not show.

**Second**, Plaintiffs have entirely failed to prove that election officials subject voters to "arbitrary" distinctions when administering the signature-verification requirement. Courts have generally found equal protection violations where a lack of uniform standards and procedures results in arbitrary and disparate treatment of different voters. *See, e.g.*, *Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 918–21 (E.D. Va. 2018). Because Plaintiffs have not proven as much here, their equal protection claim fails on summary judgment.

### III. Plaintiffs Cannot Show That Texas's Accommodations for Voters With Disabilities Are Not Reasonable Under the ADA and RA.

The Response also fails to revive CTD's claims under ADA Title II and the RA. It incorrectly claims that voters who are able to make a signature but "due to their disabilities, are unable to ensure that their signatures will be consistent," are ineligible to use the witness process. Dkt. 74 at 54. Texas's witness process contains no such limitation. TEX. ELEC. CODE § 1.011. Rather, it specifically contemplates that voters might be able to use a writing implement but still unable to make consistent signatures by providing that "[t]he person who cannot sign must affix the person's mark to the document or paper, which the witness must attest," unless "the person cannot make the mark," in which case "the witness must state that fact on the document or paper." *Id.* § 1.011(b). And CTD offers no evidence that local election officials ever apply this witness procedure in a manner that prevents Texans with disabilities from utilizing the witness option or results in rejection of their mail-in ballots. In fact, mail-in ballots signed by witnesses *cannot* be rejected for failure to comply with Texas's signature-verification requirement. *Id.* § 87.041(b)(2).

CTD also argues that Texas's offerings for curbside, accessible, and assisted voting at polling places, Dkt. 70 at 30–32; 75 at 19–20, are "no accommodation at all." But even if this were the law,

10

"Title II does not require States to employ any and all means to make [public] services accessible to persons with disabilities." *Tennessee v. Lane*, 541 U.S. 509, 531–32 (2004). And CTD has not identified any circumstance in which a Texan with a disability was excluded from voting—either by mail or otherwise—because of the signature-verification requirement.

## CONCLUSION

Because the applicable law and the record evidence foreclose Plaintiffs' ability to recover against the Secretary, this Court should enter summary judgment dismissing this case against her.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

/s/ Anne Marie Mackin
ANNE MARIE MACKIN
Texas Bar No. 24078898
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov

**ATTORNEY FOR DEFENDANT
TEXAS SECRETARY OF STATE**

## CERTIFICATE OF SERVICE

I certify that that on July 13, 2020, this document was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Assistant Attorney General
