UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES, MOVE TEXAS CIVIC FUND, LEAGUE OF WOMEN VOTERS OF TEXAS, and AMERICAN GI FORUM OF TEXAS, INC., | § § § § § § § § § | |
| *Plaintiffs*, | § § | |
| v. | § § | Civil Case No. 5:19-cv-00963-OLG |
| TEXAS SECRETARY OF STATE, TRUDY HANCOCK, in her official capacity as BRAZOS COUNTY ELECTIONS ADMINISTRATOR, and PERLA LARA in her official capacity as CITY OF MCALLEN, TEXAS SECRETARY, | § § § § § § § | |
| *Defendants*. | § § | |

**PLAINTIFFS' COMBINED REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................1

I.    PLAINTIFFS HAVE STANDING AS TO DEFENDANT SOS AND DEFENDANT
      SOS IS A PROPER PARTY IN THIS CASE .................................................................1

   A.    The Individual Plaintiffs Have Standing.............................................................1

      1.  Individual Plaintiffs Will Certainly Be Subjected to the Signature Comparison
          Procedure Again............................................................................................ 3

      2.   Individual Plaintiffs Are At Substantial Risk of Being Disenfranchised Again ... 5

   B.    Associational Plaintiffs Have Standing ...............................................................7

   C.    Organizational Plaintiffs Have Standing .............................................................10

   D.    Sovereign Immunity Does Not Bar Plaintiffs' Claims Against Defendant
         SOS .................................................................................................................18

II.   PLAINTIFFS HAVE STANDING AS TO LOCAL DEFENDANTS AND LOCAL
      DEFENDANTS ARE PROPER PARTIES IN THIS CASE.......................................22

III.  DEFENDANTS PROVIDE NO BASIS TO DENY PLAINTIFFS' REQUEST FOR
      SUMMARY JUDGMENT ON THE MERITS OF THEIR CONSTITUTIONAL
      CLAIMS. ...........................................................................................................26

   A.    Defendant SOS's Attacks on Plaintiffs' Due Process Claims Are Meritless ........27

      1.   The Right to Vote is Protected by Procedural Due Process.............................. 27

      2.  Defendant SOS's Remaining Arguments Against Plaintiffs' Due Process Claims
          Fail. ............................................................................................................ 29

   B.    Defendant SOS's Attacks on Plaintiffs' Equal Protection Claims Are
         Unavailing........................................................................................................32

      1.  Neither Discriminatory Intent Nor Discriminatory Effect Are Required To Make
          Out An Equal Protection Claim Under Anderson-Burdick. ................................ 32

      2.   Plaintiffs' Claims Succeed Under *Anderson-Burdick*........................................ 33

   C.    Defendant SOS's Argument On Relief Fails .......................................................35

IV.   PLAINTIFF CTD IS ENTITLED TO SUMMARY JUDGMENT ON THE MERITS
      OF ITS ADA AND RA CLAIMS. ..........................................................................38

CONCLUSION.................................................................................................................39

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ............................................................. 32

*Anibowei v. Barr*, 2019 WL 623090 (N.D. Tex. Feb. 14, 2019) ............................. 20, 21

*Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350 (5th Cir. 1999)......... 10, 11, 13, 18

*Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320 (2006) .............................. 37

*Burdick v. Takushi*, 504 U.S. 428 (1992)..................................................................... 32

*Bush v. Gore*, 531 U.S. 98 (2000)................................................................................ 34

*Carey v. Piphus*, 435 U.S. 247 (1978) .......................................................................... 3

*Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349 (11th Cir. 2005)............................ 4

*City of Los Angeles v. Patel*, 576 U.S. 409 (2015) ....................................................... 36

*Common Cause/Ga. v. Billups*, 554 F.3d 1340 (11th Cir. 2009)....................................... 4

*Cramer v. Skinner*, 931 F.2d 1020 (5th Cir. 1991) ....................................................... 11

*Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949 (7th Cir. 2007)................................ 1

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) .......................... 33, 35, 36

*Dem. Party of GA, Inc. v. Crittenden*, 347 F. Supp. 3d 1324 (N.D. Ga 2018) ................ 9

*Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019) ...................... 37

*Doe v. Rowe*, 156 F. Supp. 2d 35 (D. Me. 2001) ......................................................... 28

*Doe v. Wooten*, 376 F. App'x 883 (11th Cir. 2010).................................................... 21

*Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th Cir. 2014) ....................................... 12

*Fla. Democratic Party v. Detzner*, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016) ............... 37, 38

*Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153 (11th Cir. 2008) ............... 9

*Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330 (5th Cir. 2012)........................ 9

*Gamza v. Aguirre*, 619 F.2d 449 (5th Cir. 1980)..................................................... 32, 33

*Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019) .................... 28

*Gold v. Feinberg*, 101 F.3d 796 (2nd Cir. 1996) ......................................................... 33

*Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193 (11th Cir. 2020) ................................ 21

*Johnson v. Hood*, 430 F.2d 610 (5th Cir. 1970) ..................................................... 27, 29

*Knox Hill Tenant Council v. Washington*, 448 F.2d 1045 (D.C. Cir. 1971)..................... 20

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949)....................... 20

*Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir. 2008) ................................................. 34

*Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018)................................... passim

*Mathews v. Eldridge*, 424 U.S. 319 (1976)................................................................ 27

*Minor v. Happersett*, 88 U.S. 162 (1874).............................................................. 26, 34

*Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656 (1993)..................................................................................................................... 4

*O'Shea v. Littleton*, 414 U.S. 488 (1974) .................................................................... 5

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017)............................... passim

*Painter v. Shalala*, 97 F.3d 1351 (10th Cir. 1996) ...................................................... 21

*Powell v. Power*, 436 F.2d 84 (2d Cir. 1970) ............................................................. 33

*Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F.Supp. 1354 (D. Ariz. 1990) ........... 3, 28

*Reynolds v. Sims*, 377 U.S. 533 (1964)....................................................................... 34

*Saine v. Hospital Authority*, 502 F.2d 1033 (5th Cir. 1974)................................. 20, 21, 22

*Sandusky Co. Democratic Party v. Blackwell*, 387 F.3d 565 (6th Cir. 2004) ............... 10

*Saucedo v. Gardner*, 335 F. Supp. 3d 202 (D. N.H. 2018)................................. 3, 28, 36

*Scott v. Schedler*, 771 F.3d 831 (5th Cir. 2014).......................................................... 13

*Self Advocacy Solutions N.D. v. Jaeger*, 2020 WL 2951012 (D. N.D. June 3, 2020) .......... passim
*State of Wash. v. Udall*, 417 F.2d 1310 (9th Cir. 1969) ...................................................... 20
*Stringer v. Pablos*, 2020 WL 532937 (W.D. Tex. Jan. 30, 2020) ........................................ 22
*Stringer v. Whitley*, 942 F.3d 715 (5th Cir. 2019) .................................................... 6, 22
*Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334 (2014) ...................................... 2, 5
*Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020) ...................... 19, 37
*Texas Democratic Party v. Benkiser*, 459 F.3d 582 (5th Cir.2006) .............................. 1
*United States v. Atkins*, 323 F.2d 733 (5th Cir. 1963) ...................................................... 27
*United States v. Salerno*, 481 U.S. 739 (1987) ............................................................... 35
*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669
    (1973) ........................................................................................................................... 11
*Welch v. McKenzie*, 765 F.2d 1311 (5th Cir. 1985) .................................................. 27, 28
*Willet v. Cole*, 249 S.W.3d 585 (Tex. App. 2008) ...................................................... 30
*Williams v. Taylor*, 677 F.2d 510 (5th Cir. 1982) ...................................................... 27
*Woods v. Austal, U.S.A., LLC*, 2011 WL 1380054 (S.D. Ala. Apr. 11, 2011) ............... 11
*Zessar v. Helander*, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006) .................... 3, 28, 38

**State Statutes**

Tex. Elec. Code § 31.001 ............................................................................................. 21
Tex. Elec. Code § 31.001(a) ........................................................................................ 19
Tex. Elec. Code § 31.003 ............................................................................................. 21
Tex. Elec. Code § 31.005 ............................................................................................. 21
Tex. Elec. Code § 65.0541(a) ......................................................................................... 4
Tex. Elec. Code § 86.011(d) ........................................................................................... 5
Tex. Elec. Code § 87.041(b)(2) ...................................................................................... 1
Tex. Elec. Code § 87.0431 ............................................................................................. 7
Tex. Elec. Code § 87.127(a) .................................................................................... 29, 30

**Constitutional Provisions**

U.S. Const. amend. XIX ............................................................................................... 34
U.S. Const. amend. XV ................................................................................................. 34
U.S. Const. amend. XXIII ............................................................................................. 34
U.S. Const. amend. XXIV ............................................................................................. 34
U.S. Const. amend. XXVI ............................................................................................. 34

## INTRODUCTION

For the reasons detailed in Plaintiffs' Motion for Summary Judgment, in Plaintiffs' Response in opposition to each Defendant's Motion for Summary Judgment, and herein, the Court should grant Plaintiffs' Motion for Summary Judgment and require Defendants to comply with the Equal Protection and Due Process Clauses to the Constitution, the Americans with Disabilities Act of 1990 ("ADA"), and the Rehabilitation Act of 1973 ("RA").

## ARGUMENT

### I.   PLAINTIFFS HAVE STANDING AS TO DEFENDANT SOS AND DEFENDANT SOS IS A PROPER PARTY IN THIS CASE[1]

#### A.  The Individual Plaintiffs Have Standing

Plaintiffs have previously identified to the Court undisputed facts that demonstrate that Individual Plaintiffs Dr. George Richardson and Rosalie Weisfeld have standing to bring their claims.[2] In sum, these facts demonstrate that each Individual Plaintiff applied for and submitted a ballot by mail,[3] complied with every requirement of the law,[4] and had their ballot rejected

---

[1] When "[o]nly injunctive relief is sought . . . only one plaintiff with standing is required." *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (citing *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 585–86 (5th Cir.2006)) (other citations omitted).

[2] *See* Dkt 65 at 16–19.

[3] Ex. 17, Richardson Dep. 19:16–20:5, 20:14–20, 22:19–23:1; Ex. 21, Richardson Dec. ¶ 4; Ex. 26, Weisfeld Dep. 26:22–27:25, 29:11–31:7, 36:21–37:24, 39:21–40:12; Ex. 30, Weisfeld Dec. ¶ 4–7; Ex. 12, Lara Dep. 116:20–118:6.

