UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

FEDERICO FLORES, JR.,            §
MARIA GUERRERO, and              §
VICENTE GUERRERO,                §
   *Plaintiffs*,                  §
                                 §
v.                               §
                                 §
TEXAS SECRETARY OF STATE, and    §     Case No. 7:18-cv-113
ARMANDINA MARTINEZ, ALMA         §
GARCIA, ALICIA DOUGHERTY NO. 1,  §
ALICIA DOUGHERTY NO. 2,          §
YOLANDA MARTINEZ,                §
   *Defendants*.                  §

## DEFENDANT TEXAS SECRETARY OF STATE'S
## FIRST AMENDED MOTION FOR SUMMARY JUDGMENT

**KEN PAXTON**
Attorney General of Texas

**JEFFERY C. MATEER**
First Assistant Attorney General

**DARREN L. MCCARTY**
Deputy Attorney General for Civil Litigation

**THOMAS A. ALBRIGHT**
Chief, General Litigation Division

**MICHAEL R. ABRAMS**
Southern District ID No. 2513900
Texas Bar No. 24087072
Attorney-in-Charge
General Litigation Division
P.O. Box 12548
Capitol Station
Austin, TX 78711-2548
Phone: (512) 463-2120
Fax: (512) 320-0667
*michael.abrams@oag.texas.gov*

**Counsel for Defendant,
Texas Secretary of State**

## TABLE OF CONTENTS

Table of Authorities ............................................................................................ ii

Statement of the Issues ...................................................................................... 3

   I.  Texas Law Allows Mail-in Voting in Limited Circumstances. ................................. 3

      A.  A voter must qualify to vote early by mail. ............................................. 3

          a.) Early voting clerks conduct early voting, not the Secretary of State. ......................................................................................... 4

          b.) County officials appoint elections judges, who in turn appoint the Early Voting Ballot Board to receive and count mail-in ballots. ........................................................................ 5

   II.  Procedural History. .................................................................................. 6

Argument and Authorities ................................................................................. 7

   I.  Standard of Review. .................................................................................. 7

   II.  The Secretary of State Is Not a Proper Party. .......................................... 8

      A.  The Secretary of State does not supervise EVBBs. ................................ 8

   III. Plaintiffs Lack Standing Because Their Injuries Would Not Be Redressed by an Injunction. ..................................................................... 11

   IV. Texas Election Laws Are Constitutionally Sound. ................................... 12

      A.  State election laws are reviewed under the *Anderson/Burdick* balancing test. ..................................................................... 12

      B.  The burden on voting rights is minimal. .................................... 14

      C.  Plaintiffs disregarded the process available to them. ................. 16

      D.  The State's important interests justify the challenged law. ....... 17

   V.  Plaintiffs' Equal Protection Claim Also Fails Under *Anderson/Burdick*. ........... 18

Conclusion ...................................................................................................... 19

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) ...................................................................... 15, 16

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ............................................................ 8, 14, 15, 21

*Baranowski v. Hart,*
  486 F.3d 112 (5th Cir. 2007) ................................................................. 9

*Boudreaux v. Swift Transp. Co.,*
  402 F.3d 536 (5th Cir. 2005) ................................................................ 9

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ..................................................................... passim

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ............................................................................ 8

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) .......................................................................... 13

*Crawford v. Marion Cty. Election Bd.,*
  553 U.S. 181 (2008) ......................................................... 16, 17, 18, 20

*Deutsch v. Annis Enters., Inc.,*
  882 F.3d 169 (5th Cir. 2018) .............................................................. 13

*Dubuc v. Twp. of Green Oak,*
  406 F. App'x 983 (6th Cir. 2011) ....................................................... 19

*Eu v. San Francisco Cty. Democratic Central Comm.,*
  489 U.S. 214 (1989) .......................................................................... 20

*Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.,*
  528 U.S. 167 (2000) ............................................................................ 9

*Galvan v. Vera,* No. 04-18-00309-CV,
  2018 WL 4096383 (Tex. App.—San Antonio Aug. 29, 2018) ........................................ 7

*Griffin v. Roupas,*
  385 F.3d 1128 (7th Cir. 2004) ............................................................ 21

*Herrell v. Benson,*
  261 F. Supp. 3d 772, (E.D. Ky. 2017) ................................................. 19

*Inclusive Communities Project, Inc. v. Abbott,*
  2018 WL 2415034 (N.D. Tex. May 29, 2018) ...................................... 12

*John Does #1-7 v. Abbott,*
  345 F. Supp. 3d 763 (N.D. Tex. 2018) ................................................ 12

*Long v. Van de Kamp,*
  961 F.2d 151 (9th Cir. 1992) .............................................................. 11

*Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ........................................................................................ 13

*McDonald v. Bd. of Election Comm'rs of Chicago*,
   394 U.S. 802 (1969) ...................................................................................... 15

*Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*,
   40 F.3d 698 (5th Cir. 1994) ............................................................................ 8

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) ...................................................................................... 13

*OCA-Greater Houston v. Tex.*,
   867 F.3d 604 (5th Cir. 2017) .......................................................................... 12

*Ohio Democratic Party v. Husted*,
   834 F.3d 620 (6th Cir. 2016) .......................................................................... 16

*Purcell v. Gonzalez*,
   549 U.S. 1 (2006) ......................................................................................... 20

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ...................................................................................... 14

*Santana v. City of Tulsa*,
   359 F.3d 1241 (10th Cir. 2004) ...................................................................... 19

*Storer v. Brown*,
   415 U.S. 724 (1974) ...................................................................................... 15

*Stringer v. Pablos*,
   320 F. Supp. 3d 862 (W.D. Tex. 2018) ........................................................... 21

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ...................................................................................... 13

*Triple Tee Golf, Inc. v. Nike*, Inc.,
   485 F.3d 253 (5th Cir. 2007) ........................................................................... 8

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) ..................................................................... 15, 20

**Statutes**

Tex. Elec. Code § 31.001 ...................................................................................... 11

Tex. Elec. Code § 31.091(1) ................................................................................. 19

Tex. Elec. Code §§ 32.001 - .002 ............................................................................ 6

Tex. Elec. Code ch. 63 ......................................................................................... 22

Tex. Elec. Code ch. 82 .................................................................................... 4, 21

Tex. Elec. Code §§ 82.001 - .004 ............................................................................ 4

Tex. Elec. Code § 83.001 ....................................................................................... 4

Tex. Elec. Code § 86.001(a) .................................................................................... 5

Tex. Elec. Code § 86.002 ................................................................................................ 4

Tex. Elec. Code § 86.002(a) ........................................................................................... 5

Tex. Elec. Code § 86.006(a) ........................................................................................... 5

Tex. Elec. Code § 86.007(a) ........................................................................................... 5

Tex. Elec. Code § 86.009 ................................................................................................ 5

Tex. Elec. Code § 86.011 ................................................................................................ 5

Tex. Elec. Code § 87.002 ................................................................................................ 6

Tex. Elec. Code §§ 87.021 - .041 .................................................................................... 6

Tex. Elec. Code § 87.041 ............................................................................................ 1, 3

Tex. Elec. Code § 87.041(b)(2) .................................................................................... 17

Tex. Elec. Code § 87.041(e) ......................................................................................... 17

Tex. Elec. Code § 87.0431 ....................................................................................... 6, 17

Tex. Elec. Code § 87.061 ................................................................................................ 6

Tex. Elec. Code § 87.127(a) ..................................................................................... 6, 19

Tex. Elec. Code § 87.401 ................................................................................................ 7

## Rules

Fed. R. Civ. P. 25(d) ..................................................................................................... 3

Fed. R. Civ. P. 56(a) ..................................................................................................... 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| FEDERICO FLORES, JR., | § | |
| MARIA GUERRERO, and | § | |
| VICENTE GUERRERO, | § | |
|    *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| TEXAS SECRETARY OF STATE, and | § | Case No. 7:18-cv-113 |
| ARMANDINA MARTINEZ, ALMA | § | |
| GARCIA, ALICIA DOUGHERTY NO. 1, | § | |
| ALICIA DOUGHERTY NO. 2, | § | |
| YOLANDA MARTINEZ, | § | |
|    *Defendants*. | § | |

**DEFENDANT TEXAS SECRETARY OF STATE'S
FIRST AMENDED MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Federico Flores, Jr., Maria Guerrero, and Vicente Guerrero advance broad facial and as-applied attacks on the constitutionality of Texas Election Code Section 87.041, which directs county-level Early Voting Ballot Boards ("EVBBs") to accept mail-in ballots if they meet the State's statutory requirements.

The claims should be dismissed. Federal courts have long recognized that the "government must play an active role in structuring elections" and thus, a "flexible standard [of review] applies" when analyzing state election laws that may burden the right to vote. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). As a result, courts have repeatedly upheld restrictions that are generally applicable and protect the integrity of the election process. For the reasons that follow, this court should follow suit.

*First*, despite Plaintiffs' contentions, the Texas Secretary of State does not enforce or administer the challenged statutory provision. Rather, the responsibility for determining the legality of mail-in ballots rests uniquely and finally with the county-level

1

EVBBs. Because the Secretary of State does not enforce or administer Section 87.041, Plaintiffs' injuries are not fairly traceable to the Secretary of State.

*Second*, Plaintiffs lack standing because they have expressly disclaimed any intent to vote by mail in future elections. A favorable ruling from the Court will not redress their alleged injuries. The fact that they allege a harm arising from a prior election is insufficient; they must demonstrate that they would be harmed in a similar manner in the future, such that they would benefit from a prospective injunction issued by the Court. They have not made that showing on this record—in fact, the record *compels* a finding to the contrary.

*Third*, under the flexible review standard that governs these kinds of claims, a requirement that a voter properly complete and submit a mail-in ballot that meets a state's statutory requirements is not a severe restriction on an individual's due process rights. Indeed, the burden placed on voters to ensure that they properly and accurately complete the requirements set for mail-in ballots are similar to those placed on in-person voters, who must travel to a designated polling place on Election Day, often necessitating taking time off of work, arranging for childcare, and waiting in line.

The interests advanced by Texas are sufficient to defeat Plaintiffs' challenge: namely, preserving the integrity of the election process. The challenged law establishes requirements for submitting mail-in ballots in a good-faith and well-reasoned effort to ensure that the person who submitted the mail-in ballot is the person entitled to cast that ballot, as required by state election law. Texas is well within constitutional bounds in exercising that authority.

And Plaintiffs' due process claims fail for another reason, too: Texas law provides them a remedy—the potential for a civil injunctive suit brought by a county election

officer—but Plaintiffs wholly failed to explore whether that might address their concerns. They concede that they did not contact anyone in Starr County, or indeed, anyone, anywhere, after receiving notice that their ballots were rejected. Their due process claims are foreclosed because they did not take advantage of the process that Texas law affords them.

Because Plaintiffs (1) cannot demonstrate that their claims are traceable to Secretary of State; (2) cannot show how an injunction would redress their alleged injuries; and (3) cannot meet their burden of proving that the statute at issue in this case is constitutionally infirm, this Court should dismiss Plaintiffs' claims against the Texas Secretary of State.[1]

### STATEMENT OF THE ISSUES

The issues as identified above include (1) whether Plaintiffs have demonstrated that the Secretary of State is a proper party; (2) whether Plaintiffs have standing to seek a prospective injunction; and (3) whether Texas Election Code § 87.041 is constitutionally sound.

### STATEMENT OF THE CASE

## I. Texas Law Allows Mail-in Voting in Limited Circumstances.

### A. A voter must qualify to vote early by mail.

The State of Texas provides for early voting by mail, provided the person seeking to vote by mail meets the qualifications. Tex. Elec. Code ch. 82. Qualifications to vote early by mail include—

---

[1] Plaintiffs initially sued Rolando Pablos in his official capacity as the Texas Secretary of State. *See* Dkt. No. 1. David Whitley, his successor, was automatically substituted as the named defendant under Federal Rule of Civil Procedure 25(d). At this time, the position of Texas Secretary of State is vacant. As soon as David Whitley's successor is appointed, the Texas Secretary of State will alert the Court so that the current Secretary of State can be substituted as a named party pursuant to Rule 25(d).

> ➢ Declaring an anticipated absence from the county of residence on election day;

> ➢ Declaring a disability "that prevents the voter from appearing at the polling place on election day without a likelihood of needing personal assistance or of injuring the voter's health";

> ➢ Demonstrating that the person seeking to vote by mail is over the age of 65; or,

> ➢ Showing that the person seeking to vote by mail anticipates being jailed during the voting period.

Tex. Elec. Code §§ 82.001-.004.

### a.) Early voting clerks conduct early voting, not the Secretary of State.

Early voting clerks conduct early voting in Texas elections, and for purposes of general elections for state and county officers, primary elections, and special elections ordered by the governor, the county clerk for the county in which the election is held—or the county's elections administrator if one has been appointed, as in Starr County—serves as the early voting clerk. Tex. Elec. Code §§ 31.043(2), 83.001, 83.002. Plaintiffs specifically challenge the handling of mail-in ballots cast in the March 2018 Democratic primary elections.  Dkt. No. 1-5 at ¶ 2. Accordingly, the county elections administrator— not a member of the Texas Secretary of State's Office—was required by statute to serve as early voting clerk.

Once designated, the early voting clerk is responsible for "review[ing] each application for a ballot to be voted by mail" and "provid[ing] an official ballot envelope with each ballot provided to a voter." Tex. Elec. Code §§ 86.001(a), .002(a). After a voter marks their mail-in ballot, they must then return the mail-in vote to the early voting clerk in the official carrier envelope. Tex. Elec. Code § 86.006(a). Notably, a person who elects

4

to vote by mail can return their mail-in ballot on election day to the early voting clerk while polls are open. Tex. Elec. Code § 86.006(a-1). But in any case, a voter must return the ballot so that it is received no later than the time before the polls close on election day or no later than 5 p.m. on the day after election day, if returned by mail. Tex. Elec. Code § 86.007(a).

The early voting clerk also determines whether an application is defective (Tex. Elec. Code § 86.008), provides corrected ballots to voters (Tex. Elec. Code § 86.009), and determines whether ballots voted by mail are timely (Tex. Elec. Code § 86.011).

### b.) County officials appoint elections judges, who in turn appoint the Early Voting Ballot Board to receive and count mail-in ballots.

