IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES, MOVE TEXAS CIVIC FUND, and LEAGUE OF WOMEN VOTERS OF TEXAS,<br>          *Plaintiffs*,<br><br>v.<br><br>TEXAS SECRETARY OF STATE; TRUDY HANCOCK, in her official capacity as Brazos County Elections Administrator; and PERLA LARA, in her official capacity as City of McAllen, Texas Secretary,<br>          *Defendants*. | §§§§§§§§§§§§§§§ | No. 5:19-cv-00963 |

**DEFENDANT SECRETARY OF STATE'S RESPONSE TO PLAINTIFFS' COURT-ORDERED BRIEF**

Defendant Texas Secretary of State respectfully responds to the Court's August 21, 2020 order requesting further briefing in Plaintiffs' challenge to Texas's signature-verification requirement for mail-in ballots. Dkt. 88. That order recognized that, should the Court reach the merits and find that any Plaintiff is entitled to relief,[1] "Plaintiffs have not explained what an appropriate remedy may look like," and without such a showing, Defendants cannot "address[] the specific feasibility of-and/or burdens associated with-any remedial proposal." Dkt. 88 at 2. Though she disputes that Plaintiffs have shown themselves entitled to any relief, the Secretary respectfully makes this submission to "address[] the appropriateness and/or feasibility of each form of relief proposed by Plaintiffs," to the extent known to her, as the Court requested. Dkt. 88 at 4.

Plaintiffs offer two proposals— "enjoining implementation of the entire signature comparison procedure," or, in the alternative, a six-step procedure for a voter to submit an "affirmation and

---

[1] As set out in prior filings, the Secretary disputes that Plaintiffs have established the Court's jurisdiction over this case and disputes that any Plaintiff would be entitled to relief on the merits, even if the Court had jurisdiction. *See, e.g.*, Dkts. 70, 75, 79. The Secretary respectfully re-urges those arguments, and incorporates them by reference as if fully set forth herein.

1

verifying information" after their ballot has been flagged during signature verification. Dkt. 89 at 2, 5. The Secretary addresses each in turn, including—pursuant to the Court's order—"(i) any *specific* burdens associated with the implementation of any proposed procedure, (ii) why those burdens outweigh the benefit(s) of adding such a procedure, and (iii) any other reason the Defendant believes any proposed procedure is inappropriate." Dkt. 88 at 4.

At the outset the Secretary notes that—because local election officials are responsible for performing signature verification—they are best-situated to address many burdens Plaintiffs' proposals would impose. In an effort to assist the Court, the Secretary attaches a declaration from the Hays County Elections Administrator explaining how Plaintiffs' proposals would impact that county.[2] Also attached is a declaration from the Director of Elections at the Secretary of State's office, providing information about the burdens of Plaintiffs' proposals based upon the Secretary's experience advising and assisting local election officials and knowledge of the Texas Election Code.[3]

## I. Enjoining Implementation of the Entire Signature-Verification Requirement Would Be a Vastly Overbroad Result That is Not Merited Here.

Plaintiffs argue that the Court should enter an injunction under which "Texas election officials would be barred from rejecting mail-in ballots on the basis of the signature comparison provisions of the Texas Election Code." Dkt. 89 at 6. This request for wholesale invalidation of Texas's signature-verification requirement would impose burdens that far outweigh any benefit Plaintiffs can show.

### A. Plaintiffs' sweeping proposal burdens the Secretary, the State, and local election officials.

The Secretary is aware of at least five discrete burdens that would result from Plaintiffs' request for a wholesale injunction of Texas's signature-verification requirement.

---

[2] Exhibit 1, Declaration of Jennifer Anderson, Hays County Elections Administrator ("Anderson Dec.").
[3] Exhibit 2, Declaration of Brian Keith Ingram, Director of Elections, Texas Secretary of State ("Ingram Dec.").

**1.** Doing away with signature verification undermines the State's interest in the "[c]onfidence in the integrity of our electoral processes" that is "essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). Indeed, "public confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford v. Marion Cty. Elec. Bd.*, 553 U.S. 181, 197 (2008). *See also, e.g., Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 381 (1992) (noting that the "sound and efficient operation" of government programs is in the public interest).

