UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

DR. GEORGE RICHARDSON, ROSALIE §
WEISFELD, AUSTIN JUSTICE §
COALITION, COALITION OF TEXANS §
WITH DISABILITIES, MOVE TEXAS §
CIVIC FUND, LEAGUE OF WOMEN §
VOTERS OF TEXAS, and AMERICAN GI §
FORUM OF TEXAS, INC., §
§
§
*Plaintiffs* §
§
v. § Civil Case No. 5:19-cv-00963
§
TEXAS SECRETARY OF STATE, TRUDY §
HANCOCK, in her official capacity as §
BRAZOS COUNTY ELECTIONS §
ADMINISTRATOR, and PERLA LARA in §
her official capacity as CITY OF §
MCALLEN, TEXAS SECRETARY, §
§
*Defendants*. §

**PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' COURT-ORDERED
SUPPLEMENTAL BRIEF**

1

Plaintiffs file the following Reply in support of their court-ordered Supplemental Brief.

## I. AN INJUNCTION OF THE ENTIRE SIGNATURE COMPARISON PROCEDURE IS MERITED IF A NARROWER REMEDY IS NOT POSSIBLE

In Plaintiffs' Supplemental Brief in response to the Court's August 21st Order (Supplemental Brief), Plaintiffs recognized that while remedial measures short of a complete injunction are available—including the proposals set forth in Plaintiffs' Supplemental Brief—this Court should enjoin implementation of the signature comparison procedure in Texas Election Code Sections 87.041(b)(2), (e) and (f) and 87.027 entirely in the event that this Court determines a narrower remedy would be impossible, impractical, or overly burdensome.[1] In response, Defendant SOS argues that such an injunction "would impose burdens that far outweigh any benefit Plaintiffs can show."[2] Defendant SOS's arguments fail for several reasons.

### A. Texas's Interest in Preventing Voter Fraud Is Not Served By the Current Signature Comparison Procedure

Defendant SOS first argues that "[d]oing away with signature verification undermines the State's interest in the confidence in the integrity of our electoral processes."[3] However, Defendant SOS again fails to demonstrate that the existing signature comparison procedure furthers her stated interest in preserving electoral integrity, while ignoring that the use of unconstitutional voting processes undermines the very integrity Defendant SOS purports to protect.

As a preliminary matter—and as Plaintiffs have made clear in multiple submissions to this Court[4]—Plaintiffs do not dispute that the prevention of voter fraud may be a legitimate government interest. Instead, Plaintiffs object based on the fact that Defendant SOS has repeatedly failed to

---

[1] Dkt. 89 at 5.
[2] Dkt. 93 at 2.
[3] Dkt. 93 at 3 (internal quotations omitted).
[4] *See, e.g.*, Dkt. 74 at 45.

demonstrate that the current signature comparison procedure actually furthers this interest. As Plaintiffs have previously argued,[5] to avoid court-ordered relief on Plaintiffs' constitutional claims Defendants must do more than merely raise the specter of voter fraud—rather, they must demonstrate that any burden at issue is relevant to and actually furthers this interest.

Beyond citing cases that only generally describe a governmental interest in preventing voter fraud,[6] Defendant SOS points only to two statements made in supporting affidavits to support her interest in preventing fraud in mail-in-voting. The first statement, made by Hays County Elections Administrator Jennifer Anderson, states that on several occasions, Ms. Anderson has spoken with voters whose mail-in ballots have been rejected for alleged signature mismatch, and that "[e]ach time this has happened, in my experience, the voter has recognized that the signature on the [application for ballot by mail] or the carrier envelope was not, in fact, their signature."[7] The second statement, made by Keith Ingram, Director of Elections for Defendant SOS, states that although "[t]he number of mail ballots rejected because the early voting ballot board determined the signatures were not made by the same person is relatively small . . . signature comparison is an important deterrent for mail ballot fraud and ballot harvesting."[8]

These passing statements, which allude only generally to the risk of fraud in mail-in voting, fall far short of demonstrating any purported "burden" to Defendant SOS and do not comply with this Court's order that Defendants provide evidence of "any *specific* burdens" of a proposed remedy.[9] As explained in detail in footnote 46 of this Reply, Ms. Anderson's statement does not make clear whether the voters she spoke with believed, upon review of their application for ballot

---

[5] *See id.*
[6] *See* Dkt. 93 at 3.
[7] *See infra* n. 45; Dkt. 93 at Exhibit 1, ¶ 2.
[8] Dkt. 93 at Exhibit 2, ¶ 11.
[9] Dkt. 88 at 4 (emphasis in original).

by mail (ABBM) and carrier envelope, that their ballot had been signed by a different voter, or, alternatively, whether they merely agreed that they did not use their signatures on one or both of the documents.[10] Mr. Ingram's affidavit provides even less support, making only the conclusory statement that the current procedures are "an important deterrent" for fraud.[11] Without providing evidence that the existing signature comparison procedures actually further that interest, Defendant SOS fails to demonstrate any burden at all, let alone one sufficient to overcome Plaintiffs' arguments.

Despite ready access to vote-by-mail data and regular contact with local election officials across Texas, Defendant SOS points to no specific evidence that the signature comparison procedure has ever prevented mail-in ballot fraud. Defendant SOS collects a wide array of data describing the prevalence and use of mail-in ballots in Texas, including the number of mail-in ballots rejected in Texas for alleged mismatched signatures in a given election.[12] Further, Mr. Ingram—who was also deposed in this action as a fact witness—testified in his deposition that he and the Secretary of State's Office are regularly in contact with local election officials regarding "all kinds of questions" about Texas election law.[13]

Defendant SOS has had ample opportunity to support her argument that the current signature comparison procedure furthers an interest in preventing voter fraud. Having failed to do so, merely raising the specter of voter fraud is not a reason to deny injunctive relief necessary to cure Plaintiffs' constitutional injury.

---

[10] *See infra* n. 45.
[11] Dkt. 93 at Exhibit 2, ¶ 11.
[12] Dkt. 65, Exhibit 16, ¶ 2 (Declaration of Chris Rainbolt, describing data collected by the United States Election Assistance Commission received by Plaintiffs in response to a Public Information Act Request sent to Defendant SOS on June 25, 2019).
[13] Dkt. 84 at 31–32, Ingram Dep. 26:21–27:24.

**B. Texas's Interest in Enforcing "Duly-Enacted Laws" Does Not Protect Unconstitutional Laws and Procedures.**

Defendant SOS next argues that an injunction "burdens the State's interest in the application of its duly-enacted laws."[14] But neither the State of Texas nor Defendant SOS have any interest in enforcing unconstitutional procedures that purport to implement a statute, even when otherwise duly-enacted. Under Defendant SOS's interpretation of the State's interest, no law passed by the Texas Legislature could fail to pass constitutional muster. This is clearly not the law.

