IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES, MOVE TEXAS CIVIC FUND, and LEAGUE OF WOMEN VOTERS OF TEXAS,<br>    *Plaintiffs*,<br><br>v.<br><br>TEXAS SECRETARY OF STATE; TRUDY HANCOCK, in her official capacity as Brazos County Elections Administrator; and PERLA LARA, in her official capacity as City of McAllen, Texas Secretary,<br>    *Defendants*. | § § § § § § § § § § § § § § § § | No. 5:19-cv-00963 |

**DEFENDANT SECRETARY OF STATE'S SUR-REPLY TO PLAINTIFFS' COURT-ORDERED BRIEF**

Pursuant to the Court's August 21, 2020 Order, Dkt, 88, Plaintiffs filed a supplemental brief, Dkt. 89, to address "what an appropriate remedy may look like" should the Court order one. Dkt. 88. The Secretary filed her response, Dkt. 93, and Plaintiffs filed their reply, Dkt. 96 (Reply). The Secretary now respectfully submits this sur-reply showing why Plaintiffs are not entitled to injunctive relief. To avoid burdening the Court with unnecessary briefing, the Secretary incorporates by reference her response, Dkt. 93, as if fully set forth herein, and limits this sur-reply to addressing the factual and legal misunderstandings in Plaintiffs' Reply.

### I.    Errors Related to Both Requests for Injunctive Relief

The Reply makes several of the same errors with respect to both of Plaintiffs' alternative requests for injunctive relief. **First**, as to both proposed injunctions, Plaintiffs complain that the Secretary was required to present evidence "to support her argument that the current signature comparison procedure furthers an interest in preventing voter fraud," but did not. Dkt. 96 at 4; *see also id.* at 15–16, n. 45. This is wrong as a matter of both fact and law. Factually, although local officials

1

who actually administer signature-verification are best-situated to provide such evidence,[1] the Secretary still did so in an effort to assist the Court. *See* Dkt. 93-1, Ingram Dec. ¶ 11; Dkt. 93-2, Anderson Dec. ¶ 2. And Plaintiffs are wrong to suggest that, if there were "specific evidence that the signature comparison procedure has ever prevented mail-in ballot fraud," the Secretary would have it because she "collects a wide array of data describing the prevalence and use of mail-in ballots in Texas, including the number of mail-in ballots rejected in Texas for alleged mismatched signatures in a given election." Dkt. 96 at 4. While it is true that counties, as part of a biennial survey conducted by the United States Election Assistance Commission, provide information on the number of ballots rejected during signature verification, the Secretary does not know how many, if any, of those carrier envelopes were signed by someone other than the voter (and Plaintiffs do not argue otherwise).

As a legal matter, the Supreme Court has recognized that the Secretary does not bear the burden to present such evidence here. For example, in *Crawford v. Marion County Election Board*, Indiana argued that its interest in preventing election fraud justified its photo ID law, but the law's challengers pointed out that "[t]he record contains no evidence of any such fraud actually occurring in Indiana at any time in its history." 553 U.S. 181, 194 (2008). Nevertheless, the Court noted that "flagrant examples of such fraud in other parts of the country have been documented throughout this Nation's history by respected historians and journalists." *Id.* at 195 (collecting examples). Thus, the Court concluded that the State was not required to marshal any such evidence, because "[t]here is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." *Id.* at 196. So too here. There are numerous examples of fraud in connection with mail-in voting—[2]

---

[1] The fact that local officials are best-situated to provide this evidence further supports the Secretary's standing argument, *e.g.,* Dkt. 93 at 15 n.25. Though Plaintiffs summarily dismiss that argument as having been "flatly rejected," Dkt. 96 at 29, just this week, another court in this district recognized that "[t]he role of the secretary of state in enforcing Texas's election laws, while seemingly obvious . . . is not as clear as it seems." Order (Dkt. 114), *Gilby v. Hughs*, No. 1:19-CV-01063-LY (W.D. Tex. Sept. 2, 2020) (quoting *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 613–14 (5th Cir. 2017)) (alterations in *Gilby*).
[2] *E.g.*, A Sampling of Recent Election Fraud Cases from Across the United States, THE HERITAGE FOUNDATION, *available at* https://www.heritage.org/voterfraud (last visited September 4, 2020) (non-exhaustive list including 1,290 proven instances of recent voter fraud, including 35 mail-in ballot frauds in Texas since 2005); Tracy Campbell, Deliver the Vote:

even more, in fact, than the in-person voter fraud the Supreme Court acknowledged in *Crawford*.[3] Thus, the Secretary need not marshal evidence to justify Texas's signature-verification requirement.

