FILED

SEP 0 8 2020

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

DR. GEORGE RICHARDSON, ROSALIE      §
WEISFELD, AUSTIN JUSTICE            §
COALITION, COALITION OF TEXANS      §
WITH DISABILITIES, MOVE TEXAS       §
CIVIC FUND, and LEAGUE OF WOMEN     §
VOTERS OF TEXAS,                    §
                                    §
        *Plaintiffs*,               §
                                    §
*v.*                                §       Civil No. SA-19-cv-00963-OLG
                                    §
TEXAS SECRETARY OF STATE, TRUDY     §
HANCOCK, in her official capacity as §
BRAZOS COUNTY ELECTIONS            §
ADMINISTRATOR, and PERLA LARA, in   §
her official capacity as CITY OF     §
MCALLEN, TEXAS SECRETARY,            §
                                    §
        *Defendants*.               §
                                    §

## MEMORANDUM OPINION AND ORDER

On this date, the Court considered Plaintiffs' Motion for Summary Judgment (docket no.

65) ("Plaintiffs' Motion") and the Texas Secretary of State's Motion for Summary Judgment

(docket no. 70) (the "Secretary's Motion"). Having reviewed the complete record and for the

reasons set forth below, Plaintiffs' Motion is granted in part, and the Secretary's Motion is denied

in part. Specifically, Plaintiffs' Motion is granted to the extent Plaintiff Rosalie Weisfeld and

Plaintiff Coalition of Texans with Disabilities seek summary judgment on their due process claims

("Count One") and "undue burden"/"right to vote" equal protection claims ("Count Two") against

the Secretary, and the Secretary's Motion is denied as to those claims.[1] Based on those claims, the Court concludes that immediate, partial injunctive relief is also appropriate.[2]

## BACKGROUND

This case arises from provisions of the Texas Election Code (the "Election Code" or "Code") related to the process of voting by mail, and specifically, the signature-comparison procedures utilized to determine whether a ballot should be accepted or rejected. Like many states, the State of Texas ("Texas" or the "State") offers certain voters the opportunity to vote by mail. Specifically, Texas offers the opportunity to vote by mail to voters who are outside of their county of residence during an election, voters with disabilities, voters 65 years-of-age or older, and certain voters confined in jail but otherwise eligible to vote. *See* Tex. Elec. Code §§ 82.001-.004.

In order to vote by mail, an eligible voter must first request a mail-in ballot by completing a mail-in ballot application at least 11 days before the election day. *Id.* at §§ 84.001, 84.007. As part of the application, the voter signs a certificate attesting that the voter "certif[ies] that the information given in this application is true" and "understand[s] that giving false information in this application is a crime." Docket no. 65-1, Ex. 6. If the voter's application complies with all requirements, local election officials provide the voter with an official ballot, ballot envelope and carrier envelope. *See* Tex. Elec. Code §§ 86.001(b), 86.002(a). In order to cast his or her vote by mail, the voter must mark the ballot, place it in the official ballot envelope provided by the county, seal the official ballot envelope, place the official ballot envelope in the carrier envelope provided

---

[1] For the reasons set forth in Sections I and IV of this Order, the merits of Plaintiffs' other claims against the Secretary and all claims against the other defendants will be addressed by separate order, if necessary. For the same reasons, the other pending summary judgment motions will also be addressed by separate order, if necessary. *See* docket nos. 64, 65, 66 & 70.

[2] For the reasons set forth in Section III of this Order, the Court will determine whether additional injunctive relief is appropriate following the November 3, 2020 elections.

2

by the county, seal the carrier envelope, and sign the certificate on the carrier envelope. *Id.* at § 86.005(a)-(c). Specifically, the carrier envelope certificate requires the voter to "certify that the enclosed ballot expresses [the voter's] wishes independent of any dictation or undue persuasion by any person," and includes a line for the voter's signature across the flap of the envelope. *Id.* at § 86.013(c). The carrier envelope then must be returned to the county in a timely manner. *Id.* at § 86.006(a). As shown, neither the ballot application nor the carrier envelope (i) instruct the voter how to sign his or her name or (ii) notify the voter that the signatures on the application and carrier envelope will be used as part of any comparison process. *See* docket no. 84, Ingram Dep. at 32:25-35:4, 103:9-15.

Following the receipt of a voter's mail-in ballot, the Election Code instructs each local jurisdiction's Early Voting Ballot Board ("EVBB") or Signature Verification Committee ("SVC") to open the ballot envelope and determine whether to accept or reject the voter's ballot.[3] *See id.* at §§ 87.001, 87.027(a-1), 87.041. The Section states that a ballot may only be accepted if various conditions are satisfied. *Id.* at § 87.041(b). One such provision, which is central to this lawsuit, states that a ballot must be rejected if the EVBB or SVC concludes that the signature on the carrier envelope or ballot application was "executed by a person other than the voter, unless signed by a witness." *Id.* at § 87.041(b)(2).[4] The Election Code provides guidance as to which signatures an

---

[3] The signature-comparison process is generally conducted by the Early Voting Ballot Board, a statutorily required board established in each county that includes representatives from county parties. *See generally* Tex. Elec. Code § 87.001. However, the local jurisdiction's Early Voting Clerk ("EVC") may determine that a Signature Verification Committee should be established, in which case the SVC will perform the signature reviews rather than the EVBB. *See generally id.* at § 87.027. An SVC is also mandatory if the EVC receives a timely petition of at least 15 registered voters requesting such a committee. *Id.* at § 87.027(a-1).

[4] The relevant provision of the Election Code states that a ballot may only be accepted if "neither the voter's signature on the ballot application nor the signature on the carrier envelope certificate is determined to have been executed by a person other than the voter, unless signed by a witness."

EVBB or SVC should use for the purposes of comparison and states that the "committee shall compare the signature on each carrier envelope certificate . . . with the signature on the voter's ballot application." *See id.* at § 87.027(i); *see also id.* at § 87.041(b)(2). The Code provides that the "committee may also compare the signatures with any two or more signatures of the voter made within the preceding six years and on file with the county clerk or voter registrar." *Id.* at §§ 87.027(i), 87.041(e). However, the Election Code contains no guidance as to the appropriate procedure or standard for determining whether two signatures "match," and instead, signature reviewers are merely instructed to use their "best judgment." *See* docket no. 65-1, Ex. 4 p. 35; docket no. 84, Ingram Dep. at 50:15-51:5. Similarly, the Election Code does not require that EVBB or SVC members receive training in evaluating signatures. *See* docket no. 65-1, Ex. 4; docket no. 84, Ingram Dep. at 49:2-5; docket no. 84, Hancock Dep. at 31:8-19, 73:6-17. For that reason, one local election official agreed that—under the existing policies—whether a ballot is accepted or rejected very well may vary depending on which members of the review committee conduct the comparison. *See* docket no. 84, Hancock Dep. at 123:4-12.

If a ballot is rejected on the basis of the EVBB's or SVC's signature comparison, the Election Code only requires that the voter be notified about the rejection of his or her ballot within 10 days following the election. *Id.* at § 87.0431(a). Prior to a mail-in ballot's rejection, the Election Code does not *require* that local jurisdictions provide an opportunity for the voter to (i) verify his or her identity, (ii) demonstrate that he or she did indeed sign the relevant documents, or (iii) otherwise challenge the signature verification determination. Instead, the Election Code states that a "county election officer *may* petition a district court for injunctive or other relief as the court

---

*Id.* at § 87.041(b)(2). The Election Code also sets restrictions as to which voters may utilize the witness alternative. *See, e.g., id.* at § 1.011(a).

4

determines appropriate" if the county election officer "determines a ballot was incorrectly rejected or accepted by the [EVBB]." *Id.* at § 87.127(a) (emphasis added). Interestingly, Texas voters who make other mistakes during the voting process—including those who fail to bring photo identification for in person voting and those who forget to sign the carrier envelope altogether—are provided with a specific opportunity to "cure" under the Election Code prior to their ballot's rejection. *See* Tex. Elec. Code §§ 63.001(g), 65.0541, 86.011(d). Unsurprisingly, Plaintiffs assert—and the Texas Secretary of State's (the "Secretary") Director of Elections acknowledged—that the existing signature-comparison procedures may result in certain mail-in ballots being improperly rejected. *See* docket no. 84, Ingram Dep. 76:23-77:7. And as a result of the implemented procedures, the record demonstrates that Texas counties rejected at least 3,746 mail-in ballots during the 2018 general election and at least 1,567 mail-in ballots during the 2016 general election solely on the basis of mismatching signatures. *See* docket no. 65-1, Ex. 16.

Plaintiffs in this case include both individuals who had their votes rejected on the basis of signature "mismatches" and various organizations whose members and/or whose services are allegedly impacted by the State's mail-in voting signature-comparison procedures. Plaintiff Dr. George Richardson ("Richardson") had his mail-in ballot rejected by Brazos County officials during the 2018 general election. *See* docket no. 65-1, Ex. 25. Similarly, during a city run-off election in 2019, the City of McAllen rejected Plaintiff Rosalie Weisfeld's ("Weisfeld," and with Richardson, the "Individual Plaintiffs") mail-in ballot. *See* docket no. 65-1, Ex. 33. The record demonstrates that the Individual Plaintiffs were each eligible to vote by mail,[5] each mailed in his or her respective ballot well before the election date, and each complied with all instructions on

---

[5] Richardson was eligible to vote by mail as a voter over the age of 65, and Weisfeld was eligible to vote by mail as a voter who was outside of her county of residence on election day. *See* docket no. 65-1, Exs. 21 & 30.

both the application and carrier envelope, including by signing each document in the appropriate certification portion. *See* docket no. 65-1, Exs. 18-20, 25, 30-33. Notwithstanding those efforts, each Individual Plaintiff's ballot was nonetheless rejected on the basis of a perceived signature "mismatch," and each Individual Plaintiff was not notified until after the election that his or her respective ballot had been rejected. *See* docket no. 65-1, Exs. 21, 25, 30, 33. Notably, Weisfeld's ballot was rejected even though she had previously served as a member on the EVBB in Hidalgo County. *See* docket no. 84, Weisfeld Dep. at 68:22-71:20. And Richardson's ballot was rejected despite the fact that he specifically contacted local Brazos County officials to notify them of their mistake following his receipt of his rejection notice. *See* docket no. 84, Richardson Dep. at 30:9-19, 31:21-32:1. The record demonstrates that each of the Individual Plaintiffs is qualified to—and intends to—vote by mail again in the future. *See* docket no. 65-1, Ex. 30 ¶¶ 3, 13-16; docket no. 84, Weisfeld Dep. at 22:20-23, 26:22-27:5; docket no. 65-1, Ex. 21 ¶¶ 3, 12.

Whereas each of the Individual Plaintiffs have previously had a ballot improperly rejected as a result of the existing signature-comparison procedures, Plaintiffs Coalition of Texans with Disabilities ("CTD"), Austin Justice Coalition ("AJC"), MOVE Texas Civic Fund ("MOVE") and League of Women Voters ("LWV") (collectively, the "Organizational Plaintiffs") each undertake voter registration, voter outreach, voter support, and/or voter education efforts in Texas. *See generally* docket no. 65-1, Exs. 35, 45, 49, 60. Certain efforts made by the Organizational Plaintiffs have been conducted in response to the challenged signature-comparison procedures. For example, CTD specifically produces informational materials for voters—including its members with disabilities and others—that provide notice of the signature-comparison process, advise voters that they must be careful to ensure their signatures "match," and warn voters that any failure to adequately "match" their signatures may result in disenfranchisement. *See, e.g.,* docket no. 65-1,

Exs. 46 & 47. The Organizational Plaintiffs argue that their missions are frustrated and that they are forced to expend additional resources as a result of the signature-comparison procedures utilized on mail-in ballots. *See* docket no. 74 p. 4.

In the instant lawsuit, the Individual Plaintiffs and Organizational Plaintiffs challenge the State's existing signature-comparison procedures. *See* generally docket no. 1. Plaintiffs specifically take issue with both (i) the inherent flaws in the signature-comparison process (including the lack of uniform comparison standards or training regarding signature "matching") that result in incorrect ballot rejections and (ii) the fact that voters are provided no meaningful notice of a rejected ballot nor a meaningful opportunity to cure an improper rejection based on a perceived signature-mismatch. *See id.* at ¶¶ 47, 50. Plaintiffs correctly note that—as a result of the challenged features of the existing signature-comparison process for mail-in ballots—voters who were eligible to vote by mail and who chose to do so suffered disenfranchisement. *See id.* at ¶ 57. Plaintiffs further argue that the disenfranchisement of eligible voters will continue to occur in the future absent changes to the applicable signature-comparison procedures. *See id.* Similarly, the Organizational Plaintiffs argue that they will continue to be forced to expend resources helping voters avoid disenfranchisement due to improper signature rejections so long as Texas's existing procedures remain unchanged. *See id.* at ¶¶ 14, 18, 23, 26. On that basis, Plaintiffs filed the present action seeking declaratory and injunctive relief against Defendants.

Specifically, Plaintiffs seek relief against Defendant Texas Secretary of State (the "Secretary"), Defendant Trudy Hancock ("Hancock"), and Defendant Perla Lara ("Lara"). The Secretary is sued in her official capacity as the Chief Election Officer of the State of Texas. *See* Tex. Elec. Code § 31.001(a). Hancock is sued in her official capacity as the Brazos County Elections Administrator ("Brazos EA"), and Lara is sued in her official capacity as the Secretary

of the City of McAllen, Texas ("McAllen City Secretary," and, collectively with Brazos EA, the "Local Defendants"). Plaintiffs' Complaint asserts the following causes of action against each of the Defendants: (1) a claim by all Plaintiffs alleging violations of the Due Process Clause of the Fourteenth Amendment for Defendants' alleged failure to provide pre-rejection notice and an opportunity to cure to voters whose ballots are rejected on the basis of a perceived signature mismatch ("Count One"); (2) a claim by all Plaintiffs alleging violations of the Equal Protection Clause of the Fourteenth Amendment due to an allegedly severe burden that has been placed on the right to vote that is not justified by a legitimate government interest ("Count Two");[6] (3) a separate claim by all Plaintiffs alleging violations of the Equal Protection Clause of the Fourteenth Amendment due to the Secretary's, State's and/or Local Defendants' failure to provide any uniform guidelines or principles regarding the comparison of signatures ("Count Three"); and (4) a claim asserted only by Plaintiff CTD alleging violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.*, and the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794 ("Count Four"). *See* docket no. 1.

Following completion of discovery, each party filed a Motion for Summary Judgment seeking summary judgment on each of the pending claims. *See* docket no. 64 (the "McAllen Motion"); docket no. 65; docket no. 66 (the "Brazos Motion"); docket no. 70. Each party also filed responses and/or replies to the various summary judgment motions. *See* docket nos. 73, 74, 75, 76, 77, 79 & 80. In support of their arguments, the parties attached voluminous appendices of deposition testimony, affidavits, and documentary evidence to their motions and responses. In addition to relying on the aforementioned materials, Plaintiffs also rely on the expert analysis of

---

[6] Throughout this Order, this theory of relief will be referred to as Plaintiffs' "undue burden" and/or "right to vote" claim. *See* Section II.C, *infra.*

8

Dr. Linton Mohammed, Ph.D., a certified Forensic Document Examiner, whose research and professional experience focus upon handwriting, signature identification, and the scientific approach to analyzing questioned signatures.[7] *See generally* docket no. 65-1, Ex. 14 ¶¶ 1-12; docket no. 84, Mohammed Dep. at 13:22-14:1.

After completing its initial review of the materials provided by the parties, the Court requested that the parties provide the complete transcripts for each of the depositions cited in the motions. *See* docket no. 83. In response to the Court's order, the parties provided the Court with a helpful joint appendix containing the requested materials. *See* docket nos. 84 & 85. In addition, the Court issued an Order requesting additional briefing as to the appropriate remedy in the event Plaintiffs' constitutional claims were meritorious. *See* docket no. 88. In response to that Order, the parties provided the Court with detailed briefing. *See* docket nos. 89, 91, 92, 93, 96 & 98.

## LEGAL STANDARD

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(c). In making the determination of whether a genuine issue of material fact exists, the court reviews the facts and inferences to be

---

[7] The Secretary's response to Plaintiffs' Motion explains why the Secretary believes Dr. Mohammed's opinions are "unhelpful" in this case. *See* docket no. 75 pp. 15-16. However, no party appears to explicitly challenge Dr. Mohammed's expertise or the substance of his testimony, and notably, the Secretary and Brazos EA also rely on Dr. Mohammed's testimony for other purposes in their briefing. *See* docket no. 70 p. 5 n.8; docket no. 73 p. 11. Additionally, a case law search demonstrates that courts have accepted Dr. Mohammed's expert opinions in other cases involving challenges to similar signature-comparison procedures used by other states. *See, e.g., Saucedo v. Gardner*, 335 F. Supp. 3d 202, 213 (D.N.H. 2018); *Frederick v. Lawson*, 119CV01959SEBMJD, 2020 WL 4882696, at *14 (S.D. Ind. Aug. 20, 2020).

drawn from them in the light most favorable to the non-moving party. *Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.,* 336 F.3d 410, 412 (5th Cir. 2003).

At the summary judgment stage, the movant bears the burden of identifying those portions of the record it believes demonstrate the "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna,* 401 F.3d 347, 349 (5th Cir. 2005). However, the movant need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.,* 402 F.3d 536, 540 (5th Cir. 2005). The moving party may meet its burden "by pointing out 'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Products, Inc.,* 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)). If the movant satisfies its burden, the non-moving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l,* 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted); *see also Lincoln Gen. Ins. Co.,* 401 F.3d at 349. At the summary judgment stage, the non-movant cannot meet its burden with "conclusory allegations" or "unsubstantiated assertions." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.,* 530 F.3d 395, 399 (5th Cir. 2008). In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant. *Tamez v. Manthey,* 589 F.3d 764, 769 (5th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "As to materiality, the substantive law will identify which facts are material." *Anderson,* 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude

10

the entry of summary judgment." *Id.* "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## DISCUSSION

As noted above, presently pending before the Court are numerous claims asserted against each of the three Defendants, as well as four motions for summary judgment with respect to those claims. In light of the impact the pending claims and issues may have on the upcoming November 3, 2020 elections, and in order to promptly issue this Order, the Court has concluded that it is appropriate for it to focus its analysis only on certain Plaintiffs' claims against the Secretary. Indeed, as explained in subsequent Sections, narrowing the claims and issues that are addressed in this Order permits the Court to issue an order that both (i) addresses the relevant legal issues and (ii) affords time such that the appropriate remedy may be implemented prior to the November 2020 elections. *See* Section IV, *infra.*

Accordingly, although evidence related to each of the parties is relevant to the merits of the claims (and will be discussed in the Court's analysis), this Order will only specifically determine whether summary judgment is appropriate with respect to Plaintiff Weisfeld's and Plaintiff CTD's due process and "undue burden"/"right to vote" equal protection claims against the Secretary. *See* docket no. 1, "Count One" & "Count Two." For the reasons set forth in Sections I-III of this Order, the Court concludes that Plaintiffs Weisfeld and CTD are entitled to summary judgment on each of those claims. The Court further concludes that immediate injunctive relief is appropriate in advance of the November 3, 2020 elections. Finally, for the reasons set forth in Section IV of this Order, all remaining claims and motions (including Plaintiff Weisfeld's and Plaintiff CTD's other claims and all claims against the Local Defendants) will be held in abeyance

pending a hearing following the November 2020 elections and/or the resolution of any appeal of this Order.

## I.   Subject-Matter Jurisdiction and Standing

Before addressing the merits of Plaintiffs' claims, the Court will first address whether Plaintiffs' have standing to bring the asserted claims and whether the Secretary is a proper defendant with respect to those claims. The Secretary contends that Individual Plaintiffs lack Article III standing to seek injunctive relief because it is "speculative" as to whether they will again suffer the same "injury in fact" in the future. *See* docket no. 75 pp. 3-5. The Secretary argues that the Organizational Plaintiffs lack organizational standing and associational standing because they too cannot satisfy the "injury in fact" requirement. *See id.* at pp. 5-9; docket no. 70 pp. 15-20. Additionally, the Secretary argues that Plaintiffs lack standing as to claims against the Secretary because they cannot satisfy the traceability and/or redressability requirements for Article III standing as to the Secretary. *See* docket no. 70 pp. 13-15. The Secretary also contends that Plaintiffs' claims against the Secretary are barred by sovereign immunity. *See id.* at pp. 11-12. Finally, the Secretary argues that the Organizational Plaintiffs lack statutory standing under 42 U.S.C. § 1983 to assert constitutional claims against the Secretary. *See id.* at pp. 20-21.

Having reviewed the record, it is apparent that Plaintiffs Rosalie Weisfeld and CTD have standing to seek the declaratory and injunctive relief against the Secretary sought by Plaintiffs. Accordingly, the Court will explain why those Plaintiffs have "individual" and "organizational" standing, respectively, and for the purposes of efficiency—given the upcoming election—the Court will decline to specifically analyze whether other Plaintiffs also have standing. Indeed, in a lawsuit for injunctive relief, the presence of one party with standing is sufficient to satisfy Article III's case or controversy requirement. *See Texas v. United States*, 945 F.3d 355, 377-78

(5th Cir. 2019) ("Only one plaintiff need succeed because one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.") (internal quotations omitted); *Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015) (same); *see also Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) (citing *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 585-86 (5th Cir. 2006)) (other citations omitted). Additionally, the Court will also explain why the Secretary is a proper defendant as to Plaintiffs' claims and why Plaintiffs' claims against the Secretary are not barred by sovereign immunity. Finally, the Court will discuss why Plaintiff CTD also has prudential standing under § 1983 to assert constitutional claims against the Secretary.

### A. Legal Standard for Article III Standing

The constitutional requirement of standing contains three elements: "To establish standing under Article III of the Constitution, a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, No. 17-1712, —— U.S. ——, 140 S.Ct. 1615 (U.S. June 1, 2020) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). The same requirements also apply to entities seeking to establish that they have "associational" or "organizational" standing. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 609-10 (5th Cir. 2017).

> "Associational standing" is derivative of the standing of the association's members, requiring that they have standing and that the interests the association seeks to protect be germane to its purpose. By contrast, "organizational standing" does not depend on the standing of the organization's members. The organization can establish standing in its own name if it meets the same standing test that applies to individuals.

*Id.* at 610 (citations and some internal quotation marks omitted).

"[T]he injury in fact requirement under Article III is qualitative, not quantitative, in nature," and the injury "need not be substantial." *OCA-Greater Houston*, 867 F.3d at 612 (citations, internal quotation marks and brackets omitted). Thus, while an injury in fact must be (a) "concrete and particularized" and (b) "actual or imminent, not conjectural or hypothetical," *Lujan*, 504 U.S. at 560 (internal citations and quotation marks omitted), "it need not measure more than an 'identifiable trifle.'" *OCA-Greater Houston*, 867 F.3d at 612 (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999)).

### B. Injury in Fact—Weisfeld's Individual Standing

The Fifth Circuit recently explained what an individual plaintiff must demonstrate in order to satisfy the "injury in fact" requirement for the purposes of seeking injunctive and declaratory relief. Specifically, in *Stringer v. Whitely*, the Fifth Circuit explained as follows:

> Because injunctive and declaratory relief cannot conceivably remedy any past wrong, plaintiffs seeking injunctive and declaratory relief can satisfy the redressability requirement only by demonstrating a continuing injury or threatened future injury. That continuing or threatened future injury, like all injuries supporting Article III standing, must be an injury in fact. To be an injury in fact, a threatened future injury must be (1) potentially suffered by the plaintiff, not someone else; (2) concrete and particularized, not abstract; and (3) actual or imminent, not conjectural or hypothetical. The purpose of the requirement that the injury be imminent is to ensure that the alleged injury is not too speculative for Article III purposes. For a threatened future injury to satisfy the imminence requirement, there must be at least a substantial risk that the injury will occur.

942 F.3d 715, 720-21 (5th Cir. 2019) (internal quotations and citations omitted). Relying on the Fifth Circuit's *Stringer* opinion, the Secretary argues that the Individual Plaintiffs cannot satisfy this standard because it is "speculative that Individual Plaintiffs will vote this way" and "there is no basis to conclude that their hypothetical future ballots will be rejected." Docket no. 75 p. 4.

