UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

SEP 10 2020

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | |
|---|---|
| DR. GEORGE RICHARDSON, ROSALIE WEISFELD, AUSTIN JUSTICE COALITION, COALITION OF TEXANS WITH DISABILITIES, MOVE TEXAS CIVIC FUND, and LEAGUE OF WOMEN VOTERS OF TEXAS, <br><br>*Plaintiffs,* <br><br>v. <br><br>TEXAS SECRETARY OF STATE, TRUDY HANCOCK, in her official capacity as BRAZOS COUNTY ELECTIONS ADMINISTRATOR, and PERLA LARA, in her official capacity as CITY OF MCALLEN, TEXAS SECRETARY, <br><br>*Defendants.* | Civil No. SA-19-cv-00963-OLG |

## ORDER

On September 8, 2020, this Court issued a Memorandum Opinion and Order in which it granted summary judgment in favor of Plaintiffs Rosalie Weisfeld ("Weisfeld") and Coalition of Texans with Disabilities ("CTD") on certain of their claims against Texas Secretary of State (the "Secretary"). *See* docket no. 99 (the "Summary Judgment Order"). In light of the Court's determination regarding the merits of those claims, the Summary Judgment Order also instructed the Secretary to implement certain forms of immediate relief in advance of the November 2020 elections. *See id.* On September 9, 2020, the Secretary filed an Opposed Motion for Stay Pending Appeal. *See* docket no. 101 (the "Motion for Stay").

When considering whether to grant a stay pending appeal, courts consider four factors: (1) the applicant's likelihood of success on the merits; (2) the applicant's irreparable harm in the

absence of a stay; (3) the harm to other parties; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 425-26 (2009). The Secretary argues that a stay is appropriate both because the Secretary is likely to prevail on the merits and because the injunction is vague and overbroad. *See* docket no. 101.

With respect to the Secretary's first argument, the Court's Summary Judgment Order has explained in detail why two different Plaintiffs are entitled to summary judgment on two different theories of relief. Moreover, the Court's conclusion as to each such theory of relief is consistent with that of numerous other district courts that have analyzed the constitutionality of similar signature-comparison procedures in the recent weeks, months, and years. *See, e.g., Frederick v. Lawson*, No. 1:19-cv-01959-SEB-MJD, 2020 WL 4882696 (S.D. Ind. Aug. 20, 2020); *Self Advocacy Sols. N.D. v. Jaeger*, 3:20-CV-00071, 2020 WL 2951012 (D.N.D. June 3, 2020); *Saucedo v. Gardner*, 335 F. Supp. 3d 202 (D.N.H. 2018); *Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018), *appeal dismissed sub nom. Martin v. Sec'y of State of Georgia*, 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018); *Fla. Democratic Party v. Detzner*, No. 4:16cv607-MW/CAS, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016); *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990). The Court has also explained in detail its conclusions regarding Plaintiffs' standing, including why Plaintiffs' claims may properly be asserted against the Secretary. *See* docket no. 99, Section I. And those conclusions are consistent with several recent Fifth Circuit opinions, including some that have rejected similar or identical arguments by the Secretary. *See, e.g., Texas Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020); *Lewis v. Hughes*, No. 20-50654 (5th Cir. Sep. 4, 2020);[1] *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th

---

[1] The Court understands that the Secretary has continued to litigate certain issues related to its assertion of sovereign immunity before the Fifth Circuit. The merits of the Secretary's appeals in

Cir. 2017). Thus, although the Court believes that the Fifth Circuit is in a better position to determine whether the Secretary is likely to prevail on the merits of its appeal in this case, this Court does not find that argument to be particularly persuasive with respect to the Secretary's request for a stay.

As recognized by the Summary Judgment Order, however, the scope of the appropriate injunction presented a more nuanced question for this Court. *See* docket no. 99 p. 79. For that reason, the Court issued narrowly-tailored relief, and each of the Secretary's arguments regarding the scope of the Court's injunction were addressed—and in several instances *credited*—in the Summary Judgment Order. *See id.* at pp. 80-82, 93-94. In fact, as described in the Summary Judgment Order, the Court's immediate injunction was designed to *accommodate* the Secretary's stated concerns and implement the remedy that *the Secretary contended was already available under existing law. See id.* Thus, although the Secretary's general assertions may be applicable to some *other* pre-election injunctions issued by other courts, the Secretary's Motion to Stay does not demonstrate why the Secretary's general complaints are applicable to *this* immediate injunction. For the avoidance of doubt, the Court will briefly discuss those issues again.

