FILED
APR - 7 2022
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEPUTY CLERK

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
FILED
March 16, 2022
Lyle W. Cayce
Clerk

No. 20-50774

DOCTOR GEORGE RICHARDSON; ROSALIE WEISFELD; MOVE TEXAS CIVIC FUND; LEAGUE OF WOMEN VOTERS OF TEXAS; AUSTIN JUSTICE COALITION; COALITION OF TEXANS WITH DISABILITIES,

*Plaintiffs—Appellees*,

*versus*

FEDERICO FLORES, JR.; MARIA GUERRERO; VICENTE GUERRERO,

*Movants—Appellants*,

*versus*

JOHN SCOTT, *in his official capacity as the Texas Secretary of State*,

*Defendant—Appellant—Appellee.*

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:19-CV-963 - OLG

Before HIGGINBOTHAM, WILLETT, and DUNCAN, *Circuit Judges*.

PATRICK E. HIGGINBOTHAM, *Circuit Judge*, dissenting.

# JUDGMENT

This cause was considered on the record on appeal and the briefs on file.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is REVERSED and VACATED, and the cause is REMANDED to the District Court for further proceedings in accordance with the opinion of this Court.

IT IS FURTHER ORDERED that Appellees pay to Appellant the costs on appeal to be taxed by the Clerk of this Court.




**Certified as a true copy and issued as the mandate on Apr 07, 2022**

**Attest:** Lyle W. Cayce
**Clerk, U.S. Court of Appeals, Fifth Circuit**

FILED
APR - 7 2022
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY DEPUTY CLERK

# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
FILED
March 16, 2022
Lyle W. Cayce
Clerk

No. 20-50774

Doctor George Richardson; Rosalie Weisfeld; MOVE Texas Civic Fund; League of Women Voters of Texas; Austin Justice Coalition; Coalition of Texans with Disabilities,

*Plaintiffs—Appellees*,

*versus*

Federico Flores, Jr.; Maria Guerrero; Vicente Guerrero,

*Movants—Appellants*,

*versus*

John Scott, *in his official capacity as the Texas Secretary of State*,

*Defendant—Appellant - Appellee*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:19-CV-963 -OLG

Before Higginbotham, Willett, and Duncan, *Circuit Judges*.

STUART KYLE DUNCAN, *Circuit Judge*:

Plaintiffs challenged Texas's system for verifying the signatures on mail-in ballots. Based on purported constitutional defects in that system, the district court issued a detailed injunction against the Texas Secretary of State. But the Secretary does not verify mail-in ballots; that is the job of local election officials. Sovereign immunity therefore bars the injunction. We reverse the district court's order, vacate the injunction, and remand for further proceedings.

I.

A.

First, we sketch Texas's system for verifying mail-in ballots.[1]

An eligible voter applies for a mail-in ballot by timely signing and mailing an application to the early voting clerk. TEX. ELEC. CODE[2] § 84.001(a), (b), (d).[3] Upon receiving a proper application, the early voting clerk mails the voter balloting materials, including the ballot, ballot envelope, and carrier envelope. §§ 86.001(b), 86.002(a), 86.003(a). The voter then fills out the ballot, seals the ballot envelope, places it in the carrier envelope, and timely returns it. §§ 86.005(c), 86.007. The voter must sign the certificate on the carrier envelope. §§ 86.005(c), 86.013(c).

The Early Voting Ballot Board ("EVBB") is responsible for processing mail-in ballots. § 87.001. The ballots are verified by the EVBB or initially by a Signature Verification Committee ("SVC"), if one is appointed. §§ 87.041(a), 87.021(2), 87.022–024, 87.027(a), (h). The EVBB

---

[1] For more detail, we refer the reader to the motions panel opinion. *See Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 224–26 (5th Cir. 2020).

[2] All references to statutory sections in this opinion are to the Texas Election Code as effective for the 2020 General Election.

[3] A witness may sign if the applicant cannot "because of a physical disability or illiteracy." § 1.011(a).

and the SVC compare the signatures on the ballot application and the carrier envelope certificate, as well as signatures already on file. §§ 87.041(b)–(e), 87.027(h)–(i). Either body may accept or reject ballots based on signature comparisons. §§ 87.027(i), (j), 87.041(b), (d). The EVBB, however, may overrule the SVC's rejection of a ballot and accept the ballot. § 87.027(j).