[4] *Id*. Defendant Trudy Hancock, in her official capacity as Brazos County Elections Administrator ("Brazos County EA") notes that evidence in the record demonstrates that the signatures on Dr. Richardson's application and on his ballot were "pictorially dissimilar." Dkt. 73 at 11. This ignores the fact that nothing in the Texas Election Code requires a voter to sign their name in the same way every time, and that a ballot can only be lawfully rejected if it was "signed by someone other than the voter." Tex. Elec. Code § 87.041(b)(2). Whether two signatures that were actually signed by the same voter look different is irrelevant to whether they can be rejected under the law and thus irrelevant to whether the individual suffered an injury by being improperly disenfranchised. The undisputed evidence is that Dr. Richardson did sign both of the documents at issue, and despite this, his ballot was rejected anyway. This fact gets to the heart of this case—that the signature comparison procedure improperly rejects ballots signed by the correct person based on arbitrary evaluations of whether signatures look the "same" or "match." Ex. 4 at SOS_000466, 000468.

anyway—without prior notice or an opportunity to challenge the improper rejection—resulting in their unlawful disenfranchisement.[5] The undisputed evidence further demonstrates that each Individual Plaintiff votes regularly[6] and will vote by mail in the future,[7] each will be subjected to the same unlawful signature comparison procedure, Early Voting Ballot Board ("EVBB") members from their respective jurisdictions have considered the natural way each Individual Plaintiff signs as improper for signature comparison purposes,[8] and both Individual Plaintiffs have a greater natural variation in their signatures due to old age and, for Ms. Weisfeld, also due to her disability.[9]

"[A]n allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (internal quotations and citations omitted). Individual Plaintiffs are both certainly going to be burdened by the signature comparison procedure the next time they vote, which will be by mail, and are at substantial risk of having their ballots rejected. Multiple courts across the country have held that individual mail-in voters have standing to bring actions challenging arbitrary signature comparison procedures like the one at issue in this case. *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 n.5 (N.D. Ga. 2018); *Zessar v. Helander*, 2006 WL

---

[5] Ex. 17, Richardson Dep. 28:19–29:14; Ex. 25 at Richardson-00000009 (Dr. Richardson's copy of his notice of rejection); Ex. 20 (Brazos County's copy of Dr. Richardson's notice of rejection); Ex. 21, Richardson Dec. ¶¶ 6–7; Ex. 30, Weisfeld Dec. ¶ 8; Ex. 26, Weisfeld Dep. 19:23–20:6, 60:6–20; Ex. 33 (copy of Ms. Weisfeld's notice of rejection in Spanish); Ex. 29 (same, in English).

[6] Ex. 17, Richardson Dep. 19:16–20:5; Ex. 26, Weisfeld Dep. 20:1–6, 24:22–25:13; Ex. 30, Weisfeld Dec. ¶ 2.

[7] Ex. 17, Richardson Dep. 37:14–38:1; Ex. 21, Richardson Dec. ¶ 12; Ex. 26, Weisfeld Dep. 77:10–25; Ex. 30, Weisfeld Dec. ¶¶ 13–16.

[8] *See supra* n.5.

[9] Ex. 17, Richardson Dep. 19:16–20:5; Ex. 26, Weisfeld Dep. 77:1–8, 77:10–25; Ex. 30, Weisfeld Dec. ¶¶ 15–16; Ex. 14, Mohammed Expert Rep. ¶¶ 25, 32, 42–44; Ex. 15, Mohammed Dep. 65:9–67:16, 68:14–69:5.

642646, at *10 (N.D. Ill. Mar. 13, 2006); *Self Advocacy Solutions N.D. v. Jaeger*, 2020 WL 2951012 at *3, 5 (D. N.D. June 3, 2020); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 206, 224 (D. N.H. 2018).

**1.    Individual Plaintiffs Will Certainly Be Subjected To The Signature Comparison Procedure Again**

Plaintiffs have standing to bring their procedural Due Process and Equal Protection claims because they will be subjected to the signature comparison procedure again. Like the plaintiffs in *Raetzel v. Parks/Bellemont Absentee Election Bd.*, Individual Plaintiffs

> are alleging a denial of basic tenets of procedural due process. This claim arises not from a denial of their right to vote, but from the apparent lack of notice and a hearing prior to their absentee votes being disqualified. Plaintiffs allege defendants are responsible for the denial of these rights and seek relief which would prevent a similar occurrence during a future election.

762 F.Supp. 1354, 1355-56 (D. Ariz. 1990); *Carey v. Piphus*, 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property"). Individual Plaintiffs satisfy the injury-in-fact requirement and have standing to bring their procedural Due Process claims because "[s]hould the [C]ourt conclude the . . . statute which controls the manner in which absentee ballots are challenged unconstitutional, plaintiffs' injury is redressable." *Raetzel*, 762 F.Supp. at 1356.

Individual Plaintiffs also satisfy the injury-in-fact requirement and have standing to bring their Equal Protection claims. In *Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville, Fla.*, the Supreme Court held the following:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing. The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

508 U.S. 656, 666 (1993); *see also Martin*, 341 F. Supp. 3d at 1333 n.5 (citing *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005)) (noting, based on same standing theory, that individual plaintiffs had standing to bring procedural Due Process claims against the state because its signature comparison procedure provided no procedural safeguards to voters whereas voters with other alleged defects on their mail-in ballot materials were provided such safeguards).

Individual Plaintiffs satisfy this standard on multiple grounds. Unlike in-person voters, Individual Plaintiffs are subjected to an arbitrary procedure that could disenfranchise them without any recourse. Additionally, in-person voters who have issues proving identity at a polling location can submit a provisional ballot and verify identity up to six days after the election. Tex. Elec. Code § 65.0541(a). A mail-in voter whose identity is questioned because lay election officials determine that their signatures do not match has no such recourse.

Individual Plaintiffs are also treated differently than mail-in voters who are not elderly or disabled. Due to old age, Individual Plaintiffs' signatures are more likely to vary and, therefore, are more likely to be rejected by EVBB members who, following the EVBB handbook, confirm a voter's identity based on whether signatures are the "same" or "match."[10] Ms. Weisfeld also suffers an injury-in-fact for these same reasons due to her disability.[11] *Jaeger*, 2020 WL 2951012 at *3. Overall, Texas's signature comparison procedure places a burden on Individual Plaintiffs that is not placed on mail-in voters who are not old or disabled, regardless of whether or not their particular ballots are actually rejected in the future. *City of Jacksonville, Fla.*, 508 U.S. at 666.

---

[10] *See supra* n.9; Ex. 4 at SOS_000466, 000468 (EVBB Handbook issued by Defendant SOS instructing EVBB members to "use their best judgment and to verify if these signatures are the same" or "use their best judgement if the signatures match" (sic) and nothing else).
[11] *Id.*

Furthermore, some local jurisdictions, like Brazos County—by implementing Texas Election Code Section 86.011(d)—provide mail-in voters who forget to sign their carrier envelope the opportunity to cure this defect, whereas Local Defendants provide mail-in voters whose ballots are rejected due to signature mismatch—like Individual Plaintiffs—no such recourse.[12] *See Martin*, 341 F. Supp. 3d at 1333 n.5 (noting that individual plaintiffs sufficiently alleged standing where mail-in voters whose voter qualifications were challenged were given an opportunity to be heard before their ballots were rejected, but no such hearing was provided to voters whose mail-in ballots were rejected on the basis of a signature mismatch).

## 2. Individual Plaintiffs Are At Substantial Risk of Being Disenfranchised Again

Individual Plaintiffs are also at substantial risk of being disenfranchised again. *Driehaus*, 134 S. Ct. at 2341. Courts have made clear that while a past injury by itself is insufficient to confer standing for prospective injunctive relief, if that injury is accompanied by additional evidence that the Plaintiffs will certainly engage in the exact same conduct that preceded and prompted that past injury, then standing exists. *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) ("past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury.").

As detailed earlier in this brief, it is undisputed that Individual Plaintiffs will engage in the exact same conduct that resulted in their prior illegal disenfranchisement—specifically, they will vote by mail in the future and they will sign their application and carrier envelopes as required by the Texas Election Code. It is also undisputed that election officials will subject those signatures to Texas's arbitrary and standardless signature comparison procedure. It is further undisputed that Individual Plaintiffs have displayed signature variances that have resulted in election officials believing that two of their signatures were signed by different people when they were not, and that,

---

[12] Ex. 10, Hancock Dep. 47:21–48:16.

because of old age and/or disability, their signatures are likely to exhibit greater variation than the norm. *See Jaeger*, 2020 WL 2951012 at *5

> ("Considering election officials incorrectly rejected [the] ballot [of a mail-in voter plaintiff with a disability] in the 2018 general election for a signature discrepancy—coupled with the fact that she will again have to vote by mail in the upcoming primary because of the COVID-19 pandemic—there is a realistic threat of an impending deprivation of her right to vote.).

> *Stringer v. Whitley*, 942 F.3d 715 (5th Cir. 2019), upon which Defendant Texas Secretary of State ("Defendant SOS") relies to argue that the imminence of the Individual Plaintiffs' future injuries in this case have not been established, is inapposite.[13] In *Stringer*, individual plaintiffs who were disenfranchised by the state's failure to register them in accordance with the National Voter Registration Act sought declarative and injunctive relief, and alleged that they were likely to suffer the same injury in the future. *Id*. at 719–20. The Fifth Circuit held that a plaintiff must show that "there is a substantial risk that they will suffer the potential future injury absent their requested relief," and concluded that the individual plaintiffs in that case had not met that standard because the record did not indicate sufficient likelihood that the specific plaintiffs would interact with the challenged driver's license system at a time when they also needed to update their voter registration—such as after moving residences. *Id*. at 721–23. The facts in this case, however, meet the required standard. Unlike the individual plaintiffs in *Stringer*, the undisputed facts show that Individual Plaintiffs will take the requisite personal action—voting by mail in the next election and future elections—that initiates the unlawful signature comparison procedure that exposes them to a substantial risk of disenfranchisement.[14]

---

[13] Dkt 75 at 3–5.

[14] Defendant SOS also alleges that the likelihood of Dr. Richardson's future injury is speculative because "Dr. Richardson has affirmatively disavowed the notion that any mail-in ballot he casts in the future will be rejected." Dkt. 75 at 5. This fails to recognize that (1) Dr. Richardson has no control over whether his future ballots are rejected, (2) as explained in this section and the briefing

Lastly, if Individual Plaintiffs do not have standing to challenge the signature comparison procedure that illegally disenfranchised them, then no individual would ever have standing to challenge that procedure. This is true because such individuals are denied any proper procedural safeguards prior to the rejection of their ballots and are not required to be notified of the rejection of their ballots until 10 days after the election. *See* Tex. Elec. Code § 87.0431. Accordingly, if the Court adopted Defendant SOS's position, every such improper rejection would always be a past injury with its risk of occurring again only speculative until it actually occurs again, at which time it will again be merely a past injury.

## B. Associational Plaintiffs Have Standing

Plaintiffs Coalition of Texans with Disabilities ("CTD") and the League of Women Voters of Texas ("LWV") have each presented uncontested facts that demonstrate associational standing to bring claims on behalf of their members.[15] Defendant SOS again fails to recognize that every voter who chooses to vote by mail suffers a cognizable procedural Due Process and Equal Protection injury by having their ballot subjected to Texas's arbitrary and standardless signature comparison procedure.[16] Each Associational Plaintiff has provided names of members and demonstrated classes of membership who are both eligible to vote by mail and have specific plans to vote by mail in the future.[17] It is an absurd proposition that Associational Plaintiffs would have

---

in general, there are multiple reasons why he is at a substantial risk of having his ballot rejected again, and (3) he testified that he does not know who will review his mail-in materials or whether they will know of him. Ex. 81, Richardson Dep. 43:21–44:6.

[15] *See* Dkt. 74 at 29–33 & nn.88–97.

[16] *See supra* I, A, 1.

[17] *See* Dkt. 74 at 29-33 & nn.90–97. Defendant SOS claims Exhibit 68, which was filed under seal, includes "anonymous responders (who LWV has not proven are 'members')." Dkt. 75 at 5. Although the survey includes anonymous responders, the LWV's 30(b)(6) witness testified that the corresponding survey, the results of which are included in Exhibit 68, was sent out to LWV's member list. Ex. 86, LWV 30(b)(6) Dep. 81:9–83:22. Defendant SOS also mischaracterizes the evidence by claiming that Exhibit 68 is LWV's only showing of named members. This is not true.

to name specific individuals who would actually have their ballots rejected through this procedure to have standing, as it is precisely the arbitrary and unpredictable nature of the procedure that both puts all of their affected members at risk and prevents predicting with certainty which particular members will be ultimately disenfranchised.