County commissioners' courts appoint presiding election judges for each regular county election precinct, and state law sets out a detailed set of requirements for each appointed judge. Tex. Elec. Code §§ 32.001-.002. Under state law, County commissioners use the same process to appoint presiding election judges and EVBB presiding judges. Tex. Elec. Code § 87.002. The EVBB presiding judge then appoints at least two other members to the EVBB using the same method for appointing precinct election clerks. Tex. Elec. Code § 87.002(b). Once appointed and staffed, the EVBB is responsible for receiving the mail-in ballots from the early voting clerk, and then deciding whether to accept each vote. Tex. Elec. Code §§ 87.021-.041, 87.061 (declaring the EVBB as the authority responsible for counting ballots).

If a mail-in ballot is rejected, the EVBB presiding judge is required to deliver written notice to the voter no later than the tenth day after election day. Tex. Elec. Code § 87.0431. "If a county election officer . . . determines that a ballot was incorrectly rejected or accepted by the [EVBB] before the time set for convening the canvassing authority, the

county election officer may petition a district court for injunctive or other relief as the court determines appropriate." Tex. Elec. Code § 87.127(a).

## II. Procedural History.

This action was initially filed in the 381st Judicial District Court of Starr County, Texas, on April 11, 2018, Cause No. DC-18-189. The initial plaintiffs were Leticia Garza Galvan and Martie Garcia Vela. *See* Dkt. No. 1-5. Defendant Rolando Pablos, the then-Texas Secretary of State, was sued in his official capacity and was served with Plaintiff's Original Petition on April 13, 2018. Dkt. No. 1 at 1. The other defendants named, Armandina Martinez, Alma Garcia, Alicia Dougherty Nos. 1 & 2, and Yolanda Martinez, were sued in their official and individual capacities. *Id.* At the time this suit was filed, Galvan and Vela also filed an election contest, captioned *Galvan v. Vera*, No. DC-18-186, in the 229th Judicial District of Texas.[2] Dkt. No. 1-5 ¶ 57.

After a ruling from the Court dismissing the Galvans from the case for lack of standing, *see* Minute Entry for Motion Hearing Held on March 19, 2019, the operative complaint was amended to add current-named plaintiffs Federico Flores, Jr., Maria Guerrero, and Vicente Guerrero, who allege that they submitted mail-in ballots in the 2018 Democratic primary, but that their ballots were improperly rejected due to perceived signature discrepancies. *See generally* Dkt. No. 58. As the initial plaintiffs did, current named Plaintiffs contend that Section 87.401 of the Texas Election Code violates due process and equal protection principles because the Texas Legislature granted exclusive authority to EVBBs to accept or reject ballots without expressly requiring a specific process for voters to cure errors with their mail-in ballots where an EVBB rejects a voter's

---

[2] Galvan and Vela lost their election contest at the district court, a ruling upheld on appeal by the Fourth Court of Appeals in San Antonio, Texas. *See Galvan v. Vera*, No. 04-18-00309-CV, 2018 WL 4096383 (Tex. App.—San Antonio Aug. 29, 2018, no pet.) (not reported).

mail-in ballot, in violation of due process and equal protection provisions of the federal Constitution. *See* Dkt. No. 58 ¶¶ 46-51; 52-55.[3]

**ARGUMENT AND AUTHORITIES**

## I.  Standard of Review.

Federal courts favor granting summary judgment where no genuine fact issue exists. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) ("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole[.]"). The Supreme Court teaches that courts should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322.

Disputes are genuine only where "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Of course, [t]he movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citation omitted). But where, as here, the burden of proof at trial lies with the nonmoving party, a defendant may satisfy its initial burden by "'showing'—that is, pointing out to this Court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex Corp.*, 477 U.S. at 325; *Nat'l Ass'n of Gov't Emps. v. City Pub. Serv. Bd. of San Antonio, Tex.*, 40 F.3d 698, 712 (5th Cir. 1994).

---

[3] Plaintiffs' live pleading includes a third count amounting to an as-applied challenge of actions by the Starr County EVBB, but fairly read, Plaintiffs' count three does not make a claim against the Texas Secretary of State. *See* Dkt. No. 58 ¶¶ 56-59; *see also* Dkt. No. 43 at 3 (explaining that Plaintiffs' count three asserts arguments against the Starr County EVBB for the manner in which the EVBB reviewed carrier envelopes).

A defendant must demonstrate the absence of a genuine issue of material fact to win summary judgment, but it need not negate the elements of a plaintiff's case to carry their burden here. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). If a defendant meets its Rule 56 burden, the plaintiff must identify *specific* evidence in the record and articulate how that evidence supports his claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Plaintiffs cannot satisfy the burden by pointing out "'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quotation omitted).

## II.    The Secretary of State Is Not a Proper Party.

Plaintiffs have not met their burden on two of the three threshold standing requirements. To establish standing, a plaintiff must show: (1) an actual or imminent, concrete and particularized injury-in-fact; (2) that is fairly traceable to the defendant's challenged action; and (3) that is likely to be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Each element is "an indispensable part of the plaintiff's case." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). For the reasons discussed below, Plaintiffs lacks standing to bring claims against the Secretary of State because they have not alleged a fairly traceable injury. *See Friends of the Earth*, 528 U.S. at 180–81.

### A.  The Secretary of State does not supervise EVBBs.

The Secretary of State does not have a hand in county-level appointments of EVBBs, delivering or receiving mail-in ballots, or determining the validity of mail-in ballots. Plaintiffs concern themselves with the actual or potential conduct of the Starr County EVBB—not any actions of the Secretary of State. As noted above, the Starr County

EVBB was an independent body created through appointments at the *county level* pursuant to authority granted specifically to counties by the Texas Legislature.  EVBB members are not part of the Texas Secretary of State's Office nor are they employees or agents of the Secretary of State. EVBBs do not carry out their statutorily required functions at the behest or under the supervision of the Secretary of State. Indeed, it is the EVBB, not the Secretary of State, who received mail-in ballots from the county-level early voting clerk, determined the validity of ballots, and counted them. And it was a county-level official who had authority to review any ballot challenged and determine whether to seek judicial relief. *See* Tex. Elec. Code § 87.127(a).

Plaintiffs' allegations regarding the Secretary of State do not suffice to establish that the Secretary of State is a proper party. In the analogous context of a sovereign immunity defense brought by state officers sued in federal court, courts have dismissed claims when the individual officer sued lacked the requisite connection with proceedings to enforce the challenged statute. *Cf. Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1415-16 & n.10 (6th Cir. 1996) (holding that *Ex Parte Young* exception to sovereign immunity did not apply because attorney general had not commenced nor threatened to commence proceedings against plaintiffs under challenged law and because state "delegate[d] the enforcement of the challenged statutes to local prosecutors, not the Attorney General"); *Long v. Van de Kamp*, 961 F.2d 151, 152 (9th Cir. 1992) (per curiam) (explaining that under *Ex Parte Young*, there must be a connection between the defendant official and the unconstitutional statute's enforcement, including the official's threatened enforcement; "general supervisory powers" are not sufficient to establish required enforcement connection").

Despite the clear statutory delegation of authority by the Texas Legislature to county level EVBBs, Plaintiffs press forward arguing that the Secretary of State is the chief election officer in Texas. Dkt. No. 58 ¶ 10 (citing Tex. Elec. Code § 31.001). Critically, however, aside from the sole reference to the designation of the Secretary of State as the "chief election officer" for Texas, Plaintiffs do not and cannot identify any enforcement authority granted to the Secretary of State over EVBBs relevant to this lawsuit. That is because the Texas Legislature granted exclusive authority to county level officials to operate EVBBs. The EVBBs and local elections officials, not the Secretary, have the final authority with respect to the signature comparison mandated by statute. Nor do Plaintiffs point to any specific statutory language authorizing the Secretary of State to act against EVBBs by issuing orders concerning the counting or acceptance of mail-in votes.

Because Plaintiffs demonstrate neither a connection between the Secretary of State and the EVBB actions at issue in this case nor some imminent unconstitutional enforcement action by the Secretary of State, Plaintiffs cannot maintain their suit against the Secretary of State. Their alleged injuries are not at all traceable to any actions that the Secretary of State has taken or has failed to take. *See, e.g.*, *Inclusive Communities Project, Inc. v. Abbott*, 2018 WL 2415034, at *6 (N.D. Tex. May 29, 2018) (holding that group lacked standing to sue Governor Abbott where challenged provisions of law "do not provide Governor Abbott with the authority or 'definite responsibilities' to enforce the Statute."); *John Does #1-7 v. Abbott*, 345 F. Supp. 3d 763, 773 (N.D. Tex. 2018) ("Because Plaintiffs are unable to show how their alleged injuries are fairly traceable to Governor

Abbott's specific conduct, this Court joins other courts in declining to find traceability based solely on an official['Js general authority to enforce a state's laws.").[4]

## III.   Plaintiffs Lack Standing Because Their Injuries Would Not Be Redressed by an Injunction.

Plaintiffs also have failed to allege a case or controversy between them and the Secretary of State for a different reason: they have no viable claim for prospective injunctive relief, even against a properly named party.

The Supreme Court and the Fifth Circuit have repeatedly held that past harms are insufficient to create standing to seek prospective injunctive relief. *Los Angeles v. Lyons*, 461 U.S. 95, 105-07 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974); *Deutsch v. Annis Enters., Inc.*, 882 F.3d 169, 172 (5th Cir. 2018) (per curiam); *Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 288 (5th Cir. 2015). To obtain prospective injunctive relief, a plaintiff has the burden to establish standing by putting on evidence that the "threatened injury is 'certainly impending'" or that there is a "'substantial risk' that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 n.5 (2013)).

---

[4] Plaintiffs have previously pointed to *OCA-Greater Houston v. Tex.*, 867 F.3d 604 (5th Cir. 2017) for the proposition that the Secretary of State is a proper party. But *OCA-Greater Houston* addressed whether the Secretary was a proper party to a facial challenge where an organization challenged a state election statute as violating a federal statute that allegedly impacted its members. *OCA-Greater Houston*, 867 F.3d at 612-13. Specifically, the state statute at issue in *OCA-Greater Houston* barred a voter's son from serving as the voter's interpreter because the son was not registered to vote in the same county as his mother. During the litigation, the voter passed away, ending the 42 U.S.C. Section 1983 claim, and leaving only a facial challenge by OCA-Greater Houston brought pursuant to Section 208 of the Voting Rights Act. After analyzing organizational standing and the Secretary of State's redressability arguments, the Fifth Circuit found that the Secretary of State was the proper party for the facial challenge under Section 208 of the VRA. This case, however, raises both a facial challenge and an as-applied challenge for alleged violations of personal constitutional rights, *i.e.*, due process and equal protection of law, not a purported violation of a federal statute brought by an organization to vindicate rights statewide. *OCA-Greater Houston* should not be extended beyond the unique factual circumstances presented there.

In *Deutsch*, for example, a man who used a wheelchair alleged a violation of the Americans with Disabilities Act when he encountered several physical obstacles while entering a women's hair salon. 882 F.3d at 172. The Court dismissed his lawsuit for lack of standing because he failed to demonstrate that he ever intended to visit the salon again. *Id.* at 174. As the Court stated, "[m]erely having suffered an injury in the past is not enough; the plaintiff must show a 'real or immediate threat that the plaintiff will be wronged again.'" *Id.* at 173 (quoting *Lyons*, 461 U.S. at 111).

This "real or immediate threat" element of standing is missing here. In sworn deposition testimony, Plaintiffs have affirmatively disclaimed an intent to vote by mail in future elections. *See* Ex. A at 20:21-25; 21:9-19; 23:9-18; Ex. B at 14:17-22; 19:16-18; Ex. C at 9:14-23. And the procedures for voting by mail are the only procedures at issue in this lawsuit; Plaintiffs do not challenge the procedures for submitting ballots in person or any other method. *See* Dkt. No. 58 ¶¶ 46-51; 52-55. Accordingly, no ruling from the Court will redress Plaintiffs' injuries because they do not intend to vote by mail again in any election on a going forward basis. They therefore lack standing to sue for prospective injunctive relief. *See Deutsch*, 882 F.3d at 173.

## IV.    Texas Election Laws Are Constitutionally Sound.

Even if Plaintiffs could meet their burden of establishing traceability and redressability, for the reasons discussed below, their claims still fail on the merits when analyzed under the *Anderson/Burdick* balancing test.

### A.  State election laws are reviewed under the *Anderson/Burdick* balancing test.

"[T]he Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

"It does not follow, however, that the right to vote in any manner . . . [is] absolute." *Burdick*, 504 U.S. at 433.

The Supreme Court has observed that "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Burdick*, 504 U.S. at 433 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). Thus, because all election regulations impose some burden upon individual voters not every voting regulation is subject to strict scrutiny. *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, n.46 (5th Cir. 2016) (citing *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802 (1969), for the proposition that rational-basis review applies when examining different methods of casting votes).

To that end, federal courts have recognized that a "flexible standard [of review] applies" when analyzing state election laws that may burden the right to vote. *Burdick*, 504 U.S. at 434. The so-called *Anderson/Burdick* balancing test, an analysis arising from the Supreme Court's holdings in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick*, 504 U.S. 428 (1992), requires "[a] court considering a challenge to a state election law" to "weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments . . . against the precise interests put forward by the State . . . taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick*, 504 U.S. at 434.

Under this "flexible standard" of review, strict scrutiny applies only when the right to vote is "subjected to 'severe' restrictions." *Id.* However, "when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and

Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.*; *see also Celebrezze*, 460 U.S. at 788.

When evaluating state election laws, courts consider the state's election regime as a whole, including aspects that mitigate hardship that might be imposed by the challenged provisions. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 199 (2008) (considering mitigating aspects of Indiana's election laws); *see also Ohio Democratic Party v. Husted*, 834 F.3d 620, 627-28 (6th Cir. 2016) (recognizing the numerous opportunities to cast a ballot as a mitigating factor to a law altering early voting rules).

Proponents, such as the Plaintiffs in this case, advancing a facial challenge to state election law "bear a heavy burden of persuasion." *Crawford*, 553 U.S. at 200.