It is settled that "[v]oter fraud drives honest citizens out of the democratic process and breeds distrust of our government," *id.* and that it is more likely in the mail-in-ballot context. *See, e.g., Purcell*, 549 U.S. at 4 (acknowledging "the State's compelling interest in preventing voter fraud"); *Veasey v. Abbott*, 830 F.3d 216, 307 n.46 (5th Cir. 2016) (Jones, J., concurring in part) ("[T]he greatest fraud risk exists when unauthorized persons direct an elderly, immobile voter's choices on a mail-in ballot. That the ballots could get lost or stolen from the mail is no more a risk than the loss of a Social Security check."); *Crawford v. Marion Cnty. Elec. Bd.*, 553 U.S. at 225 (Souter, J., dissenting) (noting that "absentee-ballot fraud . . . is a documented problem"); *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004) ("Voting fraud . . . is facilitated by absentee voting."); *Democratic Nat'l Comm. v. Bostelmann*, No. 20-1538, 2020 WL 3619499, at *2 (7th Cir. Apr. 3, 2020) (recognizing that district court that "categorically eliminates the witness requirement applicable to absentee ballots [] gives no effect to the state's substantial interest in combatting voter fraud.") (citation omitted).

This is precisely the interest that Texas's signature-verification requirement furthers here. Anderson Dec. ¶ 2; Ingram Dec. ¶ 11. Haphazardly enjoining the entire signature-verification requirement—which was designed to (and, in fact, does, *see id.*) help ensure the voters requesting mail-in ballots are the same voters who ultimately cast them—burdens "the State's interest in counting only

3

the votes of eligible voters," as well as its efforts to ensure "orderly administration and accurate recordkeeping" in elections. *Crawford v. Marion Cty. Elec. Bd.*, 553 U.S. 181, 196 (2008).

      **2.** A wholesale injunction burdens the State's interest in the application of its duly-enacted laws. Indeed, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). *See also, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (The "inability [for a State] to enforce its duly enacted [laws] clearly inflicts irreparable harm on the State."); *Moore v. Tangipahoa Parish Sch. Bd.*, 507 F. App'x 389, 399 (5th Cir. 2013) (per curiam) (A state suffers irreparable injury when an injunction "would frustrate the State's program" and "deprive[] the State of the opportunity to implement its own legislature's decisions.").

      This burden is amplified in the election context, where the Constitution gives states the authority to choose the time, place, and manner of elections, absent federal law expressly to the contrary. U.S. CONST. art. I, §4, cl. 1. Texas retains authority to regulate mail-in ballots to the extent not preempted or otherwise controlled by federal law. *See generally Pavek v. Donald J. Trump for President, Inc.*, 967 F.3d 905, 909 (8th Cir. 2020) (even where state does not challenge an injunction, "it is in the public interest to uphold the will of the people, as expressed by acts of the state legislature, when such acts appear harmonious with the Constitution"). Plaintiffs have not even argued that signature verification is unconstitutional, in and of itself. Thus, wholly eviscerating Texas's signature-verification requirement would deprive the State and the public of implementation of the legislature's decisions— even in circumstances where Plaintiffs do not contend those decisions operate unlawfully. This would impermissibly remove the constitutionally-granted control over elections from the State. U.S. CONST. art. I, § 4; *see also Burdick*, 504 U.S. at 433.

**3.** Even if the Court found that some injunctive relief were appropriate, a wholesale injunction sweeps far more broadly than Plaintiffs' alleged injury.[4] The Supreme Court has explained that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (emphasis added). Plaintiffs have not argued (or shown) that signature verification is always unconstitutional— particularly given Texas's strong interests in election integrity, ballot security, and the enforcement of its duly-enacted statutes. Rather, at most, they have shown that two ballots were rejected for failure to satisfy Texas's signature-verification requirement, and that those voters neither pursued the relief available under law[5] nor contacted the Secretary.[6] Plaintiffs have not introduced any competent evidence of similar injuries suffered by voters throughout the State.

Consequently, an injunction upending Texas's entire signature-verification requirement for mail-in ballots would give short shrift to the State's interests outlined in this section. As such, it would intrude upon Texas's sovereign authority to administer its elections and lacks the "adequate sensitivity to the principles of federalism" required in the Elections Clause context. *Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1416 (9th Cir. 1995); *Ass'n of Cmty. Orgs. For Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 798 (7th Cir. 1995). Indeed, injunctions aimed at state election laws must "impose no burdens on the state not authorized by the [relevant federal law] which would impair the State['s] retained power to conduct its state elections as it sees fit." *Wilson*, 60 F.3d at 1416. An injunction wholly discarding Texas's signature-verification requirement would be invalid for failure to meet this standard. *See, e.g., Bostelmann*, 2020 WL 3619499, at *2 ("This court is concerned with the overbreadth of the district

---

[4] For avoidance of doubt, the Secretary contests that Plaintiffs have shown any cognizable injury.
[5] This includes the potential to ask a county election officer to petition a court for relief. Election contests are also available to candidates where miscounted mail-in ballots impact the result of an election. *See, e.g.*, TEX. ELEC. CODE §§ 221.001-243.013; *Reese v. Duncan*, 80 S.W.3d 650, 660–62 (Tex. App.—Dallas 2002, pet. denied) (affirming order for a new election because mail-in ballots with non-matching signatures had been counted).
[6] *See* Dkt. 70 at 5, 6.

court's order, which categorically eliminates the witness requirement applicable to absentee ballots and gives no effect to the state's substantial interest in combatting voter fraud.") (citation omitted).