In furtherance of this argument, Defendant SOS argues that "wholly eviscerating Texas's signature-verification requirement would deprive the State and the public of implementation of the legislature's decisions—*even in circumstances where Plaintiffs do not contend those decisions operate unlawfully.*"[15] Plaintiffs argue that the Texas Election Code provisions at issue are constitutionally sound *if they include reasonable notice and an opportunity to cure an improper rejection*. Without these safeguards guaranteed under the Constitution, these Texas Election Code provisions can never operate lawfully.[16]

The narrowly tailored detailed proposal by Plaintiffs, as well as other remedy that meets Plaintiffs' five minimum safeguards, would operate as a constitutionally-sound implementation of the signature comparison provisions. As described *infra*, however, Defendant SOS also takes issue with Plaintiffs detailed proposal, as they do with any proposal to modify the existing signature comparison procedure. Defendant SOS cannot be permitted to argue both that a narrower remedy

---

[14] Dkt. 93 at 4.

[15] Dkt. 93 at 4 (emphasis added).

[16] Plaintiffs have already responded to Defendant SOS's argument and have shown that the law is facially unconstitutional as well as unconstitutional as-applied. Dkt. 80 at 35–38.

is overly burdensome and that a wholesale injunction too broad, thereby depriving the Court of any ability to prevent unconstitutional implementation of a duly-enacted law.[17]

### C.   An Injunction of the Entire Signature Comparison Procedure is Merited Notwithstanding the Secretary of State's Other Arguments.

Finally, in contesting the appropriateness of an injunction of the signature comparison procedure, Defendant SOS argues in turn that an injunction of the signature comparison procedure would undermine uniform election regulation; that changing the signature comparison procedure at this time would violate the principle set forth in *Purcell v. Gonzalez*, 549 U.S. 1 (2006); and that Plaintiffs have shown no benefit to their proposed injunction. As explained here and in Section II of this Reply, each of these arguments is unconvincing.

**First**, Plaintiffs agree that Texas has an interest in uniform election regulation, as is clear from Plaintiffs' Equal Protection claim in this action.[18] But a wholesale injunction furthers this interest rather than hinders it. The record is clear that Texas's signature comparison procedure in its current form already fails to provide uniform standards for signature comparison and is unpredictably and inconsistently applied.[19] Further, Defendant SOS provides no evidence to support her claim that any local Texas election authorities would fail to abide by an order from this Court enjoining the enforcement of the signature comparison procedure, and an accompanying advisory from the Secretary of State. Even if this unlikely event were to occur, as described in more detail below, Defendant SOS has the power "to order [a] person to correct the offending conduct" and to "seek enforcement of the order by a temporary restraining order or a writ of injunction or mandamus obtained through the attorney general." Tex. Elec. Code § 31.005.

---

[17] For the same reason, Defendant SOS's argument that "a wholesale injunction sweeps far more broadly than Plaintiffs' alleged injury," *see* Dkt. 93 at 5, fails.
[18] *See* Dkt. 1 at ¶¶ 71–74.
[19] Dkt. 65 at 39–41 (explaining the record on Texas's ad hoc and arbitrary procedures).

**Second**, as discussed in substantially greater detail below, an injunction of the entire signature comparison procedure for the 2020 General Election does not run afoul of *Purcell v. Gonzalez*. In short, if the Court believes a complete injunction is the only remedy available for the 2020 General Election, such a remedy would satisfy *Purcell* because, as Plaintiffs argued in their Supplemental Brief, an injunction of the entire signature comparison procedure

> would impose the least burden on elections officials, including local Defendants, tasked with implementing the signature comparison procedure because it would require them to stop implementing the procedure entirely.[20]

Additionally, since signature comparison procedures occur after a voter submits a mail ballot, voters will not be affected by the lack of implementation. A complete injunction therefore would not substantially interfere with the State's election preparations and would cause no voter confusion whatsoever—meaning it would not run afoul of *Purcell*. Furthermore, Defendant SOS ignores that Plaintiffs' proposed relief asks for an order enjoining the signature comparison procedure only in the event that a narrower remedy is impossible, impractical, or overly burdensome to put in place.[21]

**Third** and finally, Defendant SOS claims that "at most, [Plaintiffs] have shown that two ballots were rejected for failure to satisfy Texas's signature-verification requirement" and "have not introduced any competent evidence of similar injuries suffered by voters throughout the State." Dkt. 93 at 5. This argument ignores the record evidence. While Plaintiffs have explicitly identified by name only Dr. Richardson and Ms. Weisfeld as having their ballots incorrectly rejected in past elections, they have also shown that thousands of Texas voters had their ballots rejected for signature mismatches in the 2016 and 2018 General Elections[22] and submitted undisputed expert

---

[20] Dkt. 89 at 6.
[21] Dkt. 89 at 5.
[22] *See* Dkt. 80 Exs. 82–83 (U.S. Election Assistance Commission data).

testimony as to the extremely high error rate to be expected under Texas's signature comparison procedure.[23]   Defendant SOS also ignores the fact that there is another lawsuit pending in the Southern District of Texas, with her as a defendant, explicitly naming several additional voters who also had their ballots incorrectly rejected for perceived signature mismatches. *See Flores et al. v. Hughs et al.*, 7:18-cv-00113 (S.D. Tex. 2019), Dkt. 58 (*Flores* Plaintiffs' Second Amended Complaint); Dkt. 94 at 2 (*Flores* Plaintiffs' Second Amended Motion for Summary Judgment and exhibits referenced therein).

Numerous courts have found this sort of evidence sufficient to support relief. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1320–21 (11th Cir. 2019) (having "no trouble finding that Florida's [vote-by-mail signature-matching] scheme imposes at least a serious burden on the right to vote" based on evidence that the "inherent nature of signatures" poses a "risk that . . . ballots will incorrectly be rejected for signature mismatch" and several sworn declarations from voters whose ballots were erroneously rejected); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 218–20 (D.N.H. 2018) (enjoining signature comparison procedure on basis of three named plaintiffs and finding that even mild risk of erroneous signature comparison "translate[s] to the disenfranchisement of dozens, if not hundreds, of otherwise qualified voters, election after election" and that "[g]iven how close some races are . . . that is a risk with real consequences.").

Plaintiffs have therefore submitted clear evidence sufficient to demonstrate the benefit of their proposed injunction: to address the severe burden of disenfranchisement suffered by Texas mail-in voters. As the Supreme Court has recognized, "[n]o right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). It is therefore a "basic truth

---

[23] *See* Dkt 65 at 12–16 & nn. 26–48; *see also* Dkt. 74 at 31–33.

that even one disenfranchised voter—let alone several thousand—is too many." *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014).

Ultimately, Defendant SOS's arguments against Plaintiffs' proposed injunction fail to demonstrate a burden sufficient to overcome the constitutional injury caused by the current signature comparison procedure. In the event that the Court determines that a narrowly tailored remedy is impossible, impractical, or overly burdensome, this Court should enjoin usage of the signature comparison procedure entirely, including the specific provisions in Texas Election Code Sections 87.041(b), (e), and (f) and 87.027.