Courts nationwide adopt this same approach, holding that states and their election administrators need not present evidence of fraud to justify identity verification requirements. *See, e.g.*, *Eu v. San Francisco Cty. Democratic Central Comm.*, 489 U.S. 214, 231 (1989) ("A State indisputably has a compelling interest in preserving the integrity of its election process."); *Am. Civil Liberties Union of New Mexico v. Santillanes*, 546 F.3d 1313, 1323 (10th Cir. 2008) ("[i]n requiring the City to present evidence of past instances of voting fraud [to justify voter ID requirement] the district court imposed too high a burden on the City.") (citing *Crawford*, 128 S.Ct. at 1617, 1623); *id.* at 1325 (overturning district court order finding that "the City did not demonstrate why this particular photo identification law is needed" or how it "serves to combat an existing problem with voter impersonation fraud in municipal elections" because "*Crawford* confirms that such a showing by the City was not necessary.") (citations and quotation marks omitted). Tellingly, the Reply does not cite a single legal authority to suggest that the Secretary was required to present evidence of fraud to justify Texas's signature-verification requirement—let alone one that undermines *Crawford* and its progeny.

**Second**, Plaintiffs dismiss the State's unquestionable interest in effectuating the will of its people, as reflected through the duly enacted laws of their representatives, quipping that "[u]nder Defendant SOS's interpretation of the State's interest, no law passed by the Texas Legislature could fail to pass constitutional muster." Dkt. 96 at 5. This badly mischaracterizes the Secretary's position, which in no way suggests that all "duly enacted" laws are immune from judicial review. Rather, the

---

A History of Election Fraud, AN American Political Tradition - 1742-2004, at xvi–xvii (2005) [Campbell, Election Fraud] (noting that our political process has been "deeply corrupted … for over two hundred years' and that voting fraud 'is a deeply embedded culture within American politics that considers cheating fully justifiable"); Larry J. Sabato & Glenn R. Simpson, Dirty Little Secrets: the Persistence of Corruption in American Politics 276 (1996) ("Our nation has a long and depressing history as a happy haven for the vote thief."); Steven F. Huefner, Remedying Election Wrongs, 44 HARV. J. ON LEGIS. 265, 271 (2007) ("Voting fraud of course is a long-standing plague on democratic elections.").

[3] *See, e.g.*, *Veasey v. Abbott*, 830 F.3d 216, 239 (5th Cir. 2016) (Finding that, in Texas, "the potential and reality of fraud is much greater in the mail-in ballot context than with in-person voting.").

Secretary simply points out that, given state power under the Elections Clause, U.S. CONST. art. I, §4, cl. 1, injunctions aimed at state election laws must "impose no burdens on the state not authorized by the [relevant federal law] which would impair the State['s] retained power to conduct its state elections as it sees fit." *Voting Rights Coal. v. Wilson*, 60 F.3d 1411, 1416 (9th Cir. 1995).

Plaintiffs' only answer to the Secretary's avowal that state law may only be enjoined to the extent of any legal violation found is a conclusory assertion that "these Texas Election Code provisions can never operate lawfully." Dkt. 96 at 5. This is not enough, for at least two reasons. First, remarkably (and despite the Secretary's invitation, *see* Dkt. 93 at 7), Plaintiffs have still failed to specify *what* "provisions" they seek to enjoin.[4] And even if they had, they have not proven that Texas's signature-verification requirement "can never operate lawfully." Dkt. 96 at 5; *cf. Wilson*, 60 F.3d at 1416. They therefore have not shown entitlement to a sweeping injunction. Such a remedy would intrude upon Texas's sovereign authority to administer its elections and would lack the "adequate sensitivity to the principles of federalism" required in the Elections Clause context. *Wilson*, 60 F.3d at 1416; *Ass'n of Cmty. Orgs. For Reform Now (ACORN) v. Edgar*, 56 F.3d 791, 798 (7th Cir. 1995).