Having reviewed the record, the Court finds the Secretary's arguments to be misplaced as to Plaintiff Weisfeld.[8] As an initial matter, the Secretary's assertion completely ignores the record evidence demonstrating that Weisfeld has repeatedly voted by mail in the past and will continue to vote by mail in the future. *See* docket no. 65-1, Ex. 30 ¶¶ 3, 13-16; docket no. 84, Weisfeld Dep. at 22:20-23, 26:22-27:5. Specifically, the record demonstrates that Weisfeld recently suffered traumatic injuries in a car accident and that, as a result, she will be voting by mail under the disability qualification in upcoming elections. *See* docket no. 65-1, Ex. 30 ¶ 16; docket no. 84, Weisfeld Dep. at 77:1-8. Moreover, Weisfeld is 63 years old, and she stated that when she turns 65, she will vote by mail for that reason as well. *See* docket no. 65-1, Ex. 30 ¶ 15. Finally, in the event she is absent from Hidalgo County (where she resides) in any upcoming elections—which may be the case given that her doctors and therapists are located in Houston—Weisfeld *also* plans to vote by mail for that reason as well. *See id.* at ¶ 16; docket no. 84, Weisfeld Dep. at 77:1-25.

In this important way, the present circumstances are distinguishable from those in *Stringer*. In *Stringer*, the plaintiffs asserted that the State's motor voter online registration practices violated plaintiffs' equal protection rights and the National Voter Registration Act's provisions that require simultaneous driver's license and voter registration applications. *See Stringer v. Pablos*, 320 F. Supp. 3d 862 (W.D. Tex. 2018). Because the record—*at that time*—did not contain "[p]laintiff-specific evidence" that any of the plaintiffs would again become "both unregistered to vote and eligible to renew their driver's licenses using the [challenged] DPS system," the Fifth Circuit held that plaintiffs had not shown that there was a "substantial risk" that plaintiffs would again become unregistered and eligible to renew their driver's licenses online. *Stringer*, 942 F.3d at 722-23. In

---

[8] To be clear, the Court has not concluded that the Secretary's arguments have merit as to Plaintiff Richardson. For the reasons set forth above and in Section IV, *infra*, the Court has not conducted that analysis as part of this Order.

this case, the record clearly demonstrates that Weisfeld will again vote by mail in the future, and thus, she *will* again be subjected to the challenged voting procedures.

Further, although it is true that the "past wrong" of Weisfeld's improperly rejected 2019 ballot cannot be remedied by the declaratory and injunctive relief sought here, *see Stringer*, 942 F.3d at 720, the prior rejection of Weisfeld's ballot certainly may be considered when evaluating the risk that such harm will occur again. *See O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) (stating that "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury"). Incredibly, Weisfeld previously served as a member on the EVBB in Hidalgo County, and thus, she was aware of both the requirement that her signatures match and the applicable signature-comparison process. *See* docket no. 84, Weisfeld Dep. at 70:1-71:20. Notwithstanding her familiarity with the process, however, *even her* ballot was rejected for a perceived signature mismatch. Given that her efforts to comply with the signature requirement were apparently insufficient to satisfy the comparison standards that were being applied by the specific review committee on the date in question, there is clearly a realistic chance that such a rejection will occur again with respect to her ballot.

Because it is clear that Weisfeld will vote by mail in the near future as a disabled voter, a voter out of the county, and—beginning in less than two years—as a voter over the age of 65, the Secretary's argument appears to ultimately rest on the fact that Weisfeld's mail-in ballots in upcoming elections *might not* be rejected due to a signature mismatches. *See* docket no. 75 p. 4 (asserting that "there is no basis to conclude that [Individual Plaintiffs'] hypothetical future ballots will be rejected."). And of course, that is true. But there is no "threshold" probability of disenfranchisement that a plaintiff must prove in order to demonstrate "substantial risk," and there certainly is no requirement that a plaintiff demonstrate that he or she is *certain* to have her ballot

rejected. Indeed, if that were the case, no voter could challenge the signature-comparison procedures at issue, as no voter would be able to show with certainty that his or her "future ballots *will* be rejected" until after that harm has occurred.

To be clear, it is true that some Texas voters may not have standing to challenge the signature-comparison procedures at question. Indeed, a voter who is ineligible to vote by mail certainly could not demonstrate a substantial risk that his or her ballot may be rejected on the basis of a perceived signature mismatch on a mail-in ballot. But in this case, the record contains specific evidence demonstrating that (i) Weisfeld <u>will</u> again vote by mail on the basis of her disability (and on other bases), (ii) Weisfeld <u>will</u> again be subjected to the same challenged procedures, and (iii) Weisfeld has previously been unable to "match" her signatures (at least to the satisfaction of one prior review committee).[9] *See Self Advocacy Sols. N.D. v. Jaeger*, 3:20-CV-00071, 2020 WL 2951012, at *5 (D.N.D. June 3, 2020) (finding that individual plaintiff had standing to challenge similar signature comparison procedures and stating that "[c]onsidering election officials incorrectly rejected [the] ballot [of a mail-in voter plaintiff with a disability] in the 2018 general election for a signature discrepancy—coupled with the fact that she will again have to vote by mail in the upcoming primary because of the COVID-19 pandemic—there is a realistic threat of an impending deprivation of her right to vote.").

In this way, this is not a case of Weisfeld attempting to remedy a "generalized grievance available to all Texans." *Stringer*, 942 F.3d at 722. Instead, there is "plaintiff-specific" proof

---

[9] The Court's conclusion with respect to Weisfeld's standing is not *dependent* on the fact that Weisfeld's ballot was previously rejected. A plaintiff need not necessarily demonstrate that he or she suffered an injury in the past in order to seek an injunction to prevent threatened future harm. *See* note 33, *infra*. Instead, the evidence of the "past wrong" to Weisfeld merely solidifies the Court's conclusion that Weisfeld faces a "substantial risk" of the improper rejection of her ballot in the future. *See O'Shea*, 414 U.S. at 496 (stating that "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury").

demonstrating that Weisfeld faces a substantial risk that her ballot will again be improperly rejected, and thus, "[o]n these facts, the prospect of future [harm to Weisfeld] is far from imaginary or speculative." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 165 (2014) (citation and internal quotations marks omitted). Thus, Weisfeld has shown "a continuing or threatened future injury to [herself]," *Stringer*, 942 F.3d at 721, and for that reason, she has satisfied the "injury in fact" requirement necessary to request the declaratory and injunctive relief sought by Plaintiffs in this case.

### C. Injury in Fact—CTD's Organizational Standing

An "organization can establish standing in its own name if it meets the same standing test that applies to individuals." *OCA-Greater Houston*, 867 F.3d at 610 (citations and internal quotation marks omitted). The Secretary argues that no Organizational Plaintiff can satisfy the injury in fact requirement for Article III standing because no Organizational Plaintiff can show a "cognizable interest" in the form of specific resources that the organization expended "to counteract" the impact of the challenged procedures. *See* docket no. 70 pp. 16-18.

Having reviewed the record, the evidence plainly demonstrates that Plaintiff CTD has satisfied the injury in fact requirement necessary to assert "organizational" standing in this case. The Court's conclusion is compelled by *OCA-Greater Houston*, a recent case in which the Fifth Circuit held that a voter rights group had "organizational" standing to challenge a provision of the Texas Election Code under a "diversion-of-resources" theory. *See* 867 F.3d at 611-12. Specifically, in *OCA-Greater Houston* the Fifth Circuit affirmed the district court's determination that a non-profit, voter outreach organization had "organizational" standing to challenge provisions of the Texas Election Code related to voter-interpreter restrictions. *See id.* In explaining

its conclusion, the Fifth Circuit stated the following with respect to the organization in that case ("OCA"):

> [OCA] went out of its way to counteract the effect of Texas's allegedly unlawful voter-interpreter restriction—not with a view toward litigation, but toward mitigating its real-world impact on OCA's members and the public. For instance, it undertook to educate voters about Texas's assistor-versus-interpreter distinction to reduce the chance that other voters would be denied their choice of interpreter in the way that [the named individual plaintiff] was—an undertaking that consumed its time and resources in a way they would not have been spent absent the Texas law. Hence, the Texas statutes at issue "perceptibly impaired" OCA's ability to "get out the vote" among its members.

*Id.* (footnote omitted).

Each portion of the Fifth Circuit's analysis in that passage could apply with equal force—if not more—to Plaintiff CTD in this case. The record demonstrates that CTD has "gone out of its way to counteract the effect of Texas's allegedly unlawful . . . restriction[,] not with a view toward litigation, but toward mitigating its real-world impact on CTD's members and the public." *Id.* The record is replete with evidence demonstrating CTD's efforts to *specifically* mitigate the effects that the State's signature-comparison procedures may have on both its members and the public. *See, e.g.*, docket no. 65-1, Ex. 47 (video produced by CTD (i) explaining the signature-comparison process, (ii) explaining that the Election Code does not provide for timely notice and an opportunity to cure if a ballot is rejected based on a perceived signature mismatch, (iii) explaining that signature-verification committees are not generally trained in signature comparison, and (iv) instructing viewers to "take special care to make sure your signature matches from the application to your ballot"); docket no. 80-1, Ex. 89 (social media post by CTD explaining that "[s]ignature discrepancies may cause your vote to go uncounted" and instructing voters to "[m]ake sure the signature on your mail in ballot is as close as possible to the . . . signature on your voter registration form"); docket no. 65-1, Ex. 46 (social media post by CTD explaining that voters must

"take care that the signature on your APPLICATION is as close as possible to the signature on your BALLOT" and attaching video with explanation of how existing signature-comparison procedures may lead to disenfranchisement); docket no. 65-1, Ex. 42 (2019 Annual Report containing reminder "to be very clear and consistent with your signatures, which can be used to toss a ballot"). In addition to that documentary evidence, CTD's corporate representative also testified that CTD trains voters on voting by mail, and when doing so, the group specifically instructs voters "to make sure your signature matches as close as possible." Docket no. 84, CTD 30(b)(6) Dep. at 71:5-25; *see also* docket no. 74-1, Ex. 74 ¶ 7 ("CTD must divert resources, such as staff and volunteer time and resources, to instruct voters (during trainings, through CTD's website, through CTD's reports, and through email or social media) to write out signatures neatly or to try to make signatures match when completing mail-in ballot applications and carrier envelopes in order to help reduce the chance of an improper rejection due to an alleged signature mismatch.").[10] CTD's testimony further indicated that this information is particularly important

---

[10] The Secretary argues that materials contained in the Plaintiffs' affidavits are inadmissible because the affidavits were obtained following the discovery deadline. *See* docket no. 75 p. 13. The Court finds the Secretary's argument to be misplaced, at least with respect to the affidavits cited in Section I of this Order. *See* docket no. 65-1, Ex. 30; docket no. 74-1, Ex. 74. As another district court explained:

> Nearly every brief in support of or in opposition to a motion for summary judgment filed in this District Court relies on affidavits or declarations signed within days of that filing. If plaintiff's argument were correct, then all of these federal litigants flout the Federal Rules of Civil Procedure, and all declarations should be stricken unless they were executed prior to the discovery deadline and shared with opposing counsel at that time. This is not how Rule 26 works.

*Woods v. Austal, U.S.A., LLC*, 2011 WL 1380054 at *2 n.4 (S.D. Ala. Apr. 11, 2011). *Even assuming* the affidavits were inadmissible as part of the summary judgment record, however, the evidence cited in the affidavits relied upon in Section I of this Order (docket no. 65-1, Ex. 30 & docket no. 74-1, Ex. 74) is *corroborated by* nearly identical, unrebutted testimony given by the same affiants in response to questioning by the Secretary at the respective affiant's deposition. Notably, the Secretary concedes that the Secretary's argument is only applicable "to the extent [the

for its members, because some disabled voters use methods of signing documents that result in their signatures looking "different." Docket no. 84, CTD 30(b)(6) Dep. at 71:5-25. Finally, uncontroverted testimony demonstrates that CTD would be able to divert its focus to other issues if it did not have to "find a way to cure . . . the signature issue." *Id.* at 73:17-74:6 (stating that the organization could "move on to the next issue that we're dealing with, be it attendant wages, transportation, [or] education"); *see also* docket no. 74-1, Ex. 74 (stating that "CTD specifically diverts these resources away from other projects, such as educating people with disabilities about other mail-in voting issues, or educating people with disabilities about attendant wages or accessibility issues related to transportation, education, or other forms of voting"). In sum, CTD has been forced to divert resources from other activities in order to specifically mitigate the effects of the challenged signature-comparison procedures in the Texas Election Code, and CTD intends to continue to divert resources towards the issue until it is remedied. *See* docket no. 84, CTD 30(b)(6) Dep. at 73:17-74:6. For that reason, the record makes clear that the challenged procedures "perceptibly impair" CTD such that it has suffered an "injury in fact" for the purposes of its assertion of "organizational" standing. *See Frederick v. Lawson*, No. 1:19-cv-01959-SEB-MJD, 2020 WL 4882696, at *10 (S.D. Ind. Aug. 20, 2020) (finding that—even though the additional burdens identified by the plaintiff organization were not "overwhelming"—organization nonetheless had standing to challenge Indiana's mail-in ballot signature-comparison procedures because "it already has diverted and expects to continue in the future diverting their limited resources, including money, time, or both, away from other tasks and toward educating voters about the challenged statutes.").

---

declarations] are not corroborated elsewhere in the record." Docket no. 75 p. 3. Thus, the issue appears moot with respect to CTD and Weisfeld's standing.

In light of the aforementioned evidence and testimony, the Secretary's response appears to be mistaken when it asserts that "no Plaintiff Organization can prove that it went out of its way to counteract the effect of Texas's allegedly unlawful signature-comparison procedure." Docket no. 75 p. 8 (quotations and citations omitted). Contrary to the Secretary's position, the above examples demonstrate that CTD conducts *specific* outreach regarding the signature-comparison procedures, and CTD was not merely engaged in "training on voter-registration in general." *Id.* at p. 6 (citing *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459-60 (6th Cir. 2014)).[11] Perhaps realizing that the record contains numerous examples of CTD's efforts directed *specifically* at the signature-comparison process *in particular*, the Secretary's response and reply are silent as to *CTD's* activities highlighted in Plaintiffs' motion and response. Instead, the Secretary's response and reply specifically focus on general "voter-education" and "voter-registration" efforts conducted by *other* organizations, *see* docket no. 75 pp. 6-9, and the Secretary appears to fold CTD into its sweeping assertion that the Organizational Plaintiffs "have done nothing to target those activities specifically toward remedying the alleged wrong in this case: rejection of mail-in ballots during the signature-verification process." *See id.* at p. 9. Instead, the evidence of CTD's actual, specific efforts is unrebutted, and as noted above, that evidence includes detailed examples of CTD going

---

[11] In arguing that the Organizational Plaintiffs have not demonstrated an injury in fact, the Secretary relies primarily on *NAACP v. City of Kyle*, 626 F.3d 233, 238–39 (5th Cir. 2010) and *Fair Elections Ohio v. Husted*, 770 F.3d 456, 460 (6th Cir. 2014). The Court finds these references unpersuasive. *City of Kyle* is distinguishable in this case for all of the reasons the Fifth Circuit explained that same analysis was inapplicable in *OCA-Greater Houston. See* 867 F.3d at 611-12 (specifically distinguishing *City of Kyle* on the basis that OCA "went out of its way to counteract the effect of Texas's allegedly unlawful voter-interpreter restriction—not with a view toward litigation, but toward mitigating its real-world impact on OCA's members and the public"). And in *Husted*, the Sixth Circuit specifically noted that the "training" that constituted the alleged injury was already part of the scheduled activities and would have occurred regardless. *See* 770 F.3d at 459-60. In this case, it is clear that CTD created specific materials regarding the challenged signature-comparison procedures that are independent of its other voting-related activities and would not have been created absent the challenged processes.

"out of its way to counteract the effect of Texas's allegedly unlawful" signature-comparison procedure by producing specific materials in order to educate its members (and others) about the signature-matching requirements and the potential for a signature-mismatch to result in disenfranchisement because voters do not receive timely notice of a ballot's rejection. *OCA-Greater Houston*, 867 F.3d at 612. Moreover, although the Secretary's reply asserts that "[t]here is no evidence that, because of Texas's signature-verification requirement, any Plaintiff Organization had to 'spend more time' on voter interaction in a manner that 'perceptibly impaired' its ability to fulfill its mission," *see* docket no. 79 p. 3, that argument again ignores the unrebutted testimony in the record. Indeed, the record makes clear that CTD expends resources educating voters about the signature-comparison issue and those resources are diverted from other activities conducted on behalf of disabled Texans, including those related to transportation and education. *See, e.g*, docket no. 84, CTD 30(b)(6) Dep. at 73:17-74:6; docket no. 74-1, Ex. 74. Thus, at least with respect to CTD, the Secretary's attempt to write-off the organizational activities as routine, non-specific "voter-registration efforts" are wholly without merit.[12]

The Secretary's other arguments with respect to CTD's "organizational" standing do not fare any better. The Secretary first asserts that the Organizational Plaintiffs "cannot identify any

---

[12] To be clear, the Court does not mean to imply that the Secretary's arguments necessarily have merit with respect to the other Organizational Plaintiffs, as the Court has not conducted that analysis as part of this Order. However, activities intended to increase voter participation *may* satisfy the "diversion-of-resources" theory for Article III standing. *See OCA-Greater Houston*, 867 F.3d at 612 (holding that the "Texas statutes at issue 'perceptibly impaired' OCA's ability to 'get out the vote' among its members"). Additionally, the Court notes that the record appears to contain evidence of other Organizational Plaintiffs also taking actions *specifically* targeted toward mitigating the impacts of the signature-verification process. *See, e.g.*, docket no. 65-1, Ex. 62 ("Vote by Mail: Step by Step" PowerPoint presentation created by LWV reminding voters that "[y]our signature [on the Application for Ballot by Mail] MUST match the one on your voter registration card," to "[b]e sure this signature [on the carrier envelope] is exactly the same as the signature on your Application for Vote by Mail," and that a ballot may be rejected if "[t]he signature on the [carrier] envelope and on the Application for Mail Ballot are different").

expenditures specifically attributable to voter-registration activities—let alone resources dedicated to mail-in ballots generally or signature-matching in particular." Docket no. 70 p. 16. As an initial matter, there is no requirement that a Plaintiff must quantify a specific monetary cost in order to satisfy the injury in fact requirement. *See, e.g., Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008) (quoting *Crawford*, 472 F.3d at 951) ("[A]n organization suffers an injury in fact when a statute 'compel[s]' it to divert more resources to accomplishing its goals" and "'[t]he fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury.'"). But *even assuming* monetary expenditures are required—and they are not—CTD testified that the amounts spent on its voter outreach (including a newsletter regarding the signature-comparison issue) would be included in the "salaries" and miscellaneous advocacy expenses represented on its annual budget.[13] *See* docket no. 84, CTD 30(b)(6) Dep. at 60:13-61:4, 62:17-63:3 & Ex. 4. Thus, the record does indicate that CTD has made financial expenditures due in part to Texas's signature-comparison procedures, and CTD is not required to place an exact dollar amount on those expenditures for the purposes of Article III standing. *See Fla. State Conf. of N.A.A.C.P.*, 522 F.3d at 1165 (11th Cir. 2008) (quoting *Crawford*, 472 F.3d at 951); *OCA-Greater Houston*, 867 F.3d at 612 (nothing that the injury in fact requirement is "qualitative, not quantitative, in nature").

The Secretary next contests CTD's (and other Organizational Plaintiffs') "organizational" standing on the basis that "[n]o Plaintiff Organization has evidence that any purported member has

---

[13] CTD's representative testified that the organizations expenditures are not broken down by to each individual advocacy issue. *See* docket no. 84, CTD 30(b)(6) Dep. at 60:13-61:4. However, with respect to the line items under which CTD's representative indicated that the signature-comparison related costs may be included, the organization's budget spreadsheet states the amounts spent on payroll and "miscellaneous expenses" in 2018 and in 2019. *See* docket no. 84, CTD 30(b)(6) Dep. at Ex. 4.

had a ballot rejected for signature mismatch, or that it has expended any resources assisting or registering any voter whose mail-in ballot was rejected for that reason." Docket no. 70 p. 17. The Secretary fails to explain why this fact is relevant for the purposes of CTD's *organizational* standing, and importantly, it is not. Indeed, for the purposes of organizational standing, the relevant injury to CTD is its "diversion of resources" to counteract the challenged signature-comparison procedures, and it very well may be *because* of CTD's specific, signature-comparison related outreach efforts that CTD's representative was unable to name a specific CTD member who has had his or her ballot rejected due to a perceived signature mismatch.[14]

Finally, the Secretary's assertion that "the evidence indicates that Plaintiff Organizations will continue their existing voter-related activities without regard to any action by the Secretary related to mail-in ballot signature matching" is factually misleading as to CTD. *See* docket no. 70 p. 17 & n.76. The deposition testimony cited by the Secretary merely states that CTD intends to continue voter education into the future, and neither the question nor answer indicates whether the nature of those activities may be impacted by changes to the existing signature-matching procedures.[15] Importantly, although CTD intends to continue its voter-education efforts into the future irrespective of changes to the signature-matching procedures, that does not mean that the scope of CTD's activities may not be modified or reduced. The Fifth Circuit has repeatedly made clear that an organization that conducts voter-outreach as one of its core initiatives may still satisfy the injury in fact requirement if the organization is forced to expend resources on specific types of

---

[14] To be clear, the record does not demonstrate that a CTD member has never had his or her mail-in ballot rejected based on a perceived signature mismatch. Instead, the deposition testimony cited by the Secretary merely indicates that CTD's representative did not know whether a member's ballot had been rejected on that basis. *See* docket no. 84, CTD 30(b)(6) Dep. at 66:1-4.

[15] *See* docket no. 70 p. 17 & n.76 (citing docket no. 70-4, CTD 30(b)(6) Dep. at 72:21-25) (Q: "So does – and I think I know the answer based on what you just said, but does the Coalition of Texans with Disabilities intend to continue training voters on voting by mail?"; A: "Yes. Yes.").

voter education that would not otherwise have been necessary absent the challenged procedure. *See Fowler*, 178 F.3d at 361 (although voter registration was one of plaintiff's central initiatives, organization "expended resources registering voters . . . who would have already been registered if the [state] had complied with the requirement under the NVRA that [the state] must make voter registration material available at public aid offices."); *see also OCA-Greater Hous*ton, 867 F.3d at 610-12 (notwithstanding that OCA also conducted other "get out the vote" initiatives, OCA established injury in fact because it "undertook to educate voters about Texas's assistor-versus-interpreter distinction to reduce the chance that other voters would be denied their choice of interpreter[,] . . . an undertaking that consumed its time and resources in a way they would not have been spent absent the Texas law"). In this case, unrebutted testimony demonstrates that CTD would redirect certain resources to other projects in the event voters were no longer subjected to the challenged signature-comparison procedures. *See* docket no. 84, CTD 30(b)(6) Dep. at 73:17-74:6. The Secretary's suggestion otherwise is without merit.

In sum, and irrespective of whether certain of the Secretary's arguments may have merit with respect to other Organizational Plaintiffs in this case,[16] the record makes clear that CTD has been and will continue to be "perceptibly impaired" by the signature-comparison procedures at issue such that that it has suffered an "injury in fact" for the purposes of its "organizational" standing to challenge those procedures. *OCA-Greater Houston*, 867 F.3d at 612.

### D. Traceability and Redressability

Having determined that at least two Plaintiffs have satisfied the requisite showing of "injury in fact," the Court must now consider whether those Plaintiffs have also demonstrated that

---

[16] The Court reiterates that it has not evaluated the Secretary's arguments with respect to the other Organizational Plaintiffs.

they have satisfied the traceability and redressability requirements of Article III standing as to the Secretary. The Secretary argues that those two prongs are not satisfied—at least with respect to the Secretary—because "whether a mail-in ballot is rejected or counted depends on the actions of local election officials, not the Secretary." Docket no. 70 p. 14.