---

its other cases are not in front of this Court, but with respect to this case, the Court points out that (i) Plaintiffs assert a facial challenge to the applicable Code provisions, and (ii) the Secretary has—in recent weeks—*actually taken* each of the actions it had argued that it did not have the authority to take in this case. *See* docket no. 99, Sections I.D & I.E (describing how—during this Court's consideration of the parties' motions for summary judgment—the Secretary (i) issued an advisory to local election officials related to the signature-comparison provisions, (ii) made edits regarding signature-comparison provisions to its "dear voter" letter, (iii) ordered Harris County officials to comply with the Secretary's interpretation of certain mail-in ballot provisions pursuant to Tex. Elec. Code. § 31.005, and (iv) engaged the Attorney General to pursue litigation against Harris County pursuant to § 31.005(b)). Thus, irrespective of whether the Secretary has "some connection" to the enforcement of *other* provisions of the Election Code, it is beyond question that the Secretary has a "sufficient connection" to the provisions at issue in this case for the purposes of satisfying *Ex parte Young*.

3

As an initial matter, the Secretary's concerns about the implementation of Tex. Elec. Code § 87.127 were addressed in the Summary Judgment Order. Every brief filed by the Secretary related to the summary judgment motions indicated that the Secretary believed that § 87.127 provided an appropriate remedy for any voter who contended that his or her ballot was properly rejected. *See, e.g.*, docket no. 101 p. 4; docket no. 75 (arguing that "Texas's process is sound" because of the availability of the relief in § 87.127); docket no. 79 p. 9 (citing § 87.127 and asserting that there is "no probable value of any additional process" because plaintiffs' "means to obtain relief in state court is sufficient to satisfy procedural due process"). Notably, the Secretary's remedy briefing argued that the "potential benefit" of the completely new affidavit procedure suggested by Plaintiffs would not be justified in advance of the November 2020 elections *because* "[e]xisting remedial options" already existed in § 87.127(a). *See* docket no. 93 p. 17. When the Secretary made its prior arguments to this Court, it expressed no qualms that § 87.127 may be too "vague" or "burdensome" to implement for the upcoming elections and/or that its implementation may depend on whether "the official has the resources to pursue such action" (or any other practical issue for that matter). *See* docket no. 101 p. 5. Indeed, the Court assumes the Secretary would have highlighted its concerns with the adequacy of the apparently existing remedial framework had it had those concerns at the time it made its prior arguments. Because those concerns were not raised, it appeared clear the Secretary *already knew* how to uniformly implement the relief it said was *already available* under the Election Code, and the Court took the Secretary's contentions at face value. The Court fails to understand how the Secretary will be "irreparably harmed" by ordering local election officials to implement the procedures the Secretary said were available.

However, even assuming that the Secretary does not have an existing plan or had not considered how § 87.127 may actually be implemented on a statewide basis for all categories of

mail-in voters—which would itself raise concerns about the sincerity of the Secretary's prior arguments to this Court—the Court still believes the scope of the immediate relief is appropriate. The Secretary has several weeks (i) to determine how the existing statutory provisions should best be implemented and (ii) to provide such guidance to local officials. Importantly, those procedures do not need to be finalized at the time mail-in applications and carrier envelopes are first mailed to voters, as the procedures only impact the review and processing of the materials *following the return of voters' carrier envelopes*. Notably, the Secretary has provided no *specific* reason why its instructions regarding such a procedure cannot be issued in this timeframe. And in the event, the Secretary's office itself needs guidance regarding the efficient implementation of the remedial procedures set forth in § 87.127, the record demonstrates that Caldwell County may be able to provide it.[2] Finally, as noted above, the Court did not order a "completely new" cure procedure *because* the Secretary contended that the existing procedures could be utilized. To the extent the Secretary now believes a different "cure" procedure—perhaps using an affidavit like those used by voters who fail to present a photo ID during in-person voting—would be more appropriate, the Secretary is welcome to propose such a procedure.[3] Indeed, if such a proposed procedure appears

---

[2] The record demonstrates that Caldwell County previously implemented the procedures in § 87.127 such that five voters (who were able to provide adequate confirmation that they signed both their application and carrier envelope) had their votes reinstated, whereas one voter (who was apparently unable to provide such confirmation) did not. *See* docket no. 84, Ingram Dep. at 45:12-46:16. This also demonstrates that—contrary to the Secretary's assertion—the fact that a voter notifies a county election officer regarding an improper signature rejection does not mean that the voter's ballot must automatically be accepted. Instead, it merely means that the voter—at that point—is entitled to "process," through which it may be determined whether the ballot should be accepted or rejected.