Following its review, the EVBB secures rejected ballots and delivers them to the general custodian of election records. § 87.043(c). No more than ten days after an election, the EVBB must notify a voter in writing that his ballot was rejected. § 87.0431(a). No more than thirty days after an election, the early voting clerk must notify the Attorney General of the EVBB's rejections and provide certified copies of balloting materials. § 87.0431(b).

B.

In August 2019, Plaintiffs[4] filed suit challenging this verification system. They brought claims under the due process and equal protection clauses of the Fourteenth Amendment, as well as the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 794. The named defendants were the Secretary of State[5] ("the Secretary"), in her official capacity, as well as two local election officials.

After denying the Secretary's motion to dismiss and receiving cross-motions for summary judgment, in September 2020 the district court granted Plaintiffs partial summary judgment on their constitutional claims and ordered "detailed and lengthy" injunctive relief pertaining to the November 2020 election. *Richardson v. Tex. Sec'y of State* (*Richardson II*), 978 F.3d 220,

[4] Plaintiffs are individuals (Dr. George Richardson and Rosalie Weisfeld) who claim their votes have been previously rejected based on signature mismatches, as well as organizations (Austin Justice Coalition, Coalition of Texans With Disabilities, Move Texas Civic Fund, and League of Women Voters of Texas) whose members or services are allegedly impacted by the challenged system.

[5] Ruth Hughs, the Secretary when suit was filed, has been replaced by John Scott.

227 (5th Cir. 2020); *see also Richardson v. Tex. Sec'y of State* (*Richardson I*), 485 F. Supp. 3d 744, 801–03 (W.D. Tex. 2020).

The Secretary timely appealed, and a motions panel stayed the injunction. *Richardson II*, 978 F.3d at 224. While declining to reach standing or sovereign immunity, the panel found the Secretary likely to succeed on the merits because Texas's system did not implicate due process rights and survived the *Anderson / Burdick* test. *Id.* at 228–33, 235–41.[6] The panel also concluded that the injunction likely went beyond the remedy available under *Ex parte Young* by purporting to "control the Secretary in [the] exercise of *discretionary* functions." *Id.* at 241; *see Ex parte Young*, 209 U.S. 123 (1908). Judge Higginbotham concurred on the grounds that the Supreme Court has "consistently counseled against court-imposed changes to 'election rules on the eve of an election.'" *Richardson II*, 978 F.3d at 244 (Higginbotham, J., concurring) (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, --- U.S. ---, 140 S. Ct. 1205, 1207 (2020) (per curiam)).

## II.

"We review a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo*." *Planned Parenthood of Greater Tex. v. Kauffman*, 981 F.3d 347, 354 (5th Cir. 2020) (en banc) (citation omitted). Similarly, "[w]e review the district court's jurisdictional determination of sovereign immunity *de novo*." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019), *cert. denied* --- U.S. ---, 141 S. Ct. 1047 (2021).

---

[6] Under *Anderson / Burdick*, a law that does not place a "severe" burden on voting rights will be upheld if it is a "reasonable, nondiscriminatory restriction" justified by "the State's important regulatory interests." *Richardson II*, 978 F.3d at 233 & n.26 (citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983); *Burdick v. Takushi*, 504 U.S. 428 (1992)). Instead of *Anderson / Burdick*, the district court applied the due process analysis from *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Richardson I*, 485 F. Supp. 3d at 778. The motions panel held *Eldridge* was the wrong test. *Richardson II*, 978 F.3d at 233–34.

III.

The Secretary raises sovereign immunity as a threshold ground for reversal. He contends that, because he does not enforce the challenged ballot verification system, Plaintiffs' suit falls outside the *Ex parte Young* exception to sovereign immunity. *See Ex parte Young*, 209 U.S. at 157 (state officer defendant must have "some connection with the enforcement of the act"). We agree.

Plaintiffs claim the process of verifying signatures on mail-in ballots violates their rights under the Fourteenth Amendment and federal disability laws. But, as discussed, the Texas Election Code places those duties in the hands of local election officials: the early voting clerk, the EVBB, and the SVC. *See Richardson II*, 978 F.3d at 224–26. The Secretary has no enforcement role. *See Lewis v. Scott*, No. 20-50654, --- F.4th ---, slip. op at 5 (5th Cir. March 16, 2022) (holding "[i]t is local election officials, not the Secretary, who verify voters' signatures and notify voters of a mismatch"). "Where a state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, our *Young* analysis ends." *City of Austin*, 943 F.3d at 998 (citation omitted).