Even if the Court required a showing of "substantial risk" of actual improper disenfranchisement, Associational Plaintiffs have met that standard by showing the certainty that their members will vote by mail and be subjected to the arbitrary, error-prone, and standardless signature comparison procedure. Additionally, CTD and LWV have demonstrated that their members—who are predominantly people with disabilities and elderly respectively—are particularly susceptible to greater than normal signature variances, and, therefore, particularly at risk of improper rejection.[18] Paired with the fact that Associational Plaintiffs have members residing across Texas, and that in every major election 20% to 25% of mail-in ballots rejected in

---

LWV has specifically provided names of members who will vote by mail in the future. Ex. 60, Chimene Dec. ¶¶ 13–14; Exs. 65, 67 (filed under seal) (e-mails between LWV President Grace Chimene and six named LWV members).

[18] *See* Dkt. 74 at 32 & nn.90, 93–95; *see also* Ex. 37, CTD 30(b)(6) Dep. 19:7–11 ("[In 1994], I [Chase Bearden] was a gymnast. I broke my neck in a morning workout and went from being an elite athlete to being paralyzed from the neck down."); 71:21–25 (CTD's 30(b)(6) witness, Chase Bearden, explaining how his disability often makes "my writing look[] different"), 13:6–10, 14:21–15:15 (member Rene Lopez "also has a significant disability like myself [(Chase Bearden)] . . . I asked her if she was going to participate by going to the polls or was she going to end up doing a mail-in ballot, and she said she was actually thinking about leaning towards mail-in ballot just because of all her underlying health conditions"), 75:13–76:13 (Q. And Rene Lopez, is she a member of CTD? A. Yes. Q. Is she planning to vote by mail in the future? A. Yes. Yes. Q. In the next election? A. Yes. Q. And how is she eligible to vote by mail— . . . A. She has a significant disability, impairs part of her arms and her legs, similar to me. Q. And, Chase, are you a member of CTD? A. Yes. Q. Are you planning to vote by mail in the next election? A. Yes. Q. And based on what eligibility? A. Disability); 15:1–8 ("trying to understand and make sure that all of our members, the way they're looking right now, many of them are confused about how COVID's going to affect many of them, so we're seeing a greater number of people who are talking about using mail-in ballots and these are the people that a lot of them tend to have signature issues."); Ex. 86, LWV 30(b)(6) Dep. 85:2.

Texas are rejected because of a signature mismatch determination (numbering in the thousands statewide),[19] this demonstrates the substantial risk that members of Associational Plaintiffs will be actually disenfranchised by the signature comparison procedure.

Contrary to Defendant SOS's contentions, this is more than the type of bare statistical probability analysis that was rejected in *Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 343–44 (5th Cir. 2012).[20] Analysis of any future harm is necessarily dependent on some evaluation of probability, and while a bare statistical likelihood is not sufficient in itself to infer a substantial risk as to any particular plaintiff, it is nevertheless competent evidence to be considered along with other evidence indicating a substantial risk. Such evidence is regularly employed by courts in the context of voting rights, where the specific voter who will be harmed is impossible to know. *See, e.g.*, *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1162–64 (11th Cir. 2008) (finding associational standing where "the injuries are foreseeable and the expected results of unconscious and largely unavoidable human errors;" collecting cases, recognizing the probability calculus involved in cases alleging future injury); *Dem. Party of GA, Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1337 (N.D. Ga 2018); *Sandusky Co. Democratic Party*

---

[19] *See* Dkt. 74 at 31–33, 32 n.95; Dkt. 65 at 1. Defendant SOS completely misunderstands Plaintiffs' Election Assistance Commission ("EAC") evidence. Plaintiffs provided not only the number of Uniformed & Overseas Citizens Absentee Voting Act ("UOCAVA") ballots rejected for the more broad reasons of "signature problems" and "signatures issues" during the 2016 and 2018 General Elections, but also provided the number of non-UOCAVA mail-in ballots rejected for signature mismatch during those elections, which numbered in the thousands. *See* Dkt. 65 at 1 & n.1; Ex. 16, Rainbolt Dec.; *see Jaeger*, 2020 WL 2951012 *3 (other courts have used EAC survey data to calculate the percent of rejected ballots that were rejected due to a signature mismatch determination). Plaintiffs obtained the EAC data in this case via an open records request to Defendant SOS by Plaintiffs' counsel prior to the initiation of this lawsuit. Ex. 16, Rainbolt Dec. ¶ 1; Exs. 84–85. Plaintiffs produced the 2016 and 2018 EAC data during the discovery period. Now that the data is the subject of controversy, Plaintiffs will re-send the complete dataset to Defendants electronically and mail it to the Court on a hard drive because the contents of the spreadsheet are too large to upload to CM-ECF. Exs. 82–83; Ex. 16, Rainbolt Dec. ¶ 1.
[20] Dkt. 75 at 5–6.

*v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004)) (associational plaintiffs conferred standing despite

not identifying specific members who would be harmed because "by their nature, mistakes cannot

be specifically identified in advance.").

### C. Organizational Plaintiffs Have Standing

As explained in detail in Plaintiffs' Response to Defendants' Motions for Summary

Judgment, Organizational Plaintiffs have suffered an injury-in-fact and have standing.[21] The Fifth

Circuit has explained that "an organization has standing to sue on its own behalf where it devotes

resources to counteract a defendant's allegedly unlawful practices." *Ass'n of Cmty Orgs. for*

*Reform Now v. Fowler*, 178 F.3d 350, 360 (5th Cir. 1999). Specific to Organizational Plaintiffs'

standing, the Fifth Circuit in *OCA-Greater Houston v. Texas* held that the plaintiff in the case, the

Organization for Chinese Americans ("OCA"),  had suffered an injury-in-fact—even though the

"injury was not large"—because the allegedly unlawful Texas statute at issue in the case

"'perceptibly impaired' OCA's ability to 'get out the vote'" when OCA "went out of its way to

counteract the effect of" the statute by "educat[ing] voters" on how to avoid being negatively

impacted by it. 867 F.3d 604, 606, 612 (5th Cir. 2017). Organizational Plaintiffs show, through

extensive documentary evidence and deposition and declaration[22] testimony, that they go beyond

---

[21] *See* Dkt. 74 at 2–13.

[22] The fact that Plaintiffs obtained these declarations after the discovery deadline does not render
them improper. That deadline cuts off the parties' right to compel one another to produce
previously unrequested information. It does not disallow Plaintiffs from independently
investigating potential new evidence. As one district court has observed:

> Nearly every brief in support of or in opposition to a motion for summary judgment
> filed in this District Court relies on affidavits or declarations signed within days of
> that filing. If [the argument that such documentation may not be produced after the
> close of discovery] were correct, then all of these federal litigants flout the Federal
> Rules of Civil Procedure, and all declarations should be stricken unless they were
> executed prior to the discovery deadline and shared with opposing counsel at that
> time. This is not how Rule 26 works.

satisfying this form of standing, which, like individual standing, "need not measure more than an

'identifiable trifle.'"[23] *Id.* at 612 (quoting *Fowler*, 178 F.3d at 358); *see United States v. Students

Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973).

Despite this, in her Response to Plaintiffs' Motion for Summary Judgment, Defendant SOS

claims that no Organizational Plaintiff presents "evidence that it diverted resources from its normal

activities to combat the allegedly unlawful effects of the signature-verification procedure at issue

in this lawsuit."[24] Without directly addressing almost any of the extensive evidence in the record

or even pointing to what other purpose mail-in voting guidance on signatures could serve,[25]

Defendant SOS additionally argues that Organizational Plaintiffs' "voter-registration and voter-

---

*Woods v. Austal, U.S.A., LLC*, 2011 WL 1380054 at *2 n.4 (S.D. Ala. Apr. 11, 2011); *see also Fowler*, 178 F.3d at 357 (quoting *Cramer v. Skinner*, 931 F.2d 1020, 1025 (5th Cir. 1991) (parties must "submit affidavits and comparable evidence" in response to a motion for summary judgment).

All the declaration testimony covers central issues in the case and Defendant SOS has deposed each of the declarants. Defendant SOS could have easily discussed any of the topics covered by the declarants, but instead used a small fraction of her allotted seven hours of deposition time for each declarant, and, in some cases, did not ask questions about some of the main issues involved in the case. Additionally, Defendant SOS only specifically points to LWV's and MOVE's declaration testimony regarding COVID-19 as being new information. As explained in the previous paragraph, providing declarations at this stage of the litigation is proper. Regardless, both LWV and MOVE have provided, during the discovery period, deposition testimony or documentary evidence showing their ramping up of mail-in ballot efforts because of COVID-19. This evidence shows that their injury is not only ongoing, but also increasing as mail-in ballot use spikes while the unlawful signature comparison procedure remains in place. Ex. 59, LWV 30(b)(6) Dep. 115:5–10 (discussing COVID-19 related YouTube video that provides guidance on how to sign mail-in ballot materials to avoid improper rejection); Ex. 64 (LWV YouTube video titled "Vote by Mail-Texas Style," which provides COVID-19-related guidance on voting by mail and also guidance on how to sign mail-in ballot materials to avoid improper rejection); Ex. 87, at MOVE-00000372 (Vote by Mail listed as one of three measures focused on in MOVE's "Protecting our Democracy During a Pandemic" campaign); Ex. 88 (draft MOVE email to public about COVID-19 related efforts mentioning that issues like "vote by mail could not be more relevant."); Ex. 60, Chimene Dec. ¶ 18; Ex. 49,  Galloway Dec. ¶ 11.

[23] *See* Dkt. 74 at 2–13; *see* Dkt. 65 at 19–28.

[24] Dkt. 75 at 6.

[25] The only evidence Defendant SOS directly addresses in this section of their Response is LWV's and MOVE's declaration testimony on efforts related, in part, to COVID-19. Dkt. 75 at 8–9.

education efforts are not, and have never been, designed to counteract allegedly erroneous rejections of mail-in ballots for signature mismatch."[26] However, Organizational Plaintiffs' counteracting efforts help to reduce the chance of an improper mail-in ballot rejection based on a signature mismatch because each Organizational Plaintiff's instructions alert voters to the abnormal scrutiny applied to Applications for Ballot by Mail ("ABBM") and carrier envelope signatures, and, further, these instructions provide guidance for voters to use when writing out their signatures, which, if followed, can help to build some consistency among their signatures.[27]

Defendant SOS further claims that Organizational Plaintiffs only "occasionally discuss mail-in-ballots in the course of their everyday voter-education and voter-registration activities"[28] and that "[i]t is not an injury to address mail-in ballot procedures when providing training on voter-registration in general."[29] Defendant SOS mischaracterizes Fifth Circuit precedent on

---

[26] Dkt. 75 at 6.

[27] Plaintiffs cited extensive record evidence supporting this point in their Motion for Summary Judgment and their Response to Defendants' Motions for Summary Judgment. Dkt. 65: Dkt. 74; *see also* Voting Accommodations in Texas - The Laws and the Options! - YouTube, available at https://www.youtube.com/watch?v=pXrAZZZS3BQ at 34:18–36:20 (accessed July 8, 2020) (June 20, 2020 video of a LWV hosted webinar with representatives from Defendant SOS and Disability Rights Texas. In response to guidance to viewers from the representative of Disability Rights Texas to sign the ABBM and carrier envelope using the same name and generally the same way, the Legal Director of the Elections Division of Defendant SOS explains that, though not required, "it makes it easier for the signature comparison if you're consistent there.").