### B. The burden on voting rights is minimal.

Plaintiffs argue that the mail-in ballot provisions of the Texas Election Code violate the Due Process Clause because the statute fails to provide for notice that a voter is being disenfranchised and given an opportunity to be heard. What Plaintiffs' argument misses is that "[o]rdinary and widespread burdens [on the right to vote], such as those requiring 'nominal effort' of everyone, are not severe." *Crawford*, 553 U.S. at 225 (Scalia, J., concurring). "Burdens are severe if they go beyond the merely inconvenient." *Id.*

As an initial matter, mail-in voters are given notice that their genuine and accurate signatures are required. *See* Tex. Elec. Code § 87.041(b)(2). The EVBB will also turn to signatures on file with the county clerk or voter registrar, if necessary to evaluate a signature. Tex. Elec. Code § 87.041(e). After voting, if a ballot is rejected for a signature mismatch, state law requires notice be sent to the voter. Tex. Elec. Code § 87.0431. And, if the signature needs to be updated to cure any mismatch for future elections, the voter

can update the signature on file with the county clerk or voter registrar. Tex. Elec. Code § 87.041(e).

The burden to make sure that a signature matches when signing an absentee ballot is no more a burden than the burden placed on in-person voters, who must travel to a designated polling place on Election Day, often necessitating taking time off of work, arranging for childcare, and waiting in line.

The Supreme Court has previously concluded that similar laws, requiring nominal effort of everyone, are not severe. For example, in *Crawford*, the Supreme Court considered whether a state's voter-identification law, which required in-person voters to present photo identification, unconstitutionally burdened the right to vote. *Crawford*, 553 U.S. at 185. In an opinion authored by Justice Stevens, the Court found that "the inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase of the usual burdens of voting." *Id.* at 198.

Here, the challenged law does not run afoul of *Crawford*. Rather, it requires only that vote-by-mail voters take the initiative to update their signatures—at any time prior to an election—and make sure they are using the same signature when signing their mail-in ballot. The requirements are no more than one of the "usual burdens of voting." *Crawford*, 553 U.S. at 198. Moreover, in *Crawford*, the Supreme Court recognized that the voter-identification law at issue might place "a somewhat heavier burden . . . on a limited number of persons," but the Court declined to consider these burdens because "on the basis of the evidence in the record it [was] not possible to quantify either the

magnitude of the burden on this narrow class of voters or the portion of the burden imposed on them that [was] fully justified." *Crawford*, 553 U.S. at 199-200.

So too here.

There is no competent evidence suggesting the actual number of voters whose genuine signatures were improperly rejected, and at least two state courts—one a district court and one an appellate court—have rejected challenges to the results of the election that included a challenge concerning mail-in ballots.

At bottom, Plaintiffs' complaints about properly cast votes rejected in the signature-comparison process do not yield a harm large enough to outweigh Texas's interest in maintaining the integrity of elections.

## C. Plaintiffs disregarded the process available to them.

Plaintiffs argue that the EVBB rejected "an incredible 13.5%" of mail-in ballots submitted in the March 2018 democratic primary. Dkt. No. 58 ¶ 4. But their protestations that they lack any means of challenging rejected ballots directly conflict with Texas law. "If a county election officer . . . determines that a ballot was incorrectly rejected or accepted by the [EVBB] before the time set for convening the canvassing authority, the county election officer may petition a district court for injunctive or other relief as the court determines appropriate." Tex. Elec. Code §§ 87.127(a), 31.091(1).

Thus, Plaintiffs could have petitioned to the county election officer—in this case the Starr County Elections Administrator John Rodriguez[5]—and raised their concerns with their rejected ballots to ascertain whether the county election officer would file suit to challenge the EVBB's decisions. But Plaintiffs concede that they never spoke with any

---

[5] *See* http://www.co.starr.tx.us/page/starr.Elections.

16

official in Starr County—or for that matter, any official in the Secretary of State's office—after their ballots were rejected. Ex. A at 17:12-22; 19:14-16; 20:7-10; Ex. B, at 14:17-22; 19:16-18; Ex. C at 12:10-25–13:1-10. They cannot claim that the procedures prescribed by Texas law are inadequate when they completely failed to take advantage of those procedures. *See, e.g.*, *Santana v. City of Tulsa*, 359 F.3d 1241, 1244 (10th Cir. 2004) ("A party cannot create a due process claim by ignoring established procedures."); *see also, e.g.*, *Dubuc v. Twp. of Green Oak*, 406 F. App'x 983, 989 (6th Cir. 2011) (holding that property owners who failed to take advantage of a zoning board's postdeprivation appeals procedures could not claim that those procedures violated due process); *Herrell v. Benson*, 261 F. Supp. 3d 772, 777–78 (E.D. Ky. 2017) (noting that the plaintiff "was afforded due process, but waived his right to it by refusing to participate in the process offered to him.").

### D. The State's important interests justify the challenged law.

When restrictions on due process rights of voters are reasonable and not a severe burden—as in this case—the State's important regulatory interests are generally sufficient to justify the restriction. *Burdick*, 504 U.S. at 434. Here, Texas's mail-in ballot requirements promote Texas's interests in—

- ➢ Preserving the integrity of its election process;
- ➢ Maintaining an orderly election process and preventing dilution of votes by those who are not eligible to vote; and,
- ➢ Ensuring administrative convenience and efficiency.

Texas "indisputably has a compelling interest in preserving the integrity of its election process." *Eu v. San Francisco Cty. Democratic Central Comm.*, 489 U.S. 214, 231 (1989); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (acknowledging "the State's

compelling interest in preventing voter fraud"); *Veasey v. Abbott*, 830 F.3d 216, n.46 (5th Cir. 2016) ("[T]he greatest fraud risk exists when unauthorized persons direct an elderly, immobile voter's choices on a mail-in ballot. That the ballots could get lost or stolen from the mail is no more a risk than the loss of a Social Security check."); *Crawford*, 553 U.S. at 225 (Souter, J., dissenting) (noting that "absentee-ballot fraud . . . is a documented problem"); *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004) ("Voting fraud . . . is facilitated by absentee voting.").

Plainly stated: Texas has a weighty, undeniable interest in ensuring that only eligible voters cast mail-in ballots, necessitating various requirements to guarantee the reliability of mail-in votes and provide for finality on Election Day.

Because complying with the nominal effort of properly signing a ballot is not a harm that outweighs Texas's weighty interests in protecting the franchise, Plaintiffs' due process claim fails.

## V. Plaintiffs' Equal Protection Claim Also Fails Under *Anderson/Burdick*.

*Anderson/Burdick* applies to Equal Protection claims directed at state voting laws. *Stringer v. Pablos*, 320 F. Supp. 3d 862, 897–98 (W.D. Tex. 2018) (citing several election law cases applying the *Anderson/Burdick* framework). Plaintiffs' equal protection challenge fails for the same reasons their due process challenge must be rejected—"the character and magnitude of the asserted injury" is slight and Texas's regulatory interests sufficiently weighty to justify the restrictions. Plaintiffs' equal protection challenge fails for an additional reason—the categories of voters Plaintiffs allege are unequally treated are not "similarly situated" for purposes of the law challenged in this action.

Plaintiffs compare mail-in voters to provisional ballot voters, in attempt to contrast the process afforded. Dkt. No. 58 ¶¶ 34-40. The two are not the same. A mail-in voter is a person already qualified to vote. *E.g.*, Tex. Elec. Code ch. 82 (listing categories of eligible "qualified" voters and identifying qualifications for such qualified voters to early vote by mail). A provisional voter, on the other hand, is a person who lacks credentials evidencing qualifications to vote in a precinct. *See* Tex. Elec. Code ch. 63.

A key difference between the two is that provisional ballot voters generally have already proven their identification when they show up to vote in person. The exception is for provisional ballots because of a lack of identification. For such votes to count, the voter has to show proper identification at the voter registrar's office. The same cannot be said of mail-in ballot voters, which is why the state has so many safeguards in place to verify identity.

The challenges and impediments to voting by mail raise concerns different from an in-person voter claiming authorization to vote and who lacks adequate credentials to demonstrate a right to vote. The two sets of voters are not similarly situated, and thus, cannot serve as comparators for purposes of an equal protection violation.

Thus, even if Plaintiffs could identify something more than harm from the nominal effort required to outweigh Texas's interest in protecting its elections, Plaintiffs' equal protection claim would still fail for lack of a valid comparator.

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims against the Texas Secretary of State should be dismissed.

**Dated:** July 29, 2019.

**Respectfully submitted**.

**KEN PAXTON**
Attorney General of Texas

**JEFFERY C. MATEER**
First Assistant Attorney General

**DARREN L. MCCARTY**
Deputy Attorney General for Civil Litigation

**THOMAS A. ALBRIGHT**
Chief, General Litigation Division

*/s/ Michael R. Abrams*
**MICHAEL R. ABRAMS**
Southern District ID No. 2513900
Texas Bar No. 24087072
Attorney-in-Charge
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: (512) 463-2120
Facsimile: (512) 320-0667
michael.abrams@oag.texas.gov

**Counsel for Defendant**
**Texas Secretary of State**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed electronically with the Court and delivered by CM/ECF on July 29, 2019 to all counsel of record.

/s/ *Michael R. Abrams*
Michael R. Abrams
Assistant Attorney General

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

FEDERICO FLORES, JR.,            §
MARIA GUERRERO, and              §
VICENTE GUERRERO,                §
    Plaintiffs,              §
                      §
                      §  CIVIL ACTION NO.7:18-cv-113
                      §
v.                               §
                      §
TEXAS SECRETARY OF STATE and     §
ARMANDINA MARTINEZ, ALMA         §
GARCIA, ALICIA DOUGHERTY NO.     §
1, ALICIA DOUGHERTY NO. 2,       §
YOLANDA MARTINEZ,                §
    Defendants.              §

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

VICENTE GUERRERO

JULY 25, 2019

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

    ORAL DEPOSITION OF VICENTE GUERRERO, produced as a

witness at the instance of the Defendant, and duly sworn,

was taken in the above-styled and -numbered cause on the

July 25th day of July, 2019, from 12:40 p.m. to 1:23 p.m.,

before TOI K. DOWELL, CSR, in and for the State of Texas,

reported by machine shorthand at the home of Vicente

Guerrero and Maria Guerrero, 19 Florez Street, Roma, Texas,

78584 pursuant to the Federal Rules of Civil Procedure and

the provisions stated on the record or attached hereto.

Exhibit C - Page 1 of 7

**Page 2**

```
 1        A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFFS:
 4
       Ms. Marty Vela
 5     NAJVAR LAW FIRM
       2180 North Loop West, Suite 255
 6     Houston, Texas  77018-8014
       Phone (281) 404-4696
 7     Email: jerad@najvarlaw.com
 8   FOR THE DEFENDANTS:
 9     Mr. Michael R. Abrams
       ASSISTANT ATTORNEY GENERAL
10     Office of the Attorney General-019
       General Litigation Division
11     Post Office Box 12548, Capitol Station
       Austin, Texas 78711-2548
12     Phone: (512)463-2120
       Email: michael.abrams@oag.texas.gov
13
       Mr. Jose Garza
14     GARZA GOLANDO MORAN
       405 North Saint Mary's Street, Suite 700
15     San Antonio, Texas
       Phone: (210)892-8543
16     Email: garzapalm@aol.com
17
18   ALSO PRESENT:  Nelson Troncoso, Interpreter
                    Mrs. Maria Guerrero
19
20
21
22
23
24
25
```

**Page 3**

```
 1            I N D E X
 2
 3   Appearances............................................  2
 4   VICENTE GUERRERO
 5     Examination by Mr. Abrams..........................  4
 6     Examination by Mr. Garza...........................  14
 7     Examination by Ms. Vela............................  18
 8   Changes and Signature Page.............................  21
 9   Reporter's Certificate.................................  23
10         E X H I B I T S
11   NO.  DESCRIPTION                          PAGE
12   1   Declaration                          10
13   2   Notice of Rejected Ballot                13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                 (Interpreter Sworn.)
 2                 VICENTE GUERRERO,
 3   having been first duly sworn, testified as follows:
 4                 EXAMINATION
 5   BY MR. ABRAMS:
 6     Q   Good afternoon, sir.
 7     A   Good afternoon.
 8     Q   My name is Michael Abrams, and I represent the
     Texas Secretary of State in this lawsuit.
10         Sir, could you please state your name for the
11   record.
12     A   Vicente Guerrero.
13     Q   Mr. Guerrero, how old are you?
14     A   Well, I was born on August 11th, 1935.  So I'm
15   80-something years old; 83 or 84, that's my age.  I'm old
16   already.
17     Q   I'm just a little younger, but not very much.
18   Mr. Guerrero, have you ever been deposed before?
19     A   No.  No.
20     Q   So I just want to go over some of the ground rules
21   for how depositions work so that this can go smoothly.
22     A   Okay.
23     Q   So if you could, please give a verbal answer to my
24   questions rather than shaking your head.  That way the court
25   reporter can get a clear record.
```

**Page 5**

```
 1         And that goes to actually a second thing.  Because
 2   the court reporter is taking everything down, we would
 3   appreciate it if you could wait until the translator has
 4   finished translating my question before you start your
 5   answer; and in turn, I will wait until you're completely
 6   finished before I ask my next question.
 7         Is that okay?
 8     A   Yes.  Agree, yes.
 9     Q   And do you understand that you have taken an oath,
10   and it is the same oath that you would be taking in a court
11   of law?
12     A   The same as in a court, yes.
13     Q   I don't think that this deposition will go very
14   long; but if for any reason you need to take a break, please
15   let me know, and we'll find the time to make sure you can
16   take a break.
17         Have you ingested anything or taken any medication
18   that would prevent you from answering my questions this
19   afternoon and understanding my questions?
20     A   No.
21         MRS. GUERRERO:  (Through the interpreter) You
22   did take some medication, but you're saying no.
23     A   Yes, I did take some medication; but, I mean, I'm
24   going to be speaking the truth.  So that's it, and I might
25   say something else.
```

Case 5:18-cv-00963-OLG Document 86-5 Filed 08/19/20 Page 29 of 49
Case 5:18-cv-00113 Document 85-2 Filed 07/16/20 Page 3 of 7
Vicente Guerrero — 7/25/2019

**6**

1  Q  (By Mr. Abrams)  Okay.  And the medication doesn't
2  prevent you from understanding my questions or being able to
3  give honest answers, correct?
4  A  No, no, no, no.
5  Q  Okay.  Mr. Guerrero, what did you do to prepare for
6  today's deposition?
7  A  No, nothing.  I know this has to do with what I
8  signed; my signature.  That's it.  That's the only thing.
9  Q  Okay.  Did you speak with anyone prior to today's
10  deposition?
11  A  No, no one.
12  Q  And did you review any documents before your
13  deposition?
14  A  No.  Just that letter that I got, and I signed it,
15  and that's it.
16  Q  Just to clarify, what letter are you referring to?
17  A  When they send me that paper to vote.
18  Q  Are you referring to your application?
19  A  Yes, when I signed it.  That's it.
20  Q  So you reviewed your ballot application before
21  today's deposition?
22  A  No, no.  I mean the ballot was the only thing I
23  signed, and that's it.
24  Q  Do you have the document with you that you
25  reviewed?