**4.** Eliminating signature verification undermines the State's interest in uniform election regulation. As the Supreme Court has recognized, States must regulate elections "if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process[]." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). Although the Election Code charges the Secretary with "obtain[ing] and maintain[ing] uniformity in the application, operation, and interpretation of this code," TEX. ELEC. CODE § 31.003, it does not provide her the power to coerce local officials. Instead, it authorizes the Secretary to "assist and advise all election authorities with regard to the application, operation, and interpretation of this code." *Id.* § 31.004(a). Thus, the Secretary "maintain[s] an informational service for answering inquiries of election authorities relating to the administration of the election laws or the performance of their duties." *Id.* § 31.004(b). But the Secretary's enforcement powers do not allow her to coerce any local election official's handling of a mail-in ballot. *See, e.g.*, *id.* § 31.005.

Thus, the proposed injunction of all signature verification in Texas (outside of any direct effect on Brazos County and the City of McAllen) would be toothless. Other than the two made defendants herein, none of the numerous[7] local election authorities in the State would be subject to the Court's injunction, *see* FED. R. CIV. P. 65, as they are not acting in concert with any named party to this case, and therefore could not be sanctioned for continuing to conduct signature verification for mail-in ballots. The Secretary could certainly advise and counsel local election officials to refrain from signature verification, but she lacks coercive power to force compliance. So, even if election officials

---

[7] *See* Ingram Dec. ¶ 3.

6

largely complied with such a request, some might not, potentially disrupting uniformity of mail-in ballot requirements across counties and other political subdivisions.[8]

Moreover, Plaintiffs would simply have the Secretary tell local officials "not to reject ballots based on a signature-mismatch until the legislature is able to add protections designed to prevent the disenfranchisement of mail-in voters." Dkt. 89 at 6. This does not specify what statutes are enjoined, or for how long. For instance, would local officials be expected to accept a ballot submitted in a carrier envelope that is not signed at all?[9] Or should they only accept ballots submitted in a signed carrier envelope (but regardless of whether the signature could have been executed by a person other than the voter)?[10] Does this impact the witness signature option?[11] What "protections designed to prevent the disenfranchisement of mail-in voters" need the legislature "add" before signature verification returns? And who decides when sufficient requirements have been "added"? Given these ambiguities, even if enforceable, such an injunction would impermissibly lack "specific standards to ensure its equal application." *Bush v. Gore*, 531 U.S. 98, 106 (2000) (per curiam). This not only presents equal protection problems of its own, it also undermines the State's interest in uniform election regulation.

**5.** As discussed in more detail below,[12] implementing an injunction will alter the status quo at a crucial moment in the election cycle. *See, e.g.*, *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) ("Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase."). Entirely eliminating

---

[8] Depending on the circumstances, a local election authority's actions might be reviewable in an election contest. *See* TEX. ELEC. CODE § 221.003(a) (requiring the tribunal "to ascertain whether the outcome of the contested election, as shown by the final canvass, is not the true outcome because . . . (2) an election officer . . . (C) engaged in other fraud or illegal conduct or made a mistake"). But that is a private cause of action brought by the losing candidate, not an enforcement action brought by the Secretary of State. *See id.* § 232.002 ("Any candidate in an election may contest the election.").
[9] *Id.* § 87.041(b)(1) ("A ballot may be accepted only if the carrier envelope certificate is properly executed . . .").
[10] *Id.* § 87.041(b)(2) ("A ballot may be accepted only if neither the voter's signature on the ballot application nor the signature on the carrier envelope certificate is determined to have been executed by a person other than the voter, unless signed by a witness . . .").
[11] *Id.*
[12] *Infra*, Part II(C).

signature verification less than two months before an election—when informational materials about this requirement have already been prepared and distributed—[13] will cause confusion and uncertainty among voters and election officials alike.[14] For the same reasons Plaintiffs' six-step procedure should not be imposed this close to an election, an order purporting to entirely eviscerate signature verification (particularly one as vague and overbroad as Plaintiffs propose) is unwarranted.