## II.   PLAINTIFFS' PROPOSED NARROW REMEDY STRIKES THE APPROPRIATE BALANCE BETWEEN THE EXISTING SIGNATURE-MATCHING PROCESS AND A CONSTITUTIONALLY REQUIRED PROCESS.

In their Supplemental Brief to the Court, Plaintiffs outlined the five minimum safeguards they believe that any ballot rejection procedure must meet to comply with the Constitution. *See* Dkt. 89 at 2–3. These Constitutional minimums were informed by courts around the country that have implemented specific remedial measures to cure states' unconstitutional signature matching procedures. *See, e.g.*, *Democratic Executive Comm. of Florida v. Lee*, 915 F.3d 1312, 1321 (11th Cir. 2019); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1341–42 (N.D. Ga. 2018). Plaintiffs' proposed narrow notice and cure procedure is just one example of a framework that could satisfy these minimum constitutional requirements, and therefore, the specific terms of the injunction could be modified to some degree to account for particularities in the Texas Election Code. Plaintiffs would not object to a different procedure ordered by the Court that complies with these five minimum safeguards. In their responsive briefing, however, Defendants fail to address most of these five minimum safeguards directly and, further, do not propose specific alternatives or modifications to Plaintiffs' detailed proposal.

**A.  The Proposed Notice and Cure Procedure Imposes No Significant Burden on Local or State Election Officials.**

It is important to note at the outset that while the issue of improper ballot rejections is a significant problem that likely disenfranchises thousands of Texas voters in every major election, that number is distributed among 254 independent Texas counties, making the burden of providing a notice and cure opportunity to voters extremely low for any particular Early Voting Clerk (EVC).

*See Democratic Exec. Comm. of Fla v. Detzner*, 347 F. Supp. 3d 1017, 1032 (N.D. Fla. 2018)

> ("This is therefore a limited order providing limited relief for a limited number of affected voters. Across 45 of Florida's 67 counties, there are just over 4,000 rejected ballots for mismatched signatures. The county supervisors of elections and canvassing boards are surely up to the task.").[24]

Indeed, while Defendant SOS provides an unsworn declaration from the Hays County Elections Administrator indicating that Hays County has 137,000 registered voters, notably missing from that declaration is the number of ballots that Hays County has rejected for an alleged signature mismatch in the past or that it expects it might reject in the future, likely because this would make obvious how little would actually be required of this particular county to comply with the proposed remedial measures.[25] Furthermore, neither local Defendant identified any particular

---

[24] U.S. Election Assistance Commission data shows that during the 2016 General Election Texas counties reported rejecting 1,567 mail-in ballots for perceived signature mismatches as well as 367 mail-in ballots submitted under the Uniformed & Overseas Citizens Absentee Voting Act for signature issues more broadly, and 1,873 and 440 mail-in ballots for the same reasons respectively in 2018 General Election. *See* Dkt. 65 Ex. 49, Rainbolt Dec. ¶ 2; Dkt. 80 Exs. 82–83 (2016 EAC data columns OU (non-matching signature) and ID (UOVACA-problem with signature), 2018 EAC data columns JC (non-matching signature) and HC (UOVACA-problem with signature). This data shows that even the largest counties in Texas, like Harris County (row 108), rejected only 126 ballots for signature mismatches in 2016 and 112 in 2018. Most counties rejected only a handful. Finally, Plaintiffs note that they mistakenly doubled the 2018 EAC numbers in the Rainbolt declaration at Dkt. 65, Ex. 49. The correct numbers are displayed here and may be confirmed in the EAC data itself, previously provided to the Court as raw data at Dkt. 80 Ex. 82 (2018 EAC data, column JC).

[25] *See* Anderson Dec., Dkt 93-1. Hays County did not provide the number of ballot rejections in response to EAVS (provided by the SOS to the federal government) in either the 2016 or 2018 General Elections. *See* Dkt. 80 Exs. 82–83 (2016 EAC data, row 112, column JC).

burden placed on them in their responses to Plaintiffs' supplemental briefing, instead choosing to again raise the exact same argument—that neither local Defendant is a proper party—that each made in their motions to dismiss and their motions for summary judgment.[26] As laid out below, Plaintiffs' detailed proposal imposes no significant burden on local or State election officials.

**First**, the EVC of each county is responsible—both under the Texas Election Code and in reality, as testified to by local Defendants—for handling virtually every aspect of early voting within their respective jurisdictions, including managing the Early Voting Ballot Board (EVBB) by providing EVBB committee members with the EVBB Handbook, a space to convene, and all the office supplies necessary to carry out their tasks; providing assistance whenever the EVBB needs help in making a signature determination (for example, by providing more signatures for review); and mailing out rejection notices for the EVBB.[27] They regularly correspond with voters for a multitude of reasons related to the mail-in ballot process—via e-mail, text messages, phone calls, and/or physical mail.[28] As common sense would dictate and fact witnesses testified, the cost

---

[26] *See generally* Dkts. 91, 92.

[27] *See* Dkt. 74 at 27–28 & nn. 81–84.

[28] *Id.* Defendant SOS additionally contends that Plaintiffs' detailed proposal actually would not prevent the harm caused to voters by the signature comparison procedure that Plaintiffs allege because some voters still might not get notice in time to cure an improper rejection. Dkt. 93 at 17–18. This argument is premised on the fact that some voters may choose not to provide an e-mail address or phone number on their application, and therefore, only the mail option would be available, and that some voters may not check their mail or might ignore phone calls and e-mails. *Id.* Ignoring the wild speculation on voter behavior here, Plaintiffs' detailed proposal is specially crafted to maximize the opportunity to voters in these situations within the limited constraints of an election, engaging methods to provide the fastest possible notice, and allowing a voter to cure up to the day before canvassing. The record in this case is clear that if these procedures had been in place, Individual Plaintiffs actually would have received notice and actually would have taken steps to cure the improper rejection of their ballots. *See, e.g.*, Dkt. 65, Ex 27(Weisfeld ABBM listing e-mail and phone); Dkt 65 at 18 & nn.64-68; Dkt 65 at 17 & nn.56-61. Additionally, in the alternative, Plaintiffs believe that the canvass deadline and the deadline to mail notices of rejection can be extended to provide voters more time to cure, which would directly address Defendant SOS's argument.

of such communication is negligible.[29] Reaching out to voters to communicate a notice of rejection and the opportunity to cure would not therefore work a substantial disturbance in the normal day-to-day operations of local county EVCs. Additionally, the current Notice of Rejection forms already advise voters to contact their EVCs to find out what option they have to vote, and the current version of the ABBM already informs voters that election officials may contact them using email and phone if they have any questions.[30]

**Second**, Plaintiffs' proposal that the EVBB meet three times—once on election day or the day after, once on the sixth or seventh day after election day, and once on the tenth day after election day—will not "impose additional burdens on local election officials" by requiring "additional meetings of" the EVBB, as Defendant SOS claims.[31] Rather, Defendant SOS's own guidance to the EVBB states that the EVBB "generally meets twice during an election" at primarily the same times Plaintiffs propose they meet the first two times.[32] A single third meeting on the tenth day after the election therefore does not require additional "meetings," plural, beyond what Defendant SOS already recommends, nor is so burdensome as to substantially disrupt the State's election proceedings. In fact, Defendant Brazos EA testified that the Brazos County EVBB typically meets three times every election already—the Saturday before Election Day, on Election Day, and six days after Election Day.[33] Accommodating Plaintiffs' suggested framework would simply require moving one of those meetings.