**Third**, the Reply offers no meaningful rejoinder to the Secretary's showing that changing the signature-verification process—either by wholly invalidating it or by modifying it—would cause voter confusion and would burden local election officials. *Compare* Dkt. 96 at 7, 11 (summarily asserting without evidence that "[a] complete injunction [] would not substantially interfere with the State's election preparations and would cause no voter confusion whatsoever" and that "Plaintiffs' detailed proposal imposes no significant burden on local or State election officials") *with* Anderson Dec. (explaining several ways changes to mail-in ballot process would impose additional burden and

---

[4] The closest the Reply comes to specifying the statutes Plaintiffs actually challenge still does not provide an exhaustive list thereof. *See* Dkt. 96 at 9 ("this Court should enjoin usage of the signature comparison procedure entirely, *including* the specific provisions in Texas Election Code Sections 87.041(b), (e), and (f) and 87.027.") (emphasis added). If Plaintiffs ask the Court to enjoin something "entirely," they ought, at the very least, identify each component part to be enjoined.

expense on local election officials and result in voter confusion) *and* Ingram Dec. (explaining several ways changes to mail-in ballot process would burden the Secretary's office and local election officials).

**Fourth**, the Reply does not cure Plaintiffs' failure to prove any cognizable injury, as required to support a grant of injunctive relief. Conceding that they have only identified two voters whose ballots were rejected during signature-verification in the past, Plaintiffs suggest that the mere fact that other ballots were rejected during signature-verification supports their request for an injunction. Dkt. 96 at 7, 10.[5] But "general data . . . does not establish a substantial risk that Plaintiffs themselves will" be injured and is therefore insufficient to substantiate an award of injunctive relief. *Stringer v. Whitley*, 942 F.3d 715, 722 (5th Cir. 2019). For similar reasons, Plaintiffs cannot rely upon allegations—by three individuals not party to this case—that their ballots were "incorrectly rejected" under Texas's signature-verification requirement. Dkt. 96 at 8 (citing *Flores v. Hughs*, No. 7:18-cv-00113 (S.D. Tex.)).[6] Rather, "Plaintiff-specific [proof is] needed before Plaintiffs' claims can be properly characterized as an attempt to remedy an imminent injury to Plaintiffs instead of a generalized grievance available to all Texans." *Id.* In this vein, for the reasons the Secretary has already briefed, Plaintiffs' contention that expert testimony supports finding that an "extremely high error rate [is] to be expected" during signature verification is not, in fact, substantiated by the record, and cannot support a grant of injunctive relief. Dkt. 96 at 8. *See* Dkt. 75 at 15–16.

**Fifth**, Plaintiffs' reliance upon out-of-circuit authorities also does not support issuance of injunctive relief. *See* Dkt. 96 8–9 (citing *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1320–21 (11th Cir. 2019); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 218–20 (D.N.H. 2018); *Martin v. Kemp*, 341

---

[5] The weakness of Plaintiffs' reliance upon their own calculations (Dkt. 96 at 4, n. 12)—which cannot be verified and, in any event, have nothing to do with whether rejected ballots were *improperly* rejected—has already been explained. *See* Dkt. 75 at 4 (citing *Stringer v. Whitley*, 942 F.3d. at 722). The Reply further emphasizes that these calculations are not evidence and should not be relied upon by noting that Plaintiffs "mistakenly doubled the 2018 [Election Assistance Commission] numbers" in representing them to the Court. Dkt. 96 at 10, n. 24.

[6] The fact that Plaintiffs cite only to the *Flores* plaintiffs' filings—and not any factual finding by the district court in that case—further emphasizes the impropriety of Plaintiffs' attempt to rely on that case to support their claim for relief.

F. Supp. 3d 1326, 1341–42 (N.D. Ga. 2018), *appeal dismissed sub nom. Martin v. Sec'y of State of Ga.*, No. 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018)). Not only do these cases not control this Court, they would not show Plaintiffs are entitled to relief if they did. None of these cases involved any means to rectify the consequences of an erroneously rejected mail-in ballot. *See Lee*, 915 F.3d at 1315 (no mention of any remedial procedures); *Saucedo*, 335 F. Supp. 3d at 209 ("there is no procedure by which a voter can contest a moderator's decision that two signatures do not match, *nor are there any additional layers of review of that decision*.") (emphasis added); *Martin*, 341 F. Supp. 3d at 1339 (considering a situation where, not only was there no remedial procedure at all for ballots rejected for mismatched signatures, "the statute elsewhere already provides notice, a hearing, and an opportunity to appeal for absentee voters whose ballots are challenged for ineligibility."). Texas, on the other hand, allows local election officials[7] and aggrieved candidates[8] alike to seek judicial relief in the event of a misapplication of the signature-verification requirement. Moreover, Plaintiffs have made no attempt to analogize any evidence of burden in these cases to the relevant burdens here.