The Secretary's argument is without merit, and recent Fifth Circuit guidance in a similar election case also involving the Secretary explains why. On June 4, 2020, less than three weeks before the Secretary's office filed its motion, the Fifth Circuit explained why complaints like Plaintiffs' are traceable to and redressable by the Secretary. *See Texas Democratic Party v. Abbott*, 961 F.3d 389, 399 (5th Cir. 2020). Specifically, the Fifth Circuit stated as follows:

> Texas's vote-by-mail statutes are administered, at least in in the first instance, by local election officials. But the Secretary of State has the duty to "obtain and maintain uniformity in the application, operation, and interpretation of" Texas's election laws, including by "prepar[ing] detailed and comprehensive written directives and instructions relating to" those vote-by-mail rules. Tex. Elec. Code § 31.003. And the Secretary of State has the power to "take appropriate action to protect" Texans' voting rights "from abuse by the authorities administering the state's electoral processes." [*Id.* at § 31.005(a) & (b)]. Based on that, the state officials have not shown—at least as to the Secretary of State—that they are likely to establish that the plaintiffs lack standing.

*Tex. Democratic Party*, 961 F.3d at 399 (certain citations in footnotes omitted). Although the Court recognizes that the Fifth Circuit's most recent guidance was issued by a motions panel rather than a merits panel, the Court finds the analysis to be directly applicable in this case.[17] Moreover, the analysis is also consistent with that from other recent Fifth Circuit precedent. *See OCA-Greater Houston*, 867 F.3d at 613 (holding that the "invalidity of a Texas election statute is, without question, fairly traceable to and redressable by . . . its Secretary of State, who serves as the 'chief election officer of the state.'" (quoting Tex. Elec. Code § 31.001(a))).

---

[17] Notably, the recent *Texas Democratic Party* opinion is relied upon by the Secretary for other purposes in the summary judgment briefing. *See, e.g.*, docket no. 70 p. 22; docket no. 75 p. 18.

The Secretary attempts to distinguish *Texas Democratic Party* on the basis that "the Secretary has taken the available steps within her authority" in this case. Docket no. 79 p. 4 (noting that Secretary has advised local election officials "to mail notices of rejected ballots to affected voters as soon as possible"). The Secretary then appears to contend that there are no additional actions the Secretary could take to ensure that Texans' voting rights are not violated by the existing signature-comparison procedures. *See id.* This assertion is both (i) hard to believe in the abstract, and (ii) contradicted by other actions taken by the Secretary in the period since it filed its briefing.

In this case, Plaintiffs allege that the existing signature-comparison procedures are unconstitutional, and "the invalidity of a Texas election statute is, without question, fairly traceable to and redressable by . . . its Secretary of State." *OCA-Greater Houston*, 867 F.3d at 613. Indeed, the Secretary is the State's chief election officer, Tex. Elec. Code § 31.001(a), and under the Code, the Secretary has the duty to "obtain and maintain uniformity in the application, operation, and interpretation of the code." *Id.* at § 31.003. Further, and notwithstanding that many voting processes are administered primarily by local authorities, the Election Code specifically vests in the Secretary numerous powers that it may use to protect voters' rights, including those explicitly cited by the Fifth Circuit in *Texas Democratic Party. See* 961 F.3d at 399. As a specific example, Tex. Elec. Code § 31.005, which is titled "Protection of Voting Rights," states as follows:

> (a) **The secretary of state may take appropriate action to protect the voting rights of the citizens of this state** from abuse by the authorities administering the state's electoral processes.
>
> (b) If the secretary determines that a person performing official functions in the administration of any part of the electoral processes is exercising the powers vested in that person in a manner that impedes the free exercise of a citizen's voting rights, **the secretary may order the person to correct the offending conduct**. If the person fails to comply, **the secretary may seek enforcement of the order** by a temporary restraining order or a writ of injunction or mandamus obtained through the attorney general.

*Id.* (emphasis added). Thus, in the event the Court determines that the Texas Election Code is being implemented by local officials in a way that violates certain mail-in voters' fundamental right to vote, the Secretary not only (i) has the authority to order the local official to change course,[18] but (ii) also has the authority to seek enforcement through the Attorney General in the event the local official fails to comply with the Secretary's order. *See id.* Indeed, the Secretary's representative testified that the Secretary's office has previously threatened enforcement actions from the Attorney General pursuant to § 31.005(b) in order to obtain compliance with its orders. *See* docket no. 84, Secretary 30(b)(6) at 26:4-27:17. And in recent weeks, the Secretary has not only ordered compliance from local officials who allegedly acted "contrary to [the Secretary's] guidance" related to mail-in ballot provisions pursuant to § 31.005(b), but has also sought enforcement of its "order" through the Attorney General pursuant to the same section.[19]

Further, those procedures are separate from the Secretary's authority to issue election advisories to local election officials, an action which the Secretary routinely takes. *See* docket no.

---

[18] As an example, following remand in *OCA-Greater Houston*, the Secretary was ordered to notify all county elections departments that "they are not to enforce [certain provisions of the Texas Election Code]." *OCA-Greater Houston v. Texas*, 1:15-CV-679-RP, 2018 WL 2224082, at *5 (W.D. Tex. May 15, 2018).

[19] On August 27, 2020, Keith Ingram, the Secretary's Director of Elections sent a letter to the Harris County Clerk—pursuant to § 31.005—ordering Harris County to "halt any plan to send an application for ballot by mail to all registered voters" because such an action would be, according to the Secretary, "an abuse of voters' rights." Letter from Keith Ingram, Director of Elections to Chris Hollins, Harris County Clerk (August 27, 2020). The Secretary also stated that its office would "request that the Texas Attorney General take appropriate steps under Texas Election Code 31.005" in the event Harris County failed to comply with the Secretary's order. *Id.* Sure enough, on August 31, 2020, the Texas Attorney General filed an application for temporary restraining order against Harris County, and in doing so, cited § 31.005(b) as the authority under which it sought its requested relief. *See* Plaintiff's Original Verified Petition and Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction at pp. 2-3, *Texas v. Hollins*, No. 2020-52383 (D. Ct. Harris Cnty.) (filed Aug. 31, 2020) (citing § 31.005(b) and stating that under § 31.005 the "proper defendant is 'a person performing official functions in the administration of any part of the electoral processes' who 'fails to comply' with an order from the Secretary of State").

79 p. 4; docket no. 84, Ingram Dep. at 17:16-18:3, 24:25-25:10, 83:3-13; docket no. 93-2, Exs. B & C. The Secretary's briefing highlights *two* such advisories its office has distributed related to signature-comparison procedures in recent months, *see* docket no. 93-2, Exs. B & C, and the Secretary certainly has the authority to issue *other* advisories related to the subject. Importantly, both local officials in this case testified that they viewed the Secretary's advisories as binding. *See* docket no. 84, Hancock Dep. at 81:7-11 (stating that she is obligated to comply with the Secretary's advisories as the Brazos County EA); docket no. 84, McAllen 30(b)(6) Dep. at 40:9-18 (stating that if the Secretary sends an advisory, "that's what we follow").

Finally, the inconsistency of the Secretary's argument is perhaps best demonstrated by the fact that—in the period since the Secretary stated that she had taken "the available steps within her authority" and that there was no additional "authority that the Secretary has exercised or could exercise" related to the challenged signature-comparison procedures—the Secretary has both (i) issued a new advisory recommending that EVBBs convene "as early as possible" and describing the qualification and acceptance of mail-in ballots and (ii) made amendments to the State's "dear voter" letter such that it now informs voters of the signature-comparison process. *See* docket no. 93-2, Exs. A & B. Thus, it is apparent that the Secretary's arguments in this case are conflating the actions the Secretary *wishes* to take with the actions the Secretary is *able* to take under the Texas Election Code. *See, e.g.*, note 19, *supra* (describing (i) recent letter issued by Secretary's office pursuant to § 31.005 directing Harris County to cease its plan to send mail-in ballot applications to all registered voters and (ii) a lawsuit filed by the Texas Attorney General pursuant to § 31.005(b) seeking enforcement of Secretary's order).

In this case, the relevant Election Code provisions, binding Fifth Circuit precedent, and the Secretary's own conduct in recent months, make clear that Plaintiffs' alleged injuries are both

traceable to and redressable by the Secretary.[20] Accordingly, the Court concludes that the traceability and redressability requirements for Article III standing are also satisfied, at least with respect to Plaintiffs' constitutional claims against the Secretary.[21]

### E. Sovereign Immunity

Next, the Secretary asserts that this Court lacks jurisdiction because Plaintiffs' claims against the Secretary are barred by sovereign immunity. *See, e.g.*, docket no. 70 pp. 11-13. As a general rule, sovereign immunity precludes suits against states and state officials in their official capacities. *See City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). However, the Supreme Court provided an exception to that general rule in *Ex parte Young*, 209 U.S. 123, 161 (1908), and pursuant to that exception, a suit alleging a constitutional violation against a state official in his or her official capacity for prospective injunctive relief is not a suit against the state and, therefore, does not violate the Eleventh Amendment. *See id.*; *see also Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (stating *Ex parte Young* exception permits only "suits for prospective . . . relief against state officials acting in violation of federal law"). "To be sued pursuant to the exception, state officials must have some connection to the state law's enforcement, which ensures

---

[20] As noted above, the Court has not yet evaluated whether Plaintiffs' injuries are *also* traceable to and redressable by the Local Defendants.

[21] It is not just repeated Fifth Circuit precedent that supports the Court's conclusion. In *Frederick v. Lawson*, a recent district court decision addressing the constitutionality of Indiana's mail-in ballot signature-comparison procedures, the court rejected a nearly identical argument made by Indiana's Secretary of State. *See* 2020 WL 4882696, at *11. Specifically, the court noted that Indiana's Secretary of State is the "chief election official" of the state and heads the office responsible for "advis[ing] county election officials regarding the manner in which to implement the signature verification requirement." *Id.* For that reason, the court concluded that "although the Secretary does not personally review ballot signatures or make the comparisons herself . . . she is sufficiently connected with the duty of enforcement of the challenged provisions such that the alleged invalidity of those provisions is fairly traceable to and redressable by her." *Id.*

that the suit is not effectively against the state itself." *Tex. Democratic Party*, 961 F.3d at 400 (internal quotations, citations, and alterations omitted).

The Secretary contends that there is not a "sufficient connection" between the Secretary and the enforcement of the vote-by mail election provisions at issue in this case. *See* docket no. 70 p. 12. Unfortunately for the Secretary, the Fifth Circuit has rejected the Secretary's same argument—*twice*—in recent months. First, in *Texas Democratic Party*, the Fifth Circuit noted that there is a "significant overlap" between the standing and *Ex parte Young* analyses. *See* 961 F.3d at 401. In that case, the Fifth Circuit's motions panel rejected the Secretary's argument that it lacked the "requisite connection" to be sued because "none of the state officials enforces the mail-in ballot rules." *Id.* Specifically, the Fifth Circuit concluded as follows:

> [O]ur precedent suggests that the Secretary of State bears a sufficient connection to the enforcement of the Texas Election Code's vote-by-mail provisions to support standing. That, in turn, suggests that *Young* is satisfied as to the Secretary of State.

*Id.* (citing *OCA-Greater Houston*, 867 F.3d at 613 and *City of Austin*, 943 F.3d at 1002). The Secretary again asserted the same argument to the Fifth Circuit in recent weeks in relation to yet another case involving the Secretary's enforcement of mail-in ballot provisions. In *Lewis v. Hughs*, a challenge to various Texas mail-in ballot provisions (including *the same signature-comparison provisions* at issue in this case), the Secretary sought an immediate appeal of the district court's denial of the Secretary's motion to dismiss on the grounds of sovereign immunity. No. 20-50654 (5th Cir. Sep. 4, 2020). The Fifth Circuit summarily affirmed the district court's determination, and stated that "we are convinced that no substantial question exists in this matter with respect to whether the Texas Secretary of State bears a sufficient connection to the enforcement of the Texas Election Code's vote-by-mail provisions to satisfy *Ex parte Young*'s 'some connection' requirement." *Id.*

32

The above analysis is directly applicable in this case. As described in the prior Section, the Texas Election Code provides the Secretary with broad authority to intervene if the Code is being implemented in "a manner that impedes the free exercise of a citizen's voting rights," including both by ordering compliance from local officials and by seeking intervention from the Attorney General if necessary to obtain compliance. *See* Section I.D, *supra*; Tex. Elec. Code § 31.005(a) & (b). And the prior Section notes that the Secretary has both (i) previously threatened to engage the Attorney General in order to ensure compliance with its orders pursuant to § 31.005, and (ii) in fact done so in recent weeks. *See* Tex. Elec. Code § 31.005(b); docket no. 84, Secretary 30(b)(6) at 26:4-27:1; note 19, *supra*.[22]

In addition, the prior Section explains that the Secretary has the unquestioned authority to issue election advisories to local officials and that the Secretary routinely does so. *See* Section I.D, *supra*; docket no. 93-2, Exs. B & C; *see also Texas Democratic Party*, 961 F.3d at 399 (noting that Tex. Elec. Code § 31.003 imposes a duty on the Secretary of State "to 'obtain and maintain uniformity in the application, operation, and interpretation of' Texas's election laws, including by 'prepar[ing] detailed and comprehensive written directives and instructions relating to' those vote-by-mail rules"). Notably, the sovereign immunity portion of the Secretary's own brief highlights Election Advisory 2020-07, in which the Secretary recommended "mailing notices of rejected ballots to affected voters as soon as possible," *see* docket no. 70 p. 13, and the Secretary certainly

---

[22] The Secretary's August 27, 2020 letter to Harris County indicates that the Secretary believes its office has a "sufficient connection to the enforcement of the Texas Election Code's vote-by-mail provisions" such that it may order Harris County to implement those provisions in accordance with the Secretary's interpretation of the Code. *See* note 19, *supra*; *Tex. Democratic Party*, 961 F.3d at 401. For that reason, the Secretary's briefing strains credulity to the extent it asserts that the Secretary does not have a "sufficient connection to the enforcement" *of those same provisions* in the event the Secretary must order county officials to implement those provisions in accordance with the Constitution.

has the authority to issue separate advisories with *different* instructions related to the signature-comparison procedures.[23] Finally, as noted in the prior Section, the record demonstrates that the Secretary can take other steps designed to partially mitigate the risk of disenfranchisement resulting from the challenged signature-comparison procedures. *See* Section I.D, *supra*; docket no. 93-2, Ex. A (describing Secretary's recent edits to State's form "dear voter" letter).

Ignoring those powers, the Secretary's Motion specifically asserts that sovereign immunity bars Plaintiffs' claims because the Secretary's office does not itself "review [] signatures and accept[] ballots," "provide notice that a ballot has been rejected," or "act in the case of an improperly rejected ballot" pursuant to § 87.127. *See* docket no. 70 pp. 12-13. But this argument is a strawman, as Plaintiffs are not seeking an order instructing the Secretary herself to review ballots in any particular manner, mail notices of rejected ballots to voters, or reverse any specific "matching" determination by any particular EVBB. Importantly, the fact that local election officials have the sole authority to take *some actions* does not mean that the Secretary does not have the authority to take *other actions* in order to ensure that voters are provided timely notice of a mail-in ballot's rejection and a meaningful opportunity to cure an improper ballot rejection. Indeed, *even assuming* there are some forms of remedies sought by Plaintiffs that the Secretary lacks the authority to pursue, that would not mean that Plaintiffs' claims are completely barred. The Fifth Circuit, sitting *en banc*, recently made as much clear. Specifically, in *Green Valley Special Util. Dist. v. City of Schertz, Tex.*, the Fifth Circuit stated as follows with respect to whether sovereign immunity bars an entire suit when certain forms of relief are unavailable:

> [E]ven if some of the relief sought is not available, it does not follow
> that *Young* bars [plaintiff's] entire suit. Because at least one form of prospective

---

[23] Indeed, as noted in Section I.D, *supra*, the Secretary recently issued another advisory related to EVBB procedures and the qualification and acceptance of mail-in ballots (including the signature-comparison procedures). *See* docket no. 93-2, Ex. B.

> relief is possibly available to [plaintiff], its claims against the [state defendant] are
> not barred by the Eleventh Amendment.

18-51092, 2020 WL 4557844, at *8 (5th Cir. Aug. 7, 2020). For that reason, it is irrelevant that

the Secretary's office does not have the actual authority to conduct the initial signature comparison

on any specific ballot, mail any specific rejection notice, or itself file a petition under § 87.127.

Instead, the requisite "sufficient connection" is demonstrated by the numerous actions the

Secretary *does have the authority* to take. And it is therefore unsurprising that the Fifth Circuit

(and other courts) have rejected similar arguments and found that sovereign immunity does not

bar claims against a state's "chief election officer" in cases regarding the enforcement of this

State's or other states' election codes. *See Tex. Democratic Party*, 961 F.3d at 401; *Lewis*, No. 20-

50654 (5th Cir. Sep. 4, 2020); *OCA-Greater Houston v. Texas*, 1:15-CV-00679-RP, 2016 WL

9651777, at *7 (W.D. Tex. Aug. 12, 2016) (Secretary was proper *Ex parte Young* defendant in

lawsuit challenging provisions of the Texas Election Code); *see also Democratic Executive Comm.*

*of Florida v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019) (in lawsuit challenging similar mail-in

ballot signature-comparison procedures, Florida Secretary of State was proper *Ex parte Young*

defendant as "state's chief election officer" under Florida statute, which sets out similar powers

and responsibilities for the Florida Secretary of State).

    In sum, directly applicable Fifth Circuit precedent and the record in this case make clear

that the Secretary bears a "sufficient connection to the enforcement of the Texas Election Code's

vote-by-mail provisions" such that *Ex parte Young* applies with respect to Plaintiffs' claims in this

case. *See Tex. Democratic Party*, 961 F.3d at 401; *Lewis*, No. 20-50654 (5th Cir. Sep. 4, 2020).

Accordingly, the Court concludes that Plaintiffs' claims against the Secretary are not barred by

sovereign immunity.

## F. Prudential Standing Under § 1983

The Secretary next argues that the Organizational Plaintiffs, including CTD, do not have statutory standing under 42 U.S.C. § 1983 to seek relief with respect to the violation of voters' constitutional rights. *See* docket no. 70 pp. 20-21. Specifically, the Secretary states that "Plaintiff Organizations do not have voting rights," and thus, § 1983 does not provide CTD with a cause of action "claiming an injury based on the violation of a third party's rights." *Id.*

As an initial matter, the Secretary's argument is only applicable to the Organizational Plaintiffs, and the Secretary does not dispute that Weisfeld has statutory standing under § 1983 to seek relief for violations of her own constitutional rights. Thus, now the Court has concluded that Weisfeld has Article III standing to assert her constitutional claims against the Secretary, the Court's analysis of this issue could stop here. However, having reviewed the record and the applicable law, the Court will briefly explain why it concludes that CTD *also* has prudential standing to seek the requested relief.

As a general rule, "one may not claim standing . . . to vindicate the constitutional rights of some third party." *Singleton v. Wulff,* 428 U.S. 106, 114 (1976). In *Singleton,* the Supreme Court discussed the reasoning supporting the general rule against third-party standing, *see Singleton,* 428 U.S. at 113-16, and the principles set forth in *Singleton* have been summarized by another district court in this Circuit. *See Inclusive Communities Project, Inc. v. Tex. Dep't of Hous. & Cmty. Affairs,* CIV.A.3:08-CV-0546-D, 2008 WL 5191935, at *7 (N.D. Tex. Dec. 11, 2008). In *Inclusive Communities Project,* the district court summarized the reasoning behind the general rule:

> The Supreme Court in *Singleton* discussed the two principles that animate the rule against third-party standing. *See Singleton,* 428 U.S. at 113-16. First, the rule prevents courts from unnecessary or undesired adjudication of rights. Two "factual elements" help resolve this question in a particular case: the relationship between the litigant and the third party and the third party's ability to assert his own right. *Id.* at 114-16. If the litigant and the third party have a close relationship and

the litigant is a part of the third party's exercise of the right, then the court's "construction of the right is not unnecessary in the sense that the right's enjoyment will be unaffected by the outcome of the suit." *Id.* at 114-15. Moreover, if a genuine obstacle prevents the third party from asserting the right, then his absence from court "loses its tendency to suggest that his right is not truly at stake, or truly important to him." *Id.* at 116.

Second, the rule against third-party standing tends to ensure that the most effective advocate for the right is before the court, which relies on the vigorous argument of litigants. Generally, "third parties themselves . . . will be the best proponents of their own rights." *Id.* at 114. This will not always be the case, however. Rather, "the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter." *Id.* at 115.

2008 WL 5191935, at *7. The limitation on "third-party standing" is not a constitutional mandate, but is merely a "salutary rule of self-restraint," *Craig v. Boren*, 429 U.S. 190, 193 (1976), and the *Singleton* Court noted that the rule "should not be applied where its underlying justifications are absent," 428 U.S. at 114. *See also Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 333 (5th Cir. 1981) ("In cases where these justifications are inapplicable, the general rule should be excepted, and assertion of third party rights permitted.").

In this particular case, the Court concludes that precluding CTD from asserting its claims would not serve the purposes of the prudential rule against third-party standing. As an initial matter, the record indicates that CTD may be the most effective party to challenge the signature-comparison procedures on behalf of disabled Texans who are disproportionately more likely to be affected by the signature-comparison processes.[24] CTD is the largest and oldest member-driven cross-disability organization in Texas, CTD's mission is "to advocate for [disabled individuals']

---

[24] Dr. Mohammed opined that elderly and disabled voters are more likely to "have a greater range of variation in their signatures" because they may "have less pen control than most other writers." *See* docket no. 65-1, Ex. 14 ¶ 42; docket no. 84, Mohammed Dep. at 66:14-67:16. As an example in this case, CTD's representative (and member) Chase Bearden testified that "so many times [his] writing looks different" because he must use his phone to hold down documents as he signs them given his disability. *See* docket no. 84, CTD 30(b)(6) Dep. at 71:5-25.

rights to access," and part of that work includes efforts to protect "the rights of all Texans with disabilities to participate fully in the voting process." *See* docket no. 65-1, Exs. 44 & 45; docket no. 84, CTD 30(b)(6) Dep. at 25:6-26:1. Further, the record demonstrates that there is a "close relationship" between CTD and the voters for whom it is seeking to protect the third-party rights. Indeed, the record contains specific evidence regarding multiple members of the organization who intend to vote by mail but expect to have difficulties complying with the existing signature-comparison procedures due to their disabilities. *See* docket no. 84, CTD 30(b)(6) Dep. at 13:6-15:15, 75:11-76:13. In sum, CTD's claims in this case are central to the organization's purpose, and this is not a case in which the organizational plaintiff is unlikely to vigorously advocate for the rights asserted. *Cf. Hudson Valley Freedom Theater, Inc. v. Heimbach,* 671 F.2d 702, 706 (2d Cir. 1982) ("When a corporation meets the constitutional test of standing . . . prudential considerations should not prohibit its asserting that defendants, on racial grounds, are frustrating specific acts of the sort which the corporation was founded to accomplish.").

More fundamentally, however, there may be practical obstacles permitting certain voters from vindicating their rights with respect to the issues raised in this case. Importantly, the Supreme Court has stated the following:

> Where practical obstacles prevent a party from asserting rights on behalf of itself, for example, the Court has recognized the doctrine of jus tertii standing. In such a situation, the Court considers whether the third party has sufficient injury-in-fact to satisfy the Art. III case-or-controversy requirement, and whether, as a prudential matter, the third party can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal.

*Sec'y of State of Md. v. Joseph H. Munson Co., Inc.,* 467 U.S. 947, 956 (1984) (citing *Craig,* 429 U.S. at 193-94).