[3] The Court notes that the Secretary was previously given an opportunity to describe the "cure" procedure that it believed was appropriate. *See* docket no. 88 (stating that the "parties may have other proposals in mind that both protect mail-in voters' fundamental rights and the State's interests" and directing Defendants to "advise the Court if there are any remedies that Defendants would agree to in the event the Court finds that the Plaintiffs' constitutional claims have merit"). It was only after the Secretary failed to describe such a procedure that the Court determined it was

5

to adequately mitigate the risk of disenfranchisement to mail-in voters in advance of the November 2020 elections,[4] the Court would certainly consider lifting the portion of the immediate injunction requiring the instructions regarding the implementation of § 87.127.

The Secretary's arguments about "depriving [the State] of the opportunity to implement its legislature's decisions" are equally unavailing. Docket no. 101 p. 5. The Court is relieved to see that the Secretary agrees that the Texas legislature may ultimately be in a better position to design a long-term "cure" framework for signature-mismatch voters similar to the one provided for other types of voters. *See id.* (arguing that the injunction "[r]equires Texas to implement court-devised notice-and-cure procedures on a statewide basis, without allowing Texas to develop its own"). Indeed, *it is for this exact reason* that the Court determined it was appropriate to (i) merely order the Secretary to actually implement the apparently existing remedy *enacted by the legislature* in advance of the November 2020 election, and (ii) consider whether more appropriate relief—such as enjoining the signature-matching requirement until the legislature implements a more robust "cure" framework—might be appropriate following the election. *See* docket no. 99, Section III. The Court determined that this was the best means of both (i) protecting voters' rights in the upcoming election, and (ii) showing deference to the legislative process, including the legislature's determination that signature-verification is an important means of preventing voter fraud. *See id.* Further, in the event the legislature convenes a special session in the coming weeks to design a new "notice-and-cure" procedure for signature-mismatch voters, the Court would certainly consider whether all or part of its immediate injunction should be lifted. But in the absence of such

---

most appropriate to order the Secretary to instruct local election officials to implement the remedy *that the Secretary said was already available.*

[4] Any procedure would need to recognize that many mail-in voters are often (i) disabled, (ii) incarcerated in jail, and/or (iii) out of their county of residence on Election Day and/or when they receive notice of rejection.

6

actions by the legislature, the Court has determined that ordering the implementation of the remedy that *the legislature already enacted* best provides the State with "the opportunity to implement its legislature's decisions."

Additionally, the fact that the "mail-in balloting process" is underway and materials have already been printed—and in some cases, distributed to voters—is wholly irrelevant with respect to the injunctive relief issued. *See* docket no. 101 p. 11. The Court's immediate relief specifically declined to include any relief that required (i) the reprinting of existing materials and/or (ii) any new actions by voters while filling out their applications or carrier envelopes. *See* docket no. 99 pp. 81-82, 98 n.62. Instead, the immediate injunction only impacts the review and processing of voters' materials *after carrier envelopes are returned by voters*, and that process does not begin for several weeks. It is unsurprising that the Secretary does not specifically explain how the immediate injunctive relief might create voter confusion or depress turnout, especially when the alternative is potential disenfranchisement.