To find the required connection, the district court relied on the Secretary's broad duties to oversee administration of Texas's election laws. *See Richardson I*, 485 F. Supp. 3d at 771–72 (citing §§ 31.001–.005). Since then, however, our precedent has clarified that the Secretary's "general duties under the [Texas Election] Code" fail to make the Secretary the enforcer of specific election code provisions. *Tex. Democratic Party v. Abbott*, 978 F.3d 168, 180 (5th Cir. 2020) (citing §§ 31.003–.004).[7] More is needed—

---

[7] *See also Bullock v. Calvert*, 480 S.W.2d 367, 371–72 (Tex. 1972) (Reavley, J.) (rejecting argument that Secretary's role as "chief election officer" or his duty to "maintain uniformity" in application of election laws are "a delegation of authority to care for any breakdown in the election process"); *In re Hotze*, 627 S.W.3d 642, 649 (Tex. 2020) (Blacklock, J., concurring) (same).

namely, a showing of the Secretary's "connection to the enforcement of the particular statutory provision that is the subject of the litigation." *Id.* at 179; *see also City of Austin*, 943 F.3d at 999–1000 (distinguishing "general duty" to implement state law from "particular duty to enforce the statute in question" (quoting *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014))). "Th[at] is especially true here because the Texas Election Code delineates between the authority of the Secretary of State and local officials." *Tex. Democratic Party*, 978 F.3d at 179. None of the general duties cited by the district court shows that the Secretary enforces the particular verification provisions challenged here. *See Lewis*, No. 20-50654, slip op. at 5–7 (reaching same conclusion).[8]

Plaintiffs argue enforcement authority is evident in election code section 31.002, which requires the Secretary to prescribe the "design and content" of forms local officials use. Plaintiffs did not make this argument in the district court, so it is waived. *See Certain Underwriters at Lloyd's v. Axon Pressure Prods. Inc.*, 951 F.3d 248, 273 n.20 (5th Cir. 2020). But even had they not waived it, the argument would fail. Plaintiffs do not challenge the design or content of the forms associated with mail-in balloting. Rather, they challenge the processes of verifying mail-in ballots and notifying voters. The code confers the duty to verify ballots on local officials, not the Secretary. *See Lewis*, No. 20-50654, slip op. at 5. So, enjoining the Secretary to change the balloting forms "would not afford the Plaintiffs the relief that they seek, and therefore, the Secretary of State is not a proper defendant." *Mi Familia Vota v. Abbott*, 977 F.3d 461, 467–68 (5th Cir. 2020) (citation and internal quotation marks omitted).[9]

---

[8] For those reasons, we must respectfully disagree with our esteemed colleague's erudite dissenting opinion. *See post*, at 2.

[9] For that reason, our decision in *Texas Democratic Party v. Abbott* is distinguishable. There, we held the Secretary enforced a challenged age restriction on mail-in voting, because she created the mail-in application form that local officials had to use. 978 F.3d at

Plaintiffs also argue the Secretary's enforcement authority is shown because the Secretary has issued various advisories to local officials about ballot verification. We disagree. "Enforcement" for *Young* purposes means "compulsion or constraint." *City of Austin*, 943 F.3d at 1000 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010)). Offering advice, guidance, or interpretive assistance does not compel or constrain local officials in fulfilling their duty to verify mail-in ballots. *See Tex. All. for Retired Ams. v. Scott*, No. 20-40643, --- F.4th ---, slip op. at 6 (5th Cir. March 16, 2022).

Nor, finally, is the Secretary's enforcement authority shown by the fact that the Secretary wrote a letter to Harris County about a different election code provision. Even assuming the letter showed the Secretary "enforced" some mail-in ballot provisions, an official's choice "to defend *different* statutes under *different* circumstances does not show that he is likely to do the same here." *City of Austin*, 943 F.3d at 1002.

In sum, the district court erred in finding the Secretary was the proper defendant under *Ex parte Young*.

IV.