[28] Dkt. 75 at 6. As explained in Plaintiffs' Response to Defendants' Motion for Summary Judgment, educating voters on how to sign their ballots to avoid improper rejection is not part of any Organizational Plaintiff's "daily operations," and is dissimilar to a "vice president's spending time reviewing ordinances." Dkt. 74 at 11 n.29; Dkt. 75 at 9; *OCA-Greater Houston*, 867 F.3d at 612. Like OCA's guidance, the guidance Organizational Plaintiffs provide is specialized and exists to mitigate the real-world impact of Texas's unlawful signature comparison procedure. *OCA-Greater Houston*, 867 F.3d at 612.

[29] Dkt. 75 at 6. Defendant SOS cites to *Fair Elections Ohio v. Husted*, 770 F.3d 456 (6th Cir. 2014) to make this claim. Plaintiffs in their Response to Defendants' Motions for Summary Judgment further explain why this case is inapposite. *See* Dkt. 74 at 10 n.27.

organizational standing as well as the extensive evidence in the record showing that Organizational Plaintiffs have standing.

First, "the injury in fact requirement under Article III is qualitative, not quantitative, in nature," so whether an organization diverts resources to counteract an unlawful action occasionally or even only once a year does not affect standing analysis. *See Fowler*, 178 F.3d at 357-58, 360-61 (holding that organizational plaintiff had standing because it presented evidence that it expended resources counteracting the state's unlawful practices by conducting a voter registration drive at specific locations in the state at least once a year); *Scott v. Schedler*, 771 F.3d 831, 837 (5th Cir. 2014) (holding that organizational plaintiff had standing even though the only person from the organization who "devoted his time" to counteract the state's unlawful practices "estimated [six] but was not sure of the number of voter registration drives he conducted").

Second, the Fifth Circuit has found standing for organizations that devote time to educating voters on how to reduce the chance of injury from the unlawful action at issue, even when this guidance is provided while educating voters on other voting issues. In *OCA-Greater Houston*, OCA explained that in-depth conversations to voters about the unlawful Texas statute at issue in the case "take more time than merely explaining the requirements of the VRA, and therefore OCA must spend more time on each call (and reach fewer people in the same amount of time) because of Texas's statute."[30] 867 F.3d at 610. The Fifth Circuit found that OCA had standing because these additional efforts were an "undertaking that consumed its time and resources in a way they would not have been spent absent the Texas law." *Id*. at 612. All Organizational Plaintiffs, through

---

[30] Br. for Appellee at 5, 14 n.2, *OCA-Greater Houston*, 867 F.3d 604 (5th Cir. 2017) (No. 16-51126) (According to testimony from a representative of OCA, "helping voters to navigate the [Texas law at issue] requires a substantial additional expenditure of volunteer time; in her estimate, a conversation that might otherwise take five minutes takes ten to fifteen minutes.").

documentary evidence and testimony, show this form of standing; CTD, LWV, and MOVE Texas Civic Fund ("MOVE") show an additional diversion of resources through the development of educational materials, like videos, website content, written social media posts, and/or content in widely distributed organizational materials like an annual report; and MOVE also shows a diversion of monetary resources to paid text messages.

CTD expends resources specifically to guide disabled mail-in voters on how to reduce the chances of an improper rejection due to signature mismatch. CTD has created social media text posts and a video, which it has also featured on social media, geared either mainly or solely to warn mail-in voters about the signature comparison procedure and provide instruction on how to reduce the chance of improper rejection.[31] CTD has also gone out of its way to highlight this issue by providing guidance on its website and its annual report.[32] If the signature comparison procedure either did not exist or provided meaningful procedural safeguards, CTD could have spent these resources on other voting or non-voting issues that affect the disability community.[33]

CTD also spends time during trainings guiding mail-in voters on how to navigate the signature comparison procedure.[34] Absent the signature comparison procedure or if the signature

---

[31] Ex. 46 (CTD Facebook text post reminding voters to make sure mail-in ballot-related signatures match); Ex. 47 (CTD Facebook post of video reminding voters to make sure mail-in ballot-related signatures match); Ex. 89, (CTD Facebook text post reminding voters to make sure their mail-in ballot related signature "is as close as possible" to the signature on their voter registration application, one of the types of documents on file bearing a voter's signature that can be pulled during the signature comparison procedure—the URL citation to this post was provided to Defendants at note 12 of Plaintiffs' Response to Defendants' Motion for Summary Judgment).

[32] Ex. 42 at CTD-00000040, 43 (2019 Annual Report containing reminder and warning about potential for disenfranchisement); Ex. 43 at CTD-00000066 (online version of report with similar reminder); Ex. 44 at CTD-00000070 (similar reminder on CTD website).

[33] Ex. 74, Bearden Dec. ¶¶ 7–8.

[34] *Id*.; Ex. 37, CTD 30(b)(6) Dep. 37:9–39:21, 71:5–74:7.

comparison procedure provided the proper procedural safeguards, this guidance would be, as CTD's 30(b)(6) witness put it,

> one less thing I have to work on making sure they understand in the midst of a lot of information in one day they usually receive. That allows me to move on to the next issue that we're dealing with; be it attendant wages, transportation, education.[35]

Consequently, CTD could spend its limited time during trainings educating its contacts on other voting issues, or educating them about non-voting issues that affect the disability community.[36]

LWV expends resources to specifically guide mail-in voters on how to reduce the chance of an improper rejection due to signature mismatch. LWV provides on its website guidance to those interested in voting by mail on how to reduce the chance of an improper rejection based on a signature mismatch, and LWV has created a YouTube video about voting by mail during COVID-19 offering similar guidance.[37] LWV has also developed training materials for its members and volunteers as well as other voting rights organizations to use that include instructions on how to sign mail-in voting materials in order to reduce the chance of rejection.[38] LWV, through

---

[35] Ex. 37, CTD 30(b)(6) Dep. 71:5–74:7.

[36] Ex. 74, Bearden Dec. ¶ 8.

[37] Ex. 59, LWV 30(b)(6) Dep. 114:20–115:10 (both the LWV website and a YouTube video tells voters to make sure their signatures match for mail-in ballot purposes—Plaintiffs in their previous briefings, in error, stated "videos" when the LWV 30(b)(6) witness only referenced to one video during her deposition); Ex. 63 (LWV website page on voting by mail, including a reminder for voters to "[a]void any confusion by election officials and sign both your application and ballot in the same way"); Ex. 64 (LWV YouTube video titled "Vote by Mail-Texas Style," which provides guidance on how to sign mail-in ballot materials).

[38] Ex. 61 at LWV-000000281-291 (portion of "Get in the Game" voter education PowerPoint covering how to apply for and cast a mail-in ballot, including reminders that "[y]our signature [on the Application for Ballot by Mail] MUST match the one on your voter registration card," to "[b]e sure this signature [on the carrier envelope] is exactly the same as the signature on your Application for Ballot by Mail," and that a ballot may be rejected if "[t]he signature on the [carrier] envelope and on the Application for Mail Ballot are different"); Ex. 62 at LWV-000000356-365 (portion of "Vote by Mail: Step by Step" PowerPoint used in trainings which reminds voters that "[y]our signature [on the Application for Ballot by Mail] MUST match the one on your voter registration card," to "[b]e sure this signature [on the carrier envelope] is exactly the same as the signature on

its members and volunteers, provides trainings across Texas using those materials and, like OCA, spends additional time during each of these trainings teaching mail-in voters how to reduce the chance of improper rejection due to a signature mismatch.[39] *OCA-Greater Houston*, 867 F.3d at 610.

Absent the signature comparison procedure or if the signature comparison procedure provided proper procedural safeguards, LWV would not have to investigate this issue, develop educational website and YouTube content for the public, develop guidance to include in training materials for its members, volunteers, and other voting rights organizations, and have its members and volunteers provide the guidance at every "Get in the Game" and vote by mail training.[40] These resources could have gone towards accomplishing LWV's primary mission in other ways and been spent on other efforts, such as voter registration, other voter education on either mail-in voting or other forms of voting, getting-out-the-vote, and election protection for local, state, and federal elections across Texas.[41]

MOVE expends resources to specifically guide mail-in voters on how to avoid improper rejection due to signature mismatch. MOVE sends messages through social media posts and paid text messages to make sure that individual voters are following through with their mail-in ballot plans, and specifically warns voters, since the signature comparison procedure is strict and arbitrary, to sign mail-in ballots as clearly and legibly as possible to avoid improper rejection.[42] The resources diverted for these purposes—staff time in drafting, ad buys on social media, and

---

your Application for Vote by Mail," and that a ballot may be rejected if "[t]he signature on the [carrier] envelope and on the Application for Mail Ballot are different"); Ex. 59, LWV 30(b)(6) Dep. 70:3–20.

[39] Ex. 59, LWV 30(b)(6) Dep. 70:3–20; Ex. 60, Chimene Dec. ¶¶ 7–10.

[40] Ex. 60, Chimene Dec. ¶¶ 7–10, 17–18.

[41] *Id.*

[42] Ex. 49, Galloway Dec. ¶ 18.

paid text-messaging services—are transferred away from MOVE's in-person voting and voter registration activities, its other education activities, and its limited mail registration drives.[43]

MOVE also specifically trains its organizers to warn voters to sign mail-in ballots as clearly and legibly as possible to avoid improper rejection.[44] Based on thousands of interactions with potential voters, MOVE estimates that during its regular voter registration and education activities (such as tabling or canvasing at a college campus or presenting to a college class) it has between two to five minutes to engage a potential new voter and provide relevant information to them. Even the small amount of time needed to explain the risk of signature rejections on mail-in ballots and how to reduce this risk decreases the time that MOVE has to discuss other issues with a voter by as much as 25%.[45] Absent the signature comparison procedure or if the procedure provided the proper procedural safeguards, MOVE would be able to spend a quarter more of its time with every mail-in voter it interacts with on other important topics.

Austin Justice Coalition ("AJC") also expends resources specifically to guide mail-in voters on how to avoid improper rejection due to signature mismatch. AJC has developed a handout for volunteers to use that requires them to provide guidance on how to sign mail-in ballot materials while speaking with inmates.[46] AJC volunteers, during their time with inmate voters, specifically educate voters on how to sign their mail-in ballot materials.[47] AJC's additional time spent discussing how to sign the materials properly would not be necessary but for the unlawful

---

[43] *Id.*; Exs. 50, 53 (MOVE drafting text message to voters regarding mail-in ballot process and deadlines and reminding voters that "[t]he application must be signed, so make sure your signature is consistent to ensure your vote is counted").

[44] *See* Ex. 49, Galloway Dec. ¶ 16.

[45] *Id.* at ¶ 17.

[46] Ex. 36 (Project Orange reminder sheet for volunteers carrying out vote by mail drives at jail, to ensure that volunteers instruct inmates to print and sign legibly so the county can read their signature).