**7**

1  A  I don't think we have it, right?  No, no.  It's
2  been a long time already.
3  Q  Mr. Guerrero, how long have you lived in Starr
4  County?
5  A  Just a very short period of time.  Since 1966.
6  Q  Okay.  And Mr. Guerrero, are you a United States
7  citizen?
8  A  I became a U.S. citizen, yes.
9  Q  When did you become a U.S. citizen?
10  (Witness asks Mrs. Guerrero.)
11  MR. GARZA:  He can't ask her.  If he doesn't
12  remember, he doesn't remember.
13  A  Oh, okay.  Okay.  I don't remember since when.
14  Q  (By Mr. Abrams)  Okay.  Has it been at least since
15  -- have you been a U.S. citizen since at least 2000?
16  A  Yes.  I think I've been a citizen for 20 years now.
17  Maybe more, but we'll go with 20.
18  Q  Mr. Guerrero, are you registered to vote in Starr
19  County?
20  A  Yes.
21  Q  And how long have you been voting in Starr County?
22  A  I've been voting for a long time already.  It's
23  been years.
24  Q  How long?
25  A  It's been -- I've been voting for a long time.

**8**

1  Since I became a citizen.
2  Q  And have you ever voted in person?
3  A  In person?  Yes, one time; but that's it.
4  Q  Okay.  And so for the rest of the time that you
5  vote, do you -- how do you vote?
6  A  No.  That's it.  That's the only time I voted.  It
7  was just that time.  I have not voted.  It was just that one
8  time that I voted.  That's it.
9  Q  So just to make sure I understand, you have only
10  voted in the United States -- let me scratch that and start
11  over.
12  How many times have you voted in an election in
13  Starr County?
14  A  I don't remember, but I have voted before.  I don't
15  remember how many times, but I have voted already.
16  Q  Would you say you voted more than five times in the
17  past?
18  A  Maybe.  I mean, I voted for the presidents and --
19  and others.
20  Q  Do you recall submitting an application to vote by
21  mail in the 2018 democratic primary elections?
22  A  No.  Just that one in person.  I go to the court,
23  and I signed there.  We're talking about the presidential
24  elections, when those take place.
25  Q  So just to -- I'm not quite sure I'm understanding

**9**

1  when you voted in the -- when you have voted in the past, do
2  you vote -- do you go in person to submit your ballot, or do
3  you submit a ballot in the mail?
4  A  Okay.  It was just that one time that I did it by
5  mail.  The rest has been in person.
6  I went in person to submit my vote.  They present
7  me with that ballot, and that's where I vote.  That's where
8  I -- where I sign my name.
9  Q  Do you intend to vote in future elections?
10  A  If I can, yes, I'll submit my vote.
11  Q  Okay.  And for those --
12  A  The -- the thing is that sometimes they schedule me
13  for an appointment, and that's when I go and vote in person.
14  Q  So for future elections, do you intend to vote in
15  person or by mail?
16  A  I'm not going to do it by mail anymore.  Not by
17  mail, no.
18  Q  So you --
19  A  I'd rather go in person.
20  Q  So in future elections, your intent is to go vote
21  in person?
22  A  I'll go in person.  I've gone -- I have gone in
23  person all the time.
24  Q  And your intention is in the future to go in
25  person?

10

1    A    Yes.  Yes, in person.  Not by mail anymore, no.
2    Q    Okay.  Mr. Guerrero, I'd like to show you what
3    we'll mark as Exhibit 1 for your deposition.
4         (V. Guerrero Exhibit No. 1 was marked.)
5    A    This is my signature right here (indicating).
6    Q    (By Mr. Abrams)  And I'll represent that this is a
7    Declaration that you provided in this matter in which you
8    attach your Declaration -- or you attach your copy of the
9    Application to Vote by Mail and a copy of the envelope for
10   your ballot for the March 2018 primary elections.
11        Do you recognize this Declaration?
12   A    No.  I used to read a lot.  But, no, this is my
13   signature.
14   Q    Did you -- do you see the bullet points, the types
15   -- the information in Paragraphs 1 through 3?
16   A    Yes.
17   Q    Did you write that?
18   A    This?  I don't even know what it says here.  I
19   don't know either.
20   Q    Okay.  I'd like for you to turn to the next page of
21   Exhibit 1, please.  Thank you.
22   A    Okay.
23   Q    And I'll represent that this is an Application for
24   Ballot by Mail, and I'd like for you to look at the box
25   No. 10.

11

1         Is this your signature in box 10?
2    A    That is my signature.
3    Q    Okay.  And I'd like for you to turn to the last
4    page of Exhibit 1.  And I'll represent that this is an
5    envelope for your application.
6         And is that your signature on this envelope?
7    A    Right here, Vicente Guerrero (indicating).
8    Q    Okay.  Do you recall signing these two signatures?
9    A    Yes.  Yes, these are my signatures.
10   Q    Okay.  Did you -- once you signed the envelope, did
11   you mail the ballot yourself, or did someone mail the ballot
12   application for you?
13   A    We send it by mail.
14   Q    Mr. Guerrero, did you ever receive a notification
15   that your application -- that your ballot had been rejected?
16   A    No.
17   Q    Okay.  Did you ever learn, at any point, that this
18   ballot application, which is in Exhibit 1, had been
19   rejected?
20   A    Later we found out that it had been rejected, and I
21   don't know why.  I mean, we voted.  We had our signatures;
22   my wife's signature.
23   Q    How did you learn that your application had been
24   rejected?
25   A    The lady told us.  The lady told us.  Then we asked

12

1    her why.  We asked her why, if we signed the proper way.
2    Those were our signatures.
3    Q    And when you say the woman, do you recall who that
4    was who told you that the application was rejected?
5    A    My wife.  I'm talking about my wife.
6    Q    Okay.  So your wife was the one who told you?
7    A    Yes to your question, but they approached her.
8    They came to her, and then they told her that we had been
9    rejected.  We questioned why.  Those were our signatures.
10   Q    So at the same time that your wife learned that her
11   ballot had been rejected, you also learned that your ballot
12   had been rejected; is that correct?
13   A    Yes.  We found out, and we ask why, and this is our
14   signature.
15   Q    After you found out that your ballot application
16   for the March 2018 primary had been rejected, did you speak
17   with anyone in the Starr County election office about your
18   rejected ballot?
19   A    No, no one.  No.
20   Q    Did you speak with anyone in John Rodriguez's
21   office after you learned that your ballot application had
22   been rejected?
23   A    No.  No one knew.
24   Q    Did you speak with anyone in the Texas Secretary of
25   State's office?

13

1    A    No, no one.
2    Q    Okay.  So just -- you did not speak with anyone
3    after learning that your ballot application had been --
4    A    I had signed for it, I send it, and that was it.
5    With no one, no.
6    Q    Let me make sure -- just to make sure we get a
7    clear record.
8         So you did not speak with anyone after learning
9    that your ballot had been rejected?
10   A    With no one.  No, with no one.
11   Q    I'd like to show you what we'll mark as Exhibit 2.
12        (V. Guerrero Exhibit No. 2 was marked.)
13   Q    (By Mr. Abrams)  And I'll represent this is a
14   Notice of Rejected Ballot with -- regarding your ballot
15   application.
16        Do you recall ever receiving this document?
17   A    No, no.
18   Q    Okay.  Have you seen this document before today?
19   A    No, I had not seen anything.
20   Q    Mr. Guerrero, have you understood the questions
21   that I've asked today?
22   A    Yes.
23   Q    And have I been courteous with you today?
24   A    Very well, thank you.
25        MR. ABRAMS:  We pass the witness.

Case 5:18-cv-00963-OLG  Document 86-5  Filed 08/19/20  Page 31 of 49
Case 5:18-cv-00913  Document 63-1  Filed 07/28/20  Page 31 of 49
Vicente Guerrero - 7/25/2019

14

1              EXAMINATION
2  BY MR. GARZA:
3      Q   Good afternoon.  My name is Jose Garza, and I
4  represent Armandina Martinez, Alma Garcia, Alicia Dougherty,
5  Alicia Dougherty No. 2, and Yolanda Martinez.
6      THE INTERPRETER:  The second one.
7          (Counsel shows the interpreter document with
8  Defendants' names.)
9      Q   (By Mr. Garza) Do you know Armandina Martinez?
10     A   No.  I don't know anyone.
11     Q   Did you ever tell Armandina Martinez who you were
12  going to vote for in 2018?
13     A   No, I did not mention anything to her, no.
14     Q   And is there any reason Ms. Martinez --
15     A   And since your vote is confidential, you cannot
16  mention it to anyone.  They tell us that when we -- they
17  tell you not to tell anyone, no, that you voted for such
18  person.  So --
19     Q   And the same thing is true as to Alma Garcia and
20  Alicia Dougherty No. 1, and Alicia Dougherty No. 2, and
21  Yolanda Martinez; is that correct?
22          THE INTERPRETER:  Alma Martinez?
23          MR. GARZA:  Alma Garcia, Alicia Dougherty
24  No. 2.
25     A   No one.

15

1      Q   (By Mr. Garza)  Do you know any reason why they
2  know who you had voted for?
3          MS. VELA:  Objection, form.
4      A   I don't know how they would know.  I mean, I just
5  grabbed my ballot, I vote, I put my signature.
6          I'm not going around telling anyone who I voted
7  for.
8      Q   (By Ms. Garza) Thank you.  And you mentioned that
9  you don't know who Armandina Martinez is.
10         Do you know Alma Garcia?
11     A   No, I don't know.  I don't even know who they are.
12  I mean, I just show up there; they give me the ballot; I
13  sign; I vote and that's it.
14         I don't know what -- who they are looking for.
15     Q   So let me call your attention to Exhibit No. 1 that
16  Mr. Abrams gave you.  And if you could turn to the second
17  page.
18     A   This is my signature right here (indicating).
19     Q   Okay.  If you can look at the bottom of that page,
20  do you see a signature there?
21     A   Not here, no.  But this is my signature over here
22  (indicating).
23     Q   Yes, Mr. Guerrero.  I'm not talking about your
24  signature.
25         Do you see that there is another signature at the

16

1  bottom of the page?
2      A   No.
3      Q   Do you know who Ms. Vela is?
4      A   No.  I don't know anyone.
5      Q   Okay.
6      A   They just give me the ballot; I go over to the
7  ballot box; I sign; and I just put in the box; and that's
8  it.
9          I don't know who those people are.
10     Q   Okay.  Mr. Guerrero, can you read what the name is
11  at the bottom of the page?
12     A   It says "Roma."  No.  Okay.
13     Q   Let's turn to the last page.
14     A   Like I said, I don't know anyone.  They just give
15  me the ballot.  I sign it, and put in the back, and I take
16  off.
17     Q   Let's turn to the last page.
18     A   There's my signature right there (indicating).
19     Q   And at the bottom of the page, Mr. Guerrero, there
20  is the name of another person.
21         Can you read that for us?
22     A   It was right here, Vicente Guerrero.  Somebody
23  wrote it down there.  My signature is this one over here
24  (indicating).
25     Q   I'm sorry.  But -- and I apologize for going over

17

1  this with you, Mr. Guerrero.  But I just want to know,
2  there's a person listed on that first line, and I just want
3  to know if you can read that.
4      A   No.
5      Q   No.
6      A   No.  I don't know anyone.
7      Q   Okay.  Did somebody help you with your ballot when
8  you voted in the primary of 2018?
9      A   No one.  No -- I go in myself; I vote.  I mean, no
10  one is telling me "Vote for this person" or the other, this
11  or that.
12         If I like that person, I'll vote for that person.
13  That's it.
14     Q   Did anybody help you read the 2018 ballot?
15     A   No.  I know more or less what it says there.  No
16  one needs to tell me anything.  I see the names there.  I
17  know more or less who I'm going to vote for, and that's it.
18         No one tells me who to vote for.
19     Q   So let me just tell you that on your ballot
20  envelope, the third page of your -- of Exhibit No. 2 -- of
21  Exhibit No. 1 is the name of Barbara Barrios.
22         Do you know who Barbara Barrios is?
23         THE INTERPRETER:  (Through the witness) Do you
24  want a soda?
25         MR. ABRAMS:  It's okay.  Thank you.

**18**

1    A    No, no.  I don't even know these people.  As for
2  example, this lady right here, I'm looking at her; I'm not
3  gonna be asking her for her name, who she is, or what her
4  name is.
5    Q    (Mr. Garza)  And on the prior page, it says
6  "Modesta Vela."
7        Do you know who Modesta is?
8    A    No one.  No, I don't know anyone.  No one.
9    Q    And in the May 2018 -- I'm sorry -- the March 2018
10  primary, when -- did these people that came to your house,
11  did they bring you the ballot?
12        MS. VELA:  Objection, form.
13        (Witness looks to Mrs. Guerrero)
14    Q    (By Mr. Garza) You can't ask.  If you can remember
15  -- if you can't remember, that's fine.
16    A    No, I don't remember.  I don't remember.
17    Q    Okay.
18        MR. GARZA:  I don't have any other questions
19  for Mr. Guerrero.
20        MS. VELA:  I have a few questions.
21            EXAMINATION
22  BY MS. VELA:
23    Q    And Mr. Guerrero, how old are you?
24    A    Eighty-three or eighty-four.
25    Q    And what is your address?