> **B.     Plaintiffs can show no benefit to justify stripping Texas's signature-verification requirement from the law—particularly at this point in the election cycle.**

Plaintiffs assert that a sweeping injunction against Texas's signature-verification requirement will "completely remove the risk of disenfranchisement" they allege that requirement causes. Dkt. 89 at 6. But Plaintiffs have not proven widespread disenfranchisement. Instead, they have provided evidence of two ballots rejected for failure to satisfy Texas's signature-verification requirement in the past—which neither Individual Plaintiff acted to remediate.[15]

Moreover, the Secretary has acted to assist voters in completing mail-in ballots, including by implementing some of the Court's recommendations in its order requesting briefing. *See* Dkt. 88 at 2-3 (outlining items on which the Secretary "could perhaps advise local officials."). For example, as to the Court's first suggestion, the Secretary issued Advisory 2020-20 last month, reminding local officials of how soon they could convene their Early Voting Ballot Board ("EVBB"). Ingram Dec. ¶ 6 and Ex. B. Earlier this year the Secretary provided mail-in ballot guidance in Advisory 2020-07, urging that notices of rejected ballots should be mailed to voters as soon as possible. Ingram Dec. ¶ 6 and Ex. C. As to Court's second suggestion, the EVBB Handbook that the Secretary's office maintains is replete with reminders that EVBBs and SVCs can go beyond the signatures on the carrier envelope and application for ballot by mail (ABBM) to consider any signature made by the voter within the past six

---

[13] Anderson Dec. ¶ 4-6; Ingram Dec. ¶ 5, 8, 10 (detailing steps that have already been taken to prepare, print, and distribute mail-in ballot related materials).
[14] Anderson Dec. ¶ 15; Ingram Dec. ¶ 4, 7, 11.
[15] *See* Dkt. 70 at 5, 6.

years and on file with the clerk or voter registrar.[16] All of these are consistent with the statutory directives in Election Code §§ 87.027(i) and 87.041(e), stressing the propriety of reviewing other signatures in the event a signature is questioned. The Secretary's office also issued a revised Dear Voter letter in early August 2020, providing additional guidance to voters regarding signature verification. Ingram Dec. ¶ 5 and Ex. A; Anderson Dec. ¶ 5.

Plaintiffs' showing cannot possibly justify a wholesale repudiation of the State's duly enacted signature-verification requirement for mail-in ballots—particularly in the weeks before an election in which the mail-in ballot process has already begun, and where the Secretary has worked diligently to ensure that voters and election officials alike are aware of its requirements.

### C. Additional reasons a wholesale injunction is inappropriate.

Federal Rule of Civil Procedure 65(d) requires that an injunction be "specific in terms; [and] describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained." This requires "that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *United States Steel Corp. v. United Mine Workers of Am.*, 519 F.2d 1236, 1246 n.20 (5th Cir. 1975). And, the scope of relief is limited to the legal violation found. "Thus, an injunction is vague if it does not comply with the specificity requirements in in Rule 65(d), and is overbroad if it is not 'narrowly tailor[ed] . . . to remedy the specific action which gives rise to the order' as determined by the substantive law at issue." *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (per curiam) (citation omitted).

Plaintiffs' proposed injunction does not satisfy either of these requirements. For the same reasons that entirely doing away with signature verification would exceed the injury alleged,[17] it would also be overbroad in violation of Rule 65(d). And, for the same reasons a wholesale injunction would

---

[16] Early Voting Ballot Board & Signature Verification Committee Handbook for Election Judges and Clerks (2020), Texas Secretary of State, *available at* https://www.sos.texas.gov/elections/forms/ballot-board-handbook.pdf at 4-5, 7, 16, 35, 37.
[17] *Supra*, Part I(A)(3).

9

undermine uniform election regulation across the state,[18] it would also be impermissibly vague in violation of Rule 65(d). *See, e.g.*, *Scott v. Schedler*, 826 F.3d at 211 (noting requirement that injunction be "sufficiently specific to give notice of its terms."). Courts have found that "catch-all" provisions violate this requirement, as they "do not clearly define the policies, procedures, and directives that" the enjoined party is "to maintain in force." *Id.* at 212, 213–14.

## II. Plaintiffs Cannot Show That Their Six-Step "Affirmation and Verification" Proposal Will Produce Any Benefit—Let Alone Any Benefit Sufficient to Justify Its Burdens.

In the alternative, Plaintiffs ask the Court to "order Defendant Secretary of State to advise" all early voting clerks (EVCs) to follow six so-called "notice and cure requirements." Dkt. 89 at 4-5. This proposed injunction is no more appropriate than the wholesale invalidation Plaintiffs propose.

### A. Plaintiffs' six-step procedure also unduly burdens the State, the Secretary, and local election officials.

**1.** Plaintiffs' proposed procedure does not protect election integrity or ballot security, nor does it provide any meaningful safeguard against voter fraud. As discussed already, Texas's signature-verification requirement is designed to detect and eliminate fraud, an interest multiple Supreme Court and federal appellate cases recognize.[19] And there is evidence that it does just that. *E.g.*, Anderson Dec. ¶ 2; Ingram Dec. ¶ 11. Plaintiffs' six-step proposal, on the other hand, does not account for these interests, and is vulnerable to fraud throughout. For instance, someone who intercepts an ABBM and fraudulently completes it as their own can simply provide their contact information (not the defrauded voter's) for verification purposes. If the ballot is flagged during signature verification, the fraudster is contacted via the information they have provided. Then, they need only assure the clerk that the ballot is legitimate and provide information that the clerk has no way to authenticate.[20] The ballot is counted.