---

[29] Dkt. 65 at 35–36 & nn. 145–48, 43 & nn. 162–163.

[30] *See* Dkt. 65 Ex. 3 (ABBM), Ex. 5 at SOS_000740 (Notice of Rejection form distributed to election officials in February 2020).

[31] Dkt. 93 at 14–15.

[32] *See* Dkt. 65, Ex. 4 at SOS_000438–39 (EVBB should meet on Election Day or after the last day to vote early by person appearance and then once more at least 6 days after Election Day).

[33] *See* Dkt. 74–1, Ex. 77 at 91:10–92:5.

Defendant SOS's criticism of Plaintiffs' suggested requirement that all ballots must be reviewed by the EVBB by 9 a.m. on the seventh day after the election, in order to provide some form of notice and an opportunity to cure an improperly rejected ballot, is similarly misplaced. This provision is crafted to give the greatest opportunity to challenge an improperly rejected ballot, recognizing that military and overseas ballots are still timely received up to 5 p.m. on the sixth day after Election Day and that the Court may not be inclined to extend the canvassing date beyond the current 11 or 14 day deadlines imposed by the Texas Election Code.

Finally, Defendant SOS's concerns that an EVBB meeting on the sixth or seventh day would give "mere hours" for the EVBB to conduct the signature comparison process are exaggerated. The vast majority of ballots could be reviewed well in advance of this day, since all regular mail-in ballots are due to be received, at the latest, on Election Day or by 5 p.m. the day after the election, and other Federal Post Card Applicant ballots may be received earlier than the sixth day. The Hays County Election Administrator's declaration provided by Defendant SOS even indicates that at least Hays County already plans to review these overseas ballots on that timeline, currently planning its canvass on the seventh day after the election.[34]  Requiring the EVBB to finish its work in reviewing ballots immediately after the deadline—work that is already mandatory under the Election Code—is not a significant burden.

**Third**, despite Defendant SOS's claims that the proposal burdens Defendant SOS's office because she would have to provide guidance to localities and update forms,[35] Defendant SOS regularly releases updated forms and advisories closer in proximity to elections than Texas currently is to the 2020 General Election. For example, Defendant SOS updated the Dear Voter

---

[34] Dkt. 93-1 at ¶ 13.
[35] Dkt. 93 at 14.

letter only last month, in August 2020, to notify mail-in voters of the signature comparison procedure.[36] Defendant SOS also released Election Advisory No. 2020-20 on July 2, 2020, which provides guidance on counting mail ballots, only twelve days before the July 14th Primary Runoff Election.[37] And finally, Defendant SOS issued Advisory 2020-07 on February 11, 2020, only a few days before early voting began for the 2020 Primary Election.[38] The advisory recommended that county election officials "mail notices of rejected ballots to affected voters as soon as possible" and included a revised Notice of Rejected Ballot that instructs voters to contact their EVC if they believe their mail-in ballot was rejected in error.[39] This advisory and updated Notice of Rejected Ballot are only a step removed from Plaintiffs' suggested actions and Notice of Provisional Rejection.

Furthermore, as seen with respect to the above February advisory, Defendant SOS regularly distributes instructions and forms by e-mail list-serv.[40] The Brazos County Elections Administrator and the McAllen City Secretary testified that they receive all of Defendant SOS's election advisories by e-mail.[41] And local election officials are ready to implement any updates immediately as they come in, as testified to by both the Brazos County Elections Administrator and the McAllen City Secretary—even when Defendant SOS issues those updates as late as after the start of early voting.[42]

---

[36] *See* Dkt. 93-2, Ingram Dec. ¶ 5 (Defendant SOS's Elections Division issued a revised version of the Dear Voter letter in August 2020); *id.* Ex. 2 ¶ 1 (copy of revised Dear Voter letter notifying mail-in voters of the signature comparison procedure).

[37] Dkt. 93-3, Ex. B.

[38] Dkt. 65, Ex. 5.

[39] *Id*.

[40] *Id.*

[41] Dkt. 84 at 484, Hancock Dep. 81:7–18; *id.* at 1399–1400, McAllen 30(b)(6) Dep. 38:21–39:12.

[42] *See, e.g.*, *id.* at 484, Hancock Dep. 81:7–11 ("Q: And as the Brazos County elections administrator, are you obligated to act in accordance with any election advisory from the Secretary of State? A: Yes."); *id.* at 1401–1402, McAllen 30(b)(6) Dep. 40:9–41:5 (discussing how McAllen

As this record demonstrates, having Defendant SOS produce a Provisional Notice of Rejection form (which Plaintiffs would gladly work with Defendant SOS to create) and distributing it to EVCs via e-mail would not be an onerous burden nor would it substantially disturb the State's ongoing processes, preparation, or normal proceedings.[43]

**Fourth**, in her response, Defendant SOS challenges various aspects of Plaintiffs' detailed proposal as not sufficiently protecting against voter fraud and undermining confidence in the electoral process.[44] However, it is plainly apparent that the proposed remedial procedures are better suited to protect against the extremely unusual case[45] of voter fraud compared to existing signature

---

once received an email from Defendant SOS updating certain election forms and "it was after the fact that we had already had our trainings for judges and alternate judges" but that McAllen "printed out the forms and [the judges] to disregard what we had, the forms have been revised. And you know, I do what they say. You know, if they change it, we change it."); *see id* at 1427–28, McAllen 30(b)(6) Dep. 66:17–67:25 (describing one incident in which Defendant SOS updated "a couple" of forms electronically and that "just like the previous example. . . it was after the fact that early voting had started," but that McAllen downloaded the forms and updated them at each polling place "immediately, that same day").

[43] Plaintiffs also suggested that the Court, in the alternative, could order relief that offers voters post-rejection options to provide notice and cure. *See* Dkt. 89 at 5 n.14.

[44] Dkt. 93 at 10–11.