**Sixth**, Plaintiffs ignore their burden in this case, further demonstrating that they are not entitled to injunctive relief—especially in advance of the 2020 election. Plaintiffs complain that the Secretary "cannot be permitted to argue both that a narrower remedy is overly burdensome and that a wholesale injunction is too broad, thereby depriving the Court of any ability to prevent unconstitutional implementation of a duly[]enacted law." Dkt. 96 at 5–6. In a similar vein, Plaintiffs fault the Secretary for "not propos[ing] specific alternatives or modifications to Plaintiffs' detailed proposal." Dkt. 96 at 9. Respectfully, it is Plaintiffs who allege harm and ask the Court for an injunction. Plaintiffs, therefore, bear the burden to propose an injunction targeted to that injury which accounts for the other requirements of law—including the sensitivity to federalism principles

---

[7] TEX. ELEC. CODE § 87.127(a).
[8] *Id.* §§ 221.001–243.013; *Reese v. Duncan*, 80 S.W.3d 650, 660–62 (Tex. App.—Dallas 2002, pet. denied).

applicable in the Elections Clause context, Rule 65's prohibitions on vague and overbroad injunctions, and consistency with the other constraints and requirements of the Election Code. After all, "it's the Plaintiffs' burden to prove their entitlement to an injunction, not the Defendants' burden to prove the opposite." *Valentine v. Collier*, 956 F.3d 797, 802, n.1 (5th Cir. 2020).

## II.     Errors Related to Plaintiffs' Six-Prong Approach

The issues below are specific to Plaintiffs' Reply regarding their six-prong proposed injunction.

**First**, the Reply misunderstands the burden on local election officials, arguing at length that because ballots rejected during signature-verification are "distributed among 254 independent Texas counties . . . the burden of providing a notice and cure opportunity to voters is extremely low for any particular Early Voting Clerk (EVC)." Dkt. 96 at 10. Tellingly, Plaintiffs offer no evidence to support this contention. Moreover, the burden on local officials is not necessarily in the strict *volume* of ballots (indeed, this will likely differ among counties as a function of number of mail-in ballots cast). Instead, the evidence shows that Plaintiffs' proposal would burden EVCs *regardless* of the number of mail-in ballots submitted, because it would require them to do additional work and implement imprecise and unfamiliar procedures. Anderson Dec. ¶ 9, 12, 13, 14; Ingram Dec. ¶ 14, 15. The Reply wholly ignores these burdens and also fails to acknowledge the additional expense counties would bear in implementing their six-prong proposal (including, *inter alia*, the costs associated with convening EVBBs and SVCs additional times). *Compare* Dkt. 96 at 12–13 *with* Anderson Dec. ¶ 9, 13, 14; *and* Ingram Dec. ¶ 14, 15. The Reply also ignores that the burden on EVCs would be even greater if imposed at this point in the election cycle, where the mail-in ballot machinery has already been put into motion. Anderson Dec. ¶ 4–9; Ingram Dec. ¶ 10.

**Second,** Plaintiffs acknowledge the steps the Secretary has already taken to ensure that voters and local election officials are on notice of the signature verification requirement and how it is implemented. Dkt. 96 at 13–14; *see also* Ingram Dec. at Ex. A–C. From this, they extrapolate that "local

election officials are ready to implement *any* updates immediately as they come in," including changes to mail-in voting. Dkt. 96 at 13–15 (emphasis added). This is not just a bridge too far—it is contradicted by the evidence. *See* Anderson Dec. ¶ 3, 12–14; Ingram Dec. ¶ 4, 10, 12–14. The Reply does nothing to assuage these burdens.