In this case, it is not *necessarily* apparent that many individual voters who *may* be impacted by the signature-comparison procedures would have Article III standing to vindicate their own

rights and request the relief sought in this case. As noted above, the Secretary appears to argue that

an individual voter can only satisfy the injury in fact requirement in this case if the individual can

demonstrate that the he or she *will* have his or her vote rejected in the upcoming elections due to

the challenged procedures. *See* docket no. 75 p. 4. As explained above, that blanket argument is

without merit, and Weisfeld has demonstrated that she faces a "substantial risk" of having her vote

improperly rejected again based on the existing signature-comparison procedures utilized for mail-

in ballots. However, the Court recognizes that not every voter has as strong an argument as

Weisfeld on this issue, and although the Court declines to address whether *other* hypothetical mail-

in voters would individually have standing, the Secretary certainly believes they do not. For that

reason, if the Secretary's argument is accepted, the only means of protecting the constitutional

rights of *those other voters* is for (i) voters like Weisfeld and/or (ii) "closely related" organizations

to bring challenges to the existing procedures. In that way, the Secretary's argument concedes (and

in fact asserts) that there may be "a genuine obstacle" preventing certain other voters from

protecting their constitutional rights affected by the signature-comparison procedures, and thus,

this is not necessarily a case in which "the third parties themselves . . . will be the best proponents

of their own rights." *Singleton*, 428 U.S. at 114. Such findings counsel towards permitting CTD to

assert its claims in this case.[25]

On that basis, the Court therefore finds that neither underlying justification for the general

doctrine against third-party standing is applicable with respect to CTD's claims against the

Secretary in this case. Accordingly, the Court concludes that it would be improper to apply the

---

[25] Of course, in the event the Court is found to be incorrect with respect to its conclusion regarding Weisfeld's Article III standing, the Court's findings with respect to CTD's statutory standing are even more apparent. Indeed, if Weisfeld does not have standing for the reasons set forth in Section I.B, *supra*, then it is hard to imagine *any* individual voter who would have Article III standing to challenge the signature-comparison procedures at issue.

prudential doctrine against third-party standing to preclude CTD's claims against the Secretary. *See id.*; *Deerfield Med. Ctr.*, 661 F.2d at 333.

Finally, *even assuming* that CTD could not invoke § 1983 to seek relief in this case, the Fifth Circuit's recent *en banc* opinion in *Green Valley Special Utility District* noted that plaintiffs such as CTD may nonetheless pursue forward looking injunctive relief in equity against state officials for violations of federal rights in cases in which *Ex parte Young* is satisfied. 2020 WL 4557844, at *10 ("[Plaintiff] has a cause of action against [the state defendant] *at equity*, regardless of whether it can invoke § 1983. Because, as we discussed above, [plaintiff] has satisfied *Young*'s requirements, its suit for injunctive relief against the [state officials] may go forward.") (emphasis in original and footnote omitted); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) ("[A]s we have long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted."). Indeed, although there are questions about the origin of this apparent doctrine, the Supreme Court "has reaffirmed this cause of action as accepted fact." *See Green Valley Special Util. Dist.*, 2020 WL 4557844, at *30 (Oldham, J., concurring) (citations omitted). Thus, it appears CTD could pursue its constitutional claims under this alternative doctrine—given that *Ex parte Young* is satisfied with respect to the Secretary—even if § 1983 were unavailable due to any non-jurisdictional prudential doctrine against third-party standing.

## II.   Merits of Plaintiffs' Constitutional Claims

Having concluded that at least two Plaintiffs have standing to assert constitutional claims against the Secretary, the Court will next address the merits of those claims. Plaintiffs first assert as applied and facial challenges to the State's existing mail-in ballot signature-comparison procedures on the basis that the State's existing process—which does not include adequate pre-

rejection notice and/or a meaningful opportunity to cure an improperly rejected ballot—violates the Due Process Clause of the Fourteenth Amendment. *See* docket no. 1 ¶¶ 52-61. Plaintiffs also contend that the same procedures violate the Equal Protection Clause of the Fourteenth Amendment because they impose a severe burden on certain voters' right to vote that is not justified by a legitimate government interest. *See id.* at ¶¶ 62-70.[26]

### A. Applicable Legal Frameworks

Plaintiffs and the Secretary appear to agree that Plaintiffs' "undue burden"/"right to vote" equal protection claim is governed by the "*Anderson/Burdick*" standard set forth by the Supreme Court. *See* docket no. 65 p. 37 & docket no. 70 pp. 21-22 (each citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992)). However, the parties are in disagreement as to whether the "*Mathews*" standard or the same "*Anderson/Burdick*" standard governs the analysis of Plaintiffs' due process claim. *See* docket no. 65 pp. 29-30 (citing *Mathews v. Eldridge*, 424 U.S. 319, 225 (1976)); docket no. 70 pp. 21-22.

Plaintiffs contend that the *Mathews* framework should apply to any due process analysis, *see* docket no. 65 pp. 29-30, and note that numerous courts evaluating due process claims related to signature-comparison procedures for mail-in ballots have evaluated those claims under that framework, which instructs the Court to balance the following considerations:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and

---

[26] Plaintiffs also assert a separate equal protection claim in "Count Three" of the Complaint, but for the reasons discussed in Section IV, *infra*, the merits of that claim are not addressed in this Order.

administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

The Secretary, on the other hand, contends that the more flexible "*Anderson/Burdick*" test applies to the constitutional analysis of all state laws that allegedly burden the right to vote, including any due process claim. *See* docket no. 70 pp. 21-22. Under the *Anderson/Burdick* test, a court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788-89). The severity of the challenged restriction dictates whether strict scrutiny review, rational basis review, or some intermediate standard applies. *See Burdick*, 504 U.S. at 434; *see also Anderson*, 460 U.S. at 788.

The argument for applying the *Mathews* test to Plaintiffs' due process claim is a strong one, as the framework explicitly references both "procedures" and potential "procedural safeguards." *Mathews*, 424 U.S. at 335. For that reason, the standard appears to be more directly applicable to due process claims premised on mail-in ballot procedures and/or the lack of procedural safeguards related to the mail-in voting process. Notably, it appears that multiple courts have applied the *Mathews* framework to substantially similar claims involving due process challenges to similar mail-in ballot signature-comparison procedures. *See, e.g., Saucedo v. Gardner*, 335 F. Supp. 3d 202, 214 (D.N.H. 2018); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018), *appeal dismissed sub nom. Martin v. Sec'y of State of Georgia*, 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018); *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, at *7 (N.D. Ill. Mar. 13, 2006); *Frederick*, 2020 WL 4882696, at *12.

42

On the other hand, certain courts have stated that the *Anderson/Burdick* framework is meant to apply to all constitutional challenges involving voting restrictions, including both due process claims and equal protection claims. *See, e.g., Duncan v. Husted*, 125 F. Supp. 3d 674, 679-80 (S.D. Ohio 2015), *aff'd* (Mar. 7, 2016) (stating that in the Sixth Circuit, "the *Anderson-Burdick* test serves as single standard for evaluating challenges to voting restrictions" including "First Amendment, Due Process Clause of the Fourteenth Amendment, and Equal Protection Clause of the Fourteenth Amendment claims"); *Weber v. Shelley*, 347 F.3d 1101, 1105-06 (9th Cir. 2003) (analyzing equal protection and due process challenges to touchscreen voting system without voter-verified paper trail under *Anderson* and *Burdick*). However, the Secretary has failed to cite any cases in which the *Anderson/Burdick* framework has been applied to an evaluation of a due process claim related to mail-in ballot signature-comparison procedures.

For that reason, and having reviewed the various approaches, the Court concludes that the *Mathews* standard should govern this Court's due process analysis. However, the Court concludes that the question is ultimately immaterial, because as shown below in Section II.C, *infra*, the challenged signature-comparison procedures do not pass constitutional muster under *any* of the potentially-applicable standards.

## B. Plaintiffs' Due Process Claim Under the *Mathews* Framework

As an initial matter, the Secretary is correct in noting that there is no federal constitutional right to vote by mail-in ballot. *See generally McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807-08 (1969) (rejecting assertion that there was constitutional right to vote by absentee ballot). However, it is undisputed that the right to vote is a fundamental right under the United States Constitution. *Harper v. Va. Bd. of Elections*, 383 U.S. 662, 666-70 (1966); *see also Reynolds v. Sims*, 377 U.S. 533, 554 (1964) ("[T]he Constitution of the United States protects the

right of all qualified citizens to vote, in state as well as in federal elections."). For that reason, once a state creates a certain type of election regime, the state "must administer it in accordance with the Constitution." *Zessar*, 2006 WL 642646, at *6; *see also Paul v. Davis*, 424 U.S. 693, 710-12 (1976) (stating that "there exists a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either 'liberty' or 'property' as meant in the Due Process Clause" and holding that an otherwise protected interest can attain "constitutional status by virtue of the fact that [it has] been initially recognized and protected by state law" if "as a result of the state action complained of, a right or status previously recognized by state law was distinctly altered or extinguished"). Thus, "[c]ourts around the country have recognized that '[w]hile it is true that absentee voting is a privilege and a convenience to voters, this does not grant the state the latitude to deprive citizens of due process with respect to the exercise of this privilege.'" *Martin*, 341 F. Supp. 3d at 1338 (quoting *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990)); *see also Zessar*, 2006 WL 642646, at *6 (stating that "approved absentee voters are entitled to due process protection").

Because it is clear that Texas has created a mail-in ballot regime through which qualified voters may exercise their fundamental right to vote, the State must provide those voters with constitutionally-sufficient due process protections before rejecting their ballots.[27] *See Raetzel*, 762

---

[27] The Secretary's remedy briefing directed the Court to one district court that recently determined that eligible voters who risk having their votes improperly rejected on the basis of a perceived signature mismatch may not challenge Tennessee's signature-verification procedures under a procedural due process theory. *See* docket no. 98 p. 10 (citing *Memphis A. Phillip Randolph Inst. v. Hargett*, 3:20-CV-00374, 2020 WL 5095459, at *11 (M.D. Tenn. Aug. 28, 2020)). This Court respectfully declines to follow that analysis. For one, the *Hargett* court also determined that the same voters could not challenge Tennessee's signature-comparison procedures under an "undue burden"/"right to vote" theory *because* a complaint about the State's "signature-verification procedure" is one "sounding exclusively in procedural due process." *See id.* at *15. In any event, the Fifth Circuit and other circuit courts have indicated that violations of the right to vote are (i) actionable under the Due Process Clause and (ii) governed by the *Mathews*' procedural due process analysis. *See, e.g., Williams v. Taylor*, 677 F.2d 510, 514-15 (5th Cir. 1982) (applying the

F. Supp. at 1358 ("While the state is able to regulate absentee voting, it cannot disqualify ballots, and thus disenfranchise voters, without affording the individual appropriate due process protection."); *Frederick*, 2020 WL 4882696, at *12 (internal alterations and quotations omitted) ("[O]nce a state creates an absentee voting regime, the state has enabled a qualified individual to exercise her fundamental right to vote in a way that she was previously unable to do and [the state] then must administer that regime in accordance with the Constitution and afford appropriate due process protections . . . before rejecting an absentee ballot."). In order to determine whether constitutionally-sufficient process has been afforded, the Court has determined that it is appropriate to apply the balancing framework set forth by the Supreme Court in *Mathews v. Eldridge*. *See* Section II.A., *supra*. The application of the *Mathews* framework requires the Court to balance (i) "the private interest that will be affected by the official action," (ii) the "risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (iii) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute

---

*Mathews* test to Mississippi's felony disenfranchisement statute); *Georgia Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1270-71 (11th Cir. 2019) (Pryor, J., concurring) (in due process challenge to state's signature-comparison procedures, applying *Mathews* test and stating "[i]t is undeniably true that the interest in voting absentee implicates the right to vote"); *Lemons v. Bradbury*, 538 F.3d 1098, 1104-05 (9th Cir. 2008) (analyzing *Mathews* factors as part of due process challenge to Oregon's referendum signature verification process). Notably, every other district court to consider a due process challenge to similar signature-comparison procedures (at least that this Court has identified) has held that the affected voters are entitled to due process protections. *See Raetzel*, 762 F. Supp. at 1358; *Saucedo*, 335 F. Supp. 3d at 214; *Martin*, 341 F. Supp. 3d at 1338; *Frederick*, 2020 WL 4882696, at *12; *Self Advocacy Sols. N.D.*, 2020 WL 2951012, at *8; *Zessar*, 2006 WL 642646, at *6. Accordingly, the Court concludes that voters who have their mail-in ballots improperly rejected on the basis of an incorrect (but perceived) signature mismatch are entitled to assert a claim based on a violation of their due process rights. Finally, even if the Court assumes that Plaintiffs may not pursue relief under a "procedural due process" theory, Section II.C of this Order explains in detail why Plaintiffs are *also* entitled to summary judgment and injunctive relief under their "undue burden"/"right to vote" theory of relief.

procedural requirement would entail." *Mathews*, 424 U.S. at 335. The Court discusses each consideration below.

### 1. *Private Interest Affected by the Official Action*

With respect to the "private interest" at issue in this case, the Court affords this factor significant weight. Indeed, at stake here, is the fundamental right to vote. *See Harper*, 383 U.S. at 667 (1966) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society.")). Moreover, that "private interest" is not minimized by the fact that there is no constitutional right to vote by mail. The State has provided qualified voters with an opportunity to vote by mail, and the record demonstrates that the challenged processes result in disenfranchisement for some voters who elect to utilize that method of voting. It is therefore unsurprising that multiple courts that have evaluated similar signature-comparison regimes under the *Mathews* framework have afforded this first factor significant weight. *See, e.g., Martin*, 341 F. Supp. 3d at 1338 ("Here, the Court agrees with Plaintiffs that the private interest at issue implicates the individual's fundamental right to vote and is therefore entitled to substantial weight."); *Saucedo*, 335 F. Supp. 3d at 217 ("Plaintiffs argue that the individual interest at issue is the fundamental right to vote . . . The court accords this factor significant weight."). This Court concludes it is appropriate to do the same.

### 2. *Risk of Erroneous Deprivation and Probable Value of Procedural Remedies*

The record demonstrates that Texas counties rejected more than 5,000 ballots on the basis of perceived mismatching signatures during the 2016 and 2018 general elections. *See* docket no. 65-1, Ex. 16. More importantly, the record contains undisputed evidence that qualified, registered voters have had their votes improperly discarded—and have suffered disenfranchisement—as a result of the State's procedures. *See, e.g.*, docket no. 65-1, Exs. 25 & 33. Although the existence

of even a single improperly rejected ballot demonstrates some risk of erroneous deprivation, the record demonstrates both that (i) the existing signature-comparison procedures pose a significant risk to the fundamental right to vote and (ii) there is probable value in implementing additional procedural safeguards to protect voters' rights.

### a. *Existing Signature-Comparison Process Creates Risk of Erroneous Deprivation*

As an initial matter, Plaintiffs and the Secretary's Director of Elections both agree that the existing signature-comparison processes make it possible for local officials to reject a ballot based on a perceived signature mismatch when the ballot and application were in fact signed by the same person. *See* docket no. 84, Ingram Dep. at 77:8-15. That fact is inherently troublesome, and it would be enough by itself to weigh this initial consideration in Plaintiffs' favor. Nonetheless, the Court believes it is appropriate to discuss the specific flaws with the existing signature-comparison procedures in order to highlight why the risk of erroneous deprivation is so significant and acute in this case.

First, the record makes clear that there is no specific standard set forth by the State with respect to determining whether a "signature" matches. Instead, the state-issued handbook providing guidance to EVBB members merely states that signature reviewers should "check the signatures of the applicant on the application and on the carrier envelope to confirm that both signatures have been executed by the voter." Docket no. 65-1, Ex. 4 p. 14; *see also* Tex. Elec. Code § 87.041(b)(2) (stating that a ballot should be rejected if the EVBB concludes that a signature on the carrier envelope or ballot was "executed by a person other than the voter"). In Brazos County, for example, that means reviewers apply a "reasonable person" standard, whereas in McAllen city elections, reviewers are instructed to accept a ballot so long as the signatures "resemble each other." Docket no. 84, Hancock Dep. at 121:24-122:9; docket no. 84, Brazos

47

30(b)(6) Dep. at 47:25-48:4; docket no. 84, Lara Dep. at 45:13-25, 81:5-19. Moreover, members of EVBBs do not receive any specific training as to how to determine whether two signatures match. *See* docket no. 84, Brazos 30(b)(6) Dep. at 15:19-16:6; docket no. 84, Lara Dep. at 39:1-6, 81:5-19; docket no. 84, Ingram Dep. at 48:2-5. Instead, whether two signatures "match" depends solely on the determination of laypersons on the EVBB and/or SVC who are advised to use their "best judgment." *See* docket no. 84, Lara Dep. at 79:9-80:21 ("I always remind them that we are not handwriting experts."); docket no. 84, Brazos 30(b)(6) Dep. at 48:15-49:2 (stating that Brazos County does "nothing" to "ensure that EVBB members are using their best judgment"). Unsurprisingly, the determinations reached by laypersons—absent any meaningful guidance—varies among EVBB members, and the record demonstrates that whether a ballot is accepted or rejected often depends on which members on each EVBB review the ballot. *See* docket no. 84, Hancock Dep. at 122:18-123:12 & Brazos 30(b)(6) Dep. at 48:18-49:8 (indicating that Brazos County's EVBB generally has 6 to 10 two-person "teams" of reviewers and that it is "possible for different teams to reach a different conclusion with respect to the same ballot"); docket no. 84, Lara Dep. at 137:7-21 (indicating that McAllen EVBB members have previously had "a hard time agreeing on signatures."). In sum, under the exiting signature-comparison procedures, it is clear that *chance* plays a non-negligible role in determining whether any given voter's mail-in ballot is counted.

Other record evidence explains why it should not be surprising that legitimate ballots are rejected under the existing procedures. Dr. Linton Mohammed explained that laypersons—like untrained members of EVBBs or SVCs—are more likely to reject signatures provided by the same individual than are trained handwriting experts. *See* docket no. 84, Mohammed Dep. at 65:9-66:6. Specifically, Dr. Mohammed explained that individuals often have "variations" of signatures, and

individuals often use different signatures based on the type of document that is being signed. *Id.* at 28:7-25, 84:25-85:22. As a result, individuals "tend to write more carefully" when signing certain types of documents. *Id.* (describing how the same individual often has a "mixed-style signature" for documents that are routinely signed and a "readable, text-based styled signature" for more formal documents).[28] Dr. Mohammed explained that layperson reviewers "incorrectly interpret a variation as a difference" whereas experts would know not to directly compare two different "styles" of signatures. *Id.* at 65:9-66:6. According to Dr. Mohammed, the more appropriate way to compare multiple signatures is to compare those of the same "style." *See id.* at 47:2-11 (testifying that one cannot accurately compare signatures of different "styles").

These problems are specifically exacerbated by three aspects of the State's mail-in voting regime and related signature-comparison procedures. First, the mail-in ballot application and ballot carrier envelope do not inform the voter (i) that the signature on the application and the signature on the carrier envelope will be used for signature comparison or (ii) that failure to match the two signatures will result in a rejected ballot. *See* docket no. 84, Ingram Dep. at 32:25-35:4, 103:9-15.[29] Instead, those documents state that the voter is providing his or her signature only as a

---

[28] As an example, Dr. Mohammed explained that an individual will generally sign his or her formal will and testament more carefully than he or she would sign for a package at his or her doorstep. *See* docket no. 84, Mohammed Dep. at 42:13-43:22.

[29] The Secretary's most recent briefing indicates that the Secretary updated its form "dear voter" letter in August 2020 so that it now contains one sentence regarding the signature-comparison process. *See* docket no. 93-2, Ex. A. For the avoidance of doubt, this small act—while a step in the right direction—does not significantly reduce the risk of erroneous rejection nor does it otherwise mean that the State's existing procedures are now constitutionally sound. For one, providing information regarding the signature-matching requirement on the documents *actually being signed* appears to be a far more appropriate method for ensuring that voter is aware of the requirement *as he or she is signing the document*. More importantly, however, the record demonstrates that ballots are improperly rejected based on perceived signature mismatches *even when* voters are fully informed of the requirements and attempt to comply. *See* docket no. 84, Weisfeld Dep. at 45:4-17; 50:5-9; 56:18-57:5; 68:22-71:20. Thus, *even assuming* details about the signature-comparison procedures were included in both the application and carrier envelope as

certification that the information is true and/or that the enclosed ballot represents the voter's intentions. *See* docket no. 65-1, Ex. 6; Tex. Elec. Code § 86.013(c). This is important because, as noted above, voters often sign documents "more carefully" when they believe it is necessary to do so. Notably, Richardson's deposition testimony demonstrates that he believed his signatures were used for purposes other than for signature matching. *See* docket no. 84, Richardson Dep. at 25:16-22, 28:2-7. And as a result of the existing information provided, voters like Richardson *who fully comply with every instruction* on the application and carrier envelope may still have their vote rejected based on perceived mismatching signatures.

Second, EVBB members generally make their determinations based only on two signatures: the one provided on the application and the one provided on the flap of the carrier envelope. *See* Tex. Elec. Code § 87.041(b)(2). Although the Election Code *permits* EVBB members to consider any voter signature from the prior six years that is on file with the county clerk or voter registrar, the Code *does not require* that the EVBB members consider multiple comparison signatures (if available) before rejecting a ballot. *See* Tex. Elec. Code § 87.041(e). As a result, the record indicates that EVBB members generally do not request any additional signatures on file as part of their review. *See, e.g.*, docket no. 84, McAllen 30(b)(6) at 26:6-17 (testifying that McAllen EVBB has never requested additional signatures during its review during Lara's tenure); docket no. 84, Brazos 30(b)(6) Dep. at 43:2-46:13 (testifying that Brazos County

---

well, that alone would be insufficient to render the challenged signature-comparison procedures constitutionally sound in the absence of pre-rejection notice and a meaningful opportunity to cure. Indeed, at least one court has found similar signature-comparison procedures unconstitutional even after the state agreed to provide information about signature-comparison on both the ballot application and carrier envelope, because the state had not provided adequate notice of rejection or an opportunity to cure. *See Saucedo*, 335 F. Supp. 3d at 218, 222 (holding that New Hampshire's procedures were still unconstitutional notwithstanding the state's recent changes to the information provided to voters on their applications and ballots).

did not find records indicating that EVBB had requested additional signatures for any voter during any election in the prior 22 months). This increases the likelihood of erroneous rejections, as the voter may have used other "styles" of his or her own signature on prior occasions which may provide a more proper baseline for verifying the signature on the application and/or carrier envelope. *See* docket no. 84, Mohammed Dep. at 47:2-11.

Finally, older voters and disabled voters are two categories of voters that are permitted to vote by mail, and the record indicates that—as a general rule—these categories of voters are exactly the type of voters that are most likely to face difficulties matching their signatures. *See* note 24, *supra*. As a specific example in this case, CTD's representative (and member) Chase Bearden testified that "so many times [his] writing looks different" because he must use his phone to hold down documents as he signs them given his disability. *See* docket no. 84, CTD 30(b)(6) Dep. at 71:5-25. Thus, the impacts of Texas's error-prone signature comparison process are most likely to be acutely felt by the exact types of voters Texas permits to vote by mail.

Perhaps the best demonstration in the record of the real risk to voting rights created by the existing procedures are the personal experiences of the Individual Plaintiffs in this case. Both Weisfeld and Richardson properly registered to vote by mail, and after receiving their ballots, they cast their ballots by mail. Weisfeld's ballot was submitted by mail at the end of May 2019 for a June 22, 2019 contest. *See* docket no. 84, Weisfeld Dep. at 19:4-11. Richardson's ballot was received by Brazos County officials on October 17, 2018 for a November 6, 2018 contest. *See* docket no. 84, Richardson Dep. 28:8-15. Notwithstanding that each Individual Plaintiff was qualified to vote by mail and did so well before the date of the election, neither had his or her vote counted in the elections in question. Instead, laypersons—none of whom had received training in handwriting analysis or been provided uniform standards regarding signature comparison from the

State—determined that Weisfeld and Richardson had not adequately matched their prior signatures, and as a result, their ballots were rejected. The infirmity of the existing signature-comparison analysis is best demonstrated by the rejection of Weisfeld's ballot, specifically. Indeed, Weisfeld was unable to satisfy whatever apparent "matching" standards were being applied on the date in question notwithstanding the fact that she (i) was aware of the signature-comparison requirement, (ii) had herself previously served on local EVBBs, (iii) had previously served as the election administrator for local primary elections, and (iv) had sent other handwritten communications to the election officials in the period leading up to the election. *See* docket no. 84, Weisfeld Dep. at 45:4-17; 50:5-9; 56:18-57:5; 68:22-71:20.