Additionally, the Secretary's contention that the immediate injunction "displaces the State's interests in ballot integrity" and "uniform election administration"—which is also not explained further—flips the scope of the injunction on its head. *See* docket no. 101 p. 4. The immediate relief ordered by the Court gives credit to the Secretary's arguments regarding the prevention of voter fraud, and for that reason, permits the continued use of signature-verification on mail-in ballots.[5] *See* docket no. 99 pp. 80-81. Moreover, this Court and numerous other courts

---

[5] The Secretary ignores this point in its reliance on *Memphis A. Phillip Randolph Inst. v. Hargett*, No. 3:20-CV-00374, 2020 WL 5095459, at *22 (M.D. Tenn. Aug. 28, 2020). As the Secretary's own briefing notes, the court in *Hargett* declined "to enjoin enforcement of the signature-verification system in advance of the upcoming general election" because doing so would "alter Tennessee's rules for that election." *See* docket no. 101 pp. 9-10. This Court has *also* declined to enjoin the enforcement of the signature-verification process, and has instead permitted that process to continue with additional safeguards for voters whose ballots may be improperly rejected.

have explained why providing a voter with an opportunity to confirm his or her identity prior to rejection actually *furthers* the State's interests in election integrity and the prevention of voter fraud.[6] *See, e.g., Saucedo*, 335 F. Supp. 3d at 220 ("[I]f anything, additional procedures further the State's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised."); *Self Advocacy Sols. N.D.*, 2020 WL 2951012, at *10 ("[A]llowing voters to verify the validity of their ballots demonstrably advances—rather than hinders—these goals [of preventing voter fraud and upholding the integrity of elections]."); *Fla. Democratic Party v. Detzner*, 2016 WL 6090943, at *7 ("[L]etting mismatched-signature voters cure their vote by proving their identity further prevents voter fraud—it allows supervisors of elections to confirm the identity of that voter before their vote is counted."). In addition, the immediate injunction *provides uniformity*, where before, there was none. Prior to the immediate injunction, one county's election officials could decide to provide voters with constitutional protections whereas other counties' officials could decline to do so. *See* docket no. 99 pp. 91, 95, n.59. The immediate injunction ensures that local officials no longer have the *sole* discretion to determine the extent to which each voter should have his or constitutional rights protected during the voting process. *See id.*

Finally, the injunction "upends the status quo" only to the extent the "status quo" has permitted the improper rejection of ballots without providing the affected voters with timely notice and a meaningful opportunity to avoid disenfranchisement. Again, the Court has determined that it is nonetheless appropriate to permit the State to utilize its signature-verification process because

---

[6] As explained in note 2, *supra*, a voter's complaint to a local election official about an improperly rejected ballot does not mean that the ballot must automatically be accepted under the terms of the injunction. Indeed, Caldwell County's prior utilization of § 87.127 demonstrates that a voter's mail in ballot will not be reinstated if the voter is unable to ultimately demonstrate that he or she signed both the application and carrier envelope.

8

the State has an unquestioned interest in preventing voter fraud. *See* docket no. 99 pp. 80-81. Finally, the record makes clear that nothing will change with respect to local election officials' processing of the *vast* majority of mail-in ballots that officials receive. *See* docket no. 93-2 ¶ 11; docket no. 99 pp. 92-94.

The Secretary's arguments in its Motion to Stay—and its application of any "balancing"—place the Secretary's and State's interests front and center, but completely *fail to acknowledge* voters' interest in avoiding disenfranchisement on the basis of an incorrect signature "mismatch" determination in the upcoming elections.[7] The applicable standard for injunctive relief requires "balancing," and the Court considered *both* the interests of voters—whose constitutional rights are being violated—and the interests of the State as it determined the scope of the appropriate immediate relief. *See* docket no. 99 p. 78. Finally, the fact that the Secretary may have to take *some* action in the next several weeks to mitigate the risks inherent with the State's existing signature-comparison procedures does not constitute "irreparable harm," and thus, it is not a basis for withholding *all* injunctive relief or issuing a stay of the Summary Judgment Order.

Thus, for the reasons set forth above and in the Court's Summary Judgment Order (docket no. 99), the Secretary's Motion for Stay (docket no. 101) is **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** this 10 day of September, 2020.

ORLANDO L. GARCIA
Chief United States District Judge

---

[7] Nor does it matter that the Plaintiffs' have only *proved* that two voters had their ballots improperly rejected. Indeed, the problems with the State's existing procedures are not Weisfeld nor Richardson-specific, and the record evidence demonstrates that there is a substantial risk that *many* voters—including Weisfeld and others—may have their ballots improperly rejected in the upcoming elections absent injunctive relief. *See* docket no. 99, Section II.B.2.