We REVERSE the district court's order, VACATE the preliminary injunction, and REMAND for further proceedings consistent with this opinion.[10]

---

180. Here, Plaintiffs challenge not the mail-in forms but how local officials verify the signatures on those forms. *See Tex. All. for Retired Ams. v. Scott*, No. 20-40643, --- F.4th ---, slip op. at 7 (5th Cir. March 16, 2022) (distinguishing *Texas Democratic Party v. Abbott*).

[10] Also before us is an appeal of the district court's denial of permissive intervention to Appellants Federico Flores Jr., Maria Guerrero, and Vicente Guerrero, who challenged the same provisions in separate litigation. Finding no abuse of the district court's discretion, we DISMISS that appeal for lack of jurisdiction. *See Sommers v. Bank of Am., N.A.*, 835 F.3d 509, 512 (5th Cir. 2016).

PATRICK E. HIGGINBOTHAM, *Circuit Judge*, dissenting:

I must dissent with this case as well as its companion cases.[1] None present an issue of sovereign immunity, as the Eleventh Amendment does not bar these claims under the Fourteenth Amendment. Our issue is rather the antecedent question of Article III standing, turning on injury and redressability.

**I.**

I write to remind failing memories of the signal role of *Ex parte Young* in directly policing the path of cases and controversies to the Supreme Court from our state and federal courts and warn against its further diminution.[2] As I explained over twenty years ago in *Okpalobi v. Foster*, "*Ex parte Young* poses no threat to the Eleventh Amendment or to the fundamental tenets of federalism. To the contrary, it is a powerful implementation of federalism necessary to the Supremacy Clause, a stellar companion to *Marbury* and *Martin v. Hunter's Lessee*."[3] Just as then, "the destination of the majority's trek today is inevitably a narrowing of the doctrine of *Ex parte Young* . . . I decline passage on that voyage. I decline because I am persuaded that familiar principles of standing are better suited to answer these questions with less risk to the vital role of *Ex parte Young*."[4]

---

[1] Tex. *Alliance for Retired Americans v. Scott*, No. 20-40643, --- F.4th ---, (5th Cir. March 16, 2022); *Lewis v. Scott*, No. 20-50654, --- F. 4th ---, (5th Cir. March 16, 2022).

[2] 209 U.S. 123 (1908).

[3] *Okpalobi v. Foster*, 244 F.3d 405, 432 (5th Cir. 2001) (Higginbotham, J. *concurring*).

[4] *Id.*

The majority continues this Court's effort to shrink the role of *Ex parte Young*, by overly narrow readings of the state officer's duty to enforce Texas's election laws. Unlike in *Okpalobi* "where the defendants had no enforcement connection with the challenged statute,"[5] the Texas Secretary of State is the "chief election officer of the state" and is directly instructed by statute to "obtain and maintain uniformity in the application, operation, and interpretation of this code and of the election laws outside this code."[6] Moreover, the Secretary is charged to "take appropriate action to protect the voting rights of the citizens of this state from abuse by the authorities administering the state's electoral processes" and "to correct offending conduct."[7] Although recent decisions by this Court have split hairs regarding the level of enforcement authority required to satisfy *Ex parte Young*,[8] the Secretary is charged to interpret both the Texas Election Code and the election laws outside the Code, including federal law, to gain uniformity, tasks it is clearly bound to do.[9] The allegation in these cases is that the Secretary is failing in that duty. This charge should satisfy our *Ex parte Young* inquiry.

---

[5] *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017).

[6] Tex. Elec. Code § 31.001(a) and Tex. Elec. Code § 31.003.

[7] Tex. Elec. Code § 31.005(a), (b).

[8] *Compare Mi Familia Vota v. Abbott*, 977 F.3d 461 (5th Cir. 2020); *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019); *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) *with Texas Democratic Party v. Abbott*, 978 F.3d 168 (5th Cir. 2020); *Texas Democratic Party v. Abbott*, 961 F.3d 389, 401 (5th Cir. 2020); *Fusilier v. Landry*, 963 F.3d 447, 455 (5th Cir. 2020); *OCA-Greater Houston*, 867 F.3d at 613–14.

[9] *See Texas Democratic Party*, 961 F.3d at 401; *City of Austin*, 943 F.3d at 1002.