[47] *Id.*; Ex. 35, Rodionov Dec. ¶ 9; Ex. 34, AJC 30(b)(6) Dep. 44:11–14, 45:25–46:23, 60:24–61:12.

signature comparison procedure, and it takes away some of the limited time the jail provides to AJC volunteers to complete their work.[48]

Lastly, Defendant SOS also tries to compare Organizational Plaintiffs' education efforts to standing claims based on voter registration efforts in *Fowler*. 178 F.3d at 359–362. However, the voter registration activities that did not confer standing in *Fowler* are not analogous to Organizational Plaintiffs' educational activities because those voter registration activities did not counteract the state's unlawful conduct by targeting those affected by it. *Id*. Organizational Plaintiffs have standing because their educational efforts, like the voter registration efforts that did raise a fact question on standing in *Fowler*, teach mail-in voters, all of whom must have their ballots undergo the unlawful signature comparison procedure, how to reduce the chance of an improper rejection based on a signature mismatch. *See id*. at 361 (holding that organizational plaintiff raised a fact question because it presented evidence that it expended resources registering voters in certain areas "who would have already been registered if the [state] had complied with [federal law]"); *see also OCA-Greater Houston*, 867 F.3d at 612 (holding that organizational plaintiff had standing because it "undertook to educate voters about Texas's [unlawful statute] to reduce the chance that other voters would be [injured by the statute]").

### D. Sovereign Immunity Does Not Bar Plaintiffs' Claims Against Defendant SOS

Defendant SOS again argues, as she did in her Motion for Summary Judgment, that sovereign immunity bars Plaintiffs' claims against her.[49] Plaintiffs have already fully addressed why the *Ex parte Young* exception to sovereign immunity applies to Defendant SOS in their Response to Defendants' Motions for Summary Judgment.[50] In short, despite citing to *OCA-*

---

[48] *Id*.
[49] Dkt. 75 at 1–2.
[50] *See* Dkt. 74 at 14–17.

*Greater Houston* and *Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020) in her

Motion for Summary Judgment and her Response to Plaintiffs' Motion for Summary Judgment,

Defendant SOS continues to ignore the holdings in those cases. As explained in Plaintiffs'

Response, it would make no sense if "[t]he facial invalidity of a Texas election statute is, without

question, fairly traceable to and redressable by the . . . Secretary of State, who serves as the 'chief

election officer of the state,'" but for Defendant SOS to nevertheless be an improper defendant

under *Ex parte Young*. *OCA-Greater Houston*, 867 F.3d at 613 (quoting Tex. Elec. Code §

31.001(a)). This is why the Fifth Circuit explained only one month ago that its holding in *OCA-*

*Greater Houston*

> suggests that the Secretary of State bears a sufficient connection to the enforcement
> of the Texas Election Code's vote-by-mail provisions to support standing. . . .
> [which], in turn, suggests that *Young* is satisfied by the Secretary of State [with
> respect to the vote by mail provisions].

*Texas Democratic Party*, 961 F.3d at 401 (citing *OCA-Greater Houston*, 867 F.3d at 613).[51] There

is no doubt this precedent is applicable here; both this lawsuit and *Texas Democratic Party* involve

constitutional challenges to Texas's mail-in ballot provisions brought against Defendant SOS.

      Beyond renewing the arguments from her Motion for Summary Judgment, which Plaintiffs

addressed in their Response, Defendant SOS now additionally asserts that the *Ex parte Young*

exception can never apply when the relief sought requires a court to order a government official

---

[51] As also fully briefed in Plaintiffs' Response to Defendants' Motions for Summary Judgment,
the Fifth Circuit made it abundantly clear in *Texas Democratic Party*—again relying on *OCA-*
*Greater Houston*—that Defendant SOS is a properly named defendant with respect to causation
and redressability for Article III standing in challenges to Texas's mail-in ballot provisions. *See*
Dkt. 74 at 13–14; *Texas Democratic Party*, 961 F.3d at 399 (citing *OCA-Greater Houston*, 867
F.3d at 612–13). This Court applied that precedent in denying Defendant SOS's Motion to Dismiss
on the same grounds. Dkt. 41 at 13–15. Yet Defendant SOS ignores this precedent and renews her
same, already-rejected arguments on this front.

to take "affirmative action."[52] This interpretation of *Ex parte Young* has its origins in footnote 11 of *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 692 n.11 (1949)[53] and was squarely rejected by the Fifth Circuit in *Saine v. Hospital Authority*, 502 F.2d 1033 (5th Cir. 1974).

In *Saine*, the Fifth Circuit joined the D.C. Circuit and the Ninth Circuit in holding that footnote 11 of *Larson* "does not bar all actions seeking affirmative action by governmental officials." 502 F.2d at 1036–37 (citing *Knox Hill Tenant Council v. Washington*, 448 F.2d 1045 (D.C. Cir. 1971); *State of Wash. v. Udall*, 417 F.2d 1310 (9th Cir. 1969)).[54] Rather, "the footnote prohibits claims for affirmative injunctive relief where 'the relief sought would work an intolerable burden on governmental functions, outweighing any consideration of private harm.'" *Anibowei v. Barr*, 2019 WL 623090 at *6 (N.D. Tex. Feb. 14, 2019) (quoting *Saine*, 502 F.2d at 1037).[55] "This test requires the court to engage in a 'balancing analysis,' weighing, on the one hand, the burden the relief would impose on the government, and, on the other hand, the harm that denying relief

---

[52] Dkt. 75 at 2–3.

[53] Footnote 11 of *Larson* states:

> Of course, a suit *may* fail, as one against the sovereign . . . if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign . . .

*Larson*, 337 U.S. at 691 n.11 (emphasis added).

[54] *See also Schlafly v. Volpe*, 495 F.2d 273, 280 (7th Cir. 1974) (adopting Ninth Circuit's reasoning in *Udall*).

[55] As the court in *Anibowei* noted, "[a]t least one circuit has questioned whether footnote 11['s prohibition on claims seeking affirmative injunctive relief in certain instances] remains good law," given that "the Supreme Court has failed to mention footnote 11 in recent sovereign immunity cases and in its various opinions authorizing affirmative injunctive relief against state officials." *Anibowei*, 2019 WL 623090, at *6 n.8 (citing *Vann v. Kempthorne*, 534 F.3d 741, 752 (D.C. Cir. 2008)). Nevertheless, the court "assume[d] that footnote 11, as interpreted by the Fifth Circuit, remains good law—until either the Supreme Court or the Fifth Circuit holds otherwise." *Anibowei*, 2019 WL 623090, at *6 n.8.

would inflict on the plaintiff." *Anibowei*, 2019 WL 623090, at *6 (citing *Saine*, 502 F.2d at 1037

and *Doe v. Wooten*, 376 F. App'x 883, 885 (11th Cir. 2010)).[56]

In this case, any burden on governmental functions is minimal. Plaintiffs request only that

Defendant SOS be required to bring Texas's mail-in ballot practices into compliance with the

Constitution and other federal law, as she is both empowered and instructed to do under the Texas

Election Code. *See* Tex. Elec. Code §§ 31.001, 31.003, 31.005. This could be accomplished, for

example, by a simple directive to cease carrying out the signature comparison procedure or to

provide voters with meaningful pre-rejection notice and an opportunity to cure a mail-in ballot

questioned for an alleged signature mismatch. Furthermore, as discussed both in Plaintiffs' Motion

for Summary Judgment and their Response to Defendants' Motions for Summary Judgment,

Plaintiffs' claims pose no burden at all to any of the government interests identified by Defendant

SOS, but instead further those interests.[57] Weighed against these minimal to nonexistent burdens

---

[56] Defendant SOS cites to *Painter v. Shalala*, 97 F.3d 1351, 1359 (10th Cir. 1996) and dicta from *Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1211–12 (11th Cir. 2020) in support of her position. However, Defendant SOS fails to direct the Court to any case that addresses the Fifth Circuit precedent Plaintiffs have identified. Additionally, the Tenth Circuit's decision in *Painter* was based on the opposite reading of *Larson's* footnote 11 as that endorsed by the Fifth Circuit in *Saine*, and so is not persuasive here. *Compare Painter*, 97 F.3d at 1359 *with Saine*, 502 F.2d at 1036–37.

[57] *See* Dkt. 65 at 34–36, 42–44; Dkt. 74 at 37, 45–46. To the extent the burden placed on local election officials by any directive from Defendant SOS weighs into this analysis, it seems clear that a directive to cease carrying out the signature comparison process would pose no burden on governmental functions whatsoever. Alternatively, a directive to implement a cure and notice process would similarly pose little burden because, as made clear in deposition testimony and as discussed in Plaintiffs' Motion for Summary Judgment and their Response to Defendants' Motions for Summary Judgment, EVCs in a jurisdiction are

> responsible for handling virtually every aspect of early voting within their respective jurisdictions. These duties are extensive, and, as EVCs, each Local Defendant manages the EVBB by providing EVBB committee members with the EVBB Handbook, a space to convene, and all the office supplies necessary to carry out their tasks; is required to provide assistance whenever the EVBB needs help in making a signature determination (for example, by providing more signatures for review); and mails out rejection notices for the EVBB. The Local Defendants, as

is the harm that denying Plaintiffs' requested relief would inflict: the irreversible disenfranchisement of an untold number of individuals whose mail-in ballots will be rejected by layperson EVBBs applying a standardless, unlawful, and error-prone signature comparison procedure. And, as this Court itself recently stated in another case involving the right to vote, disenfranchisement constitutes an "irreparable" injury to the "fundamental right" to vote, and those disenfranchised "will *never* be able to recover" that right once the election has passed. *Stringer v. Pablos*, 2020 WL 532937, at *8 (W.D. Tex. Jan. 30, 2020) (quoting *Stringer v. Whitley*, 942 F.3d 715, 726 (Ho, J., concurring)) (emphasis in original). The Court should therefore find that the *Ex parte Young* exception is applicable to Defendant SOS in this case.

## II. PLAINTIFFS HAVE STANDING AS TO LOCAL DEFENDANTS AND LOCAL DEFENDANTS ARE PROPER PARTIES IN THIS CASE

Although there is some slight variance, Defendants Brazos County EA and Perla Lara, in her official capacity as City of McAllen, Texas City Secretary ("McAllen City Secretary") (collectively "Local Defendants") raise primarily the same arguments in their Responses to Plaintiffs' Motion for Summary Judgment as they did in their own Motions for Summary Judgment.[58] These arguments are materially the same as those the Court rejected when ruling on Local Defendants' Motions to Dismiss, and they are similarly unavailing now at the summary

---

permitted under the Texas Election Code, also regularly correspond with voters for a multitude of reasons related to the mail-in ballot process—via e-mail, text messages, phone calls, and/or physical mail, and the updated notice of rejection form recently distributed by Defendant SOS specifically contemplates communication between local election officials and voters about mail-in ballots.

Dkt. 74 at 27–28 & nn. 81–84 (citing to relevant exhibits and deposition testimony); Dkt. 65 at 36. Additionally, as common sense would dictate and as fact witnesses testified, the cost of such communication is negligible. Dkt. 65 at 35–36 & nn. 145–48, 43 & nn. 162–163. Given these facts, there is no argument that Plaintiffs' requested relief "would work an intolerable burden on governmental functions." *Saine*, 502 F.2d at 1037.

[58] *Compare generally* Dkts. 73, 76 *with* Dkts. 64, 66.

judgment stage.[59] Local Defendants claim they are improper parties (whether due to Plaintiffs'

lack of standing or failure to state a claim) because (1) they merely follow Texas law; (2) they

cannot provide the relief sought; and (3) the EVBB in each of their jurisdictions, rather than Local

Defendants themselves, is tasked with carrying out the signature comparison procedure and

ultimately rejecting a mail-in ballot. Local Defendants also contest that each Plaintiff has

established Article III injury-in-fact.