**19**

1    A    19 Florez Street in Roma, Texas.
2    Q    And do you receive your mail at that address?
3    A    Yes, I have my mail here.
4    Q    Do you usually sit outside and receive the mail?
5    A    Sometimes I am.  I'm sure not.  Sometimes I do go
6  outside, just to be resting outside.
7    Q    But your mail is delivered to this home?
8    A    Yes, at this home.
9        MS. VELA:  And for the record, we are at
10  the address that he just listed taking this deposition.
11    Q    (By Ms. Vela)  Mr. Guerrero, do you understand that
12  there is nothing wrong with voting by mail?
13    A    Well, I mean, you know, now we have this big
14  problem because I voted by mail; but I don't think I'm
15  going to be voting by mail.  I mean, it got -- it led to all
16  of this.  So I rather just go to the ballot box.
17    Q    I understand.  But my question is, do you know you
18  have the right -- the legal right to vote by mail?
19    A    Yes, I know I have rights.  But I'm not, no.
20    Q    And if the law allows you --
21    A    No.
22    Q    If the law allows you to be assisted when voting by
23  mail, would you allow your wife or your daughter to assist
24  you and vote by mail?
25    A    No, no.  After this experience, am I voting by

**20**

1  mail?  No.  I rather go to the ballot box.  I'll be there,
2  and I'll do it there.
3    Q    So the fact that your vote was rejected has
4  influenced your decision to no longer vote by mail?
5        MR. GARZA:  Objection, form.
6    A    I'm not voting by mail, no.
7        MS. VELA:  That's all I have.  Thank you.
8        MR. ABRAMS:  We have no further questions.
9        MR. GARZA:  No further questions.
10        (Deposition concluded at 1:23 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**21**

1            CHANGES AND SIGNATURE
2  WITNESS NAME:_____ DATE OF DEPOSITION:_____
3  PAGE    LINE  CHANGE  REASON
4        _____
5        _____
6        _____
7        _____
8        _____
9        _____
10        _____
11        _____
12        _____
13        _____
14        _____
15        _____
16        _____
17        _____
18        _____
19        _____
20        _____
21        _____
22        _____
23        _____
24        _____
25        _____

**Page 22**

```
1    I, VICENTE GUERRERO, have read the foregoing
2    deposition and hereby fix my signature that same is true and
3    correct, except as noted above.
4
5    _____
     VICENTE GUERRERO
6
7    STATE OF _____)
8    COUNTY OF _____)
9        Before me,_____, on this day personally
10   appeared VICENTE GUERRERO, known to me (or proved to me
11   under oath or through_____) to be the person whose
12   name is subscribed to the foregoing instrument and
13   acknowledged to me that they executed the same for the
14   purposes and consideration therein expressed.
15       Given under my hand and seal of office this _____
16   day of _____, _____.
17
18
19
     _____
20   NOTARY PUBLIC IN AND FOR
     THE STATE OF _____
21
22
23
24
25
```

**Page 24**

```
1    the completion of the deposition.
2        I further certify that I am neither counsel for, related
3    to, nor employed by any of the parties to the action in
4    which this proceeding was taken, and further that I am not
5    financially or otherwise interested in the outcome of the
6    action.
7        Subscribed and sworn to on this the 29th day of July,
8    2019
9
10       _____
         Toi K. Dowell, CSR No. 2768
11       Certified Expires 12/31/2019
         Integrity Legal Support Solutions
12       Firm Registration No. 528
         PO Box 245
13       Manchaca, TX  78652
         (512)320-8690
14       (512)320-8692 (fax)
15
16
17
18
19
20
21
22
23
24
25
```

**Page 23**

```
1            IN THE UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF TEXAS
2                 MCALLEN DIVISION
3    FEDERICO FLORES, JR.,     §
     MARIA GUERRERO, and       §
4    VICENTE GUERRERO,         §
         Plaintiffs,           §
5                              §
                              § CIVIL ACTION NO.7:18-cv-113
6                              §
     v.                        §
7                              §
     TEXAS SECRETARY OF STATE and §
8    ARMANDINA MARTINEZ, ALMA   §
     GARCIA, ALICIA DOUGHERTY NO. §
9    1, ALICIA DOUGHERTY NO. 2,  §
     YOLANDA MARTINEZ,          §
10       Defendants.            §
11           REPORTER'S CERTIFICATE
             ORAL DEPOSITION OF VICENTE GUERRERO
12                JULY 25, 2019
13       I, Toi K. Dowell, certified shorthand reporter in and
14   for the State of Texas, hereby certify to the following:
15       That the witness VICENTE GUERRERO was duly sworn by the
16   officer and that the transcript of the deposition is a true
17   record of the testimony given by the witness;
18       I further certify that pursuant to the FRCP Rule
19   30(f)(1) that the signature of the Deponent
20    X  was requested by the deponent or a party before the
21   completion of the deposition and returned within 30 days
22   from date of receipt of the transcript.  If returned, the
23   attached Changes and Signature Page contains any changes and
24   the reasons therefore;
25    _____ was not requested by the deponent or a party before
```

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

FEDERICO FLORES, JR.,           §
MARIA GUERRERO, and             §
VICENTE GUERRERO,               §
    Plaintiffs,                 §
                                §
                                §   CIVIL ACTION NO.7:18-cv-113
                                §
v.                              §
                                §
TEXAS SECRETARY OF STATE and    §
ARMANDINA MARTINEZ, ALMA        §
GARCIA, ALICIA DOUGHERTY NO.    §
1, ALICIA DOUGHERTY NO. 2,      §
YOLANDA MARTINEZ,               §
    Defendants.                 §


*****************************

ORAL DEPOSITION OF

MARIA GUERRERO

JULY 25, 2019

*****************************

    ORAL DEPOSITION OF MARIA GUERRERO, produced as a

witness at the instance of the Defendant, and duly sworn,

was taken in the above-styled and -numbered cause on the

July 25th day of July, 2019, from 12:01 p.m. to 12:38 p.m.,

before TOI K. DOWELL, CSR, in and for the State of Texas,

reported by machine shorthand at the home of Vicente

Guerrero and Maria Guerrero, 19 Florez Street, Roma, Texas,

78584 pursuant to the Federal Rules of Civil Procedure and

the provisions stated on the record or attached hereto.

```
                                         2
1          A P P E A R A N C E S
2
3  FOR THE PLAINTIFFS:
4    Ms. Marty Vela
       NAJVAR LAW FIRM
5      2180 North Loop West, Suite 255
       Houston, Texas  77018-8014
6      Phone (281) 404-4696
       Email: jerad@najvarlaw.com
7
8  FOR THE DEFENDANTS:
9    Mr. Michael R. Abrams
       ASSISTANT ATTORNEY GENERAL
10     Office of the Attorney General-019
       General Litigation Division
11     Post Office Box 12548, Capitol Station
       Austin, Texas 78711-2548
12     Phone: (512)463-2120
       Email: michael.abrams@oag.texas.gov
13
       Mr. Jose Garza
14     GARZA GOLANDO MORAN
       405 North Saint Mary's Street, Suite 700
15     San Antonio, Texas
       Phone: (210)892-8543
16
17
18  ALSO PRESENT:  Nelson Troncoso, Interpreter
19
20
21
22
23
24
25
```

```
                                         3
1            I N D E X
2
3  Appearances.......................................  2
4  MARIA GUERRERO
5     Examination by Mr. Abrams...................  4
6     Examination by Mr. Garza....................  15
7     Examination by Ms. Vela.....................  19
8     Examination by Mr. Garza....................  20
9  Changes and Signature Page.....................  21
10 Reporter's Certificate.........................  23
11         E X H I B I T S
12 NO.  DESCRIPTION                          PAGE
13  1   Declaration                           7
14  2   Notice of Rejected Ballot             12
15
16
17
18
19
20
21
22
23
24
25
```

```
                                         4
1             (The Interpreter was duly sworn)
2             MARIA GUERRERO,
3   having been first duly sworn, testified as follows:
4             EXAMINATION
5   BY MR. ABRAMS:
6     Q    Good afternoon.  Can you please state your name for
7   the record.
8     A    Marie Rosa Guerra.
9     Q    My name is Michael Abrams, and I represent the
10  Texas Secretary of State in this case.
11    A    Okay.
12        MR. JOSE GARZA:  I'm Jose Garza, and I
13  represent several of the defendants.
14    Q    (By Mr. Abrams)  Ms. Guerrero, have you ever been
15  deposed before?
16    A    Never.
17    Q    So I just want to go over a few of the, sort of,
18  ground rules of how depositions work just to help us go
19  smoothly.
20    A    Okay.
21    Q    So one thing is to give clear, verbal answers to
22  the questions rather than shaking your head, and that's so
23  that the court reporter can get a clear record of what's
24  happening.
25        And obviously we are working through a translator,
```

```
                                         5
1   but please let me finish my question, and then have the
2   translator finish the translation before you start, and then
3   I will wait until you finish and the answer's been given
4   before we move onto the next question.
5     A    Okay.
6     Q    And you understand that you are under oath today,
7   and it is the same duty to speak the truth as if you were
8   under oath in court?
9     A    Okay.
10    Q    If you need to take a break, please let me know.  I
11  don't think today's deposition is going to go very long; but
12  if we ever need to take a break, just let us know and we'll
13  find the time to take a break.
14    A    Okay.
15    Q    Have you ingested anything or taken any medication
16  that would prevent you from understanding the questions that
17  are being asked today?
18    A    Just -- just my medication for blood pressure and
19  my heart.
20    Q    And so you are able to understand and respond to
21  the questions that are being asked today; is that right?
22    A    Yes.  Yes.
23    Q    Ms. Guerrero, what did you do to prepare for
24  today's deposition?
25    A    Nothing.  Just wait.
```

Case 5:19-cv-00963-OLG   Document 86-5   Filed 08/19/20   Page 36 of 49
Case 5:19-cv-00963   Document 63-2   Filed 07/29   Page 33 of 7
Maria Guerrero - 7/25/2019

6

```
1    Q   Did you review any documents prior to the
2  deposition?
3    A   No.
4    Q   Did you meet with any attorneys before the
5  deposition?
6    A   No.
7    Q   Ms. Guerrero, are you currently employed?
8    A   No.
9    Q   When was the last time you were employed?
10   A   Well, many years ago.
11   Q   What did you do?
12   A   Work on the fields.  Lettuce.
13   Q   Okay.  When did you move to Starr County?
14   A   It's been like 40 years already.
15   Q   And were you born in Starr County?
16   A   No.  In Mexico, but I became a United States
17 citizen already.
18   Q   And when did you become a United States citizen?
19   A   I don't remember the date, but it's been like
20 20-something years ago.  I'm not quite sure how many years.
21   Q   And Ms. Guerrero, are you married?
22   A   Yes.
23   Q   And your husband is Vicente Guerrero?
24   A   Yes.
25   Q   How long have you been married?
```

7

```
1    A   Sixty years.  Too much.
2    Q   And do you have any children?
3    A   Yes.
4    Q   How many children?
5    A   Four.  Two males and two females.  Yesterday was
6  five months that one of my daughters passed away.
7    Q   I'm very sorry -- sorry for that.
8    A   Thank you.
9    Q   Ms. Guerrero, what -- what claim -- well, I mean --
10 let me back you up.
11       Are you the plaintiff in a lawsuit brought against
12 the Secretary of State and various officials for the early
13 ballot -- ballot written board?
14   A   Yes.
15   Q   And what claims are you bringing in this lawsuit?
16   A   Because they are saying that that is not the
17 signature for that vote, but that is the signature.
18       (M. Guerrero Exhibit No. 1 was marked.)
19   Q   (By Mr. Abrams)  I've handed you what we'll mark as
20 Exhibit 1 of your deposition which -- oh -- which I'll
21 represent to you is a Declaration that you have given in
22 this case.
23       Can you please review the Declaration and verify
24 that this is your signature on the bottom?
25   A   Oh, yes, this is me.  Like I was telling Mrs. -- to
```

8

```
1  the attorney over here, every time I sign, I don't write my
2  complete name, Rosa.  I just put the R.
3    Q   And do you see the handwriting on Bullet 4?
4    A   This right here (indicating)?
5    Q   Yes.
6    A   Yes.  It's in English, right?
7    Q   Did you write this?
8    A   No, no.  I don't know how to write like this.
9    Q   Okay.  Well, what it says is that you were home
10 with your husband when you voted in the March 2018 primary
11 election, and that we both signed the application and the
12 ballot envelope.
13   A   Yes, uh-huh.
14   Q   So is that statement accurate?
15   A   Well, not mine nor my husband's either.
16   Q   I'm sorry.  What do you mean by that?
17   A   What do you mean?
18       THE INTERPRETER:  You're asking if that's
19 correct?
20       MR. ABRAMS:  Yeah, if that statement is
21 correct.
22   A   Okay.  Well, I don't know.  I did not write this.
23   Q   (By Mr. Abrams)  Okay.  Let me -- I can take a step
24 back.
25       Ms. Guerrero, are you eligible to vote in Starr
```

9

```
1  County?
2    A   Yes.
3    Q   And are you registered to vote in Starr County?
4    A   Yes.
5    Q   And do you ever vote in person?
6    A   Yes.  At the beginning.
7    Q   And do you ever vote by mail?
8    A   Yes.  Several times.
9    Q   In the March 2018 primary elections, did you vote
10 by mail or submit -- did you submit an application to vote
11 by mail?
12   A   My, gosh, I don't remember that well, but I think
13 so.  It's been, like, two or three years that I've been
14 voting by mail.
15   Q   Turn to the next page of this document.
16       Do you recognize this document?
17       THE INTERPRETER:  This one.
18   A   This one right here (indicating)?
19   Q   (By Mr. Abrams) Yes.
20   A   Okay.  I see my signature here, too.
21   Q   If you look at Box 10 -- yeah, it's at the bottom
22 there.
23   A   This one right here.
24   Q   Is that your signature?
25   A   And this is my phone number.
```

10

1    Q    And do you see where you've signed your name in Box
2    10?
3    A    Right here?
4    Q    Yes.
5    A    Yes.
6    Q    Is that your signature?
7    A    Yes.
8    Q    And I notice that you didn't -- your last name
9    doesn't have your full -- it doesn't state your full name.
10        Is there a reason for that?
11   A    Guerrero, yes, it's there.  Guerrero.
12   Q    If you go back to the first page of your
13   Declaration, it says that you -- it says that you left out
14   some letters of your last name because you did not want to
15   write over the word "date."
16   A    Oh, yes.  Yes.
17   Q    So if you look back on the next page, on Page 2.
18   A    This one?  Yeah, because I didn't want to write
19   over this; so, that's why I wrote it like this.
20   Q    So you did leave off a few letters of your last
21   name in your signature?
22        MS. VELA:  Objection, form.
23   A    Just an R.  That's it, or is it --
24   Q    (By Mr. Abrams)  And if you turn to the last page
25   of the exhibit, do you recognize this document?