---

[18] *Supra*, Part I(A)(4).
[19] *Supra*, Part I(A)(1) (collecting cases).
[20] While Plaintiffs' proposal provides the option to verify identity by submitting government-issued ID numbers, *see* Dkt. 89 at 3-4, ¶ 3, this information is not required. Someone can instead submit a "copy, scan, or picture" of a document such as a "utility bill," "bank statement," "lease or rental agreement," or "credit or debit card,"—all of which the EVC has no means to verify as authentic. *See* Dkt. 89 at 4, ¶ 3; Anderson Dec. ¶ 12; Ingram Dec. ¶ 12.

10

Plaintiffs' proposal also lacks the safeguards of EVBBs and SVCs. Texas law highly regulates these entities regarding who is eligible to serve, how they are selected, and how they carry out their signature-verification and other duties. *See, e.g.*, TEX. ELEC. CODE §§ 87.001 (EVBB creation), .002-.004 (EVBB composition),[21] .021-.041 (EVBB is responsible for receiving ballots from EVC and determining whether to accept each one), .027 (SVCs). Plaintiffs' proposal contains no such safeguards for the "affirmation and identity-verification" of ballots flagged during signature verification. Instead, in a situation where an EVC has concerns about the validity of a signature but the voter (or someone purporting to be the voter) provides an affirmation and verifying information, the EVC is forced to turn the ballot over to the EVBB or SVC to be counted, even if they suspect is fraudulent. Dkt. 89 at 3-4. This does not adequately protect the State's election-integrity interests.

**2.** The proposed injunction unduly restricts a local officials' ability to canvass the vote and thereby conflicts with the Election Code's carefully crafted post-election processes—and, consequently, the State's interest in the application of its laws. *See supra,* Part I(A)(2)-(3).

This causes additional practical burdens. The latest that a mail-in ballot may arrive is the sixth day after the election, unless that day is a Saturday, Sunday, or holiday, in which case the deadline is the next business day. *Id.* § 101.057.[22] Plaintiffs' proposal would, at best, give election officials mere hours after this deadline to conduct signature verification. Dkt. 89 at 3, ¶ 1 (requiring completion of signature verification for all mail-in ballots by 9 a.m. on the seventh day after election day). Though not an issue for the November 3, 2020, general election, it also does not account for a situation where the sixth day after election day falls on a Saturday, Sunday, or legal holiday, in which case election officials would have to review mail-in ballots before they were even *due*. TEX. ELEC. CODE § 101.057.

---

[21] County commissioners courts appoint presiding election judges for each regular county election precinct, and State law sets out detailed requirements for each appointed judge. TEX. ELEC. CODE § 32.001-.002. County commissioners use the same process to appoint presiding election judges and presiding EVBB judges. *Id.* § 87.002. The EVBB presiding judge then appoints at other members to the EVBB using the method for appointing precinct election clerks. *Id.* § 87.002(b).
[22] This applies to military voters using a federal postcard application. Certain other types of mail-in ballots must arrive sooner to be considered timely. *See, e.g.*, TEX. ELEC. CODE § 86.007 (a), (d), (d-1).

And even assuming election officials across all 254 counties could meet the signature-verification deadlines in Plaintiffs' proposal, canvassing under the Election Code occurs no earlier than the third day after the election and no later than either the eleventh day or the fourteenth day afterwards, depending on the type of election. TEX. ELEC. CODE §§ 67.003(b), (c).[23] Under Plaintiffs' proposal, "[t]he voter must provide the required affirmation and verifying information to the EVC by 5 p.m. on the 10th day after Election Day to prevent the EVBB or SVC from rejecting the ballot." Dkt. 89 at 4, ¶ 3. This will necessarily prevent the canvass from occurring until after business hours on the tenth day after the election, if any mail-in ballot was flagged during signature verification. *Id.* This vastly compresses the time local officials have to conduct their canvass—from 8-11 days to 1-3 days. While this delay may not always pose a problem, such as in a small county in an off-cycle election, it could impose significant burdens in a large jurisdiction or high-turnout election, where it may be more time-consuming for the canvassing authority to prepare for and complete the canvass.

This could also pose problems in counties where the canvass requires a meeting of the Commissioners Court. In Hays County, for example, the canvass is conducted by the Commissioners Court, which meets on Tuesdays. Anderson Dec. ¶ 13. Under Plaintiffs' proposal, for the 2020 general election, the Commissioners Court would be unable to conduct the canvass during a regular meeting, which could make it difficult to get a quorum to conduct the canvass before the deadline. Anderson Dec. ¶ 13.