[45] As initially discussed in Section I above, Defendant SOS additionally claims there is "evidence" that the current signature matching system prevents fraud. This evidence consists of two statements in declarations attached to her response. First is a statement from Hays County Election Administrator Jennifer Anderson that "[o]n several occasions" voters who have received notices of rejection have come to her office and upon review "recognized that the signature on the ABBM or the carrier envelope was not, in fact, their signature." Dkt. 93-1 at ¶ 2. Plaintiffs question whether this is an artfully worded statement indicating that voters recognized that one of these documents was not signed by them using their signature, as opposed to being signed by someone else entirely. This is an important distinction because the Texas Election Code has no requirement that a voter actually sign these documents the same way, only that they sign them both. *See* Tex. Elec. Code § 87.041(b)(2) (permitting a ballot to be rejected if the application or carrier envelope signature has "been executed by a person other than the voter"). Accordingly, if this is the case—and Plaintiffs question why any voter would show up to protest rejection of a fraudulent ballot—then this statement effectively describes how the Hays County Elections Administrator counsels voters into accepting that they were disenfranchised after their ballots were improperly rejected. And, this would not be a surprising process considering that Defendant Perla Lara explained an identical procedure that she has undertaken explaining to voters that their two signatures—even if they signed them—looked different to the non-expert panel of part-time signature reviewers on the

matching procedures, while also greatly reducing the risk of improper rejection and disenfranchisement of eligible voters like the Plaintiffs, thereby *increasing* confidence in the electoral process. *See* Section I, A. (voter fraud is extremely rare and signature comparisons are an arbitrary and error-prone method of confirming identity). The Court has previously recognized that the addition of procedures like those proposed by the Plaintiffs actually add to election integrity, and further deter fraud, noting "the Secretary's stated concerns regarding voter fraud appear to be *inconsistent* with the State's apparent objections to the due process protections sought by Plaintiffs."[46]

Defendant SOS nevertheless contends that Plaintiffs' proposed notice and cure process would provide *no safeguard* against fraud. However, as discussed earlier, Plaintiffs' detailed proposal incorporates the same initial safeguards as the current mail-in ballot process. Specifically, Plaintiffs' detailed proposal would continue to require a voter to register to vote with, if they have such information, a driver's license, state ID number, or a partial social security number that the county will then verify through the TEAMS system operated by Defendant SOS. *See* Tex. Elec. Code § 13.002(c)(8). Voters are still required to complete an ABBM and, if it is accepted by the EVC, the EVC will send the voter balloting materials. After a completed ballot is mailed back to election officials, then, the same signature verification procedure currently required by the Texas Election Code is performed by the EVBB or Signature Verification Committee (SVC). On top of

---

EVBB. *See* Dkt. 84 at 1422–23, McAllen 30(b)(6) Depo. 61:18-62:13 ("I had one that actually came by, and so I showed her -- we reviewed the notice, and she requested to look at the way she had signed. And she saw that, and she's like, "Ma'am, definitely I signed differently. I'll be more careful next time."). The second statement cited, from SOS Director of Elections Keith Ingram mentions only a potential deterrent effect, not any known instances where the signature matching provisions have actually prevented fraud. Dkt 93-2 at ¶ 12. Such a deterrent effect exists equally, if not more, from the proposed remedial measures.
[46] Dkt. 41 at 24.

these existing procedures, under Plaintiffs' detailed proposal, if a voter's ballot is flagged as potentially being signed by someone other than the voter—despite having already complied with all provisions in the Texas Election Code—that voter can then be additionally required to certify that they signed both the application and the carrier envelope as well as verify to election officials the confidential information that was provided on their initial voter registration application or provide approved identifying documentation to verify identity. Because election officials are required to reach out to these voters by a variety of means rather than just sending a rejection notice after the election, they are also more likely to discover if a ballot was actually fraudulently cast as opposed to rejected in error.

Rather than recognizing these additional measures as a benefit to the integrity of the electoral process, Defendant SOS engages in speculation about how a fraudster might still succeed.[47] This speculation, however, is illustrative of the point that the proposed remedial measures actually increase ballot security. Her example is as follows: a fraudster intercepts a voter's application to vote by mail, fraudulently completes it, and, in doing so, provides their own contact information (phone or e-mail) rather than the voter's. Then, if the ballot is flagged for a signature mismatch, the county would contact the fraudster, who would then be the one asked to "verify" that the ballot was legitimate.[48] However, this ignores the fact that if the fraudster has intercepted and signed the application, then the application and carrier envelope *will already have the same signature* preventing it from being flagged in the first place because the EVBB would then be comparing two of the fraudster's signatures. Defendant SOS's example additionally fails to address how the fraudster might also be able to obtain and verify the voter's confidential

---

[47] Dkt. 93 at 10–11.
[48] *Id.*

information (driver's license, state ID, or SSN) that was provided on their original voter registration application or obtain and provide a voter's personal documentation. This additional measure shows how the remedial procedure would actually catch such a fraudster while the current process would not. Additionally, in a related hypothetical situation where a fraudster intercepted only a voter's ballot, but not the original application (thereby implicating a situation where the ballot was not actually signed by the voter and should be flagged by the EVBB), election officials would contact the *actual voter* for confirmation with the information provided on the application, and again, would require providing the confidential verifying information noted above. These procedures would catch such a fraudster with additional confirmation from the voter that a ballot was fraudulent.

Next, Defendant SOS contends that Plaintiffs' detailed proposal provides insufficient safeguards against fraud because if a voter complies with the process, "the EVC is forced to turn the ballot over to the EVBB or SVC to be counted, even if they suspect [it] is fraudulent."[49] While the proposed remedy would automatically provide an additional level of voter verification compared to the current signature comparison procedure, the EVC would still have a remedy if these situations were ever to actually happen, pursuant to Texas Election Code Section 87.127(a), which provides that

> [i]f a county election officer . . . determines a ballot was incorrectly rejected *or accepted* by the early voting ballot board before the time set for convening the canvassing authority, the county election officer may petition a district court for injunctive or other relief as the court determines appropriate (emphasis added).

Ironically, this is the same procedure that Defendant SOS has previously argued gives *voters* sufficient due process when their ballot was improperly rejected.[50] Although this provision

---

[49] *Id.* at 11.
[50] *See* Dkt. 75 at 10–11.

provides no direct recourse to a *voter* for an improper rejection, it does provide direct recourse to a *county election officer* for an allegedly improper acceptance, and thus provides a sufficient check on fraud in the circumstances described by Defendant SOS, in addition to all of the measures already described.

**Fifth**, Defendant SOS points out that Plaintiffs' proposed deadline for signature review does not account for elections where the sixth day after Election Day falls on a Saturday, Sunday, or legal holiday, which would require an additional day for overseas ballots to arrive.[51] However, Defendant SOS does not identify a situation in which this would ever actually occur, and admits that Plaintiffs' proposal would "not [be] an issue for the November 3, 2020 general election."[52] Furthermore, under Texas law, all general elections and the majority of other elections must be held on a Tuesday or a Saturday, which would mean the deadline for most elections will never fall on a weekend (nor can Plaintiffs think of any holiday that their proposed deadline would fall on). *See* Tex. Elec. Code §§ 41.001–.002. Admittedly, the Texas Election Code excepts an enumerated list of particular types of non-general elections from this rule. *Id.* at § 41.001(b). But for those elections, Plaintiffs suggest a modified remedy, either by shifting the deadline to canvass these elections, the deadline for the EVBB or SVC to review submitted ballots, and/or the deadline for election officials to send out the final notice of rejection.