**Third**, the Reply fails to address the opportunities for fraud that manifest at various stages of Plaintiffs' proposal. It emphasizes that a voter may confirm their ballot's authenticity by providing government-issued identification numbers, Dkt. 96 at 16–18, 21. But it largely ignores that Plaintiffs' six-prong proposal does not *require* such information, instead providing an alternative list of documents which EVCs have no way to authenticate. *See* Dkt. 89 at 3–4. In a last-ditch effort to grapple with this issue, Plaintiffs state that they "would not object to replacing th[at] list . . . with the list of approved identifying documents for voting in person as long as mail-in voters are not required to sign a reasonable impediment form, but are still allowed to use the documents that accompany a reasonable impediment form to verify identity." Dkt. 96 at 22. Here again, Plaintiffs fail to appreciate the burdens that this change would impose on EVCs, voters, the State, and the Secretary—particularly at this point in the election cycle.

**III.   Plaintiffs'** *Purcell* **Analysis Undermines Their Request for an Injunction.**

At bottom, Plaintiffs do not (and cannot) dispute that "[the Supreme] Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam); *Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (per curiam); *see* Dkt. 96 at 24–30. Instead, their Reply argues that this "*Purcell* principle" does not apply. That is wrong. First, the Reply argues that an injunction will "not cause voter confusion and does not disincentivize voters from voting." Dkt. 96 at 25. This argument fails, because it ignores the undisputed evidence that many voters have already completed ABBMs, many local election officials have already printed mail-in ballot materials, and changing the

8

mail-in ballot rules at this juncture will undoubtedly cause confusion among voters and officials. Anderson Dec. ¶ 3–6, 9, 14–16; Ingram Dec. ¶ 5, 8, 10.[9] Second, the Reply argues that an injunction "does not interfere with the State's ongoing election preparation," Dkt. 96 at 26. This, too, ignores the evidence. Anderson Dec. ¶ 3–6, 9, 15–16; Ingram Dec. ¶ 4–11, 14–15.

The Reply's attempt to distinguish *Republican National Committee* also fails. *Id.* In that case, by Plaintiffs' own characterization, the Supreme Court stayed an injunction entered five days before election day which would have extended the due date for ballots. Dkt. 96 at 26 (citing 140 S. Ct. at 1206–07). Plaintiffs would distinguish that precedent on the theory that here, "the election is not nearly so close." Dkt. 97 at 27. This confuses the *deadline* for sending mail-in ballots to voters (the metaphorical "finish line") with the metaphorical "starting line"—the date local election officials begin distributing ballots. The latter is the pivotal date for purposes of mail-in voting, to ensure that all voters who vote by mail are subject to the same requirements and receive the same information in their balloting materials. The Secretary of State has already certified candidates for inclusion on the ballot, and there is nothing to stop local election officials from printing mail-in ballots and distributing them to voters before this Court has time to rule. *See* Anderson Dec. ¶ 7. With the election process already underway, this case is far more akin to *Republican National Committee* than the Reply suggests.

The very foundation of *Purcell* is that "[c]ourt orders affecting elections . . . can themselves result in voter confusion and consequent incentive to stay away from the polls. As an election draws

---

[9] Plaintiffs' proposal would also have voters respond to a call or email from someone purporting to be an election official who is asking for sensitive, personally identifying information. It is surprising that Plaintiffs' counsel contend this will not disincentivize participation, as their organization has argued that requiring voters to prove who they are is inherently confusing, burdensome, and even discriminatory—particularly when a new verification process is implemented within two months of an election. *E.g.*, Texas Election Protection 2016: An overview of the challenges faced by Texas voters in the presidential election (June 2017), Texas Civil Rights Project, *available at* https://texascivilrightsproject.org/wp-content/uploads/2018/09/EP-Report.pdf (last visited Sept. 4, 2020) (asserting that when, "on August 10, 2016, less than two months before Election Day, the court issued an order with the new requirements for voter ID . . . the change in requirements so close to the election left many voters and election officials confused about what requirements were necessary in order to vote during the 2016 general election" and contending that, "[u]nsurprisingly, as soon as Early Voting began, there were rampant reports of confusion concerning the recent court-ordered changes . . .").

closer, that risk will increase." 549 U.S. at 4–5. For this reason, courts nationwide have reached similar results in recent months, weeks, and days, given the problems with changing balloting and other voting procedures at this point in the 2020 election cycle. For example, last week—in a case remarkably similar to this one—a Tennessee District Court noted that "lower federal courts should ordinarily not alter the election rules on the eve of an election," concluding, "[t]he Court believes that this principle applies here, at least to the extent that we may be considered to have reached the 'eve' of the November general election, because to enjoin enforcement of the signature-verification system in advance of the upcoming general election would be to alter Tennessee's rules for that election." *Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 5095459, at *22 (M.D. Tenn. Aug. 28, 2020) (quoting *Republican Nat'l Comm.*, 140 S. Ct. at 1207 (additional citation omitted)).[10]