> b. *Existing "Remedies" Do Not Provide Adequate Protections, Notice or a Meaningful Opportunity to Cure*

The rejection of ballots based on signature comparison might present less of a risk of erroneous deprivation if there was an effective means to cure an improperly rejected ballot. But in this case, as in the other cases in which courts have found similar processes to violate due process, the improper rejection of a ballot appears to be irremediable for all practical purposes. *See Saucedo*, 335 F. Supp. 3d at 218 (citing *Zessar*, 2006 WL 642646, at *8-9) ("It cannot be emphasized enough that the consequence of a moderator's decision—disenfranchisement—is irremediable.").

Of course, the Secretary disagrees with the assertion that the existing procedures do not provide adequate notice and an opportunity to cure. In support, the Secretary asserts the Texas Election Code already provides for procedural remedies in the event a vote is improperly rejected. Specifically, the Secretary cites to § 87.127 of the Texas Election Code, which empowers county election officials to "petition a district court for injunctive or other relief" if the election officials "determine[] that a ballot was incorrectly rejected or accepted by the [EVBB] before the time set

for convening the canvassing authority." Docket no. 75 p. 10. Additionally, the Secretary assets that "Texas law provides means to contest the outcome of an election" in the event a candidate contends that ballots were improperly accepted or rejected. *See* docket no. 75 p. 10 (citing Tex. Elec. Code §§ 221.001-243.013, 221.003(a)). Finally, the Secretary asserts that the risk of improper rejection is mitigated because voters are offered an alternative under which a witness signs their ballot in lieu of signature matching. *See* docket no. 70 pp. 23-24.

None of the existing "remedies" cited by the Secretary protect voters from the improper rejection of their mail-in ballots, at least as they are presently implemented. As an initial matter, the Texas Election Code does not require a voter to be notified that his or her ballot was rejected until ten days after the election. *Id.* at § 87.0431(a). Notwithstanding that Richardson and Weisfeld each voted by mail weeks before the election date, neither received notice of his or her ballot's rejection until following the election. *See* docket no. 84, Weisfeld Dep. at 19:4-11, 45:18-20; docket no. 84, Richardson Dep. 28:8-15, 29:2-12; docket no. 65-1, Exs. 21 & 30. Although the Secretary has sent an advisory to election officials advising them to notify voters of a rejected ballot as soon as possible, the record indicates that—even after local officials implemented that advisory—voters still generally receive "notice" after the election date. *See* docket no. 84, Hancock Dep. at 89:3-90:21 (stating that Brazos County's rejection notices generally go out the day before election day, but that "the way the mail service is, there's not really a benefit to mailing it out as soon as possible, because they're not going to get it prior to election day"); docket no. 84, McAllen 30(b)(6) Dep. at 32:8-33:7 (stating that City elections happen on Saturdays and the rejection notices go out on Monday two days after election). Indeed, because the date each county conducts its canvassing of ballots may occur between three and fourteen days following the election date but voters only must be notified of a rejected ballot within ten days of the election,

53

the Code expressly permits voters to receive notice of their rejected ballot *after* the county has conducted its final canvass of election results. *See* Tex. Elec. Code § 67.003; docket no. 84, Ingram Dep. at 87:11-88:10.

This timing feature of the required notice is only the *first* reason why the State's asserted "remedy" in Texas Election Code § 87.127 is inadequate, at least as it is presently understood and implemented by local election officials. Specifically, Section 87.127(a) provides:

> If a county election officer . . . determines a ballot was incorrectly rejected or accepted by the early voting ballot board before the time set for convening the canvassing authority, the county election officer *may* petition a district court for injunctive or other relief as the court determines appropriate.

*Id.* (emphasis added). Because (i) voters who have had their ballots improperly rejected are notified that they may contact their local election officials and (ii) § 87.127 provides the election official with discretion to file a lawsuit if the official determines the ballot was erroneously rejected, the Secretary contends that adequate protections exist. *See* docket no. 70 pp. 24-25. As noted above, however, the Election Code specifically contemplates that voters may receive notice of their rejected ballot after the county has already convened its canvassing authority, and a local official's authority to seek relief in the district court expires once canvassing has occurred. *See* § 87.127(a); docket no. 84, Ingram Dep. at 87:11-88:10. Thus, *even assuming* that local election officials were *required* to seek judicial relief on a voter's behalf following any complaint by a disenfranchised voter, the remedy would *still* be inadequate for voters who do not receive notice before canvassing has occurred.

More importantly, however, the record demonstrates that the existing procedures provided in § 87.127 are often inadequate even in cases in which a voter promptly notifies county officials of an improper rejection prior to the county's canvassing activities. Crucially, the petitioning process in § 81.127 is a *discretionary* process and not a procedural process to which voters are

*entitled.* The local officials in this case testified that they have *never* utilized the procedure despite receiving complaints from voters about improperly rejected ballots. *See* docket no. 84, Hancock Dep. at 103:4-104:10; docket no. 84, McAllen 30(b)(6) Dep. at 53:6-19, 56:5-13. Notably, McAllen City Secretary testified that she did not believe that she qualified as a "county election officer" for the purposes of utilizing § 87.127 on a voter's behalf. *See* docket no. 84, McAllen 30(b)(6) Dep. at 53:20-25. And the Brazos County election official in this case questioned how she was even supposed to "determine" that a ballot was "incorrectly rejected" by the EVBB, and as a result, testified that her office did not investigate the accuracy of any EVBB signature-matching determinations. *See* docket no. 84, Hancock Dep. at 103:25-106:23 ("I don't do that determination . . . I feel that that's the board's responsibility, and I do not check their work. It's not my responsibility to do that."); *see also* docket no. 84, McAllen 30(b)(6) Dep. at 56:14-24 (stating that McAllen election officials do not perform an additional review to determine if a ballot was incorrectly rejected). Thus, the Brazos County official testified that, as a practical matter, it would be "impossible" for her to seek relief on behalf of a voter under § 87.127. *See* docket no. 84, Hancock Dep. at 107:9-19; *see also id.* at 96:4-97:22 (stating that even if a voter contacts election officials following notice of a ballot's rejection, "there's really no remedy for that voter" if "election day has passed"). Tellingly, the Secretary's Director of Elections testified that he was only aware of the procedure being used on a single occasion by a single county official. *See* docket no. 84, Ingram Dep. at 44:22-46:1. In sum, the record makes clear that the discretionary procedures in § 87.127—at least to the extent they are presently understood and implemented by local election officials—do not afford protection for the vast majority of voters who have their ballots improperly rejected on the basis of a signature-mismatch determination.[30]

---

[30] The Secretary contends that this case is distinguishable from the other district court cases analyzing the constitutionality of other similar signature-comparison procedures because Texas's

The Secretary's second proposed remedy—the possibility of an "election contest"—is even more unrealistic. *See* docket no. 75 p. 10 (citing Tex. Elec. Code §§ 221.001-243.013, 221.003(a)). The Secretary's own description of "election contests"—as a remedy "available to *candidates* where miscounted mail-in ballots *impact the result of an election*"—perhaps best summarizes the multiple reasons why "election contests" do not provide an adequate "cure" for voters who have their mail-in ballots improperly rejected during the signature-comparison process. *See* docket no. 93 p. 5 n.5 (emphasis added). For one, the remedy is available to *candidates, not voters*. *See id.*; Tex. Elec. Code § 232.002. Equally importantly, "election contests" may only be pursued if the contestant demonstrates that the challenged process materially affected the outcome of the election. *See Willet v. Cole*, 249 S.W.3d 585, 589 (Tex. App.—Waco 2008, no pet.). Plaintiffs in this case are not seeking to overturn the results of any election, but instead are solely seeking to protect the *fundamental right to vote*. An individual's right to vote does not depend on any candidate's margin of victory, and if the Secretary's theory was correct, no Texas election procedure—or any resulting disenfranchisement—could offend due process so long as some candidate on the ballot could challenge an election's ultimate result. Finally, such a challenge also requires the contestant to demonstrate that a violation of the Election Code occurred. *See Willet*, 249 S.W.3d at 589. Indeed, in this case, Plaintiffs challenge the existing provisions of the Election Code *because* the Code apparently *permits* violations of voters' constitutional rights. For all these

---

"existing statutory framework specifically provides an avenue for court intervention in the case of a mail-in ballot." Docket no. 79 p. 9. But the record shows that § 87.127 is not a *meaningful* avenue for court intervention, especially given that *both* election officials in this case testified that it was not possible for them to utilize the referenced procedures on a voter's behalf. *See* docket no. 84, Hancock Dep. at 107:9-19; docket no. 84, McAllen 30(b)(6) Dep. at 53:20-25. The same is true with respect to election contests, which are discussed in the next paragraph.

reasons, the availability of such a challenge to the election outcome neither mitigates voters' risk of erroneous deprivation nor does it reduce the probable value of additional remedies.

The Secretary's reliance on the "witness" alternative is similarly insufficient. *See* docket no. 70 pp. 23-24 (citing Tex. Elec. Code. § 84.011(a)(4)(B)). The Secretary asserts that the option "ensur[es] that voters who cannot make their signatures match receive notice of the witness option before deciding to vote by mail." *Id.* As an initial matter, the Secretary's argument ignores that a witness can only sign for an individual voting by mail "if the person required to sign cannot do so because of a physical disability or illiteracy." Tex. Elec. Code § 1.011(a). Thus, many mail-in voters are ineligible to use the apparent witness "alternative" set forth by the Secretary. Further, many voters will not know that they apparently "cannot make their signatures match" to whatever standard is necessary until their ballot has already been rejected. Certainly Weisfeld—who had herself previously served on EVBBs—believed she "[could] make [her] signature match" when she submitted her carrier envelope. Further, the Secretary's assertion ignores that even those who are permitted to utilize the witness signature option may not have access to a person who could serve as a witness, due to other restrictions set forth in the Election Code.[31]

Finally, the Secretary asserts that the Individual Plaintiffs did not raise "their concerns of improper rejection to their county election officer" and "therefore cannot demonstrate whether [the procedures available] are effective for remediation." Docket no. 70 pp. 27-28; docket no. 75 pp. 11-12. The Secretary's argument is belied by the factual record, and indeed, perhaps the best indication of the inadequate nature of the existing remedies is the evidence demonstrating that

---

[31] The Texas Election Code permits a person to serve as a witness only one time for applications to vote by mail absent narrow exceptions, making it difficult to facilitate the efficient use of witnesses. *Id.* at § 84.004. For example, if a nursing home attendant serves as a witness for a single resident's application, that attendant can no longer serve as a witness for any other nursing home residents who must submit an application.

Richardson *did* try to seek relief from Brazos County election officials following the rejection of his ballot.[32] *See* docket no. 84, Richardson Dep. at 30:9-19, 31:21-32:1. Rather than taking action to ensure that his vote was properly counted following his complaint, Brazos County officials instead wrote a letter to Richardson notifying him that the mistaken rejection of his ballot (and his resulting disenfranchisement) was fully in compliance with the Election Code. *See* docket no. 65-1, Ex. 25. Further, even if the Court ignored that the Secretary's assertion is contradicted by the evidentiary record, the Secretary's argument is also both (i) a non-sequitur with respect to the Individual Plaintiffs,[33] and (ii) wholly inapplicable to CTD and the other Organizational Plaintiffs that have asserted claims against the Secretary.

---

[32] To the extent it is the Secretary's contention that Richardson did not *properly* notify the correct Brazos County election official, the record makes clear that Hancock would not have pursued relief pursuant to § 87.127 on Richardson's behalf for the various reasons stated in her testimony. *See* docket no. 84, Hancock Dep. at 96:4-97:22, 103:4-106:23, 107:9-19. And to the extent the Secretary faults Richardson and Weisfeld for not instituting an "election contest," *see* docket no. 75 p. 10, the Secretary ignores that such a remedy is available to candidates, not voters. *See* Tex. Elec. Code § 232.002.

[33] Notwithstanding the Secretary's assertion that Individual Plaintiffs' past injuries cannot serve as evidence of the likelihood of future harm, *see* docket no. 75 p. 4, the Secretary apparently contends that the Individual Plaintiffs are not entitled to argue that the existing procedures will violate their due process rights in the future if they do not demonstrate that they attempted to exhaust all remedies in the past. That assertion presupposes that a plaintiff *must* have suffered an injury in the past in order to challenge the future enforcement of an unconstitutional regulation, and of course, that is not the law. Each case cited by the Secretary for that proposition is inapposite in this case, because in those cases, (i) the plaintiff was actually provided pre-rejection notice and an opportunity for a pre-deprivation hearing and (ii) the plaintiff sought relief for *past injuries. See Santana v. City of Tulsa*, 359 F.3d 1241 (10th Cir. 2004) (seeking damages for deprivation of due process after defendant confiscated plaintiff's property); *Dubuc v. Twp. of Green Oak*, 406 F. App'x 983 (6th Cir. 2011) (seeking damages for deprivation of due process after defendant rezoned plaintiff's property); *Herrell v. Bensen*, 261 F. Supp. 3d 772 (E.D. Ky. 2017) (seeking relief on due process claim premised on university's failure to confer plaintiff's degree). It is similarly irrelevant that Individual Plaintiffs "did [not[ contact the Secretary's office regarding the allegedly erroneous rejections of their ballots," *see* docket no. 70 p. 28, especially given that the rejection notice does not advise voters to contact the Secretary. *See, e.g.*, docket no. 65-1, Exs. 25 & 33.

In sum, the record makes clear that the existing procedural "remedies" do not protect voters from the risk of disenfranchisement created by the State's error-prone signature-comparison process.

### c. *There is Probable Value in Providing Additional Safeguards*

In light of the evidence demonstrating the inadequacy of the existing procedural protections, it is unsurprising that the record also demonstrates that there is probable value in providing additional procedural protections for voters. Both Individual Plaintiffs in this case state that they would have taken steps to correct any mistake had they been notified of the signature-mismatch prior to their ballots' official rejections. *See* docket no. 65-1, Ex. 21 ¶ 11; docket no. 65-1, Ex. 30 ¶ 12. But the Court need not take Individual Plaintiffs' word for it, as the existing procedures set forth in the Election Code and/or those provided to voters in other circumstances demonstrate the probable value of providing additional procedural protections, including meaningful opportunities to correct signature-comparison errors.

For one, the record contains evidence demonstrating the probable value of providing additional signatures for EVBB members to consider for comparison purposes before rejecting a ballot. As noted above, EVBB members generally make their rejection decision based only on two signatures: the one provided on the application and the one provided on the flap of the carrier envelope. *See* docket no. 65-1, Ex. 4 p. 16. Although the Election Code *permits* EVBB members to consider any voter signature on file from the prior six years, the Code *does not require* that the EVBB members consider multiple comparison signatures before rejecting a ballot. *See* Tex. Elec. Code § 87.041(b)(2), (e). Unsurprisingly, Dr. Mohammed testified that a review of additional signatures improves the accuracy of any signature comparison, as it increases the likelihood that reviewers may compare multiple signatures of the same "style." *See* docket no. 84, Mohammed Dep. at 42:4-43:9. Indeed, it is for this reason that experts in Dr. Mohammed's field generally

consider *at least* ten signatures before reaching a determination regarding the authenticity of a signature. *See id.* Further, the EVBB handbook itself appears to specifically acknowledge that additional signatures may assist EVBB members in "confirming" their initial determination to accept or reject a ballot. *See* docket no. 65-1, Ex. 4 p. 16 (stating that "[t]hese additional signatures may be used to confirm that the signatures are either those [or] not those of the same person."). Thus, it is clear that advising EVBB members that they should utilize this procedure to compare any apparently "mismatched" signature *with other signatures on file* from the voter—before officially rejecting any ballot—appears to be an obvious way of improving the accuracy of the signature-comparison process. And doing so is fully compliant with the existing procedures in the Election Code.

The record also contains strong evidence demonstrating the probable value of providing more-timely notice of rejection to voters whose signatures are determined to be "mismatched." *See* docket no. 84, Hancock Dep. at 99:15-23 (agreeing that "the timing of the notice is important to whether or not the ballot can be corrected"). For example, the record makes clear that if a voter is notified that his or her mail-in ballot is rejected prior to election day, that voter is permitted to vote in person on election day. *See id.* at 96:4-20 ("If [notice is provided] prior to election day, then they would be able to cast a ballot in person."). While the in-person voting "remedy" would be insufficient for some mail-in voters,[34] such an alternative could be used by many voters to avoid disenfranchisement if they are provided early notice of their ballot's improper rejection. This is especially true for voters, like Richardson, who submitted his mail-in ballot weeks before the election date. Finally, a procedure involving a more-timely comparison of signatures (and notice

---

[34] For example, voters who are out of the county, voters who are incarcerated in jail, or voters who are unable to travel to a polling place due to disability would be unable to utilize such an approach.

of rejection) is wholly consistent with the existing provisions of the Election Code. Nothing in the Election Code prohibits EVBBs from beginning the signature-comparison process in the days leading up to the election. *See* docket no. 65-1, Ex. 4 p. 41 (stating that EVBB may meet to review signatures up to 12 days before the election date in counties with more than 100,000 residents and up to 3 days before the election date in counties with less than 100,000 residents); docket no. 84, Ingram Dep. 46:25-48:1 (testifying that each county determines when its EVBB meets and that there is no limit as to number of times EVBB may meet). And unsurprisingly, one local official in this case agreed both that (i) rejection letters could go out earlier if the respective EVBBs met earlier in the permissible window and (ii) voters' phone numbers (if provided on the application) could be used to provide additional, earlier notice of the rejection. *See* docket no. 84, McAllen 30(b)(6) Dep. at 35:3-17, 51:24-52:10.

Finally, with respect to providing additional opportunities to "cure" for voters whose ballots are rejected for a signature "mismatch," the value of those alternatives is best demonstrated by existing procedures that are *already* used to provide an opportunity to "cure" to voters under other circumstances. For example, under the Texas Election Code, and in-person voter who fails to comply with the photo ID requirement at the polling site on election day is permitted to cast a provisional ballot and is provided six days to confirm his or her identity with the country registrar. *See* Tex. Elec. Code § 65.0541. Most tellingly, if a voter completely forgets to sign his or her carrier envelope (as opposed to signing with a "mismatched" signature), the Texas Election Code and EVBB Handbook state as follows:

> [T]he clerk may deliver the carrier envelope in person or by mail to the voter and may receive, before the deadline, the corrected carrier envelope from the voter, or the clerk may notify the voter of the defect by telephone and advise the voter that the voter may come to the clerk's office in person to correct the defect or cancel the voter's application to vote by mail and vote on election day.

Tex. Elec. Code. § 86.011(d); docket no. 65-1, Ex. 4 p. 43. Indeed, Hancock testified that such a procedure is already implemented for "defective" carrier envelopes in Brazos County. *See* docket no. 84, Hancock Dep. at 48:5-14. To be clear, these forms of recourse would not necessarily provide an opportunity for *every* voter to avoid disenfranchisement following a signature-mismatch, including those who return their mail-in ballots on the eve of election day. But these "remedies" utilized elsewhere under the Election Code nonetheless demonstrate the value in providing a second opportunity for a voter to confirm his or her identity when the alternative is the complete disenfranchisement of that voter. *See Saucedo*, 335 F. Supp. 3d at 219-20.

In sum, based on the undisputed facts in the record, this Court finds that under the current statutory system, voters face a serious risk that their mail-in ballots will be improperly rejected based on a perceived signature mismatch. Further, because the existing "remedies" are inadequate (at least as presently implemented), those same voters face the wholesale deprivation of their right to vote. The Court therefore finds that there is both a meaningful risk of erroneous deprivation of certain voters' rights and probable value in providing additional procedures to protect those voters' right to vote.

### 3. Government's Interest and Burden

The third *Mathews* factor involves consideration of the government's interests, which may include "the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. With respect to the State's "interest," the Secretary defends the existing procedures by noting that the State has an undeniable interest in avoiding voter fraud by "ensuring that only eligible voters cast ballots." *See* docket no. 70 p. 26. In support, the Secretary notes that many states utilize signature matching as a method for preventing voter fraud through the use of mail-in ballots. *See id.* The Secretary's

Motion, in passing, also references the State's interest in the "orderly and efficient administration of elections" and "safeguarding public confidence in election integrity." Docket no. 70 p. 23. Finally, with respect to the burden involved with implementing additional procedures, the Secretary notes that "Texas law contains specific timeframes in which election results must be canvassed," and "[t]here is potential for an additional step to work chaos into this process, including by potentially preventing the timely canvassing of election results." Docket no. 75 pp. 12-13.

The Secretary's first asserted "interests" are unpersuasive, at least insofar as they are intended to respond Plaintiffs' challenge. Of course, the Court agrees with the Secretary's general assertion that Texas has a compelling interest in preserving the integrity of its election process by preventing voter fraud. *See Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989); *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). But in this case, the relevant question is whether that interest is furthered by utilizing signature-comparison procedures *that do not provide voters with a meaningful opportunity to avoid disenfranchisement by curing an improperly rejected ballot.* Unsurprisingly, the Secretary's briefing offers no explanation as to how the State's interest in preventing voter fraud is furthered by a process that does not provide pre-rejection notice and an opportunity to cure. As other district courts have pointed out while rejecting similar arguments, the Secretary's stated concerns regarding voter fraud instead appear to be *inconsistent* with the Secretary's apparent objections to the implementation of additional procedural protections. *See, e.g., Saucedo*, 335 F. Supp. 3d at 220 ("[I]f anything, additional procedures further the State's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised."); *Self Advocacy Sols. N.D.*, 2020 WL 2951012, at *10 ("[A]llowing voters to verify the validity of their ballots demonstrably advances—rather than hinders—these goals [of

preventing voter fraud and upholding the integrity of elections].”); *Fla. Democratic Party v. Detzner*, No. 4:16cv607-MW/CAS, 2016 WL 6090943, at *7 (Oct. 16, 2016) (“[L]etting mismatched-signature voters cure their vote by proving their identity further prevents voter fraud—it allows supervisors of elections to confirm the identity of that voter before their vote is counted.”). Notably, the State no doubt also has a compelling interest in preventing in-person voter fraud, and yet Texas presently provides pre-rejection notice and an opportunity to cure to voters who fail to comply with certain requirements for in-person voting. *See* Tex. Elec. Code. §§ 63.011, 65.0541 (providing that voters who lack identification on election day may cast a provisional ballot and provide photo identification or sworn affidavit within six days of the election in order to have their ballot counted). Here, the Secretary offers “no satisfying explanation for why [the State] cannot have both a robust signature-match protection and a way to allow every eligible voter-by-mail and provisional voter whose ballot is mistakenly rejected an opportunity to verify their identity and have their votes count.” *Democratic Executive Comm. of Fl.*, 915 at 1322. In sum, it is clear that the Secretary’s legitimate interest in preventing voter fraud actually weighs *in favor* of the implementation of additional procedural safeguards. And to the extent the Secretary separately asserts an interest in “safeguarding public confidence in election integrity,” that interest is similarly *furthered* by implementing procedures that ensure that valid mail-in ballots are not improperly rejected. *See, e.g., Self Advocacy Sols. N.D.*, 2020 WL 2951012, at *10.