## II.

None other than the inimitable Charles Alan Wright saw *Ex parte Young* as "indispensable to the establishment of constitutional government and the rule of law."[10] Professor Wright's views, drawn as they were from a lifetime of disciplined study stand on their own, gaining their strength from years of recording judicial performance and the currency of our system by the teachings of the Constitutional Convention and the acts of our first Congress. This is the wisdom of a scholar and practitioner, here grounded by the reality that *Ex parte Young* brings the axis necessary for the courts to harness the power vested in them by the Constitutional Convention of 1787—the direction of the flow to the Supreme Court of challenges to the validity of state action, a function essential to the splitting of the atom of sovereignty in a sovereign nation of sovereign states in a young republic and today.

The three-judge district courts, with direct appeal to the Supreme Court, were quickly established as a needed counter to the reach of *Ex parte Young*.[11] And with this concern faded by the creation of three-judge district courts, there came a list of seminal decisions protecting civil liberties, long and distinguished.[12] Recall that it was a three-judge district court, with its

---

[10] Charles Alan Wright & Mary Kay Kane, *Law of Federal Courts* 14 (6th ed. 2002).

[11] 36 Stat. 557; Michael E. Solimine, *The Strange Career of the Three-Judge District Court: Federalism and Civil Rights, 1956–76*, 72 CASE W. RES. L. REV. __, *4–5 (forthcoming); Barry Friedman, *The Story of* Ex parte Young, *in* FEDERAL COURTS STORIES 269–71 (Vicki C. Jackson and Judith Resnick ed., 2010).

[12] *See e.g.*, *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510 (1925), *aff'g Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary* 296 F. 928

injunctive power, that brought *Brown v. Board of Education* to the federal courts, sustaining the integration of public schools.[13]

**III.**

Another strand of history completes the relevant frame for this state-federal tension. While the need for a Supreme Court was never an issue for the delegates at the Constitutional Convention, as its absence was a driving force for its convening, whether to create a tier of lower courts divided the delegates. The cornerstone Madisonian Compromise resolved the impasse—authorizing Congress to create the lower federal courts. And it did, over resistance born of a concern of potential federal court intrusion into state affairs, the work of its judiciary. That lingering concern of the Convention led the first Congress to enact the Anti-Injunction Act: providing that "a writ of injunction [shall not] be granted to stay proceedings in any court of a state," assuring direct review of state courts by the Supreme Court.[14] An exception clause later added: "except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or

---

(D. Ore. 1924); *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), *aff'g Barnette v. W. Virginia State Bd. of Educ.*, 47 F. Supp. 251, 252 (S.D.W. Va. 1942); *Baker v. Carr*, 369 U.S. 186 (1962), *rev'g Baker v. Carr*, 179 F. Supp. 824 (M.D. Tenn. 1959); *Younger v. Harris*, 401 U.S. 37 (1971), *rev'g Harris v. Younger*, 281 F. Supp. 507, 508 (C.D. Cal. 1968); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973), *rev'g Rodriguez v. San Antonio Indep. Sch. Dist.*, 337 F. Supp. 280, 281 (W.D. Tex. 1971); *Roe v. Wade*, 410 U.S. 113 (1973), *aff'g Roe v. Wade*, 314 F. Supp. 1217, 1219 (N.D. Tex. 1970).

[13] 347 U.S. 483 (1954); *Brown v. Bd. of Ed. of Topeka, Shawnee Cty., Kan.*, 98 F. Supp. 797 (D. Kan. 1951), *rev'd sub nom. Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955). *See also Briggs v. Elliot,* 98 F. Supp. 529 (E.D.S.C. 1951) *and Davis v. County School Bd.*, 103 F. Supp. 337 (E.D. Va. 1952).

[14] 1 Stat. 334 § 5 (1793).

effectuate its judgments."[15] And there it rested, through the Civil War with its attending Constitutional amendments.

With the turn of the century, we entered the *Lochner* period, characterized by federal injunctions blocking state efforts to address social issues in the rising industrial world.[16] It is significant that from Reconstruction to the *Lochner* era, lawyers seldom reached for § 1983 given its inclusion of the language of the Privileges and Immunities Clause, language neutered in the *Slaughterhouse* cases.[17] In more recent times, § 1983 came to be a major pathway to the lower federal courts, prompting challenges to its injunctive power as violating the Anti-Injunction Act. The Supreme Court's response sheds light on the wielding and melding of federal injunctions and our federalism.