Plaintiffs comprehensively rebutted each of these arguments in their Response to

Defendants' Motions for Summary Judgment and will not burden the Court by reproducing that

response in its entirety here.[60] In short, as the Court ruled in rejecting Local Defendants' Motions

to Dismiss on the same grounds and as the undisputed evidence in this case now supports, Local

Defendants' assertions are incorrect because, under Fifth Circuit precedent, both they and

Defendant SOS are proper parties to this lawsuit based on the role each plays in the challenged

statutory scheme.[61] Furthermore, each Plaintiff has established Article III injury-in-fact as

demonstrated by undisputed evidence in the record.[62]

Defendant Brazos County EA additionally raises two new points, but neither changes this

outcome. First, she argues that Plaintiffs "attempt to mislead the Court" by "falsely stat[ing]" in

their Motion for Summary Judgment that the

> EVC manages the EVBB by providing EVBB committee members the EVBB
> Handbook, a space to convene, all the office supplies necessary to carry out their
> tasks, assistance whenever the EVBB requires help making a signature
> determination, and mails out rejection notices for the EVBB.[63]

---

[59] *See* Dkt. 74 at 19–29.

[60] *Id.*

[61] *Id.*; *see* Dkt. 41 at 16–18, 25–26, 30–31 (This Court's Order denying Local Defendants' Motions to Dismiss on substantially the same grounds).

[62] *See* Dkt. 74 at 19–26; *see supra* n.1.

[63] Dkt. 73 at 3–4 (quoting Dkt. 65 at 10) (emphasis removed).

She points out that the deposition testimony Plaintiffs cited in support of this statement relates only to the processing of ABBMs and that Defendant Brazos County EA does not have the ability to oversee, instruct, or otherwise manage the EVBB.[64]

Plaintiffs acknowledge that the testimony cited for this statement in their Motion for Summary Judgment mistakenly dealt only with the Local Defendants' oversight of the processing of ABBMs. However, in responding to Brazos County EA's Motion for Summary Judgment and prior to seeing her Response to Plaintiffs' Motion for Summary Judgment, Plaintiffs caught this error and provided a more complete citation to deposition testimony that supports all of their stated facts. Plaintiffs' description of the facts therein, supported by testimony from Trudy Hancock and Perla Lara as individual fact witnesses as well as by their testimony as the 30(b)(6) witnesses for Brazos County and the City of McAllen, is as follows:

> [A]s EVCs, each Local Defendant manages the EVBB by providing EVBB committee members with the EVBB Handbook, a space to convene, and all the office supplies necessary to carry out their tasks; is required to provide assistance whenever the EVBB needs help in making a signature determination (for example, by providing more signatures for review); and mails out rejection notices for the EVBB.[65]

Each of these contentions is supported by Local Defendants' undisputed testimony as laid out in Plaintiffs' Response.[66] Beyond the above, Plaintiffs do not otherwise allege that Local Defendants "oversee, instruct[,] or manage the EVBB,"[67] and so Defendant Brazos County EA's

---

[64] Dkt. 73 at 3–4.

[65] Dkt. 74 at 28 (citing both the testimony regarding Local Defendants' handling of the processing of ABBMs contained in Plaintiffs' Motion for Summary Judgment as well as Ex. 9, Brazos 30(b)(6) Dep. 14:5–14, 15:4–16; Ex. 10, Hancock Dep. 73:9–74:4; Ex. 11, McAllen 30(b)(6) Dep. 26:6–20; Ex. 12, Lara Dep. 26:16–27:4, 78:3–79:8; Ex. 77, Hancock Dep. 75:20–25, 89:3–90:1, 90:13–91:6, 92:12–93:8; 93:9–16; Ex. 78, Brazos 30(b)(6) Dep. 43:2–44:25; Ex. 79, Lara 31:15–33:15, 51:1–19, 112:5–113:20; Ex. 80, McAllen 30(b)(6) 13:16–14:23; Ex. 76, SOS 30(b)(6) 45:11–46:7, 47:9–5).

[66] Dkt. 74 at 28.

[67] Dkt. 73 at 4.

complaint on that front is misplaced. However, this involvement is sufficient to render Defendant Brazos County EA a proper defendant in this case, as set out comprehensively in Plaintiffs' Response to Defendants' Motion for Summary Judgment and in this Court's order rejecting her Motion to Dismiss on the same grounds.[68]

Second, Defendant Brazos County EA takes issue with Plaintiffs' statement that Dr. Richardson's mail-in ballot was "rejected by Brazos County" and that he "received a letter from Brazos County notifying him that his ballot was rejected because of a signature mismatch."[69] According to her, the EVBB rejected Dr. Richardson's ballot, and the EVBB's presiding judge signed the Notice of Rejection, and so "Brazos County" did not reject his ballot and Dr. Richardson did not "receive" the Notice of Rejection "from" Brazos County.[70]

Defendant Brazos EA's semantic mincing—and whether Defendant Brazos EA's characterizations are accurate—is ultimately irrelevant. It merely leads Defendant Brazos County EA back to her same argument that because she is not responsible for comparing signatures, or for the ultimate decision to reject a mail-in ballot, she is an improper defendant.[71] Plaintiffs do not and never have claimed either Local Defendant is responsible for those functions or that their carrying out of those functions is what renders them liable in this lawsuit. Rather, Local Defendants are liable for failing to institute a meaningful pre-rejection notice and opportunity to cure before a mail-in voter's ballot is rejected for signature mismatch—none of which involves them comparing signatures or ultimately choosing to reject a ballot. This analysis was accepted by the Court in

---

[68] *Id.* at 26–29; Dkt. 41 at 16–18, 25–26, 30–31.
[69] Dkt. 73 at 11 (quoting Dkt. 65 at 16).
[70] Dkt. 73 at 11.
[71] *Id.*

denying Local Defendants' Motions to Dismiss and nothing has changed at summary judgment so as to warrant a different outcome.[72]

Furthermore, as should be clear from the above, Plaintiffs' reference to "Brazos County" rejecting Dr. Richardson's ballot is simply shorthand for the fact that an agent of Brazos County was responsible for the action. Additionally, as Trudy Hancock testified to multiple times, the Brazos County EVBB does not in fact mail notices of rejected ballots to voters, but instead turns them over to her office, which mails the notices to the voters the next day.[73] Thus, even setting aside the fact that this semantics-based argument is ultimately irrelevant, Defendant Brazos EA is incorrect in claiming that Plaintiffs' allegations are "inaccurate[]."[74]

## III.   DEFENDANTS PROVIDE NO BASIS TO DENY PLAINTIFFS' REQUEST FOR SUMMARY JUDGMENT ON THE MERITS OF THEIR CONSTITUTIONAL CLAIMS.

Rather than meaningfully address the merits of Plaintiffs' constitutional claims, Defendant SOS[75] relies on a grab bag of disjointed arguments to obfuscate the applicable legal standards and distract from the relevant evidence. Perhaps most concerning are the outdated views on voting rights on which Defendant SOS relies, pointing to Supreme Court cases from the 19th century in an effort to minimize the institution of voting itself.[76] These arguments are meritless, and provide no basis to avoid the only conclusion compelled by the evidence and the law: Texas's signature comparison procedure is unconstitutional.

---

[72] Dkt. 74 at 26–29; Dkt. 41 at 16–18, 25–26, 30–31.

[73] Ex. 77, Hancock Dep. 75:20–25, 89:3–90:1, 90:13–91:6; 93:9–16; Ex. 78, Brazos 30(b)(6) Dep. 43:2–44:25.

[74] Dkt. 73 at 11.

[75] Local Defendants do not address the merits of Plaintiffs' constitutional or federal law claims in their responses to Plaintiffs' Motion for Summary Judgment. *See generally* Dkt. 73; Dkt. 76.

[76] *See, e.g.*, Dkt. 75 at 14 ("[T]he Supreme Court has noted that the Constitution 'does not confer the right of suffrage upon any one.'" (citing *Minor v. Happersett*, 88 U.S. 162 (1874)).

### A. Defendant SOS's Attacks On Plaintiffs' Due Process Claims Are Meritless

In *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Supreme Court laid out the test that applies to procedural Due Process claims such as Plaintiffs'.[77] Nevertheless, Defendant SOS continues to wrongly insist that a different standard applies. These efforts are unavailing for several reasons.

### 1. The Right to Vote Is Protected By Procedural Due Process

Relying on the Fifth Circuit's decisions in *Welch v. McKenzie*, 765 F.2d 1311 (5th Cir. 1985), and *Johnson v. Hood*, 430 F.2d 610 (5th Cir. 1970) (per curiam), Defendant SOS asserts that "the right to vote is not a liberty or property interest capable of triggering the Due Process Clause."[78] Putting aside this cavalier dismissal of such a fundamental right—as well as her own concessions in prior briefings that "[t]he private interest in voting is undeniably important"[79]— Defendant SOS's conclusory pronouncement is plainly incorrect.

Although Defendant SOS argues that Due Process violations of the right to vote are not "cognizable in federal court," the Fifth Circuit has found that such violations are actionable under the Due Process Clause. *See, e.g.*, *United States v. Atkins*, 323 F.2d 733, 743 (5th Cir. 1963) (holding that the right to vote is a "private interest" under the Due Process Clause and that officials "could not deprive a person of the right to register to vote on the basis of secret evidence without affording notice and an opportunity for hearing."); *Williams v. Taylor*, 677 F.2d 510, 514-15 (5th Cir. 1982) (applying the *Mathews* test to Mississippi's felony disenfranchisement statute). The Fifth Circuit's approach accords with that of other federal courts, which routinely find that the right to vote is protected by the Due Process Clause. *See, e.g.*, *Georgia Muslim Voter Project v.*

---

[77] *See* Dkt. 32 at 23–33; Dkt. 65 at 29–37; Dkt. 74 at 33-38; *see also* Dkt. 41 at 21 ("The argument for applying the *Mathews* test to Plaintiffs' due process claim is a strong one[.]").

[78] Dkt. 75 at 9–10.

[79] Dkt. 35 at 7.

*Kemp*, 918 F.3d 1262, 1270-71 (11th Cir. 2019) (Pryor, J., concurring) (under the first prong of the *Mathews* test, "[i]t is undeniably true that the interest in voting absentee implicates the right to vote"); *Doe v. Rowe*, 156 F. Supp. 2d 35, 48 (D. Me. 2001) ("Plaintiffs' interest in participating in the democratic process through voting" met the first prong of the *Mathews* test after disabled voters were disenfranchised by state guardianship laws without notice and opportunity to be heard); *Saucedo v. Gardner,* 335 F. Supp. 3d 202, 214 (D. N.H. 2018) (applying *Mathews* to strike down New Hampshire's signature-matching law on procedural Due Process grounds); *Martin*, 341 F. Supp. 3d at 1338 (same in Georgia); *Zessar*, 2006 WL 642646, at *7 (same in Illinois); *Raetzel*, 762 F.Supp. at 1356-56 (same in Arizona). This Court has also noted that "multiple courts have applied the *Mathews* framework to substantially similar claims involving due process challenges to mail-in ballot signature comparison procedures."[80]

Further, *Welch* and *Johnson* do not even purportedly remove voting rights from the purview of the Due Process Clause, and are easily distinguishable from Plaintiffs' claims here. *Welch* was not a challenge to a state election law. Instead, an unsuccessful candidate challenged the results of a local Mississippi election as improper due to allegedly racially motivated irregularities, errors, and fraud. 765 F.2d at 1312. Although the conduct was egregious and the victorious candidate was convicted of felony election fraud, the court found no racial motivation and at the heart the matter was "an ordinary dispute over the counting and marking of ballots." *Id.* at 1317. Such "garden variety" election disputes, the court held, "do not rise to the level of constitutional deprivation" implicating Due Process. *Id.* To the contrary, the *Welch* decision itself pointed out that Due Process is implicated when an "election process itself" is challenged as unfair. *Id.* (internal citations omitted). Plaintiffs here have not brought a "garden variety" election dispute,

---

[80] Dkt. 41 at 21 (collecting cases).

and do not allege that state election laws have been violated. This case is a fundamental challenge to Defendants' signature comparison procedure, and the Fifth Circuit has made it clear that such a challenge is appropriately brought under the Due Process Clause.