11

1    A    Yes, because this is my signature.
2    Q    Do you recognize this as a ballot envelope?
3    A    Yes.  It can -- and this three.
4    Q    And you signed the ballot envelope with your
5    signature on the -- in the middle of the page there?
6    A    Where?
7    Q    At the top of the page?
8    A    Right here?  Yes, this is my signature right here,
9    and this one over here (indicating).
10   Q    Do you recall after submitting or -- do you recall
11   after signing your ballot application and signing the
12   envelope and you put the envelope in the mail or gave it to
13   another individual to put in the mail -- what -- what did
14   you do with the envelope once you signed it?
15   A    We put it in the mail.  Well, now I don't remember
16   if we put it in the mail or we gave it to the girl; but it
17   was already packed or closed.
18   Q    Okay.  And when you say, "gave it to the girl," who
19   is that?
20   A    I do know her, but I don't remember her name.  It's
21   just when they come here, just for this purpose.
22   Q    Do you recall receiving a notification that your
23   ballot had been rejected?
24   A    Yes.  Well, that was when the attorney came here,
25   and the other girl.

12

1    Q    I'm not trying to ask any conversations you had
2    with the attorney, but can you tell me who the attorney was?
3    A    Well, he gave me his name but I forgot.
4    Q    Was his name maybe Jared Najvar?
5    A    I can't remember.
6         (M. Guerrero Exhibit No. 2 was marked.)
7    Q    (By Mr. Abrams)  I want to show you what we'll mark
8    as Exhibit 2.  And I'll represent that this is a Notice of
9    Rejected Ballot from the Early Voting Ballot Board.
10        Do you recognize this document?
11   A    I don't remember -- remember about this one.
12   March 6th?  I don't think this is my writing here because it
13   doesn't even have the R here.
14   Q    And I'll tell you, this is a notification to you
15   that your ballot had been rejected.
16   A    Oh.
17   Q    Do you recall receiving this document?
18   A    No.
19   Q    So how do you recall learning when -- how do you
20   recall learning that your ballot in the March 2018 primary
21   was rejected?
22   A    Because the attorney came here.  It was an attorney
23   and another lady.
24   Q    And do you recall who the other woman was?
25   A    No, I didn't -- I did not know her.

13

1    Q    Did you reach out to the woman and the attorney
2    first, or did they reach out to you?
3    A    No.  They -- they came over.
4    Q    Did you -- were you expecting them when they came
5    over?
6         MS. VELA:  Objection, form.
7    A    No.  They suddenly showed up.
8    Q    (By Mr. Abrams)  Do you recall when this was?
9    A    No, I don't have the date.  They were here, but I
10   don't know when.
11   Q    Would you be able to say if it was about a couple
12   of months ago?
13   A    No.  More than that.
14   Q    Has it been a year since then?
15   A    No, not that much; but more than the two months.
16   Q    So sometime between two months and a year ago you
17   received this visit?
18   A    Yes.  They were here.
19   Q    And are you -- is it your testimony that at that
20   time you learned that your March 2018 ballot had been
21   rejected?
22        MS. VELA:  Objection, leading.
23   A    Yes.
24   Q    (By Mr. Abrams)  And what did you do after that
25   meeting?

Case 5:18-cv-00963-OLG   Document 86-5   Filed 08/19/20   Page 38 of 49
Case 5:18-cv-00963   Document 65-2   Filed on 07/29/19 in TXSD   Page 5 of 7

Maria Guerrero                                                    7/25/2019

**Page 14**

1    A   Well, nothing.
2    Q   So after learning that your ballot had been
3    rejected, did you reach out to anyone in the Starr County
4    clerk's office?
5    A   No.
6    Q   Did you reach out --
7    A   No.  I mean, I don't have -- you don't have any
8    knowledge of none of it.
9    Q   Did you reach out -- after you learned that your
10   ballot had been rejected, did you reach out to or speak with
11   anyone in the Texas Secretary of State's office?
12   A   No.
13   Q   Did you -- other than the attorney and the woman
14   who was at this meeting, did you speak with anyone about
15   your ballot being rejected?
16   A   No.
17   Q   Ms. Guerrero, do you intend to vote in future
18   elections?
19   A   Yes.
20   Q   Do you intend to vote by mail or to go in person?
21   A   Maybe I'll go in person.  I don't want these
22   problems anymore.
23   Q   So just to make sure I understand, it's your
24   testimony that in the future you may go and vote in person
25   instead of by mail?

**Page 15**

1    A   Yes.
2    Q   Have you voted in any election since the March 2018
3    primary?
4    A   No.
5         MR. ABRAMS:  Uno momento.  Give me a minute.
6    I speak a little Spanish.
7    Q   (By Mr. Abrams)  Ms. Guerrero, have you understood
8    the questions that I've asked you today?
9    A   Yes.
10   Q   And have I been courteous with you today?
11   A   Very courteous.
12        MR. ABRAMS:  Okay.  We will pass the witness.
13        MR. GARZA:  And I just have a couple of
14   questions -- follow-up questions.
15             EXAMINATION
16   BY MR. GARZA:
17   Q   First, if you could take a look again at the second
18   page of the first exhibit that you were shown.
19   A   This one?
20   Q   There, on the bottom of the page, it says -- that
21   is the name Modesta Vela.
22        Do you know who Modesta Vela is?
23   A   That was -- that was one of the people that showed
24   up here.  They came here.  This was when they brought the --
25   the envelope.

**Page 16**

1    Q   This is the application to receive a mail-in
2    ballot.  Is that -- is that what you understand?
3    A   Yes.
4    Q   And do you remember when Ms. Vela and -- was
5    Ms. -- let me back up.
6         Was Ms. Vela with more than one person?
7    A   No.  It was two.
8    Q   Do you remember when they came to your house?
9    A   No, I don't remember which date when they -- they
10   came.
11   Q   Okay.  Did you know Ms. Vela?
12   A   I did not know her.  I met her here.
13   Q   Okay.  And do you remember the name of the -- of
14   the woman that was with her?
15   A   No.
16   Q   Did -- did you already have the form at your house,
17   or did they bring you the form?
18   A   They brought it to me, and they left it here.
19   Q   Okay.  If you could, turn the page -- to the last
20   page.  If you could have a Barbara Barrios?
21   A   Oh, yes, I do know her, yes.
22   Q   And how do you know her?
23   A   I had met her here in the area before.  She used to
24   sell shoes.
25   Q   And do you remember if she came to your house?

**Page 17**

1    A   Yes, she was here before.  I never went to her
2    house.
3    Q   And did you see her sign this form?
4    A   This one here?  Yes.
5    Q   Okay.  And did you give her -- was she here by
6    herself, or did she come with other people?
7    A   With the other lady -- with that lady.
8    Q   So she came with Ms. Vela?
9    A   (Witness nods head.)
10   Q   They both came --
11        MR. GARZA:  So -- I'm sorry.  If she could
12   answer the question.
13   A   Yes.
14   Q   (By Mr. Garza)  And so was the same two ladies that
15   came -- that brought you the application that came when they
16   picked up your ballot?
17   A   Yes.
18   Q   And did -- when you -- when you signed the
19   application, did they take the application with them?
20        MS. VELA:  Objection, form.
21        THE INTERPRETER:  When they signed?
22        MR. GARZA:  When she signed.
23   A   Yes, they took it, but it was already -- the
24   envelope was already closed.
25   Q   (By Ms. Garza)  Did you put the stamp on the

**18**

1  application?  We're talking about the application first.
2      A    You mean on the envelope?
3      Q    Yes.
4      A    No.
5      Q    And on the -- on the -- on the third page, where
6  you signed for the ballot -- or where you voted, did you
7  seal the envelope after you voted?
8      A    Yes.
9      Q    And did you put the stamp on the -- on the ballot
10  envelope?
11      A    I didn't have any.
12      Q    And so did Ms. Barrios and Ms. Vela, did they take
13  your ballot with them?
14      A    Yes.
15      Q    Did they witness how you voted?
16      A    No.
17      Q    Did -- when they came to pick up your ballot, did
18  you already have your ballot, or did they bring you a
19  ballot?
20      A    No.  They brought it to me.
21      Q    Do you know how they got your ballot?
22          MS. VELA:  Objection, form.
23      A    No.  They've always been involved working with
24  ballots -- votes.
25      Q    (By Mr. Garza)  So these two ladies have helped you

**19**

1  vote before?
2      A    Yes.  The previous years, yes.
3      Q    And do you know if they had other ballots with them
4  when they came to your house?
5      A    No.  I didn't notice that.
6      Q    You didn't see them carrying other ballots with
7  them?
8      A    No.
9      Q    And when they brought the application for you, did
10  you notice whether they had other applications with them?
11      A    No.
12          MR. GARZA:  I don't have any other questions.
13          MS. VELA:  I just have a few questions.
14          EXAMINATION
15  BY MS. VELA:
16      Q    Ms. Guerrero, would you vote by mail again if you
17  knew that your vote would be counted?
18      A    No.  I'm going to go in person.
19      Q    And did the fact that your vote was rejected
20  influence your decision?
21      A    Yes, because it was -- the signature was real.  It
22  was not false -- not a false signature or forged signature.
23          MS. VELA:  Thank you.  That's all I have.
24          MR. GARZA:  I have one more question.
25

**20**

1          FURTHER EXAMINATION
2  BY MR. GARZA:
3      Q    And I'm sorry to ask.  How old are you?
4      A    I'm going to be turning 80.
5          MR. GARZA:  All right.  Thank you.
6          MR. ABRAMS:  I have no further questions.
7          (Deposition concluded)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**21**

1          CHANGES AND SIGNATURE
2  WITNESS NAME:_____ DATE OF DEPOSITION:_____
3  PAGE     LINE  CHANGE  REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Case 5:18-cv-00963-OLG Document 86-5 Filed 08/19/20 Page 40 of 49
Case 7:18-cv-00113 Document 85-2 Filed on 07/29/19 in TXSD Page 7 of 7

Maria Guerrero 7/25/2019

---

**Page 22**

1    I, MARIA GUERRERO, have read the foregoing deposition

2  and hereby fix my signature that same is true and correct,

3  except as noted above.

4

5    _____

        MARIA GUERRERO

6

7  STATE OF _____)

8  COUNTY OF _____)

9    Before me,_____, on this day personally

10  appeared MARIA GUERRERO, known to me (or proved to me under

11  oath or through_____) to be the person whose name

12  is subscribed to the foregoing instrument and acknowledged

13  to me that they executed the same for the purposes and

14  consideration therein expressed.

15    Given under my hand and seal of office this _____

16  day of _____, _____.

17

18

19

        _____

20    NOTARY PUBLIC IN AND FOR

      THE STATE OF _____

21

22

23

24

25

---

**Page 24**

1    _____ was not requested by the deponent or a party before

2  the completion of the deposition.

3    I further certify that I am neither counsel for, related

4  to, nor employed by any of the parties to the action in

5  which this proceeding was taken, and further that I am not

6  financially or otherwise interested in the outcome of the

7  action.

8    Subscribed and sworn to on this the 29th day of

9  July, 2019

10

11    _____

      Toi K. Dowell, CSR No. 2768

12    Certified Expires 12/31/2019

      Integrity Legal Support Solutions

13    Firm Registration No. 528

      PO Box 245

14    Manchaca, TX  78652

      (512)320-8690

15    (512)320-8692 (fax)

16

17

18

19

20

21

22

23

24

25

---

**Page 23**

1        UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF TEXAS

2            MCALLEN DIVISION

3  FEDERICO FLORES, JR.,      §
    MARIA GUERRERO, and        §

4  VICENTE GUERRERO,           §
        Plaintiffs,            §

5                              §
              § CIVIL ACTION NO.7:18-cv-113

6                              §
        v.                     §

7                              §

8  TEXAS SECRETARY OF STATE and §
    ARMANDINA MARTINEZ, ALMA    §
    GARCIA, ALICIA DOUGHERTY NO. §

9  1, ALICIA DOUGHERTY NO. 2,  §
    YOLANDA MARTINEZ,           §

10    Defendants.              §

11

        REPORTER'S CERTIFICATE

12    ORAL DEPOSITION OF MARIA GUERRERO
            JULY 25, 2019

13

14    I, Toi K. Dowell, certified shorthand reporter in and

15  for the State of Texas, hereby certify to the following:

16    That the witness MARIA GUERRERO was duly sworn by the

    officer and that the transcript of the deposition is a true

18  record of the testimony given by the witness;

19    I further certify that pursuant to the FRCP Rule

20  30(f)(1) that the signature of the Deponent

21    x  was requested by the deponent or a party before the

22  completion of the deposition and returned within 30 days

23  from date of receipt of the transcript.  If returned, the

24  attached Changes and Signature Page contains any changes and

25  the reasons therefore;

---

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

LETICIA GARZA GALVAN,      }
ET AL                      }
                           }
VS.                        }      Case No. 7:18-cv-113
                           }
DAVID WHITLEY, in his      }
Official Capacity as       }
Texas Secretary of State,  }
et al                      }


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

FEDERICO FLORES, JR.

MAY 13, 2019

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


ORAL DEPOSITION OF FEDERICO FLORES, JR., produced

as a witness at the instance of the Defendant David

Whitley, and duly sworn, was taken in the above-styled

and numbered cause on the 13th day of May, 2019, from

2:09 p.m. to 3:24 p.m., before Tracie L. Carbajal, CSR

in and for the State of Texas, reported by machine

shorthand, at the residence of Federico Flores, Jr.,

located at 255 East Palmas Street, La Grulla, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions attached hereto.

| | 2 |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | FOR THE PLAINTIFFS: |
| 3 | Jerad Wayne Najvar |
| | Austin Whatley |
| 4 | NAJVAR LAW FIRM, PLLC |
| | 2180 North Loop West, Suite 255 |
| 5 | Houston, Texas 77018 |
| | Telephone: (281) 404-4696 |
| 6 | E-mail: (unknown) |
| 7 | |
| | FOR THE DEFENDANT DAVID WHITLEY: |
| 8 | |
| | Michael R. Abrams |
| 9 | OFFICE OF THE ATTORNEY GENERAL - 019 |
| | Post Office Box 12548, Capitol Station |
| 10 | Austin, Texas 78711 |
| | Telephone: (512)463-2120 |
| 11 | E-Mail: Michael.Abrams@oag.texas.gov |
| 12 | |
| | ALSO PRESENT: |
| 13 | |
| | Nelson Troncoso, Interpreter |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

**Page 3**

INDEX

Appearances ..................................... 2
FEDERICO FLORES, JR.
    Examination by Mr. Abrams ................. 4
    Examination by Mr. Najvar ................. 20
    Examination by Mr. Abrams ................. 26
Reporter's Certificate ........................ 27

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notice of Deposition | 4 |
| 2 | Application for Ballot by Mail | 10 |
| 3 | Notice of Rejected Ballot | 11 |

**Page 4**

1  (Per agreement of all counsel, Federal Rule
2  30(b)(5) Read-On was waived.)
3  (Exhibit No. 1 marked.)
4  FEDERICO FLORES, JR.,
5  having been first duly sworn, testified through a
6  duly-sworn interpreter, as follows:
7  EXAMINATION
8  BY MR. ABRAMS:
9  Q. My name is Michael Abrams, and I represent
10  Defendant David Whitley in this case. Could you please
11  state your name for the record?
12  A. Federico Flores, Jr.
13  Q. Mr. Flores, how old are you?
14  A. Seventy-nine.
15  Q. Mr. Flores, have you ever been deposed before?
16  A. Just once -- one time. My boy was going to
17  receive a settlement regarding insurance, and they put
18  me under oath, and they were going to ask me questions.
19  Q. About how long ago was that?
20  A. It's been a long time already.
21  Q. So because of that, I just want to go through a
22  couple of the ground rules of how depositions work so
23  that this goes smoothly, especially with a translator
24  here?
25  A. (Witness nods head up and down.)