**3.** Under plaintiffs' proposal, EVCs and their employees must bear the burden of grappling with identity-verification criteria that are unclear at best. Plaintiffs incorporate two avenues for voters to submit what Plaintiffs call "verifying information." Under the first, the individual may provide "all of the following identification numbers that have been issued to the voter: driver license number

---

[23] "In an election described by [§] 65.051(a-1), [this includes the 2020 general election] the time for the local canvass may be set not later than the 14th day after election day."

12

issued by the Department of Public Safety, Texas personal identification number issued by the Department of Public Safety, and the last four digits of Social Security Number." Dkt. 89 at 3-4, ¶ 3. Not all of this information is required on a voter registration application.[24] Thus, not all of this information will be on file with the EVC. Ingram Dec. ¶ 13; Anderson Dec. ¶ 11.

In the foreseeable event these datapoints cannot be verified (after all, not all are required to be on file with the EVC), Plaintiffs propose a remarkably vague and broad swath of potential items that can substitute for those government-issued numbers. These include items as disparate as "any government document with the voter's name" (but not address), "employee identification card," "identification card provided by a commercial establishment," or "identification documents issued by homeless shelters and other temporary or transitional facilities." Dkt. 89 at 4, ¶ 3. This would burden EVCs, who are not used to looking to such documents for identity-verification purposes. Anderson Dec. ¶ 12; Ingram Dec. ¶ 12. Such ambiguous criteria would further burden EVCs by forcing them to decide what documents qualify. Anderson Dec. ¶ 12. For example, perhaps a Costco membership card qualifies as an "identification card provided by a commercial establishment," and maybe an old public-school report card counts as "a government document with the voter's name"—but it is unclear based upon Plaintiffs' proposal. This could result in different application across counties, because it is difficult to predict all the documents individuals might attempt to offer as proof of identity. *See* Anderson Dec. ¶ 12.

Plaintiffs' proposal further requires "[t]he EVC must memorialize in writing receiving the required affirmation and verifying information if provided over the phone by a voter," though it does not provide any information regarding how this is to be accomplished. Dkt. 89 at 4, ¶ 5. In addition

---

[24] TEX. ELEC. CODE § 13.002(8) (requiring a voter registration application to contain, *inter alia*, the following information: "(A) the applicant's Texas driver's license number or the number of a personal identification card issued by the Department of Public Safety; (B) if the applicant has not been issued a number described by Paragraph (A), the last four digits of the applicant's social security number; or (C) a statement by the applicant that the applicant has not been issued a number described by Paragraph (A) or (B)").

13

to the manpower required to handle and document any number of verification attempts, the confusing criteria Plaintiffs propose would work an additional burden upon local election officials.

**4.** The proposal also burdens the Secretary of State's office. For example, the office must develop and provide training on any new voting procedure, and answer questions about that process. Ingram Dec. ¶ 7. This, of course, would include Plaintiffs' six-step procedure, if the Court were to require its implementation. Ingram Dec. ¶ 7, 9. Providing the necessary training and education on a new signature-verification process would be particularly burdensome for the Secretary's office if it had to take place between now and the 2020 general election, since the office is already operating at or near maximum capacity. Ingram Dec. ¶ 7, 9. Moreover, the Secretary has already finalized forms that she issues to assist with voting by mail and has provided those forms to local election officials for printing. Ingram Dec. ¶ 8-10. As a result, requiring changes to these forms at this point in the election cycle would impose an additional burden on the Secretary. Ingram Dec. ¶ 8-9.

**5.** The proposed injunction imposes unfair costs on local election officials. For example, EVCs will bear the costs—in terms of communications infrastructure and likely more significantly, in terms of employee time—of contacting voters by phone, text, and email, where that information has been provided. Dkt. 89 at 3, ¶ 2. EVCs will also be responsible for handling in-person, hand-delivered, mailed, emailed, faxed, and called-in verifications. Dkt. 89 at 3, ¶ 3. Again, while this may not be an excessive burden in all cases, requiring EVCs to dedicate manpower to these tasks, especially in elections with a high volume of mail-in ballots, requires additional work. Anderson Dec. ¶ 14, 16. This could be especially burdensome in the context of the 2020 general election, given the anticipated increase in mail-in ballots and strain on local election officials' resources. Anderson Dec. ¶ 3, 15; Ingram Dec. ¶ 4.