**Sixth**, SOS contends that the proposed remedial measures necessarily shorten the time to conduct a canvass because they require that a canvass cannot be performed until 10 days after the election if any ballots have been rejected for an alleged signature mismatch and not yet cured.[53] But as Defendant SOS recognizes, this still permits the local election authority to perform the

---

[51] Dkt. 93 at 11

[52] *Id.*

[53] *Id.* at 12.

canvass within the already set deadlines imposed by the Texas Election Code, and would permit an earlier canvass if the election authority sent no mail-in ballots to voters, had not rejected any mail-in ballots, or all rejected mail-in ballots had already been cured by their voters. Instead, what Defendant SOS fails to recognize is that actual tabulations are not done simultaneously for all types of votes, and that the materials needed for the local authority to conduct the canvass will be largely tabulated well in advance of the actual canvass, needing only a final count of whether any rejections have been reversed. The only basis offered as to why this is a burden at all is that supposedly county commissioners courts may be inconvenienced if they cannot canvass an election at a regularly scheduled meeting occurring between days 7–10 after an election.[54] Holding special meetings for election canvassing is already common, however, and is already required for any election authorities that meet only monthly or bi-weekly, including many county commissioners courts.[55]

      As proof of this alleged burden, Defendant SOS points to the declaration from the Hays County Elections Administrator indicating that this would impact its regular operations to canvass the 2020 General Election, which falls on November 3rd, at its regular Tuesday meeting on November 10, 2020.[56] Even ignoring the bad math in this declaration indicating that the canvass could not be done at the regular November 17, 2020 Tuesday meeting (which would still be in compliance with the Texas Election Code's 14-day requirement to canvass a general election), this is at the very least disingenuous, as the Hays County Commissioners Court, like other election authorities, also regularly calls special meetings to canvass elections—including calling a special

---

[54] *Id.*

[55] *See, e.g.*, *Brazoria County Meeting Dates*, Brazoria County, https://www. brazoriacountytx. gov/government/commissioners-court-meeting-dates (last visited on Sep. 2, 2020).

[56] Dkt. 93 at 12.

meeting held to canvas the November 2018 General Election on *Wednesday*, November 14, 2018.[57]  Any burden on election authorities from the proposed deadline is illusory.

**Seventh**, Defendant SOS argues that the specific mechanisms by which a voter is permitted to cure an improperly rejected ballot pursuant to Plaintiffs' detailed proposal is overly burdensome on local election officials.[58] But Defendant SOS misreads the proposed curing process. Plaintiffs have proposed a curing mechanism by which a voter verifies their identity by providing confidential, personally-identifying information to election officials: their driver's license number, Texas ID number and/or last four digits of their Social Security Number. Contrary to Defendant SOS's contentions, this information is readily available to election officials because this is the same information that is required on a voter registration form, *see* Texas Election Code Section 13.002(c)(8), and as Defendant SOS acknowledges, is "on file with the EVC."[59] Accordingly, the local election official need only check that the confidential information provided by the voter matches the information in their records for that voter. The fact that a voter registration form only requires one of these numbers is irrelevant—if the voter is asked to provide all of these numbers, if they exist, the election officials will be able to match one of them to the voter's registration form. And to the extent Defendant SOS objects to the secondary forms of identification suggested by Plaintiffs, they have no issue with their proposal being modified so that a voter is allowed to provide one of these secondary forms of identification in place of the confidential information on the registration form *only* in the rare instances that a voter has not provided one of the confidential

---

[57] *See* Hays County Comm. Court Minutes Nov. 4, 2018 https://hayscountytx.com/download/court_minutes_archive/2018/11%2014%202018%20Special%20Meeting.pdf (last visited on September 2, 2020).
[58] Dkt. 93 at 12–14.
[59] Dkt. 93 at 13.

identifying numbers on their voter registration form, rather than as an *alternative* to that confidential information.[60]

Since the voter has already met the requirements for obtaining a ballot and voting by mail, any document indicating any support whatsoever that the person confirming that they signed the ballot is the voter should be sufficient. Nevertheless, Plaintiffs would not object to replacing the list of identifying documents in the detailed proposal with the list of approved identifying documents for voting in person as long as mail-in voters are not required to sign a reasonable impediment form, but are still allowed to use the documents that accompany a reasonable impediment form to verify identity. Since Defendant SOS has explained that election officials are already trained to verify such documents, this modification to the detailed plan would address any questions of ambiguity raised by the Defendant SOS about which forms of documentation would be acceptable under the proposed plan.

**Eighth**, SOS contends that the proposed remedial measures impose "unfair costs" on local elections officials, specifically as to communications infrastructure and employee time to implement the constitutionally required notice and cure provisions. As noted above, the actual number of voters affected by this procedure in a particular county is not likely to overburden elections offices. In contacting voters, the burden on a particular county is likely negligible in terms of paid staff time, and would utilize only "communications infrastructure" that the Texas Election Code already requires to be in place and in use at every elections office—phones, e-mail, fax, and postal mail.[61] As already mentioned above, and as discussed in Plaintiffs' summary

---

[60] *See* Dkt. 89 at 3–4, ¶ 3.

[61] *See, e.g.*, Tex. Elec. Code §§ 84.012 (EVC must mail ABBM free of charge to any voter requesting one); 86.004 (EVC to mail balloting materials to voters entitled to vote by mail); 86.011(d) (EVC may utilize mail, telephone, or in-person visit in allowing voter to cure carrier envelope defects); 84.007 (voter may submit ABBM by fax if fax available); 105.001 (office must

judgment briefings, local election officials such as the McAllen City Secretary and the Brazos County Elections Administrator regularly correspond with voters for a multitude of reasons related to the mail-in ballot process, via e-mail, text messages, phone calls,[62] and/or physical mail, and they are already responsible for mailing out rejection notices for the EVBB.[63] The cost of such communications is negligible.[64]

### B.   The *Purcell* Doctrine Does Not Apply to Prevent This Court From Issuing Injunctive Relief.

As briefly outlined in Section I above, the *Purcell* doctrine sometimes operates to prevent voter confusion and "chaos" that could result from court orders affecting elections. Based on this doctrine and the alleged burdens addressed above, Defendant SOS incorrectly argues that it would be improper for the Court to institute a notice and cure procedure "[b]ecause the mail-in balloting process is already underway" and because the Supreme Court "caution[ed] against federal court interference with impending elections" in *Purcell*. Dkt. 93 at 18–19 (citing 549 U.S. 1, 4 (2006)).