Similar results abound. *See, e.g.*, *Kishore v. Whitmer*, No. 20-1661, 2020 WL 4932749, at *4 (6th Cir. Aug. 24, 2020) (affirming denial of preliminary injunction where plaintiffs alleged Michigan's ballot-access restrictions, when enforced alongside stay-at-home orders, unconstitutionally burdened voting rights) (citing, *inter alia*, *Republican Nat'l Comm.*, 140 S. Ct. at 1207; *Purcell*, 549 U.S. at 4–5); *Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 4279623, at *1, *9 (M.D. Tenn. July 21, 2020) (declining to enjoin mail-in ballot procedures including "Tennessee's process for verifying that the signature on an absentee ballot matches the signature contained in the (purported) ballot-caster's voter registration record" where doing so would "change the State's careful scheduling into a chaotic attempt to get absentee ballots out on time . . .") (quoting *Perry v. Judd*, 840 F. Supp. 2d 945, 954 (E.D. Va. 2012), *aff'd,* 471 F. App'x 219 (4th Cir. 2012)) (additional citations omitted).

Indeed, courts have declined to grant relief under *Purcell* even when strongly suggesting that a plaintiff has a meritorious constitutional claim. *E.g., Garcia v. Griswold*, No. 20-CV-1268-WJM, 2020

---

[10] This case also lends additional support to one of the Secretary's arguments on the merits: namely, that there is no procedural due process interest in an absentee ballot. *Hargett*, 2020 WL 5095459, at *7 (quoting *Jordan v. Fisher*, 823 F.3d 805, 810–11 (5th Cir. 2016), as revised (June 27, 2016)). *See also* Dkt. 79 at 1, 7–8; Dkt. 75 at 9–10; Dkt. 70 at 23.

WL 4926051, at *5 (D. Colo. Aug. 21, 2020) (denying request for temporary restraining order placing candidate on ballot after the deadline; concluding, "[a]t this very late hour, the Secretary's interest in ensuring that ballots are timely printed outweighs even a meritorious claim under the Constitution") (citing, *inter alia*, *Purcell*, 549 U.S. at 4–5); *Constitution Party of Va. v. Va. State Bd. of Elections*, No. 3:20-CV-349, 2020 WL 4001087, at *7 (E.D. Va. July 15, 2020) (recognizing, in challenge to signature requirement for ballot-access, that "defendants will suffer prejudice if the Court requires them to add a new element to the signature verification process in the middle of a global pandemic, weeks before they must finalize, approve, and print the ballots.") (citing *Republican Nat'l Comm.*, 140 S. Ct. at 1207); *Bond v. Dunlap*, No. 1:20-CV-00216-NT, 2020 WL 4275035, at *15 (D. Me. July 24, 2020) (Denying request to enjoin ballot-access requirement because, "[w]hile the general election is a little over three months away, slashing the numerical signature requirement—after the submission deadline has already passed—would be altering state election rules in a way that goes beyond the court's role.") (citing, *inter alia*, *Esshaki v. Whitmer*, 2020 WL 2185553, at *2 (6th Cir. May 5, 2020) ("[F]ederal courts have no authority to dictate to the States precisely how they should conduct their elections.") (additional citation and quotation marks omitted)).

## CONCLUSION

For the reasons the Secretary has already briefed, as well as those here, Plaintiffs' request for injunctive relief should be denied.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy First Assistant Attorney General

DARREN L. MCCARTY
Deputy Attorney General for Civil Litigation

THOMAS A. ALBRIGHT
Chief for General Litigation Division

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Texas Bar No. 24078898
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 463-2798 | FAX: (512) 320-0667
anna.mackin@oag.texas.gov

**ATTORNEY FOR DEFENDANT
TEXAS SECRETARY OF STATE**

### CERTIFICATE OF SERVICE

I certify that that on September 4, 2020, this document was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record.

*/s/ Anne Marie Mackin*
ANNE MARIE MACKIN
Assistant Attorney General