Finally, a review of other existing procedures already utilized by election officials demonstrates that the implementation of additional safeguards will not result in the “chaos” or “burden” asserted by the Secretary, nor will it interfere with the “orderly and efficient administration of elections.” As noted above, the State already has existing procedures through which in-person voters who fail to present a valid identification at the polls can verify their identity

64

prior to the canvassing process. *See* Tex. Elec. Code §§ 63.001(g), 63.011, 65.0541. Additionally, the record demonstrates that local officials already provide notice and an opportunity to cure to voters who make other mistakes on the carrier envelope and/or who forget to sign the carrier envelope altogether. Tex. Elec. Code § 86.011(d). Importantly, although Plaintiffs highlight the existence of these procedures in their motion, *see* docket no. 65 p. 8, the Secretary's briefing provides no explanation as to why these existing procedures and/or an analogous process could not be extended to mail-in voters whose signatures appear to mismatch. *See Martin*, 341 F. Supp. 3d at 1339 ("Defendants fail to explain why it would impose a severe hardship to afford absentee voters a similar process for curing mismatched signature ballots as for curing qualification challenges or casting a provisional ballot."). Given that these existing procedures are already in place, the record makes clear that the "burden" created by adding additional safeguards will not be so substantial as to outweigh the fundamental disenfranchisement that results in the alternative.[35] *See Saucedo*, 335 F. Supp. 3d at 221 ("[T]his is a case not of foisting wholly novel procedures on state election officials, but of simply refining an existing one to allow voters to participate and to ensure that the process operates with basic fairness."); *Martin*, 341 F. Supp. 3d.

---

[35] The record indicates that existing procedures may also be utilized to provide mail-in voters with more timely notice of a ballot's rejection based on a perceived signature mismatch. Mail-in ballot applications already offer voters the opportunity to provide a phone number and email address, and the record demonstrates that local election officials are permitted to contact voters via telephone to correct other errors with the ballot carrier envelope. *See* Tex. Elec. Code § 86.011(d). In addition, the record further indicates that local officials already utilize email to communicate with voters who provide that information under other circumstances. *See, e.g.*, docket no. 84, Hancock Dep. at 125:20-126:8. Moreover, the City of McAllen has even utilized text messages to promptly notify voters of errors in their mail-in ballot applications. *See* docket no. 84, Lara Dep. at 107:10-110:7 (describing sending text message to voter informing voter of mistake in application, in place of written notice of application rejection). For that reason, it appears that existing processes and infrastructure could be utilized to provide more-timely notice of rejection via telephonic or electronic means (at least for voters who provide that information), and at least one local official testified that there would be no additional costs associated with implementing such a process. *See* docket no. 84, McAllen 30(b)(6) Dep. at 33:8-34:18, 35:3-17.

at 1339-40 ("Because many of the procedures Plaintiffs request are already in place, the Court finds that additional procedures would involve minimal administrative burdens while still furthering the State's asserted interest in maintaining the integrity of its elections.").

Further, to the extent the Secretary is concerned about delays to the canvassing procedure, *see* docket no. 75 pp. 12-13, the Texas Election Code provides that the canvassing process may occur up to fourteen days after the date of the election. *See* docket no. 84, Ingram Dep. at 87:11-88:10; Tex. Elec. Code § 67.003. Indeed, the relevant provision of the Code makes clear that such time is provided—in part—*so that* the EVBB can complete its verification of the identities of voters who cast provisional ballots. *Id.* at § 67.003(b)(2). For that reason, the provision that the Secretary claims imposes tight deadlines for canvassing activities actually provides flexibility *specifically so that* local officials can conduct the types of voter verification analogous to the relief sought by Plaintiffs in this case.

Lastly, any purported "burden" involved with adding additional procedures is belied by the evidence in the record regarding the number of ballots rejected due to signature mismatches. As discussed above, the record indicates that approximately 5,000 ballots were rejected on the basis of perceived signature mismatches during the 2016 general election and 2018 general election.[36] Those rejections span 254 Texas counties, and thus, to the extent the Secretary directs local officials to provide additional procedural protections for voters whose signatures are deemed to "mismatch," that evidence demonstrates that the vast majority of Texas's county election officials are unlikely to face any substantial burden if instructed to provide additional protections to a small subset of voters. *See, e.g.*, docket no. 93-2 (Ingram affidavit stating that "[t]he number of mail

---

[36] *See* docket no. 65-1, Ex. 16 (noting that 1,567 mail-in ballots were rejected statewide due to perceived signature mismatches during the 2016 general election and 3,746 mail-in ballots were rejected statewide due to perceived signature mismatches during the 2018 general election).

ballots rejected because the early voting ballot board determined the signatures were not made by the same person is relatively small"); docket no. 84, Brazos 30(b)(6) Dep. at 38:9-14 (stating that Brazos County rejected 29 mail-in ballots due to perceived signature mismatches during the 2018 general election).

### 4. *Conclusion*

In light of the fundamental importance of the right to vote, Texas's existing process for rejecting mail-in ballots due to alleged signature mismatching fails to guarantee basic fairness. Specifically, the record demonstrates that the State's existing system results in *de facto* unreviewable determinations resulting from a comparison that is inherently fraught with error, and voters are provided with no meaningful opportunity to cure improperly rejected ballots. As a result, the existing signature-comparison procedures are unconstitutional. *See Raetzel*, 762 F. Supp. at 1358 ("[The state] cannot disqualify ballots, and thus disenfranchise voters, without affording the individual due process protection . . . . [such as] advising the individual of the disqualification and the reason therefor[ ], and providing some means for the individual to make his or her position on the issue a matter of record before the appropriate election official."). Thankfully, it appears that, if implemented, already existing procedures—perhaps with minor refinements—will reduce the risk that qualified voters are wrongfully disenfranchised *and* bolster the State's proffered interests.

Accordingly, the Court finds that a balancing of the *Mathews* factors demonstrates that Plaintiff Rosalie Weisfeld and Plaintiff CTD are entitled to summary judgment on their due process claims against the Secretary. This Court's conclusion is similar to that of numerous district courts that have addressed similar due process challenges to signature-comparison procedures under the same framework in recent years *See, e.g., Saucedo*, 335 F. Supp. 3d 202; *Zessar*, 2006 WL 642646; *Martin*, 341 F. Supp. 3d 1326; *Frederick*, 2020 WL 4882696; *Self Advocacy Sols.*

*N.D.*, 2020 WL 2951012.[37] In any event, the next Section explains why the same result holds true even assuming the *Anderson/Burdick* framework and/or a "rational basis" review is applied to the analysis of the same claim and/or to Plaintiffs' "undue burden"/"right to vote" Equal Protection Clause claim.

### C. Plaintiffs' "Undue Burden"/"Right to Vote" Equal Protection Claim and Due Process Claim Under the *Anderson/Burdick* and/or "Rational Basis" Frameworks

Plaintiffs assert an equal protection claim against the Secretary on the basis that the existing signature-comparison framework places a burden on voters that is not justified by any legitimate government interest. *See* docket no. 1 ¶¶ 62-70. The parties appear to agree that such a claim should be analyzed under the *Anderson/Burdick* framework, though they disagree as to the exact level of scrutiny that should be applied. *See* docket no. 65 p. 37 & docket no. 70 pp. 21-22. The Court will address those issues below and explain why Plaintiffs are entitled to summary judgment on that theory of relief. Additionally, to the extent the Secretary argues that Plaintiffs' due process claim should have been analyzed under *Anderson/Burdick* because it is a "Fourteenth Amendment

---

[37] In addition to *Hargett, see* note 27, *supra*, the Secretary directs the Court to *Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir. 2008), in which the Ninth Circuit rejected due process and equal protection challenges to Oregon's signature-matching procedures for verifying citizens' signatures *on petitions for ballot referenda. See* docket no. 70 pp. 26-27. As an initial matter, a review of *Lemons* indicates that Oregon provided numerous additional safeguards during the signature-comparison process used for its referendum petition signatures that are not provided by the Texas Election Code for mail-in ballots. *Id.* at 1104-05 (noting that (i) Oregon's referendum signature-comparison procedures are "weighted in favor of accepting questionable signatures," (ii) rejected signatures are subject to multiple levels of review by county officials, (iii) referendum petition cover sheets specifically instruct voters to "[s]ign your full name, as you did when you registered vote," and (iv) members of the public are permitted "to observe the signature-verification process and challenge decisions by county election officials."). More importantly, the Ninth Circuit noted that the "administrative burden of verifying a referendum petition signature is significantly greater than the burden associated with verifying a vote-by-mail election signature." *Id.* at 1104. For that reason, the Court finds the other cases cited throughout this Order—that addressed nearly identical issues with respect to nearly identical claims regarding similar *mail-in ballot* signature-comparison procedures—to be far more persuasive.

challenge[] predicated on voting rights," *see* docket no. 70 pp. 21-23, the same analysis will also demonstrate why Plaintiffs are entitled to summary judgment on their due process claim even assuming that framework is applicable.

When applying the *Anderson/Burdick* test, a court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788-89). Strict scrutiny applies only when the right to vote is "subjected to 'severe' restrictions." *Burdick*, 504 U.S. at 434. In those cases, any regulation at issue "must be 'narrowly drawn to advance a compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). On the other hand, if the right to vote is not burdened at all, then "rational basis" review applies. *See Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012) (citing *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807-09 (1969)). In challenges that fall between either end of the extremes, in which the challenged regulations impose only "reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters," relevant and legitimate state interests "are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434; *see also Anderson*, 460 U.S. at 788.

The Secretary contends that rational basis review is appropriate with respect to Plaintiffs' constitutional claims. *See* docket no. 70 pp. 22-23. In support, the Secretary cites to *Texas Democratic Party* for that proposition that rational basis applies in cases in which the "right to vote is not at stake," 2020 WL 2982937, at *10, and contends that is the case here. *See* docket no. 70 pp. 22-23. Plaintiffs on the other hand argue that heightened scrutiny applies because

69

procedures that result in disenfranchisement constitute a "severe" burden on the right to vote. *See* docket no. 74 pp. 42-43.

The Secretary's assertion that "rational basis" review applies is unpersuasive. For rational basis review to be applicable, the Court would have to find that the procedures in question impose *no burden* on the right to vote. *See Husted*, 696 F.3d at 592; *Texas Democratic Party*, 2020 WL 2982937, at *10 (stating that rational basis applies in cases in which the "right to vote is not at stake"). That conclusion would be untenable in this case. *By design*, the challenged procedures result in rejected ballots, and the undisputed record in this case demonstrates that more than 5,000 voters had their ballots rejected as a result of perceived signature mismatches during the 2016 and 2018 general elections.[38] *See* Section II.B.1, *supra*. The undisputed record in this case also shows that qualified, registered voters have had their mail-in ballots improperly discarded—and have suffered disenfranchisement—as a result of the State's existing procedures. *See, e.g.*, docket no. 65-1, Exs. 25 & 33. Thus, irrespective of whether reasonable parties could debate whether the resulting burden is "severe" or "moderate," there is simply no credible basis to support the Secretary's assertion that the challenged procedures in question impose "no" burden on the right to vote.

Further, with respect to determining the applicable "burden," the Secretary is misplaced to the extent that its briefing asserts that any burden is "minimal" because (i) "mail-in voters are notified that their signatures are required and must match" at the time that they cast their ballot,

---

[38] For this reason, the Secretary's reliance on *Texas Democratic Party* is unpersuasive, at least insofar as the Secretary contends that *Texas Democratic Party* demonstrates that "rational basis" review is appropriate in this case. In *Texas Democratic Party*, a Fifth Circuit motions panel considered a challenge to a statute that allowed voters age 65 or older to vote by mail without extending that opportunity to voters under the age of 65. *See* 2020 WL 2982937. The Fifth Circuit did not consider a case in which voters utilized a form of voting for which they were eligible and yet nonetheless had their ballots rejected.

and (ii) Texas provides other forms of voting, including in-person voting or by mail with a witness

signature. *See* docket no. 70 pp. 23-24. Even assuming the Secretary's first assertion is now

accurate,[39] the fact that voters are notified of the signature-comparison process is irrelevant if there

is nonetheless uncertainty as to whether the EVBB or SVC will accept a voter's signatures as

"matching." *See* Section II.B.2.a, *supra* (noting error-prone nature of existing signature-

comparison procedures and highlighting that Weisfeld's ballot was rejected notwithstanding her

familiarity with the signature-comparison process). And the Secretary's second assertion ignores

the very reason that Texas permits certain voters to vote by mail. Indeed, certain voters are unable

to vote in person (*e.g.*, Weisfeld was out of town on election day) and other voters are ineligible

to use the "witness" signature option. *See* Tex. Elec. Code § 1.011(a); Section II.B.2.b, *supra*.

Having made the mail-in option available for eligible voters, Texas must ensure it is implemented

in compliance with the Constitution. And because there is no way for a voter to know whether his

or her signature will be deemed "mismatching" until after that determination has occurred, the

Secretary must be able to justify its decision not to provide the affected voters (those who have

their ballots improperly rejected) with additional procedural protections, including a meaningful

opportunity to "cure."

---

[39] At the time the Secretary's brief was filed on June 22, 2020, it appears that the Secretary's assertion was inaccurate. The Secretary cites to Tex. Elec. Code § 87.041(b)(2) for the proposition that voters are notified that their signatures must match. But the Section contains no such notice requirement, and the Secretary's Director of Elections testified that voters are *not informed* of the signature-matching requirement on the mail-in ballot application or on the carrier envelope. *See* docket no. 84, Ingram Dep. at 32:25-35:4, 103:9-15; *see also* Secretary 30(b)(6) Dep. at 76:25-78:4 (stating that existing "dear voter" letter did not contain information regarding signature-comparison procedures). As discussed in note 29, *supra*, the Secretary's most recent briefing indicates that the Secretary has now (as of August 2020) included a sentence about the signature-comparison requirement in its new "dear voter" letter. However, there is no indication that similar language has been included on mail-in ballot applications and/or on carrier envelopes.

Thus, for the reasons set forth in Sections II.B.2.a and II.B.2.b, *supra*,[40] the Court concludes that the existing signature-comparison procedures constitute a "severe" restriction on the right to vote for mail-in voters who are unable to "match" their signatures to the satisfaction of their local EVBB or SVC members. To be clear, the Court's conclusion with respect to the applicable burden is not premised on the mere existence of a vote-by-mail regime or the signature requirement itself.[41] Instead, the Court concludes that the challenged processes create a "severe" burden because voters who have their ballots rejected due to a perceived signature mismatch are provided untimely notice of rejection and no *meaningful* opportunity to cure. *See* Section II.B.2.b; note 30, *supra*. As a result, those voters face complete disenfranchisement, and thus, their right to vote *is* at stake.[42] Further, this Court's conclusion with respect to the appropriate level of scrutiny is consistent with that of two other courts that have also analyzed similar signature-comparison

---

[40] Rather than rehashing the various reasons why (i) the State's existing signature-comparison process is error-prone, (ii) the State's existing "remedies" (at least as presently implemented) are wholly inadequate, and (iii) the State's existing procedures create the risk of wholesale disenfranchisement for a subset of eligible voters, the Court incorporates its analysis from Section II.B.2.a and Section II.B.2.b, *supra*.

[41] For example, if the Election Code merely required voters to sign their mail-in ballots (with an alternative available for those who are unable)—and imposed *no risk* of uncorrectable rejection following compliance with that instruction—the Court agrees with the Secretary that a different level of scrutiny might be appropriate. Under such circumstances, the requirement would be more analogous to an "inconvenience" that would "not qualify as a substantial burden on the right to vote." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 199 (2008).

[42] None of the cases cited in the Secretary's Motion for the proposition that "rational basis" review applies involved the actual rejection of ballots submitted by eligible voters. *See* docket no. 70 pp. 22-23 (citing *Texas Democratic Party*, 2020 WL 2982937, at *10 (applying rational basis review to statute allowing voters 65 or older to vote by mail without extending that opportunity to voters under 65); *McDonald*, 394 U.S. at 808 n.7, 807 (applying rational basis to challenge regarding right to vote by absentee ballot); *Biener v. Calio*, 361 F.3d 206, 214 (3d Cir. 2004) (applying rational basis review to ballot access restriction); *Michigan State A. Philip Randolph Inst. v. Johnson*, 749 F. App'x 342, 350 (6th Cir. 2018) (applying rational basis review to statute outlawing straight-ticket voting)). On this basis, each case cited is distinguishable, and the Secretary's argument that relies on those cases in inapposite.

procedures under the *Anderson/Burdick* framework. *Detzner*, 2016 WL 6090943, at *7 (classifying

burden as "severe"); *Frederick*, 2020 WL 4882696, at *16 (classifying burden as "significant" and

"substantial").[43]

---

[43] In *Hargett*—a case cited by the Secretary for other purposes—the district court recently reached a different conclusion, albeit after the parties provided only minimal briefing as to the issue. *See* 2020 WL 5095459, at *11 ("Neither side did itself, or the Court, any favors in treating this claim with such brevity."). Specifically, in *Hargett*, the district court held that the burden associated with Tennessee's signature-verification requirement was "moderate at most." *See* 2020 WL 5095459, at *18. But in that case, the district court had determined that its analysis of plaintiffs' Fourteenth Amendment "undue burden"/"right to vote" claim should consider only the burden imposed by the signature-verification requirement itself, rather than any burden imposed by the fact that the state's procedures provided no meaningful notice nor an opportunity to cure. *See id.* at *15 (stating that "Plaintiffs' complaint about the signature-verification procedure . . . is not properly considered in connection with their right-to-vote claim"). This Court respectfully disagrees with the district court in *Hargett* as to this point. In this case, the Secretary has repeatedly argued (and cited Supreme Court precedent for the proposition) that—in determining the magnitude of the burden on the right to vote—the Court must consider a state's election regime in its entirety, including the existence of cure procedures, if any. *See* docket no. 30 p. 13 & docket no. 70 p. 22 (each citing *Crawford*, 553 U.S. at 199). This seems intuitive, as the extent to which a voter's "fundamental right to vote" is burdened by the State's signature-comparison requirement necessarily depends— at least in part—on the extent to which a voter is provided pre-rejection notice and an opportunity to "cure" an improper rejection. Indeed, the Supreme Court has made clear that the adequacy of "cure" procedures should be considered during the evaluation of whether a challenged restriction is justified by a legitimate state interest. *See Crawford*, 553 U.S. at 199 (finding that the "severity of [the] burden is . . . mitigated by the fact that . . . voters without photo identification may cast provisional ballots that will ultimately be counted"). For that reason, the relevant analysis in this case is not whether the State's interests justify imposing a signature-matching requirement, *see Hargett* at *15-19, but instead whether the State's interests justify imposing procedures that implement that requirement *but do not provide voters with pre-rejection notice and/or a meaningful opportunity to cure*. Similarly, the Court also respectfully disagrees with the *Hargett* court's determination that a complaint regarding signature-verification procedures "is one sounding *exclusively* in procedural due process." 2020 WL 5095459, at *15 (emphasis added) (declining to consider plaintiffs' "undue burden"/"right to vote" claim to the extent plaintiffs "complain[] about the signature-verification procedure" but considering the claim to the extent plaintiffs complain about "the existence of the signature-verification requirement"). Again, the Secretary has repeatedly argued that an "undue burden"/"right to vote" claim is the exact type of claim under which the constitutionality of the "entirety" of its signature-comparison procedures must be evaluated. *See, e.g.*, docket no. 30 p. 13; docket no. 70 pp. 21-22; docket no. 75 p. 11. Further, the fact that Plaintiffs challenge the State's signature-comparison "procedures" does not mean that the challenge must *only* be asserted as a "procedural due process" claim. *See, e.g.*, *Husted*, 696 F.3d at 591-97 (applying *Anderson/Burdick* to plaintiffs' "undue burden"/"right to vote" claim challenging Ohio's rule that automatically disqualified wrong-precinct provisional ballots without providing an opportunity to cure). In sum, the Court finds the "undue

Because the existing procedures create a "severe" burden on certain voters' right to vote, the challenged procedures must be "narrowly drawn to advance a compelling importance." *Norman*, 502 U.S. at 289. The Secretary's briefing does not attempt to satisfy that test, and—for the reasons set forth in Section II.B.3, *supra*—it is clear that the Secretary could not do so. In this case, the only interests set forth by the State are the avoidance of voter fraud, the "orderly and efficient administration of elections" and "safeguarding public confidence in election integrity." Docket no. 70 p. 23. With respect to the State's interest in avoiding voter fraud and "safeguarding public confidence in election integrity,"[44] the prior Section explains why there is no rational relationship between those interests and the implementation of procedures that do not provide voters with an opportunity to cure an improperly rejected ballot (little less are the challenged procedures narrowly-tailored to those interests). *See* Section II.B.3, *supra*. As the Court in *Detzner* correctly explained:

> [A]t issue is not the accuracy of each individual county canvassing board's review process; it is that [the State] denies mismatched-signature voters the opportunity to cure. Indeed, this Court is not being asked to order that *any* specific vote be counted, let alone those that are fraudulent. Rather, this Court is simply being asked

---

burden"/"right to vote" analyses conducted by the courts in *Frederick* and *Detzner*—which are consistent with the analytical approach advanced by the Secretary in this case—to be more persuasive than the analysis conducted in *Hargett*.

[44] As a separate issue, there is no evidence in the record demonstrating that any mismatched-signature ballots were submitted fraudulently. Unlike the Secretary, the Court does not interpret the vague statement contained in the affidavit of Jennifer Anderson to be evidence that Hays County's Elections Administrator has proof of "several" instances in which an individual committed voter fraud by signing another individual's application or ballot. *See* docket no. 93 p. 3 (citing docket no. 93-1 ¶ 2). Instead, the only clear evidence on the issue related to the rejected ballots demonstrates that the procedures in place lead to the improper rejection of valid ballots submitted by eligible voters. *See* docket no. 65-1, Exs. 25 & 33. Of course, there is no requirement that the Secretary necessarily demonstrate past instances of voter fraud in order to have an interest in preventing voter fraud in the future, and the Court's holdings in this case do not turn on the absence of such evidence. Finally, *even assuming* the evidence established that voter fraud ran rampant with the mail-in ballots at issue, "that would not be determinative," given that additional [notice and cure] procedures would *both* protect legitimate ballots from improper rejection *and* help prevent voter fraud. *Detzner*, 2016 WL 6090943, at *7.

> to require that mismatched-signature voters have the same opportunity to cure as no-signature voters. In fact, letting mismatched-signature voters cure their vote by proving their identity *further* prevents voter fraud—it allows supervisors of elections to confirm the identity of that voter before their vote is counted.

2016 WL 6090943, at *7. Similarly, public confidence in the integrity of elections is also furthered by providing voters an opportunity to cure errors that result from the "currently opaque, unreviewable process." *Saucedo*, 335 F. Supp. 3d at 220-21. As examples, the Individual Plaintiffs in this case have expressed their anger and frustration at the treatment of their votes—and the resulting disenfranchisement—that resulted from the application of the procedures presently in place. *See* docket no. 84, Weisfeld Dep. at 45:4-9; docket no. 84, Richardson Dep. at 29:19-30:8; docket no. 65-1, Ex. 24.

Nor are the existing procedures tailored to the State's interest in the "orderly and efficient administration of elections." In support of its position, the Secretary's briefing summarily asserts that "[t]here is potential for an additional step to work chaos into this process, including by potentially preventing the timely canvassing of election results." Docket no. 75 pp. 12-13. But the Court has explained that the Texas Election Code already provides flexibility as to the date of canvassing specifically so that other voters may be provided an opportunity to avoid an improper ballot rejection. *See* Section II.B.3, *supra*. Indeed, existing "cure" procedures (such as those utilized for voters who fail to provide a photo ID at the polling place) are already implemented under the Code, and those procedures have not wreaked havoc on counties' canvassing processes. Thus, there is simply no compelling (or even rational) justification for relying on the canvassing deadline as the basis for denying a similar process to the small fraction of voters whose mail-in ballots are improperly rejected due to a perceived signature "mismatch." Further, the Secretary's argument ignores that the Texas legislature explicitly contemplated that it may be necessary to conduct canvassing up to fourteen days after an election so that all ballots may be accurately

75

processed. *See* Tex. Elec. Code §§ 67.003(b)(2), (c). Thus, to the extent a county must conduct canvassing on that fourteen-day timeframe—rather than on the county's existing timeframe—so that additional procedures may be utilized to accurately process ballots, that is not "chaos." Instead, it is the exact procedure the legislature enacted. Finally, the Secretary's arguments regarding the "orderly and efficient administration of elections" and canvassing "chaos" ignore that there are numerous available procedural protections that will have no or little impact on the timing of election activities. *See, e.g.*, note 29, *supra* (discussing inclusion of information regarding signature-matching requirement on ballot application and carrier envelope); note 35, *supra* (discussing use of telephone, text message, or email to provide more-timely notice of rejection to voters).