From these threads of history, the Supreme Court in *Mitchum v. Foster* laid bare the subtle relationship of the Anti-Injunction Act, § 1983, and *Ex parte Young*. The Court saw the then sixty-four-year-old *Ex parte Young* as a critical valve to direct the flow of cases from the state courts to the Supreme Court.[18] Justice Stewart explained that "Section 1983 was thus a product of a vast transformation from the concepts of federalism that had prevailed in the late 18th century when the anti-injunction statute was enacted."[19]

---

[15] 28 U.S.C.A. § 2283 (West).

[16] *Lochner v. New York*, 198 U.S. 45 (1905).

[17] 83 U.S. 36 (1872).

[18] *Mitchum v. Foster*, 407 U.S. 225, 242 (1972).

[19] *Id.*; 42. U.S.C. § 1983.

Congress was "concerned that state instrumentalities could not protect those rights; it realized that state officers might, in fact, be antipathetic to the vindication of those rights; and it believed that these failings extended to the state courts."[20] He continued:

> The very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action under color of state law, "whether that action be executive, legislative, or judicial."[21]

*Mitchum v. Foster* is itself a contemporary example of the on-going allocation of the flow of cases to the Supreme Court from the state courts and the Congressionally created lower federal courts, as well as the role of *Ex parte Young* in that cast.

In sum, *Ex parte Young*, birthed as a tool of the *Lochner* period, proved its effectiveness in sustaining challenges to state efforts to protect workers. *Mitchum v. Foster* presents as a parallel—protecting civil rights—giving to civil rights claimants a § 1983 with the power of the injunction, albeit not always a path around the Eleventh Amendment.

## IV.

Here however, as it was in *Okpalobi*, the threshold question is standing, the Article III door to the federal courthouse, which the majority stepped past. Standing doctrine was a product of the shift to the public law model. With its focus upon injury and redressability, it rejected an

---

[20] *Mitchum*, 407 U.S. at 242.

[21] *Id.* (quoting *Ex parte Commonwealth of Virginia*, 100 U.S. 339, 346 (1879)).

ombudsman role for the federal courts. Here, as all three of our cases bring claims of constitutional violation under § 1983, there is no immunity issue, no necessary role for *Ex parte Young*.[22] As the state has no immunity from enforcement of the Fourteenth Amendment here,[23] the remaining inquiry is standing—itself a constitutional demand of injury and redressability.[24]

Under a proper Article III analysis, these suits have a redressable injury because the Secretary is directed by the election laws of Texas to interpret and conform the election code to other election laws (as federal law is state law). Power to interpret to gain uniformity with state and federal law is power to enforce.[25] And "our precedent suggests that the Secretary of State bears a sufficient connection to the enforcement of the Texas Election Code . . . to support standing."[26] Again, the claim is that the Secretary failed to discharge that duty or has done so in an unconstitutional manner. These claims can proceed if there is standing with its requirement of injury and redressability.

---

[22] These three cases also present claims under the Voting Rights Act and the Americans with Disabilities Acts, where Congress has specifically abrogated state sovereign immunity. *See e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 534 (2004); *Fusilier*, 963 F.3d at 455; *OCA-Greater Houston*, 867 F.3d at 614.

[23] *Reynolds v. Sims*, 377 U.S. 533, 537 (1964); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 454 (1976).

[24] *E.g., Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

[25] Tex. Elec. Code § 31.001(a) and Tex. Elec. Code § 31.003. *See Testa v. Katt*, 330 U.S. 236 (1947).

[26] *Texas Democratic Party*, 961 F.3d at 401 (citing *OCA-Greater Hous.*, 867 F.3d at 613).

In sum, I am persuaded that these cases ought not fail on standing or sovereign immunity grounds. Rather, we should have fully considered the merits of the plaintiffs' arguments, especially where these cases also present claims under the Voting Rights Act and Americans with Disabilities Act, thin though they all may be.[27]

## V.

Even this quick glance back sheds light on threshold questions of the role of the Court in protecting the most vital Constitutional right of a democratic government: the right to vote. And so, I am troubled by this Court's narrowing of *Ex parte Young*. *Ex parte Young* is no culprit.[28]

About this we can agree, partisan views ought to prevail by persuading voters, not by denying their right to vote. With respect to my able colleagues, I must dissent.

---

[27] *See e.g.*, *Lane*, 541 U.S. at 534; *Fusilier*, 963 F.3d at 455; *OCA-Greater Houston*, 867 F.3d at 614.

[28] *Okpalobi*, 244 F.3d at 432.