Like *Welch*, *Johnson* also involved a challenge to the results of a local Mississippi election. 430 F.2d at 611. Unlike Plaintiffs' claims here, the complaint in *Johnson* "contained no averment that the Mississippi election laws [at issue] were unconstitutional or illegal under federal law." *Id.* Thus, the Fifth Circuit "determined upon a consideration of the pleadings and the stipulated evidence that there [was] no jurisdiction in the federal court system over any of plaintiffs' claims." *Id.  Johnson* has no bearing on the validity of Plaintiffs' Due Process claims, and does not provide a basis to deny Plaintiffs' request for summary judgment.

### 2. Defendant SOS's Remaining Arguments Against Plaintiffs' Due Process Claims Fail

Defendant SOS further argues that Plaintiffs fail to prove a violation of Due Process under *Mathews*. As explained in Plaintiffs' prior briefings, proper application of the *Mathews* test to the undisputed facts compels summary judgment in Plaintiffs' favor.[81] However, several of Defendant SOS's arguments merit correction.

First, Defendant SOS repeats an argument made in prior pleadings that Individual Plaintiffs disregarded the process available to them.[82] But the two alternative processes now proffered by Defendant SOS each fail to provide a sufficient remedial measure. Defendant SOS again claims that Plaintiffs "fail[ed] to pursue" any action under Texas Election Code Section 87.127(a), and that Plaintiffs' failure to produce evidence that "Plaintiffs invoked [Section 81.127(a)] to no avail"

---

[81] *See* Dkt. 65 at 29–37; Dkt. 74 at 33–38.
[82] Dkt. 75 at 10–11.

is fatal.[83] As set forth in detail in Plaintiffs' prior pleadings,[84] the petitioning process in Section 81.127(a) is not a process available to voters, but to county election officials. The plain language of the Texas Election Code, that a "county election officer may petition a district court" for relief, reveals Defendant SOS's repeated claim that Plaintiffs failed to invoke Section 87.127(a) to be a red herring, and the undisputed facts demonstrate that it is impossible to utilize Section 87.127(a) in the manner proposed by Defendant SOS.[85]

Second, Defendant SOS also insists that Texas's signature comparison procedure does not run afoul of the Due Process Clause because "Texas law provides means to contest the outcome of an election, which offer additional avenues for review and evaluation of ballots."[86] Specifically, she states that the failure of "any Plaintiffs [to pursue] such an option here" and the lack of evidence demonstrating that the state election contest procedures are "anything but a fair and adequate avenue to obtain corrective action" provide "an independently dispositive reason why Plaintiffs' due process claim is not cognizable."[87] Not only is requiring that every improperly disenfranchised voter contest the validity of an entire election untenable as a practical matter, but Defendant SOS makes no effort whatsoever to explain how the availability of an election contest addresses Plaintiffs' concerns. Plaintiffs are not seeking to overturn the results of any election, but instead to protect the fundamental right to vote. Nor is it clear that this process would in fact protect this fundamental right for an individual mail-in voter, as an election contestant can only succeed by demonstrating that violations of the Texas Election Code materially affected the outcome of the election. *See, e.g.*, *Willet v. Cole*, 249 S.W.3d 585, 589 (Tex. App. 2008) ("To set aside the

---

[83] *Id*. at 10.
[84] *See* Dkt. 65 at 23, 32–34; Dkt. 74 at 37–38.
[85] Dkt. 65 at 23, 32–33; Dkt. 74 at 38.
[86] Dkt. 75 at 10.
[87] *Id*. at 10–11.

outcome of the election, [contestant] bore the burden of proving (1) that violations of the Election Code occurred, and (2) that they materially affected the outcome of the election."). Moreover, under Defendant SOS's theory, there is no election process that could run afoul of the Due Process Clause so long as voters are able to challenge an election's ultimate results. This is clearly not the law. The fact that Texas law allows elections to be contested does not immunize its voting procedures from Due Process scrutiny, and does not provide any basis for Defendant SOS to avoid summary judgment.

Finally, as a last effort to absolve herself of liability, Defendant SOS complains that "Plaintiffs have not offered a concrete proposal for [procedural] safeguards—either in discovery or in their Motion for Summary Judgment—instead parroting a purported entitlement to 'pre-rejection notice and an opportunity to cure.'"[88] As all parties to this litigation are aware, the parties participated in mediation ordered by this Court on March 9, 2020.[89] On March 17, 2020, Plaintiffs' deadline to provide a written settlement offer, Plaintiffs provided a detailed written proposal for resolution.[90] The claim that Plaintiffs have not provided a "specific cure proposal"[91] to Defendants is simply untrue. Further—and more to the point—Defendant SOS cites to no authority that requires "Plaintiffs [to] show that such procedure would, in fact, result in any erroneously rejected ballot being accepted, or create any value over and above what is already available via an election contest or other court action."[92] Additionally, as discussed earlier in Section I, D, Plaintiffs have provided extensive evidence showing how simple and inexpensive it would be to contact voters and provide them an opportunity to cure their ballot, not to mention that officials already

---

[88] Dkt. 75 at 12.
[89] Dkt. 54 (Order denying Defendants' Opposed Motion to be Excused from Mediation).
[90] *See* Dkt. 40 (Scheduling Order).
[91] Dkt. 75 at 12.
[92] *Id.*

communicate with voters in a variety of ways and Defendant SOS contemplates communication between election officials and voters about mail-in ballots.[93] Plaintiffs have proved every element of their Due Process claim, and are entitled to summary judgment.

### B. Defendant SOS's Attacks on Plaintiffs' Equal Protection Claims Are Unavailing

When burdens placed on the right to vote are challenged on Equal Protection grounds, the law is clear: *Anderson-Burdick* provides the appropriate balancing test, and any asserted injury must be weighed "against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)). Again refusing to engage with this standard, Defendant SOS seeks to muddy these waters and avoid summary judgment by repurposing a variety of arguments she has unsuccessfully made since the motion to dismiss stage.[94] These arguments remain unpersuasive.

#### 1. Neither Discriminatory Intent Nor Discriminatory Effect Are Required To Make Out An Equal Protection Claim Under Anderson-Burdick

Defendant SOS begins her opposition to Plaintiffs' request for summary judgment on their Equal Protection Claims by misstating the law, arguing that "intentional and purposeful discrimination" is "the most basic and essential requirement" of an Equal Protection claim.[95] Defendant SOS bases this proposition on the Fifth Circuit's decision in *Gamza v. Aguirre*, 619 F.2d 449, 450 (5th Cir. 1980). However, like her reliance on *Welch* and *Johnson*, her reliance on *Gamza* is also inapplicable. In *Gamza*, an unsuccessful candidate in a Texas school board race challenged the election results, alleging that votes were counted improperly due to the poor programming of voting machines. *Id.* at 450–51. The court held that "isolated events" such as this

---

[93] *See supra* at 21–22, 21 n.57.
[94] *See* Dkt. 75 at 13–16.
[95] *Id.* at 13.

are "not presumed to be a violation of the equal protection clause." *Id.* at 453. The court went on to clarify that "[o]ur holding today is confined to cases where inadvertent errors occur in the administration of otherwise fair voting procedures." *Id.* at 454 n.6. "Fair voting procedures" are not at issue in this case; it is the fundamental unfairness of Defendants' signature comparison procedure that Plaintiffs properly challenge under the Equal Protection Clause, and *Gamza* does not instruct otherwise.[96]

Similarly unrequired is Defendant SOS's uncited claim that Plaintiffs must demonstrate "discriminatory effect."[97] This and her "purposeful discrimination" standard ignore the Supreme Court's clear instruction that, under *Anderson-Burdick*, a more flexible standard applies, and "[h]owever slight [a challenged] burden may appear . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (applying *Anderson-Burdick*) (internal citation and quotation marks omitted). Defendant SOS's emphasis on discrimination would negate *Anderson-Burdick* entirely, and this is not the law.

### 2. Plaintiffs' Claims Succeed Under *Anderson-Burdick*

Briefly addressing the correct legal standard, Defendant SOS argues that "Texas's signature-verification procedure easily survives *Anderson-Burdick*," using as a starting point a 1874 Supreme Court decision to support her premise that "the Constitution 'does not confer the

---

[96] Defendant SOS also cites two Second Circuit opinions—*Gold v. Feinberg*, 101 F.3d 796 (2nd Cir. 1996) and *Powell v. Power*, 436 F.2d 84 (2d Cir. 1970)—in support of her contention that an Equal Protection claim requires discrimination. Dkt. 75 at 13–14. Both involve an "erroneous application of an otherwise valid statute." *Powell*, 436 F.2d at 88; *Gold*, 101 F.3d at 802 ("If "there exists a state law remedy to . . . election irregularities that is fair and adequate, human error in the conduct of elections" is not a violation of the Constitution absent willful action intended to disenfranchise voters.). That is not what is at issue in this lawsuit and both cases stand in stark contrast to Plaintiffs' claims here.

[97] Dkt. 75 at 14.

right of suffrage upon any one.'"[98] Defendant SOS's perplexing reliance on this 146-year-old

statement[99] fails to take into account the fact that the Supreme Court has more recently held that:

"Undeniably the Constitution of the United States protects the right of all qualified citizens to vote,

in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964). Nevertheless,

Defendant SOS builds upon her faulty premise, asserting that "rational basis applies to the

signature-verification process at issue," and that "Texas's signature-verification process survives

rational-basis review for the same reasons it survives under the *Anderson-Burdick* framework."[100]

For the same reasons already briefed by Plaintiffs,[101] Defendant SOS's ill-defined rational basis

standard is not applicable here, and Plaintiffs' Equal Protection claims succeed under *Anderson-*

*Burdick*.[102]

---

[98] Dkt. 75 at 14 (citing *Minor*, 88 U.S. at 178).

[99] *See* U.S. Const. amend. XIX; *see also* U.S. Const. amends. XV, XXIII, XXIV, XXVI (voting rights-related constitutional amendments passed post-1874, except for the Fifteenth Amendment, passed in 1870).

[100] *Id.* at 15.

[101] Dkt. 65 at 37–44; Dkt. 74 at 34–36, 39–47.