**Page 5**

1  Q. Okay. Please give a verbal answer and don't just
2  shake your head or say "uh-huh" or "huh-uh" just so that
3  the court reporter has a clean record.
4  A. Okay.
5  Q. Please let me finish my question before you start
6  answering, and I will do the same of letting you finish
7  your answer before I start my next question. If one of
8  my questions isn't clear, please just ask me to rephrase
9  it, and I'll try to find a better way to say it. And
10  you understand that you are under oath today, and it
11  would be the same oath as if you were in court?
12  A. Yes.
13  Q. And, also, this isn't a marathon, so if you need
14  to take a break, I understand. We're not in a rush, so
15  just let me know and we'll get to a good breaking point
16  and then we can take a break.
17  A. Okay. Fine.
18  Q. Is there any reason you wouldn't be able to
19  understand my questions today and give full and honest
20  answers?
21  A. Well, no. I mean sometimes I do understand what
22  you're saying, but I cannot talk too much or express
23  myself much in English, but if we're going to have the
24  translator here, then I will be answering.
25  Q. And you understand that we'll be using the

Case 5:18-cv-00963-OLG Document 86-5 Filed 08/19/20 Page 43 of 49
Case 5:18-cv-00963 Document 65 Filed 08/26/19 Page 43 of 49

Federico Flores, Sr. 5/13/2019

**6**

1 translator for all of your answers so that everything
2 you say should be in Spanish and everything I say will
3 be in English?
4    A. Okay. Yes.
5    Q. This is -- even though I speak a little bit of
6 Spanish myself, but I'm not good enough to ask the
7 questions to you in Spanish.
8      Mr. Flores, what did you do to prepare for
9 today's deposition?
10    A. Well, nothing. I haven't done anything. Just
11 waiting.
12    Q. Did you review any documents?
13    A. No.
14    Q. Okay. Mr. Flores, I just want to go through a
15 little bit of background about your life, and then we
16 can kind of get to the specific issues in this case.
17 Mr. Flores, how long have you lived in La Grulla?
18    A. Well, we can say all of my life; since I was a
19 little boy. I mean, we used to live with an aunt. We
20 didn't have a house, but then I got married, so I've
21 always lived here.
22    Q. So you've lived here, is it fair to say, most of
23 your adult life?
24    A. Yes.
25    Q. And are you currently employed?

**7**

1    A. No.
2    Q. Okay. What was your career or occupation?
3    A. Well, I worked out in the fields, but I also had
4 this career or profession in TV and radio repairs. I
5 did that work in Rio Grande City.
6    Q. And you mentioned that you were married?
7    A. Well, I haven't mentioned it, but, yeah, I was
8 married, but she passed away. My wife passed away.
9    Q. And do you have any children?
10    A. Yes.
11    Q. How many?
12    A. Well, now there are five. It used to be six.
13    Q. Do any of them live in La Grulla?
14    A. Well, all of them live outside the state. Only
15 one of them -- one of my daughters, who's a teacher,
16 lives on the other side of Expressway 83 in La Victoria.
17    Q. Mr. Flores, do you recall when you first
18 registered to vote?
19    A. No.
20    Q. Are you currently registered to vote?
21    A. Yes.
22    Q. What was the last election that you recall voting
23 in?
24    A. Well, exactly, I don't know which ones. I mean,
25 I don't want to lie, and we haven't had any recent

**8**

1 elections.
2    Q. For how long, approximately, do you know -- let
3 me start that over. For how long, about, have you been
4 voting in Starr County?
5    A. Well, I've been voting for a long time. I can
6 say that maybe I've been voting since I've lived here.
7 I voted when I was single and after being married.
8    Q. Would it be fair to say you've been voting for
9 more than ten years?
10    A. More than that, yes.
11    Q. Maybe more than 20?
12    A. Yes. I'm almost 100 years old. I'm going to be
13 80.
14    Q. Uh-huh. Mr. Flores, I don't want to ask you
15 anything that involved a specific conversation with your
16 attorney, but I do just want to understand how you came
17 to know about this lawsuit. Could you just tell me a
18 little bit about how you came to be aware of this
19 litigation?
20    A. Well, Amalia is the one that brought me that
21 paper so I could vote, but then I had the stroke so I
22 couldn't sign the way I used to, so that's why they
23 thought that this is not my signature. That led to all
24 of this. That's why we're here. As a matter of fact, I
25 have numbness in my hands. Right now I can move them a

**9**

1 little bit, but I can't sign like I used to before.
2    Q. You mentioned Amalia. What is Amalia's last
3 name?
4    A. Her last is Gonzalez through her husband's last
5 name.
6    Q. And is she a friend?
7    A. Well, concuna. It means that I married her
8 husband's sister.
9      THE INTERPRETER: There's no direct
10 translation for that word, concuna. I've looked it up,
11 but that's what it means.
12 BY MR. ABRAMS:
13    Q. I want to -- you said a lot of information there,
14 so I want to kind of unpack some of that. Which
15 election were you referring to there?
16    A. Well, I didn't pay attention. I mean, I've
17 always voted. I vote here from the house all the time.
18 They always bring me that form, but I don't remember
19 which that one was.
20    Q. So when you say you vote by the house in the
21 home, do you mean that you vote by mail?
22    A. Either that or that person that brings me the
23 form that picks it up for me, and that person takes it.
24    Q. But it's still a mail ballot, correct?
25    A. Yes.

10

1   Q.  How long have you been voting by mail?
2   A.  Well, I mean, I've done it for a long time.  It's
3   been several times, but I don't remember exactly a
4   number.  Right now, with the condition that I have in my
5   legs, sometimes I get lazy so they just bring me the
6   form here to the house because I have to -- if not, I
7   have to be with the walker.
8   Q.  Do you know about how many times, if any, your
9   ballot has been rejected when you voted by mail?
10  A.  No.  Just this time, and that was because I got
11  the stroke and I couldn't sign the way I used to sign
12  before on previous occasions.
13  Q.  And when you say "this time," do you know if that
14  would be the March 2018 Democratic Primary?
15  A.  Well, it was my last vote, my last participation
16  because, then, we had all this issue, and that's when
17  they saw that my signature was not the same.  It wasn't
18  familiar.  It was not the same as my previous
19  signatures, and that's because I had the stroke and I
20  had a condition in my hands.
21       (Exhibit No. 2 marked.)
22  BY MR. ABRAMS:
23  Q.  I would like to show you what we'll mark as
24  Exhibit 2.  Just take a moment and look it over, please.
25  A.  Is this the one where I voted, because I see my

11

1   signature here?
2   Q.  Well, let me ask you, can you please look at it
3   and see if you recognize what -- this is a copy of a
4   document, but could you see if you recognize what this
5   document is?
6   A.  Yes; yes.  I mean, my signature is right there.
7   I would have signed it.  I must have signed it.  It's
8   fine.  It's my signature.
9       (Exhibit No. 3 marked.)
10  BY MR. ABRAMS:
11  Q.  Mr. Flores, is the first page of this document
12  your Application to Vote by Ballot -- Ballot by Mail in
13  the -- in the Democratic Primary Election?
14  A.  Well, I think so, because I used to get them by
15  mail, and then that person brought me the other form,
16  and I told him that I already had it.  Then I filled it
17  out, and we put it back in the mail.
18  Q.  Okay.  So if you look at -- let's just go through
19  the application.  If you look at the first box, is that
20  your name there, Federico Flores, Jr.?
21  A.  Yes; yes.
22  Q.  And the second box, where it lists -- asks for
23  your residence, is that your residence, 255 East Palmas
24  Street?
25  A.  Yes; yes.

12

1   Q.  And in the fourth box, where it asks for your
2   date of birth, is that your birth date, October 3rd,
3   1939?
4   A.  Yes; yes.
5   Q.  Okay.  And it says -- in box five, you checked
6   that the reason for voting by mail is that you are 65
7   years or older, correct?
8   A.  Well, yes.  I mean, I'm older, but for sure, yes.
9   Q.  And let's skip to box ten.  And it says --
10  there's a signature line that says, "I certify that the
11  information given in this application is true, and I
12  understand that giving false information in this
13  application is a crime," and then there's your -- it
14  looks like someone has signed it, correct?
15  A.  Yes, this is my signature right here.
16  Q.  And it's dated, as well, correct?
17  A.  Well, 12-28-17.
18  Q.  Okay.  Did you sign this application?
19  A.  Yes, and that's when I had my issue with my
20  hands, and it may look a little bit different.  I mean,
21  there's not really too much difference, just a little
22  bit off.
23  Q.  The medical issues you were having with your
24  hand, how long has that been going on?
25  A.  Well, first -- ever since I had the first

13

1   stroke -- the first stroke.  I don't have an exact date.
2   I didn't really pay attention to that, but ever since I
3   had that, I've had problems with my hands, my knees, and
4   now I need to depend on the walker.  I didn't use to
5   depend on the walker before.
6   Q.  Was your first stroke before 2017?
7   A.  I believe so.  It's been a long time already
8   because I'm just here at the house.  This is where I
9   spend -- this is my space.  I mean, I don't really --
10  unless I have to go to a doctor.  I have to wait for
11  somebody -- a ride, and somebody assists me because the
12  tall (sic) is somewhat high, and I've already fallen
13  several times, so somebody has to help me.
14  Q.  In box 11 on this document, you list a witness of
15  Andres Jesus De Leon; is that correct?
16  A.  Well, I did not list him.
17  Q.  Okay.  Was Mr. De Leon in the room or next to you
18  when you were signing your application?
19  A.  No.  I signed here in the house.
20  Q.  So just to clarify, Mr. De Leon did not sign your
21  application?
22  A.  Not when I signed, no, I mean, because I signed
23  here.  This is my signature right here, but over here, I
24  mean, I don't know.
25  Q.  If you could turn to the second page.

Case 5:19-cv-00963-OLG Document 86-5 Filed 09/19/20 Page 45 of 49
Case 5:19-cv-00963 Document 65-1 Filed 08/19/20 Page 45 of 48

Federico Flores, Sr.    5/13/2019

14

1    A. (Witness complies.)
2    Q. And I'll represent to you that this is a document
3  received from your attorney of the -- it's a printout of
4  the carrier envelope that accompanied your application,
5  the ballot -- that accompanied the ballot. I apologize.
6  Do you recognize your signature on this document?
7    A. Yes.
8    Q. Do you know if you signed this document, the
9  carrier envelope?
10    A. Yes.
11    Q. And this was for the Primary Election, right?
12    A. Uh-huh.
13    Q. Is that a yes?
14    A. Yes.
15    Q. Mr. Flores, how were you notified that your
16  ballot in the March 2018 Democratic Primary was being
17  rejected?
18    A. Well, this person, Amalia, she brought me this
19  and said that it had been rejected because of my
20  signature. Not only mine. Several forms -- ballots had
21  been rejected, and, I mean, that they were going to look
22  into this and check. I mean, I agree because, I mean, I
23  wasn't signing the same way due to the condition on my
24  hands.
25    Q. So would you say that there's a difference in

15

1  your signature between the application and the carrier
2  envelope?
3    A. Well, I mean, for example, here on the F -- the
4  F, I mean, I try to -- it could be that the F -- I
5  slipped there, but, I mean, I try to sign the same way
6  all the time, but I know that's my handwriting.
7    Q. I want to show you what we'll mark as Exhibit 3,
8  and this is a Notice of Rejected Ballot that states that
9  your ballot in the Primary has been rejected; is that
10  correct? Do you recognize this document as saying that?
11    A. Yes; yes.
12    Q. Do you recall receiving this document?
13    A. Well, the lady that brings me the form to cast my
14  vote, she lives right here. She's the one that told me
15  that my signature was not the same, that they were going
16  to reject it. Not only mine. Several were rejected,
17  and I told her, "Well, it could be because I didn't -- I
18  couldn't sign the same way because of numbness in my
19  hands."
20    Q. Was -- is that -- is that person Amalia Gonzalez?
21    A. Yes. She likes -- I mean, she likes politics.
22  She's involved in politics, and she -- I mean, if she
23  supports -- she's the kind of a person if she supports a
24  candidate, then they'll come and they'll take you to
25  vote and bring you back.