Though imprecisely worded, Plaintiffs' proposal also appears to require additional meetings of the EVBB and SVC. In addition to requiring meetings on election day or the day after, the EVBB

and SVC must also meet between 7 p.m. on the sixth day after election day and 9 a.m. on the seventh day after election day. Dkt. 89 at 3, ¶ 1. And they must meet again on the tenth day after election day. *See* Dkt. 89 at 4, ¶ 3 (requiring affirmation and verifying information to be submitted to EVC "on the 10th day after Election Day to prevent the EVBB or SVC from rejecting the ballot.") This will impose additional burdens on local election officials, particularly given the strain on resources caused by other challenges of the upcoming election. Anderson Dec. ¶ 3, 14; *see* Ingram Dec. ¶ 4.

**6.** Plaintiffs are attempting to force all election authorities in the State to comply with an injunction they had no part in litigating. More specifically, 253 of Texas's 254 counties, and countless localities other than the City of McAllen, are not parties to this suit and have had no opportunity to be heard on Plaintiffs' proposed process—a process which would impact their work, their budgets, their employees and volunteers, their operations, and their day-to-day responsibilities. *See* Anderson Dec. ¶ 17. Plaintiffs have made no showing that those authorities are somehow agents of the Secretary of State or any other defendants, and therefore, it is wrong to expect them to comport with a ruling in which they had no notice nor opportunity to be heard.[25]

**7.** As noted above, the Secretary lacks authority to coerce compliance by local election officials.[26] Thus, for the same reasons Plaintiffs' proposed sweeping injunction would undermine uniform regulation of elections across the State, so, too, would their six-step procedure.

**8.** Plaintiffs are not entitled to an injunction that would be implemented in the less than two months between completion of remedial briefing in this case[27] and the November 3, 2020 election. As all are well-aware, the COVID-19 pandemic has added layers of uncertainty to the operation of

---

[25] This dilemma that Plaintiffs face—that the Secretary cannot compel a county or other local authority to comply with the Court's injunction—demonstrates the fundamental problem with Plaintiffs' claims to begin with: Plaintiffs lack standing to sue the Secretary of State. As discussed extensively in the Secretary's filings to date, EVBBs (and, where applicable, SVCs) implement the provisions of the Texas Election Code related to mail-in ballots, not the Secretary of State. *See* TEX. ELEC. CODE §§ 87.021-.041, 87.061. Recently, the Fifth Circuit confirmed that Plaintiffs cannot sue the Secretary for things she does not do. *See City of Austin v. Paxton*, 943 F.3d 993, 1002–03 (5th Cir. 2019).
[26] *Supra*, Part I(A)(4); *see also, e.g.*, TEX. ELEC. CODE §§ 31.003, 31.004(a) & (b), 31.005.
[27] *See* Dkt. 88 (setting September 4, 2020, as final briefing deadline on summary-judgment remedy).

the upcoming elections, and election officials are already stretched thin to meet the challenges of voting during a pandemic. Anderson Dec. ¶ 2-9, 17; Ingram Dec. ¶ 4. Under these circumstances, it is deeply unfair to impose an additional burden, especially when Plaintiffs did not pursue any expedited injunctive relief. This lawsuit was filed in August 2019. Dkt. 1. After discovery, the parties filed cross-motions for summary judgment. *See, e.g.*, Dkts. 64-66, 70, 73-77, 79, 80. Yet Plaintiffs have taken no action to demonstrate the urgency of their need for injunctive relief. In fact, in more than a year, Plaintiffs did not even *propose a specific remedy*—the Court had to ask them to do so. *See* Dkt. 88. As the Court noted, "in light of the fact that the upcoming general election is less than three months away . . . there very well may be good faith reasons as to why certain forms of relief may be impossible to implement in advance the November 2020 elections." Dkt. 88 at 3. Among these: it would not be equitable to foist changes to mail-in voting upon all election officials and voters across Texas, in the middle of a global pandemic, when Plaintiffs did not move with the haste or the diligence that such an injunction would demand.

The specifics of Plaintiffs' eleventh-hour proposal demonstrate as much. Plaintiffs ask that the Court order the Secretary to "prescribe the Notice of Provisional Rejection form as described in the requirements above, and . . . include information notifying voters of the signature comparison procedure in the Dear Voter Letter as well as the signature sections of the Application for Ballot by Mail (ABBM) and carrier envelope." Dkt. 89 at 5. Of course, in preparation for the 2020 general election, these materials were prepared, finalized, printed, and distributed beginning months ago. Anderson Dec. ¶ 4-6; Ingram Dec. ¶ 8, 10. Counties have already distributed ABBMs to voters and have received completed ABBMs back (in some cases, as early as January of this year). Anderson Dec. ¶ 4; Ingram Dec. ¶ 10; *see also* TEX. ELEC. CODE § 86.0015. Mail-in ballot materials—including carrier envelopes, ballot envelopes, and copies of the recently updated Dear Voter letter—have been already been printed by local election officials. *See* Anderson Dec. ¶ 6; Ingram Dec. ¶ 5. In early August, the