### 1.    The *Purcell* doctrine applies in only very limited circumstances.

In *Purcell*, the Supreme Court instructed that courts must weigh "considerations specific to election cases" in determining whether to issue an injunction, especially because "[c]ourt orders

---

be capable of receiving absentee ballot by fax if cast by certain members of the armed forces); 101.008 (secretary of state, in coordination with local election officials, shall implement a free system over phone, e-mail, or internet that allows certain mail-in voters to verify that their ballot has been received and its status); 101.102 (a person eligible to vote under the federal Military and Overseas Voter Empowerment Act may request balloting materials from the EVC via e-mail); 87.0431 (notice of rejected ballot under must be transmitted by e-mail if ballot was originally requested by e-mail under Chapter 101); *see also supra* at 11 and note 28 (discussing local Defendants' testimony that they use multiple methods to communicate with voters).

[62] Defendant SOS additionally claims that Plaintiffs do not provide any information regarding how memorializing curing over the phone is to be accomplished. Dkt. 93 at 13–14. An election official can memorialize the phone conversation by noting the relevant information provided by the voter down and retaining the notation in the EVC's records.

[63] *See* Dkt. 74 at 27–28 & nn. 81–84.

[64] Dkt. 65 at 35–36 & nn. 145–48, 43 & nn. 162–163

affecting elections . . . can themselves result in voter confusion and consequent incentive to stay away from the polls. As an election draws closer, that risk will increase." 549 U.S. at 4–5.

In interpreting the Supreme Court's decision in *Purcell* and later cases, the Fifth Circuit has instructed that the operative question is whether an injunction will "substantially disturb the election process" as measured by: (1) "the potential for voter confusion" and (2) "interference with [the State's] ongoing election preparation." *See Thomas v. Bryant*, 919 F.3d 298, 315 (5th Cir. 2019) (citing *Purcell,* 549 U.S. at 4). The potential for voter confusion "animates this concern," *Thomas*, 919 F.3d at 315, but the court should also consider "the mechanics and complexities of state election laws" so that "where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief," *Veasey v. Perry*, 769 F.3d 890, 894 (5th Cir. 2014) (citing *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)); *see also Veasey*, 769 F.3d at 897 (Costa, J., concurring in the judgment)

> ("I agree with Judge Clement that the only constant principle that can be discerned from the Supreme Court's recent decisions in this area is that its concern about confusion resulting from court changes to election laws close in time to the election should carry the day in the [*Purcell*] analysis.").

This analysis necessarily implicates the consideration of whether the change imposed by an injunction "poses a risk of interference with the rights of other [state] citizens." *Id.* at 894 (citing *Williams v. Rhodes*, 393 U.S. 23, 335 (1968)). These various concerns should be determined on the basis of a factual record whenever possible. *See Purcell*, 549 U.S. at 5 (the court of appeals should give deference to the factual findings of the district court in determining whether to stay an injunction); *Frank v. Walker*, 769 F.3d 494, 496 (7th Cir. 2014) (whether State officials will be able to properly prepare for an election in accordance with court action is a question of fact).

For example, in *Veasey*, the Fifth Circuit stayed an injunction enjoining a Texas voter ID law entered just nine days before early voting began and 24 days before Election Day. 769 F.3d at 892. The court found that voters would be confused by an injunction given that the voter ID law had been implemented in at least three prior elections; that Texas would be unable to reprint the training manuals used by poll workers and so would have to retrain Texas's 25,000 polling workers at 8,000 polling places via "word of mouth alone," which would be "extremely difficult, if not impossible" to accomplish logistically prior to the start of early voting; and that any such late retraining would pose a risk to the rights of other Texas citizens because it would likely result in "markedly inconsistent treatment of voters at different polling places throughout the State." *Id.* at 892–94. The Fifth Circuit looked to recent Supreme Court decisions as supporting its decision to stay the injunction given the proximity to the election. *See id.* at 894–95; *see also North Carolina v. League of Women Voters of N. Carolina*, 574 U.S. 927 (2014) (staying an October 3 injunction regulating an election for which early voting began October 16); *Husted v. Ohio State Conference of N.A.A.C.P.*, 573 U.S. 988 (2014) (staying an injunction affirmed on September 24 before an election for which early voting was to begin September 29).

As set out below, Defendant SOS has not presented any factual evidence to support any of the concerns identified by the Supreme Court or the Fifth Circuit that would justify staying the implementation of a notice and cure procedure until after the 2020 General Election.

**2.      The proposed notice and cure procedure will not cause voter confusion and does not disincentivize voters from voting.**

Nothing in the notice and cure procedure suggested by Plaintiffs may reasonably be argued to cause even mild voter confusion, let alone the sort of confusion that would substantially disturb the election process. Nothing about the suggested notice or cure procedure affects any step a voter would normally take to cast a ballot by mail. The voter must still request and fill out an ABBM,

submit it, receive a ballot, sign and seal the carrier envelope, and submit the ballot. There are no changes to the qualifications of who may vote or what identification or documentation must be shown to vote (as in voter ID cases). Any alleged confusion that a voter might experience upon being contacted to verify that they signed the ABBM and carrier envelope would be minor and mitigated during the EVC's communication with the voter whether via mail, e-mail, text message, and/or phone. It would also be mitigated by Plaintiffs' suggested update to the Dear Voter letter to notify voters of the signature comparison procedure—a change that Defendant SOS *has already implemented*.[65] Similarly, there is no reasonable argument that being provided notice and opportunity to cure will disincentivize people from voting.

>    **3.    The proposed notice and cure procedure does not interfere with the State's ongoing election preparation so as to substantially disturb the election process.**

Plaintiffs' detailed proposal does not interfere with the State's ongoing election preparation so as to substantially disturb the election process, for all the reasons set out above addressing why nothing in that proposal poses a substantial burden to local or State election officials. *See* Section II, A.

Defendant SOS's reliance on the Supreme Court's stay of an injunction in *Republican National Committee v. Democratic National Committee* is inapposite.[66] In that case, the Supreme Court stayed an injunction "which the plaintiffs themselves did not see the need to ask for," issued only five days before Election Day, that "[e]xtended the date by which ballots may be cast by voters." *Republic Nat'l Comm*., 140 S. Ct. at 1206–07. This "fundamentally alter[ed] the nature of

---

[65] *See* Dkt. 93-2, Ingram Dec. ¶ 5 (Defendant SOS's Elections Division issued a revised version of the Dear Voter letter in August 2020); *id.* Ex. 2 ¶ 1 (copy of revised Dear Voter letter notifying mail-in voters of the signature comparison procedure).
[66] Dkt. 93 at 18 (citing 140 S. Ct. 1205, 1207 (2020))

the election." *Id*. at 1207. But unlike in that case, Plaintiffs here *do* seek the relief being discussed; the election is not nearly so close; and nothing in Plaintiffs' suggested framework requires any modification to existing deadlines under the Texas Election Code. Mail-in ballots must still be received by the various deadlines under the Texas Election Code, Plaintiffs do not ask the EVBB to meet outside of the time already permitted, and canvasses can still be completed within statutory deadlines.[67]

In sum, the sort of concern for Texas's ongoing election preparations demonstrated in the cases cited by Defendant SOS are not present here. Plaintiffs' proposed remedy does not impose the sort of "extremely difficult, if not impossible" logistical problems identified by the Fifth Circuit in *Veasey*—retraining 25,000 poll workers at 8,000 polling places across the State by word of mouth alone, a mere nine days before early voting. *Veasey*, 769 F.3d at 893. Instead, Plaintiffs proposal would require Defendant SOS to distribute the requested guidance to election officials in Texas via the e-mail list-serv Defendant SOS already maintains, in a timeframe Defendant SOS has previously engaged in of her own volition, to election officials who already engage in the types of communications suggested, at little to no additional cost to the State's overall voting infrastructure.