Although the State's proffered interests may justify the use of signature comparison as one method of preventing voter fraud, the Secretary has failed to show how any relevant and legitimate state interest justifies the use of signature-comparison procedures *that do not provide timely notice of rejection and a meaningful opportunity to cure*. If anything, the record makes clear that the implementation of additional procedural protections would actually *further* the State's asserted interests. For that reason, Plaintiffs are entitled to summary judgment on their "undue burden"/"right to vote" Equal Protection Clause claim and their Due Process Clause claim under the *Anderson/Burdick* framework as well.

Finally, in the event the above analysis does not make it clear, the Court's conclusion is not dependent on the application of "strict," "heightened," or even "intermediate" scrutiny. Importantly, irrespective of whether the burden is classified as "severe," "moderate," or even "slight," "it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation," *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir.

2009) (quoting *Crawford*, 553 U.S. at 191), and the evidence presented by the Secretary regarding

its interests does not satisfy that standard regardless of how the Court classifies the burden.

Importantly, *even assuming* the Secretary need only satisfy a "rational" basis review—which is

not the case—the record makes clear that the Secretary still could not do so. With respect to the

nearly identical issue in *Detzner*, the Court explained:

> Even assuming that some lesser level of scrutiny applied (which it does not), [the
> State's] statutory scheme would still be unconstitutional. It is illogical, irrational,
> and patently bizarre for the [State] to withhold the opportunity to cure from
> mismatched-signature voters while providing that same opportunity to no-signature
> voters. And in doing so, the [State] has categorically disenfranchised thousands of
> voters arguably for no reason other than they have poor handwriting or their
> handwriting has changed over time. Thus, [the State's] statutory scheme does not
> even survive rational basis review.

2016 WL 6090943, at *7. The same analysis is equally applicable here. The Secretary has provided

no rational reason why it is appropriate to withhold meaningful "cure" procedures from

mismatched-signature voters while providing a cure opportunity to no-signature voters. Similarly,

there is no rational basis for providing robust cure procedures to voters who fail to show an ID

when voting in person but not those whose signatures are perceived to mismatch when voting by

mail. Indeed, the Election Code provides flexibility as to the timing of various election procedures

*so that* protections like these can be implemented. In sum, there simply is no rational reason *to*

*withhold procedural protections* from voters whose ballots are mistakenly flagged for rejection

under the State's existing error-prone signature-comparison process.

Thus, *even if* the Court accepts the Secretary's assertion that Plaintiffs' constitutional

claims should be analyzed under a "rational basis" review—and, to be clear, that is not the case

given that the disenfranchisement of eligible voters certainly constitutes *some* burden on the right

to vote—Plaintiffs are still entitled to summary judgment on their due process claims and "undue

burden"/"right to vote" equal protection claims.

### III.    Appropriate Relief

As noted above, the Court has concluded that Plaintiffs Rosalie Weisfeld and CTD are entitled to summary judgment as to the merits of their Fourteenth Amendment Due Process Clause and "undue burden"/"right to vote" Equal Protection Clause claims. Whether the *Mathews* framework or *Anderson/Burdick* framework applies, it is clear that the State's asserted interests are outweighed by—and/or fail to justify—the threat the existing procedures pose to voters' fundamental right to vote.

The Court also concludes that injunctive relief is both appropriate and necessary, and below, the Court addresses the appropriate scope of that relief.

### A. Legal Standard, Applicable Considerations, and the Parties' Proposals

To be entitled to permanent injunctive relief, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

For the reasons set forth in Section II of this Order, the Court concludes that each factor of this analysis is satisfied. Indeed, a violation of one's right to vote is an irreparable injury, and monetary damages are not adequate to compensate for that injury. A balance of the hardships also favors entry of an injunction *of an appropriate scope*, as the Court has found that the applicable government interests and/or burden—if any—do not outweigh the severe harm facing mail-in voters who have their ballots improperly rejected. Finally, given the importance of the fundamental right to vote and the risk posed to that right by the existing procedures, the Court finds that the

public interest will be furthered by the issuance of injunctive relief that is *tailored* to protect that right.

However, although the existing implementation of the State's signature-comparison procedures plainly violates certain voters' constitutional rights, the appropriate scope of the resulting injunctive relief is a more difficult question. Plaintiffs assert that one of two remedies is appropriate. Plaintiffs first contend that the Court may order the Secretary to implement a detailed "notice and cure or challenge process," and Plaintiffs' brief describes a detailed proposed remedy that Plaintiffs contend could be implemented in advance of the November 2020 elections. *See* docket no. 89 pp. 3-5.[45] In the alternative, and specifically in the event the Court concludes that Plaintiffs' proposed notice and cure procedures would be overly burdensome and/or otherwise inappropriate, Plaintiffs contend that the Court should "enjoin[] implementation of the signature comparison procedure entirely unless and until the legislature implements appropriate safeguards." *Id.* at pp. 1-2.

Among other complaints with Plaintiffs' relief proposals, the Secretary responds that the detailed procedures set forth in Plaintiffs' briefing would (i) "not protect election integrity or ballot security," (ii) impose "practical burdens" and costs on the Secretary and local election officials, (iii) require the reprinting of election materials, and (iv) cause confusion with respect to the implementation of any "cure" procedure. *See generally* docket no. 93 pp. 10-18. The Secretary

---

[45] Plaintiffs' specific proposed remedy requests that the Court: (1) mandate dates on which EVBB/SVC teams must complete signature comparisons (and thus implicitly mandate when canvassing may occur); (2) order that notice of a ballot rejection based on a perceived signature mismatch be provided within 24 hours of rejection by mail, as well as by phone, text message and email (if that contact information has been provided by the voter); (3) order the creation of a new "cure" procedure that permits a voter to prevent the rejection of his or her ballot by providing certain information and/or documentation to county election officials; and (4) order the Secretary to create a "Notice of Provisional Rejection" form that allows voters to provide the affirmation and verifying information required by the new "cure" procedures. *See* docket no. 89 pp. 3-5.

also asserts that Plaintiffs' specific remedial plan is not justified because mail-in voters have existing remedial options including the procedures provided in § 87.127. *See* docket no. 93 p. 17; docket no. 98 p. 6 n.7. Additionally, the Secretary argues that any order enjoining the implementation of signature verification during this election would "sweep[] far more broadly than Plaintiffs' alleged injury" and would give "short shrift to the State's interests" in preventing voter fraud and ensuring the orderly administration of elections. *See id.* at pp. 2-9. Finally, the Secretary asserts that *any* injunctive relief prior to the November 2020 elections would be inappropriate because the election date is "impending." *See id.* at pp. 18-19.

Many of the Secretary's concerns regarding Plaintiffs' proposals ignore a plain fact: as presently implemented, the challenged signature-comparison procedures violate certain voters' constitutional rights. Those rights are vitally important to a functioning democracy, and the Secretary cannot avoid the implementation of *any form* of injunctive relief merely because *some* burden or inconvenience may result. Moreover, the prior Section of this Order explains that *certain* remedies—such as those that provide eligible voters with an opportunity to confirm that he or she submitted the mail-in ballot in question—actually *advance* the State's interests in avoiding voter fraud and safeguarding the public's confidence in elections. Finally, although the Court recognizes that it is not its duty to draft provisions of the Election Code in the first instance, the Court has both the authority and duty to ensure that the *existing* Code provisions are implemented in a manner that is consistent with the Constitution.

On the other hand, the Court believes that certain of the Secretary's arguments have merit. For one, the State does have an unquestionable interest in preventing voter fraud, *Purcell*, 549 U.S. at 4, and the Court must give weight to that interest. *See Democratic Nat'l Comm. v. Bostelmann*, No. 20-1538, 2020 WL 3619499, at *2 (7th Cir. Apr. 3, 2020) (stating that court's "categorical

80

elimination" of witness requirement applicable to absentee ballots "gives no effect to the state's substantial interest in combatting voter fraud"). Further, the Court agrees with the Secretary that the Court should aim to implement a narrowly-tailored remedy—*if one exists*—that both protects voters' rights and protects the State's interest in utilizing signature comparison to verify the identities of mail-in voters. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."). The Court also agrees with the Secretary that any relief implemented this close to an election should be devised in a way to avoid voter confusion and substantial burdens on election officials. *See Purcell*, 549 U.S. at 4.

For that reason, the Court has concluded that it would be inappropriate to order *certain* aspects of the specific relief requested by Plaintiffs *in advance of the November 2020 elections*. For example, the Court does not believe it is appropriate to instruct the Secretary to design and implement *completely new* "cure" forms, affidavits, or identification verification procedures in advance of the November 2020 elections. In addition, the Court does not believe it is appropriate— at this stage—to notify local election officials that they must modify existing dates for EVBB/SVC meetings and/or their counties' timeframes for canvassing procedures for the upcoming elections.[46] The Court concludes that these types of relief very well may result in a substantial

---

[46] The Court does not mean to suggest that Plaintiffs' concern regarding certain dates and deadlines is not well-founded. Indeed, the Court has made clear that the Code's existing timing provisions regarding signature review, notice of rejection, cure procedures and/or canvassing are inherently problematic. *See* Sections II.B.2.a and II.B.2.b, *supra*. However, in light of the health risks and uncertainty created by the ongoing Covid-19 pandemic and the fact that certain counties have already made arrangements for these processes, *see, e.g.*, docket no. 93-1, the Court believes it would be inappropriate to mandate when each county's EVBB/SVC teams must meet and/or when canvassing must be conducted *for the November 2020 elections*.

burden on election officials and/or voter confusion if implemented quickly in advance of the November 2020 elections.[47]

Accordingly, having reviewed the briefing and the record, the Court believes it is appropriate to (i) issue narrow, immediate injunctive relief in advance of the November 2020 elections utilizing *existing procedures* in the Election Code, and (ii) set a hearing following the November 2020 elections to determine whether broader injunctive relief is appropriate at that time.[48]

---

[47] To be clear, these types of relief may be appropriate for subsequent elections. *See* Section III.C., *infra*.

[48] The Court understands that plaintiffs in a separate litigation related to the State's signature-comparison procedures would like the Court to stay this case and withhold the issuance of any judgment or relief until the court in the separate action can (i) address the merits of those plaintiffs' claims and (ii) determine to what extent those plaintiffs are entitled to relief. *See* docket no. 86, filed by plaintiffs in *Flores, et al. v. Hughs, et al*. No. 7:18-cv-00113 (S.D. Tex.). The Court believes doing so would be inappropriate for several reasons. First, it was fewer than three weeks ago that this Court was first notified of the separate litigation, notwithstanding that the *Flores* litigation had been pending since this case was filed. Indeed, the *Flores* plaintiffs knew of this case at least in October of last year, *see* docket no. 86-3, and the *Flores* plaintiffs only sought participation in this case on the eve of summary judgment in this action as well as on the eve of the November 2020 general election. The Court finds that the *Flores* plaintiffs' intervention request is untimely—at least for the purposes of seeking a stay in this action—as Plaintiffs in this action would be prejudiced. *See Adam Joseph Res. v. CNA Metals Ltd*., 919 F.3d 856, 865 (5th Cir. 2019) (stating that a court determining whether to permit intervention should consider the "length of time during which the intervenor actually knew or reasonably should have known of his interest in the case" and "the extent of prejudice to the existing parties to the litigation," among other factors). Importantly, the parties in this case have taken substantial steps to litigate the merits of their claims, and this Court has expended vast judicial resources addressing summary judgment motions in this case. This is simply not an instance in which "efficiency" or "judicial administration" favors delay of this action. Moreover, it is unclear whether the *Flores* court plans to address the merits of the *Flores* plaintiffs' claims in advance of the November 2020 elections. The *Flores* court has not yet resolved the summary judgment issues in that case, notwithstanding that (i) the *Flores* plaintiffs' motion has been pending since April 1, 2020 and (ii) the *Flores* plaintiffs' filed renewed motions for judgment filed on June 1, 2020 and August 26, 2020. Additionally, the *Flores* court stated on the record that it would "gladly" wait for this Court to address the substantive issues first. *See* docket no. 86-3 (Oct. 16, 2019 hearing transcript). Thus, it appears that the *Flores* court is fully aware that this Court may address the pending issues in the first instance, and it has not taken action to delay these proceedings. *See Save Power Ltd. v. Syntek Finance Corp*., 121 F.3d 947, 950 (5th Cir. 1997) ("[T]he court in which an action is first filed is

**B. Immediate Injunctive Relief in Advance of November 2020 Elections**

To avoid confusion and minimize the burdens in advance of the November 2020 elections, the Court will order narrow, immediate injunctive relief that is fully consistent with *existing procedures* set forth in the Texas Election Code. Specifically, the Court will order the following immediate injunctive relief as part of this Order:

> (1) The Secretary must—within ten (10) days of this Order—provide a copy of this Order to all local election officials and issue an advisory notifying all local election officials that the rejection of a voters' ballot on the basis of a perceived signature mismatch is unconstitutional if the voter is not provided with (a) pre-rejection notice of a perceived mismatched signature and (b) a meaningful opportunity to cure his or her ballot's rejection.

---

the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed."). Additionally, this Court has waited nearly three weeks since the *Flores* plaintiffs stated that a ruling in that case was "imminent," *see* docket no. 86 p. 10, and no judgment or relief has been issued. The Court has determined that Plaintiffs in this case are entitled to immediate partial relief, and the Court simply cannot wait any longer to issue its order in light of the upcoming November 2020 election date. Third, the Court—at this time—is merely issuing partial injunctive relief in advance of the November 2020 elections. In the event the *Flores* plaintiffs believe that the relief issued by this Court does not go far enough, they are welcome to make that argument to the *Flores* court, and the *Flores* court has the authority to issue broader injunctive relief in the event it concludes that doing so is necessary and appropriate. Thus, the *Flores* plaintiffs *do* have a remedy to the extent they believe that they are prejudiced by this Court's Order, whereas the Plaintiffs in this case would have *no remedy* in the event this Court withheld all relief in this case and the *Flores* court ultimately declined to issue relief in advance of the November 2020 elections. In sum, the Court finds that it would be inappropriate to permit intervention at this late stage solely for the purposes of delaying this case. However, in the event the *Flores* plaintiffs would like to intervene for the purposes of participating at the hearing at which the Court determines whether additional permanent injunctive relief is appropriate, the *Flores* plaintiffs may file a separate motion seeking participation in this case for those purposes.

(2) Further, in order to protect voters' rights in the upcoming November 2020 elections, the Secretary must—within ten (10) days of this Order—*either*:[49]

    (a) Issue an advisory to all local election officials notifying the election officials that—in light of the Court's determination as to the constitutionality of the existing procedures—mail-in ballots may not be rejected on the basis of a perceived signature mismatch under Texas Election Code § 87.041(b)(2) during the upcoming November 2020 elections; *or*

    (b) Issue an advisory to all local election officials notifying the election officials that—in light of the Court's determination as to the constitutionality of the existing procedures—the Constitution *requires* the following:

        (i) Before *rejecting* a ballot on the basis of a perceived signature "mismatch," any EVBB and/or SVC *must* compare the signatures on the voter's application and carrier envelope with all other signatures from the prior six years that are on file with the county clerk or voter registrar so that the EVBB and/or SVC can "confirm" its initial determination that a ballot should be rejected;

        (ii) Voters whose signatures are perceived to be mismatching following the comparison in (2)(b)(i) *must* be mailed notice of a rejected ballot within one day of the EVBB's and/or SVC's

---

[49] In order to maintain statewide uniformity, the Secretary must issue the *same* advisory (either the one described in (2)(a) or the one described in (2)(b)) to all local election officials.

rejection determination,[50] and the notice *must* (a) advise the voter that—in the event the voter believes his or her ballot was improperly rejected—the voter may seek relief by contacting an appropriate election official and (b) provide the appropriate local election official's (or officials') telephone number and mailing address;

(iii)    In the event a voter whose signatures are perceived to be mismatching provided his or her phone number on the voter's ballot application, local election officials must make *at least one* phone call to that number within <u>one day</u> of the EVBB's and/or SVC's rejection determination, and on the call, the election official must (a) notify the voter of his or her ballot's pending rejection based on a perceived signature mismatch, (b) advise the voter that—in the event the voter believes his or her ballot was improperly rejected—the voter may seek relief by contacting an appropriate election official, and (c) provide the appropriate local election official's (or officials') telephone number and mailing address;[51] and

---

[50] For the purposes of the "one day" requirement in <u>(2)(b)(ii)</u> and <u>(2)(b)(iii)</u>, notice must be provided by the day following the day on which the EVBB and/or SVC makes its rejection determination, unless that determination occurs on a Saturday, in which case notice must be provided by the following Monday.

[51] In the event the voter does not answer at the number provided, the local election official must leave a voicemail—if that function is available—with the same information.

> (iv)    In the event any voter notifies the appropriate local election official(s) that his or her ballot was improperly rejected based on a perceived signature mismatch or claims that he or she signed both the application and the carrier envelope,[52] the appropriate county election officer *must* pursue a challenge on behalf of the voter pursuant to § 87.127,[53] *unless* the voter *explicitly* informs the county election officer that he or she does not wish for the official to pursue relief on the voter's behalf.

> (3) Finally, in the event any local election official fails to comply with any of the Secretary's advisories described above, the Secretary must advise the local election official that he or she is "imped[ing] the free exercise of a citizen's voting rights"

---

[52] To the extent local election officials seek guidance from the Secretary as to this requirement, a voter need not specifically request that a county election official file a lawsuit on the voter's behalf or reference § 87.127 in order to trigger the local election official's duty to pursue relief. The Court provides this clarification for the avoidance of doubt, as the Secretary's summary judgment briefing appears to repeatedly fault Richardson and Weisfeld for not specifically citing § 87.127 to local election officials and/or demanding that local officials pursue such relief. *See* docket no. 70 pp. 27-28; docket no. 75 pp. 11-12; docket no. 93 p. 5 n.5. But a voter need not learn every nuanced subsection of the Election Code in order to exercise his or her right to vote. Instead, the Constitution requires that the appropriate county election officer pursue relief under § 87.127 if a voter notifies the appropriate official that he or she signed both the application and the carrier envelope, *unless* the voter also *explicitly* informs the official that he or she does not wish for the official to pursue relief on the voter's behalf. Finally, the Secretary should advise local election officials to keep records detailing, at minimum, (i) the voters who provided notice of an improperly rejected ballot, (ii) the date on which the voter contacted local officials, and (iii) the subsequent actions taken by local officials on the voter's behalf.

[53] This remedy must be available to *all* categories of voters who are eligible to vote by mail who contact the local election official regarding an improper rejection, including those who are (i) disabled, (ii) over the age of 65, (iii) out of the county at the time notice of rejection is received, and/or (iv) confined in jail at the time notice of rejection is received. In light of the Secretary's repeated contentions regarding the sufficiency of the existing "cure" opportunity provided by § 87.127, the Court expects that the Secretary can provide guidance to local officials, if necessary, regarding the appropriate implementation of § 87.127 in this manner.

in violation of the Constitution, and the Secretary must order "the person to correct the offending conduct" pursuant to § 31.005.

The Court will briefly explain why it concludes that the above injunctive relief best balances the State's interests with those of Plaintiffs, in light of the fact that the November 2020 elections are less than two months away.

Injunctive Relief (1): With respect to the first advisory that the Secretary must issue, Section II.B.2 of this Order explains the various reasons that the existing signature-comparison procedures are likely to lead to ballots being improperly rejected based on an incorrect determination that a voter's application and carrier envelope were signed by different individuals. Given the inherent inaccuracies and inconsistencies involved with signature comparison conducted by laypersons without training, it is unconstitutional to reject a ballot on that basis if a voter is not provided with pre-rejection notice and a meaningful opportunity to "cure" an improper rejection. The first portion of this Court's injunction ensures that local election officials are notified of those general requirements, and it is intended to provide context for the subsequent portions of the Court's injunction.

Injunctive Relief (2)(a): Because the existing signature-comparison procedures are unconstitutional as presently implemented, the Secretary may advise local election officials that mail-in ballots are not to be rejected on this basis during the November 2020 elections. The Court understands that the Secretary may not prefer this approach. *See generally* docket no. 93 pp. 2-9. But in the event the Secretary believes that the relief provided in (2)(b) is unduly burdensome or otherwise inappropriate (notwithstanding that it merely instructs the Secretary to advise local election officials to implement *existing protections* in the Election Code), the Secretary may

instead protect voters' fundamental rights by instructing local officials that ballots should not be rejected based on perceived signature mismatches during the November 2020 elections.

Injunctive Relief (2)(b)(i): The next four portions of the Court's injunction require the Secretary to inform local election officials that certain actions that are each *permissible* under the Election Code are in fact *required* under the Constitution in the event officials intend to reject ballots pursuant to §§ 87.041(b)(2). As noted in Section II.B.2.a of this Order, the existing signature-comparison process is inherently error prone. *See id.* Indeed, under the existing procedures, reviewers are provided no uniform standard or instruction as to what constitutes a "matching" signature, and as a result, untrained laypersons conduct a review that even trained experts find difficult. *See id.* Unsurprisingly, the record indicates that whether a ballot is accepted or rejected often depends on which two-person team of reviewers receives the ballot. *See id.*

Fortunately, the evidence in the record demonstrates that a review committee's consideration of additional signatures is one meaningful way of reducing the risk of an improper rejection. *See* Section II.B.2.c, *supra.* Further, the Election Code already sets forth procedures under which committee members can review additional signatures from the voter, and the EVBB handbook already advises committee members that additional signatures can be utilized to "confirm" any rejection determination. *Id.* at §§ 87.027(i), 87.041(e); docket no. 65-1, Ex. 4 p. 16. Conceding the apparent value of such an approach, the Secretary's response notes that the Secretary has used the EVBB handbook to "remind" EVBBs and SVCs that they can "go beyond the signatures on the carrier envelope and application for ballot by mail (ABBM) to consider any signature made by the voter within the past six years and on file with the clerk or voter registrar." Docket no. 93 pp. 8-9. However, a "reminder" is constitutionally insufficient considering (i) the fundamental rights at stake, (ii) the record evidence indicating that signature reviewers generally

do not consider the additional signatures under the existing procedures, and (iii) the inherent limitations to the "notice" and "cure" remedies discussed in subsections (2)(b)(ii), (2)(b)(iii), and (2)(b)(iv). Instead, in light of those considerations, the Constitution *requires* that signature reviewers use these additional signatures, if available, to "confirm" any decision to reject a ballot based on a perceived mismatch between the signatures provided on the voter's application and carrier envelope.

Injunctive Relief (2)(b)(ii) and (2)(b)(iii): In order for a voter to be able to take actions to "cure" an improper ballot rejection based on a perceived signature mismatch, it is vital that the voter receive prompt notice of a ballot's potential rejection. The Secretary recognizes as much, and for that reason, the Secretary has previously issued an advisory instructing local election officials "to mail notices of rejected ballots to affected voters as soon as possible." *See* docket no. 93-2, Ex. C. However, the Secretary's prior advisory ultimately leaves the timing of that notice to the discretion of local officials (at least insofar as local officials may notify the voter as late as ten days after the election), and in order for mail-in voters to have *any* opportunity to utilize the relief set forth in (2)(b)(iv), the voter must receive notice of any rejection before local canvassing has occurred. *See* Tex. Elec. Code § 87.127.

For that reason, the Constitution does not permit unreasonable delays in a county election officials' transmission of rejection notices, and in order to provide a voter due process, the Court concludes that local officials must mail notice of a ballot's rejection based on a perceived signature-mismatch to the voter within one day of the EVBB's and/or SVC's determination. Moreover, in order for mail-in voters to have a *meaningful* opportunity to "cure" any improper rejection in the limited time available, the Court concludes that it is necessary to include on the rejection notice (i) a sentence advising the voter that he or she may contact local election officials

in order to challenge any rejection on the basis of a perceived signature mismatch and (ii) the contact information for the local election official who the voter should contact.

Moreover, the Court concludes that constitutionally-sufficient "notice" also requires that local election officials make *at least one* attempt to provide notice of rejection to the voter by telephone if the voter has provided that information on his or her ballot application. This requirement recognizes that notice by mail may take several days to arrive, and thus, it very well may arrive too late for some voters to seek relief from county election officials if the county's canvassing procedures have already commenced. Additionally, this directive merely instructs election officials to provide the same form of "notice" that is implemented for voters who altogether forget to sign their carrier envelope. *See* Tex. Elec. Code. § 86.011(d); docket no. 65-1, Ex. 4 p. 43.

<u>Injunctive Relief (2)(b)(iv)</u>: In light of the error-prone nature of the signature-comparison process, the Constitution *requires* that a voter be provided a *meaningful* opportunity to "cure" the improper rejection of his or her ballot based on a perceived signature mismatch. In every brief that the Secretary has filed in relation to the pending motions, the Secretary has asserted that the existing signature-comparison procedures are constitutionally sound and/or that additional remedies are unnecessary *because* Texas Election Code § 87.127 already provides mail-in voters with an opportunity to cure a mistakenly rejected ballot. *See* docket no. 70 pp. 24-25; docket no. 75 p. 10; docket no. 79 p. 9; docket no. 93 p. 17; docket no. 98 p. 6 n.5. The Court has explained in detail why § 87.127 does not provide a *meaningful* opportunity to "cure" for voters who have their mail-in ballots improperly rejected, at least as it is *presently* understood and implemented by local election officials. *See* Section II.B.2.b, *supra.* In addition to other flaws with the existing implementation of § 87.127, a voter presently may receive relief under that Section *only if* the local

election official exercises his or her *discretion* to seek relief on a voter's behalf. *See id.* Because that remedy (as presently understood) is discretionary and only applies to "county election officers," the record evidence demonstrates that the procedure is unavailable for the vast majority of voters who have their votes rejected based on a perceived signature mismatch.[54] And whether a voter whose ballot is improperly rejected can pursue relief—in order to freely exercise his or her right to vote—may not be left to the unchecked discretion of a local official, especially if those officials *believe* that seeking relief on a voter's behalf under § 87.127 is presently "impossible." Docket no. 84, Hancock Dep. at 107:9-19.

Notably, however, the inherent flaws with § 87.127 are largely premised on the remedy's general unavailability to aggrieved voters under *existing guidance*. On the other hand, if local officials are informed that they are *required* to pursue relief on behalf of an aggrieved voter under § 87.127, the Court can see how those procedures may—in some instances—mitigate the risk of an improperly rejected ballot.[55] Accordingly, the Court believes it is appropriate for the Secretary to inform local election officials that the Constitution *requires* that they *must* pursue the relief set forth in § 87.127 that the Secretary asserts is already available to *any* mail-in voter who contends that his or her vote has been improperly rejected. *See* notes 52 & 53, *supra*.

Injunctive Relief (3): Section 31.005(a) of the Texas Election Code provides the Secretary with authority to "take appropriate action to protect the voting rights of the citizens of this state from abuse by the authorities administering the state's electoral process." *Id.* As described above,

---

[54] *See* Section II.B.2.b, *supra*; *see also* docket no. 84, Hancock Dep. at 103:4-106:23, 107:9-19; docket no. 84, McAllen 30(b)(6) Dep. at 53:20-25.

[55] The record demonstrates that the procedure—if actually pursued—may protect voters from disenfranchisement. Although the Secretary's Director of Elections testified that he was only aware of § 87.127 being utilized by a single county official on a single occasion, the record demonstrates that the use of the procedure on that occasion resulted in five voters having their ballots reinstated. *See* docket no. 84, Ingram Dep. at 44:22-46:1.

the Constitution requires that voters be provided certain procedural safeguards if their mail-in ballots are going to be subjected to the State's error-prone signature-comparison process. The above instructions describe the constitutionally-required safeguards that must be implemented for the November 2020 elections, and in the event any local election official fails to comply with the above instructions, that local election official will be "imped[ing] the free exercise of a citizen's voting rights." *Id.* at § 31.005(b). Although the Texas Election Code states that the Secretary *may* order local election officials to correct their conduct in the event a local official acts in a manner that violates a voter's constitutional rights, the Court concludes that the Constitution *requires* that the Secretary *at least try* to protect such voters' rights by issuing such an order. Thus, in the unlikely event any local election official fails to comply with the advisories described in this Section, the Secretary must immediately notify the local election official that he or she is violating voters' constitutional rights and order that the official comply with its advisory.[56]

The Court recognizes that there will be *some* burden resulting from this immediate relief, but the record demonstrates that the resulting burden will not be substantial. With respect to the requirement that EVBB and/or SCV members review additional signatures in (2)(b)(i), this supplemental procedure will not be necessary for the *vast majority* of mail-in ballots that are received. Indeed, the Secretary's Director of Election's has confirmed that only a small fraction of mail-in ballots are typically rejected based on the initial determination that the signatures on the carrier envelope and application do not match, *see* docket no. 93-2 ¶ 11, and it is only for these voters that the Constitution requires that the reviewers "confirm" their original determination using the additional signatures on file. Further, both local officials in this case testified that they are

---

[56] The Secretary's office has recently demonstrated its authority and willingness to utilize § 31.005 to protect voters' rights from "abuse" from local election officials. *See* note 19, *supra.*

familiar with the procedures involved with comparing additional signatures on file (and how these procedures are implemented), notwithstanding the fact that they also testified that EVBBs have not frequently used the procedures in their respective jurisdictions. *See* docket no. 84, McAllen 30(b)(6) Dep. at 26:6-17; docket no. 84, Brazos 30(b)(6) Dep. at 43:2-46:13.

With respect to the "notice" requirements set forth by the Court in (2)(b)(ii) and (2)(b)(iii), the Court reiterates that such notice will only be required for a small fraction of voters who submit ballots by mail. As to those voters, the available evidence in the record demonstrates that the "one day" requirement is reasonable and not overly burdensome. Indeed, both local officials in this case testified that their jurisdictions already mail rejection notices within one business day of any rejection determination by the EVBB. *See* docket no. 84, Hancock Dep. at 89:3-89:8; docket no. 84, McAllen 30(b)(6) Dep. at 32:8-33:7. Moreover, given that the Election Code provides for notice by phone in the event a voter makes other errors on his or her carrier envelope and/or ballot application, the record indicates that (i) local election officials are familiar with contacting voters by phone (if a number is provided on the voter's application), *see* note, 35, *supra*, and (ii) requiring a single phone call per perceived signature mismatch would not impose any significant burden on local officials. *See* docket no. 84, Hancock Dep. at 48:5-14; *See* docket no. 84, McAllen 30(b)(6) Dep. at 33:8-34:18, 35:3-17. The minimal burden imposed by the Court's instruction regarding "notice" is perhaps best demonstrated by the alternative available to the Court for ensuring that voters are provided "notice" such that a "cure" may be pursued in advance of a county's canvassing deadlines. Indeed, Plaintiffs requested that the Court order the Secretary to direct local election officials to modify the dates of their upcoming EVBB/SVC meetings (and/or canvassing procedures to the extent those are impacted by the review process). *See* docket no. 93 p. 3. However, local officials and the Secretary responded that doing so at this late stage would be

infeasible and/or prohibitively expensive.[57] *See, e.g.,* docket no. 93-1 ¶¶ 3, 13-14; docket no. 93-2 ¶¶ 14-15. The Court credits this evidence from local officials, at least with respect to the November 2020 elections, and the Court believes that the "notice" provided by the procedures in (2)(b)(ii) and (2)(b)(iii)—which utilizes infrastructure already in use by local election officials—reflects an appropriate compromise in advance of the upcoming elections.

To the extent the Secretary contends that the procedures set forth in (2)(b)(iv) would be overly burdensome, the Secretary may not have it both ways. The Secretary cannot argue both (i) that § 87.127 provides the existing "cure" for any voter who allegedly suffers an improper ballot rejection[58] and (ii) that the pursuit of relief under § 87.127 for each voter who allegedly suffers an improper ballot rejection would be unduly burdensome. To the extent local election officials contend that the required implementation of § 87.127 would be overly burdensome, the Court notes that the procedure will be required only for the small fraction of mail-in voters who (i) have their ballots rejected based on a perceived signature mismatch and (ii) contact local election officials regarding an improper rejection. Further, it is the State's chief election officer's position that § 87.127 provides the appropriate remedy for aggrieved voters who contend that their ballots were improperly rejected. Thus, the Court expects that the Secretary can provide guidance to local election officials as to the most appropriate and efficient means for implementing that existing remedy on voters' behalves should any voter contend that his or her ballot was improperly rejected on the basis of a signature mismatch. *See* notes 52 & 53, *supra.*

---

[57] To be clear, this type of injunctive relief, in which the dates for the signature-review meetings and/or canvassing process are Court-imposed, may be appropriate, if necessary, for subsequent elections.

[58] The Court notes that the Secretary also contends that the "election contest" procedure provides an adequate existing remedy. *See* docket no. 93 p. 5 n.5. There are *numerous* reasons why that procedure is wholly inadequate and unrealistic. That topic is addressed in more detail in Section II.B.2.b, *supra.*

Additionally, the Court notes that many of the Secretary's arguments regarding the purported impropriety of injunctive relief are wholly inapplicable with respect to the remedies set forth above. For one, the partial immediate injunction in this case in no way "deprives the State of the opportunity to implement its own legislature's decisions." *Moore v. Tangipahoa Parish Sch. Bd.*, 507 F. App'x 389, 399 (5th Cir. 2013). The State may continue utilizing signature-comparison during the November 2020 election under the Court's partial immediate relief, and the relief itself "implements [the Texas] legislature's decisions." Indeed, under the terms of the Court's injunction, local officials are merely being directed to *actually utilize* certain protections that the Texas legislature believed were appropriate to include when the existing Code provisions were enacted. Nor will the above procedures cause confusion among voters or depress turnout. *See* docket no. 93 p. 7 (citing *Purcell*, 549 U.S. at 4-5). Importantly, the immediate injunctive relief does not change anything about the steps a voter must take when submitting his or her application or carrier envelope. And providing a voter whose ballot was improperly rejected "notice" and an opportunity to "cure" is certainly less likely to depress turnout than the existing risk of wholesale disenfranchisement. Finally, to the extent the Secretary is concerned about "uniformity," *see* docket no. 93 pp. 6-7, the immediate injunctive relief *promotes* uniformity. Specifically, the above relief ensures that all mail-in voters are provided the *same* protections, rather than leaving local officials the discretion to determine the extent to which each voter should have his or constitutional rights protected.[59]

---

[59] Under the Secretary's existing guidance, one county's EVBB may choose to compare additional signatures on file with the registrar (and thus, reduce a voter's risk of rejection) whereas officials from an adjacent county may choose to forgo those protections. Similarly, under the Secretary's existing guidance, one county election official may choose to pursue relief for aggrieved voters under § 87.127 whereas another may believe that "it's not [his or her] responsibility to do that." *Compare* docket no. 84, Hancock Dep. at 103:25-106:23 *with* docket no. 84, Ingram Dep. at 44:22-

The Court reiterates that the above immediate remedy merely directs the Secretary to instruct local election officials to interpret and implement *existing procedures* in the Election Code in a manner that is consistent with the Constitution. And as the Court has stressed throughout this Order in response to various arguments by the Secretary, nothing in the remedy requires the Secretary to do anything outside of its authority. *See, e.g.*, Sections I.D & I.E, *supra*. Indeed, the Secretary has recently issued advisories to local election officials about the mail-in voting procedures and the signature-comparison requirement, and the Secretary frequently does so in the days and weeks leading up to elections.[60] *See, e.g.*, docket no. 93-2, Exs. B & C. Notably, this is not the first time that the Secretary has been ordered to issue advisories to local election officials in order to ensure that the Election Code is not being implemented in a way that violates voters' rights. *OCA-Greater Houston*, 2018 WL 2224082, at *5 (ordering Secretary to "distribute notice to all county elections departments clarifying that they are not to enforce [certain provisions of the

---

46:1. The Court's order ensures that mail-in voters are provided the same procedural safeguards irrespective of their county of residence.

[60] The Secretary claims that any injunction ordering the issuance of an advisory is inappropriate because local officials may choose to disregard the Secretary's advisory. *See* docket no. 93 pp. 6-7. Although the Court is hesitant to even engage with the Secretary's hypothetical, the Court will briefly explain why it would be an inappropriate basis to withhold injunctive relief, *even assuming* such blatant disregard for the law might occur. For one, the record demonstrates that local election officials view the Secretary's advisories as binding instructions. *See* docket no. 84, Hancock Dep. at 81:7-11; docket no. 84, McAllen 30(b)(6) Dep. at 40:9-18. In addition, the Secretary's argument presupposes that local election officials would choose to *knowingly* violate voters' constitutional rights and, in doing so, risk litigation, termination and/or other consequences. It also ignores that the Secretary may order compliance and seek an enforcement action from the Attorney General in the event local officials are violating voters' constitutional rights. *See* Tex. Elec. Code § 31.005. Indeed, the Secretary utilized those procedures in the recent weeks in order to protect the right to vote from alleged "abuse" by Harris County officials. *See* note 19, *supra*. Finally, the risk that certain local election officials may ignore the Secretary's guidance is a risk that the Secretary has apparently taken *every time* its office issues an election advisory, and to date, it has not stopped the Secretary from issuing election advisories. Similarly, that unlikely risk provides no basis for preventing the Court from ordering the Secretary to issue such advisories in this case.

Texas Election Code]" and stating that "[t]he notice should explicitly explain" various types of assistance that a voter is entitled to receive).

In sum, the Court believes that—at least for the purposes of the upcoming November 2020 elections—the above framework is narrowly tailored to both provide additional protections for voters and protect the State's interests in preventing voter fraud and ensuring the orderly administration of elections. However, in the event the Secretary ultimately concludes that State and/or local election officials are not in a position to implement the Election Code's *existing remedies* in advance of the November 2020 elections in a manner that is consistent with the Constitution, the Secretary may instead provide the advisory to local election officials set forth in (2)(a).

### C. Injunctive Relief for Subsequent Elections

The Court recognizes that the above-injunctive relief is not perfect and may not provide completely infallible protections such that every eligible voter who casts a mail-in ballot avoids disenfranchisement in the November 2020 elections. For example, although the Secretary must advise local officials to provide prompt notice of rejection as set forth above, there are various reasons why some voters may not receive their notices of rejection prior to the implementation of a county's canvassing procedures.[61] For this reason, the "cure" procedures available to voters under § 87.127—via local election officials—will be unavailable to these voters in the upcoming election. Thus, a long-term solution that addresses these timing issues—by perhaps modifying the dates governing the signature-comparison process, notice provisions and/or canvassing procedures—may ultimately be more appropriate for subsequent elections.

---

[61] For example, a voter who is away from his or her home county on Election Day may not receive "notice" that is transmitted by mail or by telephone until he or she returns.

In addition, and notwithstanding the Secretary's recent decision to add a sentence regarding signature comparison to the State's "dear voter" letter, it may be necessary to add information regarding signature comparison to the ballot application and carrier envelope as well.[62] *See note, 29, supra.* Even following the Secretary's revisions to the State's general "dear voter" letter, there remains a substantial risk that voters will submit their applications and carrier envelopes without knowing that the signatures on each document must match. *See id.* Providing information regarding the signature-matching requirement on the documents *actually being signed* appears to be a far more appropriate method for ensuring that each voter is aware of the requirement *as he or she signs the documents.* It is therefore unsurprising that at least one other state has added language regarding the signature-comparison procedures to ballot applications and carrier envelopes in response to similar challenges. *See Saucedo,* 335 F. Supp. 3d at 218.

Finally, a "notice" and "cure" procedure that is more robust than the remedy provided in the existing Code provisions may be appropriate for subsequent elections. Moreover, the Texas legislature may be in a better position to design those specific procedures. Indeed, the legislature has set forth step-by-step "cure" procedures for voters who make other mistakes while voting, and ultimately, a similar legislative framework for signature "mismatch" voters may ultimately be the most appropriate solution for addressing the procedural deficiencies inherent in the existing process.

Thus, although the Court believes a narrowly-tailored solution is appropriate for the November 2020 elections in order to (i) protect voters' rights and the State's interests, and

---

[62] The Court has determined that such a remedy would be inappropriate as part of the immediate injunctive relief ordered in this case because the record indicates that local election officials have already printed the ballot applications and carrier envelopes for the November 2020 elections. *See* docket no. 93-2 ¶ 10; docket no. 93-1 ¶ 6.

(ii) avoid substantial confusion and/or burdens on the eve of the elections, it is clear that additional safeguards may be required once the State's arguments regarding the impending nature of the November 2020 elections are no longer part of the requisite balancing analysis. Importantly, a declaration submitted by the Secretary's Director of Elections concedes that a detailed framework of relief similar to that requested by Plaintiffs "would not necessarily impose a significant burden on the Secretary of State's office" under "normal circumstances." Docket no. 93-2 ¶ 9. Accordingly, the Court will hold a hearing following the November 2020 elections to determine whether it is appropriate to enjoin the signature-comparison process during subsequent elections absent more robust procedural protections for voters who cast their ballots by mail.

## IV.    The Parties' Other Claims and Motions

In this case, the Court has determined that it is appropriate to limit the scope of this Order to the adjudication of Plaintiff Weisfeld's and Plaintiff CTD's due process and "undue burden"/"right to vote" equal protection claims against the Secretary. Specifically, the Court has determined that it is appropriate to focus this Order on the theories against the Secretary that numerous Courts have found to be meritorious in analogous challenges to similar mail-in ballot signature-comparison procedures. *See Saucedo*, 335 F. Supp. 3d 202; *Zessar*, 2006 WL 642646; *Martin*, 341 F. Supp. 3d 1326; *Detzner*, 2016 WL 6090943; *Frederick*, 2020 WL 4882696; *Self Advocacy Sols. N.D.*, 2020 WL 2951012; *Raetzel*, 762 F. Supp. 1354. The Court understands that time is of the essence in this case, and a complete analysis of each Plaintiffs' standing and/or the merits of the other claims at this time would only serve to delay this Court's Order, without *significantly* impacting the scope of the appropriate relief. Indeed, the Court need only find that one Plaintiff's due process and/or equal protection claim against the Secretary has merit in order to issue the injunctive relief described in Section III. And the Court is cognizant that any

unnecessary delay in the issuance of this Order may impact both the implementation of the appropriate relief and/or the Secretary's ability to appeal this Order, in the event the Secretary believes doing so is appropriate.

Thus, based on the adjudication of the claims addressed in this Order, Plaintiffs' Motion will be granted in part and the Secretary's Motion will be denied in part, and as set forth above, and partial, immediate injunctive relief will be ordered based on the claims addressed in this Order. To the extent Plaintiffs' Motion and the Secretary's Motion address other claims and/or seek other relief, the motions will be held in abeyance. Similarly, all other pending Motions for Summary Judgment in this case will also be held in abeyance.

Following the November 2020 elections and/or the resolution of any appeal of this Order, the Court will set a hearing at which the parties may address whether additional injunctive relief is appropriate based on Plaintiff Weisfeld's and Plaintiff CTD's due process and "undue burden"/"right to vote" equal protection claims against the Secretary. At the same hearing, the parties may also address the extent to which it is necessary for the Court to resolve the merits of the pending motions for summary judgment (to the extent they are not resolved by this Order) and/or otherwise adjudicate the parties' other remaining claims.

## CONCLUSION AND ORDER

For the reasons set forth in Sections I and II of this Order, Plaintiffs' Motion for Summary Judgment (docket no. 65) is **GRANTED IN PART**, and the Secretary's Motion for Summary Judgment (docket no. 70) is **DENIED IN PART**. Specifically, Plaintiffs' Motion is **GRANTED** to the extent Plaintiff Rosalie Weisfeld and Plaintiff Coalition of Texans with Disabilities seek summary judgment on their due process claims ("Count One") and "undue burden"/"right to vote"

equal protection claims ("Count Two") against the Secretary, and the Secretary's Motion is **DENIED** as to those claims.

As set forth in Section III of this Order,[63] the Court hereby **ENJOINS** the Secretary to implement an immediate remedial plan for the November 3, 2020 elections consistent with the following terms:

(1) The Secretary must—within <u>ten (10) days</u> of this Order—provide a copy of this Order to all local election officials and issue an advisory notifying all local election officials that the rejection of a voters' ballot on the basis of a perceived signature mismatch is unconstitutional if the voter is not provided with (a) pre-rejection notice of a perceived mismatched signature and (b) a meaningful opportunity to cure his or her ballot's rejection.

(2) Further, in order to protect voters' rights in the upcoming November 2020 elections, the Secretary must—within <u>ten (10) days</u> of this Order—<u>either</u>:

(a) Issue an advisory to all local election officials notifying the election officials that—in light of the Court's determination as to the constitutionality of the existing procedures—mail-in ballots may not be rejected on the basis of a perceived signature mismatch under Texas Election Code § 87.041(b)(2) during the upcoming November 2020 elections; <u>or</u>

(b) Issue an advisory to all local election officials notifying the election officials that—in light of the Court's determination as to the constitutionality of the existing procedures—the Constitution *requires* the following:

(i) Before *rejecting* a ballot on the basis of a perceived signature "mismatch," any EVBB and/or SVC *must* compare the signatures on the voter's application and carrier envelope with all other signatures from the prior six years that are on file with the county clerk or voter registrar so that the EVBB and/or SVC can "confirm" its initial determination that a ballot should be rejected;

(ii) Voters whose signatures are perceived to be mismatching following the comparison in <u>(2)(b)(i)</u> *must* be mailed notice of a rejected ballot within <u>one day</u> of the EVBB's and/or SVC's rejection determination, and the notice *must* (a) advise the voter that—in the event the voter believes his or her ballot was improperly rejected—the voter may seek relief by contacting an

---

[63] Additional details regarding the required scope of the immediate injunctive relief are provided in Section III.B of this Order, *supra. See also* notes 49, 50, 51, 52 & 53.

appropriate election official and (b) provide the appropriate local election official's (or officials') telephone number and mailing address;

(iii) In the event a voter whose signatures are perceived to be mismatching provided his or her phone number on the voter's ballot application, local election officials must make *at least one* phone call to that number within <u>one day</u> of the EVBB's and/or SVC's rejection determination, and on the call, the election official must (a) notify the voter of his or her ballot's pending rejection based on a perceived signature mismatch, (b) advise the voter that—in the event the voter believes his or her ballot was improperly rejected—the voter may seek relief by contacting an appropriate election official, and (c) provide the appropriate local election official's (or officials') telephone number and mailing address; and

(iv) In the event any voter notifies the appropriate local election official(s) that his or her ballot was improperly rejected based on a perceived signature mismatch or claims that he or she signed both the application and the carrier envelope, the appropriate county election officer *must* pursue a challenge on behalf of the voter pursuant to § 87.127, *unless* the voter *explicitly* informs the county election officer that he or she does not wish for the official to pursue relief on the voter's behalf.

(3) Finally, in the event any local election official fails to comply with any of the Secretary's advisories described above, the Secretary must advise the local election official that he or she is "imped[ing] the free exercise of a citizen's voting rights" in violation of the Constitution, and the Secretary must order "the person to correct the offending conduct" pursuant to § 31.005.

For the reasons set forth in Section IV of this Order, all pending Motions for Summary Judgment (including Plaintiffs' Motion and the Secretary's Motion to the extent they are not resolved by this Order) (docket nos. 64, 65, 66 & 70) are hereby **HELD IN ABEYANCE** until further notice from the Court.

Following the November 2020 elections and/or the resolution of any appeal of this Order, the Court will set a hearing in this case. At the hearing, the parties should be prepared to address (i) whether additional injunctive relief is appropriate based on Plaintiff Weisfeld's and Plaintiff CTD's due process and "undue burden"/"right to vote" equal protection claims against the

102

Secretary (*see* Section III.C, *supra*), and (ii) the extent to which it is necessary for the Court to resolve the merits of the pending motions for summary judgment and/or otherwise adjudicate the parties' other remaining claims (*see* Section IV, *supra*).

      **IT IS SO ORDERED**.

      **SIGNED** this ___ day of September, 2020.

                               ORLANDO L. GARCIA
                          Chief United States District Judge