[102] Defendant SOS also argues that "*Bush v. Gore* is wholly inapposite," and returns to her well-tread reliance on *Lemons v. Bradbury* as further justification as to why Plaintiffs' Equal Protection arguments should fail. Dkt. 75 at 15–16 (citing *Bush v. Gore*, 531 U.S. 98 (2000); *Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir. 2008)). Ironically, she attempts to distinguish *Bush* by stating that "[t]he issue was not that the standard itself was vague, but there was really no standard at all." Dkt. 75 at 15. As Plaintiffs have previously briefed at length, this is precisely why *Bush* is instructive and *Lemons* inapposite—Texas's signature comparison procedure provides no standard at all. *See, e.g.*, Dkt. 65 at 41; Dkt. 74 at 46–47.
        For the first time in this lawsuit, Defendant SOS, in her Response to Plaintiffs' Motion for Summary Judgment, argues that Dr. Linton Mohammed's testimony is unhelpful and should not be considered. Dkt. 75 at 15–16. She claims his testimony is unhelpful because Forensic Document Examiners ("FDEs") do not implement the same standard as Texas election officials. In actuality, Texas election officials do not implement any standard while comparing signatures. Also, as Dr. Mohammed stated, at the end of the day the "judgment" at issue is the same for either an FDE or a lay Texas election official—"did someone write the signature or did they not write the signature. . . . that's the judgment I think the election officials are being asked to make" and "[t]he FDEs are being asked to make as well." Ex. 15, Mohammed Dep. 58:6–17. Defendant SOS also claims that Dr. Mohammed's testimony is "unhelpful" because he reviewed a 2018 version of the EVBB Handbook, did not observe Texas election officials verify signatures, and did not point to any study

**C. Defendant SOS's Argument On Relief Fails**

Defendant SOS further argues Plaintiffs' constitutional claims request improper relief.[103] She claims that any facial challenger to a state law "must establish that no set of circumstances exists under which the act would be valid."[104] The relief doctrine relied upon by Defendant SOS is summed up by her assertion that

> Plaintiffs have not even attempted to prove that Texas's signature-verification process creates an unconstitutional burden in all circumstances (as they must for a facial claim). Nor have they shown that the process creates an unconstitutional burden when considered 'categorically' rather than based on "the peculiar circumstances of individual voters" (as is necessary for all claims).[105]

This argument mischaracterizes the law. As the Supreme Court has clarified, when confronting a facial challenge, "[t]he proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *City of Los Angeles v. Patel*, 576 U.S.

---

applying Texas's signature comparison procedure. Dkt. 75 at 15. However, the "current guidance" Defendant points to from the 2020 EVBB Handbook explaining to election officials that they are not experts and that they should use their best judgment to determine whether signatures are the "same" or "match" is no helpful guidance at all. Further, this guidance highlights one of main problems with the signature comparison procedure, which Dr. Mohammed discusses about throughout his report. *See generally* Ex. 14, Mohammed Expert Rep.; Ex. 4 at SOS_000466, 000468 (EVBB Handbook issued by Defendant SOS instructing EVBB members to "use their best judgment and to verify if these signatures are the same" or "use their best judgement if the signatures match" (sic) and nothing else). Dr. Mohammed also does not need to visit a local Texas jurisdiction to observe signature verification because the requirements of the signature comparison procedure are enshrined in Texas law. Finally, in making her claim that Dr. Mohammed did not point to any study applying Texas's signature comparison procedure, Defendant SOS fails to point to any study on that topic that currently exists. Dkt. 75 at 15.

[103] Dkt. 75 at 16.

[104] *Id.* (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

[105] *Id.* at 16 (quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 206 (2008) (Scalia, J., concurring)).

409, 418 (2015). Here, the statutes are restrictions only on voters subjected to the arbitrary signature comparison procedure. As a result, Plaintiffs lodge a proper facial challenge.[106]

Similarly unconvincing is Defendant SOS's argument that Plaintiffs' *Anderson-Burdick* claims must be dismissed for some purported failure to address the statute's effect on Texas citizens "generally" rather than on Individual Plaintiffs in particular. On the contrary, Plaintiffs consist of Associational Plaintiffs with statewide membership, Organizational Plaintiffs that collectively serve voters across Texas, and two Individual Plaintiffs. Thus, Plaintiffs' *Anderson-Burdick* analysis of the burden placed on voters has never been confined to the highly particularized individual voter analysis discussed by Justice Scalia in his concurrence in *Crawford*.[107]

In actuality, as shown in their Motion for Summary Judgment,[108] Plaintiffs prove that the unconstitutional signature comparison procedure that causes arbitrary disenfranchisement is not the product of the "peculiar circumstances" on any one individual voter.[109] Instead, the signature comparison procedure's arbitrary application to every mail-in voter—including Individual Plaintiffs, mail-in voting members of Associational Plaintiffs, and the mail-in voters Organizational Plaintiffs serve— is at the heart of Plaintiffs' claims.[110] Furthermore, as courts have recognized in a materially identical context, this sort of error-prone signature comparison procedure does violate *Anderson-Burdick*.[111] *See Fla. Democratic Party v. Detzner*, 2016 WL

---

[106] In the alternative, a facial attack is proper when the class of people affected is understood to be "voters whom election officials identify as providing noncorresponding signatures." *Jaeger*, 2020 WL 2951012 at *8; *Saucedo*, 335 F. Supp. 3d at 221–22.

[107] *See* Dkt. 65 at 37–44.

[108] *Id.*

[109] Dkt. 75 at 16 (quoting *Crawford*, 553 U.S. at 206 (Scalia, J., concurring)).

[110] *See* Dkt. 65 at 37–44.

[111] Here Defendant SOS again raises the argument that *Anderson-Burdick* requires a showing of "discriminatory intent." Dkt. 75 at 17. As already discussed in the previous sections, showing

6090943 *6–7 (N.D. Fla. Oct. 16, 2016); *Jaeger*, 2020 WL 2951012 at *8–10; *see also Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312, 1326 (11th Cir. 2019).

Defendant SOS, citing to Judge Ho's concurrence in *Texas Democratic Party*, also claims that any successful relief in this case would require the Court to "level down" and strike the mail-in ballot process as a whole.[112] 961 F.3d at 416–17. However, *Texas Democratic Party* on this specific issue is inapposite. *Texas Democratic Party* involved a group of voters ineligible to vote by mail who requested to receive the same mail-in voting benefit as voters 65 and older. *Id.* at 402–09. In his concurrence, Judge Ho noted that if the plaintiffs in the case were successful, the appropriate relief would be to level down and strike the benefit of voting by mail because, among other points, "in-person voting is the rule and mail-in voting is the exception." *Id.* at 417. When compared to the plaintiffs in *Texas Democratic Party*, Plaintiffs are at the opposite end of the spectrum. Mail-in voters are not provided the benefit of a non-arbitrary process in-person voters receive. The "general rule" here is one that does not subject voters to an arbitrary process, and an appropriate remedy would be to treat mail-in voters like in-person voters and strike down the arbitrary signature comparison procedure creating the unequal treatment. Furthermore, regarding the unequal treatment among mail-in voters, since the unconstitutional signature comparison procedure especially harms protected groups the legislature developed mail-in voting for, legislative intent additionally shows that striking the arbitrary procedure down or providing procedural safeguards would be the most appropriate remedy. *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 330 (2006) ("the touchstone for any decision about remedy is legislative intent").

---

whether Plaintiffs' disenfranchisement was the product of discriminatory intent is not required under the *Mathews* and *Anderson-Burdick* tests for Due Process and Equal Protection claims.
[112] Dkt. 75 at 18.

Ultimately, Defendant SOS asks this Court to treat Plaintiffs' claims and requested relief as implicating some novel and unsupported use of the Due Process and Equal Protection Clauses. They do not.  Time and again courts across the country have entertained constitutional challenges by parties just like Plaintiffs to signature-matching schemes just like Defendants', and each time have awarded relief just like the remedy Plaintiffs now seek. *See, e.g.*, *Fla. Democratic Party v. Detzner*, 2016 WL 6090943 at *9–10; *Martin*, 341 F. Supp. 3d 1326, 1341–42; *Zessar*, 2006 WL 642646 at *10.

## IV.    PLAINTIFF CTD IS ENTITLED TO SUMMARY JUDGMENT ON THE MERITS OF ITS ADA AND RA CLAIMS

Defendant SOS largely relies on her prior briefing in seeking to avoid summary judgment on the merits of Plaintiff CTD's claims under the ADA and the RA, and for reasons already briefed by Plaintiffs she is incorrect.[113] Defendant SOS raises two new points, but neither changes this outcome. First, Defendant SOS claims that Plaintiffs have not proven that Plaintiff CTD has members who are qualified individuals with disabilities under the ADA and the RA. This is untrue. Plaintiffs have supplied ample evidence that CTD's members are qualified individuals with disabilities for the purposes of the ADA and the RA, including documentary evidence and deposition testimony.[114] Second, Defendant SOS claims that "Plaintiffs' MSJ makes absolutely no effort to show how Texas's accommodations for voters with disabilities are inadequate."[115] This ignores the arguments previously submitted by Plaintiffs describing the inadequacies, legally and

---

[113] Dkt. 65 at 44–53; Dkt. 74 at 47–49.
[114] *See supra* n.18; Ex. 45 (screen grab of CTD "About Us" webpage: "Founded in 1978, CTD is the largest and oldest member-driven cross-disability organization in the state. "Crossdisability" refers to all types of disabilities and different functional needs, rather than a particular disability or subset of disabilities"); Ex. 37, CTD 30(b)(6) Dep. 25:9–16 ("CTD was started about 1978 by a group of people with disabilities trying to advocate for themselves . . . [a]nd our mission has pretty much stayed the same since the beginning and that was to advocate for people's rights to access."), 36:11-13 (CTD has "2200 active members across the state")).
[115] Dkt. 75 at 19.

factually, of Defendant SOS's proffered accommodations.[116] As these submissions make clear, none of Defendant SOS's claimed accommodations are reasonable under the ADA and the RA.

## CONCLUSION

Plaintiffs have standing and Defendants violated and will continue to violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Constitution, the ADA, and the RA. Therefore, this Court should grant Plaintiffs' Motion for Summary Judgment. Respectfully submitted,

/s/     *Hani Mirza*                               

**TEXAS CIVIL RIGHTS PROJECT**

Mimi M.D. Marziani
Texas Bar No. 24091906
mimi@texascivilrightsproject.org
Hani Mirza
Texas Bar No. 24083512
hani@texascivilrightsproject.org
Ryan V. Cox
Texas Bar No. 24074087
ryan@texascivilrightsproject.org
Zachary D. Dolling
Texas Bar No. 24105809
zachary@texascivilrightsproject.org

1405 Montopolis Drive
Austin, Texas 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)

**WILLKIE FARR & GALLAGHER LLP**

Richard Mancino (NY Bar No. 1852797)
Samuel Kalar (NY Bar No. 5360995)
JoAnna Suriani (NY Bar No. 5706395)

787 Seventh Avenue
New York, New York 10019

---

[116] *See* Dkt. 65 at 44–53; Dkt. 74 at 47–49.

Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: rmancino@willkie.com
      skalar@willkie.com
      jsuriani@willkie.com

-AND-

Jennifer J. Hardy (TX Bar No. 24096068)
Denis A. Fallon (TX Bar No. 24059731)
Garrett Johnston (TX Bar No. 24087812)
Audra White (TX Bar No. 24098608)

600 Travis Street, Suite 2100
Houston, Texas 77002
Telephone: (713) 510-1700
Facsimile: (713) 510-1799
Email: jhardy2@willkie.com
      afallon@willkie.com
      gjohnston@willkie.com
      awhite@willkie.com

***COUNSEL FOR PLAINTIFFS***

## CERTIFICATE OF SERVICE

By my signature below, I certify that a true and correct copy of the foregoing has been served on all counsel of record on July 13th, through the Electronic Case File System of the Western District of Texas.

/s/ _Hani Mirza_____