16

1    Q. Do you let Amalia Gonzalez check your mail?
2    A. No, I don't. I'm the only one who has the key to
3  my mail.
4    Q. Okay. So how did Amalia Gonzalez receive the
5  Notice of Rejected Ballot?
6    A. Well, because, like I said, she likes to be
7  involved in elections and taking people -- take people
8  to vote from here and there, and -- if people don't have
9  a car, they'll bring them back, or they'll bring you the
10  ballot, the form so you can fill it out and -- but
11  she's -- then she's the one that said that the signature
12  was rejected. I told her, "Well, yeah it may be
13  different because of the numbness to my hands."
14    Q. Does -- do you know whether Ms. Gonzalez works
15  for Starr County?
16    A. No; no. I don't think so, no.
17    Q. What does Ms. Gonzalez do; do you know?
18        THE INTERPRETER: Let me clarify one thing.
19    A. No. She's -- I think she's already receiving her
20  retirement benefits -- payments, and she just spends her
21  time going to the daycare centers for adults.
22    Q. Mr. Flores, after you learned that your ballot
23  was rejected, did you do anything in response to that?
24    A. No, because I never received anything back. For
25  example, this ballot right here, I just saw it -- I just

17

1  saw it right now, but I never got anything back saying
2  it was rejected. Now, here it does say that it was
3  rejected, but I never saw anything.
4    Q. But you knew that your ballot was rejected
5  because Amalia Gonzalez told you, correct?
6    A. Well, they said the issue was the signature, that
7  it was different, that they were going to check that.
8  And I told them, "Well, yeah, it could be because, I
9  mean -- because of the issue with my hands." I mean,
10  I'm not saying that I have pretty handwriting. I mean,
11  Sometimes I struggle with the letters.
12    Q. So -- and I just want to make sure I understand.
13  Once you learned that your ballot had been rejected, did
14  you talk to anyone in Starr County about the issue that
15  your ballot was rejected?
16    A. No. I don't leave the house. I'm just here.
17    Q. Did you speak with anyone on the Early Voting
18  Ballot Board?
19    A. No.
20    Q. Did you talk with anyone in John Rodriguez'
21  office in Starr County?
22    A. No.
23    Q. And just to go back to something, do you ever
24  recall receiving Exhibit 3, the Notice of Rejected
25  Ballot?

---

**18**

1   A. No; no. I have not received it, no.

2   Q. But you did learn that your ballot had been
3   rejected?

4   A. Well, we were just told that it was going to come
5   back because the signature was not the same like I used
6   to sign before, but I'm barely looking at it right now.

7   Q. And when you say, "We were told," who told you?

8   A. Amalia was the one that came and told me that
9   they did not accept my signature, and I told her it
10  could be -- it could be a little bit different because
11  ever since I had the stroke, I don't write the same. I
12  mean, it's been a long time already, and I still have
13  numbness in my hands. I used to drop everything out of
14  my hands. At least now I can grab something or if --
15  pay more attention. That way, I can -- I won't drop the
16  fork or the spoon or anything.

17  Q. And have you voted in any elections since your
18  ballot was rejected?

19  A. No; no.

20  Q. Do you intend to vote in future elections?

21  A. Well, I mean, I do have my registration card, my
22  ID where I can show it and present it, and I can vote.
23  If I like that candidate, then I'll vote. If not, they
24  don't let me vote, then that's okay, but, I mean, I have
25  the right to vote. I'm a U.S. citizen. I've never been

---

**19**

1   rejected for that, not been allowed to vote. I've
2   always voted. I've always shown my ID.

3   Q. Let me just try to ask that again just to
4   clarify. In the future, if there's another election in
5   Starr County, would you like to -- do you intend to
6   participate in a future election if there's one in Starr
7   County?

8   A. Yes. I'll just show them my registration card,
9   and, I mean, if they take it, that's fine. If not --
10  and if not, then, I mean, I will ask them, "Why? How
11  come you're not letting me vote," if they reject me. I
12  mean, they should let me vote. If not, I'll just go
13  back to Mexico like La India Maria.

14  Q. Have you had any communications with the Texas
15  Secretary of State's Office?

16  A. No.

17  Q. Have you had any communications with the Early
18  Voting Ballot Board?

19  A. No.

20  Q. This might be a shorter deposition than a lot of
21  them. If you wouldn't mind giving me five or ten
22  minutes to look over my questions and then we'll
23  probably be done pretty soon.

24  A. Take your time. That's fine. No rush.

25      MR. ABRAMS: We'll go off the record.

---

**20**

1       (Recess from 2:53 p.m. to 2:59 p.m.)

2   BY MR. ABRAMS:

3   Q. Just a few quick clarification questions. You
4   were registered to vote at the time of the March 2018
5   Primary, correct?

6   A. Yes.

7   Q. After you learned that your ballot was rejected,
8   did you attempt to speak with an attorney about the fact
9   that your ballot was rejected?

10  A. No; no.

11  Q. Hold on one second.

12      MR. ABRAMS: Will pass the witness.

13          EXAMINATION

14  BY MR. NAJVAR:

15  Q. Okay. Mr. Flores, I'm just going to have a few
16  quick questions of my own. You -- you said earlier that
17  if there's a candidate that you like in another election
18  in the future, that you would like to vote; is that
19  correct?

20  A. Yes.

21  Q. Will you vote by mail again?

22  A. Well, I'm going to try to go in person this time.
23  This way, I avoid more issues like this, more problems.
24  That way they accept -- they accept me. Then I'll be
25  taking my card to vote.

---

**21**

1   Q. Okay. Well, if -- is that more difficult for you
2   to go in person?

3   A. Well, yes, I mean, but I'll make an exception. I
4   mean, they -- they'll come and pick me up by car and
5   take me to the voting ballots, and I'll vote there.
6   Then they'll bring me back. That's the way they do it
7   when they take me to the doctor. They pick me up; they
8   assist me.

9   Q. Well, let me ask you this, Mr. Flores. If there
10  were a better process for voting by mail where you could
11  confirm that it was your ballot, would you -- would you
12  still like to vote by mail?

13      MR. ABRAMS: Objection; form. You can still
14  answer.

15  A. Well, no, because, I mean -- I mean, even if it's
16  better, and if I vote again, and then I'm going to have
17  this problem again, this issue, so I'll just go in
18  person to the voting ballots over there. I'll just have
19  one of my sons take me and bring me back.

20  Q. Okay. Well, let me ask you this. Do you
21  think -- did anybody from the elections -- did any
22  election official call you to try to confirm whether
23  that was your signature on the carrier envelope?

24  A. No.

25  Q. Do you think that before the election officials

Case 5:18-cv-00963-OLG Document 86-5 Filed 08/19/20 Page 47 of 49
Case 5:18-cv-00963-OLG Document 85-1 Filed 08/18/20 Page 47 of 49

Federico Flores, Jr. - 5/13/2019

22

```
1   can reject your ballot by comparing the signatures if
2   they think there's a difference, would you -- would you
3   like for them to call you to confirm that you voted?
4       A.  Well, I say that they should have called to
5   confirm, and that way I could have a chance to tell
6   them.  I mean, I don't see no difference here, and I
7   was -- I already had my -- the condition on my hands.
8       Q.  Is it possible that at some point your health
9   could be such that it would -- it would be impossible
10  for you to go vote in person?
11      A.  Well, that could be, I mean, because, I mean, if
12  I already had a stroke, I could get another one again.
13  I have heart problems.  I think they want to insert one
14  of those little machines here in my heart, but they
15  haven't approved it.  If not, then I won't vote anymore.
16  I mean, I don't think I have much -- too long to live
17  anyway.
18      Q.  Well, let me -- Mr. Flores, so -- I'm going to
19  ask you a hypothetical question, as if you could talk to
20  the judge right now, okay?  If the judge were sitting
21  here at the table right now, the judge in McAllen, and
22  he could tell you, "Mr. Flores, I'm going to change the
23  law so that the election officials have to call you to
24  ask you if you really signed your ballot before they
25  throw it in the trash," would that give you more
```

23

```
1   confidence in voting by mail in the future?
2           MR. ABRAMS:  Objection; form.
3       A.  Well, honestly, no, because, I mean, I think this
4   is too much.  I mean, I don't see that much difference
5   in my signature.  I wish I had other paperwork where I
6   had my signature that I could show you, and you could
7   see -- would be able to see that there's not much
8   difference in the way I sign.
9       Q.  Okay.  So I want to make sure I understand
10  because earlier you said that you've -- in recent
11  elections, you have voted by mail; is that true?
12      A.  Well, yes, because, I mean, it's not that I'm
13  lazy, but because of the condition with my legs, I
14  wanted to take advantage that I could vote this way and
15  avoid going in person.  But I know now that next time I
16  will just tell one of my sons to take me and help me
17  through the voting process, help me there and then avoid
18  all of these problems.
19      Q.  Okay.  And when you say "all of these problems,"
20  what do you mean?
21      A.  Well, I mean, all of this right here, I mean,
22  these problems.  That's what we're here for because of
23  that signature.  If it wasn't for that, I mean, there
24  wouldn't be any problem.  We would have resolved it
25  already.
```

24

```
1       Q.  Do you feel, Mr. Flores, like you have done
2   something wrong?
3       A.  Well, no.  I don't think so, no, because, I mean,
4   I say that's my signature.  It's almost the same.  Maybe
5   there's a slight difference in one of the letters, but I
6   would say it's the same.
7       Q.  Okay.  So what if one day in the future it's
8   harder for you to walk or for whatever reason it's
9   impossible for you to go to vote in person, will you
10  just not vote at all at that time?
11          MR. ABRAMS:  Objection; form.
12      A.  Well, no.  I mean, I have to find a way.  I mean,
13  I have my -- to participate in voting.  I have my sons.
14  I will just tell one of them to take me, and they'll
15  help me get off the car over there.  I have gone voting
16  before to the school, to that small house that's there,
17  but I'm not going to trust anyone again.
18      Q.  Okay.  Just let me have a moment with my notes
19  now.
20          (Recess from 3:13 p.m. to 3:18 p.m.)
21  BY MR. NAJVAR:
22      Q.  Okay.  Mr. Flores, so if there were an election
23  in the future and none of your family and nobody else
24  could take you to vote in person, would you like to
25  have -- would you consider -- would you vote by mail at
```

25

```
1   that time?
2           MR. ABRAMS:  Objection; form.
3       A.  Well, yes, I mean, as long as that person is -- I
4   mean, you trust that person who's going to take you; you
5   know that person.  Sometimes you don't know who comes to
6   get you or who's going to bring you back.
7       Q.  Well, I'm asking you if there's nobody to take
8   you to vote in person and -- would you like to vote by
9   mail in that instance?
10      A.  Well, no, I wouldn't like to vote like that
11  again.  I mean, there's no reason why I wouldn't be able
12  to go and vote like that.  It's not that far, just to
13  that small house that's there, unless you're ill, but
14  I'm fine -- if I'm fine, I can go in the car.  Maybe
15  I'll buy a hamburger on the way back.
16      Q.  Okay.  Mr. Flores, I see that you use a walker
17  here in the house when you move around.  How long have
18  you used the walker?
19      A.  Well, it's been a while already.  I mean, I have
20  two of them.  The other one doesn't have any wheels, but
21  I need it because I may fall down.  I've said since I
22  was left with this condition, and I'm afraid to fall
23  down, and they're things that I need to ambulate
24  because, also, the house is somewhat elevated.
25      Q.  Okay.  And I think this is my last question, or
```

26

1  last couple of questions, but you mentioned earlier that

2  you can't trust somebody.  Who were you talking about?

3  A.  No.  I meant -- I mean, why do you need someone

4  to come and invite you over to vote?  I would just tell

5  one of my sons to take me.  I don't -- I don't need

6  that, and it's just to that voting ballot.  It's just

7  small stations or houses.  Whoever wants to go vote, you

8  can go vote there.

9  MR. NAJVAR:  Okay.  No further questions.

10  EXAMINATION

11  BY MR. ABRAMS:

12  Q.  Just really fast.  You mentioned your sons.

13  Where do your sons live?

14  A.  Well, just one of my daughters.  She's a teacher.

15  She lives on the other side in La Victoria.  The rest

16  live outside the state.  One is in California; another

17  one in Indiana; and the other one in Illinois.  They

18  only come here in December.

19  MR. ABRAMS:  No further questions.

20  MR. NAJVAR:  No further questions.

21  (Proceedings concluded at 3:24 p.m.)

22  (According to Federal Rule 30(e)(1),

23  deponent or party must request to read and sign before

24  the deposition is completed.  Since this was not done,

25  signature is considered waived for this transcript.)

28

1  action in which this proceeding was taken, and further

2  that I am not financially or otherwise interested in the

3  outcome of the action.

4  GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this

5  the 23rd day of May, 2019.

6

7  _____

TRACIE L. CARBAJAL, Texas CSR 2885

8  Expiration Date:  12/31/19

Integrity Legal Support Solutions

9  Firm Registration No. 528

3100 W. Slaughter Lane Suite A 101

10  Austin, Texas 78748

(512)320-8690

11  (512)320-8692 (fax)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

27

1  IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

2  McALLEN DIVISION

3  LETICIA GARZA GALVAN,   }

ET AL            }

4                   }

VS.            }  Case No. 7:18-cv-113

5                   }

DAVID WHITLEY, in his   }

6  Official Capacity as   }

Texas Secretary of State,}

7  et al            }

8  REPORTER'S CERTIFICATION

9  THE STATE OF TEXAS:

COUNTY OF HIDALGO:

10

11  I, Tracie L. Carbajal, a Certified Shorthand

12  Reporter in and for the State of Texas, hereby certify

13  to the following:

14  That the witness, FEDERICO FLORES, JR., was duly

15  sworn by the officer and that the transcript of the oral

16  deposition is a true record of the testimony given by

17  the witness;

18  That the original deposition was delivered to

19  Michael R. Abrams;

20  That the amount of time used by each party at the

21  deposition is as follows:

22  Jerad Wayne Najvar - 0 hours, 18 minutes

23  Michael R. Abrams - 0 hours, 46 minutes

24  I further certify that I am neither counsel for,

25  related to, nor employed by any of the parties in the

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| FEDERICO FLORES, JR., | § | |
| MARIA GUERRERO, and | § | |
| VICENTE GUERRERO, | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| TEXAS SECRETARY OF STATE, and | § | Case No. 7:18-cv-113 |
| ARMANDINA MARTINEZ, ALMA | § | |
| GARCIA, ALICIA DOUGHERTY NO. 1, | § | |
| ALICIA DOUGHERTY NO. 2, | § | |
| YOLANDA MARTINEZ, | § | |
| *Defendants*. | § | |

**ORDER DEFENDANT TEXAS SECRETARY OF STATE'S FIRST AMENDED MOTION FOR SUMMARY JUDGMENT**

Came on this day to be heard Defendant Texas Secretary of State's First Amended Motion for Summary Judgment and after due consideration of the relevant authorities and the briefing of the parties, it is the opinion of the Court that said Motion should be **GRANTED**.

It is **FURTHER ORDERED** that Plaintiffs' claims against Defendant Texas Secretary of State are dismissed with prejudice.

SIGNED THIS _____ day of _____, 2019.

_____
THE HONORABLE RICARDO H. HINOJOSA
UNITED STATES DISTRICT JUDGE