Secretary of State's office issued a new Dear Voter, which contains new language about signature verification. Ingram Dec. ¶ 5 and Ex. A; Anderson Dec. ¶ 5. Local election officials have begun printing these letters for distribution to voters. Anderson Dec. ¶ 6; Ingram Dec. ¶ 5. Mandating changes to these materials after they have been distributed would impose additional burdens and could create the possibility of error or inconsistency, particularly as the election continues to draw near. Anderson Dec. ¶ 15; Ingram Dec. ¶ 4, 7, 11.[28]

### B. The burdens outweigh any benefit of Plaintiffs' six-step procedure.

The burdens outlined above cannot be justified by any potential benefit of Plaintiffs' proposed six-step procedure. In fact, that procedure does not even cure the fault Plaintiffs find with Texas's existing law. Currently, if a mail-in ballot is rejected under the signature-verification requirement, the EVBB presiding judge must deliver written notice to the voter no later than the tenth day after the election. TEX. ELEC. CODE § 87.0431. Existing remedial options include contacting a county election officer, who "may petition a district court for injunctive or other relief as the court determines appropriate," *id.* § 87.127(a), or contacting an aggrieved candidate, who may pursue an election contest.[29] Plaintiffs complain that notice might not reach the voter in time to do any of these things. *See* Compl. But even under Plaintiffs' proposal, this remains true.

Not all voters have a telephone number or email address, and not all voters will choose to provide the same on their ABBM. *See* Anderson Dec. ¶ 10. There is no statutory requirement that voters who have this information provide it, nor would Plaintiffs' proposal compel them to do so. *See* Dkt. 89. Thus, depending upon how long the mail takes to reach a voter, it is possible under Plaintiffs' proposal that a voter whose ballot is flagged during signature verification will not receive notice until after the tenth day post-election—the deadline to submit the "affirmation and verifying information"

---

[28] *See also infra*, Part II(C).
[29] TEX. ELEC. CODE §§ 221.001-243.013; *Reese*, 80 S.W.3d at 660–62.

17

Plaintiffs would require. *See id.* This is also possible for voters who provide a telephone number and/or email on their ABBM. After all, some people rarely check email; some people turn off or ignore their phones for various reasons; and some people decline calls, emails, and messages from unknown senders. Thus, to the extent Texas law does not provide a constitutionally sufficient notice and cure opportunity—an allegation the Secretary disputes—neither does Plaintiffs' proposal. Moreover, as explained above, the Secretary has taken steps to assist mail-in voters, including some of the Court's recommendations in its order requesting briefing.[30]

Given the complete lack of evidence that Plaintiffs' six-step proposal will redress any injury alleged, the significant burdens of changing the mail-in ballot rules after the game has begun, and the steps the Secretary has taken to assist those voting by mail, Plaintiffs' proposed injunction should be rejected because they have not shown that any potential benefit outweighs the unquestionable burdens it would impose.

## C. Injunctive relief is improper at this point in the election cycle.

The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). For example, in *Purcell v. Gonzalez*, 549 U.S. at 4, the Supreme Court relied on "considerations specific to election cases" to caution against federal court interference with impending elections. It explained that "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase." *Id.* at 4–5. To account for those risks, a federal court considering a request to enjoin state election laws before an impending election must consider potential conflicts with the timing of elections and appellate proceedings. *See id.* Similarly, the Fifth Circuit declined to grant immediate relief on a Voting Rights Act claim even though several months remained before the

---

[30] *Supra*, Part I(B).

general election. *See Veasey v. Abbott*, 830 F.3d 216, 243 (5th Cir. 2016) (en banc) (instructing the district court in July 2016 to "take the requisite time to reevaluate the evidence" and fashion a remedy to apply after the November 2016 election).

Because the mail-in balloting process is already underway, injunctive relief is inappropriate.

## CONCLUSION

"[I]t's the Plaintiffs' burden to prove their entitlement to an injunction, not the Defendants' burden to prove the opposite." *Valentine v. Collier*, 956 F.3d 797, 802, n.1 (5th Cir. 2020). Because Plaintiffs have not carried that burden here, their request for an injunction—especially as it applies to the rapidly approaching November 3, 2020 election—should be denied.

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

/s/ Anne Marie Mackin
ANNE MARIE MACKIN
Texas Bar No. 24078898
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov

**ATTORNEYS FOR DEFENDANT
TEXAS SECRETARY OF STATE**

**CERTIFICATE OF SERVICE**

  I certify that that on August 31, 2020, this document was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

              <u>*/s/ Anne Marie Mackin*</u>
              ANNE MARIE MACKIN
              Assistant Attorney General