### 4.   The proposed notice and cure procedure will not cause any changes that risk interference with the rights of other Texans.

In *Veasey* the Fifth Circuit noted that attempting to retrain 25,000 poll workers via word of mouth in nine days would result in markedly different treatment of voters at different polling places across the State. *Veasey*, 796 F.3d at 894–95. This "risk of interference with the rights of other [Texas] citizens" weighed in favor of waiting until after the election to take action. *Id.*

---

[67] *See* Dkt. 89 at 3–5 & nn. 8, 11.

(alteration in original) (citation omitted). The Fifth Circuit also pointed to the Supreme Court's observation that even though already-distributed ballots unconstitutionally excluded certain candidates, requiring Ohio to print a new set of ballots at the last minute before the election would "pose a risk of interference with the rights of other Ohio citizens, for example, absentee voters." *Id.* (citing *Williams*, 393 U.S. at 35). But nothing of that sort is threatened by Plaintiffs' proposed cure and notice procedure. Allowing mail-in voters the opportunity to confirm their signatures does not pose any sort of risk to other voters' rights, as in the case of in-person voters being subject to different interpretations of the voter ID requirements or being presented with different ballots than absentee voters.

### 5.     For these reasons, the Purcell doctrine is inapplicable here.

For all of the reasons set out above, Plaintiffs' proposed notice and cure procedure does not run afoul of the *Purcell* doctrine. An injunction requiring election officials to notify a voter of a questioned mail-in ballot and permitting that voter an opportunity to cure their ballot will not sow voter confusion or create any incentive to stay away from the polls; will not cause any substantial disturbance in the State's ongoing election preparation; and will cause no change that risks interference with other Texans' rights. Furthermore, this case does not present the sort of proximity to the election seen in *Veasey* or the Supreme Court cases on which it relied. For the same reasons, the *Purcell* doctrine does not apply to bar the complete enjoining of the signature comparison statute, as doing so would not substantially interfere with the State's election preparations—would in fact impose no burden at all—and would cause no confusion for voters, who would continue to take the normal steps to vote by mail.

### C. The Secretary of State has Authority to Enforce the Court's Order and Maintain Uniformity in the Administration of Elections.

Finally, Defendant SOS continues to argue that Plaintiffs injuries are not redressable through the Secretary of State and that it has no authority to enforce the election laws against local election authorities.[68] This argument has been flatly rejected by this Court and the Fifth Circuit, which have recognized that Defendant SOS is the proper defendant through whom to seek relief concerning the application of the Texas Election Code. *See* Dkt. 41 at 13–15; *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612–13 (5th Cir. 2017); *see also Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 n.16 (6th Cir. 2008). Defendant SOS's position is disingenuous at best, given that the Texas Election Code specifically gives Defendant SOS the power to "take appropriate action to protect the voting rights of the citizens of this state from abuse by the authorities administering the state's electoral processes . . . [and to] order the person to correct the offending conduct." Tex. Elec. Code § 31.005. And this power is not theoretical: within just the past week, on a mail-in ballot related issue in Harris County, Defendant SOS first threatened to sue—and then did sue—the Harris County Clerk in order to mandate compliance with her interpretation of the Texas Election Code, by seeking enforcement through the attorney general. *See Texas v. Hollins*, No. 2020-52383 (Harris Co. Aug. 31, 2020).[69]

---

[68] *See* Dkt. 93 at 15 & n.25.

[69] *See also* Alexa Ura, *Texas tells Harris County to halt plan to send all voters applications for mail-in ballots*, THE TEXAS TRIBUNE, (Aug. 28, 2020), https://www.texastribune.org/2020/08/28/mail-in-ballots-texas-harris-county/; Letter from Keith Ingram, Director of Elections for the Texas Secretary of State's Office to Chris Hollins, Harris County Clerk, (Aug. 27, 2020), *available at* https://static.texastribune.org/media/files/9078f160593df832d2704969c73628c5/SOSLetter_HarrisCountyVBM.pdf.

### III.    CONCLUSION

For the foregoing reasons, Plaintiffs request that the Court issue an injunction that implements their detailed proposal, or procedures that satisfy the five minimum safeguards also outlined by Plaintiffs, or, in the alternative, issue a complete injunction of the signature matching provisions of the Texas Election Code, leaving the Texas Legislature to take up the issue of implementing a procedure that complies with the Constitution if it deems necessary.

Respectfully submitted,
/s/   *Ryan V. Cox*

**TEXAS CIVIL RIGHTS PROJECT**

Mimi M.D. Marziani
Texas Bar No. 24091906
mimi@texascivilrightsproject.org
Hani Mirza
Texas Bar No. 24083512
hani@texascivilrightsproject.org
Ryan V. Cox
Texas Bar No. 24074087
ryan@texascivilrightsproject.org
Zachary D. Dolling
Texas Bar No. 24105809
zachary@texascivilrightsproject.org

1405 Montopolis Drive
Austin, Texas 78741
512-474-5073 (Telephone)
512-474-0726 (Facsimile)

**WILLKIE FARR & GALLAGHER LLP**

Richard Mancino (NY Bar No. 1852797)
Samuel Kalar (NY Bar No. 5360995)
JoAnna Suriani (NY Bar No. 5706395)

787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: rmancino@willkie.com
        skalar@willkie.com

jsuriani@willkie.com

-AND-

Jennifer J. Hardy (TX Bar No. 24096068)
Denis A. Fallon (TX Bar No. 24059731)
Garrett Johnston (TX Bar No. 24087812)
Audra White (TX Bar No. 24098608)

600 Travis Street, Suite 2100
Houston, Texas 77002
Telephone: (713) 510-1700
Facsimile: (713) 510-1799
Email: jhardy2@willkie.com
        afallon@willkie.com
        gjohnston@willkie.com
        awhite@willkie.com

**_COUNSEL FOR PLAINTIFFS_**

## CERTIFICATE OF SERVICE

By my signature below, I certify that a true and correct copy of the foregoing has been served on all counsel of record on September 2, 2020 through the Electronic Case File System of the Western District of Texas.

/s/   _Ryan